# In the United States Court of Appeals for the Eighth Circuit

3M COMPANY & SUBSIDIARIES,

*Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Appellee.*

On Appeal From The United States Tax Court
No. 5816-13 – 160 T.C. No. 3

## APPELLANT 3M COMPANY'S SEPARATE ADDENDUM

Jonathan C. Bond
Saul Mezei
Jeff Liu
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
JBond@gibsondunn.com

*Counsel for Appellant*
*3M Company & Subsidiaries*

# TABLE OF CONTENTS

Page

Tax Court Opinion (Feb. 9, 2023) ..................................................... Add. 1

Tax Court Decision (Sept. 28, 2023) ............................................ Add. 347

Constitutional, Statutory, and Regulatory
    Provisions Involved .............................................................. Add. 349

    U.S. Const. amend. XVI ....................................................... Add. 349

    5 U.S.C. § 553 ....................................................................... Add. 349

    5 U.S.C. § 706 ....................................................................... Add. 350

    26 U.S.C. § 61 ....................................................................... Add. 351

    26 U.S.C. § 482 ..................................................................... Add. 352

    26 C.F.R. § 1.482-1 (2006) (excerpts)................................. Add. 353

    26 C.F.R. § 1.482-1 (1968) (excerpts)................................. Add. 361

Appellate Case: 23-3772    Page: 2    Date Filed: 02/08/2024 Entry ID: 5361675

# United States Tax Court

160 T.C. No. 3

3M COMPANY AND SUBSIDIARIES,
Petitioner
v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 5816-13.                    Filed February 9, 2023.

_____

P is the common parent company of the P consolidated group. As among the members of the P consolidated group (and among P's foreign affiliates), ownership of trademarks had been centralized in P. Other intellectual property, including patents and nonpatented technology, was owned by S, a second-tier wholly owned U.S. subsidiary of P. S is a member of the P consolidated group.

B is a wholly owned Brazilian subsidiary of S. During 2006, B used in its business operations the trademarks owned by P. B's use of these trademarks was governed by three trademark licenses that P and B had executed in 1998. Each license concerned a separate set of trademarks. In accordance with the licenses, B paid a royalty to P equal to 1% of its sales of the trademarked products. Some products sold by B were subject to trademarks covered by more than one of the three trademark licenses. For such products, B and P calculated the trademark royalties using a stacking principle under which, for example, if a particular product used trademarks covered by all three trademark licenses, the royalties were 3% of the sales of the product. Computing the royalties using this stacking principle, B paid P trademark royalties in 2006.

B also used in its business operations patents and nonpatented technology owned by S. B paid no patent royalties and made no technology-transfer payments to S. No patent license and no technology-transfer agreement was in effect between S and B.

On its 2006 consolidated federal income-tax return, the P consolidated group reported as income the trademark royalties that B paid to P in 2006.

In the notice of deficiency, R determined that the income of the P consolidated group should be increased under I.R.C. sec. 482 to account for B's use of the intellectual property of P and S. The increase in income determined in the notice of deficiency represents an arm's-length rate of compensation for the intellectual property used by B.

P's position is that the I.R.C. sec. 482 allocation should correspond to the maximum amount that B could have paid for the intellectual property in question under the laws of Brazil, less related expenses.

R's I.R.C. sec. 482 adjustment does not take into account the effect of the Brazilian legal restrictions. A 1994 regulation, 26 C.F.R. sec. 1.482-1(h)(2) (2006), sets forth the requirements that must be met before R "will take into account the effect of a foreign legal restriction" under I.R.C. sec. 482. T.D. 8552, 59 Fed. Reg. 34971 (July 8, 1994). The Brazilian legal restrictions do not meet the requirements.

P contends that some of the requirements are invalid because they fail either the <u>Chevron</u> step 2 test or the part of the <u>State Farm</u> test that requires the agency to adequately respond to comments. <u>See</u> <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 844 (1984); <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29 (1983); <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. 91, 120, 130 (2015), <u>rev'd</u>, 926 F.3d 1061 (9th 2019). P also contends that the entire regulation addressing foreign legal restrictions, 26 C.F.R. sec. 1.482-1(h)(2) (2006), is invalid under the part of

the <u>State Farm</u> test that requires the agency to give a satisfactory explanation for the regulation and the part of the <u>State Farm</u> test that requires the agency to respond to comments. Furthermore, P contends that the entire regulation is invalid under <u>Chevron</u> step 1 because <u>Commissioner v. First Security Bank of Utah, N.A.</u>, 405 U.S. 394 (1972), and its progenitor and progeny held that under predecessors to I.R.C. sec. 482 R cannot make an allocation of income to a taxpayer who did not receive income and could not legally receive the income.

<u>Held</u>: The requirement of 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006) that "a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances" is not invalid under <u>Chevron</u> step 2.

<u>Held</u>, <u>further</u>, the requirement that foreign legal restrictions be taken into account under I.R.C. sec. 482 only if they are publicly promulgated, 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006), means that the foreign legal restrictions must be in writing.

<u>Held</u>, <u>further</u>, the Brazilian legal restrictions at issue do not meet the requirement in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) that foreign legal restrictions be taken into account under I.R.C. sec. 482 only if they are publicly promulgated.

<u>Held</u>, <u>further</u>, the requirement that foreign legal restrictions be taken into account under I.R.C. sec. 482 only if they are publicly promulgated, 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006), is not invalid under <u>Chevron</u> step 2.

<u>Held</u>, <u>further</u>, the requirement that foreign legal restrictions be taken into account under I.R.C. sec. 482 only if they are "generally applicable to all similarly situated persons (both controlled and uncontrolled)", 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006), is not invalid under <u>Chevron</u> step 2.

<u>Held</u>, <u>further</u>, the 1994 regulation, 26 C.F.R. sec. 1.482-1(h)(2) (2006), is valid under <u>Chevron</u> step 1.

Held, further, the 1994 regulation, 26 C.F.R. sec. 1.482-1(h)(2) (2006), is not invalid under P's State Farm theory.

————————

Walter A. Pickhardt and Michael J. Kaupa, for petitioner.

Justin L. Campolieta and William R. Peck, for respondent.

## CONTENTS

FINDINGS OF FACT ................................................................. 10

1. 3M do Brasil Ltda. (or 3M Brazil); its 1952 agreement with 3M Company ............................................. 11

2. The 1982 trademark licensing agreement ....................... 12

3. The 1983 licensing agreement ......................................... 12

4. The 1997 proposed licensing agreement .......................... 13

5. Termination of the 1982 trademark licensing agreement and the 1983 licensing agreement; execution of the 1998 trademark licenses; stipulations related to Brazilian law ....................................................................................... 18

6. Texts of certain Brazilian legal documents referred to in the stipulations related to Brazilian law......................... 35

7. 1999 assignment agreement; corporate restructuring .... 42

8. Business operations during the 2006 tax year................ 43

    a. 3M Global................................................................. 43

    b. 3M Brazil ................................................................ 44

    c. Intellectual property; services................................ 45

    d. Payments by 3M Brazil .......................................... 47

9. Tax reporting.................................................................... 48

**Add. 4**

10. The notice of deficiency ..................................... 48

11. Closing agreement........................................... 51

12. The petition .................................................. 51

13. The stipulation that the rate of compensation under the standard licensing agreement is an appropriate arm's-length rate under section 482 ............................. 53

14. The stipulation that the section 482 adjustment must be reduced by $4,117,370 in unreimbursed research-and-development expenses incurred by 3M Brazil .......... 53

15. The stipulation that under Brazilian law, the maximum amount that 3M Brazil could have paid to 3M IPC as patent royalties or technology-transfer payments in 2006 was $4,283,153 after reduction for the $5,104,756 in trademark royalties paid by 3M Brazil to 3M Company in 2006................................................. 53

16. The stipulation that if the Court holds that the section 482 adjustment must take into account the Brazilian legal restrictions, then the minimum section 482 adjustment should be $165,783 ......................... 56

17. Respondent's position........................................ 56

18. Petitioner's position......................................... 58

19. Other stipulations ........................................... 65

OPINION.............................................................. 65

I. Procedural matters............................................. 65

II. Review of the authorities under U.S. law relevant to the arguments by the parties................................ 67

   A. The Revenue Act of 1921......................... 70

   B. The Revenue Act of 1924......................... 72

   C. The Revenue Act of 1926......................... 72

D. The Revenue Act of 1928 ........................ 73

E. The Revenue Act of 1932 ........................ 74

F. The Revenue Act of 1934 ........................ 75

G. Regulations 86 ........................................ 75

H. The Federal Register Act and the publication of the first issue of the Federal Register .................. 79

I. The Revenue Act of 1936 ........................ 83

J. Regulations 94 ....................................... 83

K. The 1937 amendment to the Federal Register Act ....................................................... 83

L. The first edition of the Code of Federal Regulations ............................................. 84

M. The Revenue Act of 1938 ........................ 86

N. Regulations 101 .................................... 86

O. Internal Revenue Code of 1939 ............................ 86

P. Regulations 103 .................................... 87

Q. The 1942 amendment to the Federal Register Act ....................................................... 88

R. Regulations 111 .................................... 89

S. The Revenue Act of 1943 and the Treasury Decision 5426 amendments to Regulations 111 .... 94

T. L.E. Shunk Latex v. Commissioner, 18 T.C. 940 (1952) (involving tax years 1942, 1943, and 1945) ...................................................... 99

U. The Administrative Procedure Act ...................... 105

V. The lifting of the wartime suspension of the Federal Register Act requirement that regulations be codified every five years .............. 110

7

W.    The second edition of the Code of Federal
      Regulations ........................................................110

X.    The 1953 amendment to the Federal Register
      Act ...................................................................111

Y.    Regulations 118 ..................................................114

Z.    The Internal Revenue Code of 1954.....................115

AA.   The 1960 notice of proposed rulemaking.............119

BB.   The creation of a new title of the Code of
      Federal Regulations..............................................120

CC.   The 1962 final regulations ..................................120

DD.   The 1965 and 1966 notices of proposed
      rulemaking..........................................................125

EE.   The 1968 final regulations ..................................129

FF.   Commissioner v. First Security Bank,
      405 U.S. 394 (1972) (involving tax years 1955 to
      1959)..................................................................135

GG.   The Tax Reform Act of 1976................................146

HH.   Procter & Gamble Co. v. Commissioner, 95 T.C.
      323 (1990) (involving tax years ending
      June 30, 1978 and 1979), aff'd, 961
      F.2d 1255 (6th Cir. 1992); and Exxon Corp. v.
      Commissioner, T.C. Memo. 1993-616, 66 T.C.M.
      (CCH) 1707 (involving tax years 1979, 1980, and
      1981), aff'd sub nom. Texaco, Inc. v. Commissioner,
      98 F.3d 825 (5th Cir. 1996) ..................................147

II.   The 1986 amendment to section 482 ...................166

JJ.   The 1988 amendment to section 7805 regarding
      temporary regulations ..........................................178

KK.   The 1992 notice of proposed rulemaking.............178

8

LL.  The 1993 temporary regulations and the 1993 redesignation of the 1968 regulations .................183

MM.  The 1993 notice of proposed rulemaking............191

NN.  The 1994 final regulations ....................................200

OO.  Stipulations regarding the 1994 final regulations ........................................................213

PP.  The 1996 amendment to section 7805(a) regarding regulations relating to post-1996 provisions of the Internal Revenue Code............214

QQ.  Post-2006 amendments to section 482.................218

III.  Whether the Brazilian legal restrictions satisfy the seven requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006) for taking into account foreign legal restrictions.................................................................222

A.  Effect on uncontrolled taxpayers .........................223

B.  Publicly promulgated .............................................224

C.  Generally applicable...............................................229

D.  Not part of commercial transaction .....................229

E.  Exhaustion of remedies .........................................229

F.  Restriction on payment in any form ....................230

G.  Circumvention or violation of restriction ............230

IV.  Chevron step one .........................................................231

V.  Whether 26 C.F.R. sec. 1.482-1(h)(2) (2006) is reasonable under Chevron step two ..............................254

A.  Effect on uncontrolled taxpayers .........................255

B.  Publicly promulgated .............................................261

C.  Generally applicable...............................................262

D.    Not part of commercial transaction ....................262

E.    Exhaustion of remedies ........................................262

F.    Restriction on payment in any form ...................262

G.    Circumvention or violation of restriction ............263

VI.    The <u>State Farm</u> test for validity of regulations ............263

A.    Satisfactory explanation........................................265

B.    Adequate response to comments..........................267

1.    Inconsistency with <u>First Security Bank</u> ........268

2.    That some foreign legal restrictions apply only to payments between related parties...........268

3.    That some foreign legal restrictions are unpublished (comment related to the second requirement) ........................................................269

4.    Difficulty of establishing that the remedies were exhausted (comment related to the fifth requirement) ........................................................269

5.    Payment of dividends and the no-circumvention requirement (comment related to the seventh requirement)................................270

6.    Time for making deferral election ................270

VII.    Conclusion ....................................................................270

MORRISON, <u>Judge</u>: 3M Company is the common parent company of an affiliated group of corporations that filed a consolidated federal income tax return for the tax year ending December 31, 2006.[1] This affiliated group is referred to here as the 3M consolidated group. When we discuss 3M Company in its role as the representative of the members of the 3M consolidated group, we refer to 3M Company as

---

[1] The return was filed on Form 1120, U.S. Corporation Income Tax Return.

**Add. 9**

"petitioner". See infra part I (discussing 3M Company's status as representative of the group).

Respondent mailed a notice of the deficiency on December 12, 2012, determining the 3M consolidated group had an income tax deficiency of $4,847,004 for 2006. A timely petition for redetermination of the deficiency was filed. We have jurisdiction to redetermine the deficiency under section 6214(a).[2]

Only one income adjustment in the notice of deficiency remains at issue. Specifically, the notice of deficiency determined that the income of the 3M consolidated group should be increased by $23,651,332 to reflect the arm's-length compensation that 3M Brazil should have paid for intellectual property under section 482. Petitioner contends that the section 482 adjustment is improper to the extent that payments were barred by Brazilian law and that therefore the proper section 482 adjustment is only $165,783. All other adjustments in the notice of deficiency have been resolved by agreement of petitioner and respondent.

We hold that under 26 C.F.R. sec. 1.482-1(h)(2) (2006), which governs the effect of foreign legal restrictions on section 482 adjustments, the Brazilian restrictions on payments by 3M Brazil are disregarded. We reject petitioner's various arguments that the regulation is invalid.

FINDINGS OF FACT

Petitioner and respondent executed a stipulation of facts, which they later replaced with an amended stipulation of facts. The amended stipulation of facts is referred to here simply as the "stipulation". The Court adopts the statements in the stipulation as findings of fact. The documents attached to the stipulation, Exhibits 1-J through 46-J, are admitted as evidence.

At all relevant times, including when it filed the petition, 3M Company was a U.S. corporation with its principal place of business in

---

[2] Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986 as amended and in effect at all relevant times. All references to Rules are to the Tax Court Rules of Practice & Procedure.

Minnesota.[3] When we use the term "3M Company", we refer to this specific legal entity.

At all relevant times, including during the 2006 tax year, 3M Company and its U.S. and foreign subsidiaries engaged in manufacturing, research, development, marketing, and sales of products in the U.S. and throughout the world. We refer to 3M Company and its U.S. and foreign subsidiaries as "3M Global".

1.  <u>3M do Brasil Ltda. (or 3M Brazil); its 1952 agreement with 3M Company</u>

In 1946 Durex, Lixas e Fitas Adesivas Ltda. was established in Campinas, Brazil. The corporation was organized as a sociedade limitada under the laws of Brazil. The corporation was later operated under the name Minnesota Manufactureira e Mercantil, Ltda. The corporation was later renamed 3M do Brasil Ltda., which is the name it used during the 2006 tax year.[4] We refer to the corporation as "3M Brazil". 3M Brazil has always been a subsidiary of 3M Company.[5]

In 1952, 3M Brazil agreed with 3M Company to pay royalties for the use of 3M Company's intellectual property and for support services. The agreement provided that 3M Brazil would pay a royalty equal to 10% of the gross selling price of products sold by 3M Brazil. The agreement may not have included any license of trademarks.

In 1966, 3M Brazil's payment obligation under the 1952 agreement was reduced to cover only a fee for technical assistance services, which was equal to 5% of the gross selling price of 3M Brazil's products.

---

[3] 3M Company was originally named the Minnesota Mining and Manufacturing Company. It is occasionally described or referred to by that name in the record.

[4] The corporation is occasionally referred to by its previous names in documents in the record.

[5] For the period before 1999, the record suggests that 3M Brazil was wholly owned by 3M Company through direct or indirect ownership. However, the exact ownership structure of 3M Brazil before 1999 is not clear.

In 1999, there was a corporate restructuring under which 3M Brazil became a wholly owned second-tier subsidiary of 3M Company. This 1999 restructuring and the resulting ownership structure of 3M Brazil is described in detail <u>infra</u> part 7.

In 1969, 3M Company and 3M Brazil agreed to temporarily suspend all percentage-based payments under the 1952 agreement to accommodate the then financial position of 3M Brazil. The percentage-based payment schedule under the 1952 agreement was permanently replaced with a $1,000 per month fee effective July 1, 1969.

2.     The 1982 trademark licensing agreement

In March 1982, 3M Company and 3M Brazil entered into a trademark licensing agreement. Under its terms 3M Company granted 3M Brazil a nonexclusive license to use in Brazil certain trademarks identified in the agreement. Article V, entitled "COMPENSATION", provided that 3M Company waived any right to receive royalties "for as long as subsidiaries are prevented from paying royalties to parent companies in accordance with legislation presently in force in * * * Brazil." 3M Company and 3M Brazil entered into amendments of the 1982 trademark licensing agreement dated February 9, 1983, June 21, 1983, October 2, 1984, July 16, 1985, May 16, 1990, and December 30, 1994. None of the amendments affected Article V of the 1982 trademark licensing agreement.

3.     The 1983 licensing agreement

In April 1983, 3M Company and 3M Brazil entered into a licensing agreement that replaced the 1952 licensing agreement. Under the terms of the 1983 licensing agreement, 3M Company granted 3M Brazil a nonexclusive and nonassignable license to commercially exploit certain patents identified in the agreement. The 1983 licensing agreement also granted 3M Brazil a right to receive technical know-how and technical assistance from 3M Company in connection with 3M Brazil's exploitation of the licensed patents. The 1983 licensing agreement contained a provision, entitled "COMPENSATION", which stated that 3M Company "hereby waives any right to compensation for the patent license and other licenses and rights granted herein, and grants same free of charge to * * * [3M Brazil] for as long as subsidiaries are prevented from paying compensation to parent companies for industrial property in accordance with legislation currently in force in Brazil." The 1983 licensing agreement had no other provision regarding payments by 3M Brazil.

4. <u>The 1997 proposed licensing agreement</u>

During 1997, 3M Company considered the possibility of entering into a royalty-bearing licensing agreement with 3M Brazil to replace the 1983 licensing agreement, which did not provide for royalties. 3M Company drafted and signed a licensing agreement that was similar to licensing agreements that it had entered into with other foreign affiliates. The 1997 proposed licensing agreement was never countersigned by 3M Brazil and never went into effect.

In Article II of the 1997 proposed licensing agreement, 3M Company granted to 3M Brazil the following rights: (1) an exclusive and nonassignable license to make, convert, process, and use certain products in Brazil and (2) a nonexclusive and nonassignable license to market, lease, distribute, and offer for sale the products.

In Article III of the 1997 proposed licensing agreement, 3M Company granted to 3M Brazil an exclusive but nonassignable license to use manufacturing know-how to manufacture the products in Brazil. 3M Company also agreed to make manufacturing data available to 3M Brazil. 3M Brazil agreed to reimburse 3M Company for costs specially incurred in preparing and furnishing drawings, samples, plans, specifications, and other data.

In Article IV of the 1997 proposed licensing agreement, 3M Company agreed to place at the disposal of 3M Brazil, on a nonexclusive basis, technical service data in connection with marketing, leasing, selling, and servicing of 3M Company products. 3M Company also agreed to provide to 3M Brazil technical assistance services, including instructing and training a reasonable number of technical and other qualified trainer-personnel of 3M Brazil.

In Article V of the 1997 proposed licensing agreement, 3M Company granted to 3M Brazil a nonexclusive and nonassignable license to use certain trademarks in Brazil on all licensed products converted, processed, or distributed by 3M Brazil. 3M Brazil agreed to pay all items of expense as might arise in Brazil in connection with the maintenance and upkeep of the trademarks, and to pay all items of expense as might arise in Brazil in connection with the enforcement of the trademarks.

In Article VI of the 1997 proposed licensing agreement, 3M Company granted to 3M Brazil a nonexclusive license within Brazil to

use and to sublicense to the dealers and customers of 3M Brazil works and documents covered by certain copyrights in connection with 3M Brazil's sales and marketing activities.

In Article VIII of the 1997 proposed licensing agreement, 3M Brazil agreed, in consideration of and as compensation for the licenses, undertakings, and other rights granted pursuant to Articles II, III, IV, and VI, to pay 3M Company a royalty of 4% of the net selling price of licensed products manufactured in Brazil (excluding sales to 3M Company and its affiliates).

The Brazilian Patent and Trademark Office (BPTO) is an agency of the Brazilian government that has regulatory authority over industrial property in Brazil, including the recordation of certain licensing agreements providing for the transfer of industrial property.[6] The BPTO exercised this regulatory authority during the 2006 tax year.[7] As part of the recordation process, the BPTO permits the parties to a proposed industrial-property agreement to consult with the BPTO before formally submitting an agreement for recordation. The purpose of this informal consultation process is for the BPTO to identify issues or deficiencies with a proposed agreement that could preclude recordation if not appropriately addressed by the parties before formal submission.

In July 1997, 3M Company engaged in the BPTO's consultation process and sought the BPTO's views on whether the 1997 proposed licensing agreement satisfied the legal requirements for recordation. To this end, on July 30, 1997, 3M Company transmitted the 1997 proposed licensing agreement to the BPTO for review.

By letter dated October 16, 1997, the BPTO notified 3M Company that the 1997 proposed licensing agreement was not in compliance with "the legislation and/or rules usually adopted by" the BPTO for recordation purposes. The letter identified deficiencies in the agreement that required amendment or removal. This is an English translation of the body of the letter:

---

[6] The BPTO is also known as the National Institute of Industrial Property, or Instituto Nacional da Propriedade Industrial.

[7] A more detailed discussion of Brazilian intellectual-property law, including the relevant BPTO practices and procedures, is found in paragraphs 71 to 91 of the stipulation, which are quoted infra part 5.

Concerning the request of this company's letter of July 30, 1997, we inform that the agreement attached to the above process, shows the following aspects which do not agree to the legislation and/or rules usually adopted by this Institute.

1--Inclusion of matters which are not provided by art. 211 of Law

n° 9279/96--Clause VI--LICENSED COPYRIGHTS and items 1.12 and 1.13.

2--Lack of justification for the acquisition of the non patented technology, since the agreement refers to the license of several patents.

3--Establishment of a global remuneration for all the licenses referred to in the agreement, which creates difficulties for analysis, since the agreement includes licenses which need not to be recorded at Patent Office (copyrights) and licenses for which no remuneration is due (use of trademark, according to Law 8383/91, art. 50 and Act. n° 436/58, item II). We also remind that the payment of royalties shall only be considered if derived from issued patents.

4--The term of duration of the agreement has not been fixed. We remind that said term, regarding licenses concerning industrial property rights, shall not exceed the term of validity of the licensed rights and, as for know how acquisition, 5 years, according to Law n° 8383/91 art. 50 and Law n° 4131/62, art. 12, § 3°.

5--Inclusion of clauses which may create difficulties for the working of the company, such as:

a) restriction of the territory for commercialization--item 2.01

b) the licensee shall be in charge of taking all steps and shall pay all the expenses concerning industrial property rights (items 2.04, 5.11 and 7.04)

c) Prevision [sic] that all intellectual property rights, resulting from patents modification work shall become property of the licensor--item 13.06 c (art. 63 of Law n° 6279/96).

Finally, we inform that, according to the provision of art. 50 of Law 8383/91, no additional payment is allowed for the technical assistance since the maximum remuneration allowed by Law is already established by the agreement.

3M Company did not submit the 1997 proposed licensing agreement to the BPTO for formal recordation. Had it done so without addressing the deficiencies identified in the BPTO's October 16, 1997 letter, the BPTO would not have recorded the 1997 proposed licensing agreement for the reasons identified in that letter.

After receiving the October 16, 1997 letter from the BPTO, 3M Company considered whether it should attempt to record with the BPTO an agreement narrower in scope than the 1997 proposed licensing agreement. In particular, 3M Company considered two types of agreements: (1) a licensing agreement for its patents and (2) a technology-transfer agreement for its unpatented technology (such as trade secrets and know-how).

With respect to patents, 3M Company reviewed the intellectual property supporting approximately 40 of the biggest selling products manufactured by 3M Brazil. The purpose of the review was to identify which products in that group were supported by Brazilian patents. 3M Company concluded that only a small number of these products was supported by Brazilian patents. On the basis of that review, 3M Company decided not to conduct a similar review for products having smaller sales. 3M Company was aware that many of the products manufactured and sold by 3M Brazil (such as abrasives, adhesives, tapes, and scouring products) were mature products and therefore were not likely to have any remaining patent protection. It was also aware that many of the products manufactured and sold by 3M Brazil were subject to the low royalty ceilings imposed under Brazilian law with respect to payments between Brazilian companies (such as 3M Brazil) and controlling foreign companies (such as 3M Company). 3M Company decided not to enter into a patent licensing agreement and instead to enter into royalty-bearing trademark licensing agreements.

With respect to unpatented technology, 3M Company was advised by its Brazilian attorneys that, in order to enter into such an agreement, 3M Company would be required to disclose certain trade secrets to the BPTO. As a result, 3M Company was unwilling to enter into an agreement with respect to unpatented technology, for fear that its trade secrets might be disclosed by the BPTO to 3M Company's competitors and that disclosure could weaken trade secret legal protections for its unpatented technology under the laws of the various countries where 3M Global does business. The advice that 3M Company received in this regard was not entirely accurate because 3M Company was not, in fact, required to disclose its trade secrets to the BPTO. Rather, the BPTO requires only a general description of the technology being transferred, such as the field or industry to which the technology relates. Nonetheless, on the basis of the advice it received at the time, 3M Company decided not to enter into a technology transfer agreement and instead to enter into royalty-bearing trademark licensing agreements.

After it received the October 16, 1997 letter, 3M Company reevaluated its royalty-free arrangement with 3M Brazil regarding trademarks. As explained in paragraph 65 of the stipulation (which we adopt as findings of fact):

> Following receipt of the October 16, 1997 letter from the BPTO, 3M Company determined that it would change the licensing of its trademarks to 3M Brazil. 3M Company consulted Brazilian intellectual property counsel, who advised 3M Company that it would be possible to obtain up to a three percent trademark royalty on certain products by entering into three separate trademark licenses covering different sets of trademarks. Counsel advised 3M Company that if a product used multiple trademarks covered by three separate agreements, then 3M Brazil could pay up to a three percent trademark royalty. That advice was not accurate for the reasons discussed below at paragraph 94.

The reference to "paragraph 94" in the above text is a reference to paragraph 94 of the stipulation, which is quoted <u>infra</u> part 5.

**Add. 17**

5.    <u>Termination of the 1982 trademark licensing agreement and the 1983 licensing agreement; execution of the 1998 trademark licenses; stipulations related to Brazilian law</u>

On August 18, 1998, 3M Company and 3M Brazil entered into an agreement terminating the 1982 trademark licensing agreement, effective January 1, 1998.

On August 18, 1998, 3M Company and 3M Brazil entered into an agreement terminating the 1983 licensing agreement, effective January 1, 1998.

Effective January 1, 1998, 3M Company and 3M Brazil entered into three separate licensing agreements for the purpose of licensing 3M Company's trademarks to 3M Brazil (collectively, the "1998 trademark licenses"). Each of the 1998 trademark licenses related to a separate set of trademarks that was identified in the respective license. Under each of the 1998 trademark licenses, 3M Company granted 3M Brazil an exclusive, nonassignable license to use trademarks in Brazil. Under each of the 1998 trademark licenses, 3M Brazil agreed to pay 3M Company a royalty of 1% of the net selling price[8] of the products sold bearing a trademark identified in the license.

Effective March 1, 1999, the 1998 trademark licenses were amended. This amendment, which we refer to as the 1999 amendment, did not affect the particular terms of the 1998 trademark licenses that were discussed in the paragraph above.

In June 1999 the BPTO recorded each of the 1998 trademark licenses, as amended by the 1999 amendment.

The 1998 trademark licenses were in effect during the 2006 tax year.

Petitioner and respondent made the following stipulations relating to Brazilian law and its effect on 3M Brazil, which we adopt:[9]

---

[8] The net selling price is defined not to include the price of any product sold by 3M Brazil to 3M Company or the price of a prepackaged product bought by 3M Brazil from 3M Company and resold.

[9] Some errors in punctuation have been corrected.

71.  The BPTO, which is an agency of the Brazilian government, was created by Law No. 5648/1970, dated December 11, 1970, to replace the earlier National Department of Industrial Property.  During 2006, the BPTO operated pursuant to the legal authority contained in Law No. 9279/1996, dated May 14, 1996 ("the Brazilian Industrial Property Law").  Under Law No. 9279/1996, the BPTO was vested with regulatory authority over industrial property in Brazil.  Acting pursuant to Law No. 9279/1996, the BPTO exercised regulatory control within Brazil over the recordation of agreements providing for the licensing of industrial property and the transfer of technology, including agreements with foreign counterparties.

72.  The Ministry of Finance is an executive department in charge of economic policy and the treasury of the Brazilian federal government.  During 2006, the Ministry of Finance operated pursuant to the legal authority set forth under Law No. 7739/1989, dated March 16, 1989, and was regulated by Decree 5510, dated August 12, 2005, the latter being revoked and replaced on October 31, 2006 by Decree 5949.  Under Brazilian law, a Decree is a binding rule issued by the executive branch of the Brazilian government. The responsibilities of the Ministry of Finance include monetary policy, including currency and coinage; federal tax policy, including collection and enforcement of tax laws; management of federal finances and assets, including management of the Brazilian public debt; public accounting; oversight and control of cross-border trade; and oversight of financial institutions.

73.  During 2006, the Brazilian Central Bank was the principal monetary authority in Brazil.  Prior to the establishment of the Brazilian Central Bank in 1964, the monetary authority of Brazil was vested, in part, in the Agency for Currency and Credit ("SUMOC").  In 1964, the Brazilian Central Bank replaced SUMOC as the principal monetary authority in Brazil.

74.  Law No. 4131/1962, dated September 3, 1962 (also known as the "Foreign Capital Law"), was enacted by the Brazilian government for the purpose of regulating foreign capital and remittance of funds abroad.  Article 9 of

Law 4131/1962 provided that before any royalties relating to patents or trademarks, payments relating to the transfer of technology, or fees for technical assistance services could be remitted abroad, evidence of the agreement providing for such payments had to be submitted to SUMOC. "Technical assistance services" are those provided by persons with technical backgrounds, such as engineers, chemists and biologists. Such services provide expertise in the use of patented or unpatented technology. They are distinguished from "consulting services" which are not directly related to the use of patented or unpatented technology. Consulting services include advice relating to, for example, management, finance, law, marketing, logistics, and information technology.

75.

a.  On February 16, 1972, the Inspection and Registration of Foreign Capital of the Central Bank ("FIRCE"), a regulatory agency under the Brazilian Central Bank, issued Comunicado FIRCE No. 19, an instruction regarding the application of Article 9 of Law No. 4131/1962. That instruction, known as Regulation No. 19, required that a party seeking to remit payments in foreign currency abroad pursuant to an agreement that is subject to registration at the Brazilian Central Bank must produce evidence establishing that the agreement has been recorded by the BPTO.

b.  Regulation No. 19 was later superseded by the establishment of an electronic system of registration of agreements at the Central Bank, which was implemented by Circular No. 2816, dated April 15, 1998, and regulated by Circular-Letter No. 2795, dated April 15, 1998. Under Brazilian law, Circulars and Circular-Letters are binding written orders issued by the Central Bank to government employees and regulated entities. Circular-Letter No. 2795 expressly revoked Regulation No. 19. It required that a party seeking to remit payments abroad pursuant to an agreement that is subject to registration at the Brazilian Central Bank must produce evidence establishing that the agreement has been recorded by the BPTO. This

**Add. 20**

requirement applied to all contracting parties, regardless of relation, and remained in effect during 2006.

c.  Before authorizing a remittance of funds abroad, the Brazilian Central Bank does not conduct an independent review of the terms and conditions of an agreement recorded with the BPTO for purposes of determining compliance with the applicable laws, regulations, and BPTO policies or procedures.

76.  Under Articles 62, 140, and 211 of the Brazilian Industrial Property Law (which articles were included in Law No. 9279/1996 and became effective on May 15, 1997), as well as under Normative Act 135/1997, a binding administrative regulation issued by the BPTO in 1997, the following agreements are subject to recordation by the BPTO:

a.  patent/industrial design license;

b.  trademark license;

c.  technology transfer (relating to unpatented technology);

d.  technical assistance services; and

e.  franchise.

77.  Agreements related to consulting services, copyright licensing and software licensing are not among the agreements specified in Articles 62, 140, and 211 of the Brazilian Industrial Property Law as being subject to recordation by the BPTO. Consulting services agreements, copyright licenses and software licenses are not required by law to be recorded at the BPTO.  Recordation is not required for payments to be made under such agreements, including payments by Brazilian subsidiaries to their controlling foreign parent companies.  This continued to be the law during 2006.

78.  Recording an agreement subject to recordation by the BPTO is necessary for the following purposes:

a. To permit the remittance to a foreign person of (i) royalties for patents or trademarks, (ii) payments for technology transfer (relating to unpatented technology), or (iii) payments for technical assistance services (according to Law No. 4131/1962 and Circular-Letter 2795);

b. To qualify a licensee for deductions under Brazilian tax law (according to Law No. 4131/1962 and Law No. 4506/1964, dated November 30, 1964); and

c. To make the agreement effective against third parties (according to Law No. 9279/1996).

Unless one or more of the foregoing purposes are desired by the contracting parties, recordation by the BPTO is not required or necessary under Brazilian law.

79. It is the BPTO's internal policy to permit a party to a license agreement that is subject to recordation by the BPTO to initiate a consultation procedure, prior to presenting the agreement for recordation, in order to obtain the views of the BPTO regarding whether the agreement satisfies the legal, regulatory, and BPTO policy requirements for recordation.

80. Article 14 of Law No. 4131/1962 instituted a complete prohibition of the ability of Brazilian subsidiaries of foreign companies to remit royalties abroad to their controlling parent companies for the use of patents and trademarks. Given this prohibition, prior to January 1, 1992, the BPTO would not record royalty-bearing patent or trademark license agreements. Although Article 14 of Law No. 4131/1962 expressly imposed a prohibition that applied only to royalties for the use of patents and trademarks, the BPTO interpreted the prohibition as applicable to fees paid for technical assistance services and payments for the transfer of unpatented technology between Brazilian subsidiaries and controlling foreign companies providing for remittances abroad. No similar prohibition applied to unrelated companies. At all relevant times, including during the 2006 tax year, both 3M Company and 3M IPC

were controlling foreign companies with respect to 3M Brazil for purposes of applying Brazilian law.[10]

81. Article 43 of Law No. 4131/1962 imposed supplemental income taxes on dividends paid to foreign shareholders prior to 1992 that were in addition to a 25 percent withholding tax imposed on the foreign recipient. Article 43 of Law No. 4131/1962 also imposed a supplemental income tax on the foreign recipient of dividends whenever the average remittances in a three-year period exceeded a specified percentage of the foreign shareholder's equity interest and capital reinvestments in the Brazilian company. For average remittances of between 12 percent and 15 percent, the supplemental income tax rate was 40 percent; for average remittances of between 15 percent and 25 percent, the supplemental income tax rate was 50 percent; for average remittance in excess of 25 percent, the supplemental income tax rate was 60 percent. In addition, Article 44 of Law No. 4131/1962 provided that the supplementary income tax on dividends would be increased by an additional 20 percent in the case of companies with economic activities that were deemed of lesser importance to the national economy, as determined by regulations.

82.

a. On December 30, 1991, the Brazilian government enacted Law No. 8383/1991, which repealed in its entirety the supplemental income tax on dividends under Articles 43 and 44 of Law No. 4131/1962, and repealed, in part, the prohibition on the remittance of royalties between Brazilian companies and controlling foreign companies contained in Article 14 of Law No. 4131/1962. In particular, Law No. 8383/1991 permitted a Brazilian company to remit royalties to its controlling foreign company to the extent such payments were made

---

[10] As described <u>infra</u> part 7, in 1999 3M Company created a second-tier wholly owned U.S. subsidiary, 3M Innovative Properties Company ("3M IPC") and transferred much of its intellectual property to 3M IPC. 3M Brazil was a wholly owned subsidiary of 3M IPC.

deductible for Brazilian tax purposes under Article 50 of Law No. 8383/1991.

b.  Accordingly, after December 31, 1991, the BPTO began to record royalty-bearing patent and trademark license agreements between Brazilian companies and controlling foreign companies providing for remittances abroad, provided that the amounts payable under such agreements did not exceed the tax deductibility limitations and provided that the agreements were otherwise in compliance with the policies and procedures of the BPTO and other applicable laws and regulations governing industrial property transactions.  The BPTO extended this permission to technology transfer agreements and to technical assistance services agreements between Brazilian companies and controlling foreign companies.

c.  After the enactment of Law No. 8383/1991, if the BPTO recorded a royalty-bearing patent or trademark license agreement or technology transfer agreement between a Brazilian company and a controlling foreign company, then the amounts payable under such an agreement could be remitted abroad to the foreign company, subject to the fixed ceilings discussed in paragraphs 89 and 90 of this Stipulation of Facts.  In addition, the Brazilian company could deduct such payments for Brazilian tax purposes in accordance with Article 50 of Law No. 8383/1991, subject to the fixed ceilings discussed in paragraphs 87 and 88 of this Stipulation of Facts.  This was the law in 2006.

83.  The Brazilian Central Bank could impose a fine on a Brazilian licensee of up to R$250,000 pursuant to Article 58 of Law No. 4131/1962 and Provisional Measure No. 2224, dated September 4, 2001, if the licensee made an unauthorized remittance by either (a) making payments to a foreign person (controlling or noncontrolling) without prior recordation of an agreement required to be recorded at the BPTO, or (b) making payments to a foreign controlling entity in amounts exceeding the fixed ceilings described in paragraphs 89 and 90 of this Stipulation of Facts.  The Brazilian Central Bank could also impose a monetary penalty, pursuant to Article 23 of Law No.

4131/1962, of up to 300 percent of the non-authorized remitted amount on the licensee, the bank involved in remitting the funds, and any transactional broker. In addition, the Brazilian Central Bank could require the repayment of any such unauthorized remittance pursuant to item 3, Chapter 7 Title 1 of Circulars 3280/2005 and 3325/2006, issued by the Brazilian Central Bank. This was the law in 2006.

84. After the enactment of Law No. 8383/1991, the BPTO adopted the administrative position that, if a certain trademark or patent had been licensed prior to January 1, 1992, by means of an agreement recorded with the BPTO on a royalty-free basis (because of the prohibition instituted by Article 14 of Law 4131/1962), the same trademark or patent could not be licensed on a royalty-bearing basis under a new agreement signed and recorded after January 1, 1992. This internal policy of the BPTO, which was in effect during 2006, was amended in 2009 when the BPTO issued a formal opinion explaining that royalty payments would be allowed on a prospective basis, even if the licensed trademark or patent had been licensed free of charge prior to January 1, 1992. Although this was the policy of the BPTO during 1998, when the 1998 Trademark Licenses[11] were recorded, the BPTO through an error did not apply this policy to the 1998 Trademark Licenses. The BPTO recorded the 1998 Trademark Licenses although some of the covered trademarks had been previously covered by the 1982 Trademark Licensing Agreement.[12]

85. Brazil's Industrial Property Law (Law No. 9279/1996) does not treat unpatented technology (such as trade secrets and know how) as industrial property. The BPTO does not consider unpatented technology to be a proprietary right that can be licensed. The BPTO does, however, record technology transfer agreements providing

---

[11] Elsewhere in this Opinion, the 1998 Trademark Licenses are referred to as the 1998 trademark licenses (i.e., without capitalization).

[12] Elsewhere in this Opinion, the 1982 Trademark Licensing Agreement is referred to as the 1982 trademark licensing agreement (i.e., without capitalization). See supra part 4.

for the sale of unpatented technology. This was the internal policy of the BPTO in 2006.

86.

a. During the mid-1990's, Brazil altered the legislation related to the corporate income tax. In particular, Law No. 9249/1995, dated December 26, 1995, established a worldwide income tax on the net profits of corporations domiciled in Brazil. One of the corporate tax regimes adopted in Brazil is a combination of (i) the so-called "real profit" regime, which adopts accounting records of revenues and expenses, adjusted by additions and exclusions determined by law, and (ii) a social contribution payment based upon net profits. Taxable profits, if any, are then taxed at a combined tax rate up to 34 percent.

b. Roughly a year after the enactment of Law No. 9249/1995, the Brazilian government enacted Law No. 9430/1996, dated December 27, 1996, which established a system of transfer pricing rules in Brazil to address, among other things, pricing and taxation of cross-border transactions between related corporations. Although the transfer pricing methodologies under the Brazilian tax system are, in some respects, similar to the methodologies set forth in the guidelines published by the international Organization for Economic Cooperation and Development ("OECD"), Brazil's transfer pricing regime also deviates in some respects from the OECD transfer pricing guidelines. For example, instead of applying the general "arm's length principle" embodied in the OECD guidelines as the guiding principle for pricing of intercompany transactions, a number of Brazilian transfer pricing rules provide for statutory-based tests, such as fixed profits margins, maximum ceilings for deductibility of expenses on imports, minimum gross income floors for exports, and limitations on the deductibility of interest expenses based upon fixed rates and ranges.

c. Under paragraph 9 of Article 18 of Law No. 9430/1996, transactions involving patent or trademark royalties, technology transfer payments, or payments for technical assistance services in connection with the

transfer of intangibles are exempt from the transfer pricing regime. Deductibility of these amounts is governed by the fixed ceilings discussed in paragraph 87 of this Stipulation of Facts.

87. Brazilian tax law imposes fixed ceilings on the deductibility of royalties for trademarks and patents and for remuneration paid for technology transfer and technical assistance services. The ceilings were initially established by Article 74 of Law No. 3470/1958, dated November 28, 1958, which introduced a cap on the amount deductible as royalties for the license of trademarks and patents, and also on the amount deductible for remuneration paid for technology transfer and technical assistance services. Law No. 3470/1958 established a maximum deductibility limit of five percent of the gross sales price of products manufactured and sold under license, technology transfer, or technical assistance services agreements. Law No. 3470/1958 also provided that the maximum deductibility limit of five percent would be reviewed periodically by the Brazilian Ministry of Finance and adjusted according to the degree of essentiality of the industries or activities involved, so that it could be less than five percent.

88.

a. Acting pursuant to Law No. 3470/1958, the Brazilian Ministry of Finance in 1958 promulgated Portaria No. 436/58, which established decreasing maximum deductibility ceilings, ranging from five percent to one percent of gross sales, in connection with (i) royalties paid for the license of patents; (ii) technology transfer payments for unpatented technology (see paragraph 90 of this Stipulation of Facts); and (iii) amounts paid for technical assistance services.[13] Under Brazilian law, a

---

[13] Petitioner and respondent have stipulated the English translation of the text of Portaria No. 436/58. See paragraph 88c of the stipulation; Exhibit 28-J. We gather from the English translation that Portaria No. 436/58 additionally established a maximum deductibility ceiling of 1% for royalties for the use of trademarks. This may be the same as the 1% cap that is referred to in paragraph 88.e of the stipulation.

Portaria is a binding rule promulgated by an administrative agency.

b. By Article 6 of Decree-Law No. 1730/1979, dated December 17, 1979, the percentage limitation on deductions, which initially applied to gross sales of products covered by licensed technology, was amended so as to apply to net sales of such products. Under Decree-Law No. 1598/1977, dated December 26, 1977, and confirmed by Rule-Making Instruction No. 51, dated November 3, 1978, net sales are calculated by reducing the following amounts from gross sales: (1) products returned and canceled sales; (2) discounts granted on an unconditional basis; and (3) taxes levied thereon. This was the law in 2006. In addition, it was the BPTO's unwritten policy in 2006 to require, for purposes of computing net sales for patent royalties and technology transfer agreements, that gross sales be reduced by the amounts set forth in Decree-Law No. 1598/1977, as well as by the cost of all inputs or components imported from the supplier of technology or from parties related to the supplier, regardless of whether such inputs or components were manufactured by the supplier or third parties. A Decree-Law is a binding law that was issued by the executive branch during the military dictatorship that ruled Brazil between 1964 and 1985.

c. The percentages under Portaria 436/58 were applied to a comprehensive list of industries and products identified in the Portaria. In 1959, 1970 and 1994, the Ministry of Finance promulgated Portaria Nos. 113/59, 314/70 and 60/94, setting maximum deductibility ceilings for the cement, glass and informatics industries, respectively. Copies of these Portarias (in the original Portuguese version followed by an English translation) are attached as Exhibits 28-J, 29-J, 30-J and 31-J. These Portarias were in effect during 2006. They apply to the deductibility of any (i) royalty payments made for the license of patents, (ii) technology transfer payments for unpatented technology (see paragraph 90 of this Stipulation of Facts), and (iii) amounts paid for technical assistance services, regardless of whether such royalties were paid in a related or unrelated party transaction.

Royalties paid that exceed the deductible amount, to the extent such payments are otherwise permitted, are not deductible for Brazilian tax purposes. This was the law in 2006.

d. To the extent that the contracting parties are not able to determine to which product category a particular product belongs, the parties may apply for an administrative consultation, in which the Ministry of Finance may indicate the appropriate rate ceiling for the tax deduction under the Portarias. This practice was in place during 2006.

e. The deduction permitted for the payment of royalties for the license of trademarks is capped at one percent of net sales, regardless of the type of industry or product involved. This restriction was in effect during 2006 and applies to the deductibility of any royalty payments made for the license of trademarks, regardless of whether such royalties were paid in a related or unrelated party transaction. Royalties paid pursuant to trademark licenses that exceed the deductible amount, to the extent such payments are otherwise permitted, are not deductible for Brazilian tax purposes. This was the law in 2006.

f. The Federal Revenue Service, which is a division of the Ministry of Finance, interpreted Portaria 436/58 in Decision No. 283 (November 30, 2000), a copy of which (in the original Portuguese version followed by an English transaction) is attached as Exhibit 32-J. According to Decision No. 283, the deduction for royalties under a license of trademarks is capped at one percent of net sales for each product, even if more than one trademark is used on the product. In addition, the Decision further provides that no deduction for trademark royalties is allowable when the use of the trademark derives from the use of a patent, manufacturing process, or formula. As a result, the Ministry of Finance will not permit a taxpayer to deduct trademark royalties if a deduction was already claimed on the same product for the license of patents, or for the use of manufacturing processes or formulas. Under Brazilian law, a Decision is a ruling by an administrative agency made in the context of a particular case or consultation.

Although a Decision does not have any binding effect beyond the parties to the case, a Decision functions as a precedent to be followed by the administrative agency in future cases involving similar facts.

89. Since January 1, 1992, and the enactment of Law No. 8383/1991, the BPTO has imposed fixed ceilings on amounts payable by a Brazilian company to a controlling foreign company under a patent or trademark license agreement. See paragraph 82 of this Stipulation of Facts. The ceilings, which were in place during 2006, correspond to the ceilings for tax deductibility set forth in Portaria 436/58, as amended. See paragraph 88 of this Stipulation of Facts. The BPTO will not record an agreement between a Brazilian company and a controlling foreign company that does not comply with these ceilings. These ceilings do not apply to agreements and payments between unrelated companies.

90. Under its interpretation of Law Nos. 4131/1962 and 8383/1991, the BPTO also applies the same fixed ceilings that apply to royalties under a patent or trademark license agreement to payments under an agreement between a Brazilian company and a controlling foreign company providing for the transfer of unpatented technology ("technology transfer payments") and also to payments for technical assistance services. This interpretation is not published. The BPTO applied this interpretation during 2006.

91. The base against which royalties are calculated under licensing agreements recorded at the BPTO generally differs between payments for trademark royalties and payments for patent royalties or transfers of unpatented technology. With respect to trademark royalties, it is the general practice for licensing agreements to calculate the one percent royalty based upon the net sales of all trademarked merchandise sold by the licensee (whether or not manufactured by the licensee), using the definition of net sales under [Decree-]Law No. 1598/1977. Conversely, it is the general practice to calculate patent royalties and technology transfer payments (which, as described above, range from one percent of net sales to five

percent of net sales) based upon the net sales of products manufactured and sold by the licensee that incorporate patented or unpatented technology. These are general practices that are not required by Brazilian law or BPTO policy.

92. It is the BPTO's policy to limit the duration of a technology transfer agreement to a maximum of five years. As an exception to the general rule, if the parties can objectively demonstrate to the BPTO the need to continue the technology transfer, the BPTO may allow duration of a technology transfer agreement to be renewed for one additional five-year term. At the end of the five or ten-year period, the BPTO requires that the transferee be entitled to use the unpatented technology without further payment. This maximum term for a technology transfer agreement is not established in the Industrial Property Law (Law No. 9279/1996) or in any other law or regulation, but results from the application, by analogy, of Law No. 4131/1962, which provides that technical assistance services fees paid under technology transfer agreements may be deducted during only the first five years of the agreement, renewable for one additional five year term. Limiting the duration of technology transfer agreements as described above was the policy of the BPTO in 2006. This policy was not published.

93. The BPTO will not record one or more licensing agreements between a Brazilian company and a controlling foreign company providing for a license of patents or trademarks or providing for the transfer of unpatented technology if such agreement or agreements relate to the same product and call for royalties or payments that, combined, exceed the deductibility limits under Brazilian tax law. In such a case, the deductibility limitation represents the maximum allowable payment, even if more than one category of royalty or payment is involved. The BPTO normally requests that the parties precisely indicate which category of royalty is being paid. This was the policy of the BPTO in 2006. This policy was not published.

94.

a.  If a product is covered by a patent license or by a technology transfer agreement between a Brazilian company and a controlling foreign company, then the BPTO by unwritten policy requires that any trademark license between the same Brazilian company and the same controlling foreign company for that same product be granted royalty-free.  If a trademark royalty may be paid under that policy, the BPTO by unwritten policy requires that the royalties for the license of trademarks payable by a Brazilian company to a controlling foreign company must be capped at one percent of net sales for each product, even if more than one trademark is used on the product.  These unwritten policies of the BPTO were in effect at the time that the 1998 Trademark Licenses were recorded and during 2006, and they remain in effect.  These unwritten policies of the BPTO correspond to the administrative ruling set forth in Decision No. 283 (Exhibit 32-J), described in paragraph 88.f, above.

b.  As described above at paragraphs 65-68, 3M Company and 3M Brazil entered into three licensing agreements, the 1998 Trademark Licenses, covering three separate sets of trademarks.  The BPTO recorded them in June 1999.  3M Company had received erroneous legal advice that if a product used multiple trademarks covered by three separate agreements, then 3M Brazil could pay a royalty of up to three percent of net sales (one percent for each trademark covered by a separate agreement, as described in paragraph 65 above).  That legal advice was contrary to the BPTO's unwritten policy that the maximum trademark royalty for a product is one percent of net sales, regardless of how many licensed trademarks are identified on the product.

c.  The three 1998 Trademark Licenses (Exhibits 20-J, 21-J and 22-J) described the trademarks but did not describe the products on which the trademarks would be used.  The parties have not been able to determine whether 3M Brazil submitted additional information to the BPTO indicating that 3M Brazil would use trademarks covered by different licensing agreements on a single product and

pay more than a one percent royalty. However, 3M Brazil did pay 3M Company trademark royalties of up to three percent on products bearing trademarks covered by more than one licensing agreement based on the erroneous legal advice that it received.

95. Article 63 of the Brazilian Industrial Property Law (Law No. 9279/1996) provides that any improvement introduced in a licensed patent belongs to the party that made the improvement. The other party is entitled to a right of first refusal to obtain a license of the improvement. Although the law refers to patents (and not to unpatented technology), the BPTO applies this rule to unpatented technology by analogy. If an agreement contains a provision contrary to this rule and does not require the licensor to make additional payment for the improvements or reciprocate in some equivalent fashion, the BPTO may record the agreement but with a notation that such provision is not enforceable. This was the policy of the BPTO in 2006. This policy was not published.

96. If a license agreement contains one or more provisions that the BPTO considers to be burdensome to a licensee's rights, the BPTO will generally notify the parties that the BPTO considers such provisions to be burdensome, but the inclusion of such provisions will not interfere with the BPTO's recordation of the agreement. This was the policy of the BPTO in 2006. The policy was not published.

97. Based upon its interpretation of the Industrial Property Law (Law No. 9279/1996), the BPTO does not permit the payment of royalties for patent and trademark applications. However, in the case of patent applications, royalties can be charged and credited in a licensee's financial statements, but payment can be made only after the grant of the patent. This was the policy of the BPTO in 2006. This policy was not published.

98. Brazilian law allows 3M Brazil, as a sociedade limitada, to make two kinds of distributions out of its profits to its shareholders in respect of its shares: dividends and interest on net equity.

99.  Dividends can be paid by a Brazilian *sociedade limitada* to the extent of its current and retained earnings, as determined using Brazilian generally accepted accounting principles.  Apart from this limitation, Brazilian law imposes no restriction on the ability of a *sociedade limitada* to pay dividends abroad to its shareholders, including to a controlling foreign company, and authorization from the Central Bank of Brazil is not required.  Dividends of a *sociedade limitada* must be declared by the shareholders.  Dividends are not deductible by the company paying the dividend under Brazilian tax law.  Dividends are not taxable income to the recipient under Brazilian tax law.  Brazil does not impose a withholding tax on dividends paid by a Brazilian company to a foreign shareholder.  This was the law in 2006.

100.  As a *sociedade limitada*, 3M Brazil is allowed under Brazilian law to pay interest on net equity.  Interest on net equity must be declared by the shareholders of a *sociedade limitada*.  Interest on net equity is calculated by applying a long term interest rate set by the Brazilian government (the "Taxa de Juros de Longo Prazo"), to the company's equity (i.e., net assets).  The amount that can be paid as interest on net equity is limited to greater of: (i) 50 percent of the entity's profits of the current year; or (ii) 50 percent of the entity's accumulated profits (not including profits of the current year).  Apart from this limitation, Brazilian law imposes no restriction on the ability of a *sociedade limitada* to remit interest on net equity abroad to its shareholders, including to a controlling foreign company, and authorization from the Central Bank of Brazil is not required.  Under Brazilian tax law, interest on net equity is (subject to the previous limitations) deductible by the company paying the interest on net equity, and is taxable income to the recipient.  Brazil imposes a withholding tax on interest on net equity paid to foreign recipients.  The withholding tax rate applicable to payments to United States shareholders is 15 percent.  The Brazilian entity that makes the payment is required to withhold the withholding tax, and the tax is not a credit against any other tax imposed under Brazilian law.  This was the law in 2006.

101. Under Brazilian income tax law, withholding is generally required on cross-border payments made by a Brazilian company to a foreign company in the following amounts: 25% with respect to payments for services; 15% with respect to royalty payments for patents and trademarks; 15% with respect to payments under technology transfer agreements (i.e., unpatented technology); and 15% with respect to payments for technical assistance services. These are the withholding rates applicable where the recipient of a payment is resident in the United States because there is no tax treaty between Brazil and the United States and the United States is not considered a tax haven. The withholding rates may differ where the recipient is a resident of a country having a tax treaty with Brazil or of a country that is considered a tax haven. The Brazilian entity that makes the payment is required to withhold the withholding tax, and the tax is a not credit against any other tax imposed under Brazilian law. This was the law in 2006.

102. Brazil imposes a CIDE (Contribuição sobre Intervenção no Domínio Econômico) tax. The CIDE tax is imposed at the rate of ten percent on payments of royalties, technical assistance services, copyrights, and other compensation derived from contractual obligations involving the transfer of technology, made by a Brazilian company to a foreign company. The CIDE tax is not a withholding tax. It is imposed on the Brazilian paying company. This was the law in 2006.

103. The BPTO's authority does not include supervision over the payment of dividends or interest on net equity.

6.    Texts of certain Brazilian legal documents referred to in the stipulations related to Brazilian law

Certain Brazilian legal documents were referred to in the stipulations that we quoted supra part 5:

| Exhibit number of legal document | Stipulation paragraph that refers to legal document | Title of legal document |
| --- | --- | --- |
| 28-J | 88.c | Portaria No. 436/58 |
| 29-J | 88.c | Portaria No. 113/59 |
| 30-J | 88.c | Portaria No. 314/70 |
| 31-J | 88.c | Portaria No. 60/94 |
| 32-J | 88.f | Decision No. 293 (Nov. 30, 2000) |

The original documents are in Portuguese. Petitioner and respondent have stipulated the English translations of the documents, which we reproduce below.

The English translation of Exhibit 28-J (Portaria 436/58) is:

MINISTRY OF FINANCE

OFFICE OF THE MINISTER

DIRECTIVE 436 of December 30, 1958

The Minister of Finance, exerting the authority conferred upon him and in view of the provisions referred to in Article 74, paragraphs 1 and 2 of Law 3470, of November 28, 1958, pertaining to the deduction of royalties for the use of trademarks and patents, expenses for technical, scientific, administrative and similar assistance, as well as amortization quotas for patents, in ascertaining the real profits of legal entities, decides:

a) to establish the following maximum percentual coefficients for the above mentioned deductions, taking into consideration the types of production or activity, according to their degree of essentiality:

I--royalties for the use of invention patents, manufacturing processes and formulas, expenses for technical, scientific, administrative and similar assistance:

FIRST GROUP--BASIC INDUSTRIES

Type of production                                        Percentage

1. Electric Power
   01--Production and distribution . . . . . . . . . . . . . . . . . 5%
2. Fuel
   02--Petroleum and by-products . . . . . . . . . . . . . . . . . 5%
3. Transportation
   03--Street-car transportation . . . . . . . . . . . . . . . . . . 5%
4. Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
5. Transportation materials
   01--Automobiles, trucks and similar vehicles . . . . . . 5%
   02--Parts thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
   03--Tires and tubes . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
6. Fertilizers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
7. Basic Chemicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
8. Heavy Metallurgy
   01--Iron and Steel . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
   02--Aluminum  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
9. Electrical Material
   01--Transformers, Dynamos and Generators . . . . . . . 5%
   02--Electric motors for industrial use  . . . . . . . . . . . 5%
   03--Telephonic, telegraphic and signalling
       equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
10. Miscellaneous
    01--Tractors and Combines for agriculture . . . . . . . . 5%
    02--Equipment for Road Construction, and parts
        thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
    03--Equipment for the extractive and transformation
        industries, and parts thereof . . . . . . . . . . . . . . . . 5%
11. Shipbuilding
    01--Ships . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5%
    02--Equipment for ships . . . . . . . . . . . . . . . . . . . . . . . 5%

SECOND     GROUP—PROCESSING     INDUSTRY—
ESSENTIALS

Type of Production                          Percentage
1.  Packaging Equipment . . . . . . . . . . . . . . . . . . . . . . . . . 4%
2.  Foodstuffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4%
3.  Chemicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4%
4.  Pharmaceuticals . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4%
5.  Textile materials, yarn and thread . . . . . . . . . . . . . . 4%
6.  Footwear and similar goods . . . . . . . . . . . . . . . . . . . 3.5%
7.  Manufactured metal goods . . . . . . . . . . . . . . . . . . . . 3.5%
8.  Manufactured cement and asbestos goods . . . . . . . . 3.5%
9.  Electric material . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3%
10. Machinery and appliances
       01--Household appliances, not classified as
             sumptuary . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3%
       02--Office machinery and appliances . . . . . . . . . . . 3%
       03--Appliances for scientific use . . . . . . . . . . . . . . . 3%
11. Rubber and plastic manufactured goods . . . . . . . . . . 2%
12. Sanitary and toilet goods
       01--Shaving articles . . . . . . . . . . . . . . . . . . . . . . . . . . 2%
       02--Toothpaste . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2%
       03--Regular bathing soap . . . . . . . . . . . . . . . . . . . . . 2%
13. Other processing industries . . . . . . . . . . . . . . . . . . . . 1%

> II--royalties for the use of industrial and
> commercial trademarks or trade name, in any
> type of production or activity, when the use of
> the trademark or name does not derive from
> the utilization of the patent; manufacturing
> process, or formula: 1%

> b)  The maximum percentages established will incur
>     on the gross operating income, in the case of
>     public service concessionaries, or on the gross
>     receipt value of products referred to in the license
>     or assistance services contracts;

> c)  in cases of payment based on goods produced
>     each year, the coefficients established as a limit
>     for the deductions referred to in numbers I and II
>     of (a) will be applied on the sales value of the
>     goods;

d) should the situation in (c) occur, the gross receipt shall be readjusted, including the corresponding value of goods produced and not sold, on the basis of the last invoiced price and excluding the amounts that may have been added in the same way to the gross receipt of the previous year;

e) for tax purposes, as of 1959, to each fiscal year there shall be an addition of the following differences:

> I--between the amounts of royalties and other expenses referred to in article 74 of the mentioned Law, credited or paid during the base-year, and the minimum percentages established for the respective deduction, according to (b) and (d);

> II--between the quotas for the purpose of forming depreciation reserves for industrial patents evaluated in accordance with article 68 of the same Law, and the maximum limit of the deduction allowed, with respect to the gross receipt value of the goods sold, referring to the patent incorporated in the assets of the company;

f) the legal entities whose types of production are not included in the aforementioned groups may have them included by applying to the Director of the Income Tax Division; until such application is made, the minimum percentage allowed shall be applied to such types of production.

LUCAS LOPES

(Official Gazette, December 30, 1958)

The English translation of Exhibit 29-J (Portaria 113/59) is:

MINISTRY OF FINANCE

OFFICE OF THE MINISTER

DIRECTIVE 113 of May 25, 1959

The Minister of Finance decides:

To include in Directive 436, of December 30, 1958, number I -- First Group -- Basic Industry, the cement industry, with a percentage of 5%, in view of its degree of essentiality and in accordance with reports from the Income Tax Division and the General Management of the National Treasury.

LUCAS LOPES

File n° 9413-59.

(Official Gazette, May 29, 1959).

The English translation of Exhibit 30-J (Portaria 314/70) is:

Ordinance/MF n° 314/70.  Includes the 2nd Group-- processing industry

Eng. MF 314/70--Port.--Ordinance FINANCE MINISTER OF--MF n° 314 of 25.11.1970

D.O.U.: 12/01/1970

(Includes the 2nd Group--Manufacturing Industry-- Essential--of the table Ordinance No. 436, of December 30, 1958, with the percentage of 4%, glass and glass artifacts, for the purposes referred to in the Article 12 of Law No. 4131 of 3 September 1962.)

The Minister of Finance, in exercise of the powers conferred on it by Article 12, § 1 of Law No. 4,131, of September 1962, and Considering the need to improve the national glass industry by importing the latest technical achievements in the sector; considering the wide range of applications of the products of that industry.

RESOLVES:

Include in the 2nd Group -- Manufacturing Industry -- Essential -- of the table Ordinance No. 436, of December 30, 1958, with the percentage of 4%, glass and glass artifacts, for the purposes referred to in Article 12 of Law No. 4,131, of September 3, 1962.

ANTONIO DELFIM NETTO

The English portion of Exhibit 31-J (Portaria 60/94) is:

MF Ordinance No. 60
D.O.U.: 2/01/1994

The MINISTER OF FINANCE, in exercise of its statutory duties, taking into view the provisions of art. 50 of Law No. 8,383, of December 30, 1991 and Ordinance No. 303, of November 25, 1959, decides:

Article 1.  Include in the 2nd Group--Processing Industries- -Essential, Ordinance No. MF 436, of December 30, 1958, the following item:

Types of Production Percentage 14--INDUSTRIAL COMPUTER SYSTEMS, AUTOMATION AND INSTRUMENTATION 01--Machinery, equipment, apparatus, instruments and devices based on digital or analog technique with technical functions of collection, treatment, structuring, storage, switching, retrieval and presentation of information, its respective electronic inputs and opto-electronics, parts, pieces and physical support for the operation, as well as technological update sets and performance optimization (. . .) 5% [ellipses are in the original]

Art. 2.  This Ordinance shall enter into force on the date of its publication.

Fernando Henrique Cardoso

The English portion of Exhibit 32-J (Decision No. 283) is:
MINISTRY OF FINANCE

FEDERAL REVENUE SERVICE

DECISION N° 283 of November 30, 2000

SUBJECT: Corporate Income Tax

SYLLABOUS: ROYALTIES.  The percentages established over gross revenue to limit the deductibility of the amounts due in connection with royalties, must be applied to each product, and not to each trademark used on a same product.  In case of royalties for the use of industrial and commercial trademarks or trade name, in any type of production or activity, when the use of the trademark or name does not derive from the utilization of the patent, manufacturing process or formula, the maximum limit is of 1% (one per cent).

7.  <u>1999 assignment agreement; corporate restructuring</u>

In 1999, 3M Global had sales in more than 180 countries.

In 1999, 3M Company decided that much of its intellectual property should be held and managed by a newly formed U.S. subsidiary, 3M Innovative Properties Company ("3M IPC").  3M Company also added to its corporate structure another newly formed U.S. corporation, 3M Financial Management Company ("3M Financial Management").  The purpose of 3M Financial Management was to facilitate currency management and intercorporate lending between 3M Company and its affiliates.  The ownership structure of the four corporations was as follows: (1) 3M Company owned 3M Financial Management, (2) 3M Financial Management owned 3M IPC, (3) 3M IPC owned 3M Brazil.

In 1999, 3M Company executed an assignment agreement to transfer certain intellectual property to 3M IPC to facilitate, through standardization and centralization, the licensing, management, enforcement, and control of 3M Company's intellectual property.  The assignment agreement was effective April 1, 1999.  Under the agreement, 3M Company assigned to 3M IPC all U.S. patents owned, licensed to, or possessed by 3M Company; all copyrights owned, licensed to, or possessed by 3M Company; all proprietary information (defined as business, technical and other information of any kind, including both confidential and nonconfidential information) owned, licensed to, or

possessed by 3M Company; and all other intellectual property (except trademarks) owned, licensed to, or possessed by 3M Company.

As part of the assignment agreement, 3M Company also granted an exclusive license to 3M IPC, including the right to sublicense, all foreign patents controlled by 3M Company and to use any foreign trademarks controlled by 3M Company. 3M Company retained ownership of the trademarks.

As part of the assignment agreement, 3M Company also assigned to 3M IPC its ownership interest in most licenses of intellectual property from 3M Company to its affiliates or third parties.

8. <u>Business operations during the 2006 tax year</u>

   a. <u>3M Global</u>

As of the 2006 tax year, 3M Global was one of the largest technology-and- manufacturing enterprises in the world, reporting in its annual report that it had over $23 billion in worldwide gross sales and over $21 billion in worldwide assets. At the close of the 2006 tax year, 3M Global employed 75,333 people worldwide, with 34,553 employed in the United States and 40,780 employed in foreign countries. 3M Global derived roughly 60% of its annual revenues in the 2006 tax year from sources outside the United States.

3M Global's business operations are organized, managed, and internally grouped into segments based on differences in products, technologies, and services. During the 2006 tax year, 3M Global's business consisted of six primary segments: Industrial and Transportation; Health Care; Display and Graphics; Consumer and Office; Safety, Security and Protection Services; and Electro and Communications. 3M Global sold more than 50,000 different products.

During the 2006 tax year, research and product development constituted an important part of 3M Global's business activities. Research, development, and related expenses for 3M Global totaled $1.522 billion in 2006, up from $1.274 billion in 2004 and $1.246 billion in 2005.

b.    <u>3M Brazil</u>

During the 2006 tax year, neither 3M Company nor 3M IPC owned any plant, property, or equipment in Brazil. During the 2006 tax year, 3M Brazil reported for U.S. income-tax purposes approximately $563 million in sales and employed approximately 3,120 people at its corporate headquarters and its three manufacturing sites throughout Brazil, including a research and development facility at one of the manufacturing sites.

At all relevant times, including during the 2006 tax year, 3M Brazil's primary business operations included the manufacturing and distribution of 3M Global's products. The products that 3M Brazil manufactured, marketed, or sold during the 2006 tax year included abrasives, adhesives and adhesive tapes, automotive products, office and consumer products, medical-and-dental-care products, graphic-communication products, electrical products, telecommunication products, tapes (including masking tapes, packaging tapes, and diaper tapes), labels, respirators, and hearing-protection products.

3M Brazil also engaged in research-and-development activities, which led to the creation of intellectual property. During the 2006 tax year, 3M IPC had 167 patent applications pending in Brazil. During that year, Brazil granted 32 patents to 3M IPC. Two of those were developed by 3M Brazil personnel, and four were developed in Brazil by unrelated persons and were acquired by 3M Brazil from those persons.[14]

A Form 5471 pertaining to 3M Brazil was attached to the consolidated federal income tax return filed by the 3M consolidated group for the 2006 tax year. The Form 5471 is titled "Information Return of U.S. Persons with Respect to Certain Foreign Corporations". The consolidated federal income tax return was made on Form 1120. The average exchange rate for converting U.S. dollars ($) to Brazilian reais (R$) for the 2006 taxable year, as reported by the 3M consolidated group on its Form 5471 for 3M Brazil, was 2.1705157. That exchange rate is used in this Opinion unless otherwise indicated.

---

[14] We describe <u>infra</u> part 14 paragraph 128 of the stipulation, which relates to research-and-development expenses incurred by 3M Brazil.

c.     Intellectual property; services

3M IPC owns substantially all of the intellectual property used or developed by 3M Global, with the exception of trademarks, which are owned by 3M Company.  During the 2006 tax year, 3M IPC owned, or held licenses to use, a wide variety of U.S. and foreign patents in connection with 3M Global's products.[15]

During the 2006 tax year, 3M Global's products were sold under various trademarks owned by 3M Company.

The intellectual property of 3M Company and 3M IPC is collectively referred to as the 3M Intellectual Property.

Including during the 2006 tax year, 3M Company and 3M IPC had jointly licensed the 3M Intellectual Property (1) to most of the affiliates of 3M Global (but not to 3M Brazil) and (2) to third parties.

During the 2006 tax year, 3M Company and 3M IPC jointly licensed the 3M Intellectual Property to most affiliates of 3M Global using a standard licensing agreement.  3M Brazil was not among those affiliates.  The standard licensing agreement recites that "[i]nstead of negotiating separate agreements for different technologies, products, services and intellectual property rights, the Parties wish to negotiate a single agreement that will grant a license to Affiliate under the entire portfolio of 3M IPC's intellectual property rights, and will transfer intellectual property rights developed or obtained by Affiliate to 3M IPC."  The word "Affiliate" refers to a foreign affiliate.  "Parties" refers to the Affiliate, 3M Company, and 3M IPC.  Under the standard licensing agreement, the licensors (3M Company and 3M IPC, individually and collectively) grant to the licensee (a foreign affiliate) a license to manufacture goods using the licensor's intellectual property and to exercise all rights that are protected by or arise under the licensor's intellectual property.  A licensee under the standard licensing agreement agrees to pay a royalty to 3M IPC equal to 6% of the net price charged by the licensee for products manufactured using the licensor's

---

[15] As explained before, the 1999 assignment agreement transferred U.S. patents from 3M Company to 3M IPC.  The record does not appear to show when or how the foreign patents were transferred from 3M Company to 3M IPC.

intellectual property.[16] Trademarks are not used in the manufacture of products, and therefore the royalty payment does not cover the use of trademarks. The licensee also agrees to pay to 3M IPC 6% of the net price charged by the licensee to any buyer other than a 3M Global company for services provided by the licensee under the licensor's intellectual property. The licensee also agrees to pay to 3M IPC 1% of the net price charged by the licensee for products sold, licensed, leased, or otherwise disposed of by the licensee (using the licensor's intellectual property) to any buyer other than a 3M Global company. Under the standard licensing agreement, 3M Company agrees to reimburse the licensee its actual costs incurred for laboratory work undertaken by the licensee or performed by an entity other than the licensor for the licensee at the licensee's request, and related to product development or modification, or research, including basic and applied research. 3M Company also agrees to pay a markup of 10% (or other agreed markup). All types of intellectual property developed by the licensee through this arrangement would become the property of 3M IPC, except for the trademarks, which would become the property of 3M Company. The types of intellectual property include (1) patents, trademarks, domain names, copyrights, proprietary information, and (2) all intellectual rights of any kind other than patents, trademarks, domain names, copyrights and proprietary information. The standard licensing agreement does not relate to technical and support services, which are the subject of a separate agreement, as described in the next paragraph. With only a few exceptions, all of the foreign affiliates in 3M Global operated under a version of the standard licensing agreement during the 2006 tax year. 3M Brazil was one such exception.

The standard services agreement is a reciprocal agreement under which 3M Company and 3M IPC, on the one hand, and the foreign affiliate, on the other, agree to provide technical and support services to each other as may be agreed from time to time. The services include technical assistance services and selling, marketing, and general and administrative services. Under the standard services agreement, the foreign affiliate agrees to compensate 3M Company and 3M IPC at cost, and 3M Company and 3M IPC agree to compensate the foreign affiliate at cost plus a 10% markup. Most of the foreign affiliates in 3M Global operated under a version of the standard services agreement during the 2006 tax year. 3M Brazil was one exception. 3M Company and 3M

---

[16] The calculation of the net price includes a reduction for the cost of semifinished goods incorporated into the manufactured products that were purchased from a 3M Global company.

Brazil entered into a version of the standard services agreement effective January 1, 2009.

At all relevant times, including the 2006 tax year, 3M Brazil had access to, and used in its business operations, the 3M Intellectual Property, including patents, trademarks, trade names, name recognition, copyrights, software, and nonpatented technology (such as technical know-how and trade secrets). 3M Brazil's right to 3M Intellectual Property throughout the years was sometimes governed by one or more licensing agreements. The only such arrangements in effect during the 2006 tax year were the 1998 trademark licensing agreements. At all relevant times, including during the 2006 tax year, 3M Company provided services to 3M Brazil. During the 2006 tax year, those services consisted of consulting services and technical assistance services. During 2006, 3M Company provided significantly more consulting services and technical assistance services. The terms "consulting services" and "technical assistance services" are defined in paragraph 74 of the stipulation, which is quoted <u>infra</u> part 9.

### d. Payments by 3M Brazil

The 1998 trademark licenses required 3M Brazil to pay 3M Company 1% of its net sales. Brazil required that the maximum royalty for a product be 1% of net sales, regardless of how many licensed trademarks were used on the product. During 2006, 3M Brazil paid $5,104,756 in royalties to 3M Company under the 1998 trademark licenses. This $5,104,756 royalty payment, though calculated at 1% of net sales, was calculated using a stacking principle under which if a product used multiple trademarks covered by three separate agreements, then the licensee (3M Brazil) should pay up to a 3% trademark royalty. We make no finding as to what the royalty payment would have been if computed without the stacking principle. [17]

---

[17] Petitioner contends that 3M Brazil's net sales were $466,618,701 and that therefore had 3M Brazil calculated the trademark royalties at 1% of sales without stacking, 3M Brazil would have paid $4,666,187 in royalties. We do not find as fact that 3M Brazil's net sales were $466,618,701. First, petitioner failed to state this contention in its proposed findings of fact, as it was required to do by Rule 151(e)(3). Second, the only evidence supporting the contention is information in the tax return of the 3M consolidated group. A tax return is a weak source of information in a deficiency case such as this one. <u>See</u> <u>Wilkinson v. Commissioner</u>, 71 T.C. 633, 639 (1979).

During 2006, 3M Brazil paid $52,522,080 in dividends and $11,978,720 in interest on net equity to 3M IPC. The total of these payments is $64,500,800.

In 2006, 3M Brazil made no payments to 3M Company for consulting services or technical assistance services. Nor did 3M Brazil pay 3M IPC for the use of patents, trade names, name recognition, copyrights, software, or unpatented technology.

9.    Tax reporting

The 3M consolidated group reported on its consolidated federal income tax return for 2006 that it had taxable income of $4,466,124,618 and a tax liability of $1,049,490,347.

The members of the 3M consolidated group included 3M Company (the common parent of the group) and 3M IPC.

On its consolidated federal income tax return, the 3M consolidated group reported as income the $5,104,756 in trademark royalties paid by 3M Brazil to 3M Company.

The total of dividends and interest on net equity paid by 3M Brazil in 2006 ($64,500,800) was reported by the 3M consolidated group as dividends paid on Schedule M of the 3M Brazil Form 5471 for 2006.

10.    The notice of deficiency

In the notice of deficiency, respondent made 47 adjustments to the income of the 3M consolidated group.[18]

One adjustment in the notice of deficiency, labeled "Brazil Royalties", was a net $23,651,332 increase in the income of the 3M consolidated group. Petitioner and respondent have stipulated, in paragraph 120 of the stipulation, that this adjustment was calculated by "[a]pplying the royalty rates under the Standard Licensing Agreement to the intercompany licensing transactions between 3M Company, 3M IPC, and 3M Brazil at issue in this case." The phrase

---

[18] Respondent mailed the notice of deficiency to 3M Company because 3M Company was the common parent company of the 3M consolidated group. See 26 C.F.R. sec. 1.1502-77B(a)(2)(viii) (2018) (providing that notices of deficiency are mailed to the common parent of a consolidated group and that mailing to the common parent is considered a mailing to each member of the consolidated group).

"intercompany licensing transactions between 3M Company, 3M IPC, and 3M Brazil at issue in this case" refers to the following: (1) the use by 3M Brazil of trademarks owned by 3M Company, (2) the use by 3M Brazil of patents owned by 3M IPC, and (3) the transfer of technology from 3M IPC to 3M Brazil.[19]

The royalty rate used by the notice of deficiency was 6% of net sales. The notice of deficiency calculated that the royalty at the 6% rate was $27,768,702 and that this amount should be reduced by $4,117,370 for 3M Brazil's unreimbursed expenditures on research and development. Thus, the adjustment to the income of the 3M consolidated group was $23,651,332, equal to $27,768,702 minus $4,117,370. The notice of deficiency explained the $23,651,332 increase as follows:

---

[19] As the parties have stipulated, the adjustment in the notice of deficiency was based on the terms of the standard licensing agreement. The standard licensing agreement contained two major provisions: one was the license of intellectual property at a 1% royalty; the other was the license of intellectual property other than trademarks at a 6% royalty. The notice of deficiency applied a 6% royalty, rather than a 1% royalty. This suggests that the notice of deficiency did not make an adjustment for trademark royalties and that the adjustment in the notice of deficiency related to intellectual property other than trademarks. The notice of deficiency did not expressly say which types of nontrademark intellectual property bore the 6% imputed royalty. On brief, respondent contends that the 6% imputed royalty is compensation for the use of patents owned by 3M IPC and for technology transferred by 3M IPC. See infra part 17 (third paragraph). So far the adjustment in the notice of deficiency, as defended by respondent in litigation, may not seem to be related to the use of trademarks.

However, further analysis shows that the use of trademarks is relevant to the appropriate section 482 adjustment in this case, as we explain below. Petitioner opposes the 6% royalty adjustment in the notice of deficiency on the ground that 3M Brazil was prevented by Brazilian law from paying patent royalties and making technology-transfer payments to 3M IPC in excess of ceilings of between 1% and 5%. 3M Brazil was also barred by Circular-Letter 2795 from paying any patent royalties and technology-transfer payments to 3M IPC because 3M Brazil had failed to record with the BPTO a licensing agreement with respect to such royalties and payments. Petitioner recognizes, however, that 3M Brazil could have recorded such a licensing agreement and that, had it done so, it could have paid patent royalties and technology-transfer payments to 3M IPC up to the 1%-5% ceilings. However, had 3M Brazil recorded such a licensing agreement, it would have been prohibited from paying trademark royalties to 3M Company. Thus, petitioner contends that the section 482 adjustment should be limited to the maximum amount 3M Brazil could have paid 3M IPC under the 1%-5% ceilings for patent royalties and technology-transfer payments minus the trademark royalty payments it actually made. In summary, the section 482 adjustment urged by petitioner partly implicates the use of 3M Company's trademarks by 3M Brazil and the Brazilian restrictions on the payment of trademark royalties.

It is determined that in order to clearly reflect the income of the entities, in accordance with section 482 of the Internal Revenue Code, we have allocated royalty income to you from 3M do Brasil Limitada ("3M Brazil") in connection with 3M Brazil's use of intellectual property. We have determined that Brazilian legal restrictions are not taken into account for purposes of computing the arm's length amount of royalty income from 3M Brazil because it has not been established that the Brazilian legal restrictions affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time, and because it has not been established that the restrictions satisfied the conditions pursuant to Treasury Regulations sections 1.482-1(h)(2)(i) and (ii). In addition, we have determined that you are ineligible to elect the deferred income method of accounting pursuant to Treasury Regulations section 1.482-1(h)(2)(iii). Accordingly, your taxable income for the tax year ended December 31, 2006 is increased by $23,651,332, as shown in the computation below:

| | |
|---|---:|
| a. Total cost of goods sold of products manufactured by 3M Brazil (from Form 5471, Sch. C, line 2) | $332,547,422 |
| Cost of goods sold (other than raw materials) purchased from: | |
| b. U.S. affiliates (from Form 5471, Sch. M, Line 10(b)+(c)) | (42,966,307) |
| c. Foreign affiliates (from Form 5471, Sch. M, Line 10(d)) | (16,537,910) |
| d. Net cost of goods sold for manufactured products | $273,043,205 |
| e. Gross sales from Form 5471 (Sch. C, line 1a) | $563,672,096 |
| f. Times: Ratio of net to total cost of goods sold (d divided by a) | 0.821065469 |
| g. Net sales of manufactured products | $462,811,694 |
| h. Times: Manufacturing royalty rate | 6% |
| i. Proposed manufacturing royalty | $27,768,702 |
| j. Setoff for unreimbursed R & D expenses | (4,117,370) |
| k. Proposed net adjustment | $23,651,332 |

Another adjustment in the notice of deficiency was a $4,751,136 increase in income of the 3M consolidated group for "Support Service Fee--3M do Brasil LTDA". The notice of deficiency explained this "Support Service Fee" adjustment as follows:

> It is determined that an adjustment is required under section 482 of the Internal Revenue Code to reallocate $4,751,136 of income to you from 3M do Brasil LTDA [i.e., 3M Brazil] relating to support services which were never charged. Accordingly, your taxable income for the tax year ended December 31, 2006 is increased by $4,751,136.

To calculate the adjustment, the notice of deficiency applied the rate of compensation provided under the standard services agreement (which was cost, if services were provided by 3M Company or 3M IPC; or cost plus 10%, if services were provided by a licensee of intellectual property owned by 3M Company or 3M IPC) to the intercompany services transactions during 2006 between 3M Company and 3M Brazil.

11. Closing agreement

After the notice of deficiency was issued, but before the petition was filed, petitioner and respondent entered into a partial closing agreement under section 7121. One of the terms of the closing agreement was that petitioner agreed to the "Support Services Fee" adjustment of $4,751,136. At that time, petitioner understood that Brazilian law imposed no limits on what 3M Brazil could pay to 3M Company for the services it provided (which consisted of consulting services and technical assistance services). Petitioner subsequently learned that its understanding was partially incorrect because, as explained in paragraphs 74, 76, and 77 of the stipulation, Brazilian law distinguishes between remuneration for technical assistance services (to which the fixed ceilings described in paragraph 90 of the stipulation apply) and remuneration for consulting services (to which such fixed ceilings do not apply). As explained supra part 5, 3M Company provided significantly more consulting services to 3M Brazil than technical assistance services.

12. The petition

On March 6, 2013, the petition was filed. It challenged only one adjustment in the notice of deficiency, the $23,651,332 adjustment for

"Brazil Royalties". The petition explained the basis for the challenge as follows:

> 5.a.18. <u>3M Brazil's Legal Inability to Pay Royalties</u>. Brazilian law precluded 3M Brazil from paying any royalties to the Petitioner[20] other than one-percent royalties on the licensed Trademarks, which were paid and which Petitioner included in its income. In addition, under no circumstances could the royalties payable by 3M Brazil have been at a rate of six percent of net sales under Brazilian law in addition to the one-percent royalty payable on Trademarks.

> 5.a.19. <u>The Allocation Was Erroneous</u>. The Commissioner has no authority under I.R.C. § 482 to allocate income to a taxpayer from a related party where the related party is legally prohibited from paying the income to the taxpayer, and where the taxpayer did not in fact receive the income from the related party. Because 3M Brazil could not legally pay the imputed royalty income to Petitioner, and because Petitioner did not receive the royalties, the Commissioner's allocation was erroneous.

> 5.a.20. <u>The Commissioner's Reliance on Treas. Reg. § 1.482-1(h)(2)</u>. In the Notice, the Commissioner stated that restrictions on the payment of royalties under Brazilian law would not be "taken into account for purposes of computing the arm's length amount of royalty income" because the conditions under Treas. Reg. § 1.482-1(h)(2)(i) and (ii) had not been satisfied.

> 5.a.21. <u>Invalidity of Treas. Reg. § 1.482-1(h)(2)(i) and (ii)</u>. Treasury exceeded its legal authority when, in Treasury Decision 8552 (59 Fed. Reg. 34971-01, 1994-2 C.B. 93 (July 8, 1994)), it adopted Treas. Reg. § 1.482-1(h)(2)(i) and (ii). That regulation is invalid.

In recognition of the binding effect of the closing agreement, the petition did not dispute the "Support Services Fee" adjustment of $4,751,136 in the notice of deficiency.

---

[20] "Petitioner" meant the 3M consolidated group.

13. <u>The stipulation that the rate of compensation under the standard licensing agreement is an appropriate arm's-length rate under section 482</u>

As we previously observed, paragraph 120 of the stipulation includes a stipulation that the $23,651,332 increase to the income of the 3M consolidated group in the notice of deficiency was calculated by applying the royalty rates in the standard licensing agreement. <u>See supra</u> part 10. In the same paragraph of the stipulation, petitioner and respondent also agreed that the rate of compensation provided under the standard licensing agreement is "an appropriate arm's length rate under section 482 for the intercompany licensing transactions between 3M Company, 3M IPC, and 3M Brazil at issue in this case". The combined effect of these two stipulations is that petitioner and respondent agree that the $23,651,332 adjustment in the notice of deficiency reflects an appropriate arm's-length rate of compensation under section 482.[21]

14. <u>The stipulation that the section 482 adjustment must be reduced by $4,117,370 in unreimbursed research-and-development expenses incurred by 3M Brazil</u>

In paragraph 128 of the stipulation, petitioner and respondent agreed that, as determined in the notice of deficiency, the 3M consolidated group is entitled to a "setoff against any section 482 adjustment for royalties from 3M Brazil" in an amount equal to $4,117,370 for research-and-development expenses incurred by 3M Brazil that 3M Company did not reimburse but would have reimbursed had the standard agreement been in effect.

15. <u>The stipulation that, under Brazilian law, the maximum amount that 3M Brazil could have paid to 3M IPC as patent royalties or technology-transfer payments in 2006 was $4,283,153 after reduction for the $5,104,756 in trademark royalties paid by 3M Brazil to 3M Company in 2006</u>

Petitioner and respondent have stipulated that under Brazilian law the maximum amount that 3M Brazil could have paid to 3M IPC as patent royalties or technology-transfer payments in 2006 was

---

[21] Because the adjustment in the notice of deficiency reflects the royalty rate in the standard licensing agreement, and because the royalty rate in the standard licensing agreement is an arm's-length rate of compensation, it follows that the adjustment in the notice of deficiency reflects arm's-length compensation.

$4,283,153. This amount equals $9,387,909, which is the maximum amount of such payments calculated before application of the Brazilian prohibition on a Brazilian company paying trademark royalties to its controlling foreign company for a product covered by a patent license or a technology-transfer agreement, reduced by the $5,104,756 of trademark royalties as required by the prohibition.

Petitioner and respondent performed an analysis of 3M Brazil's net sales made during 2006 by commodity code[22] for the purpose of computing the maximum amount of "additional royalties or technology transfer payments" that 3M Brazil would have been permitted to deduct under Brazilian tax law and to pay to 3M Company and 3M IPC.[23] We refer to this analysis as the "maximum-deductibility analysis". The maximum-deductibility analysis assumed that all the products sold by 3M Brazil were manufactured by 3M Brazil and were covered by either (1) a currently valid patent, (2) unpatented technology that was in use for not more than five years, (3) or both. The maximum-deductibility analysis was performed in 3M Brazil's functional currency, Brazilian reais.

The maximum-deductibility analysis was jointly conducted by two Brazilian attorneys (one for petitioner and one for respondent) who practice Brazilian intellectual-property law and who are knowledgeable concerning the limitations on the deductibility under Brazilian tax law of trademark and patent royalties and technology-transfer payments. These Brazilian attorneys consulted with 3M Brazil to determine the maximum deductions under Brazilian tax law for "patent royalties or technology transfer payments"[24] with respect to the products sold by 3M Brazil according to commodity code. The highest rates were then applied to the net sales of products for each commodity code, not including intercompany sales (because intercompany sales are not subject to the payment of royalties under the standard licensing agreement), to determine the maximum amount that 3M Brazil could have deducted if it had paid 3M IPC for the "use [of] its patents or for the transfer of its unpatented technology."[25] Given that 3M Company and 3M IPC, at all relevant times, were controlling foreign companies of

---

[22] 3M Brazil sold products having more than 100 product codes in 2006. Those products were subdivided, within each product code, by commodity codes.

[23] The quoted text is from the stipulation.

[24] The quoted text is from the stipulation.

[25] The quoted text is from the stipulation.

3M Brazil, the maximum-deductibility analysis also determined the maximum amount that the BPTO would have permitted 3M IPC and 3M Brazil to include as payable to 3M IPC in any recorded agreement providing for the "use of patents or the transfer of unpatented technology".[26] See paragraphs 89 and 90 of the stipulation. Consequently, the maximum-deductibility analysis also determined the maximum amount that the Brazilian Central Bank would have permitted 3M Brazil to remit to 3M IPC as "royalties or as technology transfer payments",[27] given that Circular-Letter No. 2795 requires such payments to be made pursuant to a written agreement recorded by the BPTO. See paragraph 75.b of the stipulation.

The maximum-deductibility analysis showed that the maximum amount that 3M Brazil could have deducted as "patent royalties or technology transfer payments" [28] in 2006 was $9,387,909 subject to the following. To arrive at the maximum amount of "additional royalties or technology transfer payments"[29] that 3M Brazil could have deducted in 2006, the above amount must be reduced by the royalties that 3M Brazil paid and deducted under the 1998 trademark licenses during 2006, because, if a product is covered by a patent license or by a technology-transfer agreement between a Brazilian company and controlling foreign companies, then any trademark license between the same Brazilian company and the same controlling foreign companies for that same product must be granted royalty free. Therefore, because 3M Brazil deducted[30] and paid trademark royalties in connection with certain of the same products during 2006, the maximum amount that could have been paid as "patent royalties or as technology transfer payments"[31] must be reduced by the amount of trademark royalties paid and deducted by 3M Brazil. Petitioner and respondent have stipulated, in paragraph 126 of the stipulation, that, on the basis of the maximum-deductibility analysis, the "maximum amount of additional patent royalties and technology-transfer payments for 2006, after reduction for the trademark royalties actually paid by 3M" was $4,283,153.

---

[26] The quoted text is from the stipulation.

[27] The quoted text is from the stipulation.

[28] The quoted text is from the stipulation.

[29] The quoted text is from the stipulation.

[30] Deducted for Brazilian tax purposes.

[31] The quoted text is from the stipulation.

Petitioner and respondent have stipulated, in paragraph 127 of the stipulation, that the "maximum additional amount" that 3M Brazil could have deducted[32] and paid in 2006 to 3M IPC as "patent royalties or as technology transfer payments", in "excess of the trademark royalties actually paid to 3M Company", and using the assumptions underlying the maximum-deductibility analysis, was $4,283,153, and that the Brazilian Central Bank would have permitted 3M Brazil to make such a payment had the BPTO recorded an agreement among 3M Company, 3M IPC, and 3M Brazil providing for the payment of such amounts.

16. <u>The stipulation that if the Court holds that the section 482 adjustment must take into account the Brazilian legal restrictions, then the minimum section 482 adjustment should be $165,783</u>

Petitioner and respondent have stipulated, in paragraph 129 of the stipulation, that the "minimum section 482 adjustment" with respect to the intercompany licensing transactions among 3M Brazil, 3M Company, and 3M IPC for the 2006 year is $165,783 (equal to $4,283,153 minus an offset of $4,117,370 for unreimbursed research-and-development expenses (R & D offset)). We interpret the term "minimum section 482 adjustment" to be the minimum section 482 adjustment that would be made if petitioner were to prevail in its argument that the Brazilian legal restrictions should be taken into account. We refer to the $4,117,370 offset for unreimbursed research-and-development expenses as the $4,117,370 R & D offset.

17. <u>Respondent's position</u>

Respondent's position is that the relevant adjustment in the notice of deficiency is correct. The notice of deficiency adjusted the income of the 3M consolidated group by $23,651,332, equal to $27,768,702 minus $4,117,370. The latter two amounts have the following significance:

- The $27,768,702 amount corresponds to the 6% royalty rate set forth in the standard licensing agreement for intellectual property other than trademarks.[33]

---

[32] Deducted for Brazilian tax purposes.

[33] This point was discussed <u>supra</u> part 10 note 18.

- The $4,117,370 amount is the research-and-development expenses incurred by 3M Brazil for which it was not reimbursed. The standard licensing agreement requires the licensor to reimburse the licensee for certain research.

Respondent's position can be illustrated as follows:

| Respondent's position regarding appropriate sec. 482 adjustment for 3M Brazil's use of 3M Company's trademarks, 3M Brazil's use of 3M IPC's patents, and technology transfers from 3M IPC to 3M Brazil | |
|---|---|
| Explanation | Amount |
| 6% royalty provided by standard licensing agreement for intellectual property other than trademarks | $27,768,702 |
| R&D offset, as provided by standard licensing agreement | −4,117,370 |
| Equals the section 482 adjustment urged by respondent | 23,651,332 |

As we have explained before, because the adjustment in the notice of deficiency reflects the compensation in the standard licensing agreement and because the standard licensing agreement reflects arm's-length compensation, it follows that the adjustment in the notice of deficiency reflects arm's-length compensation. See supra part 13. What is disputed is whether arm's-length compensation can serve as the basis for the section 482 adjustment. Respondent contends that the arm's-length compensation results in the appropriate section 482 adjustment because, respondent contends, the Brazilian legal restrictions should be disregarded. By contrast, petitioner contends that the appropriate section 482 adjustment is constrained by the amounts payable under Brazilian law.

It bears emphasis that respondent contends that the 6% royalty component of the section 482 adjustment is justified only by (1) 3M Brazil's use of 3M Company's patents and (2) the transfer of technology from 3M IPC to 3M Brazil. See supra part 10 note 18. Respondent's section 482 adjustment makes no adjustment directly concerning compensation for 3M Brazil's use of 3M Company's trademarks. Recall that 3M Company, which owned all of the trademarks of 3M Global, allowed 3M Brazil to use its trademarks during the 2006 tax year. Pursuant to the 1998 trademark licenses, 3M Brazil paid 3M Company $5,104,756 of trademark royalties. This payment was reported as

income by the 3M consolidated group on its 2006 tax return. Respondent does not argue that this reporting should be adjusted under section 482 for 3M Brazil's use of 3M Company's trademarks.

Although respondent's main position is that the Brazilian legal restrictions should not be taken into account in making the section 482 adjustment, respondent has an alternative position should petitioner prevail in its argument that the Brazilian legal restrictions be taken into account. As previously explained, paragraph 129 of the stipulation means that respondent agrees that if petitioner prevails in its argument that the Brazilian legal restrictions should be taken into account, the minimum section 482 adjustment should be $165,783. See supra part 16. Although paragraph 129 says the minimum section 482 adjustment was $165,783, and therefore does not technically limit respondent's claiming that the section 482 adjustment should be more than $165,783, respondent's briefs do not argue that the section 482 adjustment should be more than $165,783 in the event that petitioner prevails in its argument that the section 482 adjustment must take into account the Brazilian legal restrictions. Thus, we consider respondent's position to be that the section 482 adjustment should be $165,783 in the event that petitioner prevails in its argument that the section 482 adjustment must take into account the Brazilian legal restrictions.

18. Petitioner's position

Petitioner concedes that the $23,651,332 allocation determined by respondent reflects an arm's-length compensation for the use of the intellectual property.[34] However, it disputes respondent's legal authority to make an allocation under section 482 because 3M Brazil was prevented under Brazilian law from paying more than $165,783 in compensation. This $165,785 amount is equal to (1) $4,283,153 minus (2) the R&D offset of $4,117,370. Petitioner contends that the appropriate transfer-pricing adjustment is $165,785. We pause here to explain petitioner's computation of this adjustment more completely.

---

[34] This concession is the result of paragraph 120 of the stipulation, which stated two things: (1) respondent's $23,651,332 sec. 482 adjustment was determined from the royalty rates under the standard licensing agreement, and (2) the rate of compensation under the standard licensing agreement is an arm's-length rate for the transactions at issue. Combining these two statements means that respondent's $23,651,332 sec. 482 adjustment reflects an arm's-length rate for the transactions at issue. See supra part 14.

The $4,283,153 amount is the maximum of patent-royalty payments and technology-transfer payments 3M Brazil could make to 3M Company assuming it had recorded with the BPTO a licensing agreement regarding such payments. Computation of the $4,283,153 amount starts with $9,387,909, an amount that does not account for the Brazilian restriction that, if a product is covered by a patent license or by a technology-transfer agreement between a Brazilian company and its controlling foreign company, any trademark license between the same companies for that same product must be granted royalty free. To account for the restriction, the $9,387,909 amount would be reduced by the $5,104,756 of trademark royalties to arrive at $4,283,153.

Finally, paragraph 128 of the stipulation requires that the section 482 adjustment be reduced by the $4,117,370 R&D offset. When $4,283,153 is reduced by $4,117,370, the result is $165,783. This is the correct section 482 adjustment in petitioner's view. The adjustment supposes that the Brazilian legal restrictions are taken into account.

Petitioner's calculations of the adjustment can also be illustrated in the table below:

| Petitioner's position regarding appropriate sec. 482 adjustment for 3M Brazil's use of 3M Company's trademarks, 3M Brazil's use of 3M IPC's patents, and technology transfers from 3M IPC to 3M Brazil | |
| --- | --- |
| Explanation | Amount |
| Maximum amount that 3M Brazil could pay 3M IPC as royalties or as technology-transfer payments, before application of the Brazilian restriction that, if a product is covered by a patent license or by a technology-transfer agreement between a Brazilian company and controlling foreign companies, any trademark license for that same product must be granted royalty free. (This maximum amount implicitly assumes that 3M Brazil records an agreement with 3M IPC regarding the use of 3M IPC's patents and the transfer of 3M IPC's technology.) | $9,387,909 |
| Reduction in trademark royalties paid, as required by the Brazilian restriction referred to above | −5,104,756 |
| Equals the sec. 482 adjustment urged by petitioner before R&D offset | 4,283,153 |
| R&D offset, as required by paragraph 128 of the stipulation | −4,117,370 |
| Equals final sec. 482 adjustment urged by petitioner | 165,783 |

We now discuss petitioner's position in the event it loses its argument that the section 482 adjustment must take into account the Brazilian legal restrictions. In its opening brief, petitioner takes the position that if the Court agrees with respondent that the Brazilian legal restrictions should be disregarded, then the proper section 482 adjustment is $23,651,332. This position is consistent with petitioner's concession, described supra part 14, that the $23,651,332 reflects arm's-length compensation for the use of the intellectual property.

Paragraph 128 of the stipulation states that the section 482 adjustment should be reduced by the $4,117,370 R&D offset. Taken literally, paragraph 128 could be construed to mean that if the Court sustains respondent's position that the correct section 482 adjustment is $23,651,332, then the $23,651,332 adjustment should be reduced by the $4,117,370 R&D offset. But the $23,651,332 calculation already incorporates the R&D offset. So a further reduction would not make sense. Perhaps recognizing this, petitioner declines to argue that paragraph 128 of the stipulation requires that the $23,651,332 should be further reduced by the $4,117,370 R&D offset. In the event the Brazilian legal restrictions are not taken into account, petitioner accepts that the section 482 adjustment should be $23,651,332.

The $23,651,332 adjustment made by the notice of deficiency did not include any adjustment related to the $5,104,756 of trademark royalties paid by 3M Brazil to 3M Company and reported as income by the 3M consolidated group (of which 3M Company was a member). The $5,104,756 trademark royalty payment was equal to 1% of sales, calculated using a stacking principle when multiple trademarks were used on the same product. The use of the stacking principle to calculate the 1% trademark royalty was improper under Brazilian law. Petitioner asserts that if the 1% trademark royalty had been calculated without using the stacking principle, the royalty would have been $4,666,187. If true, this means that 3M Brazil overpaid the trademark royalty to 3M Company by $438,569, which is the difference between $5,104,756 and $4,666,187. But petitioner does not assert that the income of the 3M consolidated group should be reduced by $438,569 to adjust for any such overpayment. Thus, we need not consider whether such a reduction would be warranted.

Thus far, we have described separately the calculations of respondent's and petitioner's litigating positions. It is worth pointing out that both positions incorporate an R&D offset of $4,117,373. Additionally, petitioner's position expressly accounts for, and

respondent's position implicitly accounts for, the $5,104,756 of trademark royalties paid by 3M Brazil to 3M Company and reported as income by the 3M consolidated group. Petitioner's position includes a reduction for the trademark royalties paid of $5,104,756 to account for the Brazilian restriction that, if a product is covered by a patent license or by a technology-transfer agreement between a Brazilian company and a controlling foreign company, a trademark license between the same companies for that same product must be granted royalty free. 3M Company reported the $5,104,756 trademark royalty it received from 3M Brazil as income; but under petitioner's position the $5,104,756 should not have been reported as income by 3M Company because 3M Brazil could not have paid the amount had it entered into a patent license or technology-transfer agreement. Respondent's position implicitly accounts for the $5,104,756 in that respondent did not make an adjustment to 3M Company's reporting of the amount in income. Thus, respondent's position on the tax treatment of the $5,104,756 trademark royalty payment can be viewed as a $0 adjustment because respondent agrees with the tax reporting of this amount by the 3M consolidated group. Equivalently, one can think of respondent's position on the tax treatment of the $5,104,756 trademark royalty payment as comprising two separate steps: (1) a determination that $5,104,756 should be included in 3M Company's income and (2) a $5,104,756 offset to reflect that the reported income of the 3M consolidated group included the $5,104,756 amount. The advantage of the two-step approach is that it makes it easier to compare respondent's position to petitioner's position. Such a comparison is made in the table below:

| Petitioner's and respondent's computations of appropriate sec. 482 adjustment: side-by-side comparison | | |
|---|---|---|
| | Respondent | Petitioner |
| Compensation for use of patents and for transfer of technology[35] | $27,768,702 | $9,387,909 |
| Compensation for use of trademarks[36] | 5,104,756 | –0– |
| Reduction for trademark royalty reported by 3M Company[37] | –5,104,756 | –5,104,756 |
| R&D offset | –4,117,370 | –4,117,370 |
| Sec. 482 adjustment | 23,651,332 | 165,783 |

The positions of petitioner and respondent can also be usefully compared in the following diagram of the relevant transactions and payments:

---

[35] Respondent: adjustment justified by arm's-length compensation.

Petitioner: adjustment should not exceed maximum payment under Brazilian law.

[36] Respondent: implicitly agrees that a 1% trademark royalty should be included in the income of 3M Company.

Petitioner: 1% trademark royalty should not be included in the income of 3M Company because Brazil requires that, if a product is covered by a patent license or by a technology-transfer agreement between a Brazilian company and a controlling foreign company, any trademark license between the same companies for that same product must be granted royalty free.

[37] Respondent: this adjustment accounts for the fact that 3M Company already reported the 1% trademark royalty in its income.

Petitioner: this adjustment is necessary because the 1% trademark royalty should not be included in the income of 3M Company and because 3M Company reported the royalty as income.



[1]Although the sec. 482 adjustments favored by petitioner and respondent are shown as running to 3M IPC, in actuality the adjustments are to the income of the 3M consolidated group, which includes both 3M Company and 3M IPC.

[2]Explanation of respondent's position:

(1) Respondent's adjustment is stipulated to be equal to payments that would have been required of 3M Brazil if it had executed the standard licensing agreement.

(2) The rate of compensation under the standard licensing agreement is the appropriate arm's-length rate under sec. 482.

(3) Thus, respondent's adjustment (the 6% royalty and the R&D setoff) is based on arm's-length compensation. It does not account for Brazilian legal restrictions.

(4) Respondent's adjustment reflects no adjustment for trademark royalties, implying a judgment that no adjustment should be made to the $5,104,756 trademark royalty.

[3]Explanation of petitioner's position:

(1) 3M Brazil did not record any licensing agreements regarding patents and technology transfers and was therefore barred from making payments for use of patents and for technology transfers under Circular-Letter 2795.

(2) However, had 3M Brazil recorded licensing agreements regarding patents and technology transfers, then (A) it would have been able to pay 3M IPC royalties of up to 1% to 5%, resulting in total payments for use of patents and for technology transfers of $9,387,909 (B) but 3M Brazil would have not been permitted to pay trademark royalties.

(3) Petitioner and respondent have stipulated that $4,117,370 should be a setoff against the sec. 482 adjustment.

(4) Petitioner does not argue that an adjustment should be made because 3M Brazil overpaid its trademark royalty payment by calculating the payment using stacking.

Brazilian legal restrictions referred to in explanation 2(A) of petitioner's sec. 482 adjustment:

(1) Law No. 8383/1991, partly repealing Article 14 of Law No. 4131/1962, permits a Brazilian company to pay patent and trademark royalties to its controlling parent company to the extent such payments are deductible.

(2) Law No. 3470/1958 and Portaria No. 436/58 (as amended by Portaria Nos. 113/59, 314/70, and 60/94) sets maximum deductibility ceilings of 1% to 5% for patent royalties and technology-transfer payments and 1% for trademark royalties.

(3) BPTO imposes fixed ceilings on royalties payable by a Brazilian company to a controlling parent corporation under a patent or trademark license agreement that are equal to the maximum deductibility ceilings on patent or trademark royalties.

(4) BPTO, by unpublished interpretation of Law Nos. 4131/1962 and 8383/1991, applies the same fixed ceilings that apply to royalties under a patent or trademark license agreement to payments under an agreement between a Brazilian company and a controlling foreign company providing for technology transfer.

[4]Licensors are 3M Company and 3M Brazil.

[5]100% owned by 3M IPC.

19.  Other stipulations

In addition to the stipulations discussed so far, petitioner and respondent have stipulated that the rate of compensation provided under the standard services agreement (which was cost, if services were provided by 3M Company or 3M IPC; or cost plus 10%, if services were provided by a licensee of intellectual property owned by 3M Company or 3M IPC) is an appropriate arm's-length rate under section 482 for the provision of services by 3M Company to 3M Brazil during the 2006 tax year in this case.  As explained before, the notice of deficiency calculated the transfer-pricing adjustment for services performed for 3M Brazil based on the rate of compensation provided under the standard services agreement and petitioner does not challenge this adjustment.  See supra parts 10 & 11.

The parties have also stipulated that the operations of 3M Brazil were "owned or controlled" by 3M Company and 3M IPC within the meaning of section 482 during the 2006 tax year.

Some other stipulations are relevant to 26 C.F.R. sec. 1.482-1(h)(2) (2006), a portion of the 1994 final regulations.  These stipulations are discussed infra part II.OO.

OPINION

I.  Procedural matters

Petitioner and respondent submitted this case without trial under Rule 122.  The record in this case consists of the stipulation and the documents attached to the stipulation.  Our findings of fact are based on the stipulation and the documents attached to the stipulation.

As a general rule, the petitioner in a Tax Court case has the burden of proving that the determinations in the notice of deficiency are incorrect.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The identity of the petitioner in this case requires some explanation.

An affiliated group is a group of corporations that are connected through stock ownership with a common parent corporation.  Sec. 1504(a)(1).  An affiliated group does not include foreign corporations.  Sec. 1504(a)(1), (b)(3).  An affiliated group of corporations may file a

consolidated return with respect to income tax. Sec. 1501. An affiliated group that has filed a consolidated return for a year is referred to as a consolidated group. 26 C.F.R. sec. 1.1502-1(h), (a) (2019). A consolidated group has only one income tax liability for the year. Sec. 1503(a); 26 C.F.R. sec. 1.1502-2(a) (2019). Each member of a consolidated group is severally liable for the income tax. Sec. 1503(a); 26 C.F.R. sec. 1.1502-6(a) (2019). The income tax of a consolidated group is generally equal to the tax imposed by section 11 on consolidated taxable income. 26 C.F.R. sec. 1.1502-2(a) (2019). Consolidated taxable income is determined by taking into account (1) the separate taxable income of each member of the consolidated group and (2) certain items of income and deduction that are determined on a consolidated basis. 26 C.F.R. sec. 1.1502-11(a) (2019). Each member's separate taxable income is calculated as if the member were a separate corporation, with certain modifications. 26 C.F.R. sec. 1.1502-12 (2019); <u>Norwest Corp. & Subs. v. Commissioner</u>, 111 T.C. 105, 165 (1998).

As a general rule, the common parent corporation of a consolidated group is the representative of all members of the consolidated group with respect to the group's tax liability. 26 C.F.R. sec. 1.1502-77B(a)(1)(i) (2019). The notice of deficiency is mailed to the common parent corporation of a consolidated group, and that mailing is considered a mailing to each member of the consolidated group. 26 C.F.R. sec. 1.1502-77B(a)(2)(viii) (2019). The common parent corporation files petitions in the Tax Court; any such petition is considered to have been filed by each member of the consolidated group. 26 C.F.R. sec. 1.1502-77B(a)(2)(x) (2019). The common parent corporation conducts proceedings before the Tax Court on behalf of the members of the consolidated group. <u>Id.</u>

The common parent corporation of the 3M consolidated group is 3M Company. 3M Company was the company to which respondent mailed the notice of deficiency. 3M Company filed the petition on behalf of the members of the 3M consolidated group. <u>See</u> <u>id.</u> As stated at the beginning of this Opinion, we use "petitioner" to refer to 3M Company in discussing 3M Company in its role as the representative of the 3M consolidated group.

In a Tax Court case, it is the petitioner that bears the burden of proof unless an exception applies. Rule 142(a)(1). Petitioner in this case does not contend that any exception applies. Nor does the record indicate that any exception applies. Therefore petitioner has the burden

of proof. This conclusion is not altered by the case's having been submitted under Rule 122. See Rule 122(b).

In the case of a corporation seeking redetermination of a tax liability, the venue for appeal is generally the U.S. Court of Appeals for the circuit in which is located the corporation's principal place of business or principal office or agency. Sec. 7482(b)(1)(B). However, the parties to the appeal may stipulate that venue is another circuit. Sec. 7482(a), (b)(2). This case involves a corporation (3M Company) seeking a redetermination of tax liability (the tax liability of the 3M consolidated group). See 26 C.F.R. sec. 1.1502-77B(a)(1)(i), (2)(x) (2019). It is stipulated that 3M Company's principal place of business was in Minnesota when the petition was filed. Therefore the venue for appeal in this case will be the U.S. Court of Appeals for the Eighth Circuit unless the parties stipulate another circuit. See sec. 7482(a), (b)(1)(B), (2); 28 U.S.C. sec. 41 (2018).

Rule 146 provides, in part: "The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or otherwise admissible. The Court's determination shall be treated as a ruling on a question of law." Our determinations regarding Brazilian law are based on the stipulation.

II.    Review of the authorities under U.S. law relevant to the arguments by the parties

In support of its argument that respondent's section 482 allocation is improper because it ascribes income to 3M Company and 3M IPC that could not be paid to these companies by 3M Brazil under Brazilian law, petitioner relies on various authorities. These authorities include (1) the text of section 482; (2) the legislative history of section 482; and (3) four cases, that, interpreting prior versions of section 482 and the regulations thereunder, held that respondent did not have authority to allocate income to a taxpayer that the taxpayer did not receive and could not legally receive. These are the four cases:

- L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. 940 (1952)

- Commissioner v. First Sec. Bank of Utah, N.A, 405 U.S. 394 (1972)

- <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. 323 (1990), <u>aff'd</u>, 961 F.2d 1255 (6th Cir. 1992).

- <u>Exxon Corp. & Affiliated Cos. v. Commissioner</u>, T.C. Memo. 1993-616, 66 T.C.M. (CCH) 1707 (1993), <u>aff'd sub nom.</u> <u>Texaco, Inc., & Subs. v. Commissioner</u>, 98 F.3d 825 (5th Cir. 1996).

In petitioner's view, "these precedents control the outcome here." Respondent disagrees with this. He contends that the judicial opinions did not determine the statutory text to be clear, that the reasoning of the opinions was influenced by regulatory text that was not applicable for tax years beginning after April 21, 1993, and that the operative statutory text was changed in 1986.[38]

---

[38] The regulations related to sec. 482 contained two sentences, which, before they were eliminated as to tax years beginning after Apr. 21, 1993, were as follows:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer.
> * * *

26 C.F.R. sec. 1.482-1A(b)(1) (2019) (applicable for tax years beginning on or before Apr. 21, 1993).

The two sentences had appeared in 1962 regulations related to sec. 482 of the Internal Revenue Code of 1954. T.D. 6595, 27 Fed. Reg. 3595, 3598 (Apr. 14, 1962); 26 C.F.R. sec. 1.482-1(b)(1) (1968). In 1968, when the regulations were substantially revised, these two sentences were unaffected. T.D. 6952, 33 Fed. Reg. 5848-5857 (Apr. 16, 1968); 26 C.F.R. sec. 1.482-1(b)(1) (1969). In 1993, the regulations containing the two sentences were redesignated and limited to tax years beginning on or before Apr. 21, 1993. T.D. 8470, 58 Fed. Reg. 5271 (Jan. 21, 1993). As redesignated and limited, the two sentences continue to appear in the annual codifications of federal regulations. 26 C.F.R. sec. 1.482-1A(b)(1) (2019) (applicable for tax years beginning on or before Apr. 21, 1993).

The two sentences also had a place in the regulations before 1962. Versions of the two sentences appeared in the comprehensive income tax regulations promulgated by the Treasury Department in 1934, 1936, 1939, 1940, 1943, and 1953:

Respondent argues that the legal principles that govern this dispute are found in the 1994 regulation that is applicable for the 2006 tax year at issue in this case. T.D. 8552, 59 Fed. Reg. 34971 (July 8, 1994); 26 C.F.R. sec. 1.482-1(h)(2) (2019) (setting forth rules regarding the effect of foreign legal restrictions). The 1994 regulation was published on July 8, 1994. T.D. 8552, 59 Fed. Reg. 35000-35001 (July 8, 1994). It is generally effective for tax years beginning after October 6, 1994. 26 C.F.R. sec. 1.482-1(j)(1) (2019). Petitioner contends that the 1994 regulation is invalid under various administrative-law principles and therefore does not control the outcome of this case.

The paragraph above is merely an overview of petitioner's and respondent's major arguments. A detailed discussion of their arguments takes place later in parts III, IV, and V of this Opinion. The parties' arguments implicate a century's worth of legal materials, such as

---

- The relevant portion of the 1934 regulations is art. 45-1(b), Regulations 86, Regulations 86 Relating to the Income Tax Under the Revenue Act of 1934, at 123 (Gov't Prtg. Off. 1935).

- The relevant portion of the 1936 regulations is art. 45-1(b), Regulations 94, Regulations 94 Relating to the Income Tax Under the Revenue Act of 1936, at 157 (Gov't Prtg. Off. 1936), 1 Fed. Reg. 1856 (Nov. 14, 1936); 26 C.F.R. sec. 3.45-1(b) (1939).

- The relevant portion of the 1939 regulations is art. 45-1(b), Regulations 101, Regulations 101 Relating to the Income Tax Under the Revenue Act of 1938, at 189-190 (Gov't Prtg. Off. 1939), 4 Fed. Reg. 680 (Feb. 10, 1939); 26 C.F.R. sec. 9.45-1 (1939 Supp.).

- The relevant portion of the 1940 regulations is sec. 19.45-1(b), Regulations 103, Regulations 103 Relating to the Income Tax Under the Internal Revenue Code 204 (Gov't Prtg. Off. 1940), 5 Fed. Reg. 417 (Feb. 1, 1940); 26 C.F.R. sec. 19.45-1 (1940 Supp.).

- The relevant portion of the 1943 regulations is sec. 29.45-1(b), Regulations 111, Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 276 (Gov't Prtg. Off. 1943); sec. 9.45-1, Regulations 111, 8 Fed. Reg. 14968 (Nov. 3, 1943); 26 C.F.R. sec. 29.45-1(b) (Cum. Supp. 1944). There was a minor amendment to this portion of the 1943 regulations in 1944. T.D. 5426, 10 Fed. Reg. 23, 24 (Jan. 2, 1945); 26 C.F.R. sec. 29.45-1, at 1905 (1944 Supp.); 26 C.F.R. sec. 29.45-1 (1949).

- The relevant portion of the 1953 regulations was sec. 39.45-1(b)(1), Regulations 118, Income Tax Regulations 118, Internal Revenue Code Part 39 of Title 26, Code of Federal Regulations 5886 (Gov't Prtg. Off. 1953), 18 Fed. Reg. 5886 (Sept. 26, 1953); 26 C.F.R. sec. 39.45-1(b)(1) (1953).

The history of the two sentences is discussed more extensively infra part II.

statutes, amendments to statutes, legislative history, regulations, public comments on regulations, preambles to regulations, and caselaw. In this part II, we discuss these materials chronologically. Using chronological order helps place the legal materials in their proper context.

A.    The Revenue Act of 1921

The central statutory provision involved in this case is section 482 of the Internal Revenue Code of 1986, as amended. As in effect for the tax year at issue, 2006, section 482 of the Internal Revenue Code of 1986 contains only these two sentences:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)[39]), the income with respect to such transfer or license shall be

---

[39] Sec. 936(h)(3)(B) provided:

The term "intangible property" means any--

(i)   patent, invention, formula, process, design, pattern, or know-how;

(ii)  copyright, literary, musical, or artistic composition;

(iii) trademark, trade name, or brand name;

(iv)  franchise, license, or contract;

(v)   method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or

(vi)  any similar item,

which has substantial value independent of the services of any individual.

commensurate with the income attributable to the intangible.

The first sentence quoted above had its statutory origins in section 240(d) of the Revenue Act of 1921, ch. 136, 42 Stat. at 260.[40] See G.D. Searle & Co. v. Commissioner, 88 T.C. 252, 356 (1987); Reuven S. Avi-Yonah, "The Rise and Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation", 15 Va. Tax Rev. 89, 95 (1995). Under section 240(d) of the Revenue Act of 1921, respondent had the power to consolidate the accounts of affiliated corporations and other related trades or businesses. Subsection (d) provided:

> [I]n any case of two or more related trades or businesses (whether unincorporated or incorporated and whether organized in the United States or not) owned or controlled directly or indirectly by the same interests, the Commissioner [of Internal Revenue] may consolidate the accounts of such related trades and businesses, in any proper case, for the purpose of making an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses.

Section 240(d) of the Revenue Act of 1921 was one of the Act's consolidated-return provisions, all of which were in section 240 of the Act. The Senate Finance Committee explained section 240(d) of the Revenue Act of 1921 as follows:

> A new subdivision is added to this section giving the Commissioner power to consolidate the accounts of related trades or businesses owned or controlled by the same interests, for the purpose only of making a correct distribution of gains, profits, income, deductions, or capital, among the related trades or businesses. This is necessary to prevent the arbitrary shifting of profits among related businesses * * *

---

[40] Revenue acts such as the Revenue Act of 1921 have been explained as follows: "There was no Internal Revenue Code before 1939. Instead each Congress reenacted revenue laws with whatever amendments were necessary." Gail Levin Richmond & Kevin M. Yamamoto, Federal Tax Research: Guide to Materials and Techniques 54 (10th ed. 2018).

S. Rept. No. 67-275, at 20 (1921), 1939-1 C.B. (Part 2) 181, 195. Petitioner cites this committee report in support of its arguments.  See infra part IV (discussing the significance of the committee report).

B.      The Revenue Act of 1924

After the Revenue Act of 1921, the next revenue act was the Revenue Act of 1924, ch. 234, 43 Stat. 253.  Section 240(d) of the Revenue Act of 1924, 43 Stat. at 288, was similar to section 240(d) of the Revenue Act of 1921; but whereas section 240(d) of the Revenue Act of 1921 had allowed only respondent to consolidate accounts, section 240(d) of the Revenue Act of 1924 allowed either respondent or the taxpayer to consolidate accounts.  It provided:

> In any case of two or more related trades or businesses (whether unincorporated or incorporated and whether organized in the United States or not) owned or controlled directly or indirectly by the same interests, the Commissioner may and at the request of the taxpayer shall, if necessary in order to make an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses, consolidate the accounts of such related trades or businesses.

Section 240(d) of the Revenue Act of 1924 was part of the consolidated-return provisions of the Act.  These provisions were in section 240 of the Act.

C.      The Revenue Act of 1926

The next revenue act was the Revenue Act of 1926, ch. 27, 44 Stat. 9.  Section 240(f) of the Revenue Act of 1926, 44 Stat. at 46, was the same as section 240(d) of the Revenue Act of 1924.  See G.D. Searle & Co. v. Commissioner, 88 T.C. at 356.  Section 240(f) of the Revenue Act of 1926 was part of the consolidated-return provisions of the Act.  These provisions were in section 240 of the Act, 44 Stat. at 46.  Section 240(a) of the Revenue Act of 1926, 44 Stat. at 46, permitted affiliated corporations to file consolidated returns.

D.    The Revenue Act of 1928

The next revenue act was the Revenue Act of 1928, ch. 852, 45 Stat. 791.  The text of section 240(f) of the Revenue Act of 1926, with significant alterations, was placed into section 45 of the Revenue Act of 1928, 45 Stat. at 806.  The other consolidated-return provisions of the Revenue Act of 1926 were placed into sections 141 and 142 of the Revenue Act of 1928, 54 Stat. at 831-832.  See G.D. Searle & Co. v. Commissioner, 88 T.C. at 356.[41]   Section 45 of the Revenue Act of 1928 provided:

---

[41] The complicated history of the Revenue Act of 1928 led some to think that it did not reenact the other consolidated-return provisions of the Revenue Act of 1926. For example, the U.S. Court of Appeals for the Third Circuit stated: "The Revenue Act of 1928 entirely eliminated the right of affiliated corporations to file consolidated returns and the provisions of Section 240 of the 1926 Act accordingly do not appear in the 1928 Act."  Nat'l Sec. Corp. v. Commissioner, 137 F.2d 600, 602 (3d Cir. 1943), aff'g 46 B.T.A. 562 (1942).  And the U.S. Court of Appeals for the Second Circuit stated: "The Revenue Act of 1928 eliminated the right of affiliated corporations to file consolidated returns".  B. Forman Co. v. Commissioner, 453 F.2d 1144, 1150 (2d Cir. 1972), aff'g in part, rev'g in part 54 T.C. 912 (1970).  These statements are incorrect. The history of the Revenue Act of 1928 began with a bill that was introduced in the House and then referred to the House Ways & Means Committee.  H.R. 1, 70th Cong. (Dec. 6, 1927) (the bill introduced in the House and referred to the Ways & Means Committee).  This bill was passed by the House, and an identical bill was then introduced in the Senate.  H.R. 1, 70th Cong. (Dec. 17, 1927) (the identical bill that was introduced in the Senate).  The House bill (and the identical bill introduced in the Senate) eliminated the consolidated-return provisions, except for the text of sec. 240(f) of the Revenue Act of 1926, which would have been reenacted had the bill been enacted as written.  H.R. 1, 70th Cong., secs. 45, 141, 142 (Dec. 6, 1927) (the bill introduced in the House and referred to the Ways & Means Committee); H.R. 1, 70th Cong., secs. 45, 141, 142 (Dec. 17, 1927) (the identical bill that was introduced in the Senate); see Jasper L. Cummings, Jr., "Consolidating Foreign Affiliates", 11 Fla. Tax Rev. 143, 188 (2011) ("[T]he House bill for the 1928 Revenue Act proposed to eliminate consolidated returns".).    Committee reports observed that the House bill eliminated the consolidated-return provisions except for the text of section 240(f) of the Revenue Act of 1926.  H.R. Rept. No. 70-2, at 20 (Dec. 7, 1927), 1939-1 C.B. (Part 2) 384, 397 ("The consolidated return is abolished in the bill for the taxable year 1929 and following taxable years, and thereafter affiliated corporations are required to file separate returns."); S. Rept. No. 70-960, at 29 (May 1, 1928), 1939-1 C.B. (Part 2) 409, 429 ("The House bill abolished the right to file consolidated returns for years after 1928."); H.R. Conf. Rept. No. 70-1882, at 16 (May 25, 1928), 1939-1 C.B. (Part 2) 444, 448 ("The House bill made no provision for the filing by affiliated corporations of a consolidated return after the taxable year 1928.").  However, the Senate approved an amendment that preserved the consolidated-return provisions.  See H.R. Conf. Rept. No. 70-1882, at 16 (May 25, 1928), 1939-1 C.B. (Part 2) 444, 448 ("The Senate amendment permits the filing of a consolidated return by an affiliated group * * *."); Cummings, supra, 188 ("The Senate rejected the elimination of consolidated returns".).  It was this Senate

In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

There were two differences between section 45 of the Revenue Act of 1928 and section 240(f) of the Revenue Act of 1926. First, a taxpayer did not have the power to invoke section 45 of the Revenue Act of 1928. See G.D. Searle & Co. v. Commissioner, 88 T.C. at 356. Only respondent could invoke the provision. Second, respondent did not have the express authority to "consolidate" accounts under section 45 of the Revenue Act of 1928. Instead, that provision gave respondent the power to distribute, apportion, and allocate gross income or deductions.

The House Ways & Means Committee in its report explained that the purpose of section 45 of the Revenue Act of 1928 was to allow respondent "in the case of two or more trades or businesses owned or controlled by the same interests" to make allocations "in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'), and in order clearly to reflect their true tax liability." H.R. Rept. No. 70-2, at 16-17 (1927), 1939-1 C.B. (Part 2) 384, 395. The Senate Finance Committee made a similar statement in its own report leading up to section 45 of the Revenue Act of 1928. S. Rept. No. 70-960, at 24 (1928), 1939-1 C.B. (Part 2) 409, 426. Petitioner cites the reports of both committees. See infra part IV.

E.    The Revenue Act of 1932

The Revenue Act of 1932, ch. 209, 47 Stat. 169, was the next revenue act after the Revenue Act of 1928. Section 45 of the Revenue Act of 1932 was the same as section 45 of the Revenue Act of 1928. Revenue Act of 1932, sec. 45, 47 Stat. at 186.

_____

amendment that made it into the Revenue Act of 1928 and became the law. Revenue Act of 1928, secs. 141 and 142, 54 Stat. at 831-832. Thus, the Revenue Act of 1928 did not eliminate the right of affiliated corporations to file consolidated returns.

F.    The Revenue Act of 1934

The Revenue Act of 1934, ch. 277, 48 Stat. 680, was the next revenue act after the Revenue Act of 1932.  Section 45 of the Revenue Act of 1934 was the same as section 45 of the Revenue Act of 1932, except that the words "trades or businesses" in the 1932 act were replaced with "organizations, trades, or businesses" in the 1934 act.  Revenue Act of 1934, sec. 45, 48 Stat. at 695.  Below is the text of section 45 of the Revenue Act of 1934:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.[42]

G.    Regulations 86

In 1934, the Treasury Department promulgated art. 45-1, Regulations 86, which related to section 45 of the Revenue Act of 1934.  Regulations 86 Relating to the Income Tax Under the Revenue Act of 1934, at 122-124 (Gov't Prtg. Off. 1935).[43]  Reproduced below is art. 45-1, Regulations 86 (emphasis added):

---

[42] The income-tax provisions of the Revenue Act of 1934, including section 45 of that Act, were applicable for tax years beginning on or after Jan. 1, 1934.  Revenue Act of 1934, sec. 1, 48 Stat. at 683.

[43] In the days before the Federal Register and the Code of Federal Regulations, the Treasury Department published its regulations in consecutively numbered pamphlets.  Henry Campbell Black, A Treatise on the Law of Income Taxation Under Federal and State Laws sec. 71 (2d ed. 1915) (available at heinonline.org); Richmond & Yamamoto, supra, 148.  One of these numbered pamphlets was Regulations 86 Relating to the Income Tax Under the Revenue Act of 1934.  This publication bears a publication date of 1935. The last sentence of the regulations reads: "In pursuance of the Act the foregoing regulations are hereby prescribed."  Underneath that sentence is the name and title of the Commissioner of Internal Revenue.  Underneath this are the words "Approved February 11, 1935" and the name and title of the Secretary of the Treasury.  Although the year of publication (1935) and the date "Approved" (Feb. 11,

Art. 45-1.  Determination of the taxable net income of a controlled taxpayer.--

(a) <u>Definitions</u>.--When used in this article--

(1)  The term "<u>organization</u>" includes any organization of any kind, whether it be a sole proprietorship, a partnership, a trust, an estate, or a corporation (as each is defined or understood in the Act or these regulations), irrespective of the place where organized, where operated, or where its trade or business is conducted, and regardless of whether domestic or foreign, whether exempt, whether affiliated, or whether a party to a consolidated return.

(2)  The terms "<u>trade</u>" or "<u>business</u>" include any trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place where carried on.

(3)  The term "<u>controlled</u>" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form nor the mode of its exercise.  A presumption of control arises if income or deductions have been arbitrarily shifted.

(4)  The term "<u>controlled taxpayer</u>" means any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests.

---

1935) would seem to indicate that Regulations 86 was promulgated in 1935, there is authority it was promulgated in 1934.  <u>Commissioner v. First Sec. Bank of Utah, N.A</u>, 405 U.S. 394, 400 n.10 (1972) ("[The] regulations * * * were issued in 1934."); <u>R.C. Reynolds, Inc. v. Commissioner</u>, 44 B.T.A. 356, 364 (1941) ("Respondent's Regulations 86 were approved on September 6, 1934."); Thomas E. Jenks, "Treasury Regulations Under Section 482", 23 Tax Lawyer 279, 279 (1970) ("The * * * regulations were issued in 1934".).

(5) "Group" or "group of controlled taxpayers" means the organizations, trades, or businesses owned or controlled by the same interests.

(6) The term "true net income" means, in the case of a controlled taxpayer, the net income (or, as the case may be, any item or element affecting net income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deduction, or the item or element of either, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, choose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto).

(b) Scope and purpose.--The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income or deductions, or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Section 45 and this article apply to the case of any controlled taxpayer, whether such taxpayer makes a separate or a consolidated return. If a controlled taxpayer makes a separate return, the determination is of its true separate net income. If a controlled taxpayer is a party to a consolidated return, the true consolidated net income of the affiliated group and the true separate net income of the controlled taxpayer are determined consistently with the principles of a consolidated return.

Section 45 grants no right to a controlled taxpayer to apply its provisions at will, nor does it grant any right to compel the Commissioner to apply such provisions. It is not intended (except in the case of the computation of consolidated net income under a consolidated return) to effect in any case such a distribution, apportionment or allocation of gross income, deductions, or any item of either, as would produce a result equivalent to a computation of consolidated net income under section 141.[44]

(c) <u>Application</u>.--Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true net income of a controlled taxpayer, the Commissioner is not restricted to the case of improper accounting, to the case of a fraudulent, colorable or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income or deductions. The authority to determine true net income extends to any case in which either by inadvertence or design the taxable net income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

<u>Regulations 86 Relating to the Income Tax Under the Revenue Act of 1934</u>, at 122-124 (Gov't Prtg. Off. 1935). We have added emphasis to the sentence that contains the phrase "complete power". Petitioner argues

---

44 Section 141 of the Revenue Act of 1934, 48 Stat. at 720-722, related to the filing of a consolidated return by an affiliated group of corporations.

that this crucial sentence was not in the version of the regulation that was in effect for the tax years at issue in <u>L.E. Shunk Latex Products, Inc. v. Commissioner</u>, 18 T.C. at 955, i.e., calendar years 1942, 1943, and 1945.  Petitioner argues that therefore the decision in <u>L.E. Shunk Latex</u> did not depend on the sentence.[45]  Because of petitioner's argument, our review of legal authorities will include the various versions in the regulations that contain this sentence.  The sentence containing the phrase "complete power" is related to the sentence that follows it.  Thus, we will include this sentence too in our review of legal authorities.

       H.     <u>The Federal Register Act and the publication of the first issue of the Federal Register</u>

In 1935 Congress enacted the Federal Register Act, ch. 417, 49 Stat. 500 (1935).  Section 5 of the Federal Register Act, 49 Stat. at 501,[46] defined four classes of documents that had to be published in the Federal Register: (1) "all Presidential proclamations and Executive orders, except such as have no general applicability and legal effect or are effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof"; (2) "such documents or classes of documents as the President shall determine from time to time have general applicability and legal effect"; (3) "such documents or classes of documents as may be required so to be published by Act of the Congress"; and (4) "such other documents or classes of documents as may be authorized to be published pursuant hereto by regulations prescribed hereunder with the approval of the President".  For these purposes, a "document" was defined as "any Presidential proclamation or Executive order and any order, regulation, rule, certificate, code of fair competition, license, notice, or similar instrument issued, prescribed, or promulgated by a Federal agency".  Federal Register Act sec. 4, 49 Stat. at 501.[47]

The Federal Register Act imposed a series of requirements that had to be followed regarding any document in the four classes of documents.  Section 2 of the Federal Register Act, 49 Stat. at 500,[48] provided that each document had to be filed with the Federal Register

---

[45] The portion of petitioner's brief containing this argument is excerpted <u>infra</u> part IV.

[46] Codified as amended at 44 U.S.C. sec. 1505(a) and (b) (2012).

[47] Codified as amended at 44 U.S.C. sec. 1501 (2012).

[48] Codified as amended at 44 U.S.C. sec. 1503 (Supp. IV 2017).

Division by the relevant agency;[49] that after filing, a copy of each document had to be made immediately available for public inspection at the Federal Register Division; and that once filed with the Federal Register Division each document had to be immediately transmitted by the Federal Register Division to the Government Printing Office. Section 3 of the Federal Register Act, 49 Stat. at 500-501,[50] required that when the Government Printing Office received each document, it was to print it "forthwith" in the Federal Register.

Section 7 of the Federal Register Act, 49 Stat. at 502,[51] set forth the legal consequences of satisfying the requirements of the Federal Register Act, including the filing requirement (in section 2 of the Act), the public-inspection requirement (also in section 2 of the Act), and the publication requirement (in section 3 of the Act). First, section 7 of the Federal Register Act provided that a document in the first, second, and third classes of documents is not valid against someone without actual knowledge of the document until the agency files the document with the Federal Register Division and a copy of the document is made available for public inspection.[52] Second, section 7 of the Federal Register Act provided that the filing of a document with the Federal Register Division

---

[49] The Division of the Federal Register was not referred to by name in the Federal Register Act, which referred only to a "division established * * * in the National Archives Establishment". Federal Register Act sec. 1, 49 Stat. at 500. A 1936 law referred to the Division of the Federal Register by its exact name. Act of Feb. 11, 1936, ch. 49, 49 Stat. at 1110. In 1968, the Division of the Federal Register was renamed the Office of the Federal Register. Act of Oct. 22, 1968, Pub. L. No. 90-620, sec. 1502, 82 Stat. at 1273-1274 (1968) (enacting 44 U.S.C. sec. 1502 (1982)). The National Archives Establishment was created in 1934. Act of June 19, 1934, ch. 668, secs. 2-3, 48 Stat. at 1122 (codified as amended at 44 U.S.C. secs. 300(a), 300(c) (1946)). In 1949, it became part of the General Services Administration and was renamed the National Archives and Records Service. Federal Property and Administrative Services Act of 1949, ch. 288, sec. 104(a), 63 Stat. at 381 (codified as amended at 44 U.S.C. sec. 391(a) (1964)); Fed. Reg. Div. et al., United States Government Organization Manual 1950-51, at 355-356. In 1984, the National Archives and Record Service was transferred to the National Archives and Records Administration, which was established as an independent agency in the executive branch. National Archives and Records Administration Act of 1984, Pub. L. No. 98-497, sec. 101, 98 Stat. at 2280 (codified as amended at 44 U.S.C. sec. 2102 (2018)); National Archives and Records Administration Act of 1984, sec. 103(a), 98 Stat. at 2283.

[50] Codified as amended at 44 U.S.C. sec. 1504 (Supp. IV 2017).

[51] Codified as amended at 44 U.S.C. sec. 1507 (2012).

[52] This provision has been described as "requiring filing as a condition precedent to validity". James H. Ronald, "Publication of Federal Administrative Legislation", 7 Geo. Wash. L. Rev. 52, 75 (1938).

is generally "sufficient" to give notice of its contents to any person subject to it or affected by it. Third, section 7 of the Federal Register Act provided that the publication in the Federal Register of a document creates the following rebuttable presumptions: (1) the document was duly issued, prescribed, or promulgated; (2) the document was filed with the Federal Register Division and was made available for public inspection; (3) the copy of the document contained in the Federal Register is the true copy of the document; and (4) all the other requirements of the Federal Register Act have been complied with.

Section 10 of the Federal Register Act, 49 Stat. at 503,[53] contained provisions regarding the effective dates for the requirements of the Federal Register Act discussed so far, including a provision that section 2 of the Federal Register Act (which contained the filing requirement, the public-inspection requirement, and the transmission-for-publication requirement) was effective 60 days after the approval of the Act, and including a provision that publication of the Federal Register would begin three days after approval of the Act. Section 10 of the Federal Register Act stated in full:

> The provisions of section 2 shall become effective sixty days after the date of approval of this Act[54] and the publication of the Federal Register shall begin within three business days thereafter: <u>Provided</u>, That the appropriations involved have been increased as required by section 9 of this Act. The limitations upon the effectiveness of documents required, under section 5(a),[55] to be published in the Federal Register shall not be operative as to any document issued, prescribed, or promulgated prior to the date when such document is first required by this or

---

[53] Codified with changes at 44 U.S.C. sec. 310 (1940).

[54] By "the date of approval of this Act", the Federal Register Act referred to the date the President had signed the Act. <u>See</u> U.S. Const. art. I, sec. 7, cl. 2 ("Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it".); <u>see also</u> <u>Edwards v. United States</u>, 286 U.S. 482, 492-494 (1932) (equating the approval of an act with the President's signature in holding that a bill became a law upon its approval by the President, regardless of Congress's adjournment).

[55] The reference to documents required under sec. 5(a) to be published in the Federal Register was to the first, second, and third classes of documents that we discussed earlier.

subsequent Act of the Congress or by Executive order to be published in the Federal Register.

The Federal Register Act was "[a]pproved" on July 26, 1935. 49 Stat. at 503. Thus, under section 10 of the Federal Register Act, section 2 was to become effective on September 24, 1935, and the publication of the Federal Register was to begin September 27, 1935. Actual publication was delayed, however, because of the lack of appropriated money. James H. Ronald, "Publication of Federal Administrative Legislation", 7 Geo. Wash. L. Rev. 52, 75 (1938).

The Federal Register Act also required each agency to make a compilation of "all documents which have been issued or promulgated prior to the date documents are required or authorized by this Act to be published in the Federal Register [September 24, 1935] and which are still in force and effect and relied upon by the agency as authority for, or invoked or used by it in the discharge of, any of its functions or activities." Federal Register Act sec. 11, 49 Stat. at 503.[56] The deadline for the agencies to compile the documents was January 26, 1936. Id. The compilation was required to be published, but no specific deadline was set for publication. Id. Because of legislative developments described later, no compilation was made or published. Bernard Kennedy, "The Code of Federal Regulations and the United States Statutes at Large", 44 Law Libr. J. 1, 1 (1951).

On February 11, 1936, Congress enacted a law that appropriated money "[f]or the printing and distribution of the Federal Register". Act of Feb. 11, 1936, ch. 49, 49 Stat. at 1110 (codified as amended at 44 U.S.C. sec. 309 (1940)). The law provided that "the provisions of section 2 of the Federal Register Act shall become effective thirty days after said appropriations become available and the publication of the Federal Register shall begin within two business days thereafter." Id.

On March 14, 1936, the first issue of the Federal Register was published. 1 Fed. Reg. 1; see Ronald, supra, at 69.

---

[56] This provision has been described as requiring "a compilation of all documents issued before the start of publication of the Federal Register and which were still in force and effect." Ronald, supra, at 78.

I.      <u>The Revenue Act of 1936</u>

The Revenue Act of 1936, ch. 690, 49 Stat. 1648, was the next revenue act after the Revenue Act of 1934.  Section 45 of the Revenue Act of 1936 incorporated the text of section 45 of the Revenue Act of 1934 without change.  Revenue Act of 1936, ch. 690, sec. 45, 49 Stat. at 1667-1668.[57]

J.      <u>Regulations 94</u>

In late 1936, the Treasury Department promulgated art. 45-1, Regulations 94, <u>Regulations 94 Relating to the Income Tax Under the Revenue Act of 1936</u>, at 156-158 (Gov't Prtg. Off. 1936), which related to section 45 of the Revenue Act of 1936.[58]  Article 45-1, Regulations 94, was identical to its 1934 predecessor, art. 45-1, Regulations 86.  Regulations 94 was filed on November 13, 1936.  1 Fed. Reg. 1863.  Article 45-1, Regulations 94, was published verbatim in the Federal Register--meaning that the text published in the Federal Register was identical to the text published in the pamphlet <u>Regulations 94 Relating to the Income Tax Under the Revenue Act of 1936</u>.  <u>Compare</u> <u>id.</u> <u>with</u> 1 Fed. Reg. 1855-1856 (Nov. 14, 1936).

K.      <u>The 1937 amendment to the Federal Register Act</u>

In 1937, Congress amended the provisions of the Federal Register Act that required the compilation of pre-September 24, 1935 documents.  Act of June 19, 1937, ch. 369, 50 Stat. 304.  The reason for the amendment was the realization that "mere compilations of documents were almost unusable because of their bulk and lack of uniformity."  Titles 1-6 C.F.R. v (1939).  The 1937 amendment replaced the requirement that the pre-September 24, 1935 documents be compiled.  Act of June 19, 1937, 50 Stat. 304; Title 1-6 C.F.R. v (1939).  Instead, the 1937 amendment required each agency to prepare a complete codification of documents that were in effect on June 1, 1938:

> On July 1, 1938, and on the same date of every fifth year thereafter, each agency of the Government shall have prepared and shall file with the Administrative Committee a complete codification of all documents which, in the

---

[57] The income-tax provisions of the Revenue Act of 1936 were applicable for tax years beginning on or after Jan. 1, 1936.  Revenue Act of 1936, sec. 1, 49 Stat. at 1652.

[58] Regulations 94 did not have a provision regarding its effective date.

opinion of the agency, have general applicability and legal effect and which have been issued or promulgated by such agency and are in force and effect and relied upon by the agency as authority for, or invoked or used by it in the discharge of, any of its functions or activities on June 1, 1938. * * *

Federal Register Act sec. 11(a), as amended by Act of June 19, 1937, 50 Stat. at 304-305, 44 U.S.C. sec. 311(a) (1940). The 1937 amendment authorized the President to direct the publication of the codification.[59] No deadline was set for publishing the codification, but the deadline for making the codification was July 1, 1938. Id. The codification of documents was to be done again every five years after July 1, 1938. Id. Under the literal text of the 1937 amendment (which is quoted above), the subsequent codifications to be made every five years after July 1, 1938, were to be of the same documents required to be codified by July 1, 1938. Id. Thus, the 1937 amendment required that essentially the same documents be codified and republished every five years until the end of time. This was a drafting error. See Ronald, supra, at 79 n.110 ("The drafters forgot the five-year clause in setting the date of determining general applicability and legal effect.").

On November 10, 1937, the President authorized the publication of the codification of documents pursuant to the Federal Register Act as amended in 1937. Titles 1-6 C.F.R. vi (1939).

### L.    The first edition of the Code of Federal Regulations

In 1939, the first edition of the Code of Federal Regulations was published, which contained documents in force on June 1, 1938. Titles 1-6 C.F.R. iii (1939).[60] Regulations 94 was apparently assumed to be in

---

[59] The 1937 amendment provided: "[T]he President * * * may authorize and direct the publication of such codification in special or supplemental editions of the Federal Register." Federal Register Act sec. 11(a), as amended by Act of June 19, 1937, 50 Stat. at 304-305, 44 U.S.C. sec. 311(a) (1940).

[60] As explained in the preface to the first edition of the Code of Federal Regulations, the Code of Federal Regulations was "divided into 50 titles analogous to the titles of the United States Code." Titles 1-6 C.F.R. iii (1939). Title 26 of the Code of Federal Regulations was "Internal Revenue". Titles 1-6 C.F.R. iii (1939). Title 26 of the Code of Federal Regulations was analogous to title 26 of the United States Code, which was the codified version of the various revenue acts. See titles 1-6 C.F.R. iii (1939) (stating that titles of the C.F.R. are analogous to titles of the U.S.C.); 26 U.S.C. sec. 10 note (1940) (History of the Internal Revenue Code) ("In June 1926 Congress

force on June 1, 1938,[61] for it was published in the first edition of the Code of Federal Regulations (1939). As printed in that publication, article 45-1 of Regulations 94 was renamed "section 3.45-1". 26 C.F.R. sec. 3.45-1 (1939).[62] The renaming required nonsubstantive changes to be made to the text of article 45-1 when it was published in the first edition of the Code of Federal Regulations as section 3.45-1.

The preface to the first edition of the Code of Federal Regulations observed that the edition included only documents in force on June 1, 1938. Titles 1-6 C.F.R. ix (1939). The preface stated that regulations that related to later periods would be covered by periodic supplements to the Code of Federal Regulations and that the first such supplement would be a 1938 Supplement that would cover the last half of 1938.[63]

---

passed the 'Code of the Laws of the United States' which was the first general codification of Federal statutes since the Revised Statutes. It was revised in 1934 and again in 1940. The compilers of the United States Code acting under the supervision of the Revision of Laws Committee of the House of Representatives, incorporated all internal revenue laws of a general and permanent nature in Title 26, Internal Revenue.").

[61] This seems to be a valid assumption. Although Regulations 94 did not have an effective-date provision, it was published in the Federal Register in 1936 and it was related to the income-tax provisions of the Revenue Act of 1936. 1 Fed. Reg. 1802 (Nov. 14, 1936). These provisions were applicable for tax years beginning on or after Jan. 1, 1936. Revenue Act of 1936, sec. 1, 49 Stat. at 1652.

[62] Other articles in Regulations 94 were similarly renamed. See 26 C.F.R. sec. 3.1-1 (1939).

[63] According to the preface to the first edition of the Code of Federal Regulations:

Supplements

The 1938 Supplement to the Code covers the period beginning June 2 and ending December 31, 1938. Each succeeding supplement will cover the period of one calendar year. Since the rules and regulations contained in the Code of Federal Regulations were codified as of June 1, 1938, it follows that this edition should be used in conjunction with the annual supplements, and in conjunction with the daily issues of the FEDERAL REGISTER.

Titles 1-6 C.F.R. ix (1939); see also infra next note (discussing the publication of the 1938 and 1939 Supplements to the first edition of the Code of Federal Regulations).

M.     The Revenue Act of 1938

Section 45 of the Revenue Act of 1938 incorporated the text of section 45 of the Revenue Act of 1936 without change.  Revenue Act of 1938, ch. 289, sec. 45, 52 Stat. at 474.

N.     Regulations 101

In 1939, the Treasury Department promulgated art. 45-1, Regulations 101, Regulations 101 Relating to the Income Tax Under the Revenue Act of 1938, at 188-190 (Gov't Prtg. Off. 1939), which related to section 45 of the Revenue Act of 1938.  Article 45-1, Regulations 101, was identical to art. 45-1, Regulations 94.  Regulations 101 was filed on February 7, 1939.  4 Fed. Reg. 687 (Feb. 10, 1939).  Article 45-1, Regulations 101, was published verbatim in the Federal Register, 4 Fed. Reg. 616, 680, meaning that the text of article 45-1 published in the Federal Register was identical to the text of article 45-1 published in the pamphlet Regulations 101 Relating to the Income Tax Under the Revenue Act of 1938.  Compare id. with 4 Fed. Reg. 616, 680.  In addition to being published in the Federal Register, Regulations 101 was published in the 1939 Supplement to the Code of Federal Regulations.[64] As printed in that supplement, art. 45-1, Regulations 101 was redesignated "§ 9.45-1."  26 C.F.R. sec. 9.45-1 (1939 Supp.).  As printed in the supplement, each "article" of Regulations 101 was redesignated a "section", and the number of each section was given the prefix "9."  See 26 C.F.R. sec. 9.1-1 (1939 Supp.).  As a consequence of the redesignation of art. 45-1, Regulations 101, nonsubstantive changes had to be made to its text when it was published in the 1939 Supplement to the Code of Federal Regulations as 26 C.F.R. sec. 9.45-1 (1939 Supp.).

O.     Internal Revenue Code of 1939

In 1939, Congress codified the tax laws as the Internal Revenue Code of 1939.  Section 45 of the Internal Revenue Code of 1939 was identical to section 45 of the Revenue Act of 1938.  Internal Revenue Code of 1939, ch. 2, sec. 45, 53 Stat. at 25.  Section 45 was among the provisions of the Internal Revenue Code of 1939 that applied for tax years beginning on or after January 1, 1939.  Id. sec. 1, 53 Stat. at 4.

---

[64] The first edition of the Code of Federal Regulations contained regulations in force on June 1, 1938.  Titles 1-6 C.F.R. iii (1939).  A 1938 Supplement contained regulations filed from June 2 to Dec. 31, 1938, except for regulations having effective dates before June 2, 1938.  C.F.R. iii (1938 Supp.).  The 1939 Supplement contained regulations filed during calendar year 1939.  Titles 1-25 C.F.R. iii (1939 Supp.).

Thus, for calendar-year taxpayers, the first year for which section 45 of the Internal Revenue Code of 1939 applied was the 1939 tax year.

Provisions of the Internal Revenue Code of 1939 authorized the Treasury Department to prescribe regulations.[65] One such provision, section 62, provided: "The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this chapter [sections 1 to 373, the income-tax provisions of the Internal Revenue Code of 1939]."

The Internal Revenue Code of 1939 also contained provisions relating to the effective dates of regulations.[66] One such provision was section 3791(b). It provided: "The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect."

P.    Regulations 103

In 1940, the Treasury Department promulgated sec. 19.45-1, Regulations 103, Regulations 103 Relating to the Income Tax under the Internal Revenue Code 203-205 (Gov't Prtg. Off. 1940), 26 C.F.R. sec. 19.45-1 (1940 Supp.), 5 Fed. Reg. 417 (Feb. 1, 1940), which related to section 45 of the Internal Revenue Code of 1939. Section 19.45-1, Regulations 103, was substantively identical to art. 45-1, Regulations 101.[67] Regulations 103 did not have an express effective-date provision. Regulations 103 was filed on January 30, 1940. 5 Fed. Reg. 424. Regulations 103 was published in the Federal Register and in the 1940 Supplement to the Code of Federal Regulations. 5 Fed. Reg. 348; 26 C.F.R. secs. 19.1-1 to 19.3801(e)-1 (1940 Supp.).[68]

---

[65] These types of authorizations had been in the tax statutes before the Internal Revenue Code of 1939. See, e.g., Revenue Act of 1934, sec. 62.

[66] These types of provisions had been extant in pre-1939 tax statutes. See, e.g., Revenue Act of 1934, sec. 506, 48 Stat. at 757, amending Revenue Act of 1926, sec. 1108(a).

[67] The only differences were in each provision's internal self-references. Section 19.45-1, Regulations 103 referred to itself as a "section" (because it was a section) and article 45-1, Regulations 101, referred to itself as an "article" (because it was an article).

[68] The 1940 Supplement to the Code of Federal Regulations contained regulations filed during 1940. Titles 1-20 C.F.R. iii (1940 Supp.).

Q.    The 1942 amendment to the Federal Register Act

In 1942, the Federal Register Act was amended again. Act of Dec. 10, 1942, ch. 717, 56 Stat. 1045. The 1942 amendment consisted of three changes, which we describe below.

First, the 1942 amendment to the Federal Register Act changed the requirement that each codification to be made every five years should correspond to documents effective as of June 1, 1938. See Federal Register Act sec. 11(a), as amended by Act of June 19, 1937, 50 Stat. at 304-305, 44 U.S.C. sec. 311(a) (1940) (before 1942 amendment).[69] The first codification had already been published as the first edition of the Code of Federal Regulations (1939). See titles 1-6 C.F.R. iii (1939). The next codification would have been required to be made on or before July 1, 1943. Federal Register Act sec. 11(a), as amended by Act of June 19, 1937, 50 Stat. at 304-305, 44 U.S.C. sec. 311(a) (1940) (before 1942 amendment). The 1942 amendment provided that, instead of documents effective June 1, 1938, the next codifications were to be of documents effective as of June 1 of the respective year in which the codification was made. Act of Dec. 10, 1942, sec. 2, 56 Stat. at 1045. Thus, under the 1942 amendment, the codification of documents to made be on or before July 1, 1938, and to also be made on or before the same date every five years thereafter, would consist of "all documents which, in the opinion of the agency, have general applicability and legal effect and which have been issued or promulgated by such agency and are in force and effect and relied upon by the agency as authority for, or invoked or used by it in the discharge of, any of its functions or activities on June 1, 1938, or on the same date of every fifth year thereafter." Act of Dec. 10, 1942, sec. 2, 44 U.S.C. sec. 311 (Supp. V 1946). This meant that the codification due July 1, 1943, would consist of documents effective on June 1, 1943.

The second change made by the 1942 amendment to the Federal Register Act was to temporarily suspend the requirement that documents be codified every five years. The reason for this suspension related to the American participation in World War II, which had resulted in a "notable increase in Federal administrative documents" and "the preoccupation of all agencies with the war effort". Titles 1-3 C.F.R. xvii (1949). These factors made it impractical to meet the July 1, 1943 deadline for the next codification. Id. The suspension of the

_____

[69] As explained before, this requirement was the result of a drafting error in the 1937 amendment to the Federal Register Act.

requirement that documents be codified every five years was only temporary. Act of Dec. 10, 1942, sec. 1, 56 Stat. at 1045. The suspension was to last until "such time after the termination of the present war as the Administrative Committee of the Federal Register shall determine." Id.

The third change made by the 1942 amendment to the Federal Register Act was to require that there be published, instead of a "new codification", a "cumulative supplement" to the Code of Federal Regulations. Id. The 1942 amendment did not set a specific deadline for publishing the cumulative supplement. As discussed below, the cumulative supplement to the Code of Federal Regulations was published in 1944.

R.    Regulations 111

In 1943, the Treasury Department promulgated Regulations 111. Regulations 111 Relating to the Income Tax Under the Internal Revenue Code (Gov't Prtg. Off. 1943). Like Regulations 103, Regulations 111 interpreted the provisions of the Internal Revenue Code of 1939. Sec. 29.1-1, Regulations 111, Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 1; sec. 19.1-1, Regulations 103, Regulations 103 Relating to the Income Tax Under the Internal Revenue Code 1. Regulations 111 was applicable "only with respect to taxable years beginning after December 31, 1941." Sec. 29.1-1, Regulations 111. Thus, 1942 was the first tax year governed by Regulations 111 for calendar-year taxpayers. Regulations 111 was filed on October 28, 1943. 8 Fed. Reg. 14379.[70]

Section 29.45-1 of Regulations 111, which related to section 45 of the Internal Revenue Code of 1939, was identical to section 19.45-1 of Regulations 103 except for a difference in prefixes. In Regulations 111 the section had the prefix "29." instead of the prefix "19." Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 275-277; Regulations 103 Relating to the Income Tax Under the Internal Revenue Code 203-205. The sentence containing the term "complete

_____

[70] The filing date of a regulation has been explained as follows: "Because they are not statutes, regulations are not enacted. Instead they are issued or promulgated by being filed with the Federal Register. The filing date generally precedes the publication date by a day or two." Richmond & Yamamoto, supra at 126. Respondent considers a Treasury regulation to be promulgated when the regulation is filed with the Federal Register Division. Rev. Rul. 56-517, 1956-2 C.B. 966.

power", and the sentence that followed, remained the same in section 29.45-1 of Regulations 111:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income or deductions, or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. * * *

Regulations 111 was published in three different ways. First, it was published in pamphlet form. Regulations 111 Relating to the Income Tax Under the Internal Revenue Code. Second, it was published in the Federal Register. 8 Fed. Reg. 14882 (Nov. 3, 1943). Third, it was published in the Cumulative Supplement to the Code of Federal Regulations. It was not published, as we explain later, in the 1943 Supplement to the Code of Federal Regulations. 26 C.F.R. secs. 29.1-1 to 29.3801(e)-1 (Cum. Supp. 1944).

We discuss in greater detail below each of these publications.

Regulations 111 in pamphlet form. In the pamphlet form, the number of each particular section of Regulations 111 was preceded by the prefix "29." Secs. 29.9-1 to 29.3801(e)-1, Regulations 111 Relating to the Income Tax Under the Internal Revenue Code. Thus, the introduction in the pamphlet observed that the number of each section of Regulations 111 is "preceded by the number 29 and a decimal point." Regulations 111 Relating to the Income Tax Under the Internal Revenue Code II.

Section 29.3-1 of Regulations 111, as published in pamphlet form, stated that Regulations 111 "constitute Part 29 of Title 26 of the 1943 Supplement to the Code of Federal Regulations". Sec. 29.3-1, Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 1. This statement that Regulations 111 would be published in the

1943 Supplement to the Code of Federal Regulations was incorrect. Regulations 111 was actually published in the Cumulative Supplement to the Code of Federal Regulations, not the 1943 Supplement to the Code of Federal Regulations. 26 C.F.R. secs. 29.1-1 to 29.3801(e)-1 (Cum. Supp. 1944).

Regulations 111 in the Federal Register. On November 3, 1943, Regulations 111 was published in the Federal Register. 8 Fed. Reg. 14882 (Nov. 3, 1943). The text of section 29.45-1 of Regulations 111 that was published in the Federal Register was the same text that was in the pamphlet Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 275-277, except that for some reason the prefix "9." was used in the Federal Register rather than the prefix "29." for that particular section of Regulations 111. 8 Fed. Reg. 14968). All other sections of Regulations 111 published in the Federal Register had the prefix "29." The Federal Register contained a table of contents for Regulations 111. 8 Fed. Reg. 14882-14888. For each section of Regulations 111, including section 9.45-1, the table of contents used the prefix "29." Id. This suggests that the use of the prefix "9." in the numbering of section 9.45-1 of Regulations 111 was inadvertent. The Federal Register contained the following introduction to Regulations 111 that stated that each section of Regulations 111 had the prefix "29.": "Inasmuch as the regulations constitute Part 29 of Title 26 of the Code of Federal Regulations, each key number is preceded by the number 29 and a decimal point." 8 Fed. Reg. 14882. This statement suggests that the use of the prefix "9." in the numbering of section 9.45-1 of Regulations 111 was inadvertent. Finally Regulations 111 was printed in the Federal Register with the following heading: "Part 29--Income Tax; Taxable Years Beginning After December 31, 1941". 8 Fed. Reg. 14882. The wording of this heading suggests that the use of the prefix "9." in the numbering of section 9.45-1 of Regulations 111 was inadvertent.

Section 29.3-1 of Regulations 111, as published in the Federal Register, stated that Regulations 111 "constitute Part 29 of Title 26 of the 1943 Supplement to the Code of Federal Regulations". 8 Fed. Reg. 14889. The same statement had been made in the pamphlet version of Regulations 111. Sec. 29.3-1, Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 1. As we observed in discussing the pamphlet version of Regulations 111, the statement was incorrect because Regulations 111 was actually published in the Cumulative Supplement to the Code of Federal Regulations rather than the 1943

Supplement to the Code of Federal Regulations. 26 C.F.R. secs. 29.1-1 to 29.3801(e)-1 (Cum. Supp. 1944).

Regulations 111 in the Cumulative Supplement to the Code of Federal Regulations. Regulations 111 was published in the Cumulative Supplement to the Code of Federal Regulations. The Cumulative Supplement to the Code of Federal Regulations, which was published in 1944, was the publication required by the 1942 amendment to the Federal Register Act. Act of Dec. 10, 1942.[71] The Cumulative Supplement to the Code of Federal Regulations contained two sets of documents:

- The first set of documents was "a codification of documents filed with the Division of the Federal Register during the period from June 2, 1938, to June 1, 1943, inclusive, which supplement the first edition of the Code of Federal Regulations and which were still in force and effect on June 1, 1943." Titles 26-27 C.F.R. iii (Cum. Supp. 1944). Regulations 111 did not fall into the first set of documents because it was filed on October 28, 1943. 8 Fed. Reg. 14979.

- The second set of documents was described in the following sentence in the Cumulative Supplement: "In order to complete the presentation of the regulations of the Bureau of Internal Revenue as of June 1, 1943, this codification contains documents filed with the Division subsequent to June 1, which were effective on that date." Titles 26-27 C.F.R. iii (Cum. Supp. 1944).[72] Regulations 111 apparently

---

[71] Titles 1-3 C.F.R. xvii (1949) explained:

Section 11 of the act [the Federal Register Act], as amended, was consequently further amended by the Act of December 10, 1942 (56 Stat. 1045; 44 U.S.C. 311a). This amendment provided that, instead of a new codification, there should be published a cumulative supplement prepared under the supervision of the Division of the Federal Register.

The Cumulative Supplement to the Code of Federal Regulations was compiled as of June 1, 1943. * * *

[72] Between the publication of the 1940 Supplement to the Code of Federal Regulations and the publication of the Cumulative Supplement to the Code of Federal Regulations, there had been published a 1941 Supplement to the Code of Federal Regulations. This annual supplement contained regulations filed during 1941. See Titles 1-7 C.F.R. iii (1941 Supp.). It did not include Regulations 111, which was not filed until the second half of 1943.

was thought to fall into the second set of documents. Regulations 111 was filed "subsequent to" June 1, 1943-- because it was filed on October 28, 1943. And Regulations 111 was seemingly "effective on" the "date" June 1, 1943, in that Regulations 111 was effective with respect to tax years beginning after December 31, 1941, and therefore was effective for any tax year that included June 1, 1943.

Section 29.3-1 of Regulations 111, as published in the Cumulative Supplement to the Code of Federal Regulations, referred to Regulations 111 in the following way: "These regulations [i.e., Regulations 111], which constitute Part 29 of Title 26 of the 1943 Supplement to the Code of Federal Regulations, are divided into six subparts." 26 C.F.R. sec. 29.3-1 (Cum. Supp. 1944). Thus the Cumulative Supplement to the Code of Federal Regulations, a publication in which Regulations 111 was actually printed, suggested that Regulations 111 was printed in the 1943 Supplement to the Code of Federal Regulations, a publication in which Regulations 111 was not printed. The same error had been made in the pamphlet form of Regulations 111 (sec. 29.3-1, Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 1) and in the text of Regulations 111 that was published in the Federal Register (sec. 29.3-1 of Regulations 111, 8 Fed. Reg. 14889). This error would eventually be corrected through an amendment to Regulations 111 published in the Federal Register. Specifically, Treasury Decision 5391, 9 Fed. Reg. 8009 (July 18, 1944), amended section 29.3-1 of Regulations 111 to say: "These regulations [i.e., Regulations 111], which constitute Part 29 of Title 26 of the Cumulative Supplement to the Code of Federal Regulations, are divided into eight subparts."

In the Cumulative Supplement to the Code of Federal Regulations, the section of Regulations 111 relating to section 45 of the Internal Revenue Code of 1939 was numbered "§ 29.45-1". 26 C.F.R. sec. 29.45-1 (Cum. Supp. 1944). This prefix "29." was used for all sections of Regulations 111 in the Cumulative Supplement to the Code of Federal Regulations. Finally Regulations 111 as printed in the Cumulative Supplement to the Code of Federal Regulations had the following heading: "PART 29--INCOME TAX; TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1941". Title 26 (ch. I, parts 2-178) C.F.R. 5973 (Cum. Supp. 1944). This was the same heading used for Regulations 111 in the Federal Register.

Regulations 111 was not published in the 1943 Supplement to the Code of Federal Regulations. Besides the Cumulative Supplement to

the Code of Federal Regulations, the Government Printing Office also published a 1943 Supplement to the Code of Federal Regulations. The 1943 Supplement contained "a codification of regulations filed by Federal agencies and published in the Federal Register during the period from June 2, 1943 through December 31, 1943." Titles 1-31 C.F.R. iii (1943 Supp.). Because Regulations 111 was filed on October 28, 1943, 8 Fed. Reg. 14979, and was published in the Federal Register on November 3, 1943, 8 Fed. Reg. 14882, Regulations 111 seemingly should have been published in the 1943 Supplement to the Code of Federal Regulations. Yet it was not. In any event, Regulations 111 had already been published in the Cumulative Supplement to the Code of Federal Regulations.

S.    The Revenue Act of 1943 and the Treasury Decision 5426 amendments to Regulations 111

Effective for tax years beginning after December 31, 1943, the Revenue Act of 1943 amended section 45 of the Internal Revenue Code of 1939 by replacing the phrase "gross income or deductions" with "gross income, deductions, credits, or allowances." Revenue Act of 1943, ch. 63, secs. 101, 128(b) and (c), 58 Stat. at 26, 48. Thus, for calendar-year taxpayers, the first year for which the 1943 amendment applied was 1944. Prior calendar years (i.e., 1939-43) were governed by section 45 of the Internal Revenue Code of 1939 before the 1943 amendment. See Internal Revenue Code of 1939 sec. 1.

To reflect the amendment of section 45 of the Internal Revenue Code of 1939 by the Revenue Act of 1943, section 29.45-1 of Regulations 111[73] was amended by Treasury Decision 5426, 10 Fed. Reg. 23-24 (filed Dec. 30, 1944; published in the Federal Register Jan. 2, 1945). Specifically, Treasury Decision 5426 made the following amendments to sec. 29.45-1, Regulations 111:

- "the income, the deduction, or the item or element of either" in sec. 29.45-1(a)(6) was replaced with "the income, the

---

[73] Treasury Decision 5426, 10 Fed. Reg. 24 (published Jan. 2, 1945), referred to the section it amended as "section 29.45-1", not "section 9.45-1". The use of the prefix "29." in the number of this section was consistent with the pamphlet form of Regulations 111 and with the copy of Regulations 111 that was published in the Cumulative Supplement to the Code of Federal Regulations, but not with the copy of Regulations 111 published in the Federal Register, which used the prefix "9." Regulations 111 Relating to the Income Tax Under the Internal Revenue Code 275-277; 8 Fed. Reg. 14968 (Nov. 3, 1943); 26 C.F.R. sec. 29.45-1 (Cum. Supp. 1944).

deductions, the credits, the allowances, or the item or element of income, deductions, credits, or allowances";

- "gross income or deductions" in the first paragraph of section 29.45-1(b) was replaced with "gross income, deductions, credits, or allowances";

- "gross income, deductions, or any item of either" in the third paragraph of section 29.45-1(b) was replaced with "gross income, deductions, credits, or allowances, or any item of gross income, deductions, credits, or allowances";

- "income or deductions" in the first paragraph of section 29.45-1(c) was replaced with "income, deductions, credits, or allowances".

T.D. 5426, 10 Fed. Reg. 24.

The particular sentences of section 29.45-1 of Regulations 111 that were amended by Treasury Decision 5426 were printed in their amended form in the 1944 Supplement to the Code of Federal Regulations. 26 C.F.R. sec. 29.45-1, at 1905 (1944 Supp.).[74] The complete text of section 29.45-1 of Regulations 111, including the portions of the text amended by Treasury Decision 5426 and the portions of the text not amended by Treasury Decision 5426, were printed in the 1949 edition of the Code of Federal Regulations. 26 C.F.R. sec. 29.45-1, at 315-316 (1949). Thus, the 1949 edition of the Code of Federal Regulations contained the text of section 29.45-1 of Regulations 111 after it was amended by Treasury Decision 5426. However, the 1949 edition of the Code of Federal Regulations omitted a comma between "gross income" and "deductions" in the following sentence:

> If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income deductions, credits, or allowances or of any item or element affecting net income,

---

[74] The 1944 Supplement to the Code of Federal Regulations "contains a codification of regulations promulgated by Federal agencies and published in the Federal Register which were filed during the period from January 1, 1944 through December 31, 1944." Titles 11-32 C.F.R. iii (1944 Supp.).

between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. * * *

26 C.F.R. sec. 29.45-1, at 316 (1949). The 1949 edition of the Code of Federal Regulations was the second edition of the Code of Federal Regulations. 26 (parts 1-79) C.F.R. v (1949).[75] The first edition was the 1939 edition. 26 C.F.R. v (1949).

The amendments to sec. 29.45-1, Regulation 111, made by Treasury Decision 5426 had no effective-date provisions. These regulatory amendments mirrored the statutory amendments by the Revenue Act of 1943, which were effective starting with the 1944 tax year for calendar-year taxpayers.[76] We assume that Treasury Decision

---

[75] The 1949 edition of the Code of Federal Regulations contained documents promulgated on or before Dec. 31, 1948, and effective as to facts or circumstances arising on or after January 1, 1949. See Titles 1-3 C.F.R. xv (1949). Between the printing of the 1944 Supplement to the Code of Federal Regulations and the printing of the 1949 edition of the Code of Federal Regulations, the following three annual supplements to the Code of Federal Regulations were published:

| Supp. to the C.F.R. | Filing dates or publication dates of documents printed in the Supp. to the C.F.R. |
| --- | --- |
| 1945 Supp. | Filed during 1945. See Titles 1-9 C.F.R. iii (1945 Supp.). |
| 1946 Supp. | Filed with Division of Federal Register and published in Federal Register during 1946. See Titles 1-8 C.F.R. iii (1946 Supp.). |
| 1947 Supp. | Filed with Division of Federal Register and published in Federal Register during 1947. See Titles 1-7 C.F.R. iii (1947 Supp.). |

Sec. 29.45-1, Regulations 111, was not printed in any of these three supplements.

[76] We explain in this note the merits of this assumption in the context of this case.

Sec. 3791(b) of the Internal Revenue Code of 1939, 53 Stat. at 467, authorized the Treasury Department to "prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect." A similar provision of the Internal Revenue Code of 1954 (sec. 7805(b)) has been interpreted to mean that a tax regulation that does not have an express effective date should be considered to have an effective date that is the same as the effective date (or at least the date of enactment) of the statute to which the regulation relates. See, e.g., Pollack v. Commissioner, 47 T.C. 92, 110-111 (1966) (holding, under sec. 7805(a) and (b) of the Internal Revenue Code of 1954, "that unless the Commissioner otherwise specifies, regulations are retroactive to the date on which

5426, like the corresponding portions of the Revenue Act of 1943, was effective starting with the 1944 tax year for calendar-year taxpayers. For the three tax years involved in <u>L.E. Shunk Latex</u>, this assumption means that Treasury Decision 5426 was not effective for the 1942 and 1943 years, but was effective for the 1945 year.  Under the assumption that the Treasury Decision 5426 regulatory amendments applied for the 1945 tax year, the relevant provisions of the Internal Revenue Code and regulations applicable for the 1942, 1943, and 1945 years (for calendar-year taxpayers) are:

---

the statute was enacted") (citations omitted)), <u>aff'd</u>, 392 F.2d 409 (5th Cir. 1968).  It would be consistent with this interpretation to assume that the amendments to sec. 29.45-1, Regulation 111 made by Treasury Decision 5426 had the same effective date as the statutory amendment made by the Revenue Act of 1943: that is, for the Treasury Decision 5426 regulatory amendments to apply for tax years beginning after December 31, 1943.  This would include the 1945 tax year at issue in <u>L.E. Shunk Latex</u>.

In theory there might be an argument against Treasury Decision 5426 being effective for the 1945 tax year.  There is caselaw holding that the Treasury Department cannot give a regulation retroactive effect if to do so would be an abuse of its discretion. <u>See</u> <u>Anderson, Clayton & Co. v. United States</u>, 562 F.2d 972, 980-981 (5th Cir. 1977) ("[A] list of some of the considerations that are relevant to a court in reviewing the Secretary's exercise of his discretionary power to adopt retroactive regulations * * * includes: (1) whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law; (2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative reenactment of the pertinent Code provisions; (3) whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers; and (4) whether according retroactive effect would produce an inordinately harsh result.").  To make Treasury Decision 5426 effective for the 1945 tax year might arguably be seen as giving Treasury Decision 5426 retroactive effect.  This is so because, although Treasury Decision 5426 was filed on Dec. 30, 1944, which was before the beginning of the 1945 tax year, it was not published until Jan. 2, 1945, which is two days into the 1945 tax year.  It appears unnecessary to delve further into the question of whether it would be impermissible to give Treasury Decision 5426 effect for the 1945 tax year.  This is so because the subject matter of Treasury Decision 5426 does not appear to be relevant to the dispute in <u>L.E. Shunk Latex</u>.  Indeed, because the regulatory amendments of Treasury Decision 5426 merely mirrored changes made to the relevant statute, it would appear that even a dispute implicating the text of the regulatory amendments of Treasury Decision 5426 would be resolved by recourse to the statutory amendment, not to the regulatory amendments found in Treasury Decision 5426.

| Year | Statute | Regulation |
|------|---------|------------|
| 1942 | Internal Revenue Code of 1939, ch. 2, sec. 45, 53 Stat. at 25. | Sec. 29.45-1, Regulations 111, 26 C.F.R. sec. 29.45-1, at 6141-6142 (Cum Supp. 1944). |
| 1943 | Internal Revenue Code of 1939, ch. 2, sec. 45, 53 Stat. at 25. | Sec. 29.45-1, Regulations 111, 26 C.F.R. sec. 29.45-1, at 6141-6142 (Cum Supp. 1944). |
| 1945 | Internal Revenue Code of 1939, ch. 2, sec. 45, 53 Stat. at 25, as amended by the Revenue Act of 1943, ch. 63, sec. 128(b) and (c), 58 Stat. at 48. | Sec. 29.45-1, Regulations 111, as amended by T.D. 5426, 10 Fed. Reg. 24 (Jan. 2, 1945), complete text as amended in 26 C.F.R. sec. 29.45-1, at 315-316 (1949), amended sentences only in 26 C.F.R. sec. 29.45-1, at 1905 (1944 Supp.). |

The significance of tax years 1942, 1943, and 1945, is that these were the tax years at issue in L.E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. at 955.

As indicated in the table above, tax years 1942 and 1943 (for calendar-year taxpayers) were governed by section 29.45-1 of Regulations 111, before its amendment by Treasury Decision 5426.[77] As indicated in the table above, tax year 1945 (for calendar-year taxpayers) was governed by section 29.45-1 of Regulations 111 after the amendment by Treasury Decision 5426.[78]

---

[77] We have not reprinted in this Opinion the pre-Treasury Decision 5426 text of sec. 29.45-1 of Regulations 111. This pre-Treasury Decision 5426 text can be found in the following source: 26 C.F.R. sec. 29.45-1, at 6141-6142 (Cum. Supp. 1944). Also, this text is the same as the text of art. 45-1 of Regulation 86, which is printed supra Opinion pt. II.G, with the following substitutions:

- "Art. 45-1" was replaced with "Sec. 29.45-1",

- "article" was replaced with "section", and

- "this article" was replaced with "this section".

[78] The text of the section as amended is not reprinted in this Opinion. However, it can be found in the following source: 26 C.F.R. sec. 29.45-1, at 315-316 (1949). Also, this text is the same as art. 45-1 of Regulation 86, which is printed supra Opinion pt. II.G, with the following substitutions:

- "Art. 45-1" was replaced with "Sec. 29.45-1",

T.  L.E. Shunk Latex v. Commissioner, <u>18 T.C. 940 (1952) (a case involving tax years 1942, 1943, and 1945)</u>

In <u>L.E. Shunk Latex Products, Inc. v. Commissioner</u>, 18 T.C. at 954-957 (1952), two manufacturers of condoms sold their products to a then-unrelated wholesaler during the period from July 1937 to July 1939.[79]  Because the two manufacturers were not related to the wholesaler, <u>id.</u> at 957, the prices charged by the manufacturers to the wholesaler during this period were arm's-length prices, <u>see id.</u> at 955, 957.  The wholesaler sold the products to its customers, who were not related to either the manufacturers or the wholesaler.  <u>See id.</u> at 948, 955.

In July 1939, the two manufacturers and the wholesaler were brought under common control.  <u>Id.</u> at 954-957.  The prices charged by the manufacturers to the wholesaler did not change.  <u>Id.</u> at 957.  These (now-intercompany) prices were arm's-length prices because they had been the prices during the period from July 1937 to July 1939 when the two manufacturers and the wholesaler were not commonly controlled.  <u>Id.</u>  The prices charged by the wholesaler to its customers also stayed the same.  <u>Id.</u>

In January 1942, the wholesaler raised its prices to its customers in accordance with an increase in the market price of the products.  <u>Id.</u>  The intercompany prices of the products sold by the two manufacturers to the wholesaler remained unchanged.  <u>Id.</u> at 958.  Had the two manufacturers been unrelated to the wholesaler, they would have increased the prices they charged to the wholesaler.  <u>Id.</u>  Therefore the unchanged intercompany prices charged by the two manufacturers to the wholesaler were below arm's-length prices.  <u>Id.</u>

Effective May 1942, the federal government imposed a wartime price-control regulation that made it illegal for the two manufacturers to raise their prices above the prices charged in March 1942.  <u>Id.</u> at 959.

---

- "article" was replaced with "section",

- "this article" was replaced with "this section", and

- the phrase "gross income and deductions", in each instance, was replaced with "gross income, deductions, credits, or allowances".

[79] The two manufacturers were L.E. Shunk Latex Products, Inc., and the Killian Manufacturing Co.  <u>L.E. Shunk Latex Prods., Inc. v. Commissioner</u>, 18 T.C. 940, 941 (1952).  The wholesaler was Killashun Sales Division.  <u>Id.</u> at 945.

Because the prices the two manufacturers charged in March 1942 were the same as the prices charged since July 1939, the price-control regulation effectively froze in place the July 1939 prices.[80] These prices were below arm's-length prices and had been since January 1942. Id. at 958. Each sale of products at these below-arm's-length-prices to the wholesaler resulted in shifting income from the two manufacturers to the wholesaler. Id. In order to correct for the income distortion resulting from the below-arm's-length intercompany prices, respondent in L.E. Shunk Latex determined an allocation under section 45 of the Internal Revenue Code of 1939 to increase the income of the two manufacturers for taxable years 1942, 1943, and 1945. Id. at 952-955.

The opinion in L.E. Shunk Latex, can be divided into several parts. In the first part, the Court rejected an argument by the two manufacturers that they and the wholesaler were not commonly controlled. Id. at 956. The Court reasoned that (1) ownership of these businesses was largely in the hands of three persons, and (2) these three persons also controlled the operations of the businesses through their management positions. Id. The Court relied on and quoted the definition of the term "controlled" from sec. 29.45-1(a)(3) of Regulations 111. L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. at 956. Thus, the following statement appears in the L.E. Shunk Latex opinion:

> "The term 'controlled' includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise." Treasury Regulations 111, sec. 29.45-1(a)(3). Cf. Granada Industries, Inc., 17 T.C. 231, 254. * * *

Id.

In the second part of the opinion, the L.E. Shunk Latex Court rejected respondent's argument that the wholesaler was merely acting as an agent for the two manufacturers. Id. at 956-957. The Court held

---

[80] Effective February 1943, the federal government replaced the May 1942 price- control regulation. L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. at 959. The new February 1943 price-control regulation required prices charged by the manufacturers not to exceed the price charged on Dec. 1, 1941. Id. The new price-control regulation had the same effect on the two manufacturers as the May 1942 price-control regulation because the prices the two manufacturers charged on Dec. 1, 1941, were the same as the prices they charged in May 1942. Id. The price-control regulations did not affect the prices charged by the wholesaler. Id.

that to consider the wholesaler an agent of the two manufacturers would be inconsistent with the purpose of section 45 of the Internal Revenue Code of 1939, a purpose that the Court described in the following passage:

> Allocation between controlled businesses of "gross income, deductions, credits or allowances" is permitted under section 45 of the Code where "necessary in order to prevent evasion of taxes, or clearly to reflect the income of any of such organizations, trades, or businesses." Section 45 empowers the Commissioner to act to rectify abnormalities and distortions in income which come about through the common control to which separate taxpaying entities may be subject. "The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer." Treasury Regulations 111, sec. 29.45-1(b).
>
> Using this standard, we think respondent erred * * *.

Id. at 956. The Court reasoned that the two manufacturers and the wholesaler dealt with each other during the years at issue in that case under a contract, negotiated before they were commonly controlled, under which the wholesaler was not an agent of the two manufacturers. Id.

In the third part of the opinion, the L.E. Shunk Latex Court explained that after the wholesaler raised its prices to its customers in January 1942, the prices charged by the two manufacturers to the wholesaler were not arm's-length prices because had the two manufacturers not been related to the wholesaler they would have charged higher prices. Id. at 957-958. We quote below the third part of the opinion:

> However, in 1942 that common control was exercised in such manner as to shift income from petitioners [the two manufacturers] to Killashun [the wholesaler], and, but for certain wartime price regulations on which petitioners rely, we would be constrained to regard action under section 45 as warranted. With the

coming of the war, and the consequent critical shortage of rubber, there appeared to be a likelihood that petitioners' products could be sold at a substantial increase in prices. In these circumstances, Killashun halted all sales in December 1941. It resumed sales in January 1942, and at the same time imposed a one-dollar per gross across-the-board increase on all products sold by it. There was no change in the items sold, or in the services or functions performed by Killashun; conditions simply made it possible to get a higher price from the trade for the same products. In the case of unpackaged goods, the increase was considerably in excess of one hundred per cent. However, although Killashun raised the price to its customers, Shunk and Killian [the two manufacturers] kept their prices to Killashun completely unchanged. On the very products on which Killashun was realizing increased income of one dollar per gross, Shunk and Killian deliberately refrained from increasing their own profits at all through an increase in the prices charged to Killashun.

We cannot believe that business organizations free of control by common interests would have acted in this way. If there had been no ties of common control or ownership between petitioners and Killashun, it would have been reasonable to expect petitioners to take advantage of market conditions and to raise their prices as was done by Killashun. Their failure to do so can be viewed only as a consequence of the common ownership and control which dominated all three entities, and plainly shifted income of petitioners to Killashun. This sort of distortion in income, springing from arrangement or manipulation made possible by common control or ownership, was exactly the kind of vice at which section 45 was aimed. Cf. Treasury Regulations 111, sec. 29.45-1; Advance Machinery Exchange, Inc., 196 F.2d 1006 (C.A.2, 1952); Asiatic Petroleum Co. v. Commissioner, 79 F.2d 234 (C.A.2, 1935), certiorari denied 296 U.S. 645; National Securities Corporation v. Commissioner, 137 F. 2d 600 (C.A. 3, 1943), certiorari denied 320 U.S. 794.

Id.

In the fourth part of the opinion, the <u>L.E. Shunk Latex</u> Court considered and rejected the argument by the two manufacturers that they had a nontax reason for declining to raise the price they charged the wholesaler in January 1942. <u>Id.</u> at 958. The two manufacturers claimed that increasing their prices to the wholesaler would have created an incentive to competitors to enter the market. <u>Id.</u> The Court rejected this explanation, <u>id.</u> at 958-959, and stated that competitors would not know, or care about, the price charged by the two manufacturers to the related wholesaler, <u>id.</u> The competitors would have cared only about the price charged by the wholesaler to its customers because that price would affect the price the competitors could charge their customers. <u>Id.</u>

In the fifth part of the opinion the <u>L.E. Shunk Latex</u> Court considered whether the two manufacturers could have legally raised their prices during the years at issue. <u>Id.</u> at 959-960. The Court analyzed the provisions of the price-control regulation and concluded that the regulation prohibited an increase in the prices charged by the two manufacturers to the wholesaler. <u>Id.</u>[81]

In the sixth part of the opinion the <u>L.E. Shunk Latex</u> Court considered the significance of the fact that the two manufacturers voluntarily decided not to raise their prices to the wholesaler in January 1942. <u>Id.</u> at 960. The Court explained that what mattered was that this price later became a legal maximum:

> We recognize that the price structure of petitioners [the two manufacturers] and Killashun [the wholesaler] from December 1941 through March 1942 was not shaped in reliance on the price regulations which followed. The regulations, so far as those prices of petitioners and Killashun were concerned, were purely a subsequent fortuitous development. The regulations merely froze a condition theretofore deliberately created without reference to them by the interests in control of the three entities. There is no basis in the record for believing that petitioners would have raised their prices to Killashun in the absence of these regulations, and we can only infer that the respective prices of the controlled entities, in relation

---

[81] However, it seems that from January 1942 to May 1942 the prices charged by the two manufacturers to the wholesaler were not subject to the price-control regulation. <u>L.E. Shunk Latex Prods., Inc. v. Commissioner</u>, 18 T.C. at 950, 957-959.

> to each other, would not have been any different even if the price regulations had never come into being. To say, therefore, that because of the price regulations an improper shift of income is to be insulated from the corrective provisions of the statute, is to permit petitioners to enjoy an unexpected piece of good fortune in reduction of their taxes. But we can see no logical basis on which petitioners can be denied this windfall, in view of the uncontroverted effect of those regulations in prohibiting petitioners from receiving the very income sought to be attributed to them. We think that the Commissioner had no authority to attribute to petitioners income which they could not have received. We therefore conclude that, in allocating Killashun's income to petitioners, respondent acted in excess of his power.

Id. at 960-961. The quotation above articulates the Court's main holding in the case: The predecessor of section 482 cannot be used to allocate income to a taxpayer that the taxpayer is barred by law from receiving. Id. at 961. This holding is also reflected in the Court's description of the main argument made by the two manufacturers, an argument with which the Court agreed. Here is the Court's description of the two manufacturers' argument:

> Petitioners argue that it is improper, under section 45, to allocate income to them based on prices higher than they were permitted to charge under the price regulations, which they assert to be their pre-1942 prices, and that section 45 does not authorize an allocation of income to them which under other laws they were prohibited from earning.

Id. at 959.

For purposes of our case, there are additional questions to consider about the holding in L.E. Shunk Latex. For example, was the holding compelled by the unambiguous text of the statute? And what role did Regulations 111 play in the Opinion? We set aside these questions for now and take them up infra Opinion part IV.

The last observation we make about L.E. Shunk Latex relates to the statute quoted in the Opinion. The Opinion quotes section 45 of the Internal Revenue Code of 1939, as that section was amended by section

128(b) and (c) of the Revenue Act of 1943.  <u>L.E. Shunk Latex Prods., Inc. v. Commissioner</u>, 18 T.C. at 955 n.4.  By way of background, recall that the case involved three tax years: 1942, 1943, and 1945.  Tax years 1942 and 1943 were governed by section 45 of the Internal Revenue Code of 1939 before its amendment by section 128(b) and (c) of the Revenue Act of 1943.  Tax year 1945 was governed by section 45 of the Internal Revenue Code of 1939 as amended by section 128(a) and (b) of the Revenue Act of 1943.  It was this later provision that was printed in a footnote in <u>L.E. Shunk Latex Prods., Inc. v. Commissioner</u>, 18 T.C. at 955 n.4, as follows:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or businesses.

U.    <u>The Administrative Procedure Act</u>

In 1946, Congress enacted the Administrative Procedure Act, or APA.[82]  Ch. 324, 60 Stat. 237 (codified as amended at 5 U.S.C. secs. 551-559, 701-705 (2018)).  The APA generally took effect on September 11, 1946.  APA sec. 12, 60 Stat. at 244 (general effective date is three months after approval of APA); 60 Stat. at 244 (APA approved June 11, 1946).  Section 12 of the APA, 60 Stat. at 244,[83] provided that no subsequent legislation would supersede the APA unless it did so expressly.  Section 3(a) of the APA[84] required each federal agency to "separately state and currently publish in the Federal Register * * * (3) substantive rules adopted as authorized by law and statements of general policy or

---

[82] When we quote the provisions of the APA, we quote the provisions as they were originally worded in 1946.  The provisions of the APA that we quote are still in effect, although sometimes the wording has changed from the original 1946 text.  For the current text of the provisions, the United States Code can be consulted.

[83] Codified as amended at 5 U.S.C. sec. 559 (2018).

[84] Codified as amended at 5 U.S.C. sec. 552(a)(1) (2018).

interpretations formulated and adopted by the agency for the guidance of the public * * *". A "rule" was defined for purposes of the APA to include an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy". Section 2(c) of the APA (codified as amended at 5 U.S.C. sec. 551(4) (2018)).

Section 4 of the APA[85] dealt with "rule making" by agencies. "Rule making" was defined as "agency process for the formulation, amendment, or repeal of a rule". Section 2(c) of the APA (codified as amended at 5 U.S.C. sec. 551(5) (2018)). Section 4(a) of the APA[86] required that "[g]eneral notice of proposed rule making" be published in the Federal Register. There was an exception to the notice-of-proposed-rulemaking requirement for "interpretive rules", for "general statements of policy", or "in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable". <u>Id.</u> This exception did not apply when notice or hearing was required by statute. <u>Id.</u> Section 4(a) of the APA[87] required the notice of proposed rulemaking to include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." Section 4(b) of the APA[88] provided:

> After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. * * *

Section 4(c) of the APA[89] provided: "The required publication * * * of any substantive rule (other than one granting or recognizing

---

[85] Codified as amended at 5 U.S.C. sec. 553 (2018).

[86] Codified as amended at 5 U.S.C. sec. 553(b).

[87] Codified as amended at 5 U.S.C. sec. 553(b).

[88] Codified as amended at 5 U.S.C. sec. 553(c).

[89] Codified as amended at 5 U.S.C. sec. 553(d).

exemption or relieving restriction or interpretive rules and statements of policy) shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule." According to the legislative history of the APA, the term "required publication" in section 4(c) of the APA[90] referred back to the requirement in section 3(a) of the APA[91] that a rule must be published in the Federal Register, and did not refer to the requirement in section 4(a) of the APA[92] that a notice of proposed rulemaking be published in the Federal Register.[93] Consistent with the legislative history, <u>Rowell v. Andrus</u>, 631 F.2d 699, 702-704 (10th Cir. 1980), held that an agency violated section 4(c) of the APA by publishing a final rule in the Federal Register less than 30 days before its effective date, and rejected the agency's argument that section 4(c) of the APA "only requires that a proposed rule be published no less than 30 days before its effective date".

Section 4(c) of the APA[94] potentially conflicted with section 3791(b) of the Internal Revenue Code of 1939 (and with analogous provisions in the Internal Revenue Codes of 1954 and 1986).[95] Section

---

[90] Codified as amended at 5 U.S.C. sec. 553(d).

[91] Codified as amended at 5 U.S.C. sec. 552(a)(1).

[92] Codified as amended at 5 U.S.C. sec. 553(b).

[93] The Attorney General's Manual on the Administrative Procedure Act 36 (1947) stated:

> The discussion on section 4(c) in the report of both the Senate and House Committees on the Judiciary makes clear that the phrase "The required publication or service of any substantive rule" does not relate back or refer to the publication of "general notice of proposed rule making" required by section 4(a); rather it is a requirement that substantive rules which must be published in the Federal Register (see section 3(a)(3)) shall be so published at least thirty days prior to their effective date. * * * The purpose of the time lag required by section 4(c) is to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuances of rules may prompt". Sen. Rep. p. 15; H.R. Rep. 25 (Sen. Doc. pp. 201, 259).

The Senate and House reports referred to in the quotation above were S. Rept. No. 79-752 (1945) and H.R. Rept. 79-1980 (1946).

[94] Codified as amended at 5 U.S.C. sec. 553(d).

[95] The analogous provisions are sec. 7805(b) of the Internal Revenue Code of 1954 and sec. 7805(b) of the Internal Revenue Code of 1986. Sec. 7805(b) of the Internal Revenue Code of 1954 was substantively the same as sec. 3791(b) of the

4(c) of the APA[96] required that a rule generally have an effective date 30 days or more after the publication of the rule in the Federal Register. APA section 4(c)[97] seemingly meant that a rule may not generally have retroactive effect. See Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750, 757 n.11 (D.C. Cir. 1987) ("The fact that the APA requires legislative rules to be given only 'future effect' is underscored by 5 U.S.C. § 553(d) (1982), which requires that such rules be published not less than 30 days before their effective date, except 'as otherwise provided by the agency for good cause found and published with the rule.'"), aff'd on other grounds, 488 U.S. 204 (1988). However, for tax regulations, section 3791(b) of the Internal Revenue Code of 1939 authorized the Treasury Department to determine the extent to which a regulation shall be applied without retroactive effect. Section 3791(b) of the Internal Revenue Code of 1939 can be interpreted to mean that the Treasury Department could give retroactive effect to a regulation.[98] The relationship between section 4(c) of the APA and section 3791(b) of the Internal Revenue Code of 1939 was not definitively resolved.[99]

---

Internal Revenue Code of 1939. Sec. 7805(b) of the Internal Revenue Code of 1986 was substantially the same as sec. 7805(b) of the Internal Revenue Code of 1954 until it was amended in 1996. With the 1996 amendment, a Treasury regulation can be made retroactive only if it was filed or issued within 18 months of the enactment of the statute to which it relates. Sec. 7805(b), as amended by the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, sec. 1101(a), 110 Stat. at 1468 (1996). This rule has exceptions. The 1996 amendment, and its effective date, are discussed infra part II.PP.

[96] Codified as amended at 5 U.S.C. sec. 553(d).

[97] Codified as amended at 5 U.S.C. sec. 553(d).

[98] A similar provision of the Internal Revenue Code of 1954 (sec. 7805(b)) was interpreted to mean that the Treasury Department can give retroactive effect to a tax regulation. See Excel Corp. v. United States, 451 F.2d 80, 84-85 (8th Cir. 1971); Butka v. Commissioner, 91 T.C. 110, 128 (1988), aff'd without published opinion, 886 F.2d 442 (D.C. Cir. 1989).

[99] Wendland v. Commissioner, 79 T.C. 355, 379-382 (1982), aff'd per curiam, 739 F.2d 580 (11th Cir. 1984), and aff'd sub nom. Redhouse v. Commissioner, 728 F.2d 1249 (9th Cir. 1984), considered a taxpayer's challenge to a Treasury regulation under the Administrative Procedure Act (APA), ch. 324, sec. 4(c), 60 Stat. at 239. On November 2, 1976, the proposed regulation was published in the Federal Register. Wendland v. Commissioner, 79 T.C. at 379. Taxpayers were informed that Treasury intended to make the regulation retroactive to October 29, 1976. Id. at 382. On December 19, 1977, the final version of the regulation was published in the Federal Register and was to be applied retroactively to October 29, 1976. Id. at 379. The taxpayer in Wendland argued that the regulation violated sec. 4(c) of the APA because the regulation was not published at least 30 days before its effective date. Id. at 379-380. Wendland recognized a "seeming conflict" between (1) the requirement of 30 days' notice in sec. 4(c) of the APA and (2) the authority of the Treasury Department to

Section 10(a) of the APA[100] provided that except as statutes preclude judicial review (or except as agency action is by law committed to agency discretion) any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. The rules regarding the scope of judicial review were set forth in section 10(e) of the APA.[101] Section 10(e) of the APA generally required a reviewing court to decide questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. Section 10(e)(B) of the APA[102] required a reviewing court to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (section 10(e)(B)(1) of the APA[103]); or excessive of statutory authority (section 10(e)(B)(3) of the APA[104]).

---

promulgate retroactive regulations granted by the successor to sec. 3791(b) of the Internal Revenue Code of 1939 (i.e., sec. 7805(b) of the Internal Revenue Code of 1954). Id. at 380. However, Wendland held that the conflict was "more apparent than real" in the context of the facts of that case. Id. at 382. Wendland observed that the parties affected by the regulation knew that the Treasury Department intended to make the regulation retroactive and could prepare for the final publication of the rule. Wendland therefore held that the purpose of sec. 4(c) of the APA, which was to "afford affected persons a reasonable time to prepare for final effectiveness of a rule or to take any action which the issuance of the rule may require", was "fulfilled." Id. at 381-382. Wendland explained that "[m]ere technical violation of the APA will not be considered cause to invalidate a regulation." Id. at 38 n.14. The relationship between these statutory provisions also came up in Wing v. Commissioner, 81 T.C. 17, 29-30 (1983), a case involving a challenge to the same regulation that had been challenged in Wendland. The Tax Court in Wing v. Commissioner, 81 T.C. at 29-30, applied the holding in Wendland, but additionally suggested that if there were a conflict between the successor to sec. 3791(b) of the Internal Revenue Code of 1939 (i.e., sec. 7805(b) of the Internal Revenue Code of 1954) and sec. 4(c) of the APA, the former provision would prevail because it was the more specific provision. Wing v. Commissioner, 81 T.C. at 30 n.17; see also Redhouse v. Commissioner, 728 F.2d at 1253.

[100] Codified as amended at 5 U.S.C. sec. 702 (2018).

[101] Codified as amended at 5 U.S.C. sec. 706 (2018).

[102] Codified as amended at 5 U.S.C. sec. 706(2).

[103] Codified as amended at 5 U.S.C. sec. 706(2)(A).

[104] Codified as amended at 5 U.S.C. sec. 706(2)(C).

V.    <u>The lifting of the wartime suspension of the Federal Register Act requirement that regulations be codified every five years</u>

On November 12, 1947, the Administrative Committee of the Federal Register terminated the 1942 suspension of the requirement that each agency codify certain documents every five years.  <u>See</u> Exec. Order No. 9,930, 13 Fed. Reg. 519 (Feb. 5, 1948), <u>reprinted in</u> 44 U.S.C. sec. 311 note (Supp. II 1949); Act of Dec. 10, 1942, secs. 1, 2 (amending Act of June 19, 1937 (amending Federal Register Act of 1935, sec. 11)).  The termination of the suspension was effective December 31, 1948.  <u>See</u> Exec. Order No. 9,930, 13 Fed. Reg. 519 (Feb. 5, 1948), <u>reprinted in</u> 44 U.S.C. sec. 311 note (Supp. II 1949).

W.    <u>The second edition of the Code of Federal Regulations</u>

On February 4, 1948, the President signed Executive Order No. 9,930 stating that "the required codification of documents in force and effect on December 31, 1948, will, under present procedures, be on file with the Administrative Committee of the Federal Register on that date"; and that "the publication of the said codification as it is in force and effect on December 31, 1948, is hereby authorized and directed to be made".  Thus, the 1948 executive order was the President's directive to publish the second edition of the Code of Federal Regulations.  This edition, published in 1949, contained documents promulgated on or before December 31, 1948, and effective for facts and circumstances arising on or after January 1, 1949.  <u>See</u> titles 1-3 C.F.R. xv (1949) (describing scope of documents contained in the second edition of the C.F.R.).  It contained the complete text of section 29.45-1 of Regulations 111, as amended to reflect the change to section 45 of the Internal Revenue Code of 1939 made by the Revenue Act of 1943, sec. 128(b) and (c), 58 Stat. at 48.[105]

---

[105] A 1952 pocket part, which supplemented the volume of the second edition Code of Federal Regulations relating to parts 1 to 79 of title 26 of the Code of Federal Regulations, contained changes and additions to parts 1 to 79 of title 26 of the Code of Federal Regulations that had been published in the Federal Register during 1949-53 and which were in force and effect on December 31, 1952.  <u>See</u> 26 (parts 1-79) C.F.R. (1949 ed. 1952 Supp.) ii.  No amendments had been made to sec. 29.45-1 of Regulations 111 (26 C.F.R. sec. 29.45-1 (1949)) during 1949-53, so the pocket part did not contain any text relating to sec. 29.45-1 of Regulations 111.

X.     The 1953 amendment to the Federal Register Act

In 1953, Congress replaced the requirement in the Federal Register Act that a new codification of regulations be made every five years.  Act of Aug. 5, 1953, ch. 333, 67 Stat. 388.  Under the 1953 amendment, the Executive was authorized to require the codification and publication of regulations "from time to time as it may deem necessary".  Federal Register Act sec. 11(a), as amended by Act of Aug. 5, 1953.  The 1953 amendment expressly provided that its provisions "shall apply to the Code of Federal Regulations, 1949 Edition".  Federal Register Act sec. 11(g), as amended by Act of Aug. 5, 1953, 67 Stat. at 389.  As a result of the 1953 amendment, the Executive was free to publish new volumes of the Code of Federal Regulations when it saw fit.  See Cervase v. Office Fed. Reg., 580 F.2d 1166, 1169 (3d Cir. 1978).

The publication of the Code of Federal Regulations up to this point can be summarized as follows:

| The Code of Federal Regulations from the 1935 enactment of the Federal Register Act until its 1953 amendment | |
| --- | --- |
| Publication requirements | Resulting Publications |
| Federal Register Act (1935) required, by 1/26/1936, the compilation of documents issued or promulgated before 9/24/1935. Publication of the compilation was required, but there was no deadline. | None. |
| 1937 amendment replaced the above requirement with the requirement that, on or before 7/1/1938, documents in force and effect on 6/1/1938 be codified. The President was authorized to have the codification published. | 1st edition of C.F.R. was published, containing documents in force on 6/1/1938. Supplements to 1st edition were also published: 1938 Supp. (documents filed 6/2/1938 to 12/31/1938); 1939 Supp. (documents filed during 1939); and 1940 Supp. (documents filed during 1940). |
| 1937 amendment also required subsequent codifications every five years of the same documents.  For example, it required a codification, on or before 7/1/1943, of documents in force and effect on 6/1/1938.  The President was authorized to have the subsequent codifications published. | No publications met this requirement before it was modified and suspended in 1942. |

| Publication requirements | Resulting Publications |
|---|---|
| 1942 amendment (first change) modified the temporal scope of the documents to be codified every five years. For example, the codification to be made on or before 7/1/1943 was to be of documents in force and effect on 6/1/1943. | No codification was published until 1949 due to suspension noted in the left column. |
| 1942 amendment (second change) suspended the requirement that there be subsequent codifications every five years. | |
| 1942 amendment (third change) required the publication of a cumulative supplement during the suspension of the requirement of subsequent codifications every five years. | A Cumulative Supplement was published containing documents (1) filed from 6/2/1938 to 6/1/1943 that were in force and effect on 6/1/1943, and (2) filed after 6/1/1943 that were effective on 6/1/1943. Annual supplements were published: 1943 Supp. (documents filed and published in Federal Register from 6/2 to 12/31/1943); 1944 Supp. (documents filed during 1944); 1945 Supp. (documents filed during 1945); 1946 Supp. (documents filed during 1946); 1947 Supp. (documents filed during 1947). |
| 1953 amendment to Federal Register Act eliminated requirement of subsequent codifications every five years; the timing of codifications was now up to the Executive. | |

The publication of the Code of Federal Regulations after the 1953 amendment to the Federal Register Act (an amendment that was effective starting with the 1949 edition of the Code of Federal Regulations) has been summarized as follows:

  In 1949, the second edition of the Code of Federal Regulations was finally published. It included all the regulations still in effect as of January 1, 1949, and was largely taken from the 1938 edition, the supplements, and the regulations issued in the Federal Register in 1948.

However, there were some additional regulations added that were not published in the <u>Federal Register</u>. These were generally either rules of procedure or rules received by the Division of the Federal Register and considered as officially promulgated and applicable to the general public or a class of the public and effective on or after January 1, 1949. Each book of the 1949 CFR, containing one or more titles, also had a subject index and a place at the back to fit a cumulative pocket supplement. Cumulative pocket supplements were issued annually for each book until it was deemed appropriate that a new edition of a particular book should be published with space in the back for subsequent pocket supplements. Each supplement also contained various finding aids, including a "Codification Guide" or "List of Sections Affected" as it was later called.

After considerable discussion on the best way to proceed, beginning in 1963 for some titles and for all titles in 1967, the Office of the Federal Register (OFR) began publishing yearly revisions to the titles of the CFR, effective on January 1 of each year. The new books were bound in soft covered, dark blue paper stock, but beginning in 1970 each annual edition of the CFR has a different color on its outside binding. If there are no changes to regulations in certain books then a colored paper stock is issued so it can be used to cover the older edition. Although ponderous in size, an annual republication of the CFR in softbound books, instead of cumulative supplements or loose-leafs, allows the researcher to determine how a regulation read on any given date.

Soon, however, it became apparent to the OFR that revising the entire <u>Code of Federal Regulations</u>, at the same time, was administratively unmanageable. So beginning on October 1, 1972, the OFR has divided the titles of the CFR into four groups with each group being revised in staggered quarters of the year. Titles 1-16 are revised effectively on January 1 of each year. Titles 17-27 are revised effectively on April 1 of each year. Titles 28-41 are revised effectively on July 1 of each year, and titles 42-50 are revised effectively on October 1 of each year.

Rick McKinney, "A Research Guide to the Federal Register and the Code of Federal Regulations," 46 L. Libr. Lights 10, 11 (2002) (footnotes omitted).

Y.    Regulations 118

In 1953, the Treasury Department promulgated section 39.45-1 of Regulations 118 to replace section 29.45-1 of Regulations 111. Regulations 118 was a comprehensive set of income-tax regulations that was promulgated, and published in the Federal Register, in 1953. 18 Fed. Reg. 5771 (Sept. 26, 1953); see sec. 39.1-1(a) of Regulations 118, 18 Fed. Reg. 5782. Regulations 118 was also printed as a pamphlet by the Government Printing Office. Income Tax Regulations, 118 Internal Revenue Code; Part 39 of Title 26, Code of Federal Regulations (Gov't Prtg. Off. 1953). The pamphlet version of Regulations 118 was for the most part a photocopy of the version of Regulations 118 that was published in the Federal Register. 18 Fed. Reg. 5771. The pamphlet had the page numbers that were used in the Federal Register. Regulations 118 was also published in the Code of Federal Regulations. 26 C.F.R. pt. 39 (1953). In 1953, a two-volume revision to the Code of Federal Regulations was published, containing those tax regulations that were (1) published in the Federal Register on or before December 31, 1953, and (2) effective on or after January 1, 1954. 26 (parts 1-79) C.F.R. v (1953).[106] These two volumes replaced title 26 of the 1949 edition of the Code of Federal Regulations. 26 (parts 1-79) C.F.R. v (1953). Like Regulations 111, Regulations 118 generally interpreted the provisions of the Internal Revenue Code of 1939. 26 C.F.R. sec. 39.1-1(a) (1953). Regulations 118 was "applicable only with respect to taxable years beginning after December 31, 1951." Id. para. (b). Section 39.45-1, Regulations 118, related particularly to section 45 of the Internal Revenue Code of 1939. See Income Tax Regulations 118, Internal Revenue Code; Part 39 of Title 26, Code of Federal Regulations III ("Each section of the regulations is preceded by the section, subsection, or paragraph of the Internal Revenue Code which it interprets."). The regulatory provision was virtually identical to its predecessor, section 29.45-1, Regulations 111. 26 C.F.R. sec. 29.45-1 (1949). The only difference was in form. In Regulations 111, paragraph (b) of section 29.45-1 had consisted of three unnumbered subparagraphs. 26 C.F.R. sec. 29.45-1(b) (1949). In Regulations 118, the three subparagraphs of

---

[106] The two volumes were: 26 (parts 1-79) C.F.R. (1953) and 26 (parts 183-299) C.F.R. (1953).

paragraph (b) of section 39.45-1 were separately numbered. 26 C.F.R. sec. 39.45-1(b)(1)-(3) (1953).

Z.    The Internal Revenue Code of 1954

In 1954, Congress recodified the federal tax laws as the Internal Revenue Code of 1954, ch. 736, 68A Stat. 3. Section 45 of the Internal Revenue Code of 1939, as amended by section 128(b) and (c) of the Revenue Act of 1943, was recodified as section 482 of the Internal Revenue Code of 1954, 68A Stat. at 162. The only difference between the two provisions was nonsubstantive: Congress replaced the words "the Commissioner is authorized to" with the words "the Secretary or his delegate may". Thus, section 482 of the Internal Revenue Code of 1954, provided:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Section 482 of the Internal Revenue Code of 1954 applied only to tax years that began after December 31, 1953, and ended after August 16, 1954. Internal Revenue Code of 1954, sec. 7851(a)(1)(A), 68A Stat. at 919, 929.[107] Thus for calendar-year taxpayers, 1954 was the first year for which section 482 of the Internal Revenue Code of 1954 was effective. This is relevant to Commissioner v. First Sec. Bank, 405 U.S. at 399-400, which involved the tax years 1955-59 of a calendar-year taxpayer. These years were governed by section 482 of the Internal Revenue Code of 1954.

---

[107] With respect to these same tax years, sec. 45 of the Internal Revenue Code of 1939 was repealed. Internal Revenue Code of 1954, sec. 7851(a)(1)(A), 68A Stat. at 919.

Section 7805(a) of the Internal Revenue Code of 1954, 68A Stat. at 917, was the provision in the Internal Revenue Code of 1954 that was analogous to section 62 of the Internal Revenue Code of 1939. Section 7805(a) of the Internal Revenue Code of 1954 provided: "[T]he Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."[108]

Section 7805(b) of the Internal Revenue Code of 1954, 68A Stat. at 917, was the provision in the Internal Revenue Code of 1954 that was analogous to section 3791(b) of the Internal Revenue Code of 1939. Section 7805(b) of the Internal Revenue Code of 1954 provided: "The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."[109]

Section 7807(a) of the Internal Revenue Code of 1954, 68A Stat. at 917, in conjunction with Treasury Decision 6091, 19 Fed. Reg. 5167 (Aug. 17, 1954), addressed the applicability of regulations promulgated under the Internal Revenue Code of 1939. Those regulations continued to be effective with respect to the Internal Revenue Code of 1954 until they were superseded. <u>Interstate Drop Forge Co. v. Commissioner</u>, 326 F.2d 743, 745 (7th Cir. 1964), <u>aff'g</u> T.C. Memo. 1963-149.[110] Thus section

---

[108] "[T]his title" referred to the Internal Revenue Code of 1954. <u>Id.</u> (a)(1), 68A Stat. at 3.

[109] In 1976, Congress made a nonsubstantive change to sec. 7805(a) and (b) of the Internal Revenue Code of 1954, substituting "Secretary" for "Secretary or his delegate" in both provisions. Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 1906(b)(13)(A), 90 Stat. at 1834.

[110] Sec. 7807(a) of the Internal Revenue Code of 1954, 68A Stat. at 917, provided:

> Until regulations are promulgated under any provision of this title which depends for its application on the promulgation of regulations (or which is to be applied in such manner as may be prescribed by regulations) all instructions, rules or regulations which are in effect immediately prior to the enactment of this title shall, to the extent such instructions, rules, or regulations could be prescribed as regulations under authority of such provision, be applied as if promulgated as regulations under such provision.

Treasury Decision 6091, 19 Fed. Reg. 5167 (Aug. 17, 1954), provided in relevant part:

39.45-1 of Regulations 118 (26 C.F.R. sec. 39.45-1 (1953)), which related to section 45 of the Internal Revenue Code of 1939, continued to be effective as to section 482 of the Internal Revenue Code of 1954 until section 39.45-1 of Regulations 118 was superseded by new regulations.[111]

It took time for the Treasury Department to promulgate regulations relating to the provisions of the Internal Revenue Code of 1954. See 26 C.F.R. v (1954). When these regulations were eventually promulgated, they were published in the Federal Register. A new title of the Code of Federal Regulations was created, named "Title 26--Internal Revenue, 1954", for the purpose of covering these regulations. See 26 C.F.R. v (1954).[112] Because the new title continued in use until

---

All regulations (including all Treasury decisions) prescribed by, or under authority duly delegated by, the Secretary of the Treasury, or jointly by the Secretary and the Commissioner of Internal Revenue, or by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, * * * applicable under any provision of law in effect on the date of enactment of the Code, to the extent such provision of law is repealed by the Code, are hereby prescribed under and made applicable to the provisions of the Code corresponding to the provision of law so repealed insofar as any such regulation is not inconsistent with the Code. Such regulations shall become effective as regulations under the various provisions of the Code as of the dates the corresponding provisions of law are repealed by the Code, until superseded by regulations issued under the Code.

[111] As explained later, regulations related to sec. 482 of the Internal Revenue Code of 1954 were promulgated in 1962. Regulation sec. 1.482-1, T.D. 6595, 27 Fed. Reg. 3597-3598 (Apr. 14, 1962), 1962-1 C.B. 43, 49-51, reprinted in 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.).

[112] The temporal scope of "Title 26--Internal Revenue, 1954" of the Code of Federal Regulations and its revisions is set forth in the table below:

| Title or revision | Scope |
| --- | --- |
| Title 26--Internal Revenue, 1954 | Regulations promulgated during 1954, and effective as to facts arising on and after Jan. 1, 1955. 26 C.F.R. v (1954). |
| 1955 revision | Regulations promulgated during 1954-55, and effective as to facts arising on and after Jan. 1, 1956. 26 (pts. 1-220) C.F.R. v (1955). |
| 1956 revision | Regulations promulgated during 1954-56, and effective as to facts arising on and after Jan. 1, 1957. 26 (pts. 1-169) C.F.R. v (1956). |

1961 (with revisions), the new title (and its revisions) ended up containing all of the 1954 Code regulations promulgated in the 1950s. However, no regulations related to section 482 of the Internal Revenue Code of 1954 were published in the 1950s. So "Title 26--Internal Revenue, 1954" and its revisions did not contain any regulations related to section 482 of the Internal Revenue Code of 1954.

The preface to the new title "Title 26--Internal Revenue, 1954" gave the following explanation of the reasons for the creation of the new title:

> The enactment of the Internal Revenue Code of 1954, August 16, 1954, gave rise to a unique problem in the codification of the rules and regulations of the Internal Revenue Service. To accommodate rules and regulations implementing the new Internal Revenue Code, a new title was established in the Code of Federal Regulations entitled "Internal Revenue, 1954", designed to replace "Title 26--Internal Revenue" contained in the 1949 Edition. However, since many of the regulations implementing the Internal Revenue Code of 1954 had not been issued by the end of 1954, it was decided to publish both titles as of January 1, 1955.

> This book, therefore, contains all of the rules and regulations constituting Title 26--Internal Revenue, 1954, including temporary rules relating to income tax and administrative matters, issued pursuant to the Internal

| | |
|---|---|
| revised as of Jan. 1, 1958 | Regulations promulgated during 1954-57, and effective as to facts arising on and after Jan. 1, 1958. 26 (pts. 1-19) C.F.R. v (1958). |
| revised as of Jan. 1., 1959 | Regulations promulgated during 1954-58, and effective as to facts arising on and after Jan. 1, 1959. 26 (pts. 1-19) C.F.R. v (1959). |
| revised as of Jan. 1, 1960 | Regulations promulgated during 1954-59, and effective as to facts arising on and after Jan. 1, 1960. 26 (pt. 1 (secs. 1.01-1.499)) v (1960). |

The revision dates in the left-hand column reflect the revision dates set forth on the title pages of the volumes.

Revenue Code of 1954, fully promulgated during 1954, and effective as to facts arising on and after January 1, 1955.

In addition to this book, pocket supplements have been published for the existing volumes of Title 26--Internal Revenue, containing changes and additions to the regulations issued pursuant to the Internal Revenue Code of 1939 which were in force and effect on December 31, 1954. Eventually, Title 26--Internal Revenue, 1954 will be published in permanent form, replacing the five volumes of Title 26--Internal Revenue containing regulations issued pursuant to the Internal Revenue Code of 1939.

26 C.F.R. v (1954). The preface quoted above explains that the title of the Code of Federal Regulations related to the Internal Revenue Code of 1939 named "Title 26--Internal Revenue" would be published "as of January 1, 1955" and that pocket supplements for that title had already been published for changes and additions "which were in force and effect on December 31, 1954." "Title 26--Internal Revenue" of the Code of Federal Regulations was published in 1954 and included regulations that (1) were published in the Federal Register on or before December 31, 1953, and (2) were effective as to facts arising on or after January 1, 1954. 26 C.F.R. v (1954). Pocket supplements to "Title 26--Internal Revenue" of the Code of Federal Regulations were published in 1955, 1956, and 1957. 26 C.F.R. (Supp. 1955); 26 C.F.R. (Supp. 1956); 26 C.F.R. (Supp. 1957). Added pocket parts to be used in conjunction with the 1957 pocket supplement were published in 1958, 1959, and 1960. 26 C.F.R. (Supp. 1957 & added pocket part 1958); 26 C.F.R. (Supp. 1957 & added pocket part 1959); 26 C.F.R. (Supp. 1957 & added pocket part 1960).

AA. The 1960 notice of proposed rulemaking

On December 10, 1960, a notice of proposed rulemaking was published in the Federal Register. 25 Fed. Reg. 12703. It proposed regulation section 1.482-1, which, according to the notice was "prescribed under" section 482 of the Internal Revenue Code of 1954. 25 Fed. Reg. at 12704.[113]

---

[113] The 1960 proposed regulations are identical to final regulations promulgated in 1962. T.D. 6595, 27 Fed. Reg. 3597-3598 (Apr. 14, 1962), 1962-1 C.B. 43, 49-51, reprinted in 26 C.F.R. sec. 1.482-1(b) (1961 ed. 1965 Cum. Supp.). We will discuss the substance of the 1962 regulations shortly.

BB.  The creation of a new title of the Code of Federal Regulations

In 1961 the Government Printing Office issued a new title in the Code of Federal Regulations, "Title 26--Internal Revenue, Revised as of January 1, 1961", which replaced "Title 26--Internal Revenue, 1954". See 26 (part 1 (secs. 1.401 to 1.860)) C.F.R. v (1961). The new title contained all regulations related to the Internal Revenue Code of 1954 that had been promulgated on or before December 31, 1960, and effective as to facts arising on or after January 1, 1961. Id. No final regulations related to section 482 of the Internal Revenue Code of 1954 were promulgated on or before December 31, 1960. Therefore, the new title did not contain any regulations related to section 482 of the Internal Revenue Code of 1954. The new title contained the following heading to act as a placemarker for future regulations under section 482 of the Internal Revenue Code of 1954: "§1[.]482  [Reserved]". 26 C.F.R. 140 (1961).

CC.  The 1962 final regulations

On April 14, 1962, a final version of regulation section 1.482-1, which was identical to the 1960 proposed version, was published in the Federal Register. T.D. 6595, 27 Fed. Reg. 3597-3598 (published Apr. 14, 1962; filed Apr. 13, 1962), 1962-1 C.B. 43, 49-51. As with the 1960 proposed regulations, the Treasury Department said that the final 1962 regulations were "prescribed under" section 482 of the Internal Revenue Code of 1954. T.D. 6565, 27 Fed. Reg. 3595. Three years after the final 1962 regulations were published in the Federal Register, they were published in the Code of Federal Regulations. 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.).

The final 1962 regulations under section 482 of the Internal Revenue Code of 1954 contained only one section, section 1.482-1, which was divided into three paragraphs: (a), (b), and (c). The entire section is set forth below:

Sec. 1.482-1 Determination of the taxable income of a controlled taxpayer.

(a) Definitions.  When used in this section--

(1) The term "organization" includes any organization of any kind, whether it be a sole

proprietorship, a partnership, a trust, an estate, an association, or a corporation (as each is defined or understood in the Internal Revenue Code or the regulations thereunder), irrespective of the place where organized, where operated, or where its trade or business is conducted, and regardless of whether domestic or foreign, whether exempt, whether affiliated, or whether a party to a consolidated return.

(2) The term "trade" or "business" includes any trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place where carried on.

(3) The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

(4) The term "controlled taxpayer" means any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests.

(5) The terms "group" and "group of controlled taxpayers" mean the organizations, trades, or businesses owned or controlled by the same interests.

(6) The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deductions, the credits, the allowances, or the item or element of income, deductions, credits, or allowances, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, chose to make (even though

such contract, transaction, or arrangement be legally binding upon the parties thereto).

(b) <u>Scope and purpose</u>. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

(2) Section 482 and this section apply to the case of any controlled taxpayer, whether such taxpayer makes a separate or a consolidated return. If a controlled taxpayer makes a separate return, the determination is of its true separate taxable income. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer are determined consistently with the principles of a consolidated return.

(3) Section 482 grants no right to a controlled taxpayer to apply its provisions at will, nor does it grant any right to compel the district director to apply such provisions. It is not intended (except in the case of the computation of consolidated taxable income under a consolidated return) to effect in any case such a distribution, apportionment, or allocation of gross income,

deductions, credits, or allowances, or any item of gross income, deductions, credits, or allowances, as would produce a result equivalent to a computation of consolidated taxable income under subchapter A, chapter 6 of the Code.

(c) <u>Application</u>. Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.). We refer to 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.) as the 1962 regulations.

There were differences between section 1.482-1 of the 1962 regulations and section 39.45-1 of Regulations 118 (26 C.F.R. sec. 39.45-1(b)(1) (1953)). One difference was that in the third sentence of section 1.482-1(b)(1) of the 1962 regulations, the phrase "the district director shall intervene" replaced the phrase "the statute contemplates that the Commissioner shall intervene" in Regulation 118. Another difference was that the term "true net income", which was used in several places in section 39.45-1 of Regulations 118 (1953), was changed to "true taxable income" each time it was used in the 1962 regulations. Neither of these differences, nor any other difference between the 1962 regulations and Regulation 118 (1953), appears relevant to the effect of legal restrictions on allocations of income under section 482 of the Internal Revenue Code of 1954. The portion of the 1962 regulations most relevant to such legal restrictions was the "complete power" passage found in the second and third sentences of 26 C.F.R. sec. 1.482-1(b)(1) (1961 ed. 1965 Cum. Supp.). These sentences in the 1962 regulations (which are quoted in the excerpt above) were not

substantively different from these sentences in the 1953 regulations. In the 1953 regulations, these two sentences had been written as follows:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. * * *

26 C.F.R. sec. 39.45-1(b)(1) (1953).

The 1962 regulations (i.e., the 1962 version of regulation section 1.482-1) had no effective-date provision. This raises the question of whether the 1962 regulations were applicable retroactively for the same tax years for which section 482 of the Internal Revenue Code of 1954 applied, i.e., to tax year 1954 and later years for calendar-year taxpayers. If they did apply retroactively, that would mean the 1962 version of regulation section 1.482-1 superseded section 39.45-1 of Regulations 118 (1953) for tax year 1954 and later years. The proposition that the 1962 regulatory provisions applied retroactively for the same years for which section 482 of the Internal Revenue Code of 1954 applied finds support in Pollack v. Commissioner, 47 T.C 92, 110 (1966), aff'd, 392 F.2d 409 (5th Cir. 1968), which held that "unless the Commissioner otherwise specifies, regulations are retroactive to the date on which the statute was enacted". (Citations omitted.) However, Pollack alone might not resolve the question of whether the 1962 regulatory provisions applied retroactively for the same years for which section 482 of the Internal Revenue Code of 1954 applied. Two other principles potentially bear on this question. First, the Treasury Department cannot give a regulation retroactive effect if to do so would be an abuse of discretion. See Anderson, Clayton & Co. v. United States, 562 F.2d 972, 980-981 (5th Cir. 1977). Thus, if the 1962 regulatory provisions were otherwise construed as having retroactive effect, there

might be an additional step of determining whether it would be an abuse of discretion for the Treasury Department to attempt to give the 1962 regulations retroactive effect. Second, section 4(c) of the APA[114] provided that substantive rules must generally be published not less than 30 days before their effective date. Section 4(c) of the APA[115] has been interpreted as prohibiting retroactive regulations. See Georgetown Univ. Hosp., 821 F.2d at 757 n.11. However, some caselaw suggests that section 4(c) of the APA[116] does not bar retroactive tax regulations, under the theory that such regulations are permitted by section 7805(b) of the Internal Revenue Code of 1954. See Redhouse v. Commissioner, 728 F.2d 1249, 1253 (9th Cir. 1984), aff'g Wendland v. Commissioner, 79 T.C. 355 (1982); Wing v. Commissioner, 81 T.C. 17, 29 n.16 (1983). We will discuss in greater detail the question of retroactivity when we discuss First Security Bank, which made repeated references to 26 C.F.R. sec. 1.482-1 (1971). See infra part II.FF. The short answer is that it does not matter whether the 1962 regulations were applicable for the same tax years for which section 482 of the Internal Revenue Code of 1954 applied, including the 1955-59 tax years at issue in First Security Bank, because there is no relevant difference between the 1962 regulations and the 1953 regulations as to the portions of the regulatory text cited and quoted by Commissioner v. First Sec. Bank, 405 U.S. at 400 & nn.8 & 10, 404 & n.18, 407 & n.25.

DD.    The 1965 and 1966 notices of proposed rulemaking

On April 1, 1965, a notice of proposed rulemaking, which proposed regulations related to section 482 of the Internal Revenue Code of 1954, was published in the Federal Register. 30 Fed. Reg. 4256 (filed Mar. 31, 1965). Under the proposal a new paragraph (d) would be added to section 1.482-1 of the 1962 regulations, which had only three paragraphs: (a), (b), and (c). The proposed paragraph (d) would be entitled "Method of allocation". The 1965 proposal would also add new regulation section 1.482-2, entitled "Determination of taxable income in specific situations". The proposal would leave unchanged the text of section 1.482-1(a), (b), and (c), except that it would make a technical change to section 1.482-1(a) by making the definitions in paragraph (a) applicable to proposed regulation section 1.482-2. No changes in the regulations were proposed in the 1965 notice of proposed rulemaking

---

[114] Codified as amended at 5 U.S.C. sec. 553(d).

[115] Codified as amended at 5 U.S.C. sec. 553(d).

[116] Codified as amended at 5 U.S.C. sec. 553(d).

other than those we have discussed here, i.e., the addition of section 1.482-1(d), the addition of section 1.482-2, and the technical change.

Of the provisions in the 1965 proposed regulations, it is important to discuss here only section 1.482-1(d)(5), which addressed the use of a deferred-income method of accounting for payments that would be barred by foreign legal restrictions. Section 1.482-1(d)(5) provided:

> (5) If payment or reimbursement for the sale, exchange, or use of property, the rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferable income or deductions, providing the taxpayer has, for the year to which the distributions, apportionments, or allocations relate, requested and received permission to use a method of accounting in which the reporting of deferable income is deferred until the income ceases to be deferable income. Such method of accounting is referred to in this section as the deferred income method of accounting. If such method has been approved, any payments or reimbursements which were prevented or would have been prevented, and any deductions attributable to such payments or reimbursements, shall be deferred until they cease to be deferable under such method of accounting. The principles of this subparagraph may be illustrated by the following example in which it is assumed that D, a domestic corporation, and F, a foreign corporation, are members of the same group of controlled entities:
>
> Example: D, which, is in the business of rendering services to unrelated parties, renders services for the benefit of F in 1965, which cost $60,000 and have a fair value of $100,000. Assume that the district director proposes to increase D's income by $100,000, but that the country in which F is located would have blocked payment in 1965 for such services. If D has received permission with respect to its 1965 return to use the deferred income

method of accounting, the $100,000 allocation and the $60,000 costs are deferable until such amounts cease to be deferable under D's method of accounting.

30 Fed. Reg. 4257.

On August 2, 1966, the Treasury Department withdrew the 1965 proposed regulations under section 482 of the Internal Revenue Code of 1954. 31 Fed. Reg. 10394 (filed Aug. 1, 1966). In their place, the Treasury Department issued new proposed regulations, which were published in a new notice of proposed rulemaking. 31 Fed. Reg. 10394 (Aug. 2, 1966). The basic features of the 1966 proposed regulations were the same as the 1965 proposed regulations: there was to be added new regulation section 1.482-1(d), entitled "Method of allocation"; there was to be added new regulation section 1.482-2, entitled "Determination of taxable income in specific situations"; and the text of section 1.482-1(a), (b), and (c), was to be unchanged except for the same technical change to section 1.482-1(a) that had been proposed in 1965 (i.e., making the definitions in paragraph (a) applicable to proposed regulation section 1.482-2).

Section 1.482-1(d)(6) of the 1966 proposed regulations, 31 Fed. Reg. 10395, addressed the use of a deferred-income method of accounting for payments that would be barred by foreign legal restrictions. These provisions of the 1966 proposed regulations were similar to section 1.482-1(d)(5) of the 1965 proposed regulations, except that the 1966 proposed regulations placed a time limit on the taxpayer's ability to elect the method of accounting. Section 1.482-1(d)(6) of the 1966 proposed regulations provided:

> (6) If payment or reimbursement for the sale, exchange, or use of property, the rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferrable income or deductions, providing the taxpayer has, for the year to which the distributions, apportionments, or allocations relate, elected to use a method of accounting in which the reporting of deferrable income is deferred until

**Add. 127**

the income ceases to be deferrable income. Under such method of accounting, referred to in this section as the deferred income method of accounting, any payments or reimbursements which were prevented or would have been prevented, and any deductions attributable directly or indirectly to such payments or reimbursements, shall be deferred until they cease to be deferrable under such method of accounting. If such method of accounting has not been elected with respect to the taxable year to which the allocations under section 482 relate, the taxpayer may elect such method with respect to such allocations (but not with respect to other deferrable income) at any time before the first occurring of the following events with respect to the allocations:

(i) Execution of Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(ii) Expiration of the period ending 30 days after the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments reflecting such allocations; or

(iii) Execution of a closing agreement or offer-in-compromise.

The principles of this subparagraph may be illustrated by the following example in which it is assumed that D, a domestic corporation, and F, a foreign corporation, are members of the same group of controlled entities:

Example. D, which is in the business of rendering a certain type of service to unrelated parties, renders such services for the benefit of F in 1965. The direct and indirect costs allocable to such services are $60,000, and an arm's length charge for such services is $100,000. Assume that the district director proposes to increase D's income by $100,000, but that the country in which F is located would have blocked payment in 1965 for such services. If, prior to the first occurring of the events described in subdivisions (i), (ii), or (iii) of this subparagraph, D elects to use the deferred income method of accounting with respect to such

allocation, the $100,000 allocation and the $60,000 of costs are deferrable until such amounts cease to be deferrable under D's method of accounting.

31 Fed. Reg. 10395.

While the 1966 proposed regulations were in proposed form, the 1962 regulation remained in effect. 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.). Meanwhile, two successive new editions of the Code of Federal Regulations were published in 1967 and 1968. Each reprinted the 1962 regulations. 26 C.F.R. sec. 1.482-1 (1967); 26 C.F.R. sec. 1.482-1 (1968). The 1967 revision to the Code of Federal Regulations contained regulations promulgated on or before December 31, 1966. 26 (part 1 (secs. 1.401-1.500)) C.F.R. v (1967). The 1968 revision to the Code of Federal Regulations contained regulations promulgated on or before December 31, 1967. 26 C.F.R. (part 1 (secs. 1.401-1.500)) v (1968).

EE.   The 1968 final regulations

On April 16, 1968, Treasury Decision 6952, which contained final amendments to the 1962 regulations was published. 33 Fed. Reg. 5848 (published Apr. 16, 1968; filed Apr. 15, 1968). Treasury Decision 6952 stated that the amendments were adopted "under" section 482 of the Internal Revenue Code of 1954. 33 Fed. Reg. 5848. Tracking the 1966 proposed regulations, the amendments that were made by Treasury Decision 6952 did the following: they added section 1.482-1(d), entitled "Method of allocation"; they added section 1.482-2, entitled "Determination of taxable income in specific situations"; and they left unchanged the existing text of section 1.482-1(a), (b), and (c) except for a technical change to section 1.482-1(a) (which made the definitions in paragraph (a) applicable to new regulation section 1.482-2). The 1968 regulatory amendments left in place the provisions containing the "complete power" passage. See 26 C.F.R. sec. 1.482-1(b)(1) (1969) (part of section 1.482-1, after its 1968 amendment by T.D. 6952).[117]

---

[117] The "complete power" passage was in the 1962 regulations. 26 C.F.R. sec. 1.482-1(b)(1) (1968) (1962 regulations). The "complete power" passage appeared in the 1934 regulations and then appeared in the 1936, 1939, 1940, 1943, and 1953 regulations. For citations of the regulations in which the "complete power" passage appeared, see the bullet points supra note 38. Neither the 1965 proposed regulations nor the 1966 proposed regulations would have changed the "complete power" passage in the 1962 regulations. 30 Fed. Reg. 4256 (Apr. 1, 1965); 31 Fed. Reg. 10394 (Aug. 2, 1966).

We use the phrase "the 1968 regulations" to refer to the regulations related to section 482 of the Internal Revenue Code of 1954, as the regulations were amended in 1968, even including the portions of the 1962 regulations related to section 482 of the Internal Revenue Code of 1954 that were not affected by the 1968 amendments. This convention has been used elsewhere. See, e.g., T.D. 8552, 59 Fed. Reg. 34972 (July 8, 1994) (preamble to 1994 final regulations); Thomas E. Jenks, "Section 482 and the Non-Recognition Provisions: The Transfer of Intangible Assets", 32 Tax Law. 775, 783 (1979); Edward Albert Purnell, "The Net Present Value Approach to Intangible Transfer Pricing Under Section 482: An Economic Model Takes the BALRM Floor", 45 Tax Law. 647, 650 n.13 (1992). Note that when we refer to the 1968 regulations, we will not cite the 1968 edition of the Code of Federal Regulations. This edition included only regulations that were promulgated on or before December 31, 1967. 26 (part 1 (secs. 1.401-1.500)) v (1968).[118] The 1968 amendments were filed on, and therefore were promulgated on, April 15, 1968. 33 Fed. Reg. 5857 (Apr. 16, 1968). Therefore the 1968 edition of the Code of Federal Regulations does not reflect the 1968 amendments.

One of the provisions of the 1968 regulations that was not in the 1962 regulations was section 1.482-1(d)(6). Section 1.482-1(d)(6) of the 1968 regulations was almost identical to section 1.482-1(d)(6) of the 1966 proposed regulations. 31 Fed. Reg. 10395 (Aug. 2, 1966). The provision allowed the use of a deferred-income method of accounting for payments that would be barred by foreign legal restrictions. Subparagraph (6) of section 1.482-1(d) of the 1968 regulations provided:

> (6) If payment or reimbursement for the sale, exchange, or use of property, the rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferrable income or deductions, providing the taxpayer has, for the

---

[118] When referring to the 1968 regulations, we will refer variously to the 1969, 1971, or 1992 editions of the Code of Federal Regulations. Although the 1992 edition reflects some post-1968 amendments to the regulations, see 26 C.F.R. sec. 1.482-2 (1992) (historical notes), these amendments are not relevant.

year to which the distributions, apportionments, or allocations relate, elected to use a method of accounting in which the reporting of deferrable income is deferred until the income ceases to be deferrable income. Under such method of accounting, referred to in this section as the deferred income method of accounting, any payments or reimbursements which were prevented or would have been prevented, and any deductions attributable directly or indirectly to such payments or reimbursements, shall be deferred until they cease to be deferrable under such method of accounting. If such method of accounting has not been elected with respect to the taxable year to which the allocations under section 482 relate, the taxpayer may elect such method with respect to such allocations (but not with respect to other deferrable income) at any time before the first occurring of the following events with respect to the allocations:

(i) Execution by the taxpayer of Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(ii) Expiration of the period ending 30 days after the date of a letter by which the district director transmits an examination report notifying the taxpayer of the proposed adjustments reflecting such allocations or before July 16, 1968, whichever is later; or

(iii) Execution of a closing agreement or offer-in-compromise.

The principles of this subparagraph may be illustrated by the following example in which it is assumed that X, a domestic corporation, and Y, a foreign corporation, are members of the same group of controlled entities:

Example. X, which is in the business of rendering a certain type of service to unrelated parties, renders such services for the benefit of Y in 1965. The direct and indirect costs allocable to such services are $60,000, and an arm's length charge for such services is $100,000. Assume that the district director proposes to increase X's income by $100,000, but that the country in which Y is located would

have blocked payment in 1965 for such services. If, prior to the first occurring of the events described in subdivisions (i), (ii), or (iii) of this subparagraph, X elects to use the deferred income method of accounting with respect to such allocation, the $100,000 allocation and the $60,000 of costs are deferrable until such amounts cease to be deferrable under X's method of accounting.

33 Fed. Reg. 5849 (Apr. 16, 1968), 26 C.F.R. sec. 1.482-1(d)(6) (1969).

Section 1.482-2 of the 1968 regulations, 33 Fed. Reg. 5849 (Apr. 16, 1968), a new provision not found in the 1962 regulations, addressed the methods for allocating income in the case of specific types of transactions. See also 33 Fed. Reg. 5848, 26 C.F.R. sec. 1.482-1(d)(1) (1969). These types of transactions were loans, sec. 1.482-2(a), services, id. para. (b), use of tangible property, id. para. (c), transfer or use of intangible property, id. para. (d), and sales of tangible property, id. para. (e). 33 Fed. Reg. 5849-5857.

For transfers or use of intangible property, here are the major rules in the 1968 regulations: an appropriate allocation may be made to reflect an arm's-length consideration, sec. 1.482-2(d)(1)(i), 33 Fed. Reg. 5852 (Apr. 16, 1968); the amount of arm's-length consideration is best indicated by comparable transactions, id. subpara. (2)(ii), 33 Fed. Reg. 5853; and in the absence of comparable transactions, the amount of arm's-length consideration may be arrived at through 12 factors, id. subpara. (2)(iii). Section 1.482-2(d)(4) of the 1968 regulations related to cost-sharing agreements for the development of intangible property. 33 Fed. Reg. 5854.

The preamble to the 1968 amendments to the section 482 regulations observed that a notice of proposed rulemaking had been made in 1965 and that those proposed amendments had been withdrawn and replaced with new proposals in 1966. 33 Fed. Reg. 5848. The preamble then stated: "After consideration of all such relevant matter as was presented by interested persons regarding the rules proposed, the amendment under section 482 is hereby adopted to read as set forth below." Id.

The 1968 regulatory amendments did not have an effective-date provision. As with the 1962 regulations, there is a question as to whether the 1968 regulations applied retroactively. Caselaw suggests that a regulation without an effective-date provision is generally

applicable for the same tax years as the statutory provisions to which the regulation relates. See Pollack v. Commissioner, 47 T.C. at 110.[119] The statutory provision to which the 1968 regulatory amendments related was section 482 of the Internal Revenue Code of 1954, 33 Fed. Reg. 5848, which was effective beginning with tax year 1954 for calendar-year taxpayers. Internal Revenue Code of 1954, sec. 7851(a)(1)(A), 68A Stat. at 919. Therefore, the caselaw suggests that for these taxpayers the 1968 amendment would be effective for tax year 1954 and subsequent years. However, this does not entirely answer the question of whether the 1968 amendments were applicable for the tax year 1954 and subsequent years. Two other principles may be relevant. First, there is caselaw holding that the Treasury Department cannot give a regulation retroactive effect if to do so would be an abuse of discretion. See Anderson, Clayton & Co., 562 F.2d at 980-981. Thus, even if the 1968 amendments were otherwise construed as having retroactive effect, there may be an additional step of determining whether it would be an abuse of discretion for the Treasury Department to attempt to give the 1968 amendments retroactive effect. Second, section 4(c) of the APA[120] provided that substantive rules must generally be published not less than 30 days before their effective date. This APA antiretroactivity rule might arguably trump section 7805(b) of the Internal Revenue Code of 1954. However, some caselaw suggests it does not. See Redhouse v. Commissioner, 728 F.2d 1253; Wing v. Commissioner, 81 T.C. at 29 n.16. We consider this retroactivity question later when we discuss First Security Bank, which repeatedly referred to 26 C.F.R. sec. 1.482-1 (1971). See infra part II.FF. The short answer is that it does not matter whether the 1968 regulations have retroactive effect as to the 1955-59 tax years at issue in First Security Bank because there is no relevant difference between the 1968 regulations and earlier regulations as to the portion of the regulations cited and quoted by First Security Bank.

On April 16, 1968, the same day that Treasury Decision 6952 was published in the Federal Register, a proposed amendment to section 1.482-2(b)(3) and the proposed addition of section 1.482-2(b)(7) were also published. 33 Fed. Reg. 5858. These proposals are not relevant to the

---

[119] This case interpreted sec. 7805(b) of the Internal Revenue Code of 1954, which granted the Treasury Department authority to prescribe the extent, if any, to which a tax regulation may be applied without retroactive effect. Sec. 7805(b) of the Internal Revenue Code of 1954 governed the 1968 regulatory amendments.

[120] Codified as amended at 5 U.S.C. sec. 553(d).

effect of legal restrictions on allocations of income under section 482 of the Internal Revenue Code of 1954.

On April 25, 1968, a correction of an error in section 1.482-2(e)(3)(i) of the 1968 regulations was published. 33 Fed. Reg. 6290 (Apr. 25, 1968). This correction is not relevant to the effect of legal restrictions on allocations of income under section 482 of the Internal Revenue Code of 1954.

On July 25, 1968, an amendment to section 1.482-2(d)(4) of the 1968 regulations was published. 33 Fed. Reg. 10569 (July 25, 1968).[121] This amendment does not appear relevant to the effect of legal restrictions on allocations of income under section 482 of the Internal Revenue Code of 1954.

The 1969 revision to the Code of Federal Regulations contained regulations promulgated on or before December 31, 1968. See 26 (part 1 (secs. 1.401-1.500)) C.F.R. v (1969). Included in the 1969 revision was section 1.482-1, which consisted of the following provisions:

- section 1.482-1(a), (b), and (c), with section 1.482-1(a) reflecting the technical change to section 1.482-1(a) made by the Treasury Decision 6952 amendment on April 16, 1968; and

- section 1.482-1(d), which had been added by the Treasury Decision 6952 amendment on April 16, 1968.

26 C.F.R. sec. 1.482-1 (1969). Also included in the 1969 revision was section 1.482-2, which was the Treasury Decision 6952 text promulgated on April 16, 1968, 33 Fed. Reg. 5849, as amended on April 25, 1968, 33 Fed. Reg. 6290, and on July 25, 1968, 33 Fed. Reg. 10569. 26 C.F.R. sec. 1.482-2 (1969).

On January 22, 1969, an amendment to section 1.482-2(b)(3) and the addition of section 1.482-2(b)(7) were published. These changes were the final version of the changes proposed on April 16, 1968. 34 Fed. Reg. 933 (Jan. 22, 1969). These changes are not relevant to the effect of

---

[121] The preamble stated that the notice-and-comment procedure was not followed because the amendment "liberalized" the regulations. 33 Fed. Reg. 10569 (July 25, 1968).

legal restrictions on allocations of income under section 482 of the Internal Revenue Code of 1954.

On January 29, 1969, a minor correction to section 1.482-2(b)(3) was published. 34 Fed. Reg. 1380 (Jan. 29, 1969). This correction is not relevant to the effect of legal restrictions on allocations of income under section 482 of the Internal Revenue Code of 1954.

The 1970 revision of the Code of Federal Regulations contained regulations promulgated on or before December 31, 1969. See 26 (part 1 (secs. 1.401-1.500)) C.F.R. v (1970). The 1970 revision contained the same text of section 1.482-1 that had been printed in the 1969 revision. 26 C.F.R. sec. 1.482-1 (1970). Section 1.482-2 in the 1970 revision was identical to the version of section 1.482-2 published in the 1969 revision, except that it included the amendments made on January 22 and 29, 1969. 26 C.F.R. sec. 1.482-2 (1970).

The 1971 revision of the Code of Federal Regulations codified regulations as of January 1, 1971, including amendments published during 1970. See 26 (part 1 (secs. 1.401-1.500)) C.F.R. i, v (1971). This 1971 revision contained the same text of sections 1.482-1 and -2 that appeared in the 1970 revision. 26 C.F.R. secs. 1.482-1, -2 (1971). The text of section 1.482-1 appears at 288-292 of the relevant volume of the 1971 revision to the Code of Federal Regulations. 26 C.F.R. sec. 1.482-1 (1971).

FF.     Commissioner v. First Security Bank, 405 U.S. 394 (1972) (a case involving tax years 1955 to 1959)

In Commissioner v. First Sec. Bank, 405 U.S. at 396, a holding company[122] owned two banks[123] and an insurance company.[124] Customers of the two banks sometimes wanted to buy credit-life insurance; the banks would refer these customers to an unrelated insurance company that had agreed to reinsure the referred business

---

[122] The holding company was First Security Corp., which the Supreme Court referred to as "Holding Company". Commissioner v. First Sec. Bank, 405 U.S. at 396.

[123] The two banks were First Security Bank of Utah, N.A., and First Security Bank of Idaho, N.A., which the Supreme Court referred to collectively as "the Banks". Commissioner v. First Sec. Bank, 405 U.S. at 396.

[124] The insurance company was First Security Life Insurance Company of Texas, which the Supreme Court referred to as "Security Life". Commissioner v. First Sec. Bank, 405 U.S. at 396.

with the insurance company that was owned by holding company. <u>Id.</u> at 398.[125] The unrelated insurance company wrote the policies and bore the insurance risks. <u>Id.</u>[126] The two banks did not receive any commissions. <u>Id.</u> Pursuant to section 482 of the Internal Revenue Code of 1954,[127] respondent allocated insurance commission income to the two banks for tax years 1955, 1956, 1957, 1958, and 1959. <u>Id.</u> at 399-400. These tax years were based on calendar years. <u>First Sec. Bank of Utah, N.A. v. Commissioner</u>, T.C. Memo. 1967-256, 26 T.C.M. (CCH) 1320, 1321 (1967), <u>rev'd and remanded</u>, 436 F.2d 1192 (10th Cir. 1971), <u>aff'd</u>, 405 U.S. 394 (1972). The amount respondent sought to allocate to the two banks was 40% of the premiums that had been received by the reinsurer from the unrelated insurance company. <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 400. The allocation was improper, the Court held, because the two banks were prohibited from receiving insurance commission income by section 92 of the National Bank Act. <u>Id.</u> at 402. This is a provision of the federal banking laws that authorizes national banks to act as insurance agents in places with a population of 5,000 or fewer. The provision has been interpreted by the courts to implicitly prohibit national banks from acting as insurance agents in places with a population of more than 5,000. Id. at 401 n.13 (citing <u>Saxon v. Ga. Ass'n of Indep. Ins. Agents, Inc.</u>, 399 F.2d 1010 (5th Cir. 1968), and <u>Commissioner v. Morris Tr.</u>, 367 F.2d 794, 795 (4th Cir. 1966), <u>aff'g</u> 42 T.C. 779 (1964)). The two banks were national banks. <u>Id.</u> at 396. Thus they were implicitly prohibited by section 92 of the National Bank Act from acting as insurance agents in places with a population of more than 5,000. The Court assumed that because the two banks could not act as insurance agents, they could not legally receive insurance commission income. <u>Id.</u> at 402. The Court also assumed that because the two banks received no compensation for referring their customers to the unrelated insurance company they did not violate section 92 of the National Bank Act. <u>Id.</u> n.16.[128] The upshot of these assumptions was that the two banks were in compliance with the law but would have been in violation of the law had they received insurance commissions.

---

[125] The unrelated insurance company was American National Insurance Company of Galveston, Texas, which the Supreme Court referred to as "American National". <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 398.

[126] Although the unrelated insurance company bore the risks, it hedged this risk through the reinsurance arrangement.

[127] Recall that this provision can be found at 68A Stat. at 162.

[128] <u>First Security Bank</u> held that it could make these assumptions because the government had failed to contest their validity. <u>Commissioner v. First Sec. Bank of Utah</u>, 405 U.S. at 402 & n.16.

The opinion first gave a one-sentence introduction to the case, <u>id.</u> at 394 & n.1 and then described the relevant facts, <u>id.</u> at 396-399. The opinion then described respondent's position as follows:

> Pursuant to his § 482 power to allocate gross income among controlled corporations in order to reflect the actual incomes of the companies, the Commissioner determined that 40% of Security Life's premium income [Security Life was the unrelated insurance company] was allocable to the Banks as compensation for originating and processing the credit life insurance. * * * It is the Commissioner's view that the 40% of the premium income so allocated is the equivalent of commissions that the Banks earned and must be included in their "true taxable income."[8]
>
> [8] See 26 CFR § 1.482-1(a)(6) (1971).

<u>Id.</u> at 399-400 & n.8. The opinion in <u>First Security Bank</u> then explained the purpose of section 482 of the Internal Revenue Code of 1954:

> The parties agree that § 482 is designed to prevent "artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises."[9] Treasury Regulations provide:
>
> "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining[129] according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."[10]
>
> The question we must answer is whether there was a shifting or distorting of the Banks' true net income resulting from the receipt and retention by Security Life [the unrelated insurance company] of the premiums above described. [Footnote omitted.]

---

[129] The <u>First Security Bank</u> opinion failed to include the comma after the word "determining" in 26 C.F.R. sec. 1.482-1(b)(1) (1971).

[9] B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders p. 15-21 (3d ed. 1971).

[10] 26 CFR § 1.482-1(b)(1) (1971). The first regulations interpreting this section of the statute were issued in 1934. They have remained virtually unchanged. Jenks, Treasury Regulations Under Section 482, 23 Tax Lawyer 279 (1970).

Commissioner v. First Sec. Bank, 405 U.S. at 400 & nn.9 &10, 401.

The next relevant portion of the First Security Bank opinion contains the reasoning for the Supreme Court's holding that respondent cannot allocate income to a taxpayer who did not receive the income and could not legally receive the income. Id. at 394-407. Petitioner and respondent have competing interpretations of the Supreme Court's reasoning. Petitioner contends that "First Security Bank found section 482 [of the Internal Revenue Code of 1954] to be clear in light of the longstanding and consistent interpretation of the concept of income". Respondent argues that First Security Bank did not determine that the text of section 482 of the Internal Revenue Code of 1954 was clear. In respondent's view, First Security Bank relied on the text of a regulation, 26 C.F.R. sec. 1.482-1 (1971). Because of this dispute regarding the reasoning of First Security Bank, we quote the Supreme Court's reasoning in full below:

We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving. In cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it. The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it. "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." Corliss v. Bowers, 281 U.S. 376, 378 (1930).

It is, of course, well established that income assigned before it is received is nonetheless taxable to the assignor. But the assignment-of-income doctrine assumes that the income would have been received by the taxpayer had he not arranged for it to be paid to another. In Harrison v. Schaffner, 312 U.S. 579, 582 (1941), we said:

> "[O]ne vested with the right to receive income [does] not escape the tax by any kind of anticipatory arrangement, however skillfully devised, by which he procures payment of it to another, since, by the exercise of his power to command the income, he enjoys the benefit of the income on which the tax is laid."[17]

One of the Commissioner's regulations for the implementation of § 482 expressly recognizes the concept that income implies dominion or control of the taxpayer. It provides as follows:

> "The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers."[18]

This regulation is consistent with the control concept heretofore approved by this Court, although in a different context. The regulation, as applied to the facts in this case, contemplates that Holding Company--the controlling interest--must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the "true taxable income" of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482. But Holding Company had no such power unless it acted in violation of federal banking laws. The "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law.

Apart from the inequity of attributing to the Banks taxable income that they have not received and may not lawfully receive, neither the statute nor our prior decisions require such a result. We are not faced with a situation such as existed in those cases, urged by the Commissioner, in which we held the proceeds of criminal activities to be taxable.[19] Those cases concerned situations in which the taxpayer had actually received funds. Moreover, the illegality involved was the act that gave rise to the income.

Here the originating and referring of the insurance, a practice widely followed, is acknowledged to be legal. Only the receipt of insurance commissions or premiums thereon by national banks is not. Had the Banks ignored the banking laws, thereby risking the loss of their charters and subjecting their officers to personal liability,[20] the illegal-income cases would be relevant. But the Banks from the inception of their use of credit life insurance in 1948 were careful never to place themselves in that position. We think that fairness requires the tax to fall on the party that actually receives the premiums rather than on the party that cannot.[21]

In L.E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952), the Tax Court considered a closely analogous situation. The same interest controlled a manufacturer and a distributor of rubber prophylactics. The OPA Price Regulations of World War II became effective on December 1, 1941. Prior thereto the distributor had raised its prices to retailers, but the manufacturer had not increased the prices charged to its affiliated distributor. The Commissioner, acting under § 482, attempted to allocate some of the distributor's income to the manufacturer on the ground that a portion of the distributor's profits was in fact earned by the manufacturer, even though the manufacturer was prohibited by the OPA regulations from increasing its prices. In holding that the Commissioner had acted improperly, the Tax Court said that he had "no authority to attribute to petitioners income which they could not have received." 18 T.C., at 961.[22]

It is argued, finally, that the "services" rendered by the Banks in making credit insurance available to customers "would have been compensated had the corporations been dealing with each other at arm's length."[23] The short answer is that the proscription against acting as insurance agent and receiving compensation therefor applies to all national banks located in places with population in excess of 5,000 inhabitants. It applies equally to such banks whether or not they are controlled by a holding company. If these Banks had been independent of any such control--as most banks are--no

commissions or premiums could have been received lawfully and there would have been no taxable income.[24] As stated in the Treasury Regulations, the "purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer . . . ."[25] We think our holding comports with such parity treatment.

We conclude that the premium income received by Security Life could not be attributable to the Banks. Holding Company did not utilize its control over the Banks and Security Life to distort their true net incomes. The Commissioner's exercise of his § 482 authority was therefore unwarranted in this case. * * *

[17] See Helvering v. Horst, 311 U.S. 112 (1940) (assignment of interest coupons attached to bonds owned by taxpayer); Lucas v. Earl, 281 U.S. 111 (1930) (taxpayer assigned to wife one-half interest in his earnings). See generally Commissioner v. Sunnen, 333 U.S. 591 (1948), and cases discussed therein at 604-610.

[18] 26 CFR § 1.482-1(b)(1) (1971).

[19] James v. United States, 366 U.S. 213 (1961); Rutkin v. United States, 343 U.S. 130 (1952).

[20] 12 U.S.C. § 93.

[21] Thus, in Commissioner v. Lester, 366 U.S. 299 (1961), in determining that a taxpayer should not be taxed on alimony payments to his divorced wife, the Court determined that it was more consistent with the basic precepts of income tax law that the wife, who received and had power to spend the payments, should be taxed rather than the husband who actually earned the money.

[22] As noted at the outset of this opinion, certiorari was granted to resolve the conflict between the decision below and that in Local Finance Corp. v. Commissioner, 407 F.2d 629 (CA7 1969). The Tax Court in this case felt bound to follow Local Finance Corp., which was decided subsequently to L.E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952). For the reasons stated in the opinion above, we think Local Finance Corp. was erroneously decided and that the earlier views of the Tax Court were correct.

See Teschner v. Commissioner, 38 T.C. 1003, 1009 (1962):

"In the case before us, the taxpayer, while he had no power to dispose of income, had a power to appoint or designate its recipient. Does the existence or exercise of such a power alone give rise to taxable income in his hands? We think clearly not. In Nicholas A. Stavroudis, 27 T.C. 583, 590 (1956), we found it to be settled doctrine that a power

to direct the distribution of trust income to others is not alone sufficient to justify the taxation of that income to the possessor of such a power.

[23] See dissenting opinion of MR. JUSTICE BLACKMUN, post, at 422.

[24] If an unaffiliated bank were able to provide the insurance at a cheaper rate because no commissions were paid, this would benefit the customers but would result in no taxable income.

[25] 26 CFR § 1.482-1(b)(1) (1971).

Commissioner v. First Sec. Bank, 405 U.S. at 403-407.

The statutory provision referred to in First Security Bank was section 482 of the Internal Revenue Code of 1954. The regulation referred to in First Security Bank was 26 C.F.R. sec. 1.482-1 (1971).

When citing and quoting the regulations related to section 482 of the Internal Revenue Code of 1954, First Security Bank referred to the 1971 edition of the Code of Federal Regulations. Commissioner v. First Sec. Bank of Utah, 405 U.S. at 400 & nn.8&10, 404 & n.18, 407 & n.25. The text of the regulations related to section 482 of the Internal Revenue Code of 1954 that were printed in the 1971 edition of the Code of Federal Regulations had appeared in various forms in the 1953, 1962, and 1968 regulations. 26 C.F.R. sec. 39.45-1 (1953) (1953 regulations); 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.) (1962 regulations); 26 C.F.R. secs. 1.482-1 and -2 (1969) (1968 regulations). First Security Bank did not expressly say which of these sets of regulations governed the tax years at issue in that case (1955-59).[130]  Looking at the text of First Security Bank, and comparing the text of the various regulations, we make the following conclusions:

- Of the regulatory provisions quoted and cited in First Security Bank, each provision appears in both the 1962 and 1968 regulations.

---

[130] Commissioner v. First Sec. Bank, 405 U.S. at 400 & nn.8&10, 404 & n.18, 407 & n.25, referred to the 1971 edition of the Code of Federal Regulations, an edition that contained the 1968 regulations. One might infer from this that the Supreme Court thought the 1968 regulations governed the case. On the other hand Commissioner v. First Sec. Bank, 405 U.S. at 400 n.10, also stated that the regulations related to sec. 482 of the Internal Revenue Code of 1954 had been virtually unchanged since 1934. Because these regulations were changed significantly in 1968, T.D. 6952, 33 Fed. Reg. 5848-5857 (Apr. 16, 1968), this might be taken to suggest that the Supreme Court thought the 1968 regulations did not govern the case.

- Of the regulatory provisions quoted and cited in <u>First Security Bank</u>, the provisions do not appear in the 1953 regulations in the form quoted or cited by the opinion with one exception.

We now explain these conclusions. We first repeat the following relevant regulatory history regarding the 1953, 1962, and 1968 regulations:

- In 1953, the Treasury Department issued a comprehensive set of income-tax regulations related to the Internal Revenue Code of 1939. 26 C.F.R. secs. 39-1 to 39.6000-1 (1953). These regulations were Regulations 118. Regulations 118 included section 39.45-1, which related to section 45 of the Internal Revenue Code of 1939. Section 39.45-1 of Regulations 118 included the "complete power" passage. 26 C.F.R. sec. 39.45-1(b)(1) (1953).

- In 1954, Congress replaced the Internal Revenue Code of 1939 with the Internal Revenue Code of 1954. The regulations that were related to the Internal Revenue Code of 1939 were applied to the relevant provisions of the Internal Revenue Code of 1954 until they were superseded by new regulations. Internal Revenue Code of 1954, sec. 7807(a); T.D. 6091, 19 Fed. Reg. 5167 (Aug. 17. 1954).

- In 1962 the Treasury Department promulgated comprehensive regulations related to section 482 of the Internal Revenue Code of 1954. Title 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.) (the 1962 regulations) replaced section 39.45-1 of Regulations 118 (26 C.F.R. sec. 39.45-1 (1953)) (the 1953 regulations). There were some differences between the 1962 regulations and the parallel provisions in the 1953 regulations, but none of the differences matter in relation to allocations of income the payment of which is barred by legal restrictions.

- In 1968, the Treasury Department made amendments to the 1962 regulations. T.D. 6952, 33 Fed. Reg. 5848 (Apr. 16, 1968). These amendments included a new regulation section 1.482-2, which related to particular types of transactions. 26 C.F.R. sec. 1.482-2 (1969). The 1968 amendment also included a provision allowing the

deferred-income method of accounting for income the payment of which is barred by foreign legal restrictions. 26 C.F.R. sec. 1.482-1(d)(6) (1969). The 1968 amendment retained the "complete power" passage which had appeared in the 1953 and the 1962 regulations. 26 C.F.R. sec. 1.482-1(b)(1) (1969).

With this regulatory history in mind, we can explain our conclusions that each regulatory provision, as quoted and cited in First Security Bank, appears in both the 1962 and 1968 regulations but not (with one exception) the 1953 regulations. We discuss below each of the four instances in which First Security Bank referred to regulations related to section 482 of the Internal Revenue Code of 1954.

The first regulatory reference in Commissioner v. First Security Bank of Utah, 405 U.S. at 400 & n.8, is the citation of 26 C.F.R. sec. 1.482-1(a)(6) (1971) after the following sentence: "It is the Commissioner's view that the 40% of the premium income so allocated is the equivalent of commissions that the Banks earned and must be included in their 'true taxable income.'" The term "true taxable income" was defined by 26 C.F.R. sec. 1.482-1(a)(6) (1971). This term was first defined in the 1962 regulations, 26 C.F.R. sec. 1.482-1(a)(6) (1961 ed. 1965 Supp.), and appeared again unchanged in the 1968 regulations, 26 C.F.R. sec. 1.482-1(a)(6) (1969).[131] The definition of "true taxable income" was not in the 1953 regulations, which used and defined a different term--"true net income". 26 C.F.R. sec. 39.45-1(a)(6) (1953).

The second regulatory reference in Commissioner v. First Security Bank of Utah, 405 U.S. at 400 & n.10, is the quotation of the portion of 26 C.F.R. sec. 1.482-1(b)(1) (1971) that stated:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer . . . . The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

---

[131] In other words, the 1962 definition of "true taxable income" was unchanged by the 1968 regulatory amendments.

(Ellipsis in original opinion.)[132]  This same text quoted in <u>First Security Bank</u> is found in the 1962 regulations, 26 C.F.R. sec. 1.482-1(b)(1) (1961 ed. 1965 Cum. Supp.), and in the 1968 regulations, 26 C.F.R. sec. 1.482-1(b)(1) (1969), but is slightly different from the 1953 regulations, 26 C.F.R. sec. 39.45-1(b)(1) (1953), which refer to "true net income" instead of "true taxable income".

The third regulatory reference in <u>Commissioner v. First Security Bank of Utah</u>, 405 U.S. at 404 & n.18, is the quotation of the portion of 26 C.F.R. sec. 1.482-1(b)(1) (1971) that stated: "The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers."  This text is found in the 1962 regulations, 26 C.F.R. sec. 1.482-1(b)(1) (1961 ed. 1965 Supp.), and in the 1968 regulations, 26 C.F.R. sec. 1.482-1(b)(1) (1969), but is slightly different from the 1953 regulations, 26 C.F.R. sec. 39.45-1(b)(1) (1953), which refer to "net income" instead of "taxable income".

The fourth regulatory reference in <u>Commissioner v. First Security Bank of Utah</u>, 405 U.S. at 407 & n.25, is the citation of 26 C.F.R. sec. 1.482-1(b)(1) (1971) for this proposition: "As stated in the Treasury Regulations, the 'purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer . . . ." (Ellipsis in original opinion.)  The text quoted in the Supreme Court opinion appears in the 1962 regulations and the 1968 regulations.  26 C.F.R. sec. 1.482-1(b)(1) (1961 ed. 1965 Supp.) (1962 regulations); 26 C.F.R. sec. 1.482-1(b)(1) (1969) (1968 regulations).  It also appears in the 1953 regulations.  26 C.F.R. sec. 39.45-1(b)(1) (1953).

We will now discuss the significance of which version of the regulations was relied on by <u>First Security Bank</u>.  Recall that the regulatory provisions cited and quoted by <u>First Security Bank</u> contain textual differences from the 1953 regulations.  Therefore a plausible case can be made that the <u>First Security Bank</u> opinion indicated that the 1953 regulation was not the version it relied on.  Whether this is correct (i.e., whether <u>First Security Bank</u> relied on the 1953 version) is not significant.  This is because there is no relevant difference between the 1953 regulations, on the one hand, and the 1962 and 1968

---

[132] When the Supreme Court quoted the text, the Supreme Court omitted the comma after the word "determining".

regulations, on the other, as to those portions of the regulations cited and quoted by First Security Bank.

First Security Bank did not cite or quote 26 C.F.R. sec. 1.482-1(d)(6) (1969).[133] This provision, which appeared in the 1968 regulations but not the 1953 regulations or the 1962 regulations, allowed taxpayers to elect the deferred-income method of accounting regarding income the payment of which would be barred by foreign legal restrictions. In First Security Bank, respondent did not argue that the availability of the deferred-income method of accounting in the regulations meant that the regulations did not prohibit respondent from allocating income under section 482 of the Internal Revenue Code of 1954 that could not be paid to the taxpayer because of legal restrictions.[134] Indeed, the government's briefs in First Security Bank did not make any reference to 26 C.F.R. sec. 1.482-1(d)(6) (1969). Therefore there is no need for us to determine whether 26 C.F.R. sec. 1.482-1(d)(6) (1969) applied for the 1955-59 taxable years at issue in First Security Bank. Such a determination would not inform our understanding of the holding or reasoning of First Security Bank.

GG. The Tax Reform Act of 1976

In 1976, Congress amended section 482 of the Internal Revenue Code of 1954 to replace "the Secretary or his delegate" with "the Secretary". 26 U.S.C. sec. 482 (1976), as amended by the Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 1906(b)(13)(A), 90 Stat. at 1834. The change was effective for tax years beginning after December 31, 1976. Tax Reform Act of 1976 sec. 1906(d)(2), 90 Stat. at 1835. Neither petitioner nor respondent contends that this change is significant.

---

[133] This provision was the same in the 1969 edition of the Code of Federal Regulations and the 1971 edition of the Code of Federal Regulations.

[134] The government made such an argument in Procter & Gamble Co. v. Commissioner, 95 T.C. 324, 341 (1990), aff'd, 961 F.2d 1255, 1259-1260 (6th Cir. 1992).

HH.    Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990) (a case involving tax years ending June 30, 1978, and June 30, 1979), aff'd, 961 F.2d 1255 (6th Cir. 1992); and Exxon Corp. v. Commissioner, T.C. Memo. 1993-616, 66 T.C.M. (CCH) 1707 (a case involving tax years 1979, 1980, and 1981), aff'd sub nom. Texaco, Inc. v. Commissioner, 98 F.3d 825 (5th Cir. 1996)

In Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 324, 326 (1990), aff'd, 961 F.2d 1255 (6th Cir. 1992), a U.S. company owned a Swiss company, which in turn owned a Spanish company. The Swiss company paid royalties to the U.S. company for the right of the Swiss company and the Spanish company to use the U.S. company's intellectual property. Id. at 324, 330. Pursuant to this arrangement, the Spanish company used the U.S. company's intellectual property. Id. at 330. The Spanish company paid no compensation to the Swiss company even though the Swiss company had paid the U.S. company for the Spanish company's right to use the U.S. company's intellectual property. Id. Respondent made an allocation of royalty income under section 482 of the Internal Revenue Code of 1954 (26 U.S.C. sec. 482 (1982)) from the Spanish company to the Swiss company for the Spanish company's use of intellectual property. Procter & Gamble Co. v. Commissioner, 95 T.C. at 330-331. To include this royalty income in the income of the Swiss company would increase the subpart F income of the Swiss company, which in turn would trigger an inclusion in the gross income of the U.S. company under section 951(a)(1)(A) of the Internal Revenue Code of 1954 (26 U.S.C. sec. 951(a)(1)(A)). Procter & Gamble Co. v. Commissioner, 95 T.C. at 331. The tax years to which these allocations related were the U.S. company's tax years ending June 30, 1978 and 1979. Id. at 323, 330-331.

The Spanish government had issued a series of letters over 10 years stating that the Spanish company was prohibited from paying royalties to the Swiss company. Id. at 326-327. The existence of such a prohibition also found support in an order of the Spanish Ministry of Industry and in Spanish Decree 3099/1976. Id. at 328-329. The Tax Court concluded that Spanish law prohibited the payment of royalties by the Spanish company to its Swiss parent. Id. at 336-337. The Court held that because the prohibition was applied consistently "there is no need to identify a specific constitutional or statutory provision codifying the prohibition in order to treat the prohibition as law." Id. at 337 (citing U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 187-188 (1987), aff'd, 865 F.2d 750 (6th Cir. 1989)).

The Tax Court in <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 335-336, then held that the allocation under section 482 of the Internal Revenue Code of 1954 was not permissible:

> We find <u>First Security Bank</u> and <u>Salyersville National Bank</u> [613 F.2d 650, 655-656 (6th Cir. 1980), a case applying <u>First Security Bank</u>] compelling with respect to the issue before the Court. As we understand these cases, section 482 simply does not apply where restrictions imposed by law, and not the actions of the controlling interest, serve to distort income among the controlled group. * * *

Thus, the Tax Court's holding in <u>Procter & Gamble</u> rested on <u>First Security Bank</u>. In the following passage, the Tax Court recognized that the reasoning of <u>First Security Bank</u> relied on the idea that the "complete power" to shift include "hardly includes the power to force a subsidiary to violate the law":

> In concluding that the Commissioner's allocation was unwarranted, the Supreme Court emphasized that there was no shifting or distorting of income because the banks simply could not receive insurance premium income. The Court stated that section 1.482-1(b)(1), Income Tax Regs., as applied to the facts--
>
>> contemplates that [First Security Corp.]--the controlling interest--must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the "true taxable income" of a subsidiary has been understated, that the Commissioner is authorized to reallocate under sec. 482. But [First Security Corp.] had no such power unless it acted in violation of federal banking laws. The "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law. [<u>Commissioner v. First Security Bank of Utah</u>, 405 U.S. at 404-405.]

<u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 334-335 (alteration in original) (footnote omitted) (quoting <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 404-405).

149

The Tax Court in <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 339, rejected respondent's argument that <u>First Security Bank</u> was distinguishable because it involved a domestic legal restriction, not a foreign legal restriction. The Tax Court explained that <u>First Security Bank</u> held that no section 482 allocation is appropriate where "the controlling interest has not utilized its power to shift income" and thus the <u>First Security Bank</u> holding did not hinge on whether the legal restriction was foreign or domestic. <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 339.

The Tax Court also rejected respondent's argument that a prohibition on making payments is distinguishable from a prohibition on receiving payments. <u>Id.</u> The Spanish company in <u>Procter & Gamble</u> was prohibited from making payments. <u>Id.</u> at 326. The two national banks in <u>First Security Bank</u> were prohibited from receiving payments. <u>See</u> <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 339. The Tax Court held that the distinction between a prohibition on making payments and a prohibition on receiving payments is a "distinction without a difference". <u>Id.</u> It reasoned that if the Spanish company was prohibited from making payments to the Swiss company, the Swiss company was prohibited from receiving them. <u>Id.</u>

The Tax Court's <u>Procter & Gamble</u> opinion rejected respondent's argument that the Spanish prohibition on payment of royalties was merely an administrative decision that the Spanish company could have appealed. <u>Id.</u> at 333, 337. The Tax Court reasoned that the Spanish subsidiary had informally communicated with the Spanish government and had concluded that an appeal would be unsuccessful and detrimental to the company's relationship with the government. <u>Id.</u> at 337.

Additionally, the Tax Court's <u>Procter & Gamble</u> opinion considered whether it was significant that the Spanish prohibition on royalty payments affected only royalty payments to a commonly owned company. <u>Id.</u> at 339-340. It held that <u>First Security Bank</u> had established the general principle that a section 482 allocation cannot be made unless "control was utilized to shift income". <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 339-340. The Tax Court held that the U.S. company did not use its control to shift income from the Spanish company to the Swiss company and that therefore no section 482 allocation was proper. <u>Id.</u> at 340.

Appellate Case: 23-3772     Page: 151     Date Filed: 02/08/2024 Entry ID: 5361675

Finally, the Tax Court in <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 340-341, addressed the significance of section 1.482-1(d)(6), which was added in 1968. 33 Fed. Reg. 5849, 26 C.F.R. sec. 1.482-1(d)(6) (1969). The regulation provided that if intercompany payments were restricted by foreign law, the taxpayer could elect to defer the corresponding income that would otherwise be allocated to the taxpayer under section 482 of the Internal Revenue Code of 1954 until the restriction was lifted. <u>Id.</u> The Tax Court held that because section 482 of the Internal Revenue Code of 1954 does not apply, the regulations under section 482 of the Internal Revenue Code of 1954 do not apply. <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. at 340-341. Excerpted in full below is the Tax Court's discussion of 26 C.F.R. sec. 1.482-1(d)(6) (1969):

> Finally, respondent suggests that if section 482 does not apply under the circumstances presented, the Court has effectively rendered section 1.482-1(d)(6), Income Tax Regs., meaningless. Respondent references Rev. Rul. 74-245, 1974-1 C.B. 124, which provides that section 1.482-1(d)(6), Income Tax Regs., will be liberally administered to allow a taxpayer relief from a section 482 allocation, by permitting deferral of the allocated income, where the payments allocated could not be effected under foreign law. Respondent emphasizes that the regulation contemplates that if the taxpayer elects to defer the allocated income, the taxpayer must likewise defer expenses relating to that income so as to ultimately match income and expense. In this case, petitioner did not elect to proceed under the regulation and claims that the regulation does not apply in the face of a Spanish law prohibiting payment of specific income.

> By virtue of our holding that section 482 does not apply, the regulations underlying section 482 likewise do not apply. We note that section 1.482-1(d)(6), Income Tax Regs., was prescribed by Treasury Decision 6952 on April 15, 1968, prior to the <u>First Security Bank</u> decision. See 1968-1 C.B. 218. Thus, no consideration was given to the effect of <u>First Security Bank</u> on the scope of the regulation. Notwithstanding the foregoing, our ruling does not render section 1.482-1(d)(6), Income Tax Regs., meaningless. Rather, we only limit the application of the regulation within the narrow confines of the facts presented in this

case. Specifically, section 482 does not apply where the taxpayer's legitimate business purposes subject it to legal restraints effectively blocking receipt of income. We do not have before us, and therefore do not address, whether a section 482 allocation may be appropriate where legitimate business purposes are lacking.

Procter & Gamble Co. v. Commissioner, 95 T.C. at 340-341 (footnote omitted).

In the excerpt above, Procter & Gamble Co. v. Commissioner, 95 T.C. at 340-341, referred to "section 1.482-1(d)(6), Income Tax Regs." This provision of the regulations, which allows the deferred-income method of accounting, was not promulgated until the 1968 regulatory amendments. 33 Fed. Reg. 5849 (Apr. 16, 1968); 26 C.F.R. sec. 1.482-1(d)(6) (1969) (1968 regulations). Although the 1968 amendments had no effective date, see T.D. 6952, 33 Fed. Reg. 5848, they related to section 482 of the Internal Revenue Code of 1954, which was effective for tax years that began after December 31, 1953, and ended after August 16, 1954. Internal Revenue Code of 1954, sec. 7851(a)(1)(A), 68A Stat. at 919, 929. Thus, the 1968 regulations were effective for the tax years at issue in Procter & Gamble Co. v. Commissioner, 95 T.C. at 323, which were the tax years ending June 30, 1978 and 1979.[135]

The U.S. Court of Appeals for the Sixth Circuit affirmed the Tax Court's decision in Procter & Gamble Co. v. Commissioner, 961 F.2d 1255 (6th Cir. 1992). The Sixth Circuit's primary holding was that First Security Bank controlled Procter & Gamble even though the restriction in First Security Bank was a domestic law and the restriction in Procter & Gamble was a foreign law. Procter & Gamble Co. v. Commissioner, 961 F.2d at 1258-1259. The Sixth Circuit reasoned that the U.S. company in Procter & Gamble did not have the "complete power" (within the meaning of regulation section 1.482-1(b)(1)) to shift income from the Swiss company to the Spanish company because Spanish law prohibited the Spanish company to make payments to the Swiss company. Id.

---

[135] Pollack v. Commissioner, 47 T.C. at 110, held that "unless the Commissioner otherwise specifies, regulations are retroactive to the date on which the statute was enacted." Although to apply the 1968 regulations retroactively might have been challenged as an abuse of discretion, see Anderson, Clayton & Co., 562 F.2d at 980-981, or as an arguable violation of the Administrative Procedure Act's antiretroactivity provision, 5 U.S.C. sec. 553(d) (codifying sec. 4(c) of the APA, as amended), the 1968 regulations were not retroactive as applied to the tax years at issue in Procter & Gamble, which were after 1968.

Excerpted below is the Sixth Circuit's main holding and the reasons given for it:

> The purpose of section 482 is "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1).
>
> It is P&G's [the U.S. company's] position that section 482 requires that any distortion of income of a controlled party result from the existence and exercise of control. P&G argues that where governing law, and not the controlling party or interests, causes a distortion of income, section 482 is unavailable to allocate income. P&G argues that the regulations promulgated under section 482 and the Supreme Court's decision in <u>Commissioner v. First Security Bank</u>, 405 U.S. 394, 92 S. Ct. 1085, 31 L. Ed. 2d 318 (1972), support this position.
>
> The term "controlled" is defined in Treas. Reg. § 1.482-1(a)(3) to include:
>
>> any kind of control, direct or indirect. . . . It is the reality of the control which is decisive, not its form or the mode of its exercise.
>
> Treas. Reg. § 1.482-1(b)(1) states the level of control that is presumed to justify making a section 482 allocation:
>
>> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers.
>
> Further, Treas. Reg. § 1.482-1(c) states:
>
>> Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes.

The foregoing regulations recognize that in order for the Commissioner to have authority to make a section 482 allocation, a distortion in a controlled taxpayer's income must be caused by the exercise of such control. In the present case there is no evidence that P&G or AG [the Swiss company] used its control over España [the Spanish company] to manipulate or shift income. Indeed, the Tax Court held that the failure of España to make royalty payments was a result of the prohibition against royalty payments under Spanish law and was not due to the exercise of control by P&G. The Spanish prohibition is expressly found in the letter approving España's organization and in the letters permitting capital increases for España. In addition, Decrees 2343/1973 ad 3099/1976 made it clear that payments for transfers of technology from Spanish entities to controlling foreign entities would be restricted.

The Supreme Court held in <u>First Security</u> that the Commissioner is authorized to allocate income under section 482 only where a controlling interest has complete power to shift income among its subsidiaries and has exercised that power. In <u>First Security</u>, two related banks offered credit life insurance to their customers. The banks were prohibited by federal law from acting as insurance agents and receiving premiums, and they referred customers to an unrelated insurance company to purchase this insurance. The insurance company retained 15 percent of the premiums for actuarial and accounting services, and transferred 85 percent of the premiums through a reinsurance agreement to an insurance company affiliated with the banks. The insurance affiliate reported the entire amount it received as reinsurance premiums as its income. The Commissioner determined that 40 percent of the affiliate's income was allocable to the banks as compensation for originating and processing the insurance. The Supreme Court set aside the Commissioner's allocation. The Court found that the holding company that controlled the banks and the insurance affiliate did not have the power to shift income among its subsidiaries unless it operated in violation of federal banking law. The Court stated that the "complete power" referred to in Treas. Reg. § 1.482-1(b)(1) does not include the power to

force a subsidiary to violate the law. So here, P&G did not have the power to shift income between España and its other interests unless it violated Spanish law. The payment or non-payment of royalties in no way depended on P&G's control of the various entities. The same result-- no royalties--would exist in the case of unrelated entities.

The Commissioner argues that <u>First Security</u> is not controlling in this case because the Supreme Court's analysis is limited to instances in which allocation under section 482 is contrary to federal law. We are not persuaded. The Supreme Court focused on whether the controlling interests utilized their control to distort income. We see no reason to alter this analysis because foreign law, as opposed to federal law, prevented payment of royalties. The purpose of section 482 is to prevent artificial shifting of income between related taxpayers. Because Spanish law prohibited royalty payments, P&G could not exercise the control that section 482 contemplates, and allocation under section 482 is inappropriate. That foreign law is involved may require a heightened scrutiny to be sure the taxpayer is not responsible for the restriction on payment. But that is not suggested in the case of the Spanish law here which was in effect long before España was created.

<u>Id.</u>

In <u>Procter & Gamble Co. v. Commissioner</u>, 961 F.2d at 1259, the government also argued before the Sixth Circuit that the Spanish company could have paid the Swiss company a dividend, even if it could not have paid it a royalty. The Sixth Circuit rejected this argument. <u>Id.</u> The Sixth Circuit reasoned that (1) the Spanish company had no obligation to arrange its affairs so as to maximize taxes, (2) payment of a royalty by the Spanish company to its Swiss parent in the guise of a dividend would be an evasion of Spanish law, and (3) the Spanish company did not have sufficient earnings from which to pay a dividend. <u>Id.</u>

Finally, the Sixth Circuit in <u>Procter & Gamble</u> held that section 1.482-1(b)(6) did not apply. Here is the Sixth Circuit's full reasoning:

The Commissioner argues that the Tax Court erred by refusing to apply Treas. Reg. § 1.482-1(b)(6), the

"blocked income" regulation. Treas. Reg. § 1.482-1(b)(6) provides in pertinent part:

> If payment or reimbursement for the sale, exchange, or use of property, the rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferrable income.

This regulation recognizes the problem posed by restrictions placed on payments in a foreign currency. Income allocated under section 482 may be deferred if payments have been blocked by currency or other restrictions under the laws of a foreign country. The Tax Court determined that because section 482 did not apply to the present case, the regulations promulgated under section 482 likewise did not apply.

The Commissioner argues that this regulation is designed to remedy the situation presented in this case. We disagree. Treas. Reg. § 1.482-1(b)(6) contemplates the situation where a temporary restriction under foreign law prevents payments, and defers the allocation of income until such time as the payments are no longer restricted. This case does not present a situation in which payments to P&G were temporarily restricted; rather, Spanish law prohibited payment of royalties altogether. This prohibition cannot be viewed as temporary because it was ultimately repealed in 1987. At the time in question, there was no reason for P&G to believe that the Spanish government would lift this ban; therefore, the payments that España was prohibited by law from making cannot be viewed as temporarily blocked payments.

The Commissioner also argues that the prohibition on royalty payments was temporary and that P&G could have deferred royalty payments under this regulation and

then at some future time P&G could have liquidated España and taken its capital out of Spain. Upon liquidation, the Commissioner argues, the temporary prohibition on payment of pesetas would end. We find this argument to be meritless because P&G need not organize its subsidiaries in such a way as to maximize its tax liabilities. There is no question that P&G may legally structure its affairs in its own best interest. <u>Salyersville</u>, 613 F.2d at 653. We agree with the Tax Court that Treas. Reg. § 1.482-1(b)(6) does not apply to this case.

<u>Id.</u> at 1259-1260.

In <u>Exxon Corp. v. Commissioner</u>, T.C. Memo. 1993-616, 66 T.C.M. (CCH) 1707, 1716-1721, 1739-1752, <u>aff'd sub nom.</u> <u>Texaco, Inc. v. Commissioner</u>, 98 F.3d 825 (5th Cir. 1996), the Tax Court addressed the effect of a restriction imposed by Saudi Arabia whereby companies which bought oil from Saudi Arabia at a below-market price could not resell the oil at a greater price. A U.S. subsidiary of Texaco (which was a type of company referred to as an "offloader") had purchased oil from Saudi Arabia at a below-market price and resold the oil to foreign affiliates at the same price. <u>Id.</u> at 1710, 1733, 1752-1760. Respondent determined in <u>Exxon</u> that income should be allocated from the foreign affiliates to the U.S. subsidiary under section 482 of the Internal Revenue Code of 1954 (26 U.S.C. sec. 482) to reflect that the price at which the U.S. subsidiary sold the oil to the foreign affiliates was below the market price. <u>Id.</u> at 1733. The tax years at issue were the calendar years 1979-81. <u>Id.</u> at 1708. Respondent also determined that the allocation of income was justified under section 61 of the Internal Revenue Code of 1954 and under the principle that income is taxed to the taxpayer who earns it. <u>Id.</u> at 1733, 1738.

The Tax Court in <u>Exxon</u> held that respondent's allocations in that case were improper under <u>First Security Bank</u> and <u>Procter & Gamble</u>. <u>Exxon Corp. v. Commissioner</u>, 66 T.C.M (CCH) at 1734-1739. <u>Exxon</u> explained that <u>First Security Bank</u> established the principle that section 482 cannot be used to allocate income to a taxpayer if receipt of the income is prohibited by law:

In <u>Commissioner v. First Security Bank</u>, <u>supra</u>, certain affiliated banks referred their customers to an independent insurance company for purposes of obtaining credit life insurance. Credit life insurance policies were written by

the independent insurance company, which then reinsured the policies with an affiliate of the banks pursuant to a "treaty of reinsurance". The independent insurance company retained 15 percent of the premiums for providing actuarial and accounting services, and the affiliated insurance company retained 85 percent of the premiums for assuming the risk under the policies. No sales commissions or referral fees were paid to the affiliated banks. These banks could not legally receive such commissions pursuant to a Federal law which prohibited banks from acting as insurance agents in locations with a population in excess of 5,000 inhabitants. During the years at issue, 85 percent of the premiums paid by the customers were reported by the affiliated life insurance company on its tax returns. The Commissioner allocated 40 percent of the affiliated life insurance company's net premium income to the banks as compensation for originating and processing the credit life insurance. The Tax Court upheld the Commissioner's allocation, but the Court of Appeals for the Tenth Circuit reversed. The Supreme Court affirmed the Court of Appeals on the ground that, since the banks could not legally receive the commissions under Federal law, the Commissioner could not reallocate them to the banks. The Court stated that it had never found a taxpayer to have income "that he did not receive and that he was prohibited from receiving" and premised this on the underlying assumption that, "in order to be taxed for income, a taxpayer must have complete dominion over it." Commissioner v. First Security Bank, 405 U.S. at 403. The Court further observed that one of the Commissioner's regulations under section 482 also recognized the concept that "income implies dominion or control" by providing:

> "The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers."

Id. at 404 (emphasis added) (quoting sec. 1.482-1(b)(1), Income Tax Regs.). The Court concluded therefrom that the parent holding company

> must have 'complete power' to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the 'true taxable income' of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482. But Holding Company had no such power unless it acted in violation of federal banking laws. The 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law.

> Id. at 404-405. Thus, the Supreme Court has indicated that, where the receipt of income is prohibited by law, the Commissioner is prohibited from allocating such income pursuant to section 482.

Exxon Corp. v. Commissioner, 66 T.C.M. (CCH) at 1735 (footnotes omitted). It is important to note that in the excerpt above Exxon recognized that First Security Bank relied upon the "complete power" regulatory provision.

Next, Exxon Corp. v. Commissioner, 66 T.C.M (CCH) at 1735-1736, observed that in Procter & Gamble the Tax Court "took the holding of First Security and applied it in the context of a foreign--as opposed to a domestic Federal or State--law."

The Tax Court in Exxon next addressed respondent's reliance on section 61 of the Internal Revenue Code of 1954 for his theory that income in question should be allocated to Texaco's U.S. subsidiary. Exxon Corp. v. Commissioner, 66 T.C.M. (CCH) at 1738-1739. Under the section 61 assignment-of-income doctrine, income is attributable to the taxpayer who earned the income even if the earner had agreed to assign the income to another taxpayer. Lucas v. Earl, 281 U.S. 111 (1930), cited in Exxon Corp. v. Commissioner, 66 T.C.M. (CCH) at 1738. The Tax Court in Exxon stated that First Security Bank had held that the assignment-of-income doctrine does not apply to income that a taxpayer is legally prohibited from receiving:

> The Supreme Court also has recognized that a legal prohibition against a taxpayer's receipt of income precludes an assignment of such income to the taxpayer by the Commissioner. In First Security (a section 482 case),

the Court discussed the interplay between section 482 and the assignment of income cases as follows:

> We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving. In cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it. The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it.

> Commissioner v. First Security Bank, 405 U.S. 394, 403 (1972). Thus, according to the above-quoted language, a taxpayer who is legally prohibited from receiving income and who does not in fact receive such income, cannot be said to have "earned" the income under a section 61 analysis.

Exxon Corp. v. Commissioner, 66 T.C.M. (CCH) at 1738-1739. Thus, Exxon rejected two theories, under sections 482 and 61 of the Internal Revenue Code of 1954, respectively, why Texaco's foreign affiliates should be allocated income.[136]

Next the Tax Court in Exxon held that the resale price restriction was a valid and binding prohibition because it was authorized by the King of Saudi Arabia, it was consistently applied, compliance with it was mandatory, and it was in effect during the years at issue. Id. at 1739-1752. Next the Tax Court held that Texaco did not ignore or circumvent the restriction. Id. at 1752-1760. Finally the Tax Court concluded: "Under the rule of Commissioner v. First Security Bank, 405 U.S. 394 (1972), its assignment of income predecessors, and its progeny, we hold that the 1979 restriction precluded a section 61 or section 482

---

[136] That the two theories are distinct from each other is evidenced by the way Exxon summarized its holding near the end of the opinion. In the summary, Exxon stated that first, "the offtakers did not 'earn' the income occasioned by the low cost of the Saudi crude within the meaning of section 61 because they did not receive it and were prohibited from receiving it", and second, they "were deprived of the requisite power to control the location of income" and so "respondent's allocation under section 482 is not warranted." Exxon Corp. & Affiliated Cos. v. Commissioner, T.C. Memo. 1993-616, 66 T.C.M. (CCH) 1707, 1739 (1993), aff'd sub nom. Texaco, Inc. & Subs. v. Commissioner, 98 F.3d 825 (5th Cir. 1996).

adjustment to the income of petitioners' offtakers in this case." Id. at 1760.

In Texaco, Inc. v. Commissioner, 98 F.3d 825 (5th Cir. 1996), the Fifth Circuit affirmed the decision of the Tax Court in Exxon. The Fifth Circuit opinion can be divided into four parts. In the first part it agreed with the Tax Court's conclusion that the resale price restriction had the effect of law. Texaco, Inc. v. Commissioner, 98 F.2d at 828. In the second part the Fifth Circuit agreed that the Tax Court properly applied First Security Bank. The second part of the Fifth Circuit's opinion is excerpted below:

We also agree with the Tax Court's legal conclusion that the teaching of Commissioner v. First Security Bank, 405 U.S. 394, 92 S. Ct. 1085, 31 L. Ed. 2d 318 (1972), bars the Commissioner from allocating income to Textrad [Texaco's U.S. subsidiary] on its sales of Saudi crude under § 482. Because the sales price of the crude is governed by Letter 103/z, Texaco did not have the power to control the sales price of the oil.

Section 482 of the Internal Revenue Code authorizes the Secretary to apportion or allocate income between organizations controlled by the same interests "if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations . . . ." 26 U.S.C. § 482 (1994). The relevant IRS regulation explains that the purpose of § 482 is "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer" and to ensure that controlling entities conduct their subsidiaries' transactions in such a way as to reflect the "true taxable income" of each controlled taxpayer. 26 C.F.R. § 1.482-1A(b)(1) (1996).[4] The regulation further explains that "[t]he standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Id.

In First Security, the Court held that § 482 did not authorize the Commissioner to allocate income to a party prohibited by law from receiving it. 405 U.S. at 404. In that case, two related banks offered credit life insurance to their customers. Federal law prohibited the banks from

acting as insurance agents and receiving premiums or commissions on the sale of insurance. The banks referred their customers to an unrelated insurance company to purchase this insurance. The insurance company retained a small percent of the premiums for administrative services and transferred the bulk of the premiums through a reinsurance agreement to an insurance company affiliated with the banks, which reported all of the reinsurance premiums it received as income. The Commissioner reallocated 40 percent of the related insurance company's income from these reinsurance premiums to the banks as compensation for originating and referring the insurance business. Id. at 396-99.

The Court concluded that due to the restrictions of federal banking law, the holding company that controlled the banks and the insurance affiliate did not have the power to shift income among its subsidiaries. In so holding, the Court emphasized that the Commissioner's authority to allocate income under § 482 presupposes that the taxpayer has the power to control its income: "The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it." Id. at 403. Indeed, as the Court noted, the Commissioner's own regulations for implementing § 482 contemplate that the controlling interest "must have 'complete power' to shift income among its subsidiaries." Id. at 404-05, 92 S. Ct. at 1091-92 (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)).

Moreover, the regulations and First Security make clear that this standard is not limited to cases where the government contends the taxpayer attempted to evade taxes. Rather, the Court explicitly extends its reasoning to circumstances where the government contends that the organization's "true taxable income" has not been reflected.[5] After explaining that the right to control the allocation of income is critical, the Court stated: "It is only where this power exists, and has been exercised in such a way that the 'true, taxable income' of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482 . . . . The 'complete power' referred to in the regulations hardly includes the power to force a

subsidiary to violate the law." Id. (emphasis added). Because the holding company in First Security could not have allocated the income to the banks unless it acted in violation of the law, the Court concluded that the banks' true income was not understated and the Commissioner's allocation under § 482 was improper.

The Sixth Circuit decision in Procter & Gamble Co. v. Commissioner, 961 F.2d 1255 (6th Cir. 1992), also supports the Tax Court's conclusion. In that case, the court held that a Spanish law prohibiting a foreign affiliate from paying royalties for the use of patents was sufficient to preclude the Commissioner from reallocating income to account for a reasonable royalty. The court stated that "the purpose of § 482 is to prevent artificial shifting of income between related taxpayers." Id. at 1259 (emphasis added). Again the deciding issue was one of control: "Because Spanish law prohibited royalty payments, [the controlling company] could not exercise the control that § 482 contemplates, and allocation under § 482 is inappropriate." Id. at 1259. See also L.E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940, 1952 WL 188 (1952) (holding that Commissioner could not allocate additional income to condom manufacturer where manufacturer sold condoms to its affiliate at price set by Office of Price Administration, even though affiliate made substantial profits on the transactions).

It is precisely this ability to control the flow of its income that Texaco lacked. The Tax Court found, and we agree, that Letter 103/z had the force and effect of law, that Textrad was obligated to comply with its requirements, and that it did so comply. Because Textrad lacked the power to sell Saudi crude above the OSP, reallocation under § 482 is inappropriate.

[4]26 C.F.R. § 1.482-1A(b)(1) reads in full:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each

controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

[5]We find no indication from the facts and contentions of the parties in First Security that the government contended that the banks or the holding company sought to evade taxes. Rather, First Security explains in general terms the type case § 482 is designed to reach without distinguishing between claims of evasion and other claims that the true income of the taxpayer has not been reflected: "The question we must answer is whether there was a shifting or distorting of the [taxpayers] true net income." Id. at 400-401 (emphasis added); see also id. at 407 (concluding that because the holding company "did not utilize its control over the [banks and the affiliated insurance company] to distort their true net incomes," the Commissioner could not exercise his § 482 authority) (emphasis added). This is consistent with the approach and structure of the regulation, which also does not distinguish between evasion and other conduct that fails to reflect the true taxable income of the taxpayer. See 26 C.F.R. § 1.482-1A(b)(1) (1996).

Texaco, Inc. v. Commissioner, 98 F.3d at 828-830.

In the third part of its opinion in Texaco, the Fifth Circuit rejected the government's reliance on the assignment-of-income doctrine to support its allocation of income:

> The Commissioner tries to justify the allocation by analogizing Texaco's conduct to an "assignment of income" and places much reliance on the Supreme Court's decision in United States v. Basye, 410 U.S. 441, 93 S. Ct. 1080, 35 L. Ed. 2d 412 (1973). However, nothing in Basye is contrary to the principles discussed above, and the Commissioner's reliance on this case is misplaced.

> In Basye, the Court relied on familiar principles "that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory

164

assignment of that income" to hold that a group of doctors' failure to actually receive a portion of their compensation that was instead placed in a retirement trust did not preclude the Commissioner from allocating that income to them. Id. at 457, 93 S. Ct. at 1089. The Court found that the sole reason the doctors could not receive the challenged portion of their income was because their medical partnership had agreed with a health plan foundation to service the foundation's members for free in exchange for contributions to a retirement trust. Id. at 449, 93 S. Ct. at 1085.

The Court's holding in Basye turned on the consensual nature of the agreement and is entirely consistent with the principles of control expressed in the regulations adopted under § 482 and in First Security. As the regulations make clear, the goal of inquiring into the transactions of controlled taxpayers under § 482 is "to ascertain whether the common control is being used to reduce, avoid or escape taxes." 26 C.F.R. § 1.482-1A(c) (1996). The Court in Basye agreed with the Commissioner that the doctors' compensation scheme was entirely voluntary--that the medical partnership possessed common control and used it to reduce, avoid, or escape taxes. That the doctors exercised that control prior to their actual possession of the income was irrelevant.

But where, as here, the taxpayer lacks the power to control the allocation of the profits, reallocation under § 482 is inappropriate. As stated above, we fully agree with the Tax Court that Letter 103/z deprived Textrad of the power to sell Saudi crude to its foreign refining affiliates for a price that exceeded the OSP. Because Texaco lacked the ability to control the allocation of the income in question, it follows that it could not have used its control to evade taxes or artificially shift its income to its foreign affiliates so that its true taxable income was not reflected.

Id. at 830.

In the fourth part of its opinion in Texaco, the Fifth Circuit rejected the government's argument that respondent's proposed allocation in that case would be consistent with the goal of tax parity:

Nor would the Commissioner's proposed allocation be consistent with § 482's goal of achieving tax parity between controlled and uncontrolled taxpayers. As the First Security Court and the regulations make clear, the "'purpose of § 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer.'" 405 U.S. at 407 (citing 26 C.F.R. § 1.482-1(b)(1) (1971)). Thus, "[t]he standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." 26 C.F.R. § 1.482-1A(b)(1) (1996).

The record evidence fully supports the Tax Court's findings that Textrad sold significant amounts of Saudi crude to unrelated customers at the same OSP it sold to its affiliates, that the volume of Textrad's sales of Saudi crude to unrelated customers during this period remained generally consistent with historic levels, and that any changes in Textrad's sales to its affiliates and its unrelated customers during this period had no nexus with the restrictions imposed by Letter 103/z. Therefore, the Tax Court did not err in concluding that the Commissioner failed to demonstrate any disparity between Texaco's treatment of its affiliates and its unrelated customers as a result of the Saudi price restrictions. Thus, under the regulation's tax parity standard, the Commissioner's allocation of Texaco's income under § 482 is improper.

Id. at 830-831 (alteration in original).

The Fifth Circuit's opinion in Texaco, Inc. v. Commissioner, 98 F.3d at 828 & n.4, 829 n.5, 830, cited 26 C.F.R. sec. 1.482-1A (1996), multiple times. This regulation was created in 1993 when Treasury Decision 8470, 58 Fed. Reg. 5271 (Jan. 21, 1993), redesignated the 1968 regulations[137] as 26 C.F.R. secs. 1.482-1A and 2A (1994), effective for tax years beginning on or before April 21, 1993.[138] The redesignated regulations were printed in the 1996 edition of the Code of Federal

---

[137] The 1968 regulations, including subsequent amendments, were at 26 C.F.R. secs. 1.482-1 and -2 (1992).

[138] The 1993 redesignation is described in greater detail infra part II.LL.

Regulations. Therefore, when the Fifth Circuit cited 26 C.F.R. sec. 1.482-1A (1996), it was citing the 1968 regulations.

    II.    <u>The 1986 amendment to section 482</u>

Recall that section 482 of the Internal Revenue Code of 1954 had one sentence:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Internal Revenue Code of 1954 sec. 482 (as amended in 1976), 26 U.S.C. sec. 482 (1982). The sentence was the same as the text of section 45 of the Revenue Act of 1928, 45 Stat. at 806, as that text was altered by three subsequent statutory changes: (1) in 1943 "gross income or deductions" was replaced with "gross income, deductions, credits, or allowances", (2) in 1954 "the Commissioner is authorized to" was replaced with "the Secretary or his delegate may", and (3) in 1976 "the Secretary or his delegate may" was replaced with "the Secretary may". Revenue Act of 1943 sec. 128(b) and (c); Internal Revenue Code of 1954 sec. 482; Tax Reform Act of 1976 sec. 1906(b)(13)(A). Because these statutory changes were relatively insignificant, it has been observed that section 482 of the Internal Revenue Code of 1954 was "essentially the same" as section 45 of the Revenue Act of 1928. <u>See</u> <u>G.D. Searle & Co. v. Commissioner</u>, 88 T.C. at 356 (comparing section 45 of the Revenue Act of 1928 to section 482 of the Internal Revenue Code of 1954 before the 1976 amendment).

The Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 2(a), 100 Stat. at 2095, redesignated the Internal Revenue Code of 1954 (as amended) as the Internal Revenue Code of 1986. The Tax Reform Act of 1986 simultaneously added a second sentence to section 482 of the Internal Revenue Code of 1986. This sentence is:

> In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Tax Reform Act of 1986, sec. 1231(e)(1), 100 Stat. at 2562-2563. The second sentence cross-references section 936(h)(3)(B), which provides that the term "intangible property" means any

> (i) patent, invention, formula, process, design, pattern, or know-how;
>
> (ii) copyright, literary, musical, or artistic composition;
>
> (iii) trademark, trade name, or brand name;
>
> (iv) franchise, license, or contract;
>
> (v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or
>
> (vi) any similar item,
>
> which has substantial value independent of the services of any individual.

The text of section 482 after the 1986 amendment can be found at 26 U.S.C. sec. 482 (1988). The text of section 482 of the Internal Revenue Code of 1954 before the 1986 amendment can be found at 26 U.S.C. sec. 482 (1982).

The portion of the Tax Reform Act of 1986 that added the second sentence to section 482 was section 1231(e)(1). The effective-date provision for section 1231(e) of the Tax Reform Act of 1986 (including section 1231(e)(1) is as follows:

> The amendments made by subsection (e) shall apply to taxable years beginning after December 31, 1986, but only with respect to transfers after November 16, 1985, or licenses granted after such date (or before such date with

respect to property not in existence or owned by the taxpayer on such date).

Id. sec. 1231(g)(2)(A), 100 Stat. at 2563.

In 2006, 3M Brazil used patents owned by 3M IPC. 3M Brazil's use of patents was not governed by a license. In 2006, 3M Brazil also used nonpatented technology owned by 3M IPC. This use was not governed by a license. Neither petitioner nor respondent contends that the amendment by the Tax Reform Act of 1986 to section 482 did not govern the use of 3M IPC's patents and nonpatented technology by 3M Brazil during the 2006 tax year.

Respondent contends that the second sentence of section 482 applies to the intangibles transactions at issue, which are (1) the use by 3M Brazil of trademarks owned by 3M Company pursuant to the 1998 trademark licenses, (2) the use by 3M Brazil of patents owned by 3M IPC, and (3) the transfer of technology from 3M IPC to 3M Brazil. Petitioner does not argue that the effective-date provision makes the second sentence of section 482 inapplicable for the case. Rather, petitioner argues that neither sentence of section 482 governs the intangibles transactions because of the effect of the Brazilian legal restrictions.[139]

The House Ways & Means Committee issued a report describing the House bill that preceded the Tax Reform Act of 1986. H.R. Rept. No. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1. The House bill contained the sentence in section 482 of the Internal Revenue Code of 1954. H.R. 3838, 99th Cong., sec. 641(e) (1985). The House bill also contained a new sentence similar to the second sentence in section 482 of the Internal Revenue Code of 1986. H.R. 3838, 99th Cong., sec. 641(e). However, the new sentence in the House bill affected only transfers of intangible property by United States persons to a foreign corporation; that is, it applied only to outbound transfers. Id. Excerpted below is most of the Ways & Means Committee report that related to the provision in the House bill:

Reasons for Change

---

[139] Petitioner argues: "Since the Commissioner has no authority under section 482 when a legal restriction exists, the arm's length standard as modified by the commensurate with income language does not come into play in such a case."

There is a strong incentive for taxpayers to transfer intangibles to related foreign corporations or possessions corporations in a low tax jurisdiction, particularly when the intangible has a high value relative to manufacturing or assembly costs. Such transfers can result in indefinite tax deferral or effective tax exemption on the earnings, while retaining the value of the earnings in the related group.

The committee is concerned that the provisions of sections 482, 367(d), and 936 that allocate income to a U.S. transferor of intangibles may not be operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles in these situations.

## Section 482

Many observers have questioned the effectiveness of the "arm's length" approach of the regulations under section 482. A recurrent problem is the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables.

A fundamental problem is the fact that the relationship between related parties is different from that of unrelated parties. Observers have noted that multinational companies operate as an economic unit, and not "as if" they were unrelated to their foreign subsidiaries. In addition, a parent corporation that transfers potentially valuable property to its subsidiary is not faced with the same risks as if it were dealing with an unrelated party. Its equity interest assures it of the ability ultimately to obtain the benefit of future anticipated or unanticipated profits, without regard to the price it sets. The relationship similarly would enable the parent to adjust its arrangement each year, if it wished to do so, to take account of major variations in the revenue produced by a transferred item.

The problems are particularly acute in the case of transfers of high-profit potential intangibles. Taxpayers

may transfer such intangibles to foreign related corporations or to possession corporations at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product. Even in the case of a proven high-profit intangible, taxpayers frequently take the position that intercompany royalty rates may appropriately be set on the basis of industry norms for transfers of much less profitable items.

Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors. See, e.g., United States Steel Corporation v. Commissioner, 617 F.2d 942 (2d Cir. 1980).[140] While the committee is concerned that such decisions may unduly emphasize the concept of comparables even in situations involving highly standardized commodities or services, it believes that such an approach is sufficiently troublesome where transfers of intangibles are concerned that a statutory modification to the intercompany pricing rules regarding transfers of intangibles is necessary.

In many cases firms that develop high profit-potential intangibles tend to retain their rights or transfer them to related parties in which they retain an equity interest in order to maximize their profits. The transferor may well be looking in part to the value of its direct or indirect equity interest in the related party transferee as

---

[140] In United States Steel Corp. v. Commissioner, 617 F.2d 942, 945 (2d Cir. 1980), rev'g T.C. Memo. 1977-140, a U.S. company (i.e., United States Steel) owned a Liberian shipping subsidiary. The Liberian company shipped ore for the U.S. company at the same rate that it charged to unrelated parties. Id. The Second Circuit held that the rates the Liberian company charged the U.S. company were arm's-length rates because they were the same rates charged to unrelated customers. Id. at 947. The government had contended that the unrelated-party transactions were infrequent, low-volume transactions that were not comparable to the transactions between the Liberian company and the U.S. company. Id. at 948, 949, 951. The Second Circuit held that the transactions were "similar enough". Id. at 947.

part of the value to be received for the transfer, rather than to "arm's length" factors. Industry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases.

Transfers between related parties do not involve the same risks as transfers to unrelated parties. There is thus a powerful incentive to establish a relatively low royalty without adequate provisions for adjustment as the revenues of the intangible vary. There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation or possessions corporation be commensurate with the income attributable to the intangible. The committee believes, therefore, that this is the measure that should be used under section 367 and section 482 in the case of transfers to a foreign corporation.

\*  \*  \*  \*  \*  \*  \*

Explanation of Provisions

The basic requirement of the bill is that payments with respect to intangibles that a U.S. person transfers to a related foreign corporation or possessions corporation must be commensurate with the income attributable to the intangible. This approach applies both to outright transfers of the ownership of the intangibles (whether by sale, contribution to capital, or otherwise), and to licenses or other arrangements for the use of intangibles.

In making this change, the committee intends to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangibles transfers. Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms. In determining whether the taxpayer could reasonably expect that projected profits would be greater than the industry norm, the committee intends that there should be taken into account any

established pattern of transferring relatively high profit intangibles to Puerto Rico or low tax foreign locations.

> The committee does not intend, however, that the inquiry as to the appropriate compensation for the intangible be limited to the question of whether it was appropriate considering only the facts in existence at the time of the transfer. The committee intends that consideration also be given the actual profit experience realized as a consequence of the transfer. Thus, the committee intends to require that the payments made for the intangible be adjusted over time to reflect changes in the income attributable to the intangible. The bill is not intended to require annual adjustments when there are only minor variations in revenues. However, it will not be sufficient to consider only the evidence of value at the time of the transfer. Adjustments will be required when there are major variations in the annual amounts of revenue attributable to the intangible.

H.R. Rept. No. 99-426, at 423-426, 1986-3 C.B. (Vol. 2) 1, 423-426 (footnotes omitted). We have added emphasis to the particular portions of the report referred to by petitioner.

The conference committee recommended that Congress add the sentence that was eventually added to section 482 by the Tax Reform Act of 1986. H.R. Conf. Rept. No. 99-841 (Vol. I), at I-504 (1986). The conference committee's report explained this recommendation as follows:

### Present Law

> Transfers to related foreign corporations as licenses or sales are subject to an "arm's-length" price standard. Uncertainty exists regarding what transfers are appropriate to treat as "arm's-length" comparables and regarding the significance of profitability, including major changes in profitability of the intangible after the transfer.

\*   \*   \*   \*   \*   \*   \*

### House Bill

<u>Payments with respect to intangibles transferred to a foreign related party must be commensurate with the income attributable to the intangible</u>. * * *

\*   \*   \*   \*   \*   \*   \*

Senate Amendment

No provision.

Conference Agreement

<u>The conference agreement follows the House bill</u>. The concerns addressed in the House bill originated in connection with transfers of intangibles from U.S. parties to foreign affiliates, particularly those operating in low-tax foreign countries. Consequently, the provisions of the House bill only were applied to transfers of intangibles from U.S. persons to their foreign affiliates. In view of the fact that the objective of these provisions--that the division of income between related parties reasonably reflect the relative economic activity undertaken by each--applies equally to inbound transfers, the conferees concluded that it would be appropriate for these principles to apply to transfers between related parties generally if income must otherwise be taken into account.

The conferees do not intend to affect present law concepts of what constitutes a single "license", to the extent those concepts are not inconsistent with the purposes of the new provision. Thus, for example, in the case of continuous transfers of technology under a continuing license agreement, the adequacy of the royalty may, in appropriate cases, be determined by applying the appropriate standards under the conference agreement on an aggregate basis with respect to the profitability and other relevant features of the transferred intangibles as a whole.

Similary [sic], the conferees do not intend to change principles that would permit offsets or other adjustments to reflect the tax impact of the taxpayer's transactions as a whole.

The conferees are also aware that many important and difficult issues under section 482 are left unresolved by this legislation. <u>The conferees believe that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect</u>.

H.R. Conf. Rept. No. 99-841 (Vol. II), at II-637 to II-638 (1986), 1986-3 C.B. (Vol. 4) 1, 637-638.  We have emphasized the three sentences of the conference committee report on which petitioner relies.  The first sentence was quoted by petitioner.  The second sentence was cited by petitioner and paraphrased by petitioner.  The third sentence was indirectly referred to by petitioner through its quotation of a passage of the Blue Book that alludes to the third sentence.[141]

In the passage excerpted above, the conference committee report acknowledged that "many important and difficult issues under section 482 are left unresolved by this legislation" and stated that "a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted" and "careful consideration should be given to whether the existing regulations could be modified in any respect."  H.R. Conf. Rept. No. 99-841 (Vol. II), at II-638, 1986-3 C.B. (Vol. 4), at 638.  We discuss the resulting study shortly.

---

[141] The so-called Blue Book for the Tax Reform Act of 1986 was a postenactment description of that law by the staff of the Joint Committee on Taxation.  Staff of J. Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 (J. Comm. Print 1987).  Petitioner quotes the following sentence from the Blue Book: "Congress believed that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect."  <u>Id.</u> at 1017.  This sentence from the Blue Book is evidently a reference to the third sentence that we have emphasized in the excerpt from the conference report.

While we are on the topic of the Blue Book, we observe that petitioner quotes two other sentences from the Blue Book in support of its argument.  These are the two sentences:

Congress intended that consideration also be given to the actual profit experience realized as a consequence of the transfer. Thus, Congress intended to require that the payments made for the intangible be adjusted over time to reflect changes in the income attributable to the intangible. * * *

<u>Id.</u> at 1016.  A similar statement is found in the House Ways & Means Committee report that we excerpted earlier in this Opinion.  H.R. Rept. No. 99-426, at 425-426 (1985), 1986-3 C.B. (Vol. 2) 1, 425-426.

The 1968 regulations--which related to section 482 of the Internal Revenue Code of 1954--seemingly carried over to section 482 of the Internal Revenue Code of 1986.[142] The first sentence of section 482 of the Internal Revenue Code of 1986 was the same as section 482 of the Internal Revenue Code of 1954. Thus, it would make sense that the 1968 regulations would be valid as to section 482 of the Internal Revenue Code of 1986, unless such regulations were inconsistent with the second sentence of section 482 of the Internal Revenue Code of 1986.[143] Our (admittedly limited) research does not reveal any successful challenge to the validity of the 1968 regulations on grounds that they were inconsistent with the second sentence of section 482 of the Internal Revenue Code of 1986.

As the conference committee report suggested, the Treasury Department and the IRS conducted a study of intercompany pricing rules. This study, which was published as Notice 88-123, 1988-2 C.B. 458, is also known as the "White Paper". Altera Corp. & Subs. v. Commissioner, 145 T.C. 91, 98 (2015), rev'd, 926 F.3d 1061 (9th Cir. 2019). The White Paper discussed various transfer-pricing problems involving services, tangible property, and intangible property. Notice 88-123, 1988-2 C.B. at 468. However, it did not discuss the effect of foreign legal restrictions on transfer pricing. With respect to intangible property, the White Paper observed that under the 1968 regulations (1) the best indication of arm's-length consideration was comparable transactions and (2) in the absence of comparable transactions, 12 factors were to be taken into account in determining arm's-length consideration. Id., 1988-2 C.B. at 460. The White Paper stated that the 1968 final regulations provided little or no guidance on the relative importance of particular factors. Id. The White Paper stated that for a transfer price for intangible property to meet the commensurate-with-income standard, adjustment must generally be made to the transfer price to reflect changes to the income stream, economic activities

---

[142] As explained in greater detail later, in 1992 the Treasury Department issued proposed regulations under sec. 482 of the Internal Revenue Code of 1986. 57 Fed. Reg. 3571 (Jan. 30, 1992). See infra part II.KK. The notice of proposed rulemaking referred to the 1968 regulations, with amendments, as "the existing regulations", 57 Fed. Reg. 3572, thus implying that the 1968 regulations had carried over to sec. 482 of the Internal Revenue Code of 1986.

[143] If a statute is amended so as to be inconsistent with a prior regulation, the regulation is no longer binding. See Zeta Beta Tau Fraternity, Inc. v. Commissioner, 87 T.C. 421, 433 (1986).

performed, assets employed, and economic costs and risks borne. Id. at 477. The White Paper also recommended that methods of pricing intangible property should include, in the absence of comparable transactions, a rate-of-return-on-assets analysis and a profit-split analysis. Id. at 485-493. The White Paper discussed the legislative history of the commensurate-with-income sentence added to section 482 in 1986. Id. at 472. In its briefs, petitioner quotes one of the paragraphs from the White Paper's discussion of legislative history of the commensurate-with-income sentence. This is the quoted paragraph:

> The 1986 Act amended section 482 to require that payments to a related party with respect to a licensed or transferred intangible be "commensurate with the income"[122] attributable to the intangible. The provision applies to both manufacturing and marketing intangibles.[123] The legislative history clearly indicates Congressional concern that the arm's length standard as interpreted in case law has failed to allocate to U.S. related parties appropriate amounts of income derived from intangibles.[124] The amendment is a clarification of prior law. Accordingly, it should not be assumed that the Service will cease taking positions that it may have taken under prior law.

[122] (e) Treatment of Certain Royalty Payments.--

(1) In General.--Section 482 (relating to allocation of income and deductions among taxpayers) is amended by adding at the end thereof the following new sentence: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."

(2) Technical Amendment.--Subparagraph (A) of section 367(d)(2) (relating to transfers of intangibles treated as transfer pursuant to sale for contingent payments) is amended by adding at the end thereof the following new sentence: "The amounts taken into account under clause (ii) shall be commensurate with the income attributable to the intangible."

Sec. 1231(e)(1), Tax Reform Act of 1986, 100 Stat. 2085 (1986).

[123] For this purpose, intangibles are broadly defined by reference to section 936(h)(3)(B) under which intangible property includes any:

(i) patent, invention, formula, process, design, pattern, or know-how;

(ii) copyright, literary, musical, or artistic composition;

(iii) trademark, trade name, or brand name;

(iv) franchise, license, or contract;

(v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or

(vi) any similar item,

which has substantial value independent of the services of any individual. See also Treas. Reg. § 1.482-2(d)(3)(ii) and Rev. Rul. 64-56, 1964-1 C.B. 113, regarding the treatment of know-how as property in a section 351 transfer.

[124] 1985 House Rep., supra n.47, at 420-427; 1986 Conf. Rep., supra n.2, at II-637 to II-638. Several commentators have suggested that the phrase "commensurate with income" derives from Nestle Co., Inc. v. Comm'r, T.C. Memo. 1963-14, where the Tax Court sanctioned a taxpayer's post-agreement increase in royalties paid by an affiliate for a very profitable intangible license. The opinion states that "[s]o long as the amount of the royalty paid was commensurate with the value of the benefits received and was reasonable, we would not be inclined to, nor do we think we would be justified to, conclude that the increased royalty was something other than what it purported to be." (Emphasis in White Paper). There is, however, nothing in the legislative record to indicate that this is the case or to indicate Congressional approval or disapproval of the result in Nestle.

Notice 88-123, 1988-2 C.B. at 472.[144] The White Paper also stated that the "commensurate with income" sentence added to section 482 in 1986 "requires that changes be made to the transfer payments to reflect substantial changes in the income stream attributable to the intangible as well as substantial changes in the economic activities performed, assets employed, and economic costs and risks borne by related entities."

---

[144] There is another portion of the White Paper that discusses the purpose of the commensurate-with-income sentence. This portion of the White Paper, which is not quoted or cited by petitioner, states:

Looking at the income related to the intangible and splitting it according to relative economic contributions is consistent with what unrelated parties do. The general goal of the commensurate with income standard is, therefore, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's length transfer of the intangible.

Notice 88-123, 1988-2 C.B. 458, 472.

Id. at 477. The White Paper stated that the 1986 amendment was a "Congressional directive to the Service to make adjustments to intangible returns that reflect the actual profit experience" and that the amendment was in part a legislative rejection of R.T. French Co. v. Commissioner, 60 T.C. 836 (1973), a case the White Paper said had "endorsed the view that a long-term, fixed rate royalty agreement could not be adjusted under section 482 based on subsequent events that were not known to the parties at the original contract date." Notice 88-123, 1988-2 C.B. at 477.[145]

JJ.   The 1988 amendment to section 7805 regarding temporary regulations

In 1988, Congress added section 7805(e), which provided:

SEC. 7805(e).  Temporary Regulations.--

(1) Issuance.--Any temporary regulation issued by the Secretary shall also be issued as a proposed regulation.

(2) 3-year duration.--Any temporary regulation shall expire within 3 years after the date of issuance of such regulation.

Sec. 7805(e), as amended by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100-647, sec. 6232(a), 102 Stat. at 3734. The 1988 amendment applied to "any regulation issued after" November 20, 1988. TAMRA sec. 6232(b), 102 Stat. at 3735.

KK.   The 1992 notice of proposed rulemaking

On January 30, 1992 the Federal Register published a notice of proposed rulemaking that proposed income tax regulations related to intercompany transfer pricing under section 482 of the Internal Revenue Code of 1986. 57 Fed. Reg. 3571 (Jan. 30, 1992).

The 1992 notice of proposed rulemaking discussed the legislative history of the commensurate-with-income sentence that had been added to section 482 by the Tax Reform Act of 1986. 57 Fed. Reg. 3571.

---

[145] For a discussion of R.T. French Co. v. Commissioner, 60 T.C. 836 (1973), see Reuven S. Avi-Yonah, "The Rise and Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation", 15 Va. Tax Rev. 89, 113-114 (1995).

Initially, the 1992 notice of proposed rulemaking made the following statement:

> The legislative history of the Act states that this change was intended to assure that the division of income between related parties reasonably reflects the economic activities each undertakes. See H.R. Rep. 99-281, 99th Cong., 2d Sess. (1986) at II-637.

Id. The citation of "H.R. Rep. 99-281, 99th Cong., 2d Sess. (1986) at II-637" was apparently an error. The cited report, H.R. Rept. No. 99-281, appears to be unrelated to tax law.[146] The House report that was related to the Tax Reform Act of 1986 was H.R. Rept. No. 99-426, a report written by the House Ways & Means Committee. However, nothing in H.R. Rept. No. 99-426 appears to correspond to the content attributed to "H.R. Rep. 99-281, 99th Cong., 2d Sess. (1986) at II-637" in the 1992 notice of proposed rulemaking. Instead, the 1992 notice of proposed rulemaking probably meant to cite H.R. Conf. Rept. No. 99-841 (Vol. II), at II-637. This is the conference committee report that was related to the Tax Reform Act of 1986. Its content corresponds to the discussion of "H.R. Rep. 99-281, 99th Cong., 2d Sess. (1986) at II-637" in the 1992 notice of proposed rulemaking. This discussion refers to dividing income so as to reflect economic activities.[147]

The 1992 notice of proposed rulemaking stated that the legislative history of the commensurate-with-income sentence "also expresses concern" about the improper use of comparables, including with respect to intangible property with high profit potential. 57 Fed. Reg. 3571 (citing the House Ways & Means Committee report, H.R. Rept. No. 99-426, at 424).

The 1992 notice of proposed rulemaking stated that the "Conference Committee report" also had recommended that the IRS study the question of whether the regulations under section 482 should

---

[146] However, we acknowledge that some secondary sources discussing sec. 482 of the Internal Revenue Code of 1986 have also referred to "H.R. 99-281, 99th Cong., 2d Sess. (1986)." Yariv Brauner, "Cost Sharing and the Acrobatics of Arm's Length Taxation", 38 Intertax 544, 557 (2010); Joel B. Rosenberg & Barbara N. McLennan, "Technology, Licensing, and Economic Issues in Transfer Pricing", 3 Corp. Bus. Tax'n Monthly 10, 19-20 (January 2002).

[147] The conference committee report stated that "the objective of these provisions" is "that the division of income between related parties reasonably reflect the relative economic activity undertaken by each". H.R. Conf. Rept. No. 99-841 (Vol. II), at II-637 (1986), 1986-3 C.B. (Vol. 4) 1, 637.

be modified. 57 Fed. Reg. 3571. This was obviously a reference to H.R. Conf. Rept. No. 99-841 (Vol. II), at II-637 to II-638, the conference committee report related to the Tax Reform Act of 1986.

The 1992 proposed regulations contained no change to section 1.482-1(d)(6) of the 1968 regulations relating to the deferred-income method of accounting for payments that would be barred by foreign legal restrictions, 33 Fed. Reg. 5849 (Apr. 16, 1968), 26 C.F.R. sec. 1.482-1(d)(6) (1969); 26 C.F.R. sec. 1.482-1(d)(6) (1992) (same as 1969 edition).

The 1992 proposed regulations made no change to the "complete-power" sentence, or the sentence thereafter, in the 1968 regulations. 57 Fed. Reg. 3578. These two sentences in the 1968 regulation were:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. * * *

26 C.F.R. sec. 1.482-1(b)(1) (1969) (1968 regulations);[148] 26 C.F.R. sec. 1.482-1(b)(1) (1992) (same as 1969 edition). Similar sentences had been in the regulations since 1934. See art. 45-1(b), Regulations 86 (1934).[149]

The 1992 proposed regulations made no changes to the definition of "controlled" in the 1968 regulations. 26 C.F.R. sec. 1.482-1(a)(3)

---

[148] No changes were made to sec. 1.482-1 of the 1968 regulations from (1) the promulgation of the 1968 amendments to sec. 1.482-1 of the regulations by Treasury Decision 6952, 33 Fed. Reg. 5848, on April 16, 1968, to (2) the publication of the 1969 edition of 26 C.F.R. See 26 C.F.R. sec. 1.482-1 (1969) (historical notes).

[149] Before 1962 the phrase "the district director shall intervene" had been "the statute contemplates that the Commissioner shall intervene". 26 C.F.R. sec. 39.45-1(b)(1) (1953).

Appellate Case: 23-3772     Page: 182     Date Filed: 02/08/2024 Entry ID: 5361675

(1969); 26 C.F.R. sec. 1.482-1(a)(3) (1992) (same as 1969 edition). This definition had been in the regulations since 1934. <u>See</u> art. 45-1(a)(3), Regulations 86 (1934).

The 1992 proposed regulations made no changes to the definition of "true taxable income" in the 1968 regulations. 26 C.F.R. sec. 1.482-1(a)(6) (1969); 26 C.F.R. sec. 1.482-1(a)(6) (1992) (same as 1969 edition). A similar term--with a similar definition--had been in the regulations since 1934. <u>See</u> art. 45-1(a)(6), Regulations 86 (1934) (defining "true net income").

The 1992 proposed regulations made no changes to the tax-parity sentence in the 1968 regulations. This 1968 sentence was: "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." 26 C.F.R. sec. 1.482-1(b)(1) (1969); 26 C.F.R. sec. 1.482-1(b)(1) (1992) (same as 1969 edition). A similar sentence regarding tax-parity had been in the regulations since 1934. <u>See</u> art. 45-1(b), Regulations 86 (1934).

The 1992 proposed regulations made no changes to the sentence in the 1968 regulations that imposed the arm's-length standard. This sentence was: "The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." 26 C.F.R. sec. 1.482-1(b)(1) (1969); 26 C.F.R. sec. 1.482-1(b)(1) (1992) (same text as 1969 edition). This sentence had been in the regulations since 1934. Art. 45-1(b), Regulations 86 (1934).

The 1992 proposed regulations contained the following addition relating to the arm's-length standard and the commensurate-with-income standard:

> In determining whether controlled taxpayers have dealt with each other at arm's length, the general principle to be followed is whether uncontrolled taxpayers, each exercising sound business judgment on the basis of reasonable levels of experience (or, if greater, the actual level of experience of the controlled taxpayer) within the relevant industry and with full knowledge of the relevant facts, would have agreed to the same contractual terms under the same economic conditions and other circumstances. * * * In the case of any transfer of an

intangible between or among controlled taxpayers, the true taxable income of the transferor with respect to such transfer must be commensurate with the income attributable to the intangible. See § 1.482-2(d).

Sec. 1.482-1(b)(1), Proposed Income Tax Regs., 57 Fed. Reg. 3578-3579 (Jan. 30, 1992).

The 1992 proposed regulations also contained proposed replacements to the transfer-pricing rules applicable to intangible property in section 1.482-2(d) of the 1968 regulations. 33 Fed. Reg. 5852 (Apr. 16, 1968); 26 C.F.R. sec. 1.482-2(d) (1992) (1968 regulations at the time of the 1992 proposed regulations);[150] sec. 1.482-2(d), Proposed Income Tax Regs., 57 Fed. Reg. 3579-3585 (Jan. 30, 1992) (1992 proposed regulations); 57 Fed. Reg. 3572 (Jan. 30, 1992) (explanation of 1992 proposed regulations). Under the 1992 proposed regulations, one of three methods would be used to determine the transfer price of intangible property: the matching-transaction method, the comparable-adjustable-transaction method, or the comparable-profit-interval method. Sec. 1.482-2(d)(3), (4), and (5), Proposed Income Tax Regs., 57 Fed. Reg. 3580-3584 (Jan. 30, 1992). The 1992 proposed regulations also proposed the following rule regarding annual adjustments: "If an intangible is transferred under an arrangement with a term covering more than one taxable year, the consideration charged in each taxable year may be adjusted to assure that it is commensurate with the income attributable to the intangible." Sec. 1.482-2(d)(6)(i), Proposed Income Tax Regs., 57 Fed. Reg. 3584. The 1992 proposed regulations included a paragraph on cost-sharing agreements. Sec. 1.482-2(g), Proposed Income Tax Regs., 57 Fed. Reg. 3595-3601. This paragraph's counterpart in the 1968 regulations was section 1.482-2(d)(4). 33 Fed. Reg. 5854 (Apr. 16, 1968); 26 C.F.R. sec. 1.482-2(d)(4) (1992) (1968 regulations at the time of the 1992 proposed regulations).

The 1992 proposed regulations also proposed modifications to the rules with regard to tangible property in section 1.482-2(e) of the 1968 regulations. 33 Fed. Reg. 5854-5857 (Apr. 16, 1968) (1968 regulations),

---

[150] Between the 1968 promulgation of sec. 1.482-2 of the regulations related to sec. 482 of the Internal Revenue Code of 1954 and the publication of the 1992 edition of title 26 of the Code of Federal Regulations, ten amendments were made to section 1.482-2 of the regulations. See 26 C.F.R. sec. 1.482-2 (1992) (historical notes). Some of the amendments were made before sec. 482 of the Internal Revenue Code of 1954 was redesignated sec. 482 of the Internal Revenue Code of 1986. Some were made after the redesignation.

26 C.F.R. sec. 1.482-2(e) (1992) (1968 regulations at the time of the 1992 proposed regulations); sec. 1.482-2(e), Proposed Income Tax Regs., 57 Fed. Reg. 3585-3586 (1992 proposed regulations); 57 Fed. Reg. 3574 (explanation of the 1992 proposed regulations). Under the proposed modifications, a comparable-profit-interval method would serve as a check on methods other than the comparable-uncontrolled-price method. Sec. 1.482-2(e), Proposed Income Tax Regs., 57 Fed. Reg. 3585-3586 (1992 proposed regulations); 57 Fed. Reg. 3574 (explanation of the 1992 proposed regulations). It has been said that the "most significant" change proposed in the 1992 proposed regulations was the introduction of the comparable-profit-interval method for transfers of intangible and tangible property. Bobbe Hirsch, Alan S. Lederman, & John M. Hughes, "Final Transfer Pricing Regulations Restate Arm's Length Principle", 72 Taxes 587, 588 (1994).

The 1992 proposed regulations were proposed to be effective--as a general rule--for tax years beginning after December 31, 1992. 57 Fed. Reg. 3601. The 1992 notice of proposed rulemaking invited the public to send comments on the 1992 proposed regulations to respondent. 57 Fed. Reg. 3578. It also invited the public to request a public hearing on the proposed regulations and stated that if such a request was received, a public hearing would be held and advance notice of the hearing would be published in the Federal Register. 57 Fed. Reg. 3578. The parties have not directed us to any record of a public hearing regarding the 1992 proposed regulations.

LL.  The 1993 temporary regulations and the 1993 redesignation of the 1968 regulations

On January 21, 1993, the Treasury Department issued Treasury Decision 8470, which was published in the Federal Register at 58 Fed. Reg. 5263. Treasury Decision 8470 did two things. First, it created temporary regulations under section 482 of the Internal Revenue Code of 1986 (26 C.F.R. secs. 1.482-1T through -7T (1994)) which were generally effective for tax years beginning after April 21, 1993. Id. sec. -1T(h) (1994) (effective date).[151] Second, it redesignated the 1968 regulations (including subsequent amendments) and made them effective for tax years beginning on or before April 21, 1993. 26 C.F.R. secs. 1.482-1A and -2A (1994); T.D. 8470, para. 1a, 58 Fed. Reg. 5271 (employing the heading "Regulations Applicable for Taxable Years

_____

[151] As explained later, 26 C.F.R. sec. 1.482-6T (1994) had no text. It was reserved for future regulations.

Beginning on or Before April 21, 1993" for sections 1.482-1A and -2A); 58 Fed. Reg. 17775 (Apr. 6, 1993) ("The temporary regulations are generally effective for taxable years beginning after April 21, 1993. Regulations §§ 1.482-1 and 1.482-2, promulgated in 1968, were redesignated as §§ 1.482-1A and 1.482-2A, and are effective for taxable years beginning on or before April 21, 1993.").

Treasury Decision 8470 contained errors that were later corrected in the Federal Register in three sets of corrections. 58 Fed. Reg. 17775 (Apr. 6, 1993); 58 Fed. Reg. 28446 (May 13, 1993); 58 Fed. Reg. 28921 (May 18, 1993). The first set of corrections related to both the 1993 temporary regulations and the redesignation of the 1968 regulations. 58 Fed. Reg. 17775 (Apr. 6, 1993). The second and third sets of corrections related only to the 1993 temporary regulations. 58 Fed. Reg. 28446 (May 13, 1993); 58 Fed. Reg. 28921 (May 18, 1993).

The changes to the section 482 regulations made by Treasury Decision 8470 (as corrected) were reflected in codified regulations published in the 1994 edition of the Code of Federal Regulations.[152] In explaining the changes made by Treasury Decision 8470 (and its corrections), we will refer to the codified regulations that were published in the 1994 edition of the Code of Federal Regulations (which reflected the changes made by Treasury Decision 8470 and its corrections) rather than the text of Treasury Decision 8470 (and its corrections) printed in the Federal Register.

---

[152] Recall that the changes made by Treasury Decision 8470 to the sec. 482 regulations include both the creation of the 1993 temporary regulations and the redesignation of the 1968 regulations.

Whereas the 1992 proposed regulations would have modified some parts of the 1968 regulations and would have left some parts of the 1968 regulations intact, the 1993 temporary regulations were a comprehensive set of regulations replacing the 1968 regulations in their entirety. See T.D. 8552, 59 Fed. Reg. 34972 (July 8, 1994) (preamble to final 1994 regulations). Section 1.482-1T set forth general transfer-pricing rules governing all types of transactions. 26 C.F.R. sec. 1.482-1T (1994). Specific types of transactions were dealt with in sections -2T(a) (loans); -2T(b) (services); -2T(c) (use of tangible property); -3T (transfers of tangible property); -4T (transfers of intangible property); -5T (comparable-profits method relating to transfer of tangible and intangible property); and -7T (cost-sharing agreements). 26 C.F.R. secs. 1.482-2T, 3T, -4T, -5T, -7T (1994). Section 1.482-6T was marked as reserved for future regulations regarding the profit-split method. 26 C.F.R. sec. 1.482-6T (1994).

Recall that section 1.482-2 of the 1968 regulations had been divided into the following five paragraphs: (a) loans, (b) services, (c) use of tangible property, (d) transfer or use of intangible property, and (e) sales of tangible property. 26 C.F.R. sec. 1.482-2 (1992). The first three paragraphs ((a), (b), and (c)) were copied verbatim to the 1993 temporary regulations. 26 C.F.R. sec. 1.482-2T(a) through (c) (1994) (1993 temporary regulations).

Paragraph (d) of section 1.482-2 of the 1968 regulations had dealt with the transfer or use of intangible property. 26 C.F.R. sec. 1.482-2(d) (1992). Paragraph (d) included subparagraph (4) regarding cost-sharing agreements. 26 C.F.R. sec. 1.482-2(d)(4) (1992). The counterparts to paragraph (d) of section 1.482-2 of the 1968 regulations were sections 1.482-4T (transfer of intangible property) and -7T (cost-sharing agreements) of the 1993 temporary regulations. 26 C.F.R. secs. 1.482-4T, -7T (1994). Section 1.482-7T of the 1993 temporary regulations regarding cost-sharing agreements was substantively the same as section 1.482-2(d)(4) of the 1968 regulations. 26 C.F.R. sec. 1.482-7T (1994) (1993 temporary regulations); 26 C.F.R. sec. 1.482-2(d)(4) (1992) (1968 regulations); see 58 Fed. Reg. 17775 (Apr. 6, 1993) ("[T]he 1968 regulations cost sharing provisions * * * will continue to apply as § 1.482-7T during the period before further action is taken on the 1992 proposed cost sharing regulations."); 59 Fed. Reg. 34987 (July 8, 1994) (stating that the 1993 temporary regulations relating to cost sharing incorporated the text of the 1968 regulations). However, the 1993 provisions were different from the 1992 proposed regulations on cost-

sharing agreements.  Sec. 1.482-2(g), Proposed Income Tax Regs., 57 Fed. Reg. 3595-3601 (Jan. 30, 1992).

Paragraph (e) of section 1.482-2 of the 1968 regulations dealt with sales of tangible property.  26 C.F.R. sec. 1.482-2(e) (1992) (1968 regulations).  Its counterpart in the 1993 temporary regulations was section 1.482-3T.  26 C.F.R. sec. 1.482-3T (1994) (1993 temporary regulations).

The 1993 temporary regulations replaced the passage containing the "complete-power" sentence in the 1968 regulations, a passage that had existed in various forms in the regulatory scheme since 1934.  This passage in the 1968 regulations had been:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers.  If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer.  * * *

26 C.F.R. sec. 1.482-1(b)(1) (1992) (1968 regulations).  In the 1993 temporary regulations, the passage was replaced by the following provision: "If a controlled taxpayer has not reported its true taxable income, the district director may make allocations between or among the members of a controlled group.  In such cases, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as "allocations").  26 C.F.R. sec. 1.482-1T(a)(2) (1994) (1993 temporary regulations).  The complete-power sentence was therefore eliminated in the 1993 temporary regulations.

The 1993 temporary regulations replaced the definition of "controlled" in the 1968 regulations with a similar definition.  See 26

C.F.R. sec. 1.482-1(a)(3) (1992) (1968 regulations). The 1993 temporary regulations provided:

> Controlled includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted as a result of the actions of two or more taxpayers acting in concert or with a common goal or purpose.

26 C.F.R. sec. 1.482-1T(g)(4) (1994) (1993 temporary regulations).

The 1993 temporary regulations defined a "group of controlled taxpayers" as "the taxpayers owned or controlled directly or indirectly by the same interests." 26 C.F.R. sec. 1.482-1T(g)(6) (1994) (1993 temporary regulations); cf. 26 C.F.R. sec. 1.482-1(a)(5) (1992) (1968 regulations) (defining a "group of controlled taxpayers" as "the organizations, trades, or businesses owned or controlled directly or indirectly by the same interests").

The 1993 temporary regulations created the concept of a "controlled transaction". A "controlled transaction" was defined as "any transaction * * * between two or more members of the same group of controlled taxpayers." 26 C.F.R. sec. 1.482-1T(g)(8) (1994) (1993 temporary regulations).

The 1993 temporary regulations replaced the definition of "true taxable income" in the 1968 regulations. See 26 C.F.R. sec. 1.482-1(a)(6) (1992) (1968 regulations). The 1993 temporary regulations provided: "True taxable income means, in the case of a controlled taxpayer, the taxable income that would have resulted had it dealt with the other member or members of the group at arm's length." 26 C.F.R. sec. 1.482-1T(g)(9) (1994) (1993 temporary regulations).

The 1993 temporary regulations modified the tax-parity sentence in the 1968 regulations. The 1968 regulations had stated: "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." 26 C.F.R. sec. 1.482-1(b)(1) (1992) (1968 regulations). By contrast, the 1993 temporary regulations stated: "The purpose of section 482 is to ensure that taxpayers clearly reflect

income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer in a manner that reasonably reflects the relative economic activity undertaken by each taxpayer." 26 C.F.R. sec. 1.482-1T(a)(1) (1994) (1993 temporary regulations).

The 1993 temporary regulations replaced the following sentence in the 1968 regulations imposing the arm's-length standard: "The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." 26 C.F.R. sec. 1.482-1(b)(1) (1992) (1968 regulations). The new sentence in the 1993 temporary regulations was: "In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." 26 C.F.R. sec. 1.482-1T(b)(1) (1994) (1993 temporary regulations).

The 1993 temporary regulation did not adopt the additional text in the 1992 proposed regulation relating to the arm's-length standard and the commensurate-with-income standard. Sec. 1.482-1(b)(1), Proposed Income Tax Regs., 57 Fed. Reg. 3578-3579 (Jan. 30, 1992). Instead, the 1993 temporary regulation adopted the following sentence: "A controlled transaction meets the arm's length standard if the results of that transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in a comparable transaction under comparable circumstances." 26 C.F.R. sec. 1.482-1T(b)(1) (1994) (1993 temporary regulations).

The matching-transaction and comparable-adjustable-transaction methods for determining the transfer prices of intangible property in the 1992 proposed regulations were combined into a single comparable-uncontrolled-transaction method in the 1993 temporary regulations. See T.D. 8470, 58 Fed. Reg. 5269 (Jan. 21, 1993) (preamble to 1993 temporary regulations); 26 C.F.R. 1.482-4T(c) (1994) (1993 temporary regulations); 26 C.F.R. sec. 1.482-2(d)(2)(iii), Proposed Income Tax Regs., 57 Fed. Reg. 3580 (Jan. 30, 1992). Instead of the comparable-profit-interval method for tangible and intangible property described in the 1992 proposed regulations (sec. 1.482-2(d)(5), Proposed Income Tax Regs., 57 Fed. Reg. 3583-3584 (Jan. 30, 1992); sec. 1.482-2(e)(1)(iii), (f), Proposed Income Tax Regs., 57 Fed. Reg. 3586-3595 (Jan. 30, 1992)), the 1993 temporary regulations described a comparable-

profit method that was broadly similar to the comparable-profit-interval method. 26 C.F.R. sec. 1.482-5T (1994) (1993 temporary regulations); T.D. 8552, 59 Fed. Reg. 34974 (July 8, 1994) (preamble to 1994 final regulations). The comparable-profit method, unlike the comparable-profit-interval method in the 1992 proposed regulations, did not serve as a mandatory check on other methods. 26 C.F.R. sec. 1.482-3T(a)(1) (1994) (1993 temporary regulations); sec. 1.482-2(e)(1)(iii), Proposed Income Tax Regs., 57 Fed. Reg. 3586 (Jan. 30, 1992); Hirsch et al., supra, at 588 ("The mandatory CPI check was deleted, while a comparable profits method (CPM), similar to the CPI, was introduced as a specified method for transfer of either tangible or intangible property.").

Section 1.482-4T(e)(2)(i) of the 1993 temporary regulations had the following provision: "If an intangible is transferred under an arrangement that covers more than one year, the consideration charged in each taxable year may be adjusted to ensure that it is commensurate with the income attributable to the intangible. Adjustments made pursuant to this paragraph (e)(2) shall be consistent with the arm's length standard and the provisions of § 1.482-1T." 26 C.F.R. sec. 1.482-4T(e)(2)(i) (1994) (1993 temporary regulations). The first sentence of the provision was similar to a sentence in the 1992 proposed regulations. Sec. 1.482-2(d)(6)(i), Proposed Income Tax Regs., 57 Fed. Reg. 3584 (Jan. 30, 1992). The second sentence of the provision had no counterpart in the 1992 proposed regulations. Id. The preamble to the 1993 temporary regulations explained the provision as follows: "Section 1.482-4T(e)(2)(i) provides that if an intangible is transferred for a period in excess of one year, the consideration charged is generally subject to annual adjustment to ensure that it is commensurate with the income attributable to the intangible. This provision is required by the 1986 amendment to section 482." 58 Fed. Reg. 5270 (Jan. 21, 1993).

The 1993 temporary regulations did not contain any rules comparable to section 1.482-1(d)(6) of the 1968 regulations (26 C.F.R. sec. 1.482-1(d)(6) (1969)), which governed the deferred-income method of accounting for payments prevented by foreign legal restrictions.[153] The 1993 temporary regulations did not contain any rules regarding the effect of foreign legal restrictions on section 482 allocations. The 1993

---

[153] Under the structure imposed by Treasury Decision 8470, sec. 1.482-1(d)(6) of the 1968 regulations (26 C.F.R. sec. 1.482-1(d)(6) (1969)) had been redesignated 26 C.F.R. sec 1.482-1A(d)(6) (1994), and applied only for tax years beginning on or before April 21, 1993. T.D. 8470, para. 1a, 58 Fed. Reg. 5271 (Jan. 21, 1993); 58 Fed. Reg. 17775 (Apr. 6, 1993).

temporary regulations contained a placeholder for such rules in section 1.482-1T(f)(2), which had the heading "Effect of Foreign legal restrictions" and the text "[Reserved]". 26 C.F.R. sec. 1-482-1T(f)(2) (1994) (1993 temporary regulations).

The preamble to the 1993 temporary regulations, T.D. 8470, 58 Fed. Reg. 5264 (Jan. 21, 1993), stated that the 1993 temporary regulations were needed immediately to provide guidance to the public and that therefore it was impractical and contrary to the public interest to comply with section 4(a) of the APA.[154]

The preamble to the 1993 temporary regulations contained a discussion of the legislative history of the commensurate-with-income sentence that had been added to section 482 by the Tax Reform Act of 1986. 58 Fed. Reg. 5264 (Jan. 21, 1993). This discussion was similar to the discussion of the legislative history in the 1992 notice of proposed rulemaking. 57 Fed. Reg. 3571 (Jan. 30, 1992).

Treasury Decision 8470, published on January 21, 1993, redesignated the 1968 regulations and provided that they applied only for earlier years, i.e., those tax years beginning on or before April 21, 1993. Until the 1993 redesignation, the 1968 regulations had two sections: 26 C.F.R. secs. 1.482-1 and -2 (1992). Section 1.482-2 of the 1968 regulations was divided into five paragraphs:

| | |
|---|---|
| 26 C.F.R. sec. 1.482-2(a) (1992) | loans |
| 26 C.F.R. sec. 1.482-2(b) (1992) | services |
| 26 C.F.R. sec. 1.482-2(c) (1992) | use of tangible property |
| 26 C.F.R. sec. 1.482-2(d) (1992) | transfer or use of intangible property |
| 26 C.F.R. sec. 1.482-2(e) (1992) | sales of tangible property |

Treasury Decision 8470 redesignated section 1.482-1 of the 1968 regulations as section 1.482-1A and made section 1.482-1A applicable for tax years beginning on or before April 21, 1993. 26 C.F.R. sec. 1.482-1A (1994); see T.D. 8470, 58 Fed. Reg. 5271 (Jan. 21, 1993); 58 Fed. Reg. 17775 (Apr. 6, 1993). For those years, Treasury Decision 8470 also created section 1.482-2A(a) through (c), which provided: "For applicable rules, see § 1.482-2T(a) through (c)." As noted before, section 1.482-2T(a) through (c) of the 1993 temporary regulations (regarding loans, services,

---

[154] Codified as amended at 5 U.S.C. sec. 553(b).

and use of tangible property, respectively) are verbatim copies of section 1.482-2(a) through (c) of the 1968 regulations, respectively. In addition, Treasury Decision 8470 created section 1.482-2A(d), which consisted of a verbatim copy of section 1.482-2(d) of the 1968 regulations (regarding transfer or use of intangible property, including subparagraph (4) regarding cost-sharing agreements). 26 C.F.R. sec. 1.482-2(d) (1992); 26 C.F.R. sec. 1.482-2A(d) (1994). Treasury Decision 8470 also created section 1.482-2A(e), which was a verbatim copy of section 1.482-2(e) of the 1968 regulations (regarding sales of tangible property). 26 C.F.R. sec. 1.482-2(e) (1992); 26 C.F.R. sec. 1.482-2A(e) (1994). In summary, sections -1 and -2 of the 1968 regulations (26 C.F.R. secs. 1.482-1 and -2 (1992)) were transformed into sections -1A and -2A (26 C.F.R. secs. 1.482-1A, -2A (1994)) and made applicable for tax years beginning on or before April 21, 1993.

MM. <u>The 1993 notice of proposed rulemaking</u>

On January 21, 1993, the same day it issued Treasury Decision 8470, the Treasury Department published a notice of proposed rulemaking in the Federal Register. 58 Fed. Reg. 5310. The notice of proposed rulemaking withdrew the 1992 proposed regulations with the exception of section 1.482-2(g), Proposed Income Tax Regs., 57 Fed. Reg. 3595 (Jan. 30, 1992), which related to cost-sharing agreements. <u>See</u> 58 Fed. Reg. 5310. Thus, paragraph 2(g) of the 1992 proposed regulations remained a proposal by the Treasury Department. 58 Fed. Reg. 17775 (Apr. 6, 1993) ("The 1992 proposed cost sharing regulations will be the basis of the final regulations that will be promulgated as § 1.482-7, and therefore, are the provisions on which comments are solicited."); <u>see also</u> 59 Fed. Reg. 34987 (July 8, 1994).

The 1993 notice of proposed rulemaking explained that the Treasury Department proposed that sections -1T through -5T of the 1993 temporary regulations (26 C.F.R. secs. 1.482-1T through -5T (1994)) eventually be made final. 58 Fed. Reg. 5310; T.D. 8470, 58 Fed. Reg. 5272. This meant that sections -1T through -5T of the 1993 temporary regulations had the status of both (1) temporary regulations and (2) proposed regulations. <u>See</u> 59 Fed. Reg. 34972 (July 8, 1994) (referring to regulations as both temporary and proposed).

Recall that section 1.482-6T of the 1993 temporary regulations was merely a placeholder for future regulations regarding the profit-split method. 26 C.F.R. sec. 1.482-6T (1994). The 1993 notice of proposed rulemaking contained the text of proposed regulations related

to the profit-split method. This text was section 1.482-6T, Proposed Income Tax Regs., 58 Fed. Reg. 5313 (Jan. 21, 1993). Although the text bore the identifier "T", for temporary, the regulation was not a temporary regulation, but a proposal for a final regulation. 58 Fed. Reg. 5310 ("In addition to the text of the temporary regulations, the final regulations that will result from the regulations proposed in this notice will be based on the text of proposed §§ 1.482-1T(f)(2) and 1.482-6T contained in this notice. These provisions are proposed to take the place of reserved sections of the temporary regulations."). Therefore, for years governed by the 1993 temporary regulations (i.e., generally tax years beginning after April 21, 1993), no applicable regulatory provision related to the profit-split method.

Recall that section 1.482-7T of the 1993 temporary regulations related to cost-sharing agreements. 26 C.F.R. sec. 1.482-7T (1994) (1993 temporary regulations); 58 Fed. Reg. 17776 (Apr. 6, 1993); 58 Fed. Reg. 28921 (May 18, 1993). Recall that section 1.482-2(g) of the 1992 proposed regulations (Proposed Income Tax Regs., 57 Fed. Reg. 3595-3601 (Jan. 30, 1992)) also related to cost-sharing agreements.

Recall that a passage from the 1993 temporary regulations related to the purpose and scope of section 482 but omitted the complete-power sentence found in the 1968 regulations. 26 C.F.R. sec. 1.482-1T(a)(1) (1994). The 1993 notice of proposed rulemaking proposed that this passage be made final through the effect of its general proposal that there be made final sections 1.482-1T to -5T of the 1993 temporary regulations, 26 C.F.R. secs. 1.482-1T through -5T (1994). 58 Fed. Reg. 5310; T.D. 8470, 58 Fed. Reg. 5272.

Recall that the 1993 temporary regulations had a provision (-4T(e)(2)(i)) permitting annual adjustments in the compensation for the long-term use of intangible property. 26 C.F.R. sec. 1.482-4T(e)(2)(i) (1994). The 1993 notice of proposed rulemaking proposed that this provision be made final through the effect of its general proposal that there be made final sections 1.482-1T to -5T of the 1993 temporary regulations, 26 C.F.R. secs. 1.482-1T through -5T (1994). 58 Fed. Reg. 5310; T.D. 8470, 58 Fed. Reg. 5272.

Recall that section 1.482-1T(f)(2) of the 1993 temporary regulations contained a placeholder for future provisions regarding the "Effect of foreign legal restrictions". The 1993 notice of proposed rulemaking included, as proposed regulations, section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312, headed "Effect of foreign

legal restrictions". Although this proposed provision was identified with a "T", for temporary, the provision was not a temporary regulation, but a proposal for a final regulation. <u>See</u> 58 Fed. Reg. 5310. Here is the text of section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312:

(i) <u>In general</u>. The district director may make an allocation under section 482 without regard to the effect of any foreign legal restriction, except as provided in paragraph (f)(2)(iv) of this section. However, an allocation under section 482 will be treated as deferrable if the following requirements are met:

(A) The taxpayer must establish to the satisfaction of the district director that the payment or receipt of part or all of the arm's length amount that would otherwise be required under section 482 was prevented because of a foreign legal restriction and circumstances described in paragraph (f)(2)(ii) of this section.

(B) The taxpayer whose U.S. tax liability may be affected by the foreign legal restrictions must elect the deferred income method of accounting, as described in paragraph (f)(2)(iii) of this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the Internal Revenue Service first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program will be considered an amended return for purposes of this paragraph (f)(2)(i) if it satisfies the requirements of a qualified amended return for purposes of § 1.6662-5(j)(1) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

(ii) <u>Applicable legal restrictions</u>. Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (f)(2) only if the conditions set forth in paragraphs (f)(2)(ii)(A) through (D) of this section are met.

(A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign.

(B) The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all effective and practical remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued).

(C) The restrictions expressly prevented the payment or receipt of part or all of the arm's length amount that would otherwise be required under section 482; a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose.

(D) The related parties subject to the restriction did not engage in any transaction with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

(iii) <u>Deferred income method of accounting</u>. If the requirements of paragraph (f)(2)(i) of this section are satisfied, any allocation that may be made under section 482 with respect to such transaction will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (f)(2)(iii), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against any amount so deferred, are subject to deferral under the provisions of § 1.461-1(a)(4).

(iv) <u>Exception for arm's length transactions</u>. Regardless of whether the election described in paragraph (f)(2)(i)(B) of this section has been made, an allocation will

not be made under section 482 with respect to a controlled transaction if the taxpayer establishes the following to the satisfaction of the district director--

(A) Payment or reimbursement for the controlled transaction was prevented at the time of the transaction because of a foreign legal restriction and circumstances described in paragraph (f)(2)(ii) of this section; and

(B) Uncontrolled transactions that establish a comparable uncontrolled price under § 1.482-3T(b) (in the case of tangible property) or a comparable uncontrolled transaction under § 1.482-4T(c) (in the case of intangible property) demonstrate that, taking into account the foreign legal restriction, the controlled transaction was at arm's length.

(v) <u>Examples</u>. The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (f)(2).

<u>Example 1</u>. (i) Parent licenses an intangible to Sub. FC law prohibits Sub from paying a royalty to Parent. The requirements of paragraphs (f)(2)(ii)(A), (B), and (C) of this section are satisfied. Parent attached to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (f)(2)(i)(B) of this section, electing the deferred income method of accounting under paragraph (f)(2)(iii) of this section. The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of its sales in country FC.[155]

---

[155] This sentence appeared in the copy of the notice of proposed rulemaking published in the Federal Register. 58 Fed. Reg. 5313 (Jan. 21, 1993). However, the copy of the notice of proposed rulemaking published in the Cumulative Bulletin contained instead the following two sentences:

The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC. Sub pays no royalty to Parent but does distribute to Parent an amount equal to 10% of its sales in country FC.

1993-1 C.B. 825, 828. In the stipulation, petitioner and respondent acknowledged that the notice of proposed rulemaking was "published in the Federal

(ii) The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%. Further, the district director determines that because the distribution from Sub to Parent had the effect of circumventing the FC law, the requirements of paragraph (f)(2)(ii)(D) of this section are not satisfied. Thus, Parent did not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable. In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482-1T(e)(4).

Example 2. The facts are the same as in Example 1, except that Sub distributes an amount equal to 8% of its sales in country FC. Because the distribution has the effect of circumventing the FC law within the meaning of paragraph (f)(2)(ii)(D) of this section, the deferred income method of accounting was not validly elected, and does not apply, with respect to the amount of the distribution. However, the election was properly made, and does apply, with respect to the 2% difference between the arm's length royalty rate and the amount of the distribution. Accordingly, of the 10% royalty allocated to Parent, 2% may be treated as deferrable. In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482-1T(e)(4).

Example 3. The facts are the same as in Example 1, except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent. Parent demonstrates the existence of comparable uncontrolled transactions in which

---

Register". However, petitioner and respondent stipulated that Exhibit 36-J "is a copy of" the notice of proposed rulemaking. Exhibit 36-J is the text of the notice of proposed rulemaking that was published in the Cumulative Bulletin. For these purposes, the Federal Register is the authoritative source. See sec. 4(a) of the APA, codified as amended at 5 U.S.C. sec. 553(b) (requiring a notice of proposed rulemaking to be published in the Federal Register). Therefore, we disregard any apparent acquiescence by petitioner and respondent to the proposition that text published in the Cumulative Bulletin should be considered the text of the notice of proposed rulemaking.

an uncontrolled parties accepted a royalty rate of 5%, even though an arm's length royalty would otherwise have equaled 10%. Because the requirements of paragraph (f)(2)(iv) of this section are satisfied, the district director does not make an allocation of royalty income to Parent under section 482.

The 1993 notice of proposed rulemaking gave the following explanation of section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312:

Section 1.482-1T(f)(2) provides guidance on the extent to which foreign legal restrictions on payments between controlled taxpayers will be respected for purposes of section 482. In general, 1.482-1T(f)(2)(i) provides that a foreign legal restriction will be recognized for this purpose if the taxpayer demonstrates that the receipt of an arm's length payment was prevented by a foreign legal restriction, and the taxpayer elects the deferred income method of accounting with respect to such payments.

Section 1.482-1T(f)(2)(ii) defines an applicable foreign legal restriction as a restriction that is publicly promulgated and generally applicable, with respect to which the controlled taxpayer has exhausted all practicable legal remedies afforded under foreign law for obtaining a waiver, expressly prevents the payment of an arm's length amount within the meaning of section 482, and was not circumvented through other transactions between the controlled taxpayers.

Section 1.482-1T(f)(2)(iii) provides that if the restriction meets the definition of an applicable foreign legal restriction and the taxpayer has elected the deferred income method of accounting, any section 482 allocation connected with the transaction will be deferrable until the restriction is removed. Deductions and credits chargeable against a deferred amount are subject to deferral under section 461.

Section 1.482-1T(f)(2)(iv) provides an exception from the election requirement in cases in which the taxpayer can demonstrate, based on a comparable uncontrolled

transaction, that the transaction as structured was at arm's length.

58 Fed. Reg. 5310. The 1993 notice of proposed rulemaking also made the following general statement:

> Before adopting these regulations, consideration will be given to any written comments that are timely submitted (preferably a signed original and eight copies) to the Commissioner of Internal Revenue. All comments will be available for public inspection and copying. A public hearing will be held upon written request by any person who submits timely written comments on the proposed rules. Notice of the time, place and date for the hearing will be published in the Federal Register.

Id. Respondent received comments pertaining to section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312-5313, from the following four organizations:

- The American Petroleum Institute, which submitted "Comments by the American Petroleum Institute on the Temporary and Proposed Regulations on Intercompany Transfer Pricing under Code section 482," dated July 20, 1993.

- Tax Executives Institute, Inc. ("Tax Executives Institute"), which submitted a letter dated August 6, 1993, enclosing "Comments of Tax Executives Institute, Inc. On Temporary and Proposed Regulations under Section 482 of the Internal Revenue Code, T.D. 8470, IL-401-88, submitted to the Internal Revenue Service."

- TRW, Inc. ("TRW"), which submitted a letter dated July 16, 1993.

- United States Council for International Business, which submitted a letter dated July 21, 1993, enclosing "Statement of the United States Council for International Business on Proposed Regulation Section 1.482(f)(2) Issued Pursuant to the Internal Revenue Code."

All four organizations that submitted comments on section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312, stated that the proposed regulations were inconsistent with the holding in First Security Bank. The American Petroleum Institute stated that the proposed regulation "apparently ignores" First Security Bank's holding, which, in the view of the American Petroleum institute, was that "an allocation of income is inappropriate where a government restriction negates the 'complete power' of a taxpayer to control the distribution of income among affiliates." All four commentators stated that the proposed regulations were inconsistent with the reasoning of the Tax Court and the Sixth Circuit in Procter & Gamble, which involved the effect of a foreign legal restriction.

Two commentators--the Tax Executives Institute and TRW--argued against the requirement of section 1.482-1T(f)(2)(ii)(A), Proposed Income Tax Regs., 58 Fed. Reg. 5312, that, for a foreign legal restriction to be taken into account, it would have to be "generally applicable to all similarly situated persons (both controlled and uncontrolled)." The Tax Executives Institute explained that "[a] legal restriction should not have to apply to all businesses in the foreign jurisdiction in order to trigger First Security Bank's limitation on section 482." The Tax Executives Institute added: "Some countries in Latin America, for example, apply such restrictions only to payments between related parties." TRW also opposed the "both controlled and uncontrolled" clause, arguing that it was inconsistent with the Sixth Circuit opinion in Procter & Gamble.

Two commentators--the American Petroleum Institute and TRW---questioned the requirement of section 1.482-1T(f)(2)(ii)(D), Proposed Income Tax Regs., 58 Fed. Reg. 5312, that "related parties subject to the restriction did not engage in any transaction with controlled or uncontrolled parties that had the effect of circumventing the restriction". Specifically, they expressed concern that the proposed rule could be interpreted to mean that the payment of dividends, or (according to the American Petroleum Institute) even just the ability to pay dividends, might be considered a way to circumvent a legal restriction.

Two commentators--the American Petroleum Institute and the Tax Executives Institute--addressed the requirement in section 1.482-1T(f)(2)(ii)(B), Proposed Income Tax Regs., 58 Fed. Reg. 5312, that the taxpayer must have "exhausted all effective and practical remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect

of success if pursued)." The American Petroleum Institute stated that the exhaustion-of-remedies requirement "will be difficult to establish with developing nations where the effectiveness of various avenues of appeal is subject to question and a vigorous pursuit of an appeal may place the taxpayer's business interests in that county at risk." The Tax Executives Institute merely requested clarification: "The regulations should also clarify (perhaps in an example) when taxpayers will be considered to have exhausted their remedies under foreign law. The requirement should not compel taxpayers to pursue futile, costly actions."

The American Petroleum Institute challenged the proposed regulation's requirement that a restriction imposed by foreign law be publicly promulgated. The American Petroleum Institute stated that, even in the industrialized world, "restrictions which have the practical force and effect of law may not necessarily be traceable to a specific published statutory or regulatory source."

Two commentators--the American Petroleum Institute and the Tax Executives Institute--argued that taxpayers should continue to be allowed to make the deferral election within the time limits that had been permitted by the 1968 regulations. Recall that the 1968 regulations required that the election be made before any of the following events occurred: (1) the taxpayer's waiver of the period for assessment, (2) 30 days after the examination report, or (3) the closing agreement or offer-in-compromise. 26 C.F.R. sec. 1.482-1A(d)(6) (1994). The 1993 proposed regulation would have required the election to be made before the IRS first contacted the taxpayer about an examination. Sec. 1.482-1T(f)(2)(i)(B), Proposed Income Tax Regs., 58 Fed. Reg. 5312.

Following the receipt of written comments relating to the 1993 notice of proposed rulemaking, the Treasury Department and respondent held a public hearing on August 16, 1993. Although several witnesses testified at the hearing, none testified regarding section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312, which related to foreign legal restrictions.

NN.    The 1994 final regulations

On July 8, 1994, Treasury Decision 8552 was published in the Federal Register. 59 Fed. Reg. 34971. Treasury Decision 8552 did two things. First, it promulgated final regulations under section 482 of the Internal Revenue Code of 1986. T.D. 8552, para. 3, 59 Fed. Reg. 34988.

These 1994 final regulations were comprehensive: They comprised all regulations related to section 482 for the tax years and transactions to which they applied. Second, it removed the 1993 temporary regulations. T.D. 8552, para. 2, 59 Fed. Reg. 34988.

The effective dates of the 1994 final regulations were specified in section 1.482-1(j) of the 1994 final regulations, which is printed below:

(1) The regulations in this are generally effective for taxable years beginning after October 6, 1994.

(2) Taxpayers may elect to apply retroactively all of the provisions of these regulations for any open taxable year. Such election will be effective for the year of the election and all subsequent taxable years.

(3) Although these regulations are generally effective for taxable years as stated, the final sentence of section 482 (requiring that the income with respect to transfers or licenses of intangible property be commensurate with the income attributable to the intangible) is generally effective for taxable years beginning after December 31, 1986. For the period prior to the effective date of these regulations, the final sentence of section 482 must be applied using any reasonable method not inconsistent with the statute. The IRS considers a method that applies these regulations or their general principles to be a reasonable method.

(4) These regulations will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985, or before August 17, 1986, for transfers or licenses to others. Nevertheless, they will apply with respect to transfers or licenses before such dates if, with respect to property transferred pursuant to an earlier and continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date.[156]

---

[156] The quoted text is found in Treasury Decision 8552, 59 Fed. Reg. 35002 (July 8, 1994). In 2003, sec. 1.482-1(j)(5) of the regulation was added. T.D. 9088, 68 Fed. Reg. 51177 (Aug. 26, 2003). Subparagraph (5) was included in the 2006 edition

202

Petitioner does not argue that any provision of section 1.482-1(j) of the 1994 final regulations results in the 1994 final regulations' not being effective for the 2006 tax year of the 3M consolidated group.

The 2006 edition of the Code of Federal Regulations contains the regulations generally applicable for the 2006 tax year for taxpayers, such as the 3M consolidated group, who use the calendar year as the tax year. Therefore, when we wish to cite the regulations that are effective for this case, we cite the 2006 edition of the Code of Federal Regulations. Between the promulgation of the 1994 final regulations and the publication of the 2006 edition of the Code of Federal Regulations, some amendments had been made to the 1994 final regulations.[157]  However, neither petitioner nor respondent relies on these amendments.  In this Opinion we do not refer to portions of the regulations that were amended after the 1994 final regulations.

As mentioned before, the second change effected by Treasury Decision 8552 was the removal of temporary regulation 1.482-1T to -6T.[158]  T.D. 8552, para. 2, 59 Fed. Reg. 34988 (July 8, 1994).  Treasury Decision 8552 provided that the effective date for the removal of the 1993 temporary regulations was October 6, 1994.  T.D. 8552, 59 Fed. Reg. 34971 (sections 1.482-1T to -6T of the 1993 regulations "are removed effective October 6, 1994").  This effective-date provision for the removal of the 1993 temporary regulations was not expressed in terms of tax years.  However, the new 1994 final regulations were generally effective for the tax years beginning after October 6, 1994.  See section 1.482-1(j)(1) of the 1994 final regulations, 59 Fed. Reg. 35002 (July 8, 1994).  Therefore it would be sensible to consider the temporary regulations to be removed generally for the tax years beginning after October 6, 1994.  If this interpretation is placed on the effective-date provision regarding the removal of the 1993 temporary regulations, then

_____

of title 26 of the Code of Federal Regulations.  This edition generally contains the regulations applicable for the 2006 tax year (for taxpayers, such as the 3M consolidated group, who use calendars years as tax years).  However, 26 C.F.R. sec. 1.482-1(j)(5) does not appear relevant to any of the regulatory provisions affecting this case.

[157] One such amendment was the 1995 addition of final regulations regarding cost-sharing agreements.  T.D. 8632, 60 Fed. Reg. 65553 (Dec. 20, 1995) (adding sec. 1.482-7).

[158] As explained before, sec. 1.482-6T of the 1993 temporary regulations (26 C.F.R. sec. 1.482-6T (1994)) was merely a placeholder.

the general scope of the section 482 regulations from this era can be described thus:

| Beginning date of tax year | Regulations generally applicable for tax year |
|---|---|
| On or before Apr. 21, 1993 | 1968 regulations, redesignated in 1993 |
| After Apr. 21, 1993, and on or before Oct. 6, 1994 | 1993 temporary regulations |

The preamble to the 1994 final regulations contained a discussion of the legislative history of the commensurate-with-income sentence that had been added to section 482 by the Tax Reform Act of 1986. 59 Fed. Reg. 34972 (July 8, 1994). This 1994 discussion of legislative history is similar to the discussions of legislative history in the 1992 notice of proposed rulemaking, 57 Fed. Reg. 3571 (Jan. 30, 1992), and in the preamble to the 1993 temporary regulations, 58 Fed. Reg. 5264 (Jan. 21, 1993); see supra part II.KK (discussing 1992 notice of proposed rulemaking) and LL (discussing preamble to the 1993 temporary regulations).

The preamble to the 1994 final regulations also explained that "[w]ritten comments responding to the notice of proposed rulemaking were received, and a public hearing was held on August 16, 1993"; and that "[a]fter consideration of all the comments", the proposed regulations under the 1993 notice of proposed rulemaking, as revised by Treasury Decision 8552, were adopted and the 1993 temporary regulations were removed. T.D. 8552, 59 Fed. Reg. 34972, 34988.

The preamble to the 1994 final regulations made the following general comparison to the 1993 temporary regulations (which were also proposed regulations): "While the final regulations reflect numerous modifications in response to the comments received on the 1993 regulations, both the format and substance of the final regulations are generally consistent with the 1993 regulations. The changes adopted are intended to clarify and refine those provisions of the 1993 regulations that required improvement, without fundamentally altering the basic policies reflected in the 1993 regulations." T.D. 8552, 59 Fed. Reg. 34975.

The 1994 final regulations included a finalized version of the 1993 temporary regulations (which were also proposed regulations) regarding the comparable-profits method. Sec. 1.482-5, 59 Fed. Reg. 35021 (text of section 1.482-5, the portion of the 1994 final regulations relating to

the comparable-profits method); 26 C.F.R. sec. 1.482-5 (1994) (1993 temporary regulations). The 1994 final regulations included a finalized version of the 1993 proposed regulations regarding the profit-split method. Sec. 1.482-6, 59 Fed. Reg. 35025 (text of section 1.482-6, the portion of the 1994 final regulations relating to the profit-split method); 59 Fed. Reg. 34986 (preamble describing history of section 1.482-6 of 1994 final regulations); sec. 1.482-6T, Proposed Income Tax Regs., 58 Fed. Reg. 5313-5316 (Jan. 21, 1993) (text of proposed regulation on profit-split method in 1993 notice of proposed rulemaking).

The 1994 final regulations had no provisions regarding cost-sharing agreements. 59 Fed. Reg. 34987. Thus, the provisions in the 1993 temporary regulations continued to apply. Id.; 26 C.F.R. sec. 1.482-7T (1994) (1993 temporary regulations).

Like the 1993 temporary regulations, the 1994 final regulations had a provision permitting the consideration charged for an intangible to be periodically adjusted to be commensurate with the income attributable to the intangible. 26 C.F.R. sec. 1.482-4(f)(2) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-4T(e)(2)(i) (1994) (1993 temporary regulations).[159] The preamble to the 1994 final regulations explained the provision as follows: "Section 1.482-4(f)(2) provides that if an intangible is transferred for a period in excess of one year, the consideration charged is generally subject to an annual adjustment to ensure that it is commensurate with the income attributable to the intangible. This provision is required by the 1986 amendment to section 482." 59 Fed. Reg. 34984.[160]

---

[159] The provision in the 1994 final regulations, which was substantially identical to the provision in the 1993 temporary regulations, was:

If an intangible is transferred under an arrangement that covers more than one year, the consideration charged in each taxable year may be adjusted to ensure that it is commensurate with the income attributable to the intangible. Adjustments made pursuant to this paragraph (f)(2) shall be consistent with the arm's length standard and the provisions of § 1.482-1. * * *

26 C.F.R. sec. 1.482-4(f)(2) (2006) (1994 final regulations); see 26 C.F.R. sec. 1.482-4T(e)(2)(i) (1994) (1993 temporary regulations).

[160] The preamble also discussed the parallel provision in the 1992 proposed regulations (sec. 1.482-2(d)(6)(i), Proposed Income Tax Regs., 57 Fed. Reg. 3584 (Jan. 30, 1992)):

In addition to providing new methods for transfers of intangibles, the 1992 regulations implemented the "commensurate

Recall that before the 1994 final regulations were promulgated, the regulatory provisions containing the "complete power" sentence were in effect only for tax years beginning on or before April 21, 1993. As we have explained, the section 482 regulations before the promulgation of the 1994 final regulations had consisted of two separate tracks. Tax years beginning on or before April 21, 1993, were generally governed by the 1968 regulations as redesignated in 1993. T.D. 8470 para. 1, 58 Fed. Reg. 5271 (Jan. 21, 1993); 58 Fed. Reg. 17775 (Apr. 6, 1993). This redesignated set of regulations had the provisions containing the "complete power" sentence. 26 C.F.R. sec. 1.482-1A(b)(1) (1994). Tax years beginning after April 21, 1993, were governed by the 1993 temporary regulations. 26 C.F.R. sec. 1.482-1T(a), (h) (1994). The 1993 temporary regulations did not have the provisions containing the "complete power" sentence. 26 C.F.R. sec. 1.482-1T(a)(1) (1994) (1993 temporary regulations).

Like the 1993 temporary regulations, the 1994 final regulations did not have the passage containing the "complete power" sentence that had existed in various forms from 1934 to 1993. Instead of this passage, the 1993 temporary regulations had provided:

> If a controlled taxpayer has not reported its true taxable income, the district director may make allocations between or among the members of a controlled group. In such cases, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as "allocations").
> * * *

26 C.F.R. sec. 1.482-1T(a)(2) (1994) (1993 temporary regulations). The 1994 final regulations had similar provisions:

> The district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income. In such case, the district director may allocate income, deductions,

with income" standard by providing that these methods could be applied to adjust the consideration charged in the year of examination (periodic adjustments) unless one of three narrow exceptions applied.

59 Fed. Reg. 34972 (July 8, 1994).

credits, allowances, basis, or any other item or element affecting taxable income (referred to as allocations). * * *

26 C.F.R. sec. 1.482-1(a)(2) (2006) (1994 final regulations).

The 1994 final regulations' definition of the word "controlled", which was similar to the definition in the 1993 temporary regulations, was as follows:

> Controlled includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

26 C.F.R. sec. 1.482-1(i)(4) (2006) (1994 final regulations); see 26 C.F.R. sec. 1.482-1T(g)(4) (1994) (1993 temporary regulations).

Like the 1993 temporary regulations, the 1994 final regulations defined a "group of controlled taxpayers" as "the taxpayers owned or controlled directly or indirectly by the same interests." 26 C.F.R. sec. 1.482-1(i)(6) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(g)(6) (1994) (1993 temporary regulations).

The 1994 final regulations, like the 1993 temporary regulations, defined a "controlled transaction" as "any transaction * * * between two or more members of the same group of controlled taxpayers." 26 C.F.R. sec. 1.482-1(i)(8) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(g)(8) (1994) (1993 temporary regulations).

The 1994 final regulations' definition of the term "true taxable income" was similar to the definition in the 1993 temporary regulations:

> True taxable income means, in the case of a controlled taxpayer, the taxable income that would have resulted had it dealt with the other member or members of the group at arm's length. * * *

26 C.F.R. sec. 1.482-1(i)(9) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(g)(9) (1994) (1993 temporary regulations).

The 1994 final regulations contained provisions regarding the purpose of section 482, which included a reference to the tax-parity goal. The purpose provisions in the 1994 final regulations were:

> The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. * * *

26 C.F.R. sec. 1.482-1(a) (2006) (1994 final regulations). These provisions were the same as the provisions in the 1993 temporary regulations, except that the 1994 final regulations omitted the clause "in a manner that reasonably reflects the relative economic activity undertaken by each taxpayer." 26 C.F.R. sec. 1.482-1T(a)(1) (1994) (1993 temporary regulations). The preamble to the 1994 final regulations explained this omission.

> The definition of true taxable income in § 1.482-1(i)(9) already incorporates the notion that, under section 482, the controlled taxpayer should earn the amount of income that would have resulted had it dealt with other controlled taxpayers at arm's length. Because a transaction at arm's length naturally would reflect the 'relative economic activity undertaken,' this definition incorporates that concept, and it is unnecessary to include the additional language in this provision.

T.D. 8552, 59 Fed. Reg. 34976.

The 1994 final regulations contained a sentence similar to the sentence in the 1993 temporary regulations that imposed the arm's-length standard. 26 C.F.R. sec. 1.482-1(b)(1) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(b)(1) (1994) (1993 temporary regulations). The sentence in the 1994 final regulations was this: "In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." 26 C.F.R. sec. 1.482-1(b)(1) (2006) (1994 final regulations).

As explained before, the 1993 temporary regulation adopted the following sentence: "A controlled transaction meets the arm's length standard if the results of that transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in a comparable transaction under comparable circumstances." 26 C.F.R. sec. 1.482-1T(b)(1) (1994) (1993 temporary regulations). The parallel sentence in the 1994 final regulations was this: "A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)." 26 C.F.R. sec. 1.482-1(b)(1) (2006) (1994 final regulations).

The 1994 final regulations under section 482, which were promulgated by Treasury Decision 8552, included 26 C.F.R. sec. 1.482-1(h)(2) (2006) (1994 final regulations). Subparagraph (2), headed "Effect of foreign legal restrictions", provides:

(i) <u>In general</u>. The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2)(iii) and (iv) of this section (Deferred income method of accounting).

(ii) <u>Applicable legal restrictions</u>. Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii)(A) through (D) of this section are met.
(A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

(B) The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

(C) The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

(D) The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

(iii) <u>Requirement for electing the deferred income method of accounting</u>. If a foreign legal restriction prevents the payment or receipt of part or all of the arm's length amount that is due with respect to a controlled transaction, the restricted amount may be treated as deferrable if the following requirements are met—

(A) The controlled taxpayer establishes to the satisfaction of the district director that the payment or receipt of the arm's length amount was prevented because of a foreign legal restriction and circumstances described in paragraph (h)(2)(ii) of this section; and

(B) The controlled taxpayer whose U.S. tax liability may be affected by the foreign legal restriction elects the deferred income method of accounting, as described in paragraph (h)(2)(iv) of this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the IRS first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign legal restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program

will be considered an amended return for purposes of this paragraph (h)(2)(iii)(B) if it satisfies the requirements of a qualified amended return for purposes of § 1.6664-2(c)(3) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

(iv) <u>Deferred income method of accounting</u>. If the requirements of paragraph (h)(2)(ii) of this section are satisfied, any portion of the arm's length amount, the payment or receipt of which is prevented because of applicable foreign legal restrictions, will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (h)(2)(iv), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against any amount so deferred, are subject to deferral under the provisions of § 1.461-1(a)(4). In addition, income is deferrable under this deferred income method of accounting only to the extent that it exceeds the related deductions already claimed in open taxable years to which the foreign legal restriction applied.

(v) <u>Examples</u>. The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (h)(2).

<u>Example 1</u>. Parent licenses an intangible to Sub. FC law generally prohibits payments by any person within FC to recipients outside the country. The FC law meets the requirements of paragraph (h)(2)(ii) of this section. There is no evidence of unrelated parties entering into transactions under comparable circumstances for a comparable period of time, and the foreign legal restrictions will not be taken into account in determining the arm's length amount. The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC.

However, because the requirements of paragraph (h)(2)(ii) of this section are satisfied, Parent can elect the deferred income method of accounting by attaching to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (h)(2)(iii)(B) of this section.

Example 2. (i) The facts are the same as in Example 1, except that Sub, although it makes no royalty payment to Parent, arranges with an unrelated intermediary to make payments equal to an arm's length amount on its behalf to Parent.

(ii) The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%. Further, the district director determines that because the arrangement with the third party had the effect of circumventing the FC law, the requirements of paragraph (h)(2)(ii)(D) of this section are not satisfied. Thus, Parent could not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable. In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482-1(g) (Collateral adjustments).

Example 3. The facts are the same as in Example 1, except that the laws of FC do not prevent distributions from corporations to their shareholders. Sub distributes an amount equal to 8% of its sales in country FC. Because the laws of FC did not expressly prevent all forms of payment from Sub to Parent, Parent cannot validly elect the deferred income method of accounting with respect to any of the arm's length royalty amount. In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482-1(g) (Collateral adjustments).

Example 4.  The facts are the same as in Example 1, except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent. Parent demonstrates the existence of a comparable uncontrolled transaction for purposes of the comparable uncontrolled transaction method in which an uncontrolled party accepted a royalty rate of 5%.  Given the evidence of the comparable uncontrolled transaction, the 5% royalty rate is determined to be the arm's length royalty rate.

The preamble to Treasury Decision 8552 explains the final 1994 regulations.  The portion of the preamble related to 26 C.F.R. sec. 1.482-1(h)(2) (2006) states:

The rules on foreign legal restrictions were originally issued in proposed form in the 1993 regulations. Section 1.482-1(h)(2) modifies and finalizes that provision. It provides that a foreign legal restriction will be taken into account to the extent that such restriction affects the results of transactions at arm's length.  If there is no evidence that the restriction affected uncontrolled taxpayers the restriction will be disregarded in determining an arm's length result, and it will be taken into account only to the extent provided in §§ 1.482-1(h)(2)(iii) and (iv), relating to the deferred income method of accounting.  A foreign legal restriction is generally defined under § 1.482-1(h)(2)(ii) as a restriction that is publicly promulgated and generally applicable, not imposed as part of a commercial transaction between the taxpayer and the foreign government, with respect to which the taxpayer has exhausted all practicable legal remedies afforded under foreign law, expressly prevents the payment, in any form, of an arm's length amount within the meaning of section 482, and was not otherwise circumvented by the controlled taxpayers.

Section 1.482-1(h)(2)(iii) provides that if a provision meets the definition of a foreign legal restriction and the taxpayer has elected the deferred income method of accounting, any section 482 allocation connected with the

transaction will be deferrable until the restriction is removed.

Section 1.482-1(h)(2)(iv) provides that if the requirements of § 1.482-1(h)(2)(iii) are satisfied, the amount subject to the restriction will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. Deductions and credits incurred in open years and that are chargeable against a deferred amount are subject to deferral under § 1.461-1(a)(4).

59 Fed. Reg. 34981.

OO. Stipulations regarding the 1994 final regulations

Petitioner and respondent have stipulated that the "administrative record pertaining to the adoption of subparagraph (h)(2) of Treas. Reg. § 1.482-1 consists of the following documents":

- The 1992 notice of proposed rulemaking, dated January 30, 1992. 57 Fed. Reg. 3571 (Jan. 30, 1992).

- "1993 Temporary Income Tax Regulations (T.D. 8470; 58 FR 5263-02), dated January 21, 1993." Note that the stipulation here cites only Treasury Decision 8470, and fails to acknowledge the three later corrections to Treasury Decision 8470 relating to errors in the 1993 temporary regulations. The three corrections are 58 Fed. Reg. 17775 (Apr. 6, 1993); 58 Fed. Reg. 28446 (May 13, 1993); and 58 Fed. Reg. 28921 (May 18, 1993). As noted in the fourth bullet point below, the stipulation later mistakenly says the corrections are to the 1993 notice of proposed rulemaking. These anomalies in the stipulation appear to be to be insignificant.

- The 1993 notice of proposed rulemaking, dated January 21, 1993. 58 Fed. Reg. 5310 (Jan. 21, 1993).

- "Corrections to the 1993 Notice of Proposed Rulemaking, dated April 6, 1993 (58 Fed. Reg. 17775), dated May 13, 1993 (58 Fed. Reg. 28446), dated May 18, 1993 (58 Fed. Reg. 28921)." In our view, while the first correction related

to both the 1993 temporary regulation and the 1993 notice of proposed rulemaking, the second and third corrections related only to the 1993 temporary regulations. They did not relate to the 1993 notice of proposed rulemaking.

- Public comments:

  ○ American Petroleum Institute, dated June 20, 1993,
  ○ Tax Executives Institute, dated August 6, 1993,
  ○ TRW, dated July 16, 1993, and
  ○ United States Council for International Business, dated July 21, 1993.

- The 1994 final regulations, T.D. 8552, dated July 8, 1994. 59 Fed. Reg. 34971 (July 8, 1994).

Petitioner and respondent stipulated that the fixed ceilings on the amounts payable as royalties for the licensing of patents, unpatented technology, and trademarks are Brazilian legal restrictions that apply only to payments made by a Brazilian company to a controlling foreign company. Petitioner and respondent stipulated that therefore, at all relevant times, including during the 2006 tax year, there is no evidence that these legal restrictions affected "an uncontrolled taxpayer under comparable circumstances for a comparable period of time" within the meaning of 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006).

Petitioner and respondent have stipulated that petitioner did not elect the deferred income method of accounting described in 26 C.F.R. sec. 1.482-1(h)(2)(iv) (2006), and that petitioner does not assert that it is entitled to use that method.

PP.  The 1996 amendment to section 7805(a) regarding regulations relating to post-1996 provisions of the Internal Revenue Code

When the section 482 regulations were adopted in 1994, section 7805 could be summarized as follows:

- Section 7805(a) authorized the Treasury Department to prescribe all "needful" regulations for the enforcement of the Internal Revenue Code. 26 U.S.C. sec. 7805(a) (1994).

- Section 7805(b) authorized the Treasury Department to determine the extent, if any, to which such regulations would apply without retroactive effect. 26 U.S.C. sec. 7805(b) (1994).[161]

In 1996, however, Congress amended section 7805(b) to provide as follows:

(1)  In general.--Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:

(A)  The date on which such regulation is filed with the Federal Register.

(B)  In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.

(C)  The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

(2)  Exception for promptly issued regulations.-- Paragraph (1) shall not apply to regulations filed or issued within 18 months of the date of the enactment of the statutory provision to which the regulation relates.

(3)  Prevention of abuse.--The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse.

(4)  Correction of procedural defects.--The Secretary may provide that any regulation may apply retroactively to correct a procedural defect in the issuance of any prior regulation.

---

[161] A similar provision had been in the tax laws since 1934.  See supra part II.F (discussing sec. 62 of the Revenue Act of 1934).

(5) Internal regulations.--The limitation of paragraph (1) shall not apply to any regulation relating to internal Treasury Department policies, practices, or procedures.

(6) Congressional authorization.--The limitation of paragraph (1) may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation.

(7) Election to apply retroactively.--The Secretary may provide for any taxpayer to elect to apply any regulation before the dates specified in paragraph (1).

(8) Application to rulings.--The Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect.

Sec. 7805(b), as amended by the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, sec. 1101(a), 110 Stat. at 1468 (1996).

So, before the 1996 amendment section 7805(b) gave the Treasury Department the discretion to make regulations without retroactive effect. See TBL Licensing LLC v. Commissioner, 158 T.C. ___ (slip op. at 25 n.10 (Jan. 31, 2022) (stating that under pre-1996 section 7805(b), "regulations generally applied retroactively unless the Secretary of the Treasury exercised his discretion to apply them prospectively"). But after the 1996 amendment section 7805(b) generally imposed an antiretroactivity rule that was keyed to when the public received notice of the content of the regulation.

Under the effective-date provision of the 1996 amendment, the 1996 amendment applied "with respect to regulations which relate to statutory provisions enacted on or after the date of the enactment of this Act [July 30, 1996]." Taxpayer Bill of Rights 2, sec. 1101(b), 110 Stat. at 1469. Would the 1994 final regulations (including 26 C.F.R. sec. 1.482-1(h)(2) (2006)) be considered "regulations which relate to statutory provisions enacted on or after the date of the enactment of this Act [July 30, 1996]"?

The effective-date provision of the 1996 amendment has been interpreted to mean that the phrase "enacted on or after the date of the enactment of this Act" modifies the term "statutory provisions." Grapevine Imp., Ltd. v. United States, 636 F.3d 1368, 1381 n.6 (Fed. Cir. 2011), vacated and remanded, 566 U.S. 971 (2012); Esden v. Bank of Bos., 229 F.3d 154, 171 n.21 (2d Cir. 2000); TBL Licensing LLC v. Commissioner, 158 T.C. at ___ (slip op. at 25 n.10); Intermountain Ins. Serv. of Vail, LLC v. Commissioner, 134 T.C. 211, 229 n.3 (2010) (Halpern & Holmes, JJ., concurring in result only), rev'd and remanded, 650 F.3d 691 (D.C. Cir. 2011), vacated and remanded, 566 U.S. 972 (2012); Steve R. Johnson, "Preserving Fairness in Tax Administration in the Mayo Era", 32 Va. Tax Rev. 269, 312 (2012). Under this view, the 1996 amendment to section 7805(b) would not govern the 1994 final regulations. The 1994 final regulations related to section 482, which was enacted before 1996. Therefore, the pre-1996 version of section 7805(b) would govern the 1994 final regulations. But pre-1996 section 7805(b) would have no effect on whether the 1994 final regulations are applicable for the 2006 tax year. The pre-1996 version of section 7805(b) generally provided that tax regulations are applied retroactively, but that is irrelevant to the 1994 final regulations as applied for the 2006 tax year, as that is a prospective application.

Another interpretation of the effective-date provision of the 1996 amendment to section 7805(b) is that the phrase "enacted on or after" modifies the word "regulations" and not the phrase "statutory provisions". John Bunge, "Statutory Protection From IRS Reinterpretation of Old Tax Laws", 144 Tax Notes 1177 (2014). Under this view, the 1996 amendment to section 7805(b) would govern the 1994 regulations because these regulations could not be said to have been "enacted" after 1996; they were promulgated in 1994. If the 1996 amendments to section 7805(b) govern the 1994 final regulations, then section 7805(b) does not prevent the 1994 final regulations from being applicable for the 2006 tax year of the 3M consolidated group. The post-1996 version of section 7805(b) is essentially a prohibition on retroactive regulations, see sec. 7805(b)(1), with certain exceptions. But the 1994 final regulations are prospective, not retroactive, with respect to the 2006 tax year.

The bottom line is that neither version of section 7805(b) would preclude the 1994 final regulations from being applicable for the 2006 tax year.

QQ.  Post-2006 amendments to section 482

After 2006, the tax year at issue, section 482 was affected by several amendments.

A 2017 law amended section 482 to add a third sentence:

> For purposes of this section, the Secretary shall require the valuation of transfers of intangible property (including intangible property transferred with other property or services) on an aggregate basis or the valuation of such a transfer on the basis of the realistic alternatives to such a transfer, if the Secretary determines that such basis is the most reliable means of valuation of such transfers.

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 14221(b)(2), 131 Stat. at 2219 (codified at 26 U.S.C. sec. 482 (2018)).  The amendment was applicable for transfers in tax years beginning after December 31, 2017.  Id. subsec. (c)(1).

The same 2017 law indirectly affected the second sentence of section 482.  As it was enacted in 1986, the sentence referred to "intangible property (within the meaning of section 936(h)(3)(B)"."  26 U.S.C. sec. 482 (Supp. IV 1987).  Section 936(h)(3)(B) then provided:

> The term "intangible property" means any--
>
> (i) patent, invention, formula, process, design, pattern, or know-how;
>
> (ii) copyright, literary, musical, or artistic composition;
> (iii) trademark, trade name, or brand name;
>
> (iv) franchise, license, or contract;
>
> (v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or
>
> (vi) any similar item,

which has substantial value independent of the services of any individual.

26 U.S.C. sec. 936(h)(3)(B) (1982). In 2017, the definition of intangible property in section 936(h)(3)(B) was amended. Tax Cuts and Jobs Act of 2017, sec. 14221(a), 131 Stat. at 2218. After the 2017 amendment, section 936(h)(3)(B) provided:

> The term "intangible property" means any--
>
> (i) patent, invention, formula, process, design, pattern, or know-how;
>
> (ii) copyright, literary, musical, or artistic composition;
>
> (iii) trademark, trade name, or brand name;
>
> (iv) franchise, license, or contract;
>
> (v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data;
>
> (vi) any goodwill, going concern value, or workforce in place (including its composition and terms and conditions (contractual or otherwise) of its employment); or
>
> (vii) any other item the value or potential value of which is not attributable to tangible property or the services of any individual.

26 U.S.C. sec. 936(h)(3)(B) (2012 ed. & Supp. V 2018). This amendment too was applicable for transfers in tax years beginning after December 31, 2017. Tax Cuts and Jobs Act of 2017, sec. 14221(c)(1).

In 2018, section 482 was amended to replace the words "intangible property (within the meaning of section 936(h)(3)(B))" with the words "intangible property (within the meaning of section 367(d)(4))". Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. U, sec. 401(d)(1)(D)(viii)(III), 132 Stat. at 1207. Section 367(d)(4) provides:

For purposes of this subsection, the term "intangible property" means any--

    (A) patent, invention, formula, process, design, pattern, or know-how,

    (B) copyright, literary, musical, or artistic composition,

    (C) trademark, trade name, or brand name,

    (D) franchise, license, or contract,

    (E) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data,

    (F) goodwill, going concern value, or workforce in place (including its composition and terms and conditions (contractual or otherwise) of its employment), or

    (G) other item the value or potential value of which is not attributable to tangible property or the services of any individual.

Consolidated Appropriations Act, 2018, sec. 401(d)(1)(D)(viii)(I), 132 Stat. at 1207 (codified at 26 U.S.C. sec. 367(d)(4) (2018)). The 2018 amendment had retroactive effect only to the extent the 2018 version of section 482 would result in the same tax liability as the pre-2018 version, i.e., only if the 2018 amendment would have no effect. Consolidated Appropriations Act, 2018, div. U, sec. 401(e), 132 Stat. at 1212-1213.

    In summary, the 2017 amendments to section 482 and section 936(h)(3)(B) added a third sentence to section 482 and altered the section 936(h)(3)(B) definition of intangible property. These amendments had prospective effect only and therefore did not affect the 2006 tax year at issue in this case. The 2018 amendment to section 482 changed the cross-reference in the definition of intangible property to the section 367(d)(4) definition of intangible property. But the 2018 amendment does not apply retroactively to past years such as 2006 to the extent it would affect tax liabilities. Therefore, for the purposes of

the 3M consolidated group's 2006 tax year, the operative text of section 482 is the text before the 2017 and 2018 amendments, which is:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

26 U.S.C. sec. 482 (Supp. IV 1987). And the operative text of section 936(h)(3)(B) is:

The term "intangible property means any--

> (i) patent, invention, formula, process, design, pattern, or know-how;
>
> (ii) copyright, literary, musical, or artistic composition;
>
> (iii) trademark, trade name, or brand name;
>
> (iv) franchise, license, or contract;
>
> (v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or
>
> (vi) any similar item,

which has substantial value independent of the services of any individual.

26 U.S.C. sec. 936(h)(3)(B) (1982).

III. <u>Whether the Brazilian legal restrictions satisfy the seven requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006) for taking into account foreign legal restrictions</u>

Title 26 C.F.R. sec. 1.482-1(h)(2) (2006) provides that a foreign legal restriction is taken into account in making allocations under section 482 if seven[162] requirements are met: (1) the restriction affected uncontrolled taxpayers under comparable circumstances for a comparable period of time, (2) the restriction was publicly promulgated, (3) the restriction was generally applicable to all similarly situated persons (both controlled and uncontrolled), (4) the restriction was not imposed as part of a commercial transaction between the taxpayer and the foreign government, (5) the taxpayer exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of the restriction (other than remedies that would have a negligible prospect of success), (6) the restriction expressly prevented the payment or receipt, in any form, of all or part of the arm's-length amount, and (7) the taxpayer and related parties did not engage in any arrangement with controlled or uncontrolled parties that circumvented the restriction, and did not materially violate the restriction. 26 C.F.R. sec. 1.482-1(h)(2)(i) and (ii) (2006).[163]   Petitioner contends that the Brazilian legal restrictions met some of these seven requirements.[164]   We discuss

---

[162] Title 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) requires that the foreign legal restriction be "publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign." As petitioner recognizes, this requirement consists of three conjunctive parts. Thus, each part must be independently satisfied for the foreign legal restriction to be taken into account. Our Opinion refers to the three parts of 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) as the second requirement, the third requirement, and the fourth requirement, respectively, of 26 C.F.R. sec. 1.482-1(h)(2) (2006).

[163] The regulation also takes a foreign legal restriction into account if the taxpayer elects to defer the restricted income, 26 C.F.R. sec. 1.482-1(h)(2)(i), (iv) (2006), but the 3M consolidated group did not make such an election. Furthermore, the election is available only with respect to foreign legal restrictions that meet the last six requirements. Id. subdiv. (iv).

[164] Although all seven requirements must be met for the Brazilian legal restrictions to be taken into account under 26 C.F.R. sec. 1.482-1(h)(2) (2006), from petitioner's perspective it is not futile to argue that only some of the requirements are

whether each of the seven requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006) is met below in part III.A, B, C, D, E, F, and G, respectively.

## A.   <u>Effect on uncontrolled taxpayers</u>

The first requirement, which is set forth in 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006), is that "a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time." The stipulation states that the Brazilian restrictions fail the first requirement:

> The parties agree that the fixed ceilings on the amounts payable as royalties for the licensing of patents, unpatented technology, and trademarks are Brazilian legal restrictions that apply only to payments made by a Brazilian company to a controlling foreign company. Therefore, at all relevant times, including during the 2006 year, there is no evidence that these legal restrictions affected "an uncontrolled taxpayer under comparable circumstances for a comparable period of time" within the meaning of Treas. Reg. § 1.482-1(h)(2)(i).

And in its briefs, petitioner does not dispute that the Brazilian restrictions fail the first requirement. We therefore hold that the Brazilian restrictions fail the first requirement.

---

met. This is because petitioner argues that the remaining requirements are invalid. In particular, petitioner challenges the validity of

- the first requirement, <u>see</u> <u>infra</u> part V.A,

- the second requirement, <u>see</u> <u>infra</u> parts V.B, VI.B.3

- the third requirement, <u>see</u> <u>infra</u> part V.C,

- the fifth requirement, <u>see</u> <u>infra</u> part VI.B.4,

- the sixth requirement, <u>see</u> <u>infra</u> part V.F, and

- the seventh requirement, <u>see</u> <u>infra</u> parts V.G, VI.B.5.

A table <u>infra</u> part VII illustrates the relationship between (1) petitioner's arguments that particular requirements are met and (2) petitioner's arguments that particular requirements are invalid.

Additionally, petitioner makes challenges to the validity of the regulation unrelated to any individual requirement of the regulation. <u>See</u> <u>infra</u> parts IV, VI.A, VI.B.1, VI.B.2, and VI.B.6.

B. <u>Publicly promulgated</u>

The second requirement, which is set forth in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006), is that the foreign legal restriction be "publicly promulgated". As part of their dispute over whether the second requirement is met, petitioner and respondent disagree on the meaning of the term "publicly promulgated". Respondent contends that to be publicly promulgated a foreign legal restriction must be in writing. Petitioner disagrees. It contends that a foreign legal restriction need not be in writing to be publicly promulgated.[165]

In favor of its position that a foreign legal restriction need not be in writing, petitioner contends that the restrictions at issue in <u>Commissioner v. First Security Bank</u>, 405 U.S. 394, <u>Texaco, Inc. v. Commissioner</u>, 98 F.3d 825, and <u>Procter & Gamble Co. v. Commissioner</u>, 95 T.C. 323, were not in writing. We disagree. The restrictions at issue in all three cases were in writing:

- <u>First Security Bank</u> concerned a federal statute, section 92 of the National Bank Act, which authorized national banks "doing business in any place the population of which does not exceed five thousand inhabitants * * * [to] act as the agent for any fire, life, or other insurance company". Act of Sept. 7, 1916, ch. 461, 39 Stat. at 753. <u>Commissioner v. First Security Bank</u>, 405 U.S. at 401, explained that this statute had been interpreted as implicitly prohibiting national banks from acting as insurance agents in places populated by more than 5,000 inhabitants: "Although § 92 does not explicitly prohibit banks in places with a population of over 5,000 from acting as insurance agents, courts have held that it does so by implication." As support for this statement, <u>Commissioner v. First Security Bank</u>, 405 U.S. at 401 n.13, cited the following two judicial opinions: "<u>Saxon v. Georgia Association of Independent</u>

---

[165] Petitioner makes an alternative argument that if the public-promulgation requirement means that a foreign legal restriction must be in writing, then the public-promulgation requirement is an unreasonable interpretation of sec. 482 that is invalid under <u>Chevron</u> step two. We analyze this <u>Chevron</u>-step-two argument in a different part of this Opinion. <u>See infra</u> part V.B. In the present part of this Opinion (i.e., part III.B) we consider whether the public-promulgation requirement of 26 C.F.R. sec. 1.482-1(h)(2) (2006) is met assuming that requirement is valid under <u>Chevron</u> step two.

**Add. 224**

Insurance Agents, Inc., 399 F.2d 1010 (CA5 1968).  See
Commissioner v. Morris Trust, 367 F.2d 794, 795 (CA4
1966)."  These two opinions were in writing and were
published in the Federal Reporter.  The statutory provision
itself was also in writing, e.g., it was published in the
Statutes at Large, although it had been omitted from the
United States Code.  U.S. Nat'l Bank of Or. v. Indep. Ins.
Agents of Am., 508 U.S. 439 (1993); Commissioner v. First
Security Bank, 405 U.S. at 401 n.12.[166]

- In Procter & Gamble Co. v. Commissioner, 95 T.C. at 336,
  the restrictions in question were reflected in letters from
  the Spanish government, an order by the Spanish Ministry
  of Industry, and Decree 3099/1976.  These were written
  documents.

- In Texaco, Inc. v. Commissioner, 98 F.3d at 827, the
  restrictions in question were "authorized by the King [of
  Saudi Arabia] and communicated to Aramco by
  [Petroleum] Minister Yamani in Letter 103/z, dated
  January 23, 1979."  Letter 103/z was a written document.

Thus, all three cases concerned legal restrictions that were in writing.
Although the courts held that the legal restrictions must be accounted
for in making transfer-pricing determinations, the courts did not
address the question of whether an unwritten legal restriction must be
accounted for.

Furthermore, the three cases did not construe the public-
promulgation requirement imposed by 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A)
(2006) because the transactions at issue were not governed by that
provision.  See supra part II.FF (describing the transactions at issue in
First Security Bank), HH (describing the transactions at issue in Procter
& Gamble and Texaco, Inc.), and NN (discussing the effective-date
provisions of the 1994 final regulations).  Because the three cases did
not interpret this regulatory requirement, they did not address the
meaning of the term "publicly promulgated".  In particular, they did not
address the issue of whether a "publicly promulgated" restriction must
be in writing.

---

[166] We have previously observed that the Supreme Court in Commissioner v.
First Security Bank, 405 U.S. at 402, held that the prohibition on national banks'
acting as insurance agents could be assumed to be a prohibition on national banks'
receiving insurance commission income.  See supra part II.FF.

In our view, a foreign legal restriction is "publicly promulgated" within the meaning of 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) only if the restriction is in writing. Taking unwritten restrictions into account in determining section 482 allocations would foster disputes between taxpayers and the Internal Revenue Service as to the substance of unwritten rules made by foreign governments. Furthermore, there would be uncertainty in the computation of federal tax liabilities to the extent such liabilities were potentially affected by such rules. We are reluctant to assign a meaning to the words of the regulation that would foster tax disputes and result in uncertainty about tax liabilities. See Mayo Found. for Med. Educ. & Res. v. United States, 562 U.S. 44, 59 (2011) (holding that it is reasonable to interpret a statute in such a way as to avoid "continuing uncertainty" and "wasteful litigation"). The regulation in question was written by the agency charged with "the administration and enforcement" of the federal tax laws. Sec. 7801(a)(1) (setting forth powers and duties of Secretary of the Treasury). We hold that the regulation's reference to a "publicly promulgated" restriction is meant to include only a written restriction. With this interpretation of the term "publicly promulgated" in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) in mind, we now consider whether the Brazilian legal restrictions at issue in this case were publicly promulgated.

Printed below is petitioner's initial argument that the Brazilian legal restrictions were publicly promulgated:

> In this case, a statute--the Brazilian Foreign Capital Law (Law No. 4131/1962)--required Brazilian companies wanting to remit royalties abroad to submit evidence of the licensing agreement to the Brazilian Central Bank. Stip. ¶ 74. The Brazilian Central Bank issued formal written guidance--Circular-Letter No. 2795--that required a Brazilian licensee wanting to submit royalties abroad to produce evidence that the licensing agreement had been recorded by the BPTO. Stip. ¶ 75.b.

> Another statute--Law No. 3470/1958--imposed fixed ceilings on the tax deductibility of royalties that could be adjusted by the Brazilian Ministry of Finance. Stip. ¶ 87. The Ministry of Finance issued regulations establishing the deduction ceilings (Portaria No. 436/58, 113/59, 314/70, and 60/94). Stip. ¶ 88. Yet another statute--Law No. 8383/1991--permitted "a Brazilian company to remit

royalties to its controlling foreign company to the extent such payments were made deductible for Brazilian tax purposes ....” Stip. ¶ 82.a. Thus, a statute restricted payment of royalties by imposing rate ceilings, and a regulation said what the rate ceilings were. These legal rules ought to satisfy any public promulgation requirement.

And respondent's position is this:

[A]t least a portion of the restrictions upon which 3M relies were not publicly promulgated. The pricing restrictions under Law No. 8383/1991 do not expressly apply to technology transfer payments for unpatented technology (such as trade secrets). Nonetheless, the BPTO administratively extends these restrictions to unpatented technology by way of an unwritten interpretation. Stip. ¶ 90.

As to respondent's position quoted above, petitioner concedes that “the pricing restrictions for royalties on <u>unpatented</u> technology were unwritten.” However, petitioner contends that these restrictions on technology-transfer payments were publicly promulgated by the BPTO because the stipulation states that (1) that the restrictions exist and (2) penalties would apply if 3M Brazil violated the restrictions.

The Brazilian restrictions on technology-transfer payments are described in paragraph 90 of the stipulation, stating that “[u]nder” the BPTO’s interpretation of Law Nos. 4131/1962 and 8382/1991 the BPTO applies the same fixed ceilings that apply to patent or trademark royalties to technology-transfer payments.[167] Paragraph 90 further states that this interpretation was applied by the BPTO during 2006 and that it was not “published”. As we noted before, petitioner concedes that the Brazilian restrictions on payments for technology transfers were unwritten. So, in short, the Brazilian legal restrictions on payments for technology transfers consist of the BPTO’s unwritten interpretation of law described in paragraph 90. Therefore, the question to consider is whether the BPTO’s unwritten interpretation described in paragraph 90 of the stipulation is publicly promulgated.

---

[167] These fixed ceilings apply only to payments to controlling foreign companies.

Petitioner contends that the BPTO's interpretation should be considered to have been publicly promulgated because the interpretation exists.[168] But 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) requires not just that the foreign legal restriction exist. The restriction must also be "publicly promulgated." To be "publicly promulgated" the restriction must be in writing, as we have explained. Petitioner concedes that the BPTO's interpretation is unwritten. This concession is consistent with the stipulation, which says that the BPTO's interpretation is "unpublished." Given petitioner's concession that the BPTO's interpretation is unwritten, and given our interpretation of the public-promulgation regulatory requirement, it follows that the BPTO's interpretation has not been publicly promulgated.[169]

Because we conclude that the restrictions on technology-transfer payments were not publicly promulgated, we cannot conclude that the relevant Brazilian legal restrictions were publicly promulgated. The relevant Brazilian legal restrictions include both limits on technology-transfer payments and limits on patent royalties. We know only the cumulative effect of these limits. Paragraph 126 of the stipulation establishes that the relevant Brazilian legal restrictions prohibited 3M Brazil from paying more than $9,387,909 for patent royalties and for technology transfers.[170] But the stipulation does not show how much of

---

[168] Petitioner states: "The Commissioner points out that the pricing restrictions for royalties on <u>unpatented</u> technology were unwritten (i.e., they were applied by analogy to the written rules applicable to patents)". Resp. Br. 70.

Although these rules were unwritten, they nonetheless were publicly promulgated by the BPTO. They were not secret rules.

[169] Still another aspect of the Brazilian legal restrictions is that if a product is covered by a patent license or by a technology-transfer agreement between a Brazilian company and a controlling foreign company, then any trademark license between the Brazilian company and the controlling foreign company for the same product must be granted royalty-free. As to products covered by patent licenses, this requirement would seem to be publicly promulgated. But as to products covered by technology-transfer agreements, this requirement is found only in an unwritten BPTO policy described in paragraph 94a of the stipulation.

[170] The $9,387,909 amount was calculated before subtracting $5,104,756 of trademark royalties actually paid by 3M Brazil, a subtraction required by the Brazilian prohibition on a Brazilian company's paying trademark royalties to its controlling foreign company for a product covered by a patent license or technology-transfer agreement. The $9,387,909 amount was also calculated before subtracting the $4,117,370 R&D offset, a subtraction required by paragraph 128 of the stipulation. When both the trademark royalty payment and the R&D offset are taken into account, the sec. 482 adjustment would be $165,785. This adjustment assumes that the

this maximum payment is attributable to the restrictions on patent royalties. Petitioner, bearing the burden of proof, is required to show how much the restrictions on patent royalties, standing alone, would affect the appropriate section 482 allocation. Petitioner has not made such a showing.

We hold that the Brazilian legal restrictions at issue are not publicly promulgated.

### C. Generally applicable

The third requirement, which is set forth in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006), is that the foreign legal restriction be generally applicable to all similarly situated persons (both controlled and uncontrolled). Petitioner does not contend that the Brazilian legal restrictions are generally applicable. We hold that the Brazilian legal restrictions do not meet the general-applicability requirement.

### D. Not part of commercial transaction

The fourth requirement, which is set forth in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006), is that the foreign legal restriction not have been imposed as part of a commercial transaction between the taxpayer and the foreign government. Although respondent broadly contends that the Brazilian legal restrictions are not "publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled) and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign", respondent does not specifically contend that the Brazilian legal restrictions were imposed as part of commercial transactions between the 3M consolidated group and the government of Brazil. As a result, we hold that the Brazilian legal restrictions were not imposed as part of commercial transactions between the 3M consolidated group and the government of Brazil.

### E. Exhaustion of remedies

The fifth requirement, which is set forth in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(B) (2006), is that a foreign legal restriction is taken into account only if the taxpayer has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of the restriction (other

---

Brazilian restrictions on patent royalties and on technology-transfer payments are taken into account (and therefore reflects petitioner's position).

than remedies that would have a negligible prospect of success if pursued). Respondent contends that 3M Company did not exhaust its remedies for obtaining a waiver of the relevant Brazilian restrictions. Petitioner disagrees.

It is not necessary for us to resolve the question of whether 3M Company exhausted the remedies for obtaining a waiver of the Brazilian legal restrictions. As we have explained, the Brazilian legal restrictions at issue fail to meet the first, second, and third requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006). See supra part III.A, B, and C. And as we explain below, the Brazilian legal restrictions do not meet the sixth requirement. See infra part III.F.

### F.     Restriction on payment in any form

The sixth requirement, which is set forth in 26 C.F.R. sec 1.482-1(h)(2)(ii)(C) (2006), is that a foreign legal restriction will be taken into account only if it "expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would be otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose)". Respondent contends that the Brazilian legal restrictions do not meet the "any form" requirement described above because, respondent contends, "Brazilian law does not restrict 3M Brazil's ability to pay dividends or interest-on-net-equity out of its earnings and profits, including out of the additional profits generated by reason of 3M Brazil's failure to pay arm's length compensation." Petitioner agrees that the Brazilian legal restrictions fail this requirement.

### G.     Circumvention or violation of restriction

The seventh requirement, which is set forth in 26 C.F.R. sec. 1.482-1(h)(2)(ii)(D) (2006), is that a foreign legal restriction is taken into account only if the related parties did not engage in an arrangement that had the effect of circumventing the restriction and did not violate the restriction in a material respect. Respondent contends that 3M Brazil materially violated the Brazilian legal restrictions. Petitioner contends that 3M Brazil did not materially violate the Brazilian legal restrictions. We need not determine whether 3M Brazil materially violated the Brazilian legal restrictions, because we have held supra part III.A, B, C, E, and F, that five other requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006) are not met.

IV.    Chevron step one

In determining whether to defer to an agency's interpretation of a statute, courts employ the two-step test articulated in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984).[171]  Under Chevron step one, a court must, "applying the ordinary tools of statutory construction, * * * determine 'whether Congress has directly spoken to the precise question at issue.'"  City of Arlington, Tex. v. FCC, 569 U.S. 290, 296 (2013) (quoting Chevron, 467 U.S. at 842). And "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, 467 U.S. at 842-843.  But if the statute is ambiguous, then under Chevron step two a court must defer to the agency's interpretation of the statute if the interpretation is reasonable.  Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 58 (2011); Chevron, 467 U.S. at 843-844.  An agency's interpretation that satisfies Chevron step two must be deferred to by a court even if the interpretation conflicts with a prior judicial interpretation of the statute.  See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982 (2005).  However, if the prior judicial precedent had held that the statute was unambiguous, then the prior judicial interpretation controls over the agency interpretation.  See id. ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior

---

[171] In Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 50, 55-58 (2011), the Supreme Court held that the Chevron test, not the test under National Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472 (1979), required the Court to defer to 26 C.F.R. sec. 31.3121(b)(10)-2(d)(3)(iii) (2005), a regulation which, like 26 C.F.R. sec. 1.482-1(h)(2) (2006), was promulgated pursuant to sec. 7805(a).  The National Muffler test was a multifactor test, as can be seen by the following text from National Muffler Dealers Assn., 440 U.S. at 477:

> In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose.  A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent.  If the regulation dates from a later period, the manner in which it evolved merits inquiry.  Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute.  * * *

court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."); id. at 982-983 ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.").

Petitioner argues that 26 C.F.R. sec. 1.482-1(h)(2) (2006) is invalid under Chevron step one because, in petitioner's view, judicial precedents have held that predecessors to section 482 unambiguously provided that there can be no allocation of unreceived income under these statutes if receiving the income is prohibited by legal restrictions. The judicial precedents relied on by petitioner for this argument are L.E. Shunk Latex, First Security Bank, Procter & Gamble, and Exxon.

Of these four cases, petitioner primarily relies on First Security Bank. Petitioner argues that in First Security Bank the Supreme Court held that the "plain meaning" of the predecessor to section 482 was that respondent cannot allocate to a taxpayer income that the taxpayer was prevented from receiving by a legal restriction.

However, petitioner's interpretation of First Security Bank is inconsistent with the portion of the opinion explaining the reasons for the holding. In that portion, there is an initial passage discussing the general principle that a taxpayer has income only to the extent the taxpayer has control over the income. Commissioner v. First Sec. Bank, 405 U.S. at 403-404. The next part of the First Security Bank opinion, 405 U.S. at 404-407, focused specifically on section 482 of the Internal Revenue Code of 1954. This portion explained that a regulation related to section 482 of the Internal Revenue Code embraced the control concept discussed in the initial passage. 26 C.F.R. sec. 1.482-1(b)(1) (1971). We now analyze in greater depth the two portions of the First Security Bank opinion, i.e., (1) the initial passage and (2) the section-482-specific portion.

The initial passage of First Security Bank stated that no decision of the Supreme Court had found that a person had "taxable income that he did not receive and that he was prohibited from receiving"; that it had long been assumed that "the person to whom the income was attributed could have received it"; that it has also been assumed that "in order to be taxed for income, a taxpayer must have complete dominion over it"; and that "the assignment-of-income doctrine assumes that the income would have been received by the taxpayer had he not arranged

for it to be paid to another" (an assumption articulated in <u>Corliss v. Bowers</u>, 281 U.S. 376, 378 (1930): "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income".). <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 403-404. Petitioner places great weight on <u>First Security Bank</u>'s identification (in the initial passage) of the principle that a taxpayer does not have taxable income the taxpayer cannot legally receive.[172]

Significantly the initial passage in <u>First Security Bank</u> involved the interpretation of the predecessors of section 61, not the predecessors of section 482. First, the principle identified in the initial passage was an application of the proposition that "[t]he income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income". <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 403 (quoting <u>Corliss</u>, 281 U.S. at 378). This proposition is a judicial interpretation of section 61 and its predecessors. <u>See Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 427-431 (1955) (holding that recovery of punitive damages for fraud and antitrust violations was gross income under section 22(a) of the Internal Revenue Code of 1939, 53 Stat. at 9, because the taxpayer had complete dominion over the recovery); <u>Foley v. Commissioner</u>, 87 T.C. 605, 608 (1986) (specifying section 61 of the Internal Revenue Code of 1954, 68A Stat. at 17, as the source of the proposition that income is an accession to wealth over which a taxpayer has complete dominion).[173] Second, the initial passage also explained that the assignment-of-income doctrine concerned situations in which a taxpayer was taxed on income over which the taxpayer had control. <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 403-404. The assignment-of-income doctrine too is an interpretation of the predecessors of section 61, not the predecessors of section 482. <u>See Sargent v. Commissioner</u>, 929 F.2d 1252, 1258 (8th Cir.

---

[172] The principle was identified in the following sentence in <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 403:

> We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving. * * *

The sentence addresses the situation in which (1) the income was not received and (2) it was illegal to receive the income. Under sec. 61, there is no taxable income in that situation. <u>Cf. James v. United States</u>, 366 U.S. 213 (1961) (stating that under sec. 61, there is taxable income if (1) the income was received and (2) it was illegal to receive the income).

[173] Sec. 61 provides that gross income generally means all income from whatever source derived.

1991), <u>rev'g</u> 93 T.C. 572 (1989); <u>Wilson v. United States</u>, 530 F.2d 772, 778-779 (8th Cir. 1976). Indeed, the cases cited in the initial passage as examples of the application of the assignment-of-income doctrine were resolved under the predecessors of section 61, not the predecessors of section 482. <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 403-404 & n.17; <u>Harrison v. Schaffner</u>, 312 U.S. 579, 581 (1941) (section 22(a) of the Revenue Act of 1928, 45 Stat. at 797); <u>Helvering v. Horst</u>, 311 U.S. 112, 114 (1940) (section 22 of the Revenue Act of 1934, 48 Stat. at 686); <u>Lucas v. Earl</u>, 281 U.S. at 114 (1930) (section 213(a) of the Revenue Act of 1918, ch. 18, 40 Stat. at 1065). But the ultimate question in <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 400, involved respondent's authority under the predecessors of section 482, not section 61. Thus, the initial passage does not constitute the complete explanation of <u>First Security Bank</u>'s holding. Such an explanation must necessarily involve the predecessors of section 482, since that was the statute supporting respondent's position in <u>First Security Bank</u>.

The following sentence was the transition between (1) <u>First Security Bank</u>'s discussion of section 61 principles and (2) its interpretation of the predecessors of section 482:

> One of the Commissioner's regulations for the implementation of § 482 expressly recognizes the concept that income implies dominion or control of the taxpayer. * * *

<u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 404.[174] <u>First Security Bank</u> then quoted the "complete power" sentence from 26 C.F.R. sec. 1.482-1(b)(1) (1971),[175] explaining that the "complete-power" sentence "is consistent with the control concept heretofore approved by this Court, although in a different context."

---

[174] Petitioner's description of this sentence in the <u>First Security Bank</u> opinion omits the Supreme Court's reference to the regulation. Here is how petitioner describes the sentence:

> As the Supreme Court stated in First Security, section 482 "recognizes the concept that income implies dominion or control of the taxpayer." 405 U.S. 404.

[175] "The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers."

The <u>First Security Bank</u> opinion next stated that the allocation of income under section 482 of the Internal Revenue Code of 1954 was improper under the "complete power" regulation:

> The regulation, as applied to the facts in this case, contemplates that Holding Company--the controlling interest--must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the "true taxable income" of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482. But Holding Company had no such power unless it acted in violation of federal banking laws. The "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law.

<u>Id.</u> at 404-405. This passage, which holds the section 482 allocation to the banks was not authorized under 26 C.F.R. sec. 1.482-1(b)(1) (1971), is in our view the core reasoning of <u>First Security Bank</u>. The passage indicated that 26 C.F.R. sec. 1.482-1(b)(1) (1971) limited transfer-pricing allocations to those situations in which the income to be allocated could legally have been paid.

That <u>First Security Bank</u> relied on a regulation rather than the text of the relevant statute indicates that <u>First Security Bank</u> did not hold that the statute was "unambiguous".[176] Had it thought the statute to be unambiguous, the Supreme Court would not have had to rely on a regulation. <u>See</u> <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 462 (2002) ("In the context of an unambiguous statute, we need not contemplate deferring to the agency's interpretation. <u>See</u> <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-843 (1984)."); <u>Andrade-Zamora v. Lynch</u>, 814 F.3d 945, 951 (8th Cir. 2016) ("If the statute is unambiguous, we simply apply the statute." (citing <u>Hawkins v. Cmty. Bank of Raymore</u>, 761 F.3d 937, 940 (8th Cir. 2014))).

---

[176] It is relevant whether <u>First Security Bank</u> held that the terms of the statute were unambiguous. <u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to <u>Chevron</u> deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."); <u>id.</u> at 982-983 ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.").

The statute in question in <u>First Security Bank</u> was section 482 of the Internal Revenue Code of 1954. Nothing indicates that <u>First Security Bank</u> thought that the unambiguous words of the statute justified its holding about the effect of legal restrictions. Although <u>First Security Bank</u> quoted the one-sentence statute in full, this quotation was relegated to a footnote to the first sentence of the opinion. The first sentence of the opinion was simply an introduction to the opinion:

> This case presents for review a determination by the Commissioner of Internal Revenue (Commissioner), pursuant to § 482 of the Internal Revenue Act [footnote quoting section 482 of the Internal Revenue Code of 1954], that the income of taxpayers within a controlled group should be reallocated to reflect the true taxable income of each.

<u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 395 & n.1. This introductory sentence merely framed the issue in the case as one arising under the predecessors of section 482 as opposed to some other provision of the Internal Revenue Code of 1954. Neither the footnote containing the text of this statute nor any other part of the <u>First Security Bank</u> opinion parsed the text of the statute so as to link the text of the statute to the principle that income cannot be attributed to a taxpayer who cannot legally receive it. That link was supplied by a regulation, 26 C.F.R. sec. 1.482-1(b)(1) (1971), which, <u>First Security Bank</u> explained, embodied the concept that "income implies dominion or control of the taxpayer". <u>Id.</u> at 404.

In our view, <u>First Security Bank</u> did not hold that the predecessor of section 482 of the Internal Revenue Code of 1954 unambiguously precluded an allocation of income that could not be legally received. <u>See</u> <u>Nat'l Cable & Telecomms. Ass'n</u>, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to <u>Chevron</u> deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."); <u>id.</u> at 982-983 ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."). We therefore reject petitioner's argument that "the Supreme Court in <u>First Security</u> determined that the plain meaning of section 482 precludes the interpretation adopted by the Commissioner in Treas. Reg. § 1.482-

1(h)(2)."  In other words, we hold that <u>First Security Bank</u> was not a <u>Chevron</u> step one opinion.[177]

Petitioner also argues that <u>L.E. Shunk Latex</u> was a <u>Chevron</u> step one opinion.  In <u>L.E. Shunk Latex Prods., Inc. v. Commissioner</u>, 18 T.C. at 961, the court held that section 45 of the Internal Revenue Code of 1939 did not authorize the allocation of income to a taxpayer who could not legally receive the income.  Section 45 of the Internal Revenue Code of 1939 was essentially the same as the first sentence of section 482.  So if <u>L.E. Shunk Latex</u> had held that section 45 of the Internal Revenue Code of 1939 unambiguously precluded respondent from making an income allocation, as petitioner argues it held, then <u>L.E. Shunk Latex</u> is a precedent that arguably precludes the allocation respondent has made of income to 3M IPC in this case.[178]  In our view, though, <u>L.E. Shunk Latex</u> is not a <u>Chevron</u> step one opinion.  It held that respondent's allocation under section 45 of the Internal Revenue Code of 1939 cannot disregard a legal restriction on the receipt of income but did not suggest that this holding stems from unambiguous statutory text.  <u>See</u> <u>Nat'l Cable & Telecomms. Ass'n</u>, 545 U.S. at 982 (stating that prior judicial construction controls if "the prior court decision holds that its construction follows from the unambiguous terms of the statute").  The statute authorized respondent to allocate income among businesses "in order to clearly * * * reflect the income" of the businesses but did not refer to the effect of legal restrictions on the receipt of income.[179]

Furthermore, recall that <u>Commissioner v. First Sec. Bank</u>, 405 U.S. at 404-405, expressly relied on the "complete power" sentence in the regulation.  As explained before, <u>First Security Bank</u>'s reliance on a regulation suggests that <u>First Security Bank</u> did not hold the statute to be unambiguous.  Petitioner contends that <u>L.E. Shunk Latex</u>, which was written in 1952, could not have relied on the regulation containing the "complete power" sentence because, petitioner contends, the regulation

---

[177] Of course, <u>First Security Bank</u> (1971) was written before <u>Chevron</u> (1984) and therefore would not have found it necessary to classify its reasoning as <u>Chevron</u> step one or <u>Chevron</u> step two.  <u>See</u> <u>United States v. Home Concrete & Supply, Inc.</u>, 566 U.S. 478, 488-489 (2012) (plurality opinion).

[178] Remember though that sec. 482 now contains "commensurate-with-income", which also serves to distinguish our case from <u>L.E. Shunk Latex</u>.  We discuss the significance of this phrase later on.

[179] Unlike 26 C.F.R. sec. 1.482-2(h)(2) (2006) (giving rules for taking into account the effect of a "foreign legal restriction").

was promulgated only in 1962.  Petitioner's contention is reflected in the following passage in its brief:

> The Supreme Court in <u>First Security Bank</u> said that the "views of the Tax Court [in <u>L.E. Shunk</u>] were correct.  405 U.S. at 406, n.22.  The decision in <u>L.E. Shunk</u> did not depend on the "complete power" regulation, which was adopted later[13] and neither did the decision in <u>First Security</u>.

> [13]The regulation was promulgated in 1962.  T.D. 6595, 1962-1 C.B. 43, 1962 IRB LEXIS 321, at *20 (July, 1962)

(Alleration in original.)  At oral argument, petitioner also pressed the contention that <u>L.E. Shunk Latex</u> was decided before the promulgation of the regulation containing the "complete power" sentence:

> [A]ll this says is that the interest controlling a group of controlled taxpayers are assumed to have complete power to cause--basically it caused them to have their records truly reflect income.  * * * Just one more thing on that point--<u>L.E. Shunk was decided before this regulation by the Tax Court and so, obviously, this regulation had no effect on the L.E. Shunk decision</u> and the Supreme Court in First Security said it agreed with L.E. Shunk.

(Emphasis added.)  We reject petitioner's theory that the "complete power" sentence first arose in 1962 and that therefore <u>L.E. Shunk Latex</u> could not have relied on the "complete power" sentence.  The "complete power" sentence first appeared in 1934 with the promulgation of Regulations 86.  Art. 45-1(b), <u>Regulations 86 Relating to the Income Tax Under the Revenue Act of 1934</u>, at 123.  The "complete power" sentence also appeared in section 29.45-1(b) of Regulations 111, which had been published in the Federal Register in 1943 and in the Cumulative Supplement to the Code of Federal Regulations in 1944.  8 Fed. Reg. 14882 (Nov. 3, 1943).  Significantly, Regulations 111 was effective for tax years beginning after December 31, 1941.  Sec. 29.1-1, <u>Regulations 111 relating to the Income Tax Under the Internal Revenue Code</u> 1.  The years at issue in <u>L.E. Shunk Latex</u> were 1942, 1943, and 1945.  <u>L.E. Shunk Latex Prods., Inc. v. Commissioner</u>, 18 T.C. at 955.  Although Regulations 111 was amended in 1944, <u>see</u> T.D. 5426, 10 Fed. Reg. 23 (Jan. 2, 1945), 26 C.F.R. sec. 29.45-1 (1944 Supp.), and this amendment was seemingly effective starting with the 1944 tax year and thus would

seem to have been effective with respect to the 1945 tax year in <u>L.E. Shunk Latex</u>, the 1944 amendment did not appreciably change the "complete power" sentence or the passage containing it. To wit, before the 1944 amendment the "complete power" passage was:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income or deductions, or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. * * *

26 C.F.R. sec. 29.45-1(b) (Cum. Supp. 1944). After the 1944 amendment, the "complete power" passage was:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income[,] deductions, credits, or allowances or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. * * *

26 C.F.R. sec. 29.45-1 (1949). As can be seen, the 1944 amendment to the "complete power" passage in Regulations 111 was insignificant. Regulations 111 was not superseded until the 1953 promulgation of

Regulations 118, a series of regulations which also contained the complete-power passage. 26 C.F.R. sec. 39.45-1(b)(1) (1953).

In 1962, the Treasury Department promulgated regulations under section 482 of the Internal Revenue Code of 1954. T.D. 6595, 27 Fed. Reg. 3597 (Apr. 13, 1962), codified at 26 C.F.R. sec. 1.482-1 (1961 ed. 1965 Cum. Supp.). These 1962 regulations included the passage containing the "complete power" sentence. 26 C.F.R. sec. 1.482-1(b)(1) (1961 ed. 1965 Cum. Supp.). However, the same passage was in section 29.45-1 of Regulations 111, which was in effect for the three tax years at issue in L.E. Shunk Latex. 26 C.F.R. sec. 29.45-1(b) (Cum. Supp. 1944) (before 1944 amendment); 26 C.F.R. sec. 29.45-1(b) (1949) (after 1944 amendment).

There were some irregularities in the official publication of section 29.45-1 of Regulations 111. Regulations 111 should seemingly have been published in the 1943 Supplement to the Code of Federal Regulations, not just the Cumulative Supplement to the Code of Federal Regulations.[180] And in the Federal Register, section 29.45-1 of Regulations 111 was inexplicably published with the prefix "9." instead of "29." Although these discrepancies may make it difficult for today's researchers to find section 29.45-1 of Regulations 111, they do not detract from the proposition that section 29.45-1 of Regulations 111 was effective as to the transactions at issue in L.E. Shunk Latex. That section 29.45-1 of Regulations 111 was effective as to the transactions at issue in L.E. Shunk Latex is supported by the fact that the opinion cited section 29.45-1 of Regulations 111 three times. L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. at 956, 958.

Consequently, we are not persuaded by petitioner's view that the regulation containing the "complete power" sentence was not effective for, or in existence for, the years at issue in L.E. Shunk Latex.

Although the "complete power" sentence was in effect for the years at issue in L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. at 956, the opinion did not quote that sentence.[181] By contrast, Commissioner v. First Sec. Bank, 405 U.S. at 404, quoted the "complete power" sentence, and also explained that this sentence led to its

---

[180] And Regulations 111 erroneously stated that it was part of the 1943 Supplement to the Code of Federal Regulations.

[181] L.E. Shunk Latex quoted the tax-parity sentence, which, like the "complete power" sentence, was in subparagraph (1) of sec. 29.45-1(b) of Regulations 111.

conclusion that section 482 could not result in the allocation of income to a taxpayer for whom receipt of the income was illegal. As Commissioner v. First Sec. Bank, 405 U.S. at 404-405, explained:

> The regulation, as applied to the facts in this case, contemplates that Holding Company--the controlling interest--must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the "true taxable income" of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482. But Holding Company had no such power unless it acted in violation of federal banking laws. The "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law.

By contrast, no textual link can be found in the L.E. Shunk Latex opinion between (1) the "complete power" sentence and (2) its holding that "the Commissioner had no authority to attribute to * * * [the two manufacturers] income which they could not have received." L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. at 961.[182]

Because First Security Bank cited L.E. Shunk Latex with favor, and because L.E. Shunk Latex did not expressly rely on the complete-power sentence, petitioner argues that First Security Bank did not rely on the complete-power regulation. We reject this argument. It is speculative to assume that L.E. Shunk Latex would not have been decided differently in the absence of the complete-power sentence. More importantly, Commissioner v. First Sec. Bank, 405 U.S. at 404-405, expressly stated that its result followed from the complete-power sentence.

Petitioner alternatively suggests that we could set First Security Bank aside and rely entirely on L.E. Shunk Latex[183] for the proposition

---

[182] Commissioner v. First Sec. Bank, 405 U.S. at 406, observed that L.E. Shunk Latex's statement that the Commissioner "had no authority to attribute to petitioners income which they could not have received" constituted the holding of L.E. Shunk Latex and stated that L.E. Shunk Latex was a "closely analogous situation" to First Security Bank.

[183] L.E. Shunk Latex is an Opinion of the Tax Court of the United States. We are a continuation of that court. Tax Reform Act of 1969, Pub. L. No. 91-172, sec. 961, 83 Stat. at 735-736 ("The United States Tax Court * * * is a continuation of the Tax Court of the United States as it existed prior to the date of enactment of this Act".).

that no income can be allocated to a taxpayer under section 482 that a taxpayer could not receive. Even if petitioner were correct that L.E. Shunk Latex concluded that the statute was unambiguous,[184] that holding would conflict with First Security Bank, for First Security Bank held the same statute to be ambiguous. In such a conflict, the Supreme Court's view should prevail over a lower court's. We would therefore reject petitioner's argument that we should adopt L.E. Shunk Latex's interpretation of a statute over First Security Bank's.

Petitioner also argues that the Tax Court's Procter & Gamble opinion was a Chevron step one opinion. The holding of Procter & Gamble Co. v. Commissioner, 95 T.C. at 335-336, can be found in the following passage: "We find First Security Bank and Salyersville National Bank compelling with respect to the issue before the Court. As we understand these cases, section 482 simply does not apply where restrictions imposed by law, and not the actions of the controlling interest, serve to distort income among the controlled group." The term "these cases" referred to First Security Bank and to Salyersville National Bank v. United States, 613 F.2d 650 (6th Cir. 1980), which was a Sixth Circuit opinion that followed directly from First Security Bank. Procter & Gamble Co. v. Commissioner, 95 T.C. at 335. The holding of Procter & Gamble did not encompass a view that the text of section 482 of the Internal Revenue Code of 1954 was unambiguous. Rather, Procter & Gamble relied on First Security Bank's interpretation of section 482 of the Internal Revenue Code of 1954. Procter & Gamble Co. v. Commissioner, 95 T.C. at 335-336. First Security Bank in turn did not state that its holding followed from the unambiguous text of section 482 of the Internal Revenue Code of 1954. Instead, Commissioner v. First Sec. Bank, 405 U.S. at 405, relied on the "complete power" regulatory sentence to interpret section 482. See 26 C.F.R. sec. 1.482-1(b)(1) (1971). Indeed, the Tax Court's opinion in Procter & Gamble, 95 T.C. at 334-335, recognized that First Security Bank had relied on the "complete power" sentence.[185] Furthermore, the Sixth Circuit's opinion,

---

[184] We emphasize that we do not think that L.E. Shunk Latex held that the statute was unambiguous.

[185] Addressing the significance of the deferred-income method of accounting in the 1968 regulations, 26 C.F.R. sec. 1.482-1(d)(6) (1971), the Tax Court stated that the regulations under sec. 482 of the Internal Revenue Code of 1954 "do not apply" because of "our holding that section 482" does not apply. Procter & Gamble Co. v. Commissioner, 95 T.C. at 341. However, as we have just explained, the holding that the statute did not apply was not reasoned from the statutory text, but from First Security Bank, which in turn relied on the "complete power" regulatory sentence.

affirming the Tax Court, also relied on First Security Bank. Procter & Gamble Co. v. Commissioner, 961 F.2d at 1259. The Sixth Circuit observed that First Security Bank had in turn relied on the "complete power" sentence: "The [First Security Bank] Court stated that the 'complete power' referred to in Treas. Reg. § 1.482-1(b)(1) does not include the power to force a subsidiary to violate the law." Procter & Gamble Co. v. Commissioner, 961 F.2d at 1259.[186] Thus, both the Tax Court and the Sixth Circuit relied ultimately on the "complete power" sentence in the 1934 regulation. They did not hold that the statute was unambiguous. They are not Chevron step-one opinions.

Petitioner also argues that Texaco, Inc. v. Commissioner, 98 F.3d 825, was a Chevron step-one opinion. In Texaco, the Fifth Circuit held that the First Security Bank opinion prevented respondent from making an allocation of income to Textrad, a U.S. company, because Textrad was prevented by Saudi law from charging a full market price when selling oil to its foreign refining affiliates. Id. at 828 ("We also agree with the Tax Court's legal conclusion that the teaching of Commissioner v. First Sec. Bank, 405 U.S. 394, 92 S. Ct. 1085, 31 L.Ed.2d 318 (1972), bars the Commissioner from allocating income to Textrad on its sales of Saudi crude under § 482."). The Fifth Circuit Texaco opinion did not state that its holding was based on the unambiguous text of section of 482 of the Internal Revenue Code of 1954. Rather, the Fifth Circuit relied on the First Security Bank opinion. Texaco, Inc. v. Commissioner, 98 F.3d at 828. The Fifth Circuit observed in Texaco, Inc. v. Commissioner, 98 F.3d at 829, that the First Security Bank opinion had in turn relied on the "complete power" regulation:

> Indeed, as the Court noted, the Commissioner's own regulations for implementing § 482 contemplate that the controlling interest "must have 'complete power' to shift income among its subsidiaries." Id. at 404-05, 92 S. Ct. at 1091-92 (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)).

The Fifth Circuit had earlier observed that the complete-power sentence was in the then-current volume of the Code of Federal Regulations, 26 C.F.R. sec. § 1.482-1A(b)(1) (1996). Id. at 828 n.4; see supra part II.HH

---

[186] Directly analyzing the meaning of the "complete power" sentence, the Sixth Circuit's opinion stated that the "complete power" sentence recognized that respondent is authorized to make a transfer-pricing allocation only when the distortion of income results from the exercise of common control, not when the distortion of income results from a legal restriction. Procter & Gamble Co. v. Commissioner, 961 F.2d at 1258.

(the last paragraph, which discusses what version of the section 482 regulations was referred to in the Fifth Circuit's <u>Texaco</u> opinion). The Fifth Circuit's observation about the existence of the regulation, and its reliance on <u>First Security Bank</u>, causes us to conclude that <u>Texaco</u> is not a <u>Chevron</u> step-one opinion.

Another aspect of the four opinions we have discussed (<u>First Security Bank</u>, 405 U.S. 394, <u>L.E. Shunk Latex</u>, 18 T.C. 940, <u>Procter & Gamble Co.</u>, 95 T.C. 323, and <u>Texaco</u>, 98 F.3d 825) is that each opinion interpreted the one-sentence version of the statute. In 1986, Congress added a second sentence to the effect that when there is a license or transfer of intangible property, the income with respect to such a license or transfer must be commensurate with the income attributable to the intangible. Tax Reform Act of 1986, sec. 1231(e)(1), 100 Stat. at 2562-2563.[187] 3M IPC allowed 3M Brazil to use its patents; it also transferred unpatented technology to 3M Brazil. Respondent seeks to allocate income to 3M IPC for the use of the patents and for the transfer of unpatented technology in amounts that correlate with the income earned by 3M Brazil from its use of the patents and the transfer to it of unpatented technology. The proposed allocation is consistent with the 1986 statutory amendment. The income respondent seeks to allocate to 3M IPC is commensurate with the income attributable to the intangible property. Therefore, the four opinions are distinguishable because they

---

[187] The statutory text that is effective for the 2006 year of the 3M consolidated group is sec. 482 of the Internal Revenue Code of 1986. Sec. 482 of the Internal Revenue Code of 1954 had contained the following single sentence:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate [in 1976, the term "Secretary or his delegate" was replaced with the term "Secretary", Pub. L. No. 94-455, sec. 1906(b)(13)(A), 90 Stat. at 1834, an inconsequential change] may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

68A Stat. at 162. Sec. 482 of the Internal Revenue Code of 1986, however, contained the following additional sentence: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." This sentence had been added by the Tax Reform Act of 1986, sec. 1231(e)(1), 100 Stat. at 2562-2563.

construed the pre-1986 statutory provision that lacked the commensurate-with-income sentence.

But petitioner argues that the 1986 statutory change is irrelevant to the effect of legal restrictions on section 482 allocations because, in petitioner's view, the scope of the 1986 amendment is limited to the purpose attributed to it by the report of the House Ways & Means Committee. Petitioner observes that that report stated that the committee intended the 1986 amendment to "make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangibles transfers" and that "consideration * * * be given the actual profit experience realized as a consequence of the transfer." H.R. Rept. No. 99-426, at 425, 1986-3 C.B. (Vol. 2), at 425. Thus, petitioner contends that the legislative intent for the 1986 amendment was to require that "income from intangibles be commensurate with income over an extended timeframe." Petitioner also observes that the Blue Book stated that the 1986 statutory amendment had been intended to ensure that "consideration also be given to the actual profit experience realized as a consequence of the transfer" of intangibles and that "payments made for the intangible be adjusted over time to reflect changes in the income attributable to the intangible." Staff of J. Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1016 (J. Comm. Print 1987). Petitioner further notes that neither the House report, the conference committee report, nor the Blue Book mentions legal restrictions on the payment or receipt of income and that none of these publications refers to First Security Bank or L.E. Shunk Latex. Respondent responds that the congressional intent behind the 1986 amendment is documented by the conference committee report, H.R. Conf. Rept. No. 99-841 (Vol. II), at II-637, 1986-3 C.B. (Vol. 4) at 637, which stated that the object of the amendment was to ensure that "the division of income between related parties reasonably reflect the relative economic activity undertaken by each". In respondent's view, the way respondent has applied 26 C.F.R. sec. 1.482-1(h)(2) (2006) in this case is consistent with the 1986 statutory change because the change was designed to "address a growing concern that multinational companies, such as 3M, were transferring valuable intangibles offshore for less than arm's length consideration". First Security Bank and the other three cases, according to respondent, are distinguishable because they had not "addressed allocation of income subject to foreign legal restrictions under section 482 as amended by the Tax Reform Act of 1986."

We do not agree with petitioner that the scope of the commensurate-with-income sentence added in 1986 is limited to the narrow "timeframe" purpose identified in the House report and the Bluebook. Even if that could be said to be Congress' purpose for the 1986 amendment, Congress used remarkably broad wording in the commensurate-with-income sentence. It was the text of the 1986 amendment that was enacted by Congress, not the purpose behind the amendment. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.") As we explained supra part II.K, a portion of the 1994 final regulations addressed the "timeframe" concern identified in the House report and the Blue Book. 26 C.F.R. sec. 1.482-4(f)(2) (2006) (1994 final regulations). If petitioner is right that the scope of the commensurate-with-income sentence of section 482 is limited to remedying the "timeframe" concern, then only this small portion of the vast 1994 final regulations was authorized by the second sentence of section 482. The rest of the 1994 final regulations would be unauthorized, including the comparable-profits method, 26 C.F.R. sec. 1.482-5 (2006), and the profit-split method, 26 C.F.R. sec. 1.482-6 (2006). These methods have a strong conceptual tie to the commensurate-with-income standard.[188]

---

[188] The comparable-profits method is strongly linked to the commensurate-with-income standard. The 1988 White Paper proposed a rate-of-return approach for determining the proper charge for an intangible property under the commensurate with income standard. See 57 Fed. Reg. 3572 (Jan. 30, 1992) (1992 notice of proposed rulemaking) (explaining that the basic arm's-length rate of return method described in the White Paper was an "approach[] for determining the proper charge for an intangible under the commensurate with income standard"). The comparable-profit-interval method in the 1992 proposed regulations was based on the rate-of-return approach. See 57 Fed. Reg. 3572-3573 (1992 notice of proposed rulemaking) (explaining that the methods put forward for pricing intangible property in the 1992 proposed regulations, which were, in order of priority, the matching-transaction method, the comparable-adjustable-transaction method, and the comparable-profit-interval method, were formulated in response to the criticism of the prominent role accorded in the White Paper to the basic arm's-length rate of return method). The comparable-profits method, adopted in the 1993 temporary regulations and the 1994 final regulations, was "broadly similar" to the comparable-profit interval method from the 1992 proposed regulations. T.D. 8552, 59 Fed. Reg. 34974 (preamble to the 1994 final regulations).

The profit-split method is also strongly linked to the commensurate-with-income standard. See G. Michael Tilton, U.S. International Tax Forms Manual: Compliance & Reporting, para. 9.08 (2020) ("The 1986 amendment to the statute created legislative sanction to use a profit-split analysis, at least in part. That amendment, which added just one sentence to the statute, was limited by its terms to

Furthermore, Congress was likely aware that by the time of the 1986 amendment, much of the interpretation of predecessors of section 482 had been made through regulations promulgated by the Treasury Department. T.D. 6595, 27 Fed. Reg. 3595 (Apr. 14, 1962) (1962 regulations); T.D. 6952, 33 Fed. Reg. 5848 (Apr. 16, 1968) (1968 regulations). It is reasonable to think that Congress would have expected that the interpretive questions posed by section 482 as amended in 1986 would be resolved by subsequent regulations, not by pre-amendment legislative history. Indeed, the conference committee report urged the Treasury Department to adopt new regulations. Specifically, the conference committee report stated that the committee was aware that "many important and difficult issues under section 482 are left unresolved by this legislation", that the committee believed that the executive branch should conduct a comprehensive study of the 1968 regulations, and that the executive branch should carefully consider whether the 1968 regulations should be modified "in any respect." H.R. Conf. Rept. No. 99-841 (Vol. II), at II-638, 1986-3 C.B. (Vol. 4) at 638.

Petitioner has a contention that bears on the proposition that Congress intended the Treasury Department to promulgate regulations to interpret section 482 after the 1986 amendment. Petitioner contends that the Treasury Department never indicated that there was a link between the 1986 amendment and the 1994 regulations regarding foreign legal restrictions.[189] To evaluate the merits of this contention we will review the various administrative pronouncements made by the Treasury Department from 1986 to 1994. We begin with the 1988 White Paper, which was the comprehensive Treasury Department and IRS study of section 482 requested by the 1986 conference committee report. Notice 88-123, 1988-2 C.B. 458. The White Paper discussed the commensurate-with-income sentence that was added to the statute in 1986 but did not discuss foreign or domestic legal restrictions on the receipt of income. Id., 1988-2 C.B. at 472-475, 478-480. The preamble to the 1992 proposed regulations discussed the commensurate-with-income sentence, 57 Fed. Reg. 3571, 3574 (Jan. 30, 1992), but the 1992

---

transfer prices for intangible property, but the 1994 final regulations provide that the profit-split method may be used as a check on another method or as a separate method.").

[189] Petitioner argues: "But the Commissioner is wrong when he asserts that the TRA 1986 amendment modified the holding of First Security. * * * The Commissioner made no such claim in the White Paper. Nor did Treasury cite TRA 1986 as one of its reasons for adopting Treas. Reg. § 1.482-1(h)(2) anywhere in the administrative record".

proposed regulations did not involve legal restrictions on the receipt of income, id. at 3578-3601. On January 21, 1993, the Treasury Department published two documents that were related to each other: Treasury Decision 8470, 58 Fed. Reg. 5263, and a notice of proposed rulemaking, 58 Fed. Reg. 5310. Treasury Decision 8470 contained the text of the 1993 temporary regulations. The preamble to Treasury Decision 8470 had a section labeled "Introduction" that discussed the 1986 commensurate-with-income amendment. 58 Fed. Reg. 5264. The preamble to Treasury Decision 8470 also had a section labeled "Provisions of the Temporary Regulations" that addressed particular provisions in the 1993 temporary regulations. The 1993 temporary regulations did not involve legal restrictions on the receipt of income except for creating a placeholder for rules involving foreign legal restrictions. 26 C.F.R. sec. 1.482-1T(f)(2) (1994) (1993 temporary regulations). The 1993 notice of proposed rulemaking, issued on the same day as the Treasury Decision, proposed that the 1993 temporary regulations be made final. 58 Fed. Reg. 5310, 5312-5313. The 1993 notice of proposed rulemaking also proposed that rules regarding foreign legal restrictions be added at regulation section 1.482-1T(f)(2). 58 Fed. Reg. 5312-5313. The preamble to the 1993 notice of proposed rulemaking did not contain an "Introduction" section like Treasury Decision 8470. It contained a section titled "Explanation of Proposed Regulations" discussing particular provisions of the proposed regulations. This section did not refer to the commensurate-with-income sentence added to the statute in 1986. But if one views the two January 21, 1993 documents as related to each other, then the discussion of the commensurate-with-income sentence in the preamble to Treasury Decision 8470 explained not just Treasury Decision 8470 but also the proposed regulations in the notice of proposed rulemaking. In 1994, the Treasury Department published Treasury Decision 8552, 59 Fed. Reg. 34971 (July 8, 1994), which contained the 1994 final regulations. The 1994 final regulations consisted of final versions of (1) the 1993 temporary regulations, which had also been proposed regulations, and (2) the 1993 proposed regulation regarding foreign legal restrictions. The preamble to Treasury Decision 8552 discussed Treasury Decision 8470 (Jan. 21, 1993) and the notice of proposed rulemaking (Jan. 21, 1993) as if the two documents were integral to each other. 59 Fed. Reg. 34972. Furthermore, the preamble to Treasury Decision 8552 had a section titled "Introduction" that discussed the 1986 addition of the commensurate-with-income sentence to the statute. 59 Fed. Reg. 34972. So to summarize, the Treasury Department did draw a link between the commensurate-with-income statutory change and the rules regarding foreign legal restrictions in 26 C.F.R. sec. 1.482-1(h)(2)

(2006) (1994 final regulations). First, the 1986 statutory change was discussed in the "Introduction" portion of the preamble to Treasury Decision 8470. 58 Fed. Reg. 5264. Treasury Decision 8470 was issued the same day as the notice of proposed rulemaking, January 21, 1993, setting forth the proposed regulations on foreign legal restrictions. T.D. 8470, 58 Fed. Reg. 5310; sec. 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312-5313. The two documents were related to each other. See T.D. 8552, 59 Fed. Reg. 34972. Second, the 1986 statutory change was discussed in the preamble to Treasury Decision 8552 under the heading "Introduction". 59 Fed. Reg. 34972. Treasury Decision 8552 contained the 1994 final regulations, including the rules in section 1.482-1(h)(2) of the 1994 final regulations which addressed foreign legal restrictions. 59 Fed. Reg. 35000-35001; 26 C.F.R. sec. 1.482-1(h)(2) (2006) (1994 final regulations). Petitioner is therefore incorrect to suggest that there is no link between the 1986 statutory change and 26 C.F.R. sec. 1.482-1(h)(2) (2006) (1994 final regulations).[190]

Petitioner invokes the 2012 Supreme Court opinion of Home Concrete in support of its argument that 26 C.F.R. sec. 1.482-1(h)(2) (2006) is invalid. But applying the analysis of Home Concrete reaffirms our conclusion that the prior caselaw does not resolve this case. In United States v. Home Concrete & Supply, LLC, 566 U.S. 478, 480, 486 (2012) (plurality opinion), the Supreme Court resolved a conflict between (1) its 1958 opinion in Colony, Inc. v. Commissioner, 357 U.S. 28 (1958), and (2) a Treasury regulation promulgated in 2010. 26 C.F.R. sec. 301.6501(e)-1(a)(1)(iii) (2011). Colony had interpreted a provision of the Internal Revenue Code of 1939. Home Concrete & Supply, 566 U.S. at 481. According to Home Concrete, the opinion in Colony had held that Congress "had 'directly spoken to the question at hand'" and therefore "left '[no] gap for the agency to fill'." Id. at 489 (plurality opinion) (citing Chevron, 467 U.S. at 842-843). Significantly Home Concrete also explained that the "operative language" of the statute interpreted by the 2010 regulation was not different from the provision

---

[190] Although we have directly addressed petitioner's argument on its face by explaining that the Treasury Department linked the 1986 statutory change to the 1994 regulations regarding foreign legal restrictions, we are skeptical that the Treasury Department was actually required to draw such a link. At this stage in the analysis, the question is whether First Security Bank is binding precedent as to this case. Respondent's argument is that First Security Bank is not binding precedent as to this case because First Security Bank interpreted the statute before it was changed in 1986. The validity of respondent's view that First Security Bank is distinguishable because it interpreted the pre-1986 version of the statute does not appear to hinge on whether the Treasury Department articulated a link between the 1986 statutory change and the 1994 regulations regarding foreign legal restrictions.

of the Internal Revenue Code of 1939 interpreted by <u>Colony</u>.  <u>Id.</u> at 483-484.  Although there had been changes to portions of the tax laws other than the provision interpreted by <u>Colony</u>, the Supreme Court in <u>Home Concrete</u> explained that these changes failed "to exert an interpretive force sufficiently strong to affect our conclusion."  <u>Id.</u> at 485.  <u>Home Concrete</u> is distinguishable.  Unlike <u>Colony</u>, <u>First Security Bank</u> did not hold that Congress had "directly addressed the precise question at issue".  <u>See</u> <u>Home Concrete & Supply</u>, 566 U.S. at 488 (plurality opinion) (quoting <u>Chevron</u>, 467 U.S. at 843).  Furthermore, compared to the changed statutory text in <u>Colony</u>, the addition of the commensurate-with-income sentence to the statute in 1986 has stronger "interpretive force" because respondent's position--of allocating income to 3M IPC commensurate with income from intangibles--is supported by the text of the 1986 amendment.  Therefore, <u>Home Concrete</u> does not counsel the invalidation of 26 C.F.R. sec. 1.482-1(h)(2) (2006) (1994 final regulations) on the grounds of the regulation's conflict with <u>First Security Bank</u>.

Having rejected petitioner's argument that caselaw has already held that section 482 is unambiguous, we next consider whether section 482 is actually unambiguous.[191]  This is a <u>Chevron</u> step one question that depends on whether Congress has "directly addressed the precise question at issue".  <u>Chevron</u>, 467 U.S. at 843.  In determining whether Congress has "directly addressed the precise question at issue", a court is to consult the plain language of the statute, and, if the intent of Congress is not clear, the legislative history.[192]

_____

[191] Petitioner's arguments regarding <u>Chevron</u> step one hinge primarily on judicial precedents that we have discussed above.  However, petitioner also makes the argument that "legislative history makes clear that the purpose of section 482 is to prevent the arbitrary shifting of profits among related taxpayers through the exercise of control" and that "3M did not exercise its control over 3M to shift profits to 3M Brazil".

[192] The U.S. Court of Appeals for the Eighth Circuit explained it this way:

In the course of a <u>Chevron</u> analysis, a court must first consider the actual words of the statute.  <u>Chevron</u>, 467 U.S. at 843 * * * (the starting point for the interpretation of a statute must be its plain language.)  If the intent of Congress is clear from the plain language of the statutory provision, that will be the end of the judicial inquiry.  <u>Id.</u>  If analysis of the statutory language does not yield an unambiguous congressional intent, the court should then look to the legislative history.  [Fn. Omitted.]  If congressional intent is clearly discernable, the agency must act in accordance with that intent and the court need not defer to the agency's interpretation of its mandate.  <u>K Mart Corp.</u>

The "precise question at issue" is whether respondent is precluded from making a section 482 allocation of income to 3M IPC that could not be paid to 3M IPC under Brazilian law.[193] The first sentence of section 482 authorizes respondent to make allocations of income between related businesses if "necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such * * * businesses." We do not see in these words an unambiguous expression of Congress' intent on how to account for legal restrictions that prevent the receipt of income. Chevron, 467 U.S. at 842-843. And, as we explained earlier, the second sentence of section 482 is consistent with the allocation of income proposed by respondent because respondent seeks to allocate income to 3M IPC for the use of the patents and for the transfer of unpatented technology in amounts that are proportionate to the income earned by 3M Brazil from its use of the patents and the transfer to it of unpatented technology. In conclusion, the actual words of section 482 do not reveal that Congress unambiguously intended to prevent respondent from making the allocation at issue.

We now turn to the legislative history of section 482 to see whether it suggests that section 482 is unambiguous in this context. See Chevron, 467 U.S. at 383 n.9 (explaining the principle subsequently known as Chevron step one: "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Ark. AFL-CIO v. FCC, 11 F.3d 1430, 1440 n.9 (8th Cir. 1993) (considering legislative history at Chevron step one). In favor of its interpretation of section 482, petitioner points to the Senate Finance Committee report that preceded the passage of the Revenue Act of 1921. See supra part II.A (discussing the Revenue Act of 1921). That Senate committee report suggested that section 240(d) of the Revenue Act of 1921 was designed to combat the "arbitrary shifting of profits among related businesses". S. Rept. No. 67-275, supra at 20, 1939-1 C.B. (Part 2) at 195. Petitioner argues that an "arbitrary shifting of profits" can

---

v. Cartier Inc., 486 U.S. 281, 291 * * * (1988); see also Chevron, 467 U.S. at 843 n.9 * * * ("the judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.")

Ark. AFL-CIO v. FCC, 11 F.3d 1430, 1440 (8th Cir. 1993).

[193] Sec. 482 also authorizes allocations of income between related businesses if "necessary in order to prevent evasion of taxes". Respondent does not argue that this basis for allocating income justifies his allocation of income to 3M IPC.

result only from the voluntary setting of intercompany prices by the common owners of related companies.

Even if the purpose of section 240(d) of the Revenue Act of 1921 were to prevent the voluntary shifting of profits, this does not mean that section 482 of the Internal Revenue Code of 1986 had the same purpose. Furthermore, we disagree with the premise that an "arbitrary shifting of profits" among related businesses can result only from the voluntary setting of intercompany prices. A legal restriction on intercompany payments could also arbitrarily shift profits. Thus, even if section 482 should be narrowly interpreted to confine respondent to correcting "arbitrary shifting of profits" (the phrase used in the 1921 Senate committee report), a foreign legal restriction could arbitrarily shift profits and therefore justify a section 482 allocation.

Petitioner next points us to the report of the House Ways and Means Committee, H.R. Rept. No. 70-2, supra at 16-17, 1939-1 C.B. (Part 2) at 395, which related to section 45 of the Revenue Act of 1928. Section 45 of the Revenue Act of 1928 is essentially identical to the first sentence of the section 482 of the Internal Revenue Code of 1986. See supra part II.D (discussing the Revenue Act of 1928); Avi-Yonah, supra, at 96. The House committee report stated that section 45 of the Revenue Act of 1928 would serve two purposes: to prevent tax evasion and to clearly reflect correct tax liability. The sentence from the House committee report quoted by petitioner was:

> The section of the new bill provides that the Commissioner may, in the case of two or more trades or businesses owned or controlled by the same interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting profits, the making of fictitious sales, and other methods frequently adopted for the purpose of "milking"), and in order clearly to reflect their true tax liability.

H.R. Rept. No. 70-2, supra at 16-17, 1939-1 C.B. (Part 2) at 395.[194] This sentence merely summarizes the two bases for allocations found in the

---

[194] A similar statement is made in the Senate Finance Committee's report regarding section 45 of the Revenue Act of 1928. S. Rept. No. 70-960, supra at 24, 1939-1 C.B. (Part 2) at 426.

plain text of section 45 of the Revenue Act of 1928.[195]  The House committee report does not show that Congress unambiguously expressed its intent to bar respondent from making allocations of income under section 482 when legal restrictions prevented the receipt of the income.  If anything is to be deduced from the existence of two types of authorizations in section 45 of the Revenue Act of 1928 (the single sentence of which was carried over as the first sentence of section 482 of the Internal Revenue Code of 1986), it might be that taxpayer-caused misallocations of income are not the sole object of section 482.

There is also legislative history of the 1986 addition of the commensurate-with-income sentence.  Petitioner, in contending that First Security Bank, L.E. Shunk Latex, Procter & Gamble, and Texaco, should control this case even though they were decided before the addition of the commensurate-with-income sentence, argues that the commensurate-with-income sentence, was intended only to serve the "timeframe" purpose identified in the House committee report and the Blue Book.  H.R. Rept. No. 99-426, supra at 425-426, 1986-3 C.B. (Vol. 2) at 425-426; General Explanation of the Tax Reform Act of 1986, supra at 1016.  But, as we have already explained, the commensurate-with-income sentence is worded too broadly to support an interpretation confining the operation of the sentence to such a purpose.  We would add here that the proposition that the scope of the commensurate-with-income sentence is not confined to the "timeframe" purpose is supported by the Conference Committee report.  H.R. Conf. Rept. No. 99-841 (Vol. II), supra at II-637 to II-638, 1986-3 C.B. (Vol. 4) at 637-638.  The conference committee report stated that the sentence was added to ensure that "the division of income between related parties reasonably reflect[s] the relative economic activity undertaken by each"; the report also urged the Treasury Department to consider comprehensive revisions to the 1968 regulations.  Id. at II-637 to II-638.

---

[195] As we have explained:

> As relevant here, this statute gives respondent broad authority to allocate gross income, deductions, credits, or allowances between or among commonly controlled corporations on two alternate bases; to prevent the evasion of taxes or in order clearly to reflect the income of such corporations.  * * *

G.D. Searle & Co. v. Commissioner, 88 T.C. 252, 357 (1987) (referring to sec. 482 of the Internal Revenue Code of 1954, 26 U.S.C. sec. 482 (1976), which is essentially identical to section 45 of the Revenue Act of 1928).

We hold that section 482 does not "unambiguously" preclude respondent from allocating income to 3M IPC.  See Chevron, 467 U.S. at 843.

V.      Whether 26 C.F.R. sec. 1.482-1(h)(2) (2006) is reasonable under Chevron step two

Having rejected petitioner's argument that 26 C.F.R. sec. 1.482-1(h)(2) (2006) is invalid under Chevron step one, we next consider petitioner's argument that portions of the regulation are invalid under Chevron step two.  A regulation satisfies Chevron step two if it is a "reasonable interpretation" of the statute.  Mayo Found. for Med. Educ. & Research, 562 U.S. at 58; Chevron, 467 U.S. at 844.  Here is a more detailed explanation of this condition:

> Deference to an agency becomes an issue when the first part of a Chevron analysis does not yield a clear congressional intent.  Chevron, 467 U.S. at 843 * * *.  In such cases, Congress delegated the interpretation and development of the statutory provision to the discretion of the agency charged with enforcing the statute.  Id. Therefore, Chevron requires that a reviewing court defer to the agency's interpretation of an ambiguous statute if that interpretation is "permissible."  Good Samaritan Hosp. v. Shalala, * * * 113 S. Ct. 2151, 2157 * * * (1993).  In order to be "permissible," the agency's construction of the statute must be reasonable.  Chevron, 467 U.S. at 844 * * *.  As long as the interpretation proposed by the agency is reasonable, a reviewing court cannot replace the agency's judgment with its own.  Therefore, we cannot balance policy considerations, or choose among competing interests when evaluating the reasonableness of an agency action. [Fn. Omitted.]  See EEOC v. Commercial Office Products Co., 486 U.S. 107 * * * (1988).

Ark. AFL-CIO, 11 F.3d at 1441.  Petitioner makes a number of challenges under Chevron step two to the validity of the various requirements imposed by 26 C.F.R. sec. 1.482-1(h)(2) (2006).[196]  We address these arguments below on a requirement-by-requirement basis.

---

[196] All of petitioner's Chevron step two challenges to 26 C.F.R. sec. 1.482-1(h)(2) (2006) are to specific requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006).

A.   <u>Effect on uncontrolled taxpayers</u>

The first requirement of 26 C.F.R. sec. 1.482-1(h)(2) (2006), which is set forth in subdivision (i), is this: "[A] foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time." The argument pressed by petitioner is that this effect-on-uncontrolled-taxpayers requirement is incompatible with the purpose of section 482, which, as described by 26 C.F.R. sec. 1.482-1(a)(1) (2006), "is to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions." Here is petitioner's full argument:

> Under the general rule [26 C.F.R. sec. 1.482-1(h)(2)(i)], in the absence of evidence indicating the effect of the foreign legal restriction on an uncontrolled taxpayer, the Commissioner will ignore the legal restriction--except that the Commissioner may (if the conditions set forth in clause (h)(2)(ii) are satisfied) allow the election of the deferred income method of accounting.

> The general rule apparently is an application of the principle that section 482 "places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer." Treas. Reg. § 1.482-1(a)(1). The general rule of Treas. Reg. § 1.482-1(h)(2)(i) is that if uncontrolled taxpayers are not subject to a foreign legal restriction, then controlled taxpayers, even if they are subject to the restriction, should be treated as if they were not subject to it.

> This is faulty logic. The purpose of section 482, according to the regulations, "is to ensure that taxpayers clearly reflect income <u>attributable to controlled transactions</u> and to prevent the avoidance of taxes <u>with respect to such transactions</u>." Treas. Reg. § 1.482-1(a)(1) (emphasis added). When a legal restriction prevents the exercise of control, then the transaction is not a controlled transaction. This is so even if the legal restriction applies only to related party transactions. As the Supreme Court stated in <u>First Security</u>, section 482 "recognizes the concept that income implies dominion or control of the taxpayer."

405 U.S. at 404. If such control cannot be exercised, then the Commissioner has no authority to allocate income under section 482. And as this Court said in <u>Procter & Gamble</u> (which involved a Spanish restriction on paying royalties to a controlling foreign parent), "we do not find it significant that Spanish law only precluded royalty payments among companies with common ownership." The Court said that "the proper focus is whether control was utilized to shift income," and [w]hen control cannot be exercised, the Commissioner has no authority to allocate income under section 482." 95 T.C. at 339-40. Thus, the general rule of Treas. Reg. § 1.482-1(h)(2)(i) is not a reasonable implementation of the statute.

Petitioner's argument essentially consists of two parts. First, petitioner argues that section 482 should be interpreted to address misallocations of income attributable to controlled transactions. Second, petitioner argues that a transaction is not a controlled transaction to the extent that a legal restriction prevents a payment of compensation with respect to the transaction.

Applying this argument to the case at hand, petitioner's position is that 3M Company did not control the amounts that 3M Brazil paid to 3M IPC for the use of patents and for unpatented technology. That control, petitioner argues, was exercised by the government of Brazil through its legal restrictions.

The first part of the argument--that section 482 is aimed at controlled transactions--is based directly on regulations under section 482. 26 C.F.R. sec. 1.482-1(a)(1) (2006) (stating that the purpose of section 482 is to clearly reflect income attributable to controlled transactions). This part of the argument seems valid.

The second part of the argument--that a transaction is a not a controlled transaction if payment for the transaction is controlled by law--is founded on a Supreme Court opinion, <u>First Security Bank</u>. The problem with the second part of the argument is that <u>First Security Bank</u> rested upon a regulatory provision from 1934 that is no longer in effect. The history of regulations under section 482 and its predecessors begins with the 1934 regulations that were related to section 45 of the Revenue Act of 1934. Art. 45-1, Regulations 86. But the 1934 regulations did not limit respondent's authority through the concept of "controlled transactions". The 1934 regulations stated that the

"interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers." Art. 45-1(b), Regulations 86. This "complete power" sentence was carried over to subsequent regulations.[197] This sentence was recognized by <u>First Security Bank</u> as a limit on the scope of section 482 of the Internal Revenue Code of 1954, such that respondent could not allocate income to a taxpayer who was barred from receiving the income because of a legal restriction. <u>Commissioner v. First Sec. Bank</u>, 394 U.S. at 404-405 & n.18 (citing 26 C.F.R. sec. 1.482-1(b)(1) (1971)). <u>First Security Bank</u> thus seemingly supports the second part of petitioner's argument discussed above, that essentially there can be no control without legal control. But the "complete-power" sentence on which <u>First Security Bank</u> relied is no longer in the regulatory scheme for tax years beginning after April 21, 1993.[198] Therefore, the sentence does not limit respondent's authority to allocate the income of the 3M consolidated group for the 2006 tax year.

We are still left with the first part of petitioner's argument--that section 482 is aimed at controlled transactions. This proposition is valid as far as it goes. But the proposition fails to defeat the section 482 allocation at issue in this case. The term "controlled transaction" was introduced in the 1993 temporary (which were also proposed) regulations and then adopted in the 1994 final regulations. 26 C.F.R. sec. 1.482-1(i)(8) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(g)(8) (1994) (1993 temporary regulations). Under both sets of regulations, the purpose of section 482 is to ensure the clear reflection of income from controlled transactions. 26 C.F.R. sec. 1.482-1(a)(1) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(a)(1) (1994) (1993

---

[197] Parts II.Y, II.CC, and II.EE, <u>supra</u>, discuss the history of the 1953, 1962, and 1968 regulations.

[198] This point can be verified by looking at a single volume of the 2006 edition of the Code of Federal Regulations. Compare

- 26 C.F.R. sec. 1.482-1A(b)(1) (2006) (the redesignated regulation containing the "complete power" passage published under the heading "REGULATIONS APPLICABLE FOR TAXABLE YEARS BEGINNING ON OR BEFORE APRIL 21, 1993")

to

- 26 C.F.R. sec. 1.482-1(a)(2), (b)(1) (2006) (1994 final regulations applicable for 2006 tax year).

Appellate Case: 23-3772     Page: 259     Date Filed: 02/08/2024 Entry ID: 5361675

temporary regulations). A "controlled transaction" is defined as "any transaction or transfer between two or more members of the same group of controlled taxpayers." 26 C.F.R. sec. 1.482-1(i)(8) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(g)(8) (1994) (1993 temporary regulations). And a group of controlled taxpayers is defined as "taxpayers owned or controlled directly or indirectly by the same interests." 26 C.F.R. sec. 1.482-1(i)(6) (2006) (1994 final regulations); 26 C.F.R. sec. 1.482-1T(g)(6) (1994) (1993 temporary regulations). Petitioner does not contest that 3M IPC and 3M Brazil are owned or controlled directly by the same interests.[199] It follows that 3M IPC and 3M Brazil are members of a group of controlled taxpayers, that all transactions between them (including the use by 3M Brazil of 3M IPC's patents and including the transfer of technology from 3M IPC to 3M Brazil), are "controlled transactions", see 26 C.F.R. sec. 1.482-1(i)(8) (2006) (1994 final regulations), and that therefore respondent's section 482 adjustment to the income of the 3M consolidated group fits the aforedescribed purpose of section 482 to achieve clear reflection of income from controlled transactions. In short, the regulation's focus on a "controlled transaction", i.e., the first part of petitioner's argument, is not inconsistent with the section 482 allocation at issue. We therefore reject petitioner's two-part argument.

Although we have considered on its terms petitioner's two-part argument challenging the effect-on-uncontrolled-taxpayers requirement, we do not vouch that this two-part challenge implicates the correct legal test for determining whether the requirement is valid under Chevron step two. If we look to the words used by the Supreme Court in Chevron, 467 U.S. at 844, this determination should be framed as whether the effect-on-uncontrolled-taxpayers requirement is a "reasonable interpretation" of section 482. Section 482 authorizes respondent to allocate income among commonly controlled businesses if the allocation is necessary to clearly reflect the income of the businesses. But no text in section 482 addresses how the allocation should account for legal restrictions on the payment of income. For example, section 482 does not mention legal restrictions on the payment of income. This

---

[199] There is an identical control test in the text of sec. 482. For an allocation of income to be made, the statute requires that the two businesses be "owned or controlled directly or indirectly by the same interests". Sec. 482. Paragraph 25 of the stipulation states that the operations of 3M Brazil were "owned or controlled" within the meaning of sec. 482 by (1) 3M Company and (2) 3M IPC. Furthermore, it has been stipulated that 3M Company indirectly owned 3M IPC and 3M Brazil in that it has been stipulated that (1) 3M IPC was a wholly owned second-tier subsidiary of 3M Company and (2) 3M Brazil was a wholly owned subsidiary of 3M IPC.

omission is an implicit signal that the Treasury Department has regulatory space to account for legal restrictions. See Chevron, 467 U.S. at 844. Exercising that authority, the Treasury Department has specified that foreign legal restrictions are taken into account only if those restrictions affect uncontrolled taxpayers. 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006). In our view, this requirement is a reasonable interpretation of section 482. That statutory text--authorizing respondent to allocate income between controlled businesses "in order * * * clearly to reflect" their income--is broad enough to accommodate the interpretation. See Springdale Mem'l Hosp. Ass'n, Inc. v. Bowen, 818 F.2d 1377, 1381 (8th Cir. 1987). The interpretation is reasonable.

Our view that the effect-on-uncontrolled-taxpayers requirement is a reasonable interpretation of section 482 is consistent with the way in which the requirement supports two of the goals ascribed to section 482 by regulation. These goals are (1) tax parity and (2) arm's-length results. 26 C.F.R. sec. 1.482-1(a)(1), (b)(1) (2006) (1994 final regulations).

The effect-on-uncontrolled-taxpayers requirement is consistent with the tax-parity goal in the regulations. The regulations state that section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer. 26 C.F.R. sec. 1.482-1(a)(1) (2006) (1994 final regulations) ("Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer."). It is consistent with this goal for income to be allocated to a U.S. company from a related foreign company, despite a foreign law barring the payment of the income, if the foreign law would have allowed an unrelated foreign company to pay the income. The allocation places the U.S. company receiving payments from a related foreign company on par with a U.S. company receiving payments from an unrelated foreign company.

The effect-on-uncontrolled-taxpayers requirement is also consistent with the arm's-length standard. The regulations explain that determinations under section 482 are to be made under the arm's-length standard and that the arm's-length standard is met if "the results of the [controlled] transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)." 26 C.F.R. sec. 1.482-1(b)(1) (2006) (1994 final regulations). If a foreign restriction governs payments between controlled taxpayers but not uncontrolled taxpayers, then allowing the restriction to affect the

taxable income of controlled taxpayers would produce a non-arm's-length result that does not meet the arm's-length standard. The effect-on-uncontrolled-taxpayers requirement, 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006), disregards such a foreign legal restriction. The requirement thus corrects the non-arm's-length result and sets the controlled taxpayers on the arm's-length standard.

Thus far we have been discussing whether the effect-on-uncontrolled-taxpayers requirement reasonably interprets the first sentence of section 482. But respondent also argues that the effect-on-uncontrolled-taxpayers requirement is a reasonable interpretation of the second sentence of section 482. Added in 1986, the second sentence of section 482 provides that in the case of transfer or license of intangible property, the income with respect to the transfer or license must be commensurate with the income attributable to the intangible. In the case of a foreign legal restriction that affects only controlled taxpayers, the restriction would be disregarded by the effect-on-uncontrolled-taxpayers requirement. If such a foreign legal restriction prevents payment of compensation for the transfer or license of intangible property, the effect of disregarding the restriction is that the transferor or licensor of the intangible property could be allocated income commensurate with the income from the intangible. In such an instance, the commensurate-with-income goal of the second sentence of section 482 is achieved by the effect-on-uncontrolled-taxpayers requirement. The Brazilian legal restrictions at issue in this case are an instance of foreign legal restrictions that prevent payment of compensation for the transfer or license of intangible property. Disregarding these restrictions achieves the goal of the second sentence of section 482, which is to ensure that income with respect to the transfer or license of intangibles is commensurate with the income attributable to the intangibles. As applied to the facts of this case, therefore, the effect-on-uncontrolled-taxpayers requirement of 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006) is a reasonable interpretation of the second sentence of section 482.

In conclusion, the effect-on-uncontrolled-taxpayers requirement of 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006) is a reasonable interpretation of both sentences of section 482. We reject petitioner's challenge to the validity of the effect-on-uncontrolled-taxpayers requirement under <u>Chevron</u> step two.

B.    Publicly promulgated

Title 26 C.F.R. 1.482-1(h)(2)(ii)(A) (2006) provides that a foreign legal restriction is taken into account under section 482 only if it is "publicly promulgated".  We held supra part III.B that this means the restriction must be in writing.

The public-promulgation requirement is a reasonable interpretation of section 482 because the requirement avoids uncertainty about, and litigation over, the existence of a foreign legal restriction.  See Mayo Found., 562 U.S. at 59 (holding that a regulation was valid under Chevron step two because, in part, the regulation reduced litigation and uncertainty).  It is difficult to discern the existence and scope of a foreign legal restriction that is not publicly promulgated.[200]  It was not unreasonable for the Treasury Department to require a foreign legal restriction to be publicly promulgated.

Petitioner contends that the public-promulgation requirement is an unreasonable interpretation of section 482 because it does not "take into account the fact that many countries rely on unpromulgated administrative guidance that is nonetheless considered binding."  Yet the structure of 26 C.F.R. sec. 1.482-1(h)(2) (2006) shows that the Treasury Department recognized that some foreign legal restrictions were not publicly promulgated.  Title 26 C.F.R. sec. 1.482-1(h)(2)(ii)(C) (2006) provides that for foreign legal restrictions to affect a section 482 allocation they must "expressly prevent[] the payment or receipt, in any form, of part or all of the arm's length amount".  This (the sixth) requirement is separate from the public-promulgation requirement imposed by 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006).  To require a restriction to be publicly promulgated implies the recognition that some restrictions are not publicly promulgated.

---

[200] As a factual matter, petitioner claims that the Brazilian legal restrictions are "easily discoverable."  Petitioner does not cite any evidence for this proposition.  Instead petitioner directs us to a website that petitioner claims exemplifies the "summaries of the rules on the Internet."  However, the website does not currently contain any content regarding any Brazilian legal restrictions.  Furthermore, petitioner made this claim in its answering brief, so respondent did not have a chance to respond to it.

As respondent points out, the difficulty in discovering unwritten laws is supported by the facts of this case.  The stipulation recounts that in at least two instances (described in paragraphs 64.b, 65, 94.b, and 94.c of the stipulation), 3M Company's attorneys misunderstood the BPTO's unwritten policies.

We hold the requirement is valid under <u>Chevron</u> step two.

## C.    Generally applicable

Title 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) requires the foreign legal restriction to be "generally applicable to all similarly situated persons (both controlled and uncontrolled)".  Petitioner contends that this requirement is an unreasonable interpretation of section 482.  Petitioner states that this requirement is similar to the effect-on-uncontrolled-taxpayers requirement.  Petitioner further states that its arguments against the reasonableness of this general-applicability requirement are similar to its arguments that the effect-on-uncontrolled-taxpayers requirement is unreasonable.  <u>See</u> <u>supra</u> part III.A (holding that effect-on-uncontrolled-taxpayers requirement is valid under <u>Chevron</u> step 2).  We hold that the general-applicability requirement is valid under <u>Chevron</u> step two.

## D.    Not part of commercial transaction

Title 26 C.F.R. sec. 1.482-1(h)(2)(ii)(A) (2006) provides that the foreign legal restriction must not have been imposed as part of a commercial transaction between the taxpayer and the foreign government.  Petitioner does not contend that this requirement is invalid under <u>Chevron</u> step two.  For the purposes of this Opinion, we conclude without further discussion that the requirement is valid under <u>Chevron</u> step two.

## E.    Exhaustion of remedies

 Title 26 C.F.R. sec. 1.482-1(h)(2)(ii)(B) (2006) provides that a foreign legal restriction will be taken into account only if the taxpayer has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of the restriction (other than remedies that would have a negligible prospect of success if pursued).  Petitioner concedes that the exhaustion-of-remedies requirement is reasonable under <u>Chevron</u> step two because the requirement does not impose on taxpayers a duty to pursue remedies with a negligible prospect of success.

## F.    Restriction on payment in any form

Title 26 C.F.R. sec 1.482-1(h)(2)(ii)(C) (2006) provides that a foreign legal restriction will be taken into account only if the restriction "expressly prevented the payment or receipt, in any form, of part or all

of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose)". Petitioner contends that the "any form" requirement is invalid because it is an unreasonable interpretation of section 482.

We need not determine whether the "any form" requirement satisfies <u>Chevron</u> step two because we have held that the Brazilian legal restrictions fail three other requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006). <u>See</u> <u>Ramm v. Commissioner</u>, 72 T.C. 671, 674-675 (1979) (finding it unnecessary for the Court to evaluate the validity of a requirement imposed by a regulation if the taxpayer did not satisfy the other requirements imposed by the regulation).

### G. Circumvention or violation of restriction

Title 26 C.F.R. sec. 1.482-1(h)(2)(ii)(D) (2006) provides that a foreign legal restriction will be taken into account only if the related parties did not engage in an arrangement that had the effect of circumventing the restriction and did not violate the restriction in a material respect. Petitioner contends that this no-circumvention requirement is invalid under <u>Chevron</u> step two. We need not determine whether the no-circumvention requirement fails <u>Chevron</u> step two. This is because we have held that three other requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006) have not been met. <u>See</u> <u>Ramm v. Commissioner</u>, 72 T.C. at 674-675.

## VI. The State Farm test for validity of regulations

In <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u> (State Farm), 463 U.S. 29, 34, 37 (1983), the Supreme Court held that the Department of Transportation failed to present an "adequate basis and explanation" for rescinding its regulatory requirement that car manufacturers equip cars with either airbags or automatic seatbelts. This failure meant that the requirement "may not be abandoned". <u>Id.</u> at 51.[201] In <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. at 106, 117-120, we held that the test employed in <u>State Farm</u> should be applied to the 2003 amendments to the section 482 regulations

---

[201] The Supreme Court held that the matter should be remanded to the agency for further consideration. <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u> (State Farm), 463 U.S. 29, 57 (1983).

regarding stock compensation in the context of cost-sharing arrangements.[202]  We held that the 2003 regulatory amendments failed the <u>State Farm</u> test.  <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. at 133.  Therefore we held that the 2003 regulatory amendments were invalid.  <u>Id.</u>[203]

Petitioner contends that 26 C.F.R. sec. 1.482-1(h)(2) (2006) regarding foreign legal restrictions is valid only if it satisfies the <u>State Farm</u> test.  Respondent disagrees.  He contends that the <u>State Farm</u> test is inapplicable to 26 C.F.R. sec. 1.482-1(h)(2) (2006).  We need not resolve whether 26 C.F.R. sec. 1.482-1(h)(2) (2006) must satisfy the <u>State Farm</u> test.  Even if 26 C.F.R. sec. 1.482-1(h)(2) (2006) is reviewable under the <u>State Farm</u> test, this review would not result in a decision for petitioner.

Petitioner makes two types of challenges to 26 C.F.R. sec. 1.482-1(h)(2) (2006) under <u>State Farm</u>: first, that the Treasury Department did not "explain[] its choices with respect to Treas. Reg. § 1.482-1(h)(2)"; and second, that the Treasury Department did not "respond[] to the comments it received objecting to aspects thereof and requesting that changes be made to the proposed regulations".  We consider both types

---

[202] The Ninth Circuit reversed our decision in <u>Altera</u>, but did not disagree that the 2003 regulatory amendments had to meet the <u>State Farm</u> test.  <u>Altera Corp. & Subs. v. Commissioner</u>, 926 F.3d 1061, 1075, 1079-1086 (9th Cir. 2019), <u>rev'g</u> 145 T.C. 91 (2015).

[203] As we explained <u>supra</u> part I.H., the 1992 proposed regulations had a paragraph on cost-sharing agreements.  Sec. 1.482-2(g), Proposed Income Tax Regs., 57 Fed. Reg. 3595-3601 (Jan. 30, 1992).  As we explained <u>supra</u> part II.LL and MM, the 1993 temporary regulations also had a provision related to cost-sharing agreements.  26 C.F.R. sec. 1.482-7T (1994) (1993 temporary regulations).  As we explained <u>supra</u> part II.NN, the 1994 final regulations had no provisions regarding cost-sharing agreements.  In 1995, the Treasury Department promulgated final regulations regarding cost-sharing agreements.  T.D. 8632, 60 Fed. Reg. 65553 (Dec. 20, 1995).  In July 2002, the Treasury Department issued a notice of proposed rulemaking with respect to a proposed amendment to the 1995 cost-sharing regulations.  67 Fed. Reg. 48997 (July 29, 2002).  In August 2003, the Treasury Department promulgated a final rule amending the 1995 cost-sharing regulations.  T.D. 9088, 68 Fed. Reg. 51171 (Aug. 26, 2003).  In <u>Altera Corp. Subs. v. Commissioner</u>, 145 T.C. at 117-120, we held that the final rule had to satisfy the <u>State Farm</u> test.  We held that the final rule did not satisfy the <u>State Farm</u> test because (1) it lacked a basis in fact, (2) the Treasury Department failed to rationally connect the choice it made with the facts it found, (3) the Treasury Department failed to adequately respond to those who had commented on the proposed rulemaking, and (4) the final rule was contrary to the evidence before the Treasury Department.  <u>Id.</u> at 120-131.

of challenges in the same sequence: (1) satisfactory explanation and (2) and adequate response to comments.

A.   <u>Satisfactory explanation</u>

<u>State Farm</u> requires the agency to "articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choices made.'" <u>State Farm</u>, 463 U.S. at 43 (quoting <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)).[204] The agency's explanation is satisfactory if the explanation is "clear enough" that the agency's "path may reasonably be discerned". <u>Encino Motor Cars v. Navarro</u>, 579 U.S. 211, 221 (2016) (quoting <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)).

Petitioner argues that "Treasury provided no rationale whatsoever for Treas. Reg. § 1.482-1(h)(2)". We disagree. The first requirement of 26 C.F.R. sec. 1.482-1(h)(2) (2006) is that the foreign legal restriction affect uncontrolled taxpayers. The words of the requirement itself express its rationale: "The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time." 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006). An "[u]ncontrolled taxpayer"--a term used in the text of the requirement--is defined elsewhere in the 1994 final regulations as "any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests." 26 C.F.R. sec. 1.482-1(i)(5) (2006). In our view, the regulatory text imposing the effect-on--uncontrolled-taxpayers requirement, 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006), means that it is a specific application of two principles of section 482: (1) the arm's-length standard and (2) the principle that section 482 should achieve tax parity between controlled and uncontrolled parties. We explain this in greater detail below.

---

[204] The statutory source for this requirement has been identified as sec. 10(e)(B)(1) of the APA (codified as amended at 5 U.S.C. sec. 706(2)(A) (2018)), which provides that a reviewing court will hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. <u>SIH Partners LLLP v. Commissioner</u>, 150 T.C. 28, 42 (2018).

The arm's-length standard has been recognized as a guiding principle of allocations of income under section 482 and its predecessors as far back as the 1934 regulations interpreting section 45 of the Revenue Act of 1934. Art. 45-1(b), Regulations 86. The arm's-length standard is still recognized in the 1994 final regulations:

> In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). * * *

26 C.F.R. sec. 1.482-1(b)(1) (2006). Under the arm's-length standard, a section 482 allocation is based on the pricing of transactions between unrelated parties--i.e., parties who deal with each other at arm's length. A foreign legal restriction that does not affect unrelated parties would not affect the pricing of transactions between unrelated parties. See 26 C.F.R. sec. 1.482-1(h)(2)(i) (2006). Thus, the Treasury Department satisfactorily explained that one of the reasons it promulgated section 1.482-1(h)(2) of the 1994 final regulations (26 C.F.R. sec. 1.482-1(h)(2) (2006)) was to advance the goal of arm's-length comparisons.

Likewise, the tax-parity goal has long been recognized in the regulatory scheme.[205] The 1994 final regulations state that section 482

---

[205] The regulations first adopted the goal of tax parity in 1934. Art. 45-1(b), Regulations 86 ("The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer."). The 1993 temporary regulations contained a sentence regarding tax parity: "Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer in a manner that reasonably reflects the relative economic activity undertaken by each taxpayer." 26 C.F.R. sec. 1.482-1T(a)(1) (1994) (1993 temporary regulations). The preamble to the Treasury Department's decision to promulgate the 1993 temporary regulations echoed the tax-parity goal: "Section 1.482-1T(a)(1) reaffirms that the purpose of section 482 is to ensure that taxpayers clearly reflect their income by placing a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the controlled taxpayer's true taxable income." T.D. 8470, 58 Fed. Reg. 5265 (Jan. 21, 1993). The preamble to the Treasury Department's decision

"places a controlled taxpayer on a tax parity with <u>an uncontrolled taxpayer</u> by determining the true taxable income of the controlled taxpayer". 26 C.F.R. sec. 1.482-1(a)(1) (2006) (emphasis added). This tax-parity goal is reflected in the 26 C.F.R. sec. 1.482-1(h)(2) (2006) treatment of foreign legal restrictions. Subdivision (1) of that regulation states that "a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected <u>an uncontrolled taxpayer</u>". (Emphasis added.) Thus, the effect-on-uncontrolled-taxpayers requirement of section 1.482-1(h)(2)(i) of the 1994 final regulations (26 C.F.R. sec. 1.482-1(h)(2)(i) (2006)) articulates a link to the goal of tax parity between controlled and uncontrolled taxpayers found in section 1.482-1(a)(1).[206] The Treasury Department satisfactorily explained that one of the reasons it promulgated section 1.482-1(h)(2) of the 1994 final regulations was to advance the goal of tax parity.

We conclude that the regulation is not invalid for want of explanation.

B. <u>Adequate response to comments</u>

One aspect of the <u>State Farm</u> test is that an agency must adequately respond to significant comments. <u>See</u> <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. at 120, 130.[207] Significant comments are

---

to promulgate the 1994 final regulations explained that both the 1993 temporary regulations and the 1994 final regulations contained the tax-parity sentence and explained why the phrase "in a manner that reasonably reflects the relative economic activity undertaken by each taxpayer" was omitted from the 1994 final regulation. T.D. 8552, 59 Fed. Reg. 34976.

[206] Indeed, as part of its argument that the effect-on-uncontrolled-taxpayers requirement fails the <u>Chevron</u> step-two test (an argument discussed <u>supra</u> part V.A), petitioner concedes that the requirement "apparently is an application of the principle that section 482 'places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer.'" Treas. Reg. § 1.482-1(a)(1)."

[207] <u>Altera</u> suggested that the adequate-response-to-comments requirement was part of the <u>State Farm</u> test but did not identify a specific portion of the <u>State Farm</u> opinion that discussed this requirement. Instead <u>Altera</u> cited a U.S. Court of Appeals opinion that held that an agency has an obligation to "respond[] to significant points raised by the public". <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. at 112 (quoting <u>Home Box Office, Inc. v. FCC</u>, 567 F.2d 9, 35-36 (D.C. Cir. 1977)). "However," <u>Altera</u> observed, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the

"those 'comments which, if true, . . . would require a change in [the] proposed rule.'" <u>La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.</u>, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (quoting <u>Am. Mining Cong. v. EPA</u>, 907 F.2d 1179, 1188 (D.C. Cir. 1990)). Petitioner has identified six types of comments regarding section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5312 (Jan. 21, 1993), to which in its view the Treasury Department did not give an adequate response.[208] We discuss below each of the types of comments discussed by petitioner.

### 1. Inconsistency with First Security Bank

First, as petitioner points out, all four commentators (the American Petroleum Institute, the Tax Executives Institute, TRW, and the United States Council for International Business) explained to the Treasury Department that section 1.482-1T(f)(2), Proposed Income Tax Regs., 58 Fed. Reg. 5212-5314, was inconsistent with <u>First Security Bank</u> and <u>Procter & Gamble</u>. Given the history of section 482, it is apparent that the Treasury Department was already aware that the proposed regulation was inconsistent with the caselaw. Indeed, one of the commentators said that the proposed regulation was an "obvious attempt" to "override" <u>Procter & Gamble</u>. Thus, these comments about inconsistency with prior caselaw were not significant. <u>Thompson v. Clark</u>, 741 F.2d 401, 409 (D.C. Cir. 1984) (stating that when comments "brought to the attention of the agency nothing which it had not already considered", the agency need not respond).

### 2. That some foreign legal restrictions apply only to payments between related parties

Second, petitioner points out that two commentators explained that some foreign legal restrictions apply only to payments between related persons. The structure of 26 C.F.R. sec. 1.482-1(h)(2) (2006) shows that the Treasury Department was aware that some foreign legal restrictions applied only to payments between related persons. Under the general applicability requirement in 26 C.F.R. sec. 1.482-

---

relevant factors." <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. at 112 (quoting <u>Sherley v. Sebelius</u>, 689 F.3d 776, 784 (D.C. Cir. 2012)).

[208] To the extent it matters whether the Treasury Department considered the public comments, petitioner has conceded that the Treasury Department considered the public comments. First, paragraph 116 of the stipulation acknowledges that "all the comments were considered". Second, petitioner's brief argues that the Treasury Department did not "respond[]" to the comments, not that it failed to consider the comments.

1(h)(2)(ii)(A) (2006), a foreign legal restriction will be accounted for in making a section 482 allocation only if the restriction applies to controlled persons (which includes related persons) and uncontrolled persons. Therefore, it is evident that the Treasury Department was aware that some foreign legal restrictions apply only to payments between related persons. Thus, these comments did not bring to the Treasury Department's attention something of which the Treasury Department was not already aware and did not require a change to the regulation. La. Fed. Land Bank Ass'n, FLCA, 336 F.3d at 1080; Thompson v. Clark, 741 F.2d at 409.

### 3. That some foreign legal restrictions are unpublished (comment related to the second requirement)

Third, petitioner points out that the American Petroleum Institute explained that some foreign restrictions with the practical force and effect of law may not be traceable to a specific published source. On that ground, the American Petroleum Institute opposed the requirement in section 1.482-1T(f)(2)(ii)(A), Proposed Income Tax Regs., 58 Fed. Reg. 5312, that the foreign legal restriction be "publicly promulgated". The Treasury Department was aware that some legal restrictions are not publicly promulgated, as is shown by its insistence that only publicly promulgated restrictions be taken into account. Thus the American Petroleum Institute's comment is not significant. See Thompson, 741 F.2d at 408.

### 4. Difficulty of establishing that the remedies were exhausted (comment related to the fifth requirement)

Fourth, petitioner observes that commentators had expressed concern that it would be difficult for a taxpayer to establish the satisfaction of the requirement, in section 1.482-1T(f)(2)(ii)(B), Proposed Income Tax Regs., 58 Fed. Reg. 5312, that the taxpayer exhaust all remedies. This requirement was made part of the 1994 final regulations. 26 C.F.R. sec. 1.482-1(h)(2)(ii)(B) (2006). In this case however, other requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006) are not met: i.e., the effect-on-uncontrolled-taxpayers requirement, the public-promulgation requirement, and the general-applicability requirement. Therefore, any failure by the Treasury Department to appropriately respond to comments regarding the exhaustion-of-remedies requirement is irrelevant to the current case.

5.   <u>Payment of dividends and the no-circumvention requirement (comment related to the seventh requirement)</u>

Fifth, petitioner observes that commentators expressed concern that the no-circumvention requirement found in section 1.482-1T(f)(2)(ii)(D), Proposed Income Tax Regs., 58 Fed. Reg. 5312, could be interpreted to mean that the payment of dividends might be considered a way to circumvent a legal restriction. In this case however, other requirements are not met: i.e., the effect-on-uncontrolled-taxpayers requirement, the public-promulgation requirement, and the general-applicability requirement. Therefore, any failure by the Treasury Department to appropriately respond to comments regarding the no-circumvention requirement is irrelevant to the current case.

6.   <u>Time for making deferral election</u>

Petitioner observes that commentators had stated that they preferred that taxpayers be allowed to continue to make the deferral election within the timeframe permitted by the 1968 regulations. <u>See</u> 26 C.F.R. sec. 1.482-1(d)(6) (1969) (1968 regulations). However, the 3M consolidated group did not elect the deferred income method of accounting. Nor does petitioner assert that the group is entitled to use that method. Therefore, any failure by the Treasury Department to respond appropriately to comments regarding the timing of the deferral election is irrelevant to the current case.

VII.   <u>Conclusion</u>

As explained above, some of petitioner's arguments involve a general challenge to the entire regulation 26 C.F.R. sec. 1.482-1(h)(2) (2006). This regulation was promulgated in 1994 to resolve questions regarding foreign legal restrictions under section 482. As to petitioner's <u>Chevron</u> step-one challenge, we hold that judicial precedent has not established that the plain language of section 482 is inconsistent with the regulation. <u>See</u> <u>supra</u> part IV. We further hold that the plain text of section 482 itself is not inconsistent with 26 C.F.R. sec. 1.482-1(h)(2) (2006). <u>See</u> <u>supra</u> part IV. This further holding also relates to <u>Chevron</u> step one.

Petitioner's <u>State Farm</u> challenge to 26 C.F.R. sec. 1.482-1(h)(2) (2006) rests in part on the theory that the Treasury Department failed to satisfactorily explain 26 C.F.R. sec. 1.482-1(h)(2) (2006). This is an

Appellate Case: 23-3772     Page: 272     Date Filed: 02/08/2024 Entry ID: 5361675

attack on the entire regulation that we reject for reasons explained <u>supra</u> part VI.A.

Petitioner's <u>State Farm</u> challenge also rests on the theory that the Treasury Department failed to adequately respond to public comments on the proposed form of the regulation. In part, this is a general attack on the regulation, which we reject. <u>See</u> <u>supra</u> part VI.B.1, 2, and 6.

That leaves petitioner's arguments that are related to particular requirements of the regulation, 26 C.F.R. sec. 1.482-1(h)(2) (2006). Petitioner's <u>Chevron</u> step-two challenge is particular to the first, second, third, sixth, and seventh requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006). We reject petitioner's <u>Chevron</u> step-two challenge to the first, second, and third requirements, <u>see</u> <u>supra</u> part V.A, B, and C, and we leave unresolved its challenge to the sixth and seventh requirements. <u>See</u> <u>supra</u> part V.F and G. Petitioner's <u>State Farm</u> challenge based on an adequate response to comments includes specific attacks on the second, fifth, and seventh requirements. <u>See</u> <u>supra</u> part VI.B.3, 4, and 5. We reject the challenge to the second requirement, <u>see</u> <u>supra</u> part VI.B.3, and leave unresolved the challenges to the fifth and seventh requirements, <u>see</u> <u>supra</u> part VI.B.4 and 5. Petitioner also argues that the second, fourth, fifth, and seventh requirements are satisfied. We hold that the second requirement is not met, <u>see</u> <u>supra</u> part III.B, we hold that the fourth requirement is met, <u>see</u> <u>supra</u> part III.D, but we leave unresolved the question of whether the fifth and seventh requirements are met, <u>see</u> <u>supra</u> part III.E and G.

The table below illustrates petitioner's contentions regarding the validity of particular requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006):

| <u>Requirement</u> | <u>Does P contend the requirement is met?</u> | <u>Does P contend the requirement is invalid under Chevron step two?</u> | <u>Does P contend the requirement is invalid because of insufficient response to comments under State Farm?</u> |
|---|---|---|---|
| 1. Restriction must affect uncontrolled taxpayers | No | Yes | No |
| 2. Restriction must be publicly promulgated | Yes | Yes | Yes |

| | | | |
|---|---|---|---|
| 3. Restriction must be generally applicable | No | Yes | No |
| 4. Restriction must not be part of a commercial transaction | Yes | No | No |
| 5. Taxpayer must exhaust remedies for obtaining waiver of restriction | Yes | No | No |
| 6. Restrictions must prohibit any form of payment | No | Yes | Yes |
| 7. Taxpayer did not circumvent or violate restriction | Yes | Yes | Yes |

The table below illustrates the Court's holdings regarding the particular requirements of 26 C.F.R. sec. 1.482-1(h)(2) (2006):

| Requirement | Is the requirement met? | Is the requirement invalid under Chevron step two? | Is the requirement invalid because of insufficient response to comments under State Farm? |
|---|---|---|---|
| 1. Restriction must affect uncontrolled taxpayers | No | No | No |
| 2. Restriction must be publicly promulgated | No | No | No |
| 3. Restriction must be generally applicable | No | No | No |
| 4. Restriction must not be part of a commercial transaction | Yes | No | No |
| 5. Taxpayer must exhaust remedies for obtaining waiver of restriction | Unresolved | No | No |
| 6. Restrictions must prohibit any form of payment | No | Unresolved | Unresolved |
| 7. Taxpayer did not circumvent or violate restriction | Unresolved | Unresolved | Unresolved |

As the table illustrates, the first, second, and third requirements are valid and are not met with respect to the Brazilian legal restrictions. Therefore the restrictions should not be taken into account in evaluating respondent's allocation of income to the 3M consolidated group. We therefore sustain respondent's determination.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.

Reviewed by the Court.

KERRIGAN, GALE, GUSTAFSON, NEGA, ASHFORD, and MARSHALL, *JJ.*, agree with this opinion of the Court.

PARIS and COPELAND, *JJ.*, concur in the result only.

FOLEY, BUCH, PUGH, URDA, JONES, TORO, GREAVES, and WEILER, JJ., dissent.

KERRIGAN, *C.J.*, concurring: I agree with the outcome in the opinion of the Court and write mainly in response to the dissents. The opinion of the Court provides a thorough analysis of the issues under consideration. I will focus solely on the arguments made against the validity of Treasury Regulation § 1.482-1(h)(2) (blocked income regulation).

In the notice of deficiency, respondent made an adjustment under section 482 "to clearly reflect the income of the entities." Respondent allocated royalty income to petitioner from its Brazilian subsidiary in connection with the subsidiary's use of intellectual property. At issue here is a Brazilian law that precluded the subsidiary from paying any royalties to petitioner other than a nominal amount.

Petitioner contends that respondent's allocation is improper because the subsidiary was not legally permitted to make the payment to petitioner. Respondent asserts that the Brazilian law should not be considered because the blocked income regulation's requirements are not satisfied. Petitioner asserts—and the dissents agree—that the blocked income regulation is invalid. I disagree on the basis of the following.

The thrust of Judge Buch's dissent is that section 482, as interpreted by the Supreme Court in *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 404–05 (1972), is unambiguous, thereby foreclosing the promulgation of regulations interpreting it. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under that interpretation, any regulation permitting the Commissioner to allocate income in the face of a legal restriction would be invalid. Judge Toro's dissent goes further and asserts that the blocked income regulation is invalid because Treasury failed to follow the Administrative Procedure Act's (APA) requirements. I disagree with both assertions and will respond to each in turn.

First, *First Security Bank* is distinguishable on its face and therefore does not control this case. In *Commissioner v. First Security Bank*, 405 U.S. at 401 n.13, the Court was interpreting a domestic Federal banking law which implicitly prohibits national banks from acting as insurance agents in places with a population of 5,000 or more. Here the Tax Court is tasked with interpreting a foreign law. Additionally, the law considered in *First Security Bank* was one of general application whereas the blocked income regulation has a specific use: It is aimed at restrictions that bar payments only to foreign

companies affiliated with the local business. I find these factual distinctions to be significant, confining *First Security Bank*'s holding to the circumstances presented in that case.

Furthermore, the version of section 482 that the Supreme Court interpreted in *First Security Bank* differs significantly from the statutory text that controls this case. In 1986 Congress amended section 482, making the first substantive change since 1954. The amendment added the following new sentence to section 482: "In the case of any transfer (or license) of intangible property . . . the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."

As a result of the sentence added to section 482, Treasury promulgated new regulations in 1994. The new regulations made changes to the section 482 regulations, including the elimination of the complete power regulation provided in Treasury Regulation § 1.482-1(b)(1) (complete power regulation). *See* Treas. Reg. § 1.482-1(b)(1) (1971) ("The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income . . . of each of the controlled taxpayers."). The holding in *First Security Bank* was grounded in this provision; it stated: "The 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law." *Commissioner v. First Security Bank*, 405 U.S. at 405. Because the complete power regulation no longer exists—as a result of the 1994 promulgation—I disagree with Judge Buch's dissent's reliance on *First Security Bank*.

Judge Buch's dissent also relies on a prior decision of this Court, *Procter & Gamble Co. v. Commissioner*, 95 T.C. 323 (1990), *aff'd*, 961 F.2d 1255 (6th Cir. 1992), to bolster its argument that section 482 is unambiguous. In *Procter & Gamble* the tax years in issue were 1978 and 1979, meaning that the 1954 version of section 482 governed that dispute. We concluded in *Procter & Gamble* that the *First Security Bank* analysis applied and held: "Where the controlling interest has not utilized its power to shift income, a section 482 allocation is inappropriate." *Procter & Gamble Co.*, 95 T.C. at 339. Once again, Judge Buch's dissent is relying upon a case that was grounded in the complete power provision, which is no longer part of the regulations.

None of the cases cited in Judge Buch's dissent interpreted the version of section 482 that controls this case. Those courts did not have

the opportunity to consider whether the sentence added to section 482 addressing "commensurate with the income attributable to the intangible" would affect their interpretation of section 482. In this case the additional sentence is essential to our analysis because at issue is the amount of income to be allocated upon the transfer or license of intangible property.

Here the Brazilian blocking statute would prevent petitioner from receiving royalty income that is "commensurate with the income attributable to the intangible." By preventing the application of the blocking statute, the challenged regulation accomplishes perfectly Congress' purpose in enacting the 1986 amendment. All considered, one cannot argue that *First Security Bank* unambiguously defined section 482 since the Court there was not considering the current statute.

Second, I agree with the opinion of the Court that Treasury adhered to the APA's procedural requirements in promulgating the blocked income regulation. Legislative rules—those that "create[] rights, assign[] duties, or impose[] obligations, the basic tenor of which is not already outlined in the law itself"—are subject to APA notice-and-comment rulemaking procedures. *SIH Partners LLLP v. Commissioner*, 150 T.C. 28, 40 (2018) (quoting *Dia Navigation Co. v. Pomeroy*, 34 F.3d 1255, 1264 (3d Cir. 1994)), *aff'd*, 923 F.3d 296 (3d Cir. 2019). To comply with these procedures, the issuing agency must: "(1) publish a notice of proposed rulemaking in the Federal Register; (2) provide 'interested persons an opportunity to participate * * * through submission of written data, views, or arguments'; and (3) [a]fter consideration of the relevant matter presented, * * * incorporate in the rules adopted a concise general statement of their basis and purpose." *Oakbrook Land Holdings, LLC v. Commissioner*, 154 T.C. 180, 190 (2020) (citing 5 U.S.C. § 553(b) and (c)), *aff'd*, 28 F.4th 700 (6th Cir. 2022). The APA provides that a reviewing court shall set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a).

The 1993 temporary regulations eliminated the complete power regulation and included a place holder for rules relating to foreign legal restrictions. *See* Temp. Treas. Reg. § 1.482-1T. The preamble to these temporary regulations specifically addressed the 1986 amendment to section 482 and the accompanying legislative history. T.D. 8470, 58 Fed. Reg. 5264, (Jan. 21, 1993). The 1993 Notice of Proposed Rulemaking (1993 Notice) included as proposed regulations Temporary Treasury Regulation § 1.482-1T(f)(2), which addresses foreign legal restrictions,

a.k.a. the blocked income regulation. *See* 58 Fed. Reg. 5312. The 1993 Notice does not specifically mention the 1986 amendment to section 482; however, the background section includes the following: "The preamble to the temporary regulations contains a full explanation of the reasons underlying the issuance of the proposed regulation." *Id.* at 5310. The 1993 Notice further states: "These provisions are proposed to take the place of reserved section of the temporary regulations." *Id.* It additionally states: "Before adopting these regulations, consideration will be given to any written comments that are timely submitted . . . ." *Id.*

In promulgating the 1994 regulations—which include the blocked income regulation—Treasury issued proper notice, received comments from various interested persons, and held a public hearing. Where Treasury erred, Judge Toro's dissent argues, was in failing to adequately respond to the four comments relating to the blocked income regulation. And because of that failure, according to Judge Toro's dissent, the regulation should be invalidated. I disagree.

In their Stipulation of Facts, the parties agreed that the 1993 Notice stated the following: "Before adopting these regulations, consideration will be given to any written comments that are timely submitted . . . to the Commissioner of Internal Revenue." The parties stipulated further that the Commissioner received only four comments—from the American Petroleum Institute, the Tax Executives Institute, TRW, Inc., and the United States Council for International Business—pertaining to the proposed blocked income regulation. The comments generally contended that Treasury was attempting to overturn *Procter & Gamble* and questioned whether the agency had the authority to issue the proposed regulation. The comments failed to address the elimination of the complete power regulation and the 1986 amendment to section 482 in the context of the blocked income regulation.

In July 1994 Treasury adopted final regulations which specifically address the 1986 amendment to section 482 and include the blocked income regulation. The preamble provides a history regarding the regulations starting with proposed regulations in 1992. It also specifically addresses the addition in the 1993 regulations of a section dealing with foreign legal restrictions. The parties' own stipulations make it clear that Treasury reviewed the comments. I believe that the preamble included in the 1994 regulation acknowledges that the comments were considered. I would take it a step further and argue

**Add. 278**

that the preamble is sufficient to respond to the four comments regarding the proposed blocked income regulation.

The opinion of the Court concludes that the comments are insignificant. I do not think the determination of whether the comments are significant affects our outcome under the second step of *Chevron*, which requires us to consider whether the regulation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The U.S. Court of Appeals for the D.C. Circuit in *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003), stated that "the agency 'need not address every comment, but it must respond in a reasoned manner to those that raise significant problems'" (quoting *Reytblatt v. NRC*, 105 F.3d 715, 722 (D.C. Cir. 1997)). *City of Waukesha* stated further that "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Id.* at 258 (quoting *Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996)).

The parties stipulated that Treasury considered all comments to the 1994 regulations in their proposed form. Even assuming the comments went to the relevant factors and raised significant problems— they arguably did not—Treasury considered them and therefore the regulations cannot be invalidated on the grounds that it failed to specifically respond.

The proposed regulations at issue make clear that the regulations—including those on foreign legal restrictions—are addressing the 1986 amendment to section 482. Treasury understood that there was opposition to the new regulations. And I believe going forward with the proposed blocked income regulation in the face of opposing comments is indeed acknowledgment of them.

On the basis of that analysis, I agree that Treasury adhered to the APA's procedural requirements. Thus it did not take an action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (finding that the reviewing court considers only whether the agency "articulate[d] a satisfactory explanation for its action"). Therefore, the second step of *Chevron* is satisfied.

Finally, I find aspects of Judge Toro's dissent troubling. Determining whether a comment is significant may result in an analysis

that is more subjective than objective. That being so, I am concerned that Judge Toro's dissent would create a slippery slope whereby courts would be constantly faced with determining whether comments are significant and whether the agency responded appropriately to them.

Judge Toro's dissent maintains that Treasury should have provided a more in-depth response. This viewpoint requires the Court to consider whether the agency did enough. That clearly exceeds the APA's requirement that the reviewing court determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Judge Toro's dissent would therefore place a greater burden on both the agency and the court system.

The result of this heightened scrutiny would likely be the undoing of years of regulatory promulgation. This would create uncertainty for both taxpayers and Treasury, performing a disservice to the tax system as a whole. For all of those reasons, I am wary of the approach taken in Judge Toro's dissent.

GALE, PARIS, ASHFORD, and COPELAND, *JJ.*, agree with this concurring opinion.

COPELAND, *J.*, concurring in the result: I agree with the decision of the Court. In my view, the result of this case is dictated by the plain text of section 482—specifically, the second sentence added by amendment in 1986:

> In any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. *In the case of any transfer (or license) of intangible property . . . the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.*

Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562–63 (emphasis added).

In *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 403 (1972), the Supreme Court held that for purposes of section 482 allocations, "income" may never include payments that the taxpayer "did not receive and that he was prohibited from receiving." This holding was followed in our cases *Procter & Gamble Co. v. Commissioner*, 95 T.C. 323 (1990), *aff'd*, 961 F.2d 1255 (6th Cir. 1992), and *Exxon Corp. v. Commissioner*, T.C. Memo. 1993-616, *aff'd sub nom. Texaco, Inc. v. Commissioner*, 98 F.3d 825 (5th Cir. 1996).

In each of these cases—*First Security Bank*, *Procter & Gamble*, and *Exxon*—the courts held that the IRS could not (for purposes of properly allocating income under section 482) create deemed payments between related companies if applicable law (whether domestic or foreign) had forbidden such payments in fact. However, each of these cases was decided with respect to tax years prior to 1986, the year Congress amended section 482. And it appears that no cases on this issue have been decided between *Exxon* and the case before us today.

When we look to the legislative history of the 1986 amendment, we find that Congress' aim was to assist the IRS in the difficult task of determining an arm's-length value for the transfer and license of

intangibles between related companies. *See* H.R. Rep. No. 99-841 (Vol. II), at II-637 (1986) (Conf. Rep.), 1986-3 C.B. (Vol. 4) 1, 637 ("Uncertainty exists regarding what transfers are appropriate to treat as 'arm's-length' comparables and regarding the significance of profitability, including major changes in profitability of the intangible after the transfer."); H.R. Rep. No. 99-426, at 424 (1985), 1986-3 C.B. (Vol. 2) 1, 424 ("The problems are particularly acute in the case of transfers of high-profit potential intangibles. Taxpayers may transfer such intangibles to foreign related corporations . . . at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product.").

To remedy the situation, Congress specified a new standard for determining an arm's-length value for intangibles: Whereas taxpayers and the courts previously often looked to comparable transactions between unrelated parties, or to industry norms, the commensurate-with-income standard directs taxpayers, the courts, and the IRS to consider also "the actual profit experience realized as a consequence of the transfer. Thus, the committee intends to require that the payments made for the intangible be adjusted over time to reflect changes in the income attributable to the intangible." H.R. Rep. No. 99-426, at 425–26, 1986-3 C.B. (Vol. 2) at 425–26.

Congress then invited the Treasury Department to modify its regulations under section 482 to address the amended statute. *See* H.R. Rep. No. 99-841 (Vol. II), at II-638, 1986-3 C.B. (Vol. 4) at 638. ("The conferees are . . . aware that many important and difficult issues under section 482 are left unresolved by this legislation. The conferees believe that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect."). The Treasury Department accordingly produced a "White Paper," published as I.R.S. Notice 88-123, 1988-2 C.B. 458, and ultimately issued new regulations under section 482, in part addressing the new commensurate-with-income standard. *See* T.D. 8552, 1994-2 C.B. 93. Congress' invitation to the Treasury Department further confirms that Congress intended to change the existing law under section 482 as it related to the transfer and license of intangibles.

The new regulations, which have remained in place for over 24 years, put logical concrete parameters on the concept of "commensurate with income" as it relates to intangibles. They also provide certainty

regarding the effects of foreign legal restrictions, which according to the regulations will not upset otherwise necessary reallocations under section 482 unless they are publicly promulgated—as was the case in *First Security Bank*, *Procter & Gamble,* and *Exxon* but is not the case here for 3M. The new regulations likewise require accountability, as the legal restrictions must apply equally to controlled and uncontrolled taxpayers, as was the situation confronted by the Supreme Court in *First Security Bank* and our Court in *Exxon*. Specifically, the new regulations provide that

> a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2) (iii) and (iv) of this section (Deferred income method of accounting).

Treas. Reg. § 1.482-1(h)(2)(i) (1994).

The legal restrictions at issue in *First Security Bank* and *Exxon* applied equally to controlled and uncontrolled taxpayers. The restrictions at issue in *Procter & Gamble* applied only to controlled taxpayers, so the new regulations might appear to have contradicted our holding (and the U.S. Court of Appeals for the Sixth Circuit's holding) in that case. However, the courts in *Procter & Gamble* did not have the opportunity to address the commensurate-with-income standard and Congress' mandate that the Treasury Department issue appropriate regulations. The statute as it relates to intangibles specifically tasked the Treasury Department with "careful consideration . . . [as] to whether the existing regulations could be modified in any respect." H.R. Rep. No. 99-841 (Vol. 2), at II-638, 1986-3 C.B. (Vol. 4) at 638.

The first, preexisting, sentence of section 482 incorporated—without modification—existing standards for determining taxable income. This sentence authorized the IRS to reallocate gross income, deductions, and credits among related parties if "necessary in order . . . *clearly to reflect the income* of any of such organizations, trades, or businesses." (Emphasis added.) By contrast, the sentence added by the 1986 amendment specified a *new* standard for determining income in the context of intangible transfers among related parties: "In the case of

any transfer (or license) of intangible property . . . the income with respect to such transfer or license *shall be* commensurate with the income attributable to the intangible." (Emphasis added.) However taxable income from the transfer of intangibles was determined before the amendment, now we must impose the commensurate-with-income standard to determine the taxable portion of income of a taxpayer that transfers an intangible to a taxpayer in the same controlled group. In effect, the new sentence added to section 482 now more clearly defines the "income" that must be "clearly reflect[ed]" under the first sentence.

Indeed, Congress clearly intended "commensurate with income" to mean something different from that which the then-existing caselaw held. As the House Committee on Ways and Means explained:

> Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors. *See, e.g.*, *United States Steel Corporation v. Commissioner*, 617 F.2d 942 (2d Cir. 1980). While the committee is concerned that such decisions may unduly emphasize the concept of comparables even in situations involving highly standardized commodities or services, it believes that such an approach is sufficiently troublesome where transfers of intangibles are concerned that a *statutory modification* to the intercompany pricing rules regarding transfers of intangibles is necessary.

H.R. Rep. No. 99-426, at 424, 1986-3 C.B. (Vol. 2) at 424 (emphasis added).

The committee report also supports an inference to what a plain reading of the new statutory text indicates—namely, that the new commensurate-with-income standard cannot be implemented consistently with a strict adherence to the *First Security Bank* holding. In particular:

> In requiring that payments be commensurate with the income stream [from the intangible], the bill does not intend to mandate the use of the "contract manufacturer"

or "cost-plus" methods of allocating income or any other particular method. As under present law, all the facts and circumstances are to be considered in determining what pricing methods are appropriate in cases involving intangible property, including the extent to which the transferee bears real risks with respect to its ability to make a profit from the intangible or, instead, sells products produced with the intangible largely to related parties (which may involve little sales risk or activity) and has a market essentially dependent on, or assured by, such related parties' marketing efforts. However, the profit or income stream generated by or associated with intangible property is to be given *primary weight*.

*Id.* at 426, 1986-3 C.B. (Vol. 2) at 426 (emphasis added).

In specifying "all the facts and circumstances" that are to be weighed, the committee gives us an example—the relative risks borne by the parties—which suggests that the relevant facts and circumstances are those internal to generating income from the intangible, rather than such external factors as legal restrictions on payments to the transferor. Moreover, accommodating such restrictions in cases like the present one would give "primary weight" to the restriction,[1] rather than to the "income stream generated by . . . [the] intangible property," contrary to congressional intent.

It is important to note that the tax years at issue in *Procter & Gamble* were 1978 and 1979, and in *Exxon* 1979–81—all prior to the 1986 amendment of section 482 (which was effective for tax years beginning after December 31, 1986). Therefore, there is no reason to construe our decision in the present case as overturning either of our precedents, as there we were dealing with a different version of the law as it relates to income from intangibles.

The Court views the IRS's allocation to the 3M consolidated group as "consistent with the 1986 statutory amendment" and "supported by the language of the 1986 amendment." Such allocation is in fact

---

[1] We also note that, if we were to agree with 3M in the present case, we would be giving primary weight to a Brazilian legal restriction that was not publicly promulgated, creating further uncertainty—arguably of the sort that Congress was attempting to avert with the 1986 amendment.

required by the amended statute, with or without the clarifications of Treasury Regulation § 1.482-1(h)(2).

KERRIGAN, GALE, and PARIS, *JJ.*, agree with this opinion concurring in the result.

BUCH, *J.*, dissenting: "Blocked income" is income that a taxpayer is prohibited by law from receiving. We have previously held that blocked income cannot be taxed. *L.E. Shunk Latex Prods., Inc. v. Commissioner*, 18 T.C. 940, 961 (1952). The U.S. Courts of Appeals for the Fifth and Sixth Circuits have held that blocked income cannot be taxed. *Texaco, Inc. v. Commissioner*, 98 F.3d 825 (5th Cir. 1996), *aff'g Exxon Corp. v. Commissioner*, T.C. Memo. 1993-616; *Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255 (6th Cir. 1992), *aff'g* 95 T.C. 323 (1990). And the Supreme Court has held that blocked income cannot be taxed. *Commissioner v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394 (1972). In response, the Department of the Treasury promulgated a regulation under section 482 that results in the taxing of blocked income. Treas. Reg. § 1.482-1(h)(2)(ii)(A) (promulgated by T.D. 8552, 1994-2 C.B. 93, 125–26). We are asked to decide whether this regulation exceeds the Department of the Treasury's power to tax.

As a trial court, we may depart from our own precedent if we have special justification for doing so. *Sec. State Bank v. Commissioner*, 111 T.C. 210, 213 (1998), *aff'd*, 214 F.3d 1254 (10th Cir. 2000). As a national court whose cases can be appealed in any one of the geographic circuits, we are not required to follow the precedent of circuits other than the one in which the present case is appealable. *Golsen v. Commissioner*, 54 T.C. 742, 756–58 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). But we are required to follow the precedent of the Supreme Court. *Parks v. Commissioner*, 145 T.C. 278, 341 (2015) (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)), *aff'd sub nom. Parks Found. v. Commissioner*, 717 F. App'x 712 (9th Cir. 2017). Because the opinion of the Court is contrary to established Supreme Court precedent prohibiting the taxation of blocked income, I dissent.

I.    *Background*

A predicate to imposing an income tax is to define what is income. Section 61 does that in the broadest possible terms. It includes in the definition of income: compensation for services, gross income from businesses, gains, royalties, and many more items.

Income is not limited to amounts actually received. Although individuals are typically taxed on amounts they have received (i.e., on a cash basis), businesses are often taxed on an accrual basis. A common result is that businesses are often taxed on money they have the right to receive in the future but have not yet received. *See, e.g.*, *Commissioner v. Hansen*, 360 U.S. 446, 466–67 (1959).

In an effort to minimize their tax liabilities, both individuals and corporations have been known to manipulate their receipt of income. One example might be a parent who is taxed at a higher rate attempting to shift income to a child or a grandchild who is taxed at a lower rate. *See, e.g.*, *Harrison v. Schaffner*, 312 U.S. 579 (1941). Another example might be a corporation diverting its income directly to its shareholders. *See, e.g.*, *United States v. Joliet & C.R. Co.*, 315 U.S. 44, 45 (1942).

Businesses that operate through multiple entities spread across multiple countries can try to manipulate their receipt of income through additional means. Different countries impose taxes at different rates, and some countries don't impose taxes on certain types of income. *See, e.g.*, *Amazon.com, Inc. & Subs. v. Commissioner*, 148 T.C. 108, 120–21 (2017) (discussing tax considerations in the selection of a potential European headquarters location), *aff'd*, 934 F.3d 976 (9th Cir. 2019); *Bausch & Lomb, Inc. v. Commissioner*, T.C. Memo. 1996-57, 71 T.C.M. (CCH) 2031, 2035 (noting that Ireland "generally exempted from . . . tax income earned through export sales of goods manufactured in Ireland"). To take advantage of differing tax structures in different countries, a corporation might attempt to shift income to a lower tax jurisdiction so that it is taxed at a lower rate. *See, e.g.*, *Eaton Corp. & Subs. v. Commissioner*, 47 F.4th 434, 437 (6th Cir. 2022), *aff'g in part, rev'g in part* T.C. Memo. 2017-147.

A.    *The Power to Allocate Income*

Long ago, Congress vested the Commissioner with the power to allocate gross income between commonly controlled organizations. *See* I.R.C. § 482. That power has remained largely unchanged since the Internal Revenue Code of 1939, at which time section 45 of the 1939 Code provided:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Congress renumbered that provision as section 482 when enacting the Internal Revenue Code of 1954. And it kept that same numbering when it enacted the Internal Revenue Code of 1986. With the enactment of both the 1954 Code and the 1986 Code, Congress made minor changes to section 482. During the year at issue it provided:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

I.R.C. § 482. The only material change between the 1939 Code and the Code as in effect during the year at issue is the addition of the second sentence.

The Commissioner has used section 482 in a variety of ways to allocate items across controlled entities. For example, in *Kenco Restaurants, Inc. v. Commissioner*, 206 F.3d 588 (6th Cir. 2000), *aff'g* T.C. Memo. 1998-342, the Commissioner used section 482 to allocate management fees and administrative expenses across a group of commonly owned domestic companies to more clearly reflect the income of the controlled entities. In *Likins-Foster Honolulu Corp. v. Commissioner*, 840 F.2d 642, 647 (1988), *aff'g* T.C. Memo. 1985-572, the Commissioner used section 482 to allocate interest income to a parent company that had made an interest-free loan to its subsidiary, because "[s]uch a scheme does not reflect true taxable income." And in *Bausch & Lomb Inc. v. Commissioner*, 933 F.2d 1084 (2d Cir. 1991), *aff'g* 92 T.C. 525 (1989), the Commissioner used section 482 to adjust royalty rates paid by an Irish subsidiary for the use of its parent company's manufacturing technology and related intangibles to better reflect arm's-length consideration. As these varied examples illustrate, the

Commissioner can use section 482 in myriad ways to allocate income among commonly controlled entities.

### B.    *The Blocked Income Problem*

Commonly controlled entities don't necessarily have an unfettered ability to allocate income amongst themselves. On occasion, domestic or foreign laws may limit, or outright prohibit, the allocation of income between commonly controlled entities. For example, a foreign country might prohibit the payment of royalties from a subsidiary in that country to a parent located elsewhere. *See, e.g.*, *Procter & Gamble*, discussed *infra*. Or a domestic law might prohibit a regulated entity from receiving certain types of income. *See, e.g.*, *First Security Bank*, discussed *infra*. When a law prohibits an entity from receiving income, that income is sometimes referred to as blocked income.

Regulations in effect from 1934 through 1993 shed light on the Commissioner's interpretation of section 482 and its predecessor, section 45. Throughout that time, the relevant portion of the regulation remained unchanged in all material respects[1] and provided:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income or deductions, or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer.

---

[1] The opinion of the Court provides details regarding the various iterations over time of the relevant portion of the 1934 regulation, quoted here. The opinion of the Court characterizes those reiterations as "identical to," *see* op. Ct. p. 83, "identical to," *see* op. Ct. p. 86, "substantively identical to," *see* op. Ct. p. 87, "identical to . . . except for a difference in prefixes," *see* op. Ct. p. 89, "virtually identical to," *see* op. Ct. p. 114, "not substantively different from," *see* op. Ct. p. 123–24, and having "left in place," *see* op. Ct. p. 129, the preceding iterations. We will not repeat each iteration here.

Art. 45-1(b), Regulations 86, Regulations 86 Relating to the Income Tax Under the Revenue Act of 1934, at 123 (Gov't Prtg. Off. 1935). This regulation acknowledges that, for the Commissioner to allocate income to a taxpayer, that taxpayer must have "complete power" over that income.

C.    *Taxing and Allocating Blocked Income*

Section 482 is silent as to blocked income, and the regulations in effect from 1934 through 1993 did not explicitly purport to tax blocked income.[2] But the Commissioner repeatedly attempted to use section 482 (and its predecessor, section 45) in an effort to tax blocked income.

The first such case we have identified was *L.E. Shunk Latex Products*, 18 T.C. 940, in which the Tax Court held that the Commissioner could not allocate, and thereby tax, blocked income. In *L.E. Shunk Latex*, three commonly controlled entities were involved in the manufacture and sale of latex products. Two corporations, L.E. Shunk Latex Products, Inc. (Shunk), and Killian Manufacturing Co. (Killian), manufactured the products and sold them to a partnership, Killashun Sales Division (Killashun), which resold them. *Id.* at 941. As the U.S. involvement in World War II began, Killashun increased its prices. *Id.* at 950. In 1942, after Killashun had increased its prices but before Shunk or Killian had done so, the United States enacted wartime price controls. *Id.* The result was that Shunk and Killian were selling products to Killashun at pre-war prices while Killashun was reselling those products at inflated wartime prices. The Commissioner sought to allocate some of Killashun's profits to Shunk and Killian. *Id.* at 952.

The Tax Court opined that the Commissioner could not make such an allocation. Had the Commissioner sought to allocate income from the period before the price controls had taken effect, our Court hypothesized that "we would be constrained to regard [the] action . . . as warranted." *Id.* at 957. But this Court used that counterfactual example to highlight why the Commissioner could not allocate the income as he chose. We noted "the uncontroverted effect of those [price control]

---

[2] During a portion of this time, the Treasury regulations included a provision addressing blocked income. *See, e.g.*, Treas. Reg. § 1.482-1(d)(6) (promulgated by T.D. 6952, 1968-1 C.B. 218, 222) (allowing treatment of blocked income as deferrable income). Both this Court and the Sixth Circuit held that this regulation did not authorize the taxing of blocked income, with the Sixth Circuit further stating that the regulation applied only "where a temporary restriction under foreign law prevents payments." *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1260.

regulations in prohibiting petitioners from receiving the very income sought to be attributed to them." *Id.* at 961. In allocating Killashun's income to Shunk and Killian, the Commissioner exceeded his authority because "the Commissioner had no authority to attribute to petitioners income which they could not have received." *Id.* Nowhere in our opinion did we rely on, or even mention, the "complete power" passage in the regulations under (then) section 45.

The only case we have identified in which the Commissioner was permitted to allocate blocked income to a taxpayer is *Local Finance Corp. v. Commissioner*, 407 F.2d 629 (7th Cir. 1969), *aff'g* 48 T.C. 773 (1967). In that case, the Commissioner successfully allocated commissions from the sales of insurance policies to a finance company notwithstanding a state law prohibiting that finance company from receiving such commissions. Relying principally on federal supremacy principles, the U.S. Court of Appeals for the Seventh Circuit held that "the Commissioner is not precluded from making his allocation, since the criteria of what constitutes income under section 61 and the appropriateness of an allocation under section 482 are matters of federal law." *Id.* at 633. But subsequent developments demonstrate that this case was an aberration.

### D. *The Supreme Court on Blocked Income*

In *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, the Supreme Court considered facts remarkably similar to those presented in *Local Finance. First Security Bank* involved a situation where banks referred their customers for the purchase of insurance policies. Those policies were underwritten by an independent insurer and then reinsured with Security Life. Security Life and the banks were commonly controlled by a holding company. *Id.* at 398. Although the banks offered the insurance policies to their customers, they did not receive commissions because they had been advised that they were prohibited (blocked) by law from receiving income from their customers' purchases of such insurance. *Id.* at 397. Because insurance companies were taxed at a lower rate than banks, not paying commissions to the banks lowered the overall tax liability of the commonly controlled companies.

In *First Security Bank*, the Supreme Court considered the application of section 482 to the blocked income, and it explicitly rejected the conclusion reached in *Local Finance*. The Court began its analysis by looking to the definition of income, without regard to section 482:

We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving. In cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it. The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it.

*Id.* at 403. Only after defining income did the Court look to the complete power regulation as then in effect and only as reinforcement of its own conclusion.

One of the Commissioner's regulations for the implementation of § 482 expressly recognizes the concept that income implies dominion or control of the taxpayer . . . . This regulation is consistent with the control concept heretofore approved by this Court, although in a different context.

*Id.* at 404. The Court did not rely on that regulation, but merely cited it for the proposition that even the Commissioner recognized that blocked income could not be taxed. Indeed, the Court was clear that it was interpreting the statute, not the regulations, writing:

Apart from the inequity of attributing to the Banks taxable income that they have not received and may not lawfully receive, neither the statute nor our prior decisions require such a result.

*Id.* at 405. Ultimately, the Court concluded that the "income received by Security Life *could not* be attributable to the Banks." *Id.* at 407 (emphasis added). For good measure, the Court noted that "*Local Finance Corp.* was erroneously decided and that the earlier views of the Tax Court [in *L.E. Shunk Latex*] were correct." *Id.* at 406 n.22.

The Supreme Court has explained on at least two occasions the import of its holding in *First Security Bank*. In *United States v. Basye*, 410 U.S. 441 (1973), the Court explicitly described its holding in *First Security Bank* as describing what the Commissioner is not permitted to do. "We held there that the Commissioner *could not* properly allocate income to one of a controlled group of corporations under 26 U. S. C. § 482 where that corporation could not have received that income as a matter of law." *Id.* at 453 n.13 (emphasis added). And in *Commissioner*

*v. Banks*, 543 U.S. 426, 434 (2005), the Court cited *First Security Bank* for the proposition that "attribution of income is resolved by asking whether a taxpayer exercises complete dominion over the income in question."

E.    *Interpreting* First Security Bank

In the years since the Supreme Court decided *First Security Bank*, cases involving many variations of blocked income have arisen. Although *First Security Bank* involved a federal law that blocked income, the later cases also dealt with state and foreign laws that blocked income. Although *First Security Bank* involved a law that prohibited the taxpayer from receiving income, subsequent cases also dealt with laws that prohibited the controlled entity from making payments to the taxpayer. And at least one of these cases involved a situation in which a taxpayer could have taken steps to structure its business in such a way that the blocking statute did not apply. Notwithstanding these variations, in each case the deciding court found that *First Security Bank* prohibited the Commissioner from allocating and taxing blocked income.

1.    Salyersville National Bank

In *Salyersville National Bank v. United States*, 613 F.2d 650 (6th Cir. 1980), the Sixth Circuit faced a set of facts very similar to those in *First Security Bank* and *Local Finance*. Like those cases, *Salyersville National Bank* involved a bank that was prohibited by state law from receiving commissions from the sales of insurance. To facilitate the purchase of insurance, the bank would refer its clients to the bank's president, who was licensed to sell insurance. *Salyersville Nat'l Bank*, 613 F.2d at 650–51. The bank president would sell the insurance and receive the commissions. *Id.* The Commissioner attempted to use his power under section 482 to allocate the commission income from the bank president (a shareholder of the bank) to the bank under section 482. The court found that *First Security Bank* prohibited such an allocation, describing the Supreme Court as having "held that income *could not be reallocated* to a taxpayer who did not receive the income and who could not lawfully have received it." *Id.* at 655 (emphasis added).[3]

_____

[3] One additional observation about *Salyersville National Bank* is noteworthy. The bank involved in that case could have received commissions if it took steps to

2. Procter & Gamble

In *Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255, the Sixth Circuit held that section 482 could not be used to allocate income to a taxpayer when the controlled entity was prohibited by foreign law from making payments to the taxpayer. Procter & Gamble organized a Spanish entity to manufacture and sell products in Spain. *Id.* at 1256. The Spanish entity relied on the intellectual property of other Procter & Gamble affiliates. *Id.* at 1256–57. Various Spanish decrees limited the ability of the Spanish entities to make royalty payments to their foreign owners. *Id.* at 1257. These decrees varied depending on the extent of foreign ownership; and although there was a procedure to seek a waiver, Procter & Gamble did not avail itself of that procedure. *Id.* As a result, Procter & Gamble's Spanish entity was prohibited from making royalty payments to other Procter & Gamble affiliates. *Id.* The Commissioner attempted to use section 482 to allocate income from the Spanish entity to another Procter & Gamble entity. *Id.* at 1257–58. Because the Spanish entity was able to use Procter & Gamble's intellectual property without paying a royalty, the Commissioner based this allocation on a hypothetical royalty that the Commissioner argued should have been paid by the Spanish entity. *Id.*

Both this Court and the Sixth Circuit rejected the Commissioner's arguments. In doing so, both this Court and the Sixth Circuit described section 482, and not any regulations thereunder, as prohibiting the Commissioner's proposed allocation.

The Tax Court determined that section 482 does not apply to blocked income. Citing both *First Security Bank* and *Salyersville National Bank*, we wrote: "As we understand these cases, *section 482 simply does not apply* where restrictions imposed by law, and not the actions of the controlling interest, serve to distort income among the controlled group." *Procter & Gamble*, 95 T.C. at 336 (emphasis added). We further explained that, when it is a law that blocks income, the taxpayer is not using its control over its subsidiaries to manipulate or shift income among them. *Id.* at 338. As he does in this case, the Commissioner directed the Court in *Procter & Gamble* to his then-extant regulations. But we expressly stated that, "[b]y virtue of our holding that

---

qualify as an insurance agent. The Commissioner argued that the bank had a duty to do so. The court rejected this argument, because "the fact that taxpayer may have had the power to enable it to receive the income legally does not require that it exercise that power." *Salyersville Nat'l Bank*, 613 F.2d at 655.

section 482 does not apply, the regulations under section 482 likewise do not apply." *Id.* at 341.

Dissatisfied, the Commissioner sought reconsideration. The result, common when reconsideration is sought, was a more emphatic statement of our interpretation of *First Security Bank*.

> Stated another way, in *Commissioner v. First Security Bank of Utah*, *supra*, the Supreme Court interpreted section 482 so that an allocation *cannot be made* when the taxpayer's receipt of the allocated income is prohibited by law.

*Procter & Gamble Co. v. Commissioner*, T.C. Memo. 1990-638, 60 T.C.M. (CCH) 1463, 1466 (emphasis added).

The Sixth Circuit agreed. It described the Supreme Court as having "held in *First Security* that the Commissioner is authorized to allocate income under section 482 only where a controlling interest has complete power to shift income among its subsidiaries and has exercised that power." *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1259. It cited the then-extant regulations, not as support for this proposition, but as merely recognizing this limit on the Commissioner's authority to make an allocation. *Id.* at 1258.

### 3. Exxon/Texaco

In *Texaco*,[4] the Tax Court and the Fifth Circuit were asked to apply section 482 to income distortions caused by foreign price controls. Saudi Arabia sold crude oil at a price that was below market rates, but it required that the purchasers likewise resell it at below-market rates. *Texaco, Inc. v. Commissioner*, 98 F.3d at 827. These price restrictions, however, applied only to crude oil and not to products refined from that oil. *Id.* Under this set of rules, Exxon and Texaco affiliates would purchase Saudi crude oil and then sell it to their affiliates at below-market rates. Those entities, in turn, would refine the oil and sell the refined products at market rates. Because the refining affiliates purchased crude at below-market rates but sold their refined products at market rates, the profits of the refining affiliates were inflated. *Id.*

---

[4] For purposes of deciding the section 482 issue, cases involving Texaco and Exxon were consolidated before the Tax Court.

The Commissioner sought to use section 482 to allocate income from the refining affiliates to the crude oil resellers.

Both this Court and the Fifth Circuit rejected the Commissioner's arguments. In doing so, both this Court and the Fifth Circuit described section 482, as interpreted by *First Security Bank*, as prohibiting the Commissioner's proposed allocation.

In deciding whether the Commissioner could use section 482 to allocate blocked income, the Tax Court looked to the cases that had already addressed blocked income and found that the Commissioner had no such authority. We described *First Security Bank* as standing for the proposition that the Commissioner lacked the authority to reallocate blocked income.

> The Supreme Court affirmed the Court of Appeals on the ground that, since the banks could not legally receive the commissions under Federal law, the Commissioner could not reallocate them to the banks.

*Exxon Corp.*, 66 T.C.M. (CCH) at 1735. We understood that the Supreme Court reached this conclusion without relying on the regulations under section 482. We noted that the Supreme Court "*observed* that one of the Commissioner's regulations under section 482 *also recognized* the concept that 'income implies dominion or control'" and went on to quote the regulation. *Id.* (emphasis added).

We rightly observed in *Exxon* that the prohibition on allocating blocked income relates to the very concept of income. We described our holding in *Procter & Gamble* as being "premised upon the important domestic tax concept, as espoused by the Supreme Court in *First Security*, that a section 482 allocation cannot be made when receipt of the income at issue is prohibited by law." *Id.* at 1736. And quoting *First Security Bank*, we explicitly characterized this as relating to the very definition of income.

> [A] taxpayer who is legally prohibited from receiving income and who does not in fact receive such income, cannot be said to have "earned" the income under a section 61 analysis.

*Id.* at 1739.

The Fifth Circuit likewise agreed that *First Security Bank* stands for the proposition that "§ 482 did not authorize the Commissioner to allocate income to a party prohibited by law from receiving it." *Texaco, Inc. v. Commissioner*, 98 F.3d at 828. Like other courts before it, the Fifth Circuit did not rely on the complete power regulation but instead described it as merely explaining the purpose of section 482. *Id*. at 829. And like the courts before it, the Fifth Circuit concluded that "where, as here, the taxpayer lacks the power to control the allocation of the profits, reallocation under § 482 is inappropriate." *Id*. at 830.

### 4. Tower Loan

The last case in our chronology adds a small but emphatic point to this discussion. In *Tower Loan of Mississippi, Inc. v. Commissioner*, T.C. Memo. 1996-152, 71 T.C.M. (CCH) 2581, we were again asked by the Commissioner to allocate commissions on the sale of insurance to a financial institution that was prohibited from receiving those commissions. In denying the Commissioner's proposed allocation, we described *First Security Bank* in clear and concise terms.

> We understand the Supreme Court's opinion to forbid allocation of income to a taxpayer when restrictions imposed by law prohibit the taxpayer from receiving such income.

*Id*. at 2583.

### II. *The 1994 Blocked Income Regulation*

Faced with a string of losses spanning *L.E. Shunk Latex* in 1952 to the Sixth Circuit's opinion in *Procter & Gamble* in 1992, the Department of the Treasury promulgated regulations purporting to authorize the allocation, and thus taxation, of blocked income.[5] The final version of the blocked income portion of that regulation, which the Commissioner would have us apply in this case, provides:

> (2) Effect of foreign legal restrictions—(i) In general. The district director will take into account the effect of a foreign legal restriction to the extent that such restriction

---

[5] Section 7805(a) authorizes the Secretary of the Treasury to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."

affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2)(iii) and (iv) of this section (Deferred income method of accounting).

(ii) Applicable legal restrictions. Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii)(A) through (D) of this section are met.

(A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

(B) The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

(C) The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

(D) The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

Treas. Reg. § 1.482-1(h)(2)(i) and (ii).

Some of the conditions set forth in paragraph (h)(2)(ii)(A) through (D) were present in the cases discussed above. The Spanish decree at issue in *Procter & Gamble* applied differently depending on the extent of control and thus did not apply similarly to both controlled and uncontrolled taxpayers. Also, Procter & Gamble did not exhaust all remedies in seeking a waiver. Likewise, the bank in *Salyersville National Bank* could have taken steps to qualify as an insurance agent and thereby lift the restriction blocking its receipt of income.

### A. *The Test for Validity*

The path to analyze the validity of a regulation is well trod. We begin with the statute and ask whether there is a gap to fill. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.* (*Chevron*), 467 U.S. 837, 842–43 (1984).[6] But if Congress has left a gap to fill, then we look to see whether the regulation is a permissible construction of the statute. *Id.* at 843. As a court, we give deference to the agency; "the court does not simply impose its own construction on the statute." *Id.*

---

[6] Some have questioned the continuing viability of *Chevron. See* Nicholas R. Bednar & Kristin E. Hickman, *Chevron's Inevitability*, 85 Geo. Wash. L. Rev. 1392, 1408 (2017) ("Since 2000, several Supreme Court opinions have seemed to weaken *Chevron* in both substance and scope."); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109–11 (2015) (Scalia, J., concurring) (explaining that *Chevron* "developed an elaborate law of deference to [agency] interpretations" "[h]eedless of the original design of the [Administrative Procedure Act]" and suggesting that it may cause persistent problems if not "uprooted"). We need not confront *Chevron's* viability; it was well settled long before *Chevron* was decided that a regulation that exceeds the power of its governing statute is invalid. *See, e.g., Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134 (1936) ("A regulation which . . . operates to create a rule out of harmony with the statute, is a mere nullity.").

But what if the agency promulgates a regulation that is contrary to existing caselaw? The Supreme Court answered this question in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). Relying on the framework set forth in *Chevron*, the Court held that a "prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982.[7] Under *Brand X* and predicated on *Chevron*, we look to prior cases interpreting a statute to determine whether those cases held that the statute was unambiguous.[8]

A problem arises, however, when trying to apply this standard to pre-*Chevron* cases. The problem was clearly described by Justice Scalia:

> In cases decided pre-*Brand X*, the Court had no inkling that it *must* utter the magic words "ambiguous" or "unambiguous" in order to (poof!) expand or abridge executive power, and (poof!) enable or disable administrative contradiction of the Supreme Court. Indeed, the Court was unaware of even the utility (much less the necessity) of making the ambiguous/nonambiguous determination in cases decided pre-*Chevron*, before that opinion made the so-called "Step 1" determination of ambiguity *vel non* a customary (though hardly mandatory) part of judicial-review analysis. For many of those earlier cases, therefore, it will be incredibly difficult to determine whether the decision purported to be giving meaning to an ambiguous, or rather an unambiguous, statute.

*United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 493–94 (2012) (Scalia, J., concurring) (footnote omitted).

*Home Concrete* presented just such a problem. Section 6501(a) generally provides the Commissioner with a three-year period within

---

[7] Justice Stevens, in concurrence, contrasted a prior judicial construction by a court of appeals and one by the Supreme Court, noting that the latter "would presumably remove any pre-existing ambiguity." *Brand X*, 545 U.S. at 1003 (Stevens, J., concurring).

[8] As with *Chevron*, some have questioned the continuing viability of *Brand X*. *See, e.g.*, *Baldwin v. United States*, 140 S. Ct. 690, 691, (2020) (Thomas, J., dissenting from denial of certiorari) ("*Brand X* appears to be inconsistent with the Constitution, the Administrative Procedure Act (APA), and traditional tools of statutory interpretation."). As with *Chevron*, we need not confront the viability of *Brand X*.

which to assess tax. The Code extends that period to six years, however, if the taxpayer omits gross income over a certain threshold. I.R.C. § 6501(e). In 2010, the Department of the Treasury promulgated a regulation that defined an omission as including a situation in which a taxpayer reported an overstated basis resulting in an understatement of income. Treas. Reg. § 301.6501(e)-1. In deciding the validity of this regulation, the Supreme Court looked to a pre-*Chevron* case to see whether that case had left a gap for the agency to fill.

The case on which *Home Concrete* relied expressly held that the statute it was interpreting was ambiguous. In *Colony, Inc. v. Commissioner*, 357 U.S. 28, 30 (1958), the taxpayer overstated its basis in assets it sold, thereby understating its gross profit. Although it had reported its gross receipts, the Commissioner sought to apply a special, longer limitations period that applies when a taxpayer omits gross income. *Id.* at 29–31. The taxpayer argued that, by virtue of having reported its gross receipts, it did not "omit" income, even if income (having been reduced by the overstated basis) was understated. *Id.* at 33. Before embarking on a review of legislative history, the Supreme Court in *Colony* expressly stated: "[I]t cannot be said that the language is unambiguous." *Id.* The Supreme Court ultimately held that when an item is disclosed on the face of a return, as in the case of an overstated basis, it is not omitted. *Id.* at 36

Notwithstanding the express statement in *Colony* that the operative text of the statute it was interpreting was ambiguous, the Supreme Court in *Home Concrete* held that "*Colony* determines the outcome in this case." *Home Concrete*, 566 U.S. at 483. The Court considered the Department of the Treasury's new regulation redefining an omission to include an overstatement of basis. *Id.* at 486. But the Court held that "*Colony* has already interpreted the statute, and there is no longer any different construction that is consistent with *Colony* and available for adoption by the agency."[9] *Id.* at 487.

B.    *Applying Brand X and Home Concrete*

The Supreme Court, in deciding *First Security Bank*, foreclosed the allocation, and thus the taxation, of blocked income. Without using

---

[9] The opinion of the Court also cites *Home Concrete*, writing: "According to *Home Concrete*, the opinion in *Colony* had held that Congress 'had directly spoken to the precise question at issue' and therefore 'left no gap for the agency to fill.'" *See* op. Ct. p. 249. But that passage and others cited in the opinion of the Court are found in Part IV-C of *Home Concrete*, which was not joined by a majority of the Court.

the word "unambiguous," the Court made clear that blocked income is not, and cannot be, allocated to someone who did not and cannot receive it. It said so directly: "[I]ncome received by Security Life *could not* be attributable to the Banks." *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. at 407 (emphasis added). And it reiterated that holding in a subsequent case: "[T]he Commissioner *could not* properly allocate income to one of a controlled group of corporations under 26 U. S. C. § 482 where that corporation could not have received that income as a matter of law." *Basye*, 410 U.S. at 453 n.13.

Every court to have considered *First Security Bank* in the context of blocked income has understood it as describing a limit on the Commissioner's power to allocate income. The Sixth Circuit understood it: "[T]he Commissioner is authorized to allocate income under section 482 only where a controlling interest has complete power to shift income among its subsidiaries and has exercised that power." *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1259. The Fifth Circuit understood it: "§ 482 did not authorize the Commissioner to allocate income to a party prohibited by law from receiving it." *Texaco, Inc. v. Commissioner*, 98 F.3d at 828. And until today, we understood it: "We understand the Supreme Court's opinion to forbid allocation of income to a taxpayer when restrictions imposed by law prohibit the taxpayer from receiving such income." *Tower Loan*, 71 T.C.M. (CCH) at 2583. The opinion of the Court runs counter to these repeated unambiguous statements interpreting sections 61 and 482 as interpreted and applied by the Supreme Court in *First Security Bank*.

The opinion of the Court and the concurring opinions all observe that a new sentence was added to section 482 in 1986. *See* op. Ct. pp. 244–49; Kerrigan concurring op. pp. 277–78; Copeland op. concurring in the result p. 281. During the year at issue, that sentence provided: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Although the opinion of the Court notes the passage of this amendment, it does not explain how this sentence addresses blocked income.

Nothing in this sentence addresses blocked income. It addresses the transfer or license of intangible property, which may be wholly unrelated to blocked income. Likewise, blocked income may be wholly unrelated to the transfer or license of intangible property. Thus, for example, the 1986 amendment does not address blocked income from

price controls as occurred in *Texaco*, or the regulation of an industry as occurred in *First Security Bank*.

When amending a statute, Congress is presumptively aware of existing judicial interpretations of that statute. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018). And when it uses materially the same wording, Congress indicates an intent to incorporate existing judicial interpretations. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). In *First Security Bank*, and as further explained in *Basye*, the Supreme Court held that blocked income cannot be allocated to someone who has not received it and is legally barred from receiving it. As noted in Judge Pugh's dissenting opinion, this goes to the very definition of income under section 61. Nothing about the sentence added to section 482 indicates that Congress intended to change the longstanding precedent that blocked income cannot be allocated and taxed.

C.    *Plain Meaning*

If the Supreme Court had not already answered the question before us, a court would need to turn to the plain meaning of "income" to determine whether a taxpayer could be taxed on income that it did not receive and that it was prohibited from receiving. Because I would find *First Security Bank* controlling, I need not answer that question. But because the opinion of the Court does not find *First Security Bank* controlling, it must wrestle with interpreting the operative statute.

After purporting to identify the precise question at issue and reciting the first sentence of section 482, the opinion of the Court concludes in cursory fashion: "We do not see [in the first sentence of section 482] an unambiguous expression of Congress's intent on how to account for legal restrictions that prevent the receipt of income." *See* op. Ct. p. 251. *Chevron* instructs that "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9. We cannot deem a statute ambiguous until we exhaust these tools. *See, e.g.*, *Castañeda v. Souza*, 810 F.3d 15, 30 (1st Cir. 2015). Rather than open the toolbox, the opinion of the Court summarily concludes that the statute is ambiguous and defers to the Department of the Treasury. This is not sufficient. *See Pereira v. Sessions*, 138 S. Ct. 2105, 2120–21 (2018) (Kennedy, J., concurring) (suggesting that such cursory analysis constitutes an

abdication of the judiciary's proper role in interpreting federal statutes and noting that this type of reflexive deference is "troubling").

The appeal to legislative history offered by Judge Copeland in concurring in the result is likewise unavailing. Judge Copeland argues that a "Committee report also supports an inference to what a plain reading of the new statutory language indicates—namely, that the new commensurate-with-income standard cannot be implemented consistently with a strict adherence to the *First Security Bank* holding." *See* Copeland op. concurring in the result pp. 284–85. The legislative history cannot bear the weight of this inference. When a plain reading of the statute is sufficient, we need not look to legislative history. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) ("If the text is clear, it needs no repetition in the legislative history . . . ."). And we do not look to legislative history to find ambiguity where none exists. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("Even [members of the Supreme Court] who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.'" (quoting *Milner v. Dept. of Navy*, 562 U.S. 562, 572 (2011))). Even if ambiguity existed, looking to legislative history is fraught. *Piper v. Chris-Craft Indus.*, 430 U.S. 1, 26 (1977) ("Reliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously."). But insofar as blocked income is concerned, and as discussed in Judge Toro's dissent, the legislative history is silent. *See* Toro dissenting op. p. 338.

III.  *Conclusion*

3M had a blocked income problem in that its Brazilian subsidiary was compelled by foreign law to pay below-market royalty rates. The Commissioner sought to apply section 482 to allocate blocked income to 3M. In *First Security Bank*, the Supreme Court held that section 482 cannot be used to allocate blocked income to someone who did not receive it and could not receive it. Congress has not amended section 482 in any way that would materially alter the Supreme Court's holding in *First Security Bank*. To the extent the Department of the Treasury promulgated regulations that are inconsistent with limits on section 482, as described by the Supreme Court in *First Security Bank*, I would hold those regulations to be invalid.

URDA, JONES, TORO, and GREAVES, *JJ*., agree with this dissent.

PUGH, *J.*, dissenting: The opinion of the Court upholds Treasury Regulation § 1.482-1(h)(2) (1994), addressing the effect of foreign legal restrictions ("blocked income"), that itself is blocked by Supreme Court and Tax Court precedent. For this simple reason I respectfully dissent.

In *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 407 (1972), the Supreme Court construed "income" under section 482 when it held that "the premium income received by Security Life could not be attributable to the Banks."[1] That is how we viewed *First Security Bank* in *Procter & Gamble Co. v. Commissioner*, 95 T.C. 323, 336 (1990) (holding that *First Security Bank* was controlling and therefore "section 482 simply does not apply" to reallocate income that a Spanish subsidiary could not pay under Spanish law), *aff'd*, 961 F.2d 1255 (6th Cir. 1992).

The 1986 amendment to section 482 did not modify the meaning of "income" in that section, so it could not open the door to the Treasury Department to issue a regulation that contravenes *First Security Bank* and *Procter & Gamble*. "It would be difficult, perhaps impossible, to give the same [statutory] language here a different interpretation without effectively overruling [a prior case interpreting identical operative language], a course of action that basic principles of *stare decisis* wisely counsel us not to take." *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 483 (2012) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008)). "[S]*tare decisis* in respect to statutory interpretation has 'special force,' for 'Congress remains free to alter what we have done.'" *John R. Sand & Gravel Co.*, 552 U.S. at 139 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73 (1989)).

FOLEY, BUCH, URDA, and TORO, *JJ.*, agree with this dissent.

---

[1] Rather than relying upon the "complete power" regulation, the Supreme Court noted that the regulation "recognize[d]" and was "consistent with" the concept that "in order to be taxed for income, a taxpayer must have complete dominion over it." *Commissioner v. First Security Bank*, 405 U.S. at 403–04.

TORO, *J.*, dissenting: This case requires the Court to consider whether the U.S. Department of the Treasury and the Internal Revenue Service[1] complied with procedural requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706, in promulgating Treasury Regulation § 1.482-1(h)(2) (2006). The answer to this question is relevant because "deference [under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984),] is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (first quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); and then citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174–76 (2007)).

Three subsidiary questions inform this analysis. First, is Treasury subject to the same APA procedural rules as other agencies? Second, do those rules require Treasury to explain its reasoning and respond to significant comments when adopting regulations? And, third, did Treasury comply with these requirements in promulgating Treasury Regulation § 1.482-1(h)(2)?

The answers to these questions are plain and require a decision for 3M.

First, the Supreme Court made clear in *Mayo Foundation for Medical Education & Research v. United States*, 562 U.S. 44, 55 (2011), that it was "not inclined to carve out an approach to administrative review good for tax law only." Rather, the Court emphasized that it had "expressly '[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action.'" *Id.* (quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)); *see also* 5 U.S.C. § 701(b)(1). Thus, Treasury is subject to the same APA procedural rules as other agencies. *See, e.g.*, *Oakbrook Land Holdings, LLC v. Commissioner*, 28 F.4th 700 (6th Cir. 2022) (analyzing the procedural validity of a Treasury regulation under the APA), *aff'g* 154 T.C. 180 (2020); *Hewitt v. Commissioner*, 21 F.4th 1336 (11th Cir. 2021) (same), *rev'g and remanding* T.C. Memo. 2020-89; *see also Altera Corp. & Subs. v. Commissioner*, 145 T.C. 91, 119 (2015) (citing *Mayo Foundation*, 562 U.S. at 55), *rev'd on other grounds*, 926 F.3d 1061 (9th Cir. 2019).

---

[1] For convenience, I refer to the Treasury Department and the IRS as "Treasury."

Second, Supreme Court precedent, uniform court of appeals authorities, and hornbook administrative law have long recognized that an agency must both explain its reasoning and respond to significant comments submitted in response to its proposed rulemaking. *See, e.g.*, *Encino Motorcars, LLC*, 579 U.S. at 221 ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 48 (1983) ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . ."); *see also, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment." (first citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); and then citing *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984))); Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 5.4 (6th ed. 2019) ("To have any reasonable prospect of obtaining judicial affirmance of a major rule, an agency must set forth the basis and purpose of the rule in a detailed statement . . . in which the agency . . . explains its method of reasoning from factual predicates to the expected effects of the rule, relates the factual predicates and expected effects of the rule to each of the statutory goals or purposes the agency is required to further or consider, responds to all major criticisms contained in the comments on its proposed rule, and explains why it has rejected at least some of the most plausible alternatives to the rule it has adopted."); James T. O'Reilly, *Administrative Rulemaking* § 8:5 (2022) ("The APA creates a duty upon the agency to give reasoned responses to all significant comments in a rulemaking proceeding.").

Third, the record here leaves no doubt that Treasury failed to comply with these requirements. In promulgating Treasury Regulation § 1.482-1(h)(2) (and the entire regulation package of which it was a part), Treasury repeatedly expressed the view that it did not have to follow the APA's notice and comment procedures. *See* Intercompany Transfer Pricing and Cost Sharing Regulations Under Section 482, 57 Fed. Reg. 3571, 3578 (proposed Jan. 30, 1992) ("It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) and the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply to these regulations, and, therefore, an initial Regulatory Flexibility Analysis is not required."); T.D. 8470, 58 Fed. Reg. 5263, 5271, 1993-1 C.B. 90, 98 (Jan. 21, 1993) (same); T.D. 8552, 59 Fed. Reg. 34,971, 34,988, 1994-2 C.B. 93, 112 (July 8, 1994) (same). Consistent with this view, Treasury provided no explanation of why the existing

rule on foreign legal restrictions (or, more colloquially, blocked income) needed to be changed, failed to even mention that its new position was contrary to judicial opinions on point, failed to explain how its new rule was consistent with the text of the statute or related to the factors set out in the statute, and neither acknowledged nor responded to significant comments challenging Treasury's authority to promulgate the regulation and pointing out flaws in its proposed approach. These failings resulted in an arbitrary and capricious action that cannot be sustained. In view of this conclusion, Treasury Regulation § 1.482-1(h)(2) can receive no deference. *Encino Motorcars, LLC*, 579 U.S. at 221. Absent a regulation supporting the Commissioner's determination, our decision in *Procter & Gamble Co. v. Commissioner*, 95 T.C. 323 (1990), *aff'd*, 961 F.2d 1255 (6th Cir. 1992), requires that we hold for 3M. Because the opinion of the Court[2] reaches a contrary conclusion, I respectfully dissent.

I. *The Opinion of the Court Analyzes the APA's Procedural Requirements Incorrectly.*

The opinion of the Court, which spans 274 pages, spends little time on the APA's procedural requirements. Its analysis of 3M's APA procedural challenge to Treasury Regulation § 1.482-1(h)(2) takes a mere eight pages. And in each step of that analysis, the opinion of the Court draws the wrong conclusions.

A. *Treasury Failed to Provide Adequate Reasons for Its Action.*

The opinion of the Court first considers 3M's argument that Treasury did not provide a satisfactory explanation for its action. The opinion rejects the argument, concluding that "the regulation is not invalid for want of explanation." *See* op. Ct. p. 267. That conclusion runs counter to more than four decades of administrative law.

As the Supreme Court has explained,

Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for so-called "notice-and-comment rulemaking."[3] First, the agency must issue a "[g]eneral

---

[2] Following the Court's tradition, I refer to the opinion by Judge Morrison, which received 7 votes (out of 17) from active judges, as the opinion of the Court.

[3] Contrary to the position Treasury claimed in the rulemaking process, the Commissioner (correctly) does not dispute that the rulemaking here was subject to

notice of proposed rule making," ordinarily by publication in the Federal Register. § 553(b). Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c). An agency must consider and respond to significant comments received during the period for public comment. See *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Thompson v. Clark*, 741 F.2d 401, 408 (CADC 1984). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." § 553(c).

*Mortg. Bankers Ass'n*, 575 U.S. at 96; *see also id.* at 109 (Scalia, J., concurring in the judgment) ("Before an agency makes a rule, it normally must notify the public of the proposal, invite them to comment on its shortcomings, consider and respond to their arguments, and explain its final decision in a statement of the rule's basis and purpose. 5 U.S.C. § 553(b)–(c); *ante,* at 96."). Moreover, the APA grants authority to a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In exercising this authority, courts have interpreted the APA to require agencies to engage in reasoned decisionmaking. *Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998))). "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC*, 579 U.S. at 221. To comply with the APA, "[an] agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). And when the rules reflect a change in the agency's position, the agency should provide a reasoned explanation for the change. *Encino*

---

notice and comment under section 553(b) and (c) of the APA. *See Green Valley Invs., LLC v. Commissioner*, No. 17379-19, 159 T.C., slip op. at 7–8 (Nov. 9, 2022); *see also, e.g., Iowa League of Cities v. EPA*, 711 F.3d 844, 873–75 (8th Cir. 2013) (distinguishing between legislative rulemaking, which is subject to notice and comment, and interpretative rulemaking, which is not).

*Motorcars, LLC*, 579 U.S. at 221. The explanation need not always be more detailed than that which would suffice in the absence of a change, but it must "at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Although the scope of judicial review under the APA is "narrow," "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). That role includes "examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Id.* (citing *Fox Television Stations, Inc.*, 556 U.S. at 515 (noting "the requirement that an agency provide reasoned explanation for its action")).[4]

### 1. *The Record Is Utterly Silent on Treasury's Reasons for Adopting Treasury Regulation § 1.482-1(h)(2).*

When it adopted Treasury Regulation § 1.482-1(h)(2), Treasury offered no explanation for its choices with respect to the rule. Not a single sentence. Treasury did not explain why a revision to the existing rule was needed. Although it described how its new rule worked (essentially repeating the text of the regulation in the preamble), Treasury did not explain how the rule related to any particular statutory text or how it took into account and advanced the factors reflected in the statute.[5] It did not "display awareness that it [was] changing [its]

---

[4] The APA's requirements on this point "are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).

[5] At the time Treasury Regulation § 1.482-1(h)(2) was proposed and finalized, section 482 provided as follows:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

position" or attempt to show the "good reasons" behind its new policy. *Encino Motorcars, LLC*, 579 U.S. at 221. Under the relevant precedents, these simple observations should suffice to find in 3M's favor.

The opinion of the Court, however, contends that at least one or two of Treasury's reasons for adopting the rule can be inferred from the rule's text and "principles of section 482." *See* op. Ct. p. 266. Specifically, the opinion points to the first two sentences of Treasury Regulation § 1.482-1(h)(2)(i), which read as follows:

> The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time.

From these sentences, the opinion of the Court constructs a "reasonable explanation" for Treasury's action that is nowhere to be found in the record itself. These sentences, the opinion argues, demonstrate that "Treasury . . . satisfactorily explained that one of the reasons it promulgated [the regulation] was to advance the goal of arm's-length comparisons," *see* op. Ct. p. 266, and "the goal of tax parity," *id.* at 267.

But the two sentences on which the opinion of the Court relies do no such thing. They simply tell us what the district director will do under the new rule. Describing a rule is not the same as explaining its rationale, *cf. Gerber v. Norton*, 294 F.3d 173, 183 (D.C. Cir. 2002), and Treasury said nothing at all about its reasons for adopting Treasury Regulation § 1.482-1(h)(2). Nor did it provide "a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168). In the face of Treasury's utter silence, the opinion of the Court is constrained to speculate and construct a rationale on the agency's behalf.

---

As relevant here, therefore, one might surmise that the relevant statutory factors included the presence of or absence of common control and an attempt to evade taxes or a failure to clearly reflect income. In the case of an intangible transfer, the factors would also have included whether income from the transfer was commensurate with income attributable to the intangible.

2. *This Court Is Not Permitted to Make Up for Treasury's Omission.*

Judicial speculation of this kind is impermissible under longstanding principles of administrative law. *See, e.g.*, *State Farm*, 463 U.S. at 43 ("The reviewing court should not attempt itself to make up for [the agency's] deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given." (citing *SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947))). The Supreme Court has repeatedly emphasized that "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's decision." *Encino Motorcars*, *LLC*, 579 U.S. at 224; *see also State Farm*, 463 U.S. at 50 ("[T]he courts may not accept . . . *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (Citation omitted.)). The opinion of the Court offers no explanation for ignoring these principles. *See Michigan*, 576 U.S. at 758 (criticizing the dissent for adopting a "line of reasoning [that] contradicts the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action" (citing *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 87 (1943))).

Indeed, the opinion of the Court's efforts here constitute the type of "laborious examination of the record" apparently designed to "formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution" that courts have found to be inappropriate. *Home Box Office*, 567 F.2d at 36 (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)). They represent an implicit recognition that, with respect to Treasury Regulation § 1.482-1(h)(2), the record here does not in fact "enable us to see what major issues of policy were ventilated [during the rulemaking process] and why the agency reacted to them as it did." *Id.*; *see also Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (citing *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015)). And Treasury's "action must be measured by what [it] did, not by what it might have done." *Michigan*, 576 U.S. at 759 (quoting *Chenery I*, 318 U.S. at 93–94). Courts may overlook inartful explanations when the agency's path may be reasonably discerned, but they may not clear a path for the agency where none exists.

3. *Even if Accepted, the Reasons the Opinion of the Court Supplies for Treasury's Action Are Insufficient.*

Moreover, even if one were to (1) accept the opinion of the Court's position that at least some of Treasury's reasons for adopting the rule are self-evident, and (2) attribute the opinion's explanation to Treasury, that explanation still would not satisfy the APA's procedural requirements.

When an agency changes an existing policy, the APA requires that it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC*, 579 U.S. at 221 (quoting *Fox Television Stations, Inc.*, 556 U.S. at 515). As the opinion of the Court recognizes, Treasury Regulation § 1.482-1(h)(2) represented a departure from Treasury's previous approach to blocked income cases, which had been reflected in Treasury Regulation § 1.482-1(d)(6) (1968) (1968 Regulation).[6] The 1968 Regulation was a taxpayer-favorable rule that allowed taxpayers to use a deferred income method of accounting *if* the Commissioner made a section 482 adjustment with respect to an item blocked by a foreign legal restriction. Taxpayers generally could wait until after their returns had been selected for audit to elect the deferred income method. By contrast, Treasury Regulation § 1.482-1(h)(2) provides that the Commissioner will respect a foreign legal restriction only if the restriction meets specified criteria and "it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time." *Id.* subdivs. (i) and (ii). A taxpayer may still elect the deferred income method of accounting, but only if the foreign legal restriction satisfies the specified criteria and the taxpayer makes the election on a timely U.S. tax return or amended return filed *before* the IRS first contacts the taxpayer regarding an examination of that year. *Id.* subdivs. (iii) and (iv).

These changes were significant,[7] and Treasury owed the public and the courts an explanation for them. Neither Treasury's silence nor

---

[6] In 1993, the 1968 Regulation was redesignated Treasury Regulation § 1.482-1A(d)(6) and made applicable only for tax years beginning on or before April 21, 1993. *See* T.D. 8470, 58 Fed. Reg. 5263, 5271, 1993-1 C.B. at 99 (Jan. 21, 1993).

[7] The Commissioner argues that Treasury Regulation § 1.482-1(h)(2) "simply add[ed] clarity to Treasury's longstanding position," pointing to Treasury's litigation of blocked income cases and citing *Macon County Samaritan Memorial Hospital v.*

the opinion of the Court's proffered explanation "display[s] awareness" of the changes or "show[s] that there are good reasons" for the new approach.[8] *Encino Motorcars, LLC*, 579 U.S. at 221. And nothing in the regulatory history explains whether or why the prior approach had proved unsatisfactory. *See, e.g.*, *Fox Television Stations, Inc.*, 556 U.S. at 535 (Kennedy, J., concurring in part and concurring in the judgment);[9] *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the

---

*Shalala*, 7 F.3d 762, 765–66 (8th Cir. 1993). But the fact pattern present in *Macon County* is not comparable to the one present here. In that case, the controlling statute had recently been amended to provide, for the first time, a definition of the very term that the regulation interpreted. *Id.* at 764, 766. Accordingly, the reasons for amending the regulation were to some extent self-evident: There had been a statutory reset. As described in Part II below, the addition of the second sentence to section 482 is not analogous because it did not manifestly bear on the blocked income issue. Additionally, the U.S. Court of Appeals for the Eighth Circuit found that (1) the regulatory change was not really a change because the agency had previously issued informal guidance adopting the same position and (2) in any event, the agency had in fact "provide[d] a reasoned analysis" in "repeated, detailed explanations of the initial regulation and its subsequent amendments." *Id.* at 766. Neither circumstance is present here. *Cf. Gatewood v. Outlaw*, 560 F.3d 843, 847–48 (8th Cir. 2009) (upholding final rule implementing agency policy on procedural grounds where (1) the agency had "consistently sought to implement the same substantive policy" through various prior interim rules, Program Statements, and positions in litigation regarding the validity of those actions, and (2) the Supreme Court had discerned the reason for the policy and concluded that the rule was substantively reasonable).

[8] Treasury had at least three chances to explain its reasoning: (1) in the rulemaking redesignating the 1968 Regulations, *see* T.D. 8470, 58 Fed. Reg. 5263, 5271, 1993-1 C.B. at 96 (Jan. 21, 1993), (2) in the Notice of Proposed Rulemaking proposing the new approach, *see* Intercompany Transfer Pricing Regulations Under Section 482, 58 Fed. Reg. 5310, 5310–12, 1993-1 C.B. 825, 825–28 (proposed Jan. 21, 1993), and (3) when it finalized the rules after receiving comments that questioned the approach, *see* T.D. 8552, 59 Fed. Reg. 34,971, 34,981, 1994-2 C.B. at 104 (July 8, 1994). It availed itself of none of these opportunities.

[9] As Justice Kennedy observed in *Fox Television Stations*, he wrote separately "to underscore certain background principles for the conclusion that an agency's decision to change course may be arbitrary and capricious if the agency sets a new course that reverses an earlier determination but does not provide a reasoned explanation for doing so" and to agree with the "dissenting opinion of Justice Breyer [who wrote for four Justices] that the agency must explain why 'it now reject[s] the considerations that led it to adopt that initial policy.'" *Fox Television Stations, Inc.*, 556 U.S. at 535 (Kennedy, J., concurring in part and concurring in the judgment) (quoting *id.* at 550 (Breyer, J., dissenting)).

line from the tolerably terse to the intolerably mute." (Footnote omitted.)).

4. *A Carefully Reasoned Explanation for Treasury's Actions Was Particularly Important in Light of the Context of the Regulation and Adverse Judicial Precedent.*

Providing reasons for Treasury's proposed approach was particularly important here, where several prior judicial decisions, including a Supreme Court decision, had rejected the approach Treasury adopted. According to the opinion of the Court, "[Treasury] was . . . aware that the proposed regulation was inconsistent with the caselaw." *See* op. Ct. p. 268. Indeed, citing one of the commenters, the opinion seems to imply that the regulation was a direct response to Treasury's losses in the courts.[10] *See id.* Of course (as already discussed) the record itself says nothing about Treasury's awareness. But even if what the opinion of the Court assumes is true, then Treasury should have explained why it disagreed with the considered views expressed in the caselaw. Regardless of whether these cases precluded Treasury's actions as a matter of law, *see* Buch dissenting op. pp. 287–305, the opinion of the Court does not and cannot dispute that at a minimum the cases raised points that cast doubt on the wisdom of Treasury's proposed course. *See, e.g.*, *Commissioner v. First Sec. Bank of Utah, N.A.* (*First Security*), 405 U.S. 394, 405 (1972) ("We think that fairness requires the tax to fall on the party that actually receives the premiums rather than on the party that cannot."); *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1259 ("The purpose of section 482 is to prevent artificial shifting of income between related taxpayers. Because Spanish law prohibited royalty payments, P&G could not exercise the control that section 482 contemplates, and allocation under section 482 is inappropriate."); *see also United States v. Basye*, 410 U.S. 441, 453 n.13 (1973) (characterizing *First Security* as "involv[ing] a deflection of

---

[10] The regulatory timeline suggests that the opinion of the Court is likely correct in this regard. As described further in Part II below, Treasury began overhauling its transfer pricing regulations soon after Congress amended section 482 in 1986. It issued lengthy discussions of its proposed amendments in 1988, *see* I.R.S. Notice 88-123, 1988-2 C.B. 458, and in 1992, *see* Intercompany Transfer Pricing and Cost Sharing Regulations Under Section 482, 57 Fed. Reg. 3571. Neither set of proposals included Treasury Regulation § 1.482-1(h)(2) or said anything else about blocked income, however. The regulation was added to the broader package in 1993, *see* T.D. 8470, 58 Fed. Reg. 5263, 5263–5271, 1993-1 C.B. at 90–123 (Jan. 21, 1993), approximately nine months after the Commissioner lost his appeal on the blocked income issue in *Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255.

income imposed by law, not an assignment arrived at by the consensual agreement of two parties acting at arm's length"). Thus, even assuming Treasury had authority to act as it did, *but see* Buch dissenting op. pp. 287–305, it needed to explain its thinking before adopting a contrary rule.

To illustrate, the opinion of the Court argues that Treasury adopted Treasury Regulation § 1.482-1(h)(2) to advance the goals of arm's-length comparisons and tax parity. If we assume for the sake of argument that this is so, in the context of blocked income, these two goals are in tension with principles that had been highlighted by the Supreme Court, a court of appeals, and this Court. For example, the courts had asked whether it is fair to interpret section 482 so as to impose tax on an amount that a taxpayer is legally restricted from receiving, *see, e.g.*, *First Security*, 405 U.S. at 405, and whether, given the focus of section 482 on controlled taxpayers, it is reasonable for the Commissioner to reallocate income where the controlled taxpayers themselves could not, *see, e.g.*, *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1259. The cases answered no on both counts. And saying that a rule advances the arm's-length principle or tax parity does nothing to explain how those goals should be weighed against the statutory factors identified by the courts and the fairness concerns they embody. In light of these considerations, which the opinion of the Court argues Treasury was well aware of, and which multiple commenters brought to its attention, *see* Part I.B.2 below, Treasury's failure to "give . . . reasons for its decisions," *see Encino Motorcars, LLC*, 579 U.S. at 221, cannot be overlooked.

5.     *Much More Robust Explanations by Other Agencies Have Been Found Wanting.*

Records far more favorable to agencies than the one present here have failed to pass muster with the Supreme Court. *See, e.g.*, *Encino Motorcars, LLC*, 579 U.S. 211; *State Farm*, 463 U.S. 29.

*Encino Motorcars, LLC*, 579 U.S. 211, is particularly instructive. A brief recitation of its facts is helpful for understanding the Court's holding, and I therefore summarize the Supreme Court's description here.

In 1966, Congress passed a law exempting certain employees of automobile dealerships from the requirements of the Fair Labor Standard Act of 1938, 29 U.S.C. § 201–219. *Encino Motorcars, LLC*, 579

U.S. at 215. The exemption applied to "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles." *Id.* (quoting Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, § 209, 80 Stat. 830, 836).

In 1970, the Department of Labor (Department) issued a regulation that interpreted the exemption as excluding "service advisors," dealership employees who market and sell automobile repairs to customers. *Id.* at 214–16. The U.S. Court of Appeals for the Fifth Circuit rejected the Department's interpretation, and its holding in this regard was followed by several district courts. *See id.* at 216 (first citing *Brennan v. Deel Motors, Inc.*, 475 F.2d 1095, 1096 (5th Cir. 1973); then citing *Yenney v. Cass Cnty. Motors*, 81 CCH LC ¶ 33,506 (D. Neb. 1977); then citing *Brennan v. N. Bros. Ford, Inc.*, 76 CCH LC ¶ 33,247 (E.D. Mich. 1975), *aff'd sub nom. Dunlop v. N. Bros. Ford, Inc.*, 529 F.2d 524 (6th Cir. 1976) (unpublished table decision); and then citing *Brennan v. Imp. Volkswagen, Inc.*, 81 CCH LC ¶ 33,522 (D. Kan. 1975)).[11] In parallel, Congress amended the statute. *Id.*

In 1978, the Department issued an opinion letter adopting the view of the courts that service advisors were exempt. *Id.* at 217. It acknowledged that the new policy was a reversal of the Department's prior position. And in its Field Operations Handbook, the Department stated that it would revise its 1970 regulation accordingly. *Id.* It finally issued a notice of proposed rulemaking in 2008. *See id.* (citing 73 Fed. Reg. 43,654 (July 28, 2008)).

Three years later, however, the Department again reversed itself and abandoned the proposed rule. *Id.* at 218 (citing 76 Fed. Reg. 18,832, 18,833 (Apr. 5, 2011)). Instead, it issued a final rule that followed the original regulation, i.e., concluding that service advisors were not exempt. *Id.* (citing 76 Fed. Reg. at 18,859). After reciting the history and summarizing the comments it received on the issue, the Department explained its decision by saying that "the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met." 76 Fed. Reg. at 18,838. It further stated that it "believes that this interpretation is reasonable" and "sets forth the appropriate approach," and that the Department "disagrees with [a court of appeals] that the regulation impermissibly narrows the statute." *Id.*

---

[11] Years later, the U.S. Court of Appeals for the Fourth Circuit reached the same conclusion. *Walton v. Greenbrier Ford*, 370 F.3d 446, 452–53 (4th Cir. 2004).

This explanation was not enough for the Supreme Court. In particular, the Court focused on the change in a longstanding agency position and the reliance interests that position had created. The Court articulated the legal standards as follows:

> In explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." [*Fox Television Stations*, 556 U.S. at 515]; *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, [556 U.S.] at 515–516. It follows that an "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." [*Nat'l Cable & Telecomms. Ass'n v.*] *Brand X* [*Internet Servs.*, 545 U.S. 967,] 981 [(2005)].

*Encino Motorcars, LLC*, 579 U.S. at 221–22. Applying these principles to the facts before it, the Court stated:

> [T]he unavoidable conclusion is that the 2011 regulation was issued without the reasoned explanation that was required in light of the Department's change in position and the significant reliance interests involved. In promulgating the 2011 regulation, the Department offered barely any explanation. A summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position.

*Id.* at 222.

The parallels to this case are easy to see. Here, too, we have a change in agency position that is contrary to judicial decisions. Here, too, we have longstanding industry reliance on those decisions and the more moderate approach of the 1968 Regulation. And here we have significantly less discussion (none in fact) of the reasons for the change

than was present in *Encino Motorcars*. The opinion of the Court's conclusion is inconsistent with the holding of *Encino Motorcars*, where the Supreme Court characterized the agency's explanation as "[saying] almost nothing," *id.* at 223, and emphasized that "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's decision," *id.* at 224.

B.   *Treasury Also Acted Arbitrarily and Capriciously by Failing to Address Significant Comments.*

The shortcomings identified above more than suffice to set aside the challenged regulation. But that is not all. Treasury cannot complain that it was never told of the problems with its proposed approach. That is where the comments that Treasury failed to address come in.

1.   *Administrative Law Requires an Agency to Respond to Significant Comments.*

As already discussed above, when promulgating regulations subject to notice and comment, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.' § 553(c). An agency must consider and respond to significant comments received during the period for public comment." *Mortg. Bankers Ass'n*, 575 U.S. at 96.

The reasons for the APA procedural requirements are easy to understand, as courts have explained:

> [They] are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule. To this end there must be an exchange of views, information, and criticism between interested persons and the agency. Consequently, the notice required by the APA, or information subsequently supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. Moreover, a dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points raised by the public. A response is also mandated by *Overton Park*, which requires a reviewing court to assure itself that all relevant factors have been considered by the agency.

*Home Box Office*, 567 F.2d at 35–36 (footnote omitted) (citations omitted); *see also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019) (The purpose of notice and comment rulemaking is to "give[] affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes" while "afford[ing] the agency a chance to avoid errors and make a more informed decision."); *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1929 n.13 (2020) (Thomas, J., concurring in the judgment in part and dissenting in part) ("[T]he notice and comment process at least attempts to provide a 'surrogate political process' that takes some of the sting out of the inherently undemocratic and unaccountable rulemaking process." (quoting Michael Asimow, *Interim-Final Rules: Making Haste Slowly*, 51 Admin. L. Rev. 703, 708 (1999))); *Iowa League of Cities*, 711 F.3d at 873 ("Notice and comment procedures secure the values of government transparency and public participation . . . ."); *id.* at 871 ("Notice and comment procedures . . . were undoubtedly designed to protect the concrete interests of . . . regulated entities by ensuring that they are treated with fairness and transparency after due consideration and industry participation.").

For these reasons, an agency fails to provide adequate reasons for its decisions, *see Encino Motorcars, LLC*, 579 U.S. at 221, if it fails to respond to "significant points" and consider "all relevant factors" raised by public comments, *see also, e.g.*, *Home Box Office*, 567 F.2d at 35–36 (establishing this principle); *Carlson*, 938 F.3d at 343–44 (applying the principle). Our Court and other courts therefore require that an agency respond to any "significant comments" received by the agency. *See, e.g.*, *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 295, 296–97 (8th Cir. 1985); *Lloyd Noland Hosp. & Clinic v. Heckler*, 762 F.2d 1561, 1567 (11th Cir. 1985); *Altera Corp. & Subs.*, 145 T.C. at 112. "[U]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Can. Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)); *see also PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 209 (D.C. Cir. 2011) (same). Again, this is hornbook law, *see, e.g.*, Hickman & Pierce, *supra*, § 5.4, and courts of appeals have routinely affirmed the requirement for more than four decades.[12]

---

[12] *See, e.g.*, *Home Box Office*, 567 F.2d 9 (decided by the D.C. Circuit in 1977); *PPG Indus., Inc. v. Costle*, 630 F.2d 462, 466 (6th Cir. 1980); *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1470 (7th Cir. 1985); *Menorah Med. Ctr.*, 768 F.2d at 295, 296–97 (decided by the Eighth Circuit in 1985); *Brewer v. Madigan*, 945 F.2d 449, 457 n.7 (1st

Significant comments generally are "those 'comments which, if true, . . . would require a change in [the] proposed rule.'" *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (quoting *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1188 (D.C. Cir. 1990)). Or, put another way, a significant comment "cast[s] doubt on the reasonableness of the rule the agency adopts." *See Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 116 (D.C. Cir. 1987). It is well settled that "an agency must respond to comments 'that can be thought to challenge a fundamental premise' underlying the proposed agency decision." *Carlson*, 938 F.3d at 344 (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)). Such comments may include "challenges to the lawfulness of the proposed rule" or "[c]hallenges to the internal integrity or reasonableness of the regulatory structure." *See Balt. Gas & Elec. Co.*, 817 F.2d at 116.

2. *The Comments Here Were Significant and Required a Response.*

3M argues that Treasury did not respond to significant comments during the rulemaking process. The opinion of the Court rejects that argument, concluding that (1) Treasury was not required to respond to some of the comments 3M cites because Treasury was already aware of the points raised by those comments, *see* op. Ct. pp. 268–69, and (2) the Court need not decide whether Treasury was required to respond to the remaining comments because those comments are irrelevant in the context in this case, *see* op. Ct. pp. 269–70. Once again the opinion's conclusions find no support in the APA or the caselaw.

The comments at issue in this case, which the opinion of the Court describes, *see* op. Ct. pp. 199–200, included, among other things, concerns about Treasury's authority to issue Treasury Regulation § 1.482-1(h)(2). Specifically, four commenters pointed out that the proposed rule contradicted the Supreme Court's decision in *First Security* and the decisions of this Court and the U.S. Court of Appeals for the Sixth Circuit in *Procter & Gamble* and called for changes to the rule. The comments questioned whether, under that precedent, Treasury had the authority to promulgate Treasury Regulation § 1.482-1(h)(2) in the form that was ultimately adopted.

These are quintessential "significant comments." *See, e.g.*, *La. Fed. Land Bank Ass'n*, 336 F.3d at 1080; *Balt. Gas & Elec. Co.*, 817 F.2d

Cir. 1991); *Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992); *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021).

at 116. Treasury was required to respond to these comments because they "challenge[d] a fundamental premise" of the proposed regulation, *Carlson*, 938 F.3d at 344, and "cast doubt on the reasonableness of the rule" that Treasury adopted, *Balt. Gas & Elec. Co.*, 817 F.2d at 116. And certainly, if true, the comments "would require a change in [the] proposed rule." *La. Fed. Land Bank Ass'n.*, 336 F.3d at 1080 (quoting *Am. Mining Cong.*, 907 F.2d at 1188).

Comments telling Treasury (in so many words) that "based on Supreme Court and other judicial authorities, you are attempting to regulate outside of your permissible sphere" squarely "'challenge a fundamental premise' underlying the proposed agency decision." *Carlson*, 938 F.3d at 344 (quoting *MCI WorldCom*, 209 F.3d at 765). They undercut Treasury's assumption that section 482 permitted it to act as it proposed to do. Confronted with that challenge, Treasury needed to respond. Silence was not a viable option. Perhaps Treasury thought it had good reasons to act (for example, because it believed an amendment to section 482 had changed the legal landscape). But if it did, it needed to state those reasons. It could not hold them in reserve until its actions were challenged in court. *See Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998) ("An agency is required to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them." (citing *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988))); *see also id.* ("An agency must also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant.").

There is no dispute here that Treasury did not respond; in fact, Treasury did not even acknowledge the comments. *Cf. PSEG Energy Res. & Trade LLC*, 665 F.3d at 210 ("To characterize objections [which Treasury did not even do here] . . . is not to answer them."). Treasury's silence in this regard provides no basis on which to conclude that the agency engaged in reasoned decisionmaking. *Judulang*, 565 U.S. at 53; *see also PPL Wallingford*, 419 F.3d at 1198 ("An agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." (quoting *Can. Ass'n*, 254 F.3d at 299)); *PSEG Energy Res. & Trade LLC*, 665 F.3d at 208 (same); *cf. City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1168 (D.C. Cir. 1987) ("Lacking

any indication of . . . a reasoned determination . . . we are forced to conclude that the FCC acted irrationally . . . .").[13]

### 3. *The Opinion of the Court's Reliance on Thompson Is Misplaced.*

In reaching its contrary conclusion that Treasury's procedures were adequate, the opinion of the Court cites *Thompson*, 741 F.2d at 409, for the proposition that "when a comment 'brought to the attention of the agency nothing which it had not already considered,' the agency need not respond." The opinion reasons that, because Treasury was already aware that Treasury Regulation § 1.482-1(h)(2) was inconsistent with prior caselaw, it was not required to respond to comments that raised the point. But this conclusion is wrong, for at least three reasons.

First, when promulgating the rule, Treasury never indicated its awareness of the contrary caselaw. Of course, one might assume that Treasury knew about the cases in light of their profile within the tax community. But (as discussed in Part I.A.2 above) we are not permitted to speculate. Rather, we evaluate agency decisionmaking based on what the agency actually says at the time of its decision and not based on assumptions or post hoc rationalizations. *See Chenery I*, 318 U.S. at 87

---

[13] Chief Judge Kerrigan's concurring opinion contends that an agency's decision to "go[] forward with the proposed [challenged] regulation in the face of opposing comments is indeed acknowledgement of them." *See* concurring op. p. 279. I am aware of no authority supporting the view. And as Part I demonstrates, plenty of authority contradicts it.

After all, "[t]he fundamental purpose of the response requirement is . . . to show that the agency has indeed considered all significant points articulated by the public." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988); *see also, e.g.*, *Mortg. Bankers Ass'n*, 575 U.S. at 109 (Scalia, J., concurring in the judgment) ("Before an agency makes a rule, it normally must notify the public of the proposal, invite them to comment on its shortcomings, [and] *consider and respond to their arguments* . . . ." (Emphasis added.)). And if "the agency's mind must be open to considering" the comments it receives, *Grand Canyon Air Tour Coal.*, 154 F.3d at 468 (citing *McLouth Steel Prods. Corp.*, 838 F.2d at 1323), the "agency must also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant," *id.* Forging ahead without any explanation can hardly be viewed as rational decisionmaking.

This makes sense. The opposite rule would permit agencies to say nothing at all in response to comments and, when challenged, respond that moving forward with the proposed rule was an implicit acknowledgement and rejection of the points the comments had raised. The APA requires words (that is, an agency response to public arguments) and, unlike elsewhere in life, actions cannot speak louder.

("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *see also State Farm*, 463 U.S. at 50 (courts may not accept post hoc rationalizations). And the parties agree that Treasury did not discuss or even cite the adverse cases during the rulemaking process.

Second, even if we assume that Treasury was aware of the cases at the time of its rulemaking, "'knowing' is not . . . the same as actually considering the problems raised by [commenters]." *Gerber*, 294 F.3d at 183. The APA requires the latter. *See* 5 U.S.C. § 553(c) (providing that an agency must "consider[] . . . the relevant matter presented" in the notice and comment process). Indeed, the whole point of requiring an agency to respond to significant comments is to ensure that the agency complies with this aspect of the APA. *See, e.g.*, *Nat. Res. Def. Council, Inc.*, 859 F.2d at 188. While Treasury may have considered internally the implications of the contrary cases during the rulemaking process, it did nothing to show commenters and our Court that it engaged in such an analysis. It therefore cannot demonstrate that it satisfied the requirements of the APA. And in the absence of any such demonstration (e.g., a discussion of the caselaw or Treasury's reasons for adopting Treasury Regulation § 1.482-1(h)(2) despite that caselaw), Treasury did not meet its APA obligations.

Third, *Thompson*—the case on which the opinion of the Court relies—and similar cases in fact refute the opinion of the Court's conclusion. In *Thompson*, 741 F.2d at 409, the D.C. Circuit found that the agency had already explained its action and that its previous explanations adequately addressed the comments it received. Other cases reach similar conclusions where an agency has previously selected and explained a course of action and continues to receive comments objecting to its decision. *See, e.g.*, *Nat. Res. Def. Council, Inc.*, 859 F.2d at 189 ("EPA, in effect, responded in advance; as a result, there was no error in failing to respond to legal objections that were thereafter raised during the comment period."); *cf. Gatewood*, 560 F.3d at 848 ("When the agency has articulated and acted on a consistent rationale throughout the course of a lengthy informal rulemaking process, the final rule is not arbitrary and capricious because the rationale was not fully reiterated in the final agency action."). Similarly, courts have not required agencies to respond to comments that are fundamentally at odds with policy determinations that have already been made by the executive branch. *See Sherley v. Sebelius*, 689 F.3d 776, 784–85 (D.C. Cir. 2012) (concluding that, in implementing an executive order expanding federal support for embryonic stem cell research, the National Institute of

Health was not required to respond to comments categorically rejecting any such research).[14]  This case does not present any of these circumstances.

   To begin with, the comments at issue did not concern discretionary, policy matters; rather, they addressed Treasury's authority for promulgating the rule.  *See Balt. Gas & Elec. Co.*, 817 F.2d at 116 (noting that significant comments that require a response may well include "challenges to the lawfulness of the proposed rule").

   Moreover, unlike the agency in *Thompson*, during the course of the rulemaking process, Treasury did not discuss Treasury Regulation § 1.482-1(h)(2) at all other than by summarizing its provisions.  As already noted, Treasury did not explain its reasons for adopting the rule, why the existing rules needed changing, why blocked income rules resulted in income not being clearly reflected, and so on.  Nor did Treasury discuss or even cite the contrary authorities flagged by the commenters.  Accordingly, cases like *Thompson*, 741 F.2d at 409, where the agency has previously explained its decision, give Treasury no quarter; rather they highlight the procedural failings in the rulemaking process before us.  *See also Gatewood*, 560 F.3d at 848; *Balt. Gas & Elec. Co.*, 817 F.2d at 116.

   For these reasons, the opinion of the Court errs when it cites *Thompson* in support of its position.  True—an agency need not respond to comments it has already considered and addressed, as that case says.  But to rely on this rule an agency must show its work,[15] just as the agency (and not the courts) must show that it has met all the APA's requirements.  *See Encino Motorcars, LLC*, 579 U.S. at 224 ("It is not

---

[14] In that kind of case, the agency is not required to respond because "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors."  *Sherley*, 689 F.3d at 784 (quoting *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006)).

[15] As the D.C. Circuit put it in *Rodway v. USDA*, 514 F.2d 809, 817 (D.C. Cir. 1975):

> The basis and purpose statement [required by the APA] is not intended to be an abstract explanation addressed to imaginary complaints.  Rather, its purpose is, at least in part, to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.

The court continued: "This purpose is patent on the face of the statute [i.e., section 553(c) of the APA]."  *Id.* n.13.

the role of the courts to speculate on reasons that might have supported an agency's decision."); *see also Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 648 (D.C. Cir. 2020) (rejecting an agency's claims that its reasoning was apparent from its actions and "a backdrop of well-known public disagreement"). The agency made the required showing in *Thompson*, 741 F.2d at 409. But Treasury has failed to do so here.[16]

*Natural Resources Defense Council, Inc.*, 859 F.2d 156, provides another helpful example that refutes the opinion of the Court's conclusion. In that case, as here, existing caselaw raised questions about the validity of a rule that the Environmental Protection Agency (EPA) had proposed. Commenters flagged these questions at a public hearing, then challenged final rules on the grounds that EPA had failed to respond to comments. The D.C. Circuit described the EPA's response to this challenge as follows:

> EPA replies that there was no need to respond to Industry's objections. The Notice of Proposed Rulemaking dealt fully, EPA contends, with the issues raised by the veto regulations, including the . . . legal objections. *See* 43 Fed. Reg. 37,078, 37,087 (1978). The Federal Register notice discussed the *Ford Motor Co.* [*v. EPA*, 567 F.2d 661 (6th Cir. 1977),] and *State of Washington* [*v. EPA*, 573 F.2d 583 (9th Cir. 1978),] decisions, noting EPA's view that the veto regulations, although perhaps in tension with dicta in

---

[16] When presented with facts closer to those now before us, courts have consistently required more from the agency. *See, e.g.*, *Hewitt v. Commissioner*, 21 F.4th at 1351 (holding that a comment on a proposed regulation "was significant and required a response by Treasury to satisfy the APA's procedural requirements"); *Carlson*, 938 F.3d at 347 (holding that the Postal Regulatory Commission "fell short of the APA's requirement for reasoned decisionmaking" when it failed to address significant public comments); *Sierra Club v. EPA*, 863 F.3d 834, 838 (D.C. Cir. 2017) (noting that "if we conclude that the substantive comments raised meritorious issues unanswered by EPA, then we must remand for further proceedings" and remanding because "EPA failed to respond adequately to comments disputing [its] explanations"); *Menorah Med. Ctr.*, 768 F.2d at 295, 295–96 (stating that an agency's failure to respond to criticisms that "cast serious doubt on the premise grounding the [agency's] explanation" was arbitrary and capricious). Note that the Sixth Circuit's approach in *Oakbrook Land Holdings, LLC v. Commissioner*, 28 F.4th 700, was based on a finding that the comments at issue did not address "the problem that Treasury sought to solve—providing a method for I.R.C. § 170(h)(5)(A)'s perpetuity requirement to be met upon judicial extinguishment." *Id.* at 715. That kind of distinction is unavailable here, where the comments were directed at Treasury's authority to issue the very regulation at issue and, therefore, were clearly addressed at "the problem Treasury sought to solve." *Id.*

those two cases, were consistent with the cases' holdings. *See* [43 Fed. Reg.] at 37,087–88. The agency's view, as set forth in the [Notice of Proposed Rulemaking], was that the veto regulations themselves constitute "guidelines" under the [APA] and therefore address the concern that federal supervision be pursuant to formally promulgated standards.

*Nat. Res. Def. Council, Inc.*, 859 F.2d at 188. Not surprisingly, the D.C. Circuit agreed that the EPA's Notice of Proposed Rulemaking responded adequately to the objections raised at the hearing:

> In the circumstances before us, EPA, in effect, responded in advance; as a result, there was no error in failing to respond to legal objections that were thereafter raised during the comment period. The agency had, for all practical purposes, already noted and addressed the objections. EPA's legal position (which we have sustained) was clear to the public at all times, and the court is thus not faced on review with uncertainty as to whether the agency overlooked substantive objections. Accordingly, EPA did not run afoul of section 553(c) of the APA.

*Id.* at 189.[17]

Compare Treasury's actions here to those of EPA. One looks in vain in the record before us for a "discuss[ion]" of the relevant cases or for an explanation by Treasury that its "regulation[], although perhaps in tension with dicta [in the relevant cases was] consistent with [or even distinguishable from] the cases' holdings." *Id.* at 188. All we have is silence and post hoc rationalizations, with the resulting "uncertainty as to whether the agency overlooked substantive objections." *Id.* at 189. Those are not the marks of nonarbitrary agency action.[18]

---

[17] The D.C. Circuit decided *Natural Resources Defense Council, Inc.* in 1988, before the Supreme Court issued its 2015 decision in *Mortgage Bankers Ass'n*, 575 U.S. 92. There the Supreme Court stated that "[a]n agency must consider and respond to significant comments *received during the period for public comment.*" *Id.* at 96 (emphasis added). I need not resolve here whether, after *Mortgage Bankers Ass'n*, an agency may rely on a response made "in advance." Here, Treasury offered no response at all—in advance or otherwise.

[18] For another example of an adequate explanation (even if "minimally" so) by an agency in the face of adverse judicial precedent, see *Peck v. Thomas*, 697 F.3d 767, 773 (9th Cir. 2012).

To summarize, *Thompson*, the only case the opinion of the Court cites in support of its "significant comments" holdings, in fact contradicts the opinion's conclusion. And the opinion's repeated assertion that "Treasury was aware" of the points made by comments, *see* op. Ct. p. 269, has no legal significance. Accordingly, the opinion of the Court errs in holding that Treasury was not required to respond to the comments 3M identifies. The comments were significant, and Treasury was required to respond.[19]

4. *The Elimination of the "Complete Power" Regulation Does Not Excuse Treasury's Procedural Shortcomings.*

Chief Judge Kerrigan's concurring opinion appears to suggest that Treasury's failure to comply with the APA's procedural requirements may be overlooked in part because of the elimination of the "complete power" regulation. The concurring opinion faults the commenters for "fail[ing] to address the elimination of the complete power regulation . . . in the context of the blocked income regulation." *See* concurring op. p. 278.[20] But this gets the requirements of the APA backwards. As discussed in Part I.A above, it was Treasury's responsibility (not the commenters') to explain adequately why it departed from its existing position and how the elimination of the "complete power" regulation was tied to its decision to adopt Treasury Regulation § 1.482-1(h)(2). No one disputes that Treasury did not do so.

Treasury's failure is all the more puzzling because the elimination of the complete power regulation weakened Treasury's position in connection with Treasury Regulation § 1.482-1(h)(2), rather than strengthening it as the concurring opinion appears to suggest. A

---

[19] Chief Judge Kerrigan's concurring opinion suggests that the approach I have followed here would "place a greater burden on both the agency and the court system." *See* concurring op. p. 280. Any such "burden" flows from the decisions Congress made when enacting the APA and the interpretations given to that statute by the Supreme Court and the courts of appeals. As a trial court, we are not authorized to relieve Treasury from this burden, whether we deem it wise or not.

[20] The concurring opinion uses the phrase "the elimination of the complete power" regulation as shorthand for Treasury's decision in 1993 to redesignate former Treasury Regulation § 1.482-1(b)(1) as Treasury Regulation § 1.482-1A(b)(1) and make that regulation applicable only for tax years beginning on or before April 21, 1993. *See* T.D. 8470, 58 Fed. Reg. 5263, 5271, 1993-1 C.B. at 99 (Jan. 21, 1993); *see also* op. Ct. p. 68 n.38. For convenience, I will follow the concurring opinion's convention, recognizing that the regulation remains in effect for certain tax years.

**Add. 329**

close reading of the text of the "complete power" regulation and *First Security* confirms this.

The "complete power" regulation provided:

> The interests controlling a group of controlled taxpayers *are assumed* to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer.

Treas. Reg. § 1.482-1A(b)(1) (2019) (emphasis added) (applicable for tax years beginning on or before April 21, 1993). In other words, under this regulation, in applying section 482, the Commissioner would *assume*—that is, take as a given without having to prove it—that a group of controlled taxpayers had full power to cause every member of the group to reflect the correct income for tax purposes. Put yet another way, the regulation permitted the Commissioner to assume that if the controlled group wanted to get to the "right" tax answer, it could have done so. In light of this assumption, if the Commissioner were to find that "this was not done," he could assume (again, take as a given without regard to the facts) that this was the result of some action by the group and within the group's control.

This assumption was beneficial to the Commissioner. Instead of having to undertake a factual analysis to demonstrate that the group had the power to control the tax affairs of a relevant member and that it in fact had used that power for untoward purposes, the Commissioner could simply "assume" that this was so and proceed with an adjustment. In a way, the Commissioner could assume "guilt by association."

In its decision in *First Security*, the Supreme Court acknowledged the existence of the "complete power" regulation. *See First Security*, 394 U.S. at 404. But the Supreme Court placed a limit on how far assumed

"guilt by association" could be taken in light of the text of the statute and existing interpretations of the term "income" as used in the Code. In the Court's view, an actual ability "to shift income among . . . subsidiaries" must exist for section 482 to apply. *Id.* The Commissioner was not allowed simply to "assume" this was so when applicable legal rules defeated the assumption. *Id.* at 404–05. That is what the Court meant when it said that "income implies dominion or control of the taxpayer." *Id.* at 404. And that is what the Court meant when it said the "regulation is consistent with the control concept heretofore approved by this Court, although in a different context." *Id.* And that is why the Court concludes "[t]he 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law." *Id.* at 405. In effect, the Supreme Court was saying it is fine for the Commissioner to "assume" (and not to have to prove) that a common group generally controls the income of its members, but that assumption breaks down, and will not be respected by a court, when it results in the fiction that the group has "the power to force a subsidiary to violate the law." *Id.*

It is a mistake to read the "complete power" regulation as somehow having limited the Commissioner's authority. To the contrary, the regulation made it easier for the Commissioner to win cases under section 482. And the Supreme Court in *First Security* did not read the "complete power" regulation as having imposed a limitation on the Commissioner that the Commissioner could not disavow (resulting in the Commissioner's losing the case). Rather, *First Security* read the "complete power" regulation as having given the Commissioner wide latitude. Yet, even in the context of that wide latitude, the statute (and particularly the definition of the word "income" as previously interpreted by the Court) imposed limits. The "assumption" that common groups could do what they wished with respect to their members' income did not hold when legal rules placed limits on that power. In those circumstances, there was no "income" to allocate, and the Commissioner could not make it otherwise by regulation, no matter how favorable the "assumptions" asserted in his favor.

With this background in mind, it is not clear to me why the prospective elimination of the "complete power" regulation obviates the need for Treasury to respond to the significant comments raised by the commenters. Although the landscape had changed somewhat, the new terrain was less favorable to Treasury, further weighing in favor of fully addressing significant comments in compliance with the APA. The

change simply does not insulate Treasury from APA requirements as the Chief Judge's concurrence suggests.[21]

5.  *The Opinion of the Court Fails to Analyze Whether Treasury Was Required to Respond to the Remaining Comments.*

Although the errors described in the preceding sections are sufficient to find for 3M, perplexingly, the opinion of the Court does not even analyze the remaining comments on which 3M relies. Rather, the opinion assumes that no response was required because the comments (regarding the exhaustion of remedies rule, the no-circumvention requirement, and electing the deferred income method) relate to provisions of the regulation that do not control the outcome of this case. For example, the opinion of the Court states that "any failure by [Treasury] to appropriately respond to comments regarding the exhaustion-of-remedies requirement is irrelevant" because "[i]n this

---

[21] The concurring opinion also observes that "[t]he parties' own stipulations make it clear that Treasury reviewed the comments." *See* concurring op. p. 278. The concurring opinion "take[s] it a step further and argue[s] that [blanket statement in] the preamble [that the comments were considered] is sufficient to respond to the four comments regarding the proposed blocked income regulation." *See* concurring op. pp. 278–79.

To the extent the concurring opinion intends to suggest that 3M stipulated its case away, that is not so. The stipulation of the parties to which the concurring opinion refers states:

> As stated in T.D. 8552, "written comments responding to the notice of proposed rulemaking were received, and a public hearing was held on August 16, 1993," and "after consideration of all the comments," the proposed regulations under the 1993 Notice of Proposed Rulemaking, as revised by T.D. 8552, were adopted, and the temporary regulations under T.D. 8470 were removed.

That stipulation merely describes what the preamble states. It cannot fairly be read as an admission by 3M that Treasury complied with the APA, a point that 3M vigorously disputes. Nor does the Commissioner maintain that 3M should lose because of the stipulation.

More importantly, courts have repeatedly rejected agency claims that a blanket statement that "all comments were considered" discharges an agency's obligations under the APA. *See, e.g.*, *PPG Indus.*, 630 F.2d at 466 ("[Courts] are not required to 'take the agency's word that it considered all relevant matters.'" (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980))); *see also Hewitt*, 21 F.4th at 1351 ("[T]he fact that Treasury stated that it had considered 'all comments,' without more discussion, does not change our analysis, as it does not 'enable [us] to see [NYLC's] objections and why [Treasury] reacted to them as it did." (quoting *Lloyd Noland*, 762 F.2d at 1566)). The concurring opinion cites no authority to the contrary, and I am aware of none.

case . . . other requirements of [Treasury Regulation §] 1.482-1(h)(2) (2006) are not met: i.e., the effect-on-uncontrolled-taxpayers requirement, the public-promulgation requirement, and the general-applicability requirement." *See* op. Ct. p. 270. The reasoning seems to be that, if 3M cannot satisfy at least one necessary element of the regulation, then procedural defects with respect to any other element (or indeed all other elements) of the regulation do not matter.

But this analysis puts the cart before the horse. If Treasury Regulation § 1.482-1(h)(2) is procedurally invalid, then 3M does not need to satisfy any of its requirements. The opinion of the Court seems to forget that a defect with respect to one aspect of a regulation can invalidate the entire rule. *See* 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8381 (2d ed. 2022) ("Sometimes a court will determine that a portion of a complex agency action (generally a rule) is legally defective but that the remainder of the action is not. This situation raises the question of severance—i.e., whether the court should vacate and remand the entire action or, instead, merely vacate and remand the defective portion, leaving the rest in place."). And there is no showing in the opinion of the Court that the regulatory requirements here would or could be severed. All of this is to say that other comments on which 3M relies raised meaningful issues, and the opinion of the Court has not engaged with them.

II.      *The Commissioner's Additional Arguments Are Similarly Unavailing.*

The Commissioner argues that Treasury satisfied its burden because "the agency's explanation need only be 'clear enough that its "path may reasonably be discerned."' *Encino Motorcars*[*, LLC*, 579 U.S. at 221] (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))."[22] Resp't's Am. Answering Br. 23. Regarding Treasury's path here, the Commissioner says:

---

[22] As I have said before:

In *Bowman Transportation*, the case that gave rise to the "path may reasonably be discerned" formulation, the Supreme Court observed that the Interstate Commerce Commission had in fact provided an explanation of how it had viewed the relevant evidence and proceeded to discuss that explanation. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 290 (1974) ("The question before the Commission was whether service on the routes at issue would be enhanced by permitting new entry, and as to this the performance by

Section 1.482-1(h)(2) was part of a major effort by Treasury to overhaul the section 482 transfer pricing regulations following the 1986 amendment to section 482. Throughout the rulemaking process, Treasury issued extensive statements explaining the manner in which the revised rules (including section 1.482-1(h)(2)) operate and how they align with the statutory goals of section 482, as articulated by Congress.

*Id.* The Commissioner cites various administrative pronouncements that were issued as part of the overhaul and elaborates on his reasoning as follows:

Section 1.482-1(h)(2) appears in revised section 1.482-1, along with bedrock transfer pricing principles such as tax parity, comparability, true taxable income, and the arm's length standard. Treasury explained how the revisions to section 1.482-1 implement Congress' objective to ensure a division of income between related parties that reflects the value of their respective economic contributions. . . . These extensive discussions not only explain the reasoning behind section 1.482-1(h)(2), but they are also incorporated in the plain text of the rule . . . .

*Id.* at 24. Thus, the Commissioner relies on the text of the regulation, the regulation's inclusion in a larger regulatory package, the reasons provided for the package more generally, and the 1986 amendment to section 482 to argue that the purpose of Treasury Regulation § 1.482-1(h)(2) was both obvious and adequately explained.

It is true that during the rulemaking process Treasury explained the regulatory package more generally and responded to some comments regarding other parts of the package. But a careful review of the regulatory history shows that it undercuts, rather than supports, the Commissioner's position.

---

prospective entrants on new routes was of limited relevance. The Commission noted with respect to transit times that different highway conditions might make experience there a poor indication of the times applicants could provide on the routes they sought to enter."). The record here fails to provide even "that minimal level of analysis," *Encino Motorcars, LLC v. Navarro*, 579 U.S. [at 221], required by *Bowman Transportation*.

*Oakbrook Land Holdings, LLC*, 154 T.C. at 225 n.18 (Toro, J., concurring in the result).

Treasury Regulation § 1.482-1(h)(2) was first proposed in 1993, more than six years after Congress added the second sentence to section 482. *See* Prop. Treas. Reg. § 1.482-1T(f)(2), 58 Fed. Reg. 5310, 5312 (Jan. 21, 1993). At the time, Treasury had already put forward two detailed explanations of the 1986 amendment and Treasury's plans to overhaul the transfer pricing regulations: (1) Notice 88-123, 1988-2 C.B. 458 (generally known as the "white paper"), and (2) the 1992 proposed regulations, *see* Intercompany Transfer Pricing and Cost Sharing Regulations Under Section 482, 57 Fed. Reg. 3571 (proposed Jan. 30, 1992). Both were lengthy documents in which Treasury explained how it intended to implement the statutory change and otherwise amend the transfer pricing regulations. Neither publication mentioned blocked income or any of the caselaw addressing the issue.

When Treasury finally proposed the blocked income regulation in 1993, the regulatory preamble again said nothing about Treasury's reasons for issuing the proposal. *See* Intercompany Transfer Pricing Regulations Under Section 482, 58 Fed. Reg. at 5310, 5310–12 (proposed Jan. 21, 1993). Instead, the preamble referred to a package of temporary regulations issued under section 482 on the same day, stating that "[t]he preamble to the temporary regulations contains a full explanation of the reasons underlying the issuance of the proposed regulations." *Id.* at 5310. But when one turns to the preamble to the temporary regulations, one again finds no mention of blocked income or related caselaw, *see* T.D. 8470, 58 Fed. Reg. 5263, 5263–5271, 1993-1 C.B. at 90–123 (Jan. 21, 1993), except that Temporary Treasury Regulation § 1.482-1T(f)(2), titled "Effect of foreign legal restrictions," was "[Reserved]," *id.* at 5281, 1993-1 C.B. at 111.

The Commissioner is undeterred by this omission, pointing to Treasury's reasons for adopting the broader package as well as the text of the proposed regulation as sufficient evidence of Treasury's rationale. But it cannot be that incorporating a rule into a broader package eliminates the need to explain the reasons for the rule.[23] And particularly given the context here, where multiple courts had rejected Treasury's proposed approach, general comments about transfer pricing and the arm's-length principle were insufficient to explain why Treasury should (or could) include the blocked income rule in the broader package. Thus, the materials Treasury cites do not allow us to "reasonably . . .

---

[23] Such an approach would invite agencies to consolidate their rulemakings to avoid the requirements of the APA with respect to the individual components of a package.

discern[]" its rationale for going ahead with the rule despite the contrary authorities. *See Bowman Transp., Inc.*, 419 U.S. at 286.

The Commissioner attempts to rely on *Encino Motorcars*, quoting the Supreme Court's statement that only a "minimal level of analysis" is required to satisfy arbitrary and capricious review. *See Encino Motorcars, LLC*, 579 U.S. at 221. But the Commissioner conveniently ignores that, in this case, Treasury provided *no* analysis for why it adopted Treasury Regulation § 1.482-1(h)(2). Additionally, in *Encino Motorcars* the Court recognized that the level of explanation required depends on context. *Id.* at 222 ("A summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position."). As already discussed, the circumstances here are closely analogous to those in *Encino Motorcars*, which required a more detailed explanation. And in that case, the Supreme Court found the agency's brief (but existing) explanation insufficient. *See* Part I.A.5 above. Here, I reach the same conclusion regarding Treasury's nonexistent explanation.

Nor, as the Commissioner appears to contend, does the 1986 amendment to section 482 suffice to explain Treasury's choices on blocked income. The amendment added one sentence that said: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2563. To state the obvious, nothing in this sentence expressly mentions blocked income. For example, the sentence does not specify whether legal restrictions should be taken into account in deciding whether income is "commensurate." Moreover, the sentence seems perfectly consistent with what may be viewed as a central lesson of the blocked income cases: that income for purposes of section 482 does not include amounts that a taxpayer is legally prohibited from receiving. *See* Buch dissenting op. pp. 287–305.[24] And the sentence addresses

---

[24] As is evident from the text, the term "income" is front and center in the second sentence of section 482. In promulgating Treasury Regulation § 1.482-1(h)(2), Treasury offered no explanation why the usual canons of construction should not inform the interpretation of that term in the second sentence. As the Supreme Court has said, "[w]hen 'all (or nearly all) of the' relevant judicial decisions have given a term or concept a consistent judicial gloss, we presume Congress intended the term or

income from transfers of intangibles only, whereas blocked income can be present in many types of transactions.[25] (Indeed, Treasury Regulation § 1.482-1(h)(2) itself on its face applies to all transactions and is not limited to those involving transfers of intangibles, as one might expect it to be if it truly were an implementation of the 1986 amendment.) In short, if one wants to rely on the second sentence of section 482 to support the rule reflected in Treasury Regulation § 1.482-1(h)(2), one must show why that is so. Connecting the dots between the second sentence of section 482 and Treasury Regulation § 1.482-1(h)(2) requires explanation; it is neither obvious nor reasonably discernable.

For those who consider legislative history relevant, *Warger v. Shauers*, 574 U.S. 40, 48 (2014), the statute's silence on these issues should come as no surprise, for at least three reasons.

First, the legislative history suggests that Congress was focused on a problem other than blocked income—namely, the transfer of high-profit potential intangibles offshore for compensation that did not reflect their true value. *See* H.R. Rep. No. 99-841 (Vol. II), at II-637 (1986) (Conf. Rep.) (hereinafter Conference Report), *as reprinted in* 1986-3 C.B. (Vol. 4) 1, 637 ("Uncertainty exists regarding what transfers are appropriate to treat as 'arm's-length' comparables and regarding the significance of profitability, including major changes in profitability of the intangible after the transfer."); H.R. Rep. No. 99-426, at 424 (1985) (hereinafter House Report), *as reprinted in* 1986-3 C.B. (Vol. 2) 1, 424 ("The problems are particularly acute in the case of transfers of high-profit potential intangibles. Taxpayers may transfer such intangibles to

---

concept to have that meaning when it incorporated it into a later-enacted statute." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 243 (2011) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 659 (2010) (Scalia, J., concurring in part and concurring in the judgment)). In such a case, "[t]he consistent gloss represents the public understanding of the term." *Id.*; *see also, e.g.*, *Hylton v. U.S. Attorney General*, 992 F.3d 1154, 1158 (11th Cir. 2021) (declining to afford *Chevron* deference to a position of the Board of Immigration Appeals because the application of canons of construction resolved any ambiguity and relying in part on the prior-construction canon, which "establishes that '[i]f a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, . . . they are to be understood according to that construction'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 54, at 322 (2012))); *id.* ("When Congress use[s] the materially same language in [a more recent enactment], it presumptively [is] aware of the longstanding judicial interpretation of the phrase and intend[s] for it to retain its established meaning." (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018))).

[25] For a more detailed discussion of the second sentence, see *Altera Corp. & Subs.*, 145 T.C. at 96–98.

foreign related corporations . . . at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product."). In other words, Congress was focused on the undervaluation of high-profit-potential intangibles by related parties. Consistent with this focus, neither the discussion in the Conference Report nor that in the House Report mentioned blocked income, even though both included detailed explanations of the purpose and effect of adding the second sentence to section 482. *See, e.g.*, Conference Report, at II-637–38; House Report, at 420–27.

Second, the second sentence of section 482 makes perfect sense as a response to the intangible valuation issue and little sense as a response to blocked income concerns. As already discussed, the second sentence says nothing about cases in which a taxpayer is legally prohibited from receiving income.[26] Rather, it focuses specifically on transfers of intangibles and provides that an intangible should be priced according to the income it generates. Moreover, *First Security*, the most famous blocked income case at the time, did not even involve a transfer of intangibles, so its outcome was unaffected by the second sentence regardless of how one reads it. It is unclear why Congress would have enacted a partial fix rather than a complete one if it wished to reverse the blocked income cases.

Finally, when a committee of Congress prepares a detailed explanation of a legislative proposal, one might expect it to mention that the proposal reverses a decision of the Supreme Court if that in fact is one of the proposal's objectives. As noted above, neither the Conference Report nor the House Report mentions *First Security* or any other blocked income case. *See* Conference Report, at II-637–38; House Report, at 420–27. The House Report does, however, address a separate line of cases that the proposal was intended to reverse, cases that were relevant to—as one might expect—the undervaluation of high-profit-potential intangibles. *See* House Report, at 424 (citing *U.S. Steel Corp. v. Commissioner*, 617 F.2d 942 (2d Cir. 1980)). All of which leaves the

---

[26] The legislative history's general endorsement of allocating income based on a taxpayer's economic activity, *see, e.g.*, Conference Report, at II-637–38, does not establish that Congress intended for legal restrictions that bind the taxpayer to be ignored. Treasury can apply economic principles while respecting legal rules that are binding on the taxpayer, and nothing in the legislative history suggests that it should do otherwise.

reader of the legislative history with a feeling of "expressio unius est exclusio alterius."

To summarize, nothing in the second sentence or its history directs Treasury to act with respect to blocked income as it did.[27] Accordingly, Treasury cannot rely on the second sentence or the legislative history accompanying its enactment to argue that Treasury's path in adopting Treasury Regulation § 1.482-1(h)(2) "may reasonably be discerned." *See Encino Motorcars, LLC*, 579 U.S. at 221 (quoting *Bowman Transp., Inc.*, 419 U.S. at 286).[28]

Judge Copeland's opinion concurring in the result contends that "the new commensurate-with-income standard cannot be implemented consistently with a strict adherence to the *First Security Bank* holding." *See* Copeland concurring in the result op. p. 284. The concurring opinion appears to rely on legislative history in support of this conclusion. But, regardless of the merits (or demerits) of relying on legislative history either generally or in this case, *see* Buch dissenting op. p. 305, as I have explained above, the legislative history is simply silent on the issue of blocked income.

The passage quoted by Judge Copeland proves this point. It begins by stating that, "[i]n requiring that payments be commensurate with the income stream [from the intangible], the bill does not intend to mandate the use of the 'contract manufacturer' or 'cost-plus' methods of allocating income or any other particular method." House Report, at 426. Thus, the passage's focus is on the choice of method, an issue entirely separate from blocked income. The second sentence of the passage confirms this focus, stating that "[a]s under present law, all the facts and circumstances are to be considered *in determining what pricing methods are appropriate* in cases involving intangible property." *Id.* (emphasis added). The sentence then provides examples of factors, such as the degree of risk borne by parties,

---

[27] Indeed, given the text and history of the second sentence, it makes sense that Treasury did not immediately think to include the blocked income rule in its update to the regulations.

[28] The Commissioner also argues that "the data-based factors under *State Farm* do not apply" if "an agency rule does not require fact-finding or empirical analysis." Resp't's Am. Answering Br. 18. But the Supreme Court relied in part on the *State Farm* standard in *Encino Motorcars, LLC*, 579 U.S. at 221, a case which, like this one, involved statutory interpretation in the face of contrary caselaw. *See id.* at 216–18. And in any event, my conclusions here do not depend on any "data-based factors."

that typically are considered in selecting a transfer pricing method. Again, selecting a method has nothing to do with blocked income.

Moreover, even if one were to read the legislative history Judge Copeland cites as having something to say about blocked income, a rule that categorically excludes certain foreign restrictions from consideration, as Treasury Regulation § 1.482-1(h)(2) does, can hardly be reconciled with the passage's statement that "all facts and circumstances are to be considered." And even more importantly for my purposes, none of the "weighing" of relevant factors that Judge Copeland undertakes, *see* Copeland concurring in the result op. p. 285, appears anywhere in the administrative rulemaking record that Treasury developed. We may not affirm the Commissioner's decision here for reasons Treasury did not offer or based on a "weighing" of factors Treasury did not undertake.[29]

III.  *Treasury's Historical Position on the Nature of Its Regulations Provides a Better Explanation for Its Actions Here Than the Justifications Offered by Either the Opinion of the Court or the Commissioner.*

As Justice Holmes wrote in another tax case, "a page of history is worth a volume of logic." *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921). That observation is particularly apt here. History appears to offer a better explanation for Treasury's actions with respect to Treasury Regulation § 1.482-1(h)(2) than either the opinion of the Court or the Commissioner. As noted above, when adopting the challenged regulation (and the entire package of which that regulation was a part), Treasury "determined" that "that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) . . . do[es] not apply to these regulations."

"When an agency engaged in a particular rulemaking exercise believes the APA does not require it to provide notice and receive comments at all, it is not difficult to see why that agency might think

---

[29] To the extent Judge Copeland argues that the Commissioner should prevail based on the second sentence of section 482, regardless of Treasury Regulation § 1.482-1(h)(2), I further note that neither the Commissioner nor Judge Copeland's opinion (or the opinion of the Court for that matter) actually undertakes to show what "the profit or income stream generated by or associated with intangible property is." *See* Copeland concurring in the result op. p. 285 (quoting House Report, at 426). We simply do not know how much more income 3M Brazil made as a result of using the relevant intangibles than it would have made without them. This seems to me a critical omission for anyone who wishes to rely on the commensurate-with-income principle to decide this case.

that a rather brief explanation, offered as it were out of its own generosity, should be good enough." *Oakbrook Land Holdings, LLC*, 154 T.C. at 222 (Toro, J., concurring in the result). Here Treasury "determined" that notice and comment were not required by the APA. Thus, although it in fact provided both notice and an opportunity to comment, it appears not to have thought itself bound to satisfy the standards set out in *Home Box Office* and its progeny and affirmed in *State Farm*, *Encino Motorcars*, and other recent Supreme Court decisions. Viewed in that light, I can at least understand Treasury's actions, even if, in carrying out my reviewing responsibility under the APA, I cannot approve of them.

Treasury's position appears to have been based on its historical view that the regulations were interpretative and therefore not subject to notice and comment under the APA. *See* Kristin E. Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 Notre Dame L. Rev. 1727, 1729 (2007) ("Treasury acknowledges that APA section 553 governs its various regulatory efforts. Treasury also contends, however, that most Treasury regulations are interpretive in character and thus exempt from the public notice and comment requirements by the APA's own terms." (Footnote omitted.)). Indeed, provisions of the Internal Revenue Manual (IRM) dating back to at least 1994 reflect the IRS's by-then-longstanding view that nearly all Treasury regulations were interpretative (rather than legislative) rules that did not require notice and comment. One such provision stated: "Most regulations set forth interpretations to resolve ambiguities or fill gaps in the tax statutes. . . . In rare instances, regulations contain guidance that is technically legislative, rather than interpretative." IRM (30)(15)20 § 212 (Aug. 1, 1994). And the IRM continued on to state: "[The APA's] requirements do not apply if the rules are interpretative . . . . If you think that there are unusual circumstances so that your regulations would not be interpretative, consult with your Assistant or Associate Chief Counsel to determine whether the [APA] applies to your regulations project." *Id.* § 531.1. But as we have recently made clear, and as the Commissioner does not dispute, a regulation like the one here is legislative, not interpretative. *See Green Valley*, No. 17379-19, 159 T.C., slip op. at 8–15.

Put simply, Treasury erroneously assumed the regulations were interpretative. That assumption colored its view of its responsibilities under the APA, which in turn contributed to its failure to meet the APA procedural requirements. While all of this may be understandable (and

regrettable) and one cannot fault the drafters of these particular regulations for following what they thought were long-established Treasury positions, it does not justify this Court's jumping into the breach to rescue Treasury from its own mistake.[30]

IV.  *Additional Considerations*

A.  *Compliance with the APA's Procedural Requirements Serves Important Values.*

It bears emphasizing that requiring agencies to comply with the APA's procedural requirements is not a pointless exercise. Although some might argue what Treasury was trying to do when adopting Treasury Regulation § 1.482-1(h)(2)—essentially overturn judicial precedent it did not like—was "obvious" to the tax world and that Treasury's failure to explain its reasoning and address comments on the record is harmless, the argument would be misplaced.

As the Supreme Court recently explained, "[p]rocedural requirements can often seem [an idle and useless formality]." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1909 (citations omitted). But they "serve[] important values of administrative law." *Id.*

Requiring Treasury to explain its reasoning and respond to comments here

> promotes "agency accountability," *Bowen v. American Hospital Assn.*, 476 U.S. 610, 643 (1986), by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority. Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (internal quotation marks omitted). Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly functioning of the process of review,"

---

[30] Chief Judge Kerrigan's concurring opinion expresses concern that my "dissent would create a slippery slope whereby courts would be constantly faced with determining whether comments are significant and if the agency responded appropriately to them." *See* concurring op. p. 280. But the APA already requires precisely this type of review, and decades of administrative law jurisprudence from the Supreme Court and the courts of appeals demonstrate that we must not shy away from our duty. *See* Part I above.

[*Chenery I*], 318 U.S. [at] 94 . . . , forcing both litigants and courts to chase a moving target.

*Id.* The facts of this case demonstrate the wisdom of the Supreme Court's observations, and "[e]ach of the[] values [identified by the Supreme Court is] markedly undermined," *id.*, when the opinion of the Court gives Treasury a pass on explaining its reasoning and responding to comments here.[31]

That an agency's attempt to overturn judicial precedent might be viewed as "obvious" makes it more important (not less) for the agency to explain its reasoning contemporaneously. The rule of law would be undermined if courts were to permit agencies to attempt to overrule judicial decisions without so much as an acknowledgment that they are doing so. I am not aware of any other agency that has made as bold a claim as that made here. Nor of any other court's countenancing such a claim. Treasury's silence in these circumstances was arbitrary and capricious under the APA.

B.     *Review of Tax Regulations May Raise Special Concerns.*

Before concluding, I wish to return briefly to the first subsidiary question I asked at the beginning of this dissent: Is Treasury subject to the same procedural APA rules as other agencies? In *Mayo Foundation* the Supreme Court said "yes." The analysis above is based on that premise.

In reaching its conclusion in *Mayo Foundation*, however, the Court noted that "Mayo has not advanced any justification" supporting a different outcome, and the Court's conclusion there appears to have been premised on the "the absence of such justification." *Mayo Foundation*, 562 U.S. at 55.

---

[31] The outcome here would be no different under Justice Kavanaugh's partial dissent in *Regents of the University of California*, 140 S. Ct. at 1934. In Justice Kavanaugh's view, under the relevant Supreme Court precedents, "the *post hoc* justification doctrine merely requires that courts assess agency action based on the official explanations of the agency decisionmakers, and not based on after-the-fact explanations advanced *by agency lawyers during litigation* (or by judges)." *Id.* Even under that view, however, the Commissioner could not prevail as we do not have before us any additional "official explanations of the agency decisionmakers." *Id.* Rather, all we have are an utterly silent record and "explanations advanced by agency lawyers during litigation" or arguments offered "by judges." *Id.* (emphasis omitted).

As a lower court, we are bound to follow the Supreme Court's *Mayo Foundation* decision. But it is appropriate to note that applying the APA's procedural requirements to Treasury regulations creates some wrinkles that may not be present when courts review rulemaking by other agencies.

For example, in general, courts can review promptly rulemaking proceedings that other agencies undertake. *See* Wright & Miller, *supra*, § 8303 (describing "special statutory review proceedings [that] funnel judicial review of agency action directly to courts of appeals" (often the D.C. Circuit) subject to strict time limits, such as 60 or 90 days). By contrast, Treasury regulations might not be subject to judicial review for decades. The Anti-Injunction Act generally precludes an aggrieved taxpayer's immediate challenge of a newly adopted regulation.[32] I.R.C. § 7421(a); *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1593 (2021) ("[T]he Anti-Injunction Act bars pre-enforcement review, prohibiting a taxpayer from bringing . . . a 'preemptive[]' suit to foreclose tax liability. . . . And it does so always—whatever the taxpayer's subjective reason for contesting the tax at issue. If the dispute is about a tax rule—as it is in the run-of-the-mine suits the Government raises—the sole recourse is to pay the tax and seek a refund."); *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 543 (2012) ("Because of the Anti-Injunction Act, taxes can ordinarily be challenged only after they are paid, by suing for a refund."). As then-Judge Kavanaugh has explained:

> Among other things, the [Anti-Injunction] Act generally bars pre-enforcement challenges to certain tax statutes and regulations. The Act requires plaintiffs to instead raise such challenges in refund suits after the tax has been paid, or in deficiency proceedings. The Act thus creates a narrow exception to the general administrative law principle that pre-enforcement review of agency regulations is available in federal court. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 152–53 (1967). The Act thereby "protects the Government's ability to collect a consistent stream of revenue."

---

[32] The Anti-Injunction Act forbids any "suit for the purpose of restraining the assessment or collection of any tax." I.R.C. § 7421(a). The Declaratory Judgment Act's tax exception, 28 U.S.C. § 2201(a), which "is at least as broad as the Anti-Injunction Act," *Bob Jones Univ. v. Simon*, 416 U.S. 725, 733 n.7 (1974), reinforces that prohibition.

*Fla. Bankers Ass'n v. U.S. Dep't of the Treas.*, 799 F.3d 1065, 1066–67 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *NFIB*, 567 U.S. at 543). Thus, an aggrieved taxpayer must wait until the Commissioner applies the regulation at issue to that taxpayer and either determines a deficiency with respect to the taxpayer or denies a request for a refund (or fails to act on such a request) by the taxpayer. Only then would the taxpayer have the opportunity to seek judicial review to address any procedural shortcomings in the adoption of the relevant regulation. And, as this case demonstrates, by then many years may have passed since the challenged regulation was first adopted.

In addition, when another agency fails to comply with the APA's procedural requirements, the reviewing court usually can order a remand permitting the agency promptly to address any procedural shortfall. By contrast, our authority in a case like this one is limited to redetermining the deficiency. We can set aside the regulation in reaching our decision, but ordering a remand for further rulemaking is not open to us. Any further rulemaking would be left to Treasury's discretion.

Thus, judicial review of Treasury regulations differs in some key respects from judicial review of other regulations. And, when combined, these differences create some challenges.

For example, we must review in 2023 a regulation Treasury promulgated in 1993. And in undertaking our review, we must apply the APA using the *Mayo Foundation* lens, which the Supreme Court provided in 2011, as well as other APA-related decisions (such as *Encino Motorcars*) issued long after 1993. It is possible that, if Treasury had been aware of these subsequent pronouncements, it might have recognized that the regulation at issue was legislative (not interpretative) and prepared a different record that addressed the procedural deficiencies identified above.[33] But we must review the record that Treasury actually developed back in 1993, not one that it might have developed with the benefit of decisions issued in 2011 and

---

[33] Treasury of course knows how to provide meaningful responses to comments. *See, e.g.*, T.D. 9846, 2019-9 I.R.B. 583, 84 Fed. Reg. 1838 (Feb. 5, 2019) (Treasury Decision concerning regulations under section 965 spanned 78 pages of the Federal Register, including a preamble of more than 36 pages, of which more than 30 pages responded to comments); T.D. 9790, 2016-45 I.R.B. 540, 81 Fed. Reg. 72,858 (Oct. 21, 2016) (Treasury Decision concerning regulations under section 385 spanned 127 pages of the Federal Register, including a preamble of more than 90 pages, of which more than 80 pages responded to comments).

beyond. The unfortunate predicament Treasury faces flows (1) from its own assumptions about the nature of the regulations at issue and (2) from Congress's decision to make Treasury subject to the APA and at the same time, under the Anti-Injunction Act, defer most APA challenges to Treasury regulations until an issue arises in the context of an actual dispute between a taxpayer and the Commissioner. This may seem unfair and may subject to an APA challenge regulations long on the books, but if the current state of the law is unsatisfactory from Treasury's perspective, relief must come from Congress (or perhaps the Supreme Court), not us. Constrained as I am to evaluate Treasury's regulations using the same standards as those used for other agency rulemaking, I must conclude that Treasury's action here did not meet those standards.

V.   *Conclusion*

For the reasons noted above, Treasury "fail[ed] to follow the correct procedures in issuing" Treasury Regulation § 1.482-1(h)(2). *Encino Motorcars, LLC*, 579 U.S. at 220. Therefore, that regulation cannot receive *Chevron* deference. *Id.* at 221. In the absence of a valid regulation, *Procter & Gamble Co.*, 95 T.C. 323, requires us to hold for 3M. Because the opinion of the Court concludes otherwise, I respectfully dissent.

BUCH, URDA, JONES, GREAVES, and WEILER, *JJ.*, agree with this dissent.

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| 3M COMPANY AND SUBSIDIARIES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. 5816-13 |
| | ) | |
| COMMISSIONER OF INTERNAL REVENUE, | ) | Judge Morrison |
| | ) | |
| Respondent. | ) | |

## DECISION

Pursuant to the opinion of the Court filed February 9, 2023, it is

ORDERED AND DECIDED: That there is a deficiency in income tax due from petitioner for the taxable year 2006 in the amount of $3,587,304.

**(Signed) Richard T. Morrison**
**Judge**

Entered:

\* \* \* \* \* \* \* \* \*

The parties stipulate that the foregoing decision is in accordance with the opinion of the Court and respondent's computation, and that the Court may enter this decision, without prejudice to the right of either party to contest the correctness of the decision entered herein.

**Entered and Served 09/28/23**

Appellate Case: 23-3772    Page: 349    Date Filed: 02/08/2024 Entry ID: 5361675

Docket No. 5816-13       - 2 -

It is further stipulated that interest will be credited or paid as provided by law on any overpayment in tax due to petitioner.

It is further stipulated that interest will be assessed as provided by law on the deficiency due from petitioner.

WILLIAM M. PAUL
Acting Chief Counsel
Internal Revenue Service

Justin L.    Digitally signed by
Justin L. Campolieta
Campolieta Date: 2023.09.21
16:15:16 -04'00'

By: _____

WALTER A. PICKHARDT
Faegre Baker Daniels LLP
Counsel for Petitioner
Tax Court Bar No. PWO295

JUSTIN L. CAMPOLIETA
Special Trial Attorney (SL)
Tax Court Bar No. CJ1671

Date: ___September 21, 2023___     Date: ___September 21, 2023___

# Constitutional, Statutory, and Regulatory Provisions Involved

## U.S. Const. amend. XVI

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

## 5 U.S.C. § 553. Rule making

(a)    This section applies, according to the provisions thereof, except to the extent that there is involved—

   (1)    a military or foreign affairs function of the United States; or

   (2)    a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b)    General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

   (1)    a statement of the time, place, and nature of public rule making proceedings;

   (2)    reference to the legal authority under which the rule is proposed;

   (3)    either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

   (4)    the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply—

(A)   to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B)   when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c)   After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.  When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d)   The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1)   a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2)   interpretative rules and statements of policy; or

(3)   as otherwise provided by the agency for good cause found and published with the rule.

(e)   Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.


## 5 U.S.C. § 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)   compel agency action unlawfully withheld or unreasonably delayed; and

(2)    hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    contrary to constitutional right, power, privilege, or immunity;

(C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)    without observance of procedure required by law;

(E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 26 U.S.C. § 61.  Gross income defined

### (a)    General definition

Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1)    Compensation for services, including fees, commissions, fringe benefits, and similar items;

(2)    Gross income derived from business;

(3)    Gains derived from dealings in property;

(4)    Interest;

(5)    Rents;

(6)    Royalties;

(7)    Dividends;

(8)　Annuities;

(9)　Income from life insurance and endowment contracts;

(10)　Pensions;

(11)　Income from discharge of indebtedness;

(12)　Distributive share of partnership gross income;

(13)　Income in respect of a decedent; and

(14)　Income from an interest in an estate or trust.

**(b)　Cross references**

For items specifically included in gross income, see part II (sec. 71 and following).　For items specifically excluded from gross income, see part III (sec. 101 and following).

## 26 U.S.C. § 482.　Allocation of income and deductions among taxpayers

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.　In the case of any transfer (or license) of intangible property (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.　For purposes of this section, the Secretary shall require the valuation of transfers of intangible property (including intangible property transferred with other property or services) on an aggregate basis or the valuation of such a transfer on the basis of the realistic alternatives to such a transfer, if the Secretary determines that such basis is the most reliable means of valuation of such transfers.

Appellate Case: 23-3772　　Page: 354　　Date Filed: 02/08/2024　Entry ID: 5361675

**26 C.F.R. § 1.482-1 (2006). Allocation of income and deductions among taxpayers** (*excerpts*)

(a)   *In general*—(1) *Purpose and scope*.  The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions.  Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer.  This § 1.482-1 sets forth general principles and guidelines to be followed under section 482.  Section 1.482-2 provides rules for the determination of the true taxable income of controlled taxpayers in specific situations, including controlled transactions involving loans or advances, services, and property.  Sections 1.482-3 through 1.482-6 elaborate on the rules that apply to controlled transactions involving property.  Section 1.482-7T sets forth the cost sharing provisions applicable to taxable years beginning on or after October 6, 1994, and before January 1, 1996.  Section 1.482-7 sets forth the cost sharing provisions applicable to taxable years beginning on or after January 1, 1996.  Finally, § 1.482-8 provides examples illustrating the application of the best method rule.

(2)   *Authority to make allocations*.  The district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income.  In such case, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as allocations).  The appropriate allocation may take the form of an increase or decrease in any relevant amount.

(3)   *Taxpayer's use of section 482*.  If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged.  Except as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply such provisions.  Therefore, no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions.  See § 1.6662-6T(a)(2) or successor regulations.

(b) *Arm's length standard*—(1) *In general*. In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. See § 1.482-1(d)(2) (Standard of comparability). Evaluation of whether a controlled transaction produces an arm's length result is made pursuant to a method selected under the best method rule described in § 1.482-1(c).

(2) *Arm's length methods*—(i) *Methods*. Sections 1.482-2 through 1.482-6 provide specific methods to be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's length standard, and if they do not, to determine the arm's length result. Section 1.482-7 provides the specific method to be used to evaluate whether a qualified cost sharing arrangement produces results consistent with an arm's length result.

(ii) *Selection of category of method applicable to transaction*. The methods listed in § 1.482-2 apply to different types of transactions, such as transfers of property, services, loans or advances, and rentals. Accordingly, the method or methods most appropriate to the calculation of arm's length results for controlled transactions must be selected, and different methods may be applied to interrelated transactions if such transactions are most reliably evaluated on a separate basis. For example, if services are provided in connection with the transfer of property, it may be appropriate to separately apply the methods applicable to services and property in order to determine an arm's length result. But see § 1.482-1(f)(2)(i) (Aggregation of transactions). In addition, other applicable provisions of the Code may affect the characterization of a transaction, and therefore affect the methods applicable under section 482. See for example section 467.

* * *

(h)   *Special rules*—(1) *Small taxpayer safe harbor*.  [Reserved]

(2)   *Effect of foreign legal restrictions*—(i) *In general*.  The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length.  Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time.  In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2) (iii) and (iv) of this section (Deferred income method of accounting).

(ii)   *Applicable legal restrictions*.   Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii) (A) through (D) of this section are met.

(A)   The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

(B)   The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

(C)   The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

(D)   The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

(iii)   *Requirement for electing the deferred income method of accounting*.  If a foreign legal restriction prevents the payment or receipt of

part or all of the arm's length amount that is due with respect to a controlled transaction, the restricted amount may be treated as deferrable if the following requirements are met—

(A) The controlled taxpayer establishes to the satisfaction of the district director that the payment or receipt of the arm's length amount was prevented because of a foreign legal restriction and circumstances described in paragraph (h)(2)(ii) of this section; and

(B) The controlled taxpayer whose U.S. tax liability may be affected by the foreign legal restriction elects the deferred income method of accounting, as described in paragraph (h)(2)(iv) of this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the IRS first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign legal restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program will be considered an amended return for purposes of this paragraph (h)(2)(iii)(B) if it satisfies the requirements of a qualified amended return for purposes of § 1.6664-2(c)(3) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

(iv) *Deferred income method of accounting.* If the requirements of paragraph (h)(2)(ii) of this section are satisfied, any portion of the arm's length amount, the payment or receipt of which is prevented because of applicable foreign legal restrictions, will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (h)(2)(iv), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against any amount so deferred, are subject to deferral under the provisions of § 1.461-1(a)(4). In addition, income is deferrable under this deferred income method of accounting only to the extent that it exceeds the related deductions already claimed in open taxable years to which the foreign legal restriction applied.

(v) *Examples.* The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (h)(2).

*Example 1*.  Parent licenses an intangible to Sub.  FC law generally prohibits payments by any person within FC to recipients outside the country.  The FC law meets the requirements of paragraph (h)(2)(ii) of this section.  There is no evidence of unrelated parties entering into transactions under comparable circumstances for a comparable period of time, and the foreign legal restrictions will not be taken into account in determining the arm's length amount.  The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC.  However, because the requirements of paragraph (h)(2)(ii) of this section are satisfied, Parent can elect the deferred income method of accounting by attaching to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (h)(2)(iii)(B) of this section.

*Example 2*.  (i) The facts are the same as in *Example 1*, except that Sub, although it makes no royalty payment to Parent, arranges with an unrelated intermediary to make payments equal to an arm's length amount on its behalf to Parent.

(ii)   The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%.  Further, the district director determines that because the arrangement with the third party had the effect of circumventing the FC law, the requirements of paragraph (h)(2)(ii)(D) of this section are not satisfied.  Thus, Parent could not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable.  In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482-1(g) (Collateral adjustments).

*Example 3*.  The facts are the same as in *Example 1*, except that the laws of FC do not prevent distributions from corporations to their shareholders.  Sub distributes an amount equal to 8% of its sales in country FC.  Because the laws of FC did not expressly prevent all forms of payment from Sub to Parent, Parent cannot validly elect the deferred income method of accounting with respect to any of the arm's length royalty amount.  In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482-1(g) (Collateral adjustments).

Appellate Case: 23-3772     Page: 359     Date Filed: 02/08/2024 Entry ID: 5361675

*Example 4*.  The facts are the same as in *Example 1*, except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent.  Parent demonstrates the existence of a comparable uncontrolled transaction for purposes of the comparable uncontrolled transaction method in which an uncontrolled party accepted a royalty rate of 5%.  Given the evidence of the comparable uncontrolled transaction, the 5% royalty rate is determined to be the arm's length royalty rate.

(3)  *Coordination with section 936*—(i) *Cost sharing under section 936*.  If a possessions corporation makes an election under section 936(h)(5)(C)(i)(I), the corporation must make a section 936 cost sharing payment that is at least equal to the payment that would be required under section 482 if the electing corporation were a foreign corporation.  In determining the payment that would be required under section 482 for this purpose, the provisions of §§ 1.482-1 and 1.482-4 will be applied, and to the extent relevant to the valuation of intangibles, §§ 1.482-5 and 1.482-6 will be applied.  The provisions of section 936(h)(5)(C)(i)(II) (Effect of Election—electing corporation treated as owner of intangible property) do not apply until the payment that would be required under section 482 has been determined.

(ii)  *Use of terms*.  A cost sharing payment, for the purposes of section 936(h)(5)(C)(i)(I), is calculated using the provisions of section 936 and the regulations thereunder and the provisions of this paragraph (h)(3).  The provisions relating to cost sharing under section 482 do not apply to payments made pursuant to an election under section 936(h)(5)(C)(i)(I).  Similarly, a profit split payment, for the purposes of section 936(h)(5)(C)(ii)(I), is calculated using the provisions of section 936 and the regulations thereunder, not section 482 and the regulations thereunder.

(i)  *Definitions*.  The definitions set forth in paragraphs (i)(1) through (10) of this section apply to §§ 1.482-1 through 1.482-8.

(1)  *Organization* includes an organization of any kind, whether a sole proprietorship, a partnership, a trust, an estate, an association, or a corporation (as each is defined or understood in the Internal Revenue Code or the regulations thereunder), irrespective of the place of organization, operation, or conduct of the trade or business, and regardless of

Appellate Case: 23-3772     Page: 360     Date Filed: 02/08/2024 Entry ID: 5361675

whether it is a domestic or foreign organization, whether it is an exempt organization, or whether it is a member of an affiliated group that files a consolidated U.S. income tax return, or a member of an affiliated group that does not file a consolidated U.S. income tax return.

(2) *Trade* or *business* includes a trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place of operation. Employment for compensation will constitute a separate trade or business from the employing trade or business.

(3) *Taxpayer* means any person, organization, trade or business, whether or not subject to any internal revenue tax.

(4) *Controlled* includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

(5) *Controlled taxpayer* means any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers. Uncontrolled taxpayer means any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests.

(6) *Group*, *controlled group*, and *group of controlled taxpayers* mean the taxpayers owned or controlled directly or indirectly by the same interests.

(7) *Transaction* means any sale, assignment, lease, license, loan, advance, contribution, or any other transfer of any interest in or a right to use any property (whether tangible or intangible, real or personal) or money, however such transaction is effected, and whether or not the terms of such transaction are formally documented. A transaction also includes the performance of any services for the benefit of, or on behalf of, another taxpayer.

(8) *Controlled transaction* or *controlled transfer* means any transaction or transfer between two or more members of the same group of

controlled taxpayers. The term uncontrolled transaction means any transaction between two or more taxpayers that are not members of the same group of controlled taxpayers.

(9) *True taxable income* means, in the case of a controlled taxpayer, the taxable income that would have resulted had it dealt with the other member or members of the group at arm's length. It does not mean the taxable income resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement the controlled taxpayer chose to make (even though such contract, transaction, or arrangement is legally binding upon the parties thereto).

(10) *Uncontrolled comparable* means the uncontrolled transaction or uncontrolled taxpayer that is compared with a controlled transaction or taxpayer under any applicable pricing methodology. Thus, for example, under the comparable profits method, an uncontrolled comparable is any uncontrolled taxpayer from which data is used to establish a comparable operating profit.

(j) *Effective dates*—(1) The regulations in this are generally effective for taxable years beginning after October 6, 1994.

(2) Taxpayers may elect to apply retroactively all of the provisions of these regulations for any open taxable year. Such election will be effective for the year of the election and all subsequent taxable years.

(3) Although these regulations are generally effective for taxable years as stated, the final sentence of section 482 (requiring that the income with respect to transfers or licenses of intangible property be commensurate with the income attributable to the intangible) is generally effective for taxable years beginning after December 31, 1986. For the period prior to the effective date of these regulations, the final sentence of section 482 must be applied using any reasonable method not inconsistent with the statute. The IRS considers a method that applies these regulations or their general principles to be a reasonable method.

(4) These regulations will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985, or before August 17, 1986, for transfers or licenses to others. Nevertheless, they will apply with respect to transfers or licenses before such dates if, with respect to property transferred pursuant to an earlier and

continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date.

(5)    The last sentences of paragraphs (b)(2)(i) and (c)(1) of this section and of paragraph (c)(2)(iv) of § 1.482-5 apply for taxable years beginning on or after August 26, 2003.

## 26 C.F.R. § 1.482-1 (1968). Allocation of income and deductions among taxpayers (*excerpts*)

* * *

(b)    *Scope and purpose*. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

(2)    Section 482 and this section apply to the case of any controlled taxpayer, whether such taxpayer makes a separate or a consolidated return. If a controlled taxpayer makes a separate return, the determination is of its true separate taxable income. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer are determined consistently with the principles of a consolidated return.

(3)    Section 482 grants no right to a controlled taxpayer to apply its provisions at will, nor does it grant any right to compel the district director to apply such provisions.  It is not intended (except in the case of the computation of consolidated taxable income under a consolidated return) to effect in any case such a distribution, apportionment, or allocation of gross income, deductions, credits, or allowances, or any item of gross income, deductions, credits, or allowances, as would produce a result equivalent to a computation of consolidated taxable income under subchapter A, chapter 6 of the Code.

* * *

(d)    *Method of allocation*. (1) The method of allocating, apportioning, or distributing income, deductions, credits, and allowances to be used by the district director in any case, including the form of the adjustments and the character and source of amounts allocated, shall be determined with reference to the substance of the particular transactions or arrangements which result in the avoidance of taxes or the failure to clearly reflect income.  The appropriate adjustments may take the form of an increase or decrease in gross income, increase or decrease in deductions (including depreciation), increase or decrease in basis of assets (including inventory), or any other adjustment which may be appropriate under the circumstances.  See § 1.482-2 for specific rules relating to methods of allocation in the case of several types of business transactions.

(2)    Whenever the district director makes adjustments to the income of one member of a group of controlled taxpayers (such adjustments being referred to in this paragraph as "primary" adjustments) he shall also make appropriate correlative adjustments to the income of any other member of the group involved in the allocation.  The correlative adjustment shall actually be made if the U.S. income tax liability of the other member would be affected for any pending taxable year.  Thus, if the district director makes an allocation of income, he shall not only increase the income of one member of the group, but shall decrease the income of the other member if such adjustment would have an effect on the U.S. income tax liability of the other member for any pending taxable year. For the purposes of this subparagraph, a "pending taxable year" is any taxable year with respect to which the U.S. income tax return of the other member has been filed by the time the allocation is made, and with respect to which a credit or refund is not barred by the operation of any law

Appellate Case: 23-3772    Page: 364    Date Filed: 02/08/2024 Entry ID: 5361675

or rule of law. If a correlative adjustment is not actually made because it would have no effect on the U.S. income tax liability of the other member involved in the allocation for any pending taxable year, such adjustment shall nevertheless be deemed to have been made for the purpose of determining the U.S. income tax liability of such member for a later taxable year, or for the purposes of determining the U.S. income tax liability of any person for any taxable year. The district director shall furnish to the taxpayer with respect to which the primary adjustment is made a written statement of the amount and nature of the correlative adjustment which is deemed to have been made. For purposes of this subparagraph, a primary adjustment shall not be considered to have been made (and therefore a correlative adjustment is not required to be made) until the first occurring of the following events with respect to the primary adjustment:

(i) The date of assessment of the tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such adjustment,

(ii) Acceptance of a Form 870-AD (Offer of Waiver of Restriction on Assessment and Collection Deficiency in Tax and Acceptance of Overassessment),

(iii) Payment of the deficiency,

(iv) Stipulation in the Tax Court of the United States, or

(v) Final determination of tax liability by offer-in-compromise, closing agreement, or court action.

The principles of this subparagraph may be illustrated by the following examples in each of which it is assumed that X and Y are members of the same group of controlled entities and that they regularly compute their incomes on the basis of a calendar year:

*Example 1.* Assume that in 1968 the district director proposes to adjust X's income for 1966 to reflect an arm's length rental charge for Y's use of X's tangible property in 1966; that X consents to an assessment reflecting such adjustment by executing a Waiver, Form 870; and that an assessment of the tax with respect to such adjustment is made in 1968. The primary adjustment is therefore considered to have been made in

1968.  Assume further that both X and Y are United States corporations and that Y had net operating losses in 1963, 1964, 1965, 1966, and 1967. Although a correlative adjustment would not have an effect on Y's U.S. income tax liability for any pending taxable year, an adjustment increasing Y's net operating loss for 1966 shall be deemed to have been made for the purposes of determining Y's U.S. income tax liability for 1968 or a later taxable year to which the increased operating loss may be carried. The district director shall notify X in writing of the amount and nature of the adjustment which is deemed to have been made to Y.

*Example 2*.  Assume that X and Y are United States corporations; that X is in the business of rendering engineering services; that in 1968 the district director proposes to adjust X's income for 1966 to reflect an arm's length fee for the rendition of engineering services by X in 1966 relating to the construction of Y's factory; that X consents to an assessment reflecting such adjustment by executing a Waiver, Form 870; and that an assessment of the tax with respect to such adjustment is made in 1968.  Assume further that fees for such services would properly constitute a capital expenditure by Y, and that Y does not place the factory in service until 1969.  Although a correlative adjustment (increase in basis) would not have an effect on Y's U.S. income tax liability for a pending taxable year, an adjustment increasing the basis of Y's assets for 1966 shall be deemed to have been made in 1968 for the purpose of computing allowable depreciation or gain or loss on disposition for 1969 and any future taxable year.  The district director shall notify X in writing of the amount and nature of the adjustment which is deemed to have been made to Y.

*Example 3*.  Assume that X is a U.S. taxpayer and Y is a foreign taxpayer not engaged in a trade or business in the United States; that in 1968 the district director proposes to adjust X's income for 1966 to reflect an arm's length interest charge on a loan made to Y; that X consents to an assessment reflecting such allocation by executing a Waiver, Form 870; and that an assessment of the tax with respect to such adjustment is made in 1968.  Although a correlative adjustment would not have an effect on Y's U.S. income tax liability, an adjustment in Y's income for 1966 shall be deemed to have been made in 1968 for the purposes of determining the amount of Y's earnings and profits for 1966 and subsequent years, and of any other effect it may have on any person's U.S.

income tax liability for any taxable year.  The district director shall notify X in writing of the amount and nature of the allocation which is deemed to have been made to Y.

(3)   In making distributions, apportionments, or allocations between two members of a group of controlled entities with respect to particular transactions, the district director shall consider the effect upon such members of an arrangement between them for reimbursement within a reasonable period before or after the taxable year if the taxpayer can establish that such an arrangement in fact existed during the taxable year under consideration.  The district director shall also consider the effect of any other nonarm's length transaction between them in the taxable year which, if taken into account, would result in a setoff against any allocation which would otherwise be made, provided the taxpayer is able to establish with reasonable specificity that the transaction was not at arm's length and the amount of the appropriate arm's length charge. For purposes of the preceding sentence, the term arm's length refers to the amount which was charged or would have been charged in independent transactions with unrelated parties under the same or similar circumstances considering all the relevant facts and without regard to the rules found in § 1.482-2 by which certain charges are deemed to be equal to arm's length.  For example, assume that one member of a group performs services which benefit a second member, which would in itself require an allocation to reflect an arm's length charge for the performance of such services.  Assume further that the first member can establish that during the same taxable year the second member engages in other nonarm's length transactions which benefit the first member, such as by selling products to the first member at a discount, or purchasing products from the first member at a premium, or paying royalties to the first member in an excessive amount.  In such case, the value of the benefits received by the first member as a result of the other activities will be set-off against the allocation which would otherwise be made.  If the effect of the set-off is to change the characterization or source of the income or deductions, or otherwise distort taxable income, in such a manner as to affect the United States tax liability of any member, allocations will be made to reflect the correct amount of each category of income or deductions.  In order to establish that a set-off to the adjustments proposed by the district director is appropriate, the taxpayer must notify the district

director of the basis of any claimed set-off at any time before the expiration of the period ending 30 days after the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments or before July 16, 1968, whichever is later. The principles of this subparagraph may be illustrated by the following examples, in each of which it is assumed that P and S are calendar year corporations and are both members of the same group of controlled entities:

*Example 1*. P performs services in 1966 for the benefit of S in connection with S's manufacture and sale of a product. S does not pay P for such services in 1966, but in consideration for such services, agrees in 1966 to pay P a percentage of the amount of sales of the product in 1966 through 1970. In 1966 it appeared this agreement would provide adequate consideration for the services. No allocation will be made with respect to the services performed by P.

*Example 2*. P renders services to S in connection with the construction of S's factory. An arm's length charge for such services, determined under paragraph (b) of § 1.482-2, would be $100,000. During the same taxable year P makes available to S a machine to be used in such construction. P bills S $125,000 for the services, but does not bill for the use of the machine. No allocation will be made with respect to the excessive charge for services or the undercharge for the machine if P can establish that the excessive charge for services was equal to an arm's length charge for the use of the machine, and if the taxable income and income tax liabilities of P and S are not distorted.

*Example 3*. Assume the same facts as in *Example 2*, except that, if P had reported $25,000 as rental income and $25,000 less service income, it would have been subject to the tax on personal holding companies. Allocations will be made to reflect the correct amounts of rental income and service income.

(4)  If the members of a group of controlled taxpayers engage in transactions with one another, the district director may distribute, apportion, or allocate income, deductions, credits, or allowances to reflect the true taxable income of the individual members under the standards set forth in this section and in § 1.482-2 notwithstanding the fact that the ultimate income anticipated from a series of transactions may not be

Appellate Case: 23-3772    Page: 368    Date Filed: 02/08/2024 Entry ID: 5361675

realized or is realized during a later period. For example, if one member of a controlled group sells a product at less than an arm's length price to a second member of the group in one taxable year and the second member resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, notwithstanding that the second member of the group had not realized any gross income from the resale of the product in the first year. Similarly, if one member of a group lends money to a second member of the group in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second member does not realize income during such year. The provisions of this subparagraph apply even if the gross income contemplated from a series of transactions is never, in fact, realized by the other members.

(5)  Section 482 may, when necessary to prevent the avoidance of taxes or to clearly reflect income, be applied in circumstances described in sections of the Code (such as section 351) providing for nonrecognition of gain or loss. See, for example, "National Securities Corporation v. Commissioner of Internal Revenue", 137 F. 2d 600 (3d Cir. 1943), cert. denied 320 U.S. 794 (1943).

(6)  If payment or reimbursement for the sale, exchange, or use of property, the rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferrable income or deductions, providing the taxpayer has, for the year to which the distributions, apportionments, or allocations relate, elected to use a method of accounting in which the reporting of deferrable income is deferred until the income ceases to be deferrable income. Under such method of accounting, referred to in this section as the deferred income method of accounting, any payments or reimbursements which were prevented or would have been prevented, and any deductions attributable directly or indirectly to such payments or reimbursements, shall be deferred until they cease to be deferrable under such method of accounting.

If such method of accounting has not been elected with respect to the taxable year to which the allocations under section 482 relate, the taxpayer may elect such method with respect to such allocations (but not with respect to other deferrable income) at any time before the first occurring of the following events with respect to the allocations:

(i) Execution by the taxpayer of Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(ii) Expiration of the period ending 30 days after the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments reflecting such allocations or before July 16, 1968, whichever is later; or

(iii) Execution of a closing agreement or offer-in-compromise.

The principles of this subparagraph may be illustrated by the following example in which it is assumed that X, a domestic corporation, and Y, a foreign corporation, are members of the same group of controlled entities:

*Example*. X, which is in the business of rendering a certain type of service to unrelated parties, renders such services for the benefit of Y in 1965. The direct and indirect costs allocable to such services are $60,000, and an arm's length charge for such services is $100,000. Assume that the district director proposes to increase X's income by $100,000, but that the country in which Y is located would have blocked payment in 1965 for such services. If, prior to the first occurring of the events described in subdivisions (i), (ii), or (iii) of this subparagraph, X elects to use the deferred income method of accounting with respect to such allocation, the $100,000 allocation and the $60,000 of costs are deferrable until such amounts cease to be deferrable under X's method of accounting.

## CERTIFICATE OF SERVICE

I hereby certify that, on February 7, 2024, the Separate Addendum was electronically filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ Jonathan C. Bond*
Jonathan C. Bond
