# In the United States Court of Appeals for the Eighth Circuit

---

3M COMPANY & SUBSIDIARIES,

*Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Appellee.*

---

On Appeal From The United States Tax Court
No. 5816-13 – 160 T.C. No. 3

---

## APPELLANT'S OPENING BRIEF

---

Jonathan C. Bond
Saul Mezei
Jeff Liu
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
JBond@gibsondunn.com

*Counsel for Appellant*
 *3M Company & Subsidiaries*

# SUMMARY OF THE CASE

The Internal Revenue Service (IRS) allocated as "income" to appellant 3M Company, under 26 U.S.C. § 482, $23.65 million in intellectual-property royalties from a Brazilian subsidiary that Brazilian law forbade the subsidiary from paying to 3M. The IRS's allocation rests on a Treasury regulation, 26 C.F.R. § 1.482-1(h)(2), under which the IRS will ignore foreign legal restrictions on transactions between affiliates unless various additional criteria are met. The Tax Court upheld Treasury's regulation and the allocation in a splintered ruling with no majority opinion.

3M's position is that the blocked-income regulation is both substantively and procedurally invalid. 3M contends that the regulation contravenes Section 482 and Supreme Court precedent construing the statute to bar the IRS from allocating "income" to a taxpayer that the law prohibits it from receiving. 3M additionally contends that the regulation is invalid under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, 701 *et seq.*, because Treasury neither provided a reasoned explanation nor responded to significant comments.

3M respectfully submits that oral argument would be beneficial and that 20 minutes per side would be adequate to address the issues.

i

## CORPORATE-DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, appellant 3M Company states that it is a publicly held nongovernmental corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

ii

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ......................................... 3

STATEMENT OF ISSUES .................................................... 3

STATEMENT OF THE CASE ................................................ 4

    A.    3M's Operations And 2006 U.S. Tax Return ......................... 5

        1.    3M's global business ...................................................... 5

        2.    3M's Brazilian operations ............................................. 6

        3.    3M's 2006 U.S. tax return ............................................ 7

    B.    The Notice Of Deficiency And The Blocked-Income Rule ........................................................................... 7

        1.    Section 482 .................................................................. 7

        2.    Treasury's blocked-income rule .................................. 10

        3.    The IRS's Section 482 allocation ............................... 11

    C.    The Tax Court's Ruling ................................................... 12

        1.    Plurality opinion ........................................................ 12

        2.    Concurrences .............................................................. 14

        3.    Dissents ...................................................................... 14

SUMMARY OF ARGUMENT .............................................. 15

STANDARD OF REVIEW .................................................... 19

Appellate Case: 23-3772    Page: 4    Date Filed: 02/08/2024 Entry ID: 5361698

ARGUMENT ........................................................................... 19

I.   THE IRS'S SECTION 482 ALLOCATION IS UNLAWFUL
     BECAUSE IT RESTS ON A SUBSTANTIVELY INVALID
     READING OF THE STATUTE ..................................................... 19

     A.   Section 482 Does Not Allow The IRS To
          Allocate As "Income" To 3M Royalty Payments
          Prohibited By Law ..................................................... 20

          1.   "Income" in Section 482 excludes legally
               prohibited payments............................................ 20

          2.   The royalties the IRS allocated cannot
               constitute income to 3M because they
               were barred by law............................................. 31

     B.   The Tax Court Erred In Upholding The IRS's
          Allocation Under *Chevron* And The Blocked-
          Income Regulation..................................................... 32

          1.   *Chevron* has no application because
               Section 482 unambiguously excludes
               prohibited payments ........................................... 34

          2.   *Chevron* deference is unwarranted
               because the agency's statutory
               interpretation is unreasonable ........................... 45

II.  THE IRS'S SECTION 482 ALLOCATION IS INDEPENDENTLY
     UNLAWFUL BECAUSE IT RESTS ON A PROCEDURALLY
     INVALID REGULATION ........................................................ 47

     A.   The APA Required Treasury To Provide A
          Reasoned Explanation For Its Blocked-Income
          Rule And Respond To Significant Concerns
          Raised By Comments .................................................. 47

iv

B.     Treasury Defaulted On Its APA Obligations Here ............................................................................. 52

        1.     Treasury articulated no reasoned explanation for adopting the blocked-income regulation .............................................. 53

        2.     Treasury failed to respond to significant comments ............................................................ 60

CONCLUSION ....................................................................... 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM *(separately bound)*:

    Tax Court Opinion (Feb. 9, 2023) ............................................ Add. 1

    Tax Court Decision (Sept. 28, 2023) .................................... Add. 347

    Constitutional, Statutory, And Regulatory Provisions Involved .................................. Add. 349

Appellate Case: 23-3772    Page: 6    Date Filed: 02/08/2024    Entry ID: 5361698

# TABLE OF AUTHORITIES

## Cases

*American Fuel & Petrochemical Manufacturers* v. *EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ............................................................. 62

*Azar* v. *Allina Health Services*,
  139 S. Ct. 1804 (2019) ........................................................................ 50

*Bragdon* v. *Abbott*,
  524 U.S. 624 (1998) ............................................................................ 43

*Carlson* v. *Postal Regulatory Commission*,
  938 F.3d 337 (D.C. Cir. 2019) ............................................................. 62

*Chevron, U.S.A., Inc.* v. *Natural Resources Defense
  Council, Inc.*,
  467 U.S. 837 (1984) ............................................................... 12, 16, 33

*Colony, Inc.* v. *Commissioner*,
  357 U.S. 28 (1958) .............................................................................. 38

*Commissioner* v. *First Security Bank of Utah, N.A.*,
  405 U.S. 394 (1972) ........................................ 1, 4, 8, 16, 20, 24, 25, 26,
                                                             27, 28, 32, 35, 39, 40, 55, 57

*Commissioner* v. *Hansen*,
  360 U.S. 446 (1959) ............................................................................ 23

*CTS Corp.* v. *EPA*,
  759 F.3d 52 (D.C. Cir. 2014) ............................................................... 50

*Department of Commerce* v. *New York*,
  139 S. Ct. 2551 (2019) ........................................................................ 50

*DHS* v. *Regents of the University of California*,
  140 S. Ct. 1891 (2020) .................................................................. 49, 50

vi

*Encino Motorcars, LLC* v. *Navarro*,
579 U.S. 211 (2016)........................................................ 4, 46, 47, 48, 56

*Epic Systems Corp.* v. *Lewis*,
138 S. Ct. 1612 (2018)................................................................ 34

*Estate of Robertson* v. *Commissioner*,
15 F.3d 779 (8th Cir. 1994)......................................................... 19

*FCC* v. *Prometheus Radio Project*,
141 S. Ct. 1150 (2021)................................................................ 48

*Forest Grove School District* v. *T.A.*,
557 U.S. 230 (2009)................................................................... 43

*G.D. Searle & Co.* v. *Commissioner*,
88 T.C. 252 (1987)....................................................................... 8

*Gas Transmission Northwest Corp.* v. *FERC*,
363 F.3d 500 (D.C. Cir. 2004)..................................................... 48

*Gerber* v. *Norton*,
294 F.3d 173 (D.C. Cir. 2002)..................................................... 63

*Gomez* v. *United States*,
490 U.S. 858 (1989)................................................................... 23

*Goodrich* v. *Edwards*,
255 U.S. 527 (1921)................................................................... 22

*Greater Boston Television Corp.* v. *FCC*,
444 F.2d 841 (D.C. Cir. 1970)..................................................... 56

*Helvering* v. *Horst*,
311 U.S. 112 (1940)................................................................... 24

*Home Box Office, Inc.* v. *FCC*,
567 F.2d 9 (D.C. Cir. 1977)......................................................... 61

*Iowa League of Cities* v. *EPA*,
711 F.3d 844 (8th Cir. 2013)................................................. 49, 51

Appellate Case: 23-3772    Page: 8    Date Filed: 02/08/2024 Entry ID: 5361698

*Kisor* v. *Wilkie*,
139 S. Ct. 2400 (2019) ........................................................................ 45

*L.E. Shunk Latex Products, Inc.* v. *Commissioner*,
18 T.C. 940 (1952) .................................................................... 9, 26, 27

*Lechmere, Inc.* v. *NLRB*,
502 U.S. 527 (1992) ........................................................................... 35

*Make the Road New York* v. *Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ............................................................ 50

*Mann Construction, Inc.* v. *United States*,
27 F.4th 1138 (6th Cir. 2022) ...................................................... 52, 66

*Mayo Foundation for Medical Education & Research* v.
*United States*,
562 U.S. 44 (2011) .............................................................................. 52

*McDonald* v. *Commissioner*,
853 F.2d 1494 (8th Cir. 1988) ............................................................ 19

*MCI Telecommunications Corp.* v. *AT&T Co.*,
512 U.S. 218 (1994) ............................................................................ 45

*Menorah Medical Center* v. *Heckler*,
768 F.2d 292 (8th Cir. 1985) ........................................ 4, 48, 59, 60, 62

*MikLin Enterprises, Inc.* v. *NLRB*,
861 F.3d 812 (8th Cir. 2017) (en banc) .............................. 4, 17, 36, 37

*Milner* v. *Department of Navy*,
562 U.S. 562 (2011) ............................................................................ 44

*Motor Vehicle Manufacturers Ass'n of the United States, Inc.*
v. *State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) .............................................................. 4, 48, 58, 59

*National Association of Manufacturers* v. *Department of*
*Defense*,
583 U.S. 109 (2018) ............................................................................ 20

Appellate Case: 23-3772    Page: 9    Date Filed: 02/08/2024 Entry ID: 5361698

*National Cable & Telecommunications Ass'n* v. *Brand X Internet Services,*
545 U.S. 967 (2005)..................................................... 13, 17, 35, 36, 45

*Natural Resources Defense Council, Inc.* v. *EPA,*
859 F.2d 156 (D.C. Cir. 1988) ............................................................ 63

*Pereira* v. *Sessions,*
138 S. Ct. 2105 (2018)................................................................... 34, 35

*Perez* v. *Mortgage Bankers Ass'n,*
575 U.S. 92 (2015)........................................................................ 49, 62

*Perrin* v. *United States,*
444 U.S. 37 (1979)............................................................................... 21

*PPL Wallingford Energy LLC* v. *FERC,*
419 F.3d 1194 (D.C. Cir. 2005) ................................................ 49, 60, 63

*Prill* v. *NLRB,*
755 F.2d 941 (D.C. Cir. 1985) ............................................................ 45

*Procter & Gamble Co.* v. *Commissioner,*
961 F.2d 1255 (6th Cir. 1992)................................... 4, 9, 20, 29, 30, 57

*PSEG Energy Resources & Trade LLC* v. *FERC,*
665 F.3d 203 (D.C. Cir. 2011) ............................................................ 63

*Rauenhorst* v. *U.S. Department of Transportation,*
95 F.3d 715 (8th Cir. 1996).................................................................. 48

*Red River Valley Sugarbeet Growers Ass'n* v. *Regan,*
85 F.4th 881 (8th Cir. 2023) ............................................................... 58

*Reiter* v. *Sonotone Corp.,*
442 U.S. 330 (1979)............................................................................. 39

*Salyersville National Bank* v. *United States,*
613 F.2d 650 (6th Cir. 1980)............................................................... 29

Appellate Case: 23-3772    Page: 10    Date Filed: 02/08/2024 Entry ID: 5361698

*SEC* v. *Chenery Corp.*,
  318 U.S. 80 (1943)..................................................44

*SEC* v. *Chenery Corp.*,
  332 U.S. 194 (1947).................................................58

*Texaco, Inc.* v. *Commissioner*,
  98 F.3d 825 (5th Cir. 1996)..........................29, 30, 31

*Thompson Truck & Trailer, Inc.* v. *United States*,
  901 F.3d 951 (8th Cir. 2018).......................................21

*Thompson* v. *Clark*,
  741 F.2d 401 (D.C. Cir. 1984)......................................65

*Tower Loan of Mississippi, Inc.* v. *Commissioner*,
  T.C. Memo. 1996-152, 1996 WL 134989 (Mar. 26, 1996)..................29

*United States* v. *Basye*,
  410 U.S. 441 (1973)................................................28

*United States* v. *Home Concrete & Supply, LLC*,
  566 U.S. 478 (2012)........................4, 14, 38, 46

*Wheaton* v. *McCarthy*,
  800 F.3d 282 (6th Cir. 2015).......................................34

## Constitutional Provisions

U.S. Const. Amend. XVI.................................................23

## Statutes

5 U.S.C. § 553 ....................................4, 11, 49, 60

5 U.S.C. § 706 ............................4, 47, 48, 49, 60, 62

26 U.S.C. § 61 ......................................................22

26 U.S.C. § 482 ......................1, 3, 7, 8, 19, 20, 28

Appellate Case: 23-3772   Page: 11   Date Filed: 02/08/2024 Entry ID: 5361698

26 U.S.C. § 965 ................................................................................ 24

26 U.S.C. § 6214 ................................................................................ 3

26 U.S.C. § 7482 ................................................................................ 3

26 U.S.C. § 7483 ................................................................................ 3

Pub. L. No. 94-455, § 1906, 90 Stat. 1834 (1976).............................. 9

Pub. L. No. 99-514, § 1231, 100 Stat. 2562-2563 (1986)..................... 9, 41

Pub. L. No. 115-97, § 14221, 131 Stat. 2219 (2017)................................ 9

Pub. L. No. 115-141, Div. U, Tit. IV, § 401,
132 Stat. 1207 (2018) ..................................................................... 9

## Regulations

26 C.F.R. § 1.482-1 (2006) ...........................3, 10, 40, 46, 47, 51, 53, 59, 60

26 C.F.R. § 1.482-1 (1994) ................................................................ 55

26 C.F.R. § 1.482-1 (1971) ................................................................ 28

26 C.F.R. § 1.482-1 (1968) ................................................................ 55

58 Fed. Reg. 5263 (Jan. 21, 1993) ................................................ 11, 54

58 Fed. Reg. 5310 (Jan. 21, 1993) ............................................. 11, 53, 54

59 Fed. Reg. 34,971 (July 8, 1994) ........................... 11, 44, 51, 54, 62, 63

## Rules

Fed. R. App. P. 13................................................................................ 3

Tax Court Rule 122 ........................................................................... 4

## Other Authorities

Henry Campbell Black, *A Treatise on the Law of Income
Taxation* (1918) ........................................................................... 24

xi

*Black's Law Dictionary* (5th ed. 1979) ...................................................... 21

Kristin E. Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 Notre Dame L. Rev. 1727 (2007) ............................................................. 51

H.R. Rep. No. 2, 70th Cong., 1st Sess. (1927) ........................................... 8

Edwin R.A. Seligman, *The Income Tax* (1914) ........................................ 24

S. Rep. No. 275, 67th Cong., 1st Sess. (1921) ........................................... 8

S. Rep. No. 960, 70th Cong., 1st Sess. (1928) ........................................... 8

*Webster's New International Dictionary* (2d ed. 1947) ............................ 21

Appellate Case: 23-3772    Page: 13    Date Filed: 02/08/2024 Entry ID: 5361698

## INTRODUCTION

The Internal Revenue Code authorizes the Internal Revenue Service (IRS) to reallocate "income" among commonly controlled taxpayers to "reflect" their true incomes. 26 U.S.C. § 482. More than 50 years ago, the Supreme Court recognized an important, inherent limitation on that authority: The IRS cannot allocate as "income" to a taxpayer payments that it never received because they were prohibited by law. *Commissioner* v. *First Security Bank of Utah, N.A.*, 405 U.S. 394, 401-406 (1972).

That simple principle resolves this case. The IRS determined a tax deficiency against appellant 3M Company after allocating to 3M as "income" more than $23 million in royalties from a foreign subsidiary—royalties never paid because foreign law undisputedly barred such payments. That allocation flouts the statute and *First Security*—as every federal court to consider the issue until now has correctly recognized.

The Tax Court nevertheless upheld the IRS's allocation in a fractured ruling with no majority opinion. But none of the rationales adopted below justifies that result. The plurality sustained the IRS's allocation based not on Section 482, but on a Treasury Department regulation—the "blocked income" rule—that claims authority to ignore foreign legal

restrictions unless they meet additional criteria found nowhere in the statute. But that regulation cannot rescue the IRS's improper allocation because—as explained in three dissenting opinions joined by eight judges—the rule is both substantively and procedurally unlawful.

The blocked-income rule is substantively invalid because it contravenes the statute and Supreme Court precedent. The plurality did not attempt to show that the rule embodies the best reading of Section 482 but instead sustained it only by stretching doctrines of deference. But those doctrines do not authorize an agency to override a statute or a Supreme Court decision settling its meaning. The plurality's fallback theory—that the rule can be sustained as interpreting an amendment to Section 482 post-dating *First Security*—fails twice over: the amendment is irrelevant to blocked income, and the regulation does not interpret that amendment.

The blocked-income rule is also procedurally invalid because Treasury made no attempt to comply with the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, 701 *et seq.*, in promulgating it. Mistakenly believing the rule exempt from the APA, Treasury neither articulated any reasoned basis for it nor responded to public comments raising significant concerns. The plurality implausibly posited that Treasury

2

somehow complied with APA requirements that the agency itself deemed inapplicable. And the plurality improperly backfilled post hoc reasoning on Treasury's behalf, contrary to settled law.

For all of those reasons, the judgment below should be reversed.

## STATEMENT OF JURISDICTION

The Tax Court had jurisdiction under 26 U.S.C. § 6214(a) to review the IRS's deficiency determination. The Tax Court entered its decision on September 28, 2023. Addendum (Add.) 347. Appellant 3M Company timely noticed its appeal on December 22, 2023. 26 U.S.C. § 7483; Fed. R. App. P. 13(a)(1)(B). This Court has jurisdiction under 26 U.S.C. § 7482(a)(1). Venue is proper under 26 U.S.C. § 7482(b)(1)(B) because 3M Company has its principal place of business in Minnesota. Add. 10-11.

## STATEMENT OF ISSUES

I.  Whether the IRS's Section 482 allocation to 3M is unlawful because it rests on a substantively invalid interpretation of the statute, embodied in Treasury's blocked-income rule, 26 C.F.R. § 1.482-1(h)(2), that treats as "income" royalty payments that were not made and were forbidden by Brazilian law.

- 26 U.S.C. § 482

3

- *Commissioner* v. *First Security Bank of Utah, N.A.*, 405 U.S. 394 (1972)

- *United States* v. *Home Concrete & Supply, LLC*, 566 U.S. 478 (2012)

- *Procter & Gamble Co.* v. *Commissioner*, 961 F.2d 1255 (6th Cir. 1992)

- *MikLin Enterprises, Inc.* v. *NLRB*, 861 F.3d 812 (8th Cir. 2017) (en banc)

II.     Whether the IRS's Section 482 allocation is unlawful because it rests on a Treasury regulation that is procedurally invalid under the APA given Treasury's failures to provide any reasoned explanation for the rule and to respond to significant comments.

- 5 U.S.C. §§ 553(b)-(c), 706(2)

- *Motor Vehicle Manufacturers Ass'n of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)

- *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211 (2016)

- *Menorah Medical Center* v. *Heckler*, 768 F.2d 292 (8th Cir. 1985)

## STATEMENT OF THE CASE

This case was submitted on stipulated facts without trial under Tax Court Rule 122.  Add. 10.  The record thus consists of the parties' stipulation and attached exhibits.  Appendix (App.) 25-385.

4

## A. 3M's Operations And 2006 U.S. Tax Return

### 1. *3M's global business*

3M Company is an American corporation and the common parent of a group of affiliates that filed a consolidated U.S. federal income-tax return for 2006. App. 28. 3M and its subsidiaries operate a worldwide business enterprise spanning a range of industries, from office supplies to industrial products and transportation. App. 30-31. In 2006, 3M and its affiliates operated more than 40 major technology platforms that formed the basis for 50,000 different products worldwide. App. 30. Research and development, and related intellectual property, are important parts of 3M's business. App. 37.

In 1999, 3M transferred nearly all of its intellectual property (excluding trademarks) to a U.S. subsidiary, 3M Innovative Properties Company (IP Co.). App. 40-41. During 2006, 3M and IP Co. jointly licensed the intellectual property to affiliates under a standardized licensing agreement. App. 42. That license permitted affiliates to manufacture and sell goods using 3M's intellectual property in exchange for a royalty calculated as a percentage of affiliates' net sales. Add. 45-46; App. 42-44.

5

## 2.   *3M's Brazilian operations*

Not all 3M affiliates entered the standard licensing agreement. One such exception was 3M do Brasil Ltda. (3M Brazil), a wholly owned subsidiary, which manufactured and distributed products in Brazil.  App. 38-39.  3M Brazil used 3M's intellectual property, but its rights were addressed by multiple, separate agreements structured based on limitations imposed by Brazilian law.  Add. 18-42, 44, 46-48.

For much of its existence, 3M Brazil was prohibited by Brazilian law from paying any royalties to 3M.  App. 62-63.  Accordingly, in the 1980s, 3M's intellectual-property licenses with 3M Brazil were royalty-free.  App. 46, 48.

In 1991, Brazil partially repealed its prohibition on remitting royalties to controlling foreign companies.  App. 64.  Brazil's 1991 law, which remained effective in 2006, permitted cross-border royalty remittances between related entities only to the extent such payments were deductible for Brazilian tax purposes.  App. 64-65.  Implementing regulations established deductibility ceilings for patent royalties—which ranged from 1% to 5% of net sales, depending on the industry and product type—and a flat 1% deductibility ceiling for trademark royalties.   App. 69-72.   The

6

Brazilian Patent and Trademark Office, which must approve intellectual-property licensing agreements, established royalty-remittance limits corresponding to those ceilings. App. 73. Against that legal backdrop, 3M entered into three royalty-bearing licenses with 3M Brazil fixing royalty amounts pursuant to Brazilian law. App. 53-55.

### 3. 3M's 2006 U.S. tax return

In 3M's consolidated return for 2006, 3M reported that it received $5,104,756 that year in royalties from 3M Brazil. App. 82. It is undisputed that 3M Brazil paid 3M nearly all of the net royalties that Brazilian law allowed (all but $165,783, which is not at issue on appeal). App. 92-94.

## B. The Notice Of Deficiency And The Blocked-Income Rule

In 2012, the IRS issued notice of a $4,847,004 deficiency in 3M's 2006 return. Add. 10, 50. That deficiency was based on the IRS's allocation of more than $23 million in additional income to 3M under 26 U.S.C. § 482, "to reflect the arm's-length compensation that 3M Brazil should have paid for intellectual property." Add. 10.

### 1. Section 482

Section 482 authorizes the IRS to "allocate gross income" among commonly controlled entities "clearly to reflect the income of any of" the

7

entities or "to prevent evasion of taxes." 26 U.S.C. § 482. The IRS has never suggested that 3M evaded taxes; only Section 482's reflect-the-income provision is at issue. Add. 50.

First enacted as Section 240(d) of the Revenue Act of 1921, the key portion of what is now Section 482 has remained "essentially the same" through multiple recodifications and amendments. *G.D. Searle & Co.* v. *Commissioner*, 88 T.C. 252, 356 (1987). The provision was enacted for "the purpose only of making a correct distribution of * * * income" among related businesses by "prevent[ing] the arbitrary shifting of profits among" those businesses. S. Rep. No. 275, 67th Cong., 1st Sess. 20 (1921); see H.R. Rep. No. 2, 70th Cong., 1st Sess. 16-17 (1927); S. Rep. No. 960, 70th Cong., 1st Sess. 24 (1928). As the Supreme Court has summarized, "§ 482 is designed to prevent the artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises." *Commissioner* v. *First Security Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972) (internal quotation marks omitted).

Consistent with that purpose—and embracing the Tax Court's longstanding interpretation—the Supreme Court in *First Security* recognized a fundamental limit on the IRS's Section 482 authority: The IRS

8

cannot reallocate income from one commonly controlled entity to another that could not legally receive it. See 405 U.S. at 401-406 & n.22 (endorsing *L.E. Shunk Latex Products, Inc.* v. *Commissioner*, 18 T.C. 940 (1952)). The Court explained that it is inherent in "the concept of income" that the taxpayer "could have received" the funds. *Id.* at 403. In other words, "to be taxed for income, a taxpayer must have complete dominion over it." *Ibid.* Lower courts since *First Security* have consistently applied that principle, including to reject IRS allocations of income to taxpayers based on payments barred by foreign law. See, *e.g.*, *Procter & Gamble Co.* v. *Commissioner*, 961 F.2d 1255, 1258-1260 (6th Cir. 1992).

The text of Section 482 construed by *First Security* remains materially the same today. Congress amended Section 482 in 1986 and 2017 to address valuation of intangible property. Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2562-2563 (1986); Pub. L. No. 115-97, § 14221(b)(2), 131 Stat. 2219 (2017). Neither amendment addressed blocked income. Two other technical edits did not alter Section 482's substance. Pub. L. No. 115-141, Div. U, Tit. IV, § 401(d)(1)(D)(viii)(III), 132 Stat. 1207 (2018) (updating cross-reference); Pub. L. No. 94-455, § 1906(b)(13)(A), 90 Stat. 1834 (1976) (replacing "Secretary or his delegate" with "Secretary").

9

### 2. *Treasury's blocked-income rule*

Despite *First Security* and decisions applying it, Treasury has long claimed power to reallocate income to U.S. taxpayers from controlled foreign entities even though foreign law barred the foreign entities from making the payments. That position is embodied in Treasury's blocked-income rule, 26 C.F.R. § 1.482-1(h)(2) (2006). Under that regulation, the IRS will disregard a foreign legal restriction on payments of arm's-length amounts to a U.S. affiliate *unless* an array of additional, nonstatutory criteria are met. *Ibid*. Among other things, a foreign legal restriction must be "generally applicable" to both "controlled and uncontrolled" taxpayers alike, must be "publicly promulgated," and must "expressly preven[t] the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482." *Id.* § 1.482-1(h)(2)(ii)(A), (C). (Unless otherwise noted, citations of the blocked-income rule in this brief refer to the 2006 version, which governs the tax year at issue, see Add. 202. Section 1.482-1(h)(2) remains unchanged today.)

Treasury never articulated any rationale for those additional requirements. It first proposed the blocked-income rule in 1993—nine months after losing in *Procter & Gamble*—as part of a broader regulatory package.

10

58 Fed. Reg. 5310, 5312-5313 (Jan. 21, 1993) (Proposed Rule). But unlike certain other aspects of that package—including provisions simultaneously adopted as temporary rules—Treasury's proposal did not articulate any rationale for the blocked-income rule. See *id.* at 5310-5311; cf. *id.* at 5311-5312 (describing rationales for other provisions); 58 Fed. Reg. 5263, 5264-5271 (Jan. 21, 1993) (1993 Temporary Rule) (explanation for temporary-rule provisions).

When Treasury finalized the blocked-income rule in 1994, it again articulated no rationale, simply summarizing the rule's terms. 59 Fed. Reg. 34,971, 34,973, 34,981, 35,000-35,001 (July 8, 1994) (Final Rule). Treasury also did not respond to (or even mention) public comments challenging its proposed rule on various legal and policy grounds—including that the rule contravened *First Security*. Instead, the final rule stated that the APA's notice-and-comment requirements, set forth in 5 U.S.C. § 553, "d[id] not apply to these regulations." *Id.* at 34,988.

### 3. The IRS's Section 482 allocation

Invoking Treasury's blocked-income rule, the IRS allocated $23,651,332 in additional royalties from 3M Brazil to 3M "in order to clearly reflect the income of the entities." Add. 50 (quoting App. 106).

11

That amount, the IRS asserted, reflected the "arm's length amount of royalty income from 3M Brazil" for its "use of intellectual property" licensed by 3M. *Ibid.* (citation omitted). The IRS "determined that Brazilian legal restrictions are not taken into account" because the blocked-income rule's requirements were not all met. *Ibid.* (citation omitted).

## C. The Tax Court's Ruling

3M timely petitioned the Tax Court for redetermination, arguing that Treasury's blocked-income rule is both substantively and procedurally unlawful. The Tax Court upheld the deficiency by a 9-8 vote, with no majority opinion. Add. 1-346.

### 1. *Plurality opinion*

After a lengthy survey of the stipulated facts and legal background, Add. 9-221, a seven-judge plurality concluded that the IRS's blocked-income rule is valid, Add. 222-274. The plurality did not assert that the regulation reflects the best interpretation of Section 482. Instead, it upheld the regulation under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Add. 231-263. The plurality concluded that the Supreme Court's decision in *First Security* construing Section 482 to foreclose allocations of blocked income did not preclude

12

Treasury from taking a different view in its regulation. Invoking *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services*, 545 U.S. 967 (2005), the plurality interpreted *First Security* as not resolving the unambiguous meaning of Section 482 but instead as resting on a then-extant, since-superseded Treasury regulation. Add. 231-254. The plurality alternatively reasoned that the language added to Section 482 in 1986 concerning valuation of intangibles enabled Treasury to disregard *First Security*. Add. 244-250.

The plurality rejected 3M's contention that the blocked-income rule is invalid under the APA based on Treasury's failure to articulate any rationale or to respond to public comments. Add. 263-270. In the Tax Court, the Commissioner did not defend—and the plurality did not endorse—Treasury's position in adopting the 1994 rule that the APA did not apply. Instead, the plurality held that Treasury *had* complied with those requirements. The plurality inferred a rationale for the blocked-income rule from its operative provisions and various aspects of the broader regulatory scheme. Add. 265-267. And it concluded that Treasury had no duty to respond to comments because Treasury was "aware" of the concerns commenters raised, rendering the comments "not significant." Add. 267-270.

Appellate Case: 23-3772    Page: 26    Date Filed: 02/08/2024 Entry ID: 5361698

### 2. Concurrences

Five judges joined one or both of two concurrences.  Add. 275-286.

Chief Judge Kerrigan sought to distinguish *First Security*.  Add. 275-276.  She also posited that invalidating the blocked-income rule on APA grounds "would create a slippery slope whereby courts would be constantly faced with determining whether comments are significant and whether the agency responded appropriately to them."  Add. 280.

Judge Copeland, relying largely on legislative history, concluded that the valuation language added in 1986 to Section 482 "dictated" the approach in the blocked-income rule.  Add. 281.

### 3. Dissents

Eight judges joined one or more of three dissents.

Judge Buch explained why the blocked-income rule is substantively invalid under *First Security* and cannot be saved by *Brand X*.  Add. 287-306.  He noted that "[e]very court to have considered" the issue has recognized that *First Security* established "a limit on the Commissioner's power" under Section 482.  Add. 303.  *Brand X*, he stated, is inapplicable under *United States* v. *Home Concrete & Supply, LLC*, 566 U.S. 478 (2012), which declined to defer to a Treasury rule purporting to override a

14

pre-*Chevron* Supreme Court decision.  Add. 302-304.  Judge Buch explained that the 1986 amendment is irrelevant because it addresses valuation of intangible property, not blocked income.  Add. 303-304.

Judge Pugh echoed those points.  Add. 306.

Judge Toro explained that Treasury was required, but had failed, to comply with the APA's requirements.  Add. 307-346.  He concluded that Treasury had "utterly" failed to articulate the blocked-income rule's rationale or to respond to significant comments.  Add. 311.

## SUMMARY OF ARGUMENT

I.    The IRS's Section 482 allocation of income to 3M is unlawful because it rests on a substantively invalid interpretation of the statute.

A.    The IRS cannot allocate as "income" to 3M royalties from its Brazilian subsidiary that undisputedly were barred by Brazilian law.

1.    Section 482 and Supreme Court precedent make clear that the IRS cannot allocate as "income" payments that are prohibited by law.  The ordinary meaning of income excludes payments that are legally barred.  Reading "income" in Section 482 to exclude payments that cannot legally be made also avoids serious constitutional questions.

15

Supreme Court precedent cements that reading. The Court held in *Commissioner* v. *First Security Bank of Utah, N.A.*, 405 U.S. 394 (1972), that Section 482 does not authorize the IRS to allocate legally prohibited payments as income. That view accorded with the Tax Court's own then-longstanding position. Courts have held uniformly that *First Security* bars allocating as income payments prohibited by law, including foreign law.

2. Section 482 bars allocating as income to 3M the royalties at issue. The parties stipulated that 3M Brazil was barred by Brazilian law from paying the more than $23 million in royalties the IRS allocated to 3M. That should end the analysis. By refusing to account for the Brazilian legal prohibition, the IRS flouted the statute and *First Security*.

B. The Tax Court erred in upholding the IRS's allocation. The plurality upheld Treasury's blocked-income regulation, and with it the IRS's allocation, not because the plurality believed that the rule correctly interprets Section 482, but instead based on deference under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* itself may be on borrowed time—the Supreme Court is currently considering its fate—but even as *Chevron* stands today it cannot save Treasury's rule.

16

1. *Chevron* does not apply because Section 482, by its terms and as authoritatively construed in *First Security*, clearly answers the question presented: *Blocked* income is not "income" under Section 482. The Tax Court plurality erred in holding that Treasury could disregard *First Security* under *Chevron* and *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services*, 545 U.S. 967 (2005). *Brand X* does not authorize an agency to supersede or distort a Supreme Court decision settling a statute's meaning. See *MikLin Enterprises, Inc.* v. *NLRB*, 861 F.3d 812, 822-824 (8th Cir. 2017) (en banc). The plurality's contention that *First Security* did not definitively interpret Section 482, but instead rested on a Treasury regulation, is demonstrably incorrect.

The plurality's alternative theory that the 1986 amendment authorizes the blocked-income rule notwithstanding *First Security* is equally incorrect. That amendment does not address blocked income, and the blocked-income rule does not purport to interpret the amendment. Judge Copeland's conclusion—that the 1986 amendment's legislative history *compels* the approach embodied in the rule—has even less to commend it.

2. *Chevron* would not support deference in any event because Treasury's interpretation in its regulation is unreasonable. That

17

interpretation exceeds any arguable ambiguity in the statute. The regulation also deserves no deference because it is procedurally deficient.

II.     The IRS's allocation is independently unlawful because the blocked-income rule it applies is procedurally invalid under the APA.

A.     The APA imposes basic requirements on agencies promulgating rules that will have the force of law. Two of those requirements are critical here: An agency must articulate a reasoned basis for a rule and must address on the record significant concerns raised by comments. Those requirements applied to the blocked-income rule. Although Treasury stated in adopting the rule that the APA was inapplicable, the IRS abandoned that position in the Tax Court. For good reason: The blocked-income regulation is indisputably a legislative rule subject to the APA.

B.     Treasury did not comply with the APA because it did not try. Consistent with its mistaken belief that the APA was inapplicable, Treasury did not articulate any reasoned basis for the blocked-income rule in proposing or adopting it. And Treasury did not mention, much less respond to, multiple comments raising serious legal, policy, and practical concerns. The Tax Court plurality's position that Treasury somehow complied with duties it disavowed is implausible. And the plurality's

18

effort to supply after-the-fact explanations the agency never offered was improper and contrary to law.

## STANDARD OF REVIEW

This Court reviews the Tax Court's legal conclusions de novo. *Estate of Robertson* v. *Commissioner*, 15 F.3d 779, 781 (8th Cir. 1994). "The parties having stipulated to the facts below," this Court also "review[s] the tax court's application of the law to the facts de novo." *McDonald* v. *Commissioner*, 853 F.2d 1494, 1495 (8th Cir. 1988).

## ARGUMENT

### I.  THE IRS'S SECTION 482 ALLOCATION IS UNLAWFUL BECAUSE IT RESTS ON A SUBSTANTIVELY INVALID READING OF THE STATUTE

The IRS's deficiency determination cannot stand because it is premised on an allocation of purported "income" under 26 U.S.C. § 482 that the statute does not authorize.  The agency ascribed to 3M substantial royalties from 3M Brazil that undisputedly were barred by Brazilian law. Section 482's text and Supreme Court precedent preclude the IRS from sweeping payments that 3M Brazil never made because they were prohibited by law into 3M's "income."  The deference principles that the Tax Court plurality invoked cannot rescue the agency's distortion of the statute.

19

## A. Section 482 Does Not Allow The IRS To Allocate As "Income" To 3M Royalty Payments Prohibited By Law

Section 482 authorizes the IRS (as relevant) to "allocate gross income" among entities under common control if "necessary * * * clearly to reflect the income of any of" those entities. 26 U.S.C. § 482. That text permits the IRS to reallocate gross income to a taxpayer only to capture more accurately the taxpayer's true "income." The central question here is whether a taxpayer's "income" under Section 482 encompasses payments that were not and *could not lawfully* have been made—so-called "blocked income," *Procter & Gamble Co.* v. *Commissioner*, 961 F.2d 1255, 1259 (6th Cir. 1992) (citation omitted). It does not.

### 1. *"Income" in Section 482 excludes legally prohibited payments*

The ordinary meaning of "income" excludes payments that were not and could not lawfully have been made. The Supreme Court's decision in *Commissioner* v. *First Security Bank of Utah, N.A.*, 405 U.S. 394 (1972), confirms that understanding, as courts have consistently recognized.

a. Statutory interpretation "begins with the statutory text, and ends there as well" if the text is "unambiguous." *National Association of Manufacturers* v. *Department of Defense*, 583 U.S. 109, 127 (2018)

20

(citation omitted). And, "unless otherwise defined, words" in a statute "will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin* v. *United States*, 444 U.S. 37, 42 (1979).

The ordinary meaning of Section 482's critical term—"income"—excludes payments that were not made and were forbidden by law. "Ordinarily, a word's usage accords with its dictionary definition." *Thompson Truck & Trailer, Inc.* v. *United States*, 901 F.3d 951, 953 (8th Cir. 2018) (citation omitted). Lay and legal dictionaries consistently define "income" as the "gain" or "benefit" that a person derives from an activity. *E.g.*, *Webster's New International Dictionary* 1258 (2d ed. 1947) ("That gain or recurrent benefit (usually measured in money) which proceeds from labor, business or property[.]"); *Black's Law Dictionary* 687 (5th ed. 1979) ("The gain derived from capital, labor or effort, or both combined, including profit or gain through sale or conversion of capital; something of exchangeable value."). Inherent in those definitions is that the person actually *derives* the benefit.

A gain or benefit that a person *cannot* derive is not "income." If a restaurant prohibits patrons from paying gratuities (and enforces that prohibition), a waiter's "income" does not include hypothetical tips he

21

never received but might have earned absent that policy. The same is true where a payment is legally prohibited. If a statute sets a price ceiling on widgets, a seller's income from selling a widget is the actual price purchasers paid subject to that ceiling. No ordinary English speaker would say that the seller's "income" from the sale is the higher, counterfactual price that a purchaser might have paid absent the price ceiling.

Tax law accords with that ordinary meaning. "[T]he definition of income approved by th[e] [Supreme] Court" in the tax context for more than a century "is '[t]he gain derived from capital, from labor, or from both combined.'" *Goodrich* v. *Edwards*, 255 U.S. 527, 535 (1921) (citation omitted). For income to exist, such a gain must actually materialize. See *ibid.* The Code's definition of "gross income," which applies throughout the Code "[e]xcept as otherwise provided," echoes that same straightforward understanding. 26 U.S.C. § 61(a). Section 61 defines "gross income" as "all income from whatever source *derived*" and provides illustrative examples, such as "[c]ompensation for services," "[r]ents," and "[r]oyalties." *Ibid.* (emphasis added). One does not "deriv[e]" wages, rents, or royalties that are not and cannot lawfully be paid. *Ibid.* As the Tax Court plurality rightly acknowledged, "[u]nder sec[tion] 61, there is no taxable income"

22

where "(1) the income was not received and (2) it was illegal to receive the income." Add. 233 n.172.

To be sure, the Internal Revenue Code includes within "income" certain sums that a taxpayer is entitled to receive even if those sums are not immediately paid in cash. For example, the Supreme Court has long recognized that income may be taxed on an accrual basis, *i.e.*, when the taxpayer "acquire[s] a fixed right to receive" a sum, even though it is not disbursed until later. *Commissioner* v. *Hansen*, 360 U.S. 446, 466 (1959). But that only underscores the key point: If a payment to a taxpayer is legally barred, the taxpayer does *not* have a "right to receive" it. *Ibid.*

Interpreting "income" in Section 482 to exclude legally prohibited payments also avoids serious constitutional questions about its scope. Courts should "avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez* v. *United States*, 490 U.S. 858, 864 (1989). Construing Section 482 to sweep in blocked income would test the limits of Congress's authority under the Sixteenth Amendment to "lay and collect taxes on incomes, from whatever source derived, without apportionment." U.S. Const. Amend. XVI. The Supreme Court has

23

previously construed "incomes" in that Amendment consistently with its ordinary meaning—*i.e.*, as "an economic gain" that the taxpayer "derives," such as a "right to receive" payment. *Helvering* v. *Horst*, 311 U.S. 112, 115, 117-118 (1940). Ratification-era authorities are in accord. See, *e.g.*, Edwin R.A. Seligman, *The Income Tax* 679 (1914); Henry Campbell Black, *A Treatise on the Law of Income Taxation* 73, 78 (1918). The Supreme Court is currently considering a different issue under the Amendment: whether it authorizes taxation under 26 U.S.C. § 965(a) of a U.S. shareholder's pro rata share of a controlled foreign corporation's previously accumulated deferred foreign income. *Moore* v. *United States*, cert. granted, No. 22-800 (argued Dec. 5, 2023). Whatever *Moore* concludes on that distinct issue, reading Section 482 to treat as income payments never made because they were *barred* by law would call that provision's constitutionality into question. This Court can and should avoid that constitutional question by interpreting "income" in Section 482 to exclude payments never made because they were legally prohibited.

b.    That is precisely the reading of Section 482 the Supreme Court adopted in *First Security*, where it rejected the IRS's claim of power to reallocate as "income" payments prohibited by law. 405 U.S. at 401-406.

24

i.     In *First Security*, several banks and an insurance company (Security Life) were commonly owned by a holding company.  405 U.S. at 396.  The banks sought to offer borrowers "credit life insurance"—policies to pay off loans in the event of death, illness, or injury.  *Ibid.*  But the banks were barred by federal law from acting as insurance agents and from receiving shares of insurance premiums as commissions.  *Id.* at 400-402.  The banks instead referred borrowers to an independent insurer, which reinsured the policies with Security Life.  Security Life received most of the premiums, which it reported as income.  *Id.* at 398-399.

Because insurers were taxed at a lower rate than the banks, the affiliated group's total tax liability was lower than if the banks had received a share of the premiums.  405 U.S. at 398-399.  Displeased with that result, the IRS reallocated the affiliated companies' incomes under Section 482.  *Id.* at 400.  Specifically, the IRS reallocated 40% of Security Life's premium income to the banks—representing "the equivalent of commissions" that the banks would have earned had they not been legally barred from receiving insurance premiums.  *Ibid.*

The Supreme Court rejected the IRS's allocation, and in doing so made clear that Section 482 does not permit allocating as "income" to a

25

taxpayer payments that were not and legally could not be made. 405 U.S. at 401-406. It was undisputed in *First Security* that federal law forbade payment of insurance premiums to the banks. *Id.* at 401-402. That legal restriction, *First Security* held, was fatal to the IRS's attempt to allocate those premiums to the banks as "income." *Id.* at 402.

The *First Security* Court explained that the very "concept of income" presupposes "that the person to whom the income was attributed *could have received it*." 405 U.S. at 403 (emphasis added). And it "kn[e]w of no decision of th[e] Court wherein a person ha[d] been found to have taxable income that he did not receive and that he was prohibited from receiving." *Ibid. First Security* underscored the "inequity of attributing to the Banks taxable income that they have not received and may not lawfully receive," noting that "neither the statute nor [the Court's] prior decisions require such a result." *Id.* at 405. Instead, *First Security* concluded, "fairness requires the tax to fall on the party that actually receives the premiums rather than on the party that cannot." *Ibid.*

ii.     *First Security* did not write on a blank slate. The Supreme Court expressly endorsed the Tax Court's ruling in *L.E. Shunk Latex Products, Inc.* v. *Commissioner*, 18 T.C. 940 (1952), which had addressed

26

a "closely analogous situation." 405 U.S. at 406. In *Shunk*, a manufacturer charged an affiliated distributor one price for certain products, and the distributor charged third-party retailers a higher price. 18 T.C. at 959. Wartime price controls later capped those prices as they stood. *Ibid.* The Commissioner invoked what is now Section 482 to allocate some of the distributor's income to the manufacturer, "on the ground that a portion of the distributor's profits was in fact earned by the manufacturer." *First Security*, 405 U.S. at 406. The Tax Court rejected that reallocation "in view of the uncontroverted effect of [the price-control] regulations in prohibiting [the manufacturer] from receiving the very income sought to be attributed to [it]." *Shunk*, 18 T.C. at 961. "[T]he Commissioner," *Shunk* held, "had no authority to attribute to petitioners income which they could not have received." *Ibid.* The *First Security* Court adopted the same view and approved *Shunk* as "correct." 405 U.S. at 406 n.22.

*First Security* also noted that Treasury's own regulations were "consistent with" the Court's interpretation of Section 482. 405 U.S. at 404. A Treasury rule promulgated under Section 482 "expressly recognize[d] the concept that income implies dominion or control of the taxpayer" to receive and direct the sum at issue as the taxpayer sees fit. *Ibid.* That

27

rule "'assumed'" that the "controlling interest" in an affiliated group "ha[s] 'complete power' to shift income among its subsidiaries." *Ibid.* (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)). The Court explained that "[i]t is only where this power exists, and has been exercised in such a way that the 'true taxable income' of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482." *Id.* at 404-405. But that power was *not* present in *First Security*, the Court held, because the "federal banking laws" barred the banks from receiving the premiums, and the parent company could not "force a subsidiary to violate the law." *Id.* at 405. The language and logic of Treasury's own regulation thus reinforced the Court's reading of the statute.

iii. Decisions since *First Security* have consistently confirmed its definitive interpretation of Section 482's scope. The very next Term, the Supreme Court itself explained that *First Security* had "held * * * that the Commissioner could not properly allocate income to one of a controlled group of corporations under 26 U.S.C. § 482 where that corporation could not have received that income as a matter of law." *United States* v. *Basye*, 410 U.S. 441, 453 n.13 (1973) (*First Security* addressed Section 482's application to "a deflection of income imposed by law").

28

Lower courts, including both circuits to address the issue and (until the ruling below) the Tax Court, have uniformly echoed that understanding. See *Texaco, Inc.* v. *Commissioner*, 98 F.3d 825, 828-831 (5th Cir. 1996), affirming T.C. Memo. 1993-616, 1993 WL 534017 (1993); *Procter & Gamble*, 961 F.2d at 1258-1260, affirming 95 T.C. 323 (1990); *Salyersville National Bank* v. *United States*, 613 F.2d 650, 652-656 (6th Cir. 1980); *Tower Loan of Mississippi, Inc.* v. *Commissioner*, T.C. Memo. 1996-152, 1996 WL 134989, at *3-*6 (Mar. 26, 1996); Add. 294-298 (Buch, J., dissenting) (discussing these cases in detail).

*Procter & Gamble* and *Texaco* are especially instructive because they applied *First Security*'s interpretation of Section 482 to reject IRS attempts to allocate as "income" payments blocked by foreign law. In *Procter & Gamble*, the Sixth Circuit rejected an allocation of royalties that foreign law prohibited. 961 F.2d at 1256-1260. Procter & Gamble sold products in Spain through a wholly owned subsidiary, but Spanish law forbade royalty payments by Spanish entities to residents of foreign countries. *Id.* at 1256-1257. The IRS nevertheless allocated income to Procter & Gamble "under section 482" to represent "royalty payments" from the Spanish subsidiary. *Id.* at 1257. The Tax Court rejected that

29

allocation, and the Sixth Circuit affirmed. *Id.* at 1258-1260. It held that, "[b]ecause Spanish law prohibited royalty payments," the "allocation under section 482 [wa]s inappropriate" under *First Security*. *Id.* at 1259.

The Fifth Circuit reached the same result in *Texaco*. In that case, one Texaco affiliate (Textrad) purchased crude oil from Saudi Arabia and resold it to affiliated refiners at below-market prices, which were mandated by a Saudi price cap on resales of unrefined Saudi crude oil. 98 F.3d at 827. Because no price cap existed for refined oil, the refiners resold the refined oil above the price cap, reaping "large profits." *Ibid.* The IRS allocated $1.7 billion in income to Textrad based on what it would have earned by reselling the unrefined oil at market prices. *Ibid.* The Tax Court rejected that allocation, and the Fifth Circuit affirmed. *Id.* at 827-831. The Fifth Circuit recited *First Security*'s holding that "§ 482 d[oes] not authorize the Commissioner to allocate income to a party prohibited by law from receiving it," *id.* at 828, and endorsed the Sixth Circuit's decision in *Procter & Gamble*, *id.* at 829-830. Applying that same principle, the Fifth Circuit held the IRS's allocation invalid because Textrad was barred by Saudi law from receiving the income the

30

IRS imputed to it. *Id.* at 830. Courts thus have consistently recognized that Section 482 and *First Security* settle the blocked-income issue.

### 2. *The royalties the IRS allocated cannot constitute income to 3M because they were barred by law*

Applying that settled understanding of Section 482 and *First Security* to the stipulated facts resolves this case. The only adjustment at issue is the IRS's "determin[ation] that the income of the 3M consolidated group should be increased by $23,651,332 to reflect the arm's-length compensation that 3M Brazil should have paid for intellectual property under section 482." Add. 10; see Add. 50-51; App. 106. The parties stipulated to the amount of additional royalties that 3M Brazil would have paid 3M absent the Brazilian legal restrictions. Add. 53-64.

The parties further stipulated, however, that Brazilian law barred 3M Brazil from paying nearly all of those additional royalties to 3M. Add. 53-58; App. 93-94. The parties agreed that then-applicable Brazilian law capped the amount of royalties that 3M Brazil could remit for the licensed intellectual property. Add. 54-55 (citing App. 73-74). And they stipulated that, applying that restriction—and accounting for royalties 3M Brazil did pay and offsets for certain other payments—3M Brazil could not lawfully have paid $23.6 million in additional royalties. Add. 53-58; App.

31

93-94.  Instead, it was undisputed below that, if Brazilian law is taken into account, the *most* in additional royalties that 3M Brazil could lawfully have paid 3M—and the appropriate amount of the IRS adjustment—was less than 1% of that figure ($165,783).  Add. 53-58; App. 93-94.

The IRS thus expressly *conceded* that 3M Brazil could not lawfully have paid the $23.6 million in royalties the IRS allocated to 3M as income.  That should be the ballgame.  Under Section 482 and *First Security*, the IRS cannot allocate income based on payments barred by law. *First Security*, 405 U.S. at 401-406.  3M lacked "dominion or control" over royalty payments that 3M Brazil could not lawfully make, and 3M had no "power to force a subsidiary to violate the law." *Id.* at 404-405.  The IRS's tax deficiency overtly refused to "tak[e] into account" the "Brazilian legal restrictions."  Add. 50 (quoting App. 106).  That refusal contravenes Section 482 and *First Security*.

## B. The Tax Court Erred In Upholding The IRS's Allocation Under *Chevron* And The Blocked-Income Regulation

The Tax Court nevertheless upheld the IRS's tax-deficiency determination, but no opinion commanded a majority.  Add. 1-286.  The plurality concluded that the IRS's $23.6 million allocation of income to 3M was a valid exercise of its Section 482 authority.  Add. 222-274.  But it

32

did not attempt to show that Section 482 is best read to treat as "income" payments that a taxpayer legally cannot receive. Instead, the plurality relied entirely on judicial deference under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984), to sustain the interpretation embodied in Treasury's blocked-income regulation. Add. 231-263. *Chevron*, however, cannot save the agency's misreading of the statute.

The Supreme Court is currently considering whether to overrule or narrow *Chevron*. *Loper Bright Enterprises* v. *Raimondo*, cert. granted, No. 22-451 (argued Jan. 17, 2024); *Relentless, Inc.* v. *Department of Commerce*, cert. granted, No. 22-1219 (argued Jan. 17, 2024). 3M preserves all arguments that may arise from those decisions.

Even as *Chevron* stands today, however, it cannot rescue the IRS's action here. *Chevron* has no role to play because Section 482, by its terms and as authoritatively interpreted by the Supreme Court, clearly forecloses treating legally prohibited payments as 3M's income. Even if the statute contained some ambiguity, the agency's reading is unreasonable.

33

### 1. Chevron *has no application because Section 482 unambiguously excludes prohibited payments*

*Chevron* is inapplicable because "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira* v. *Sessions*, 138 S. Ct. 2105, 2113 (2018). A statute is "ambigu[ous]" only if a court, after exhausting all the "'traditional tools of statutory construction,' is left with an unresolved ambiguity." *Epic Systems Corp.* v. *Lewis*, 138 S. Ct. 1612, 1630 (2018) (citation omitted). Where those tools "supply an answer, '*Chevron* leaves the stage.'" *Ibid.* (citation omitted). Just so here.

a. Construed on a blank slate, Section 482's text speaks clearly. The ordinary meaning of "income" should be the beginning and end of the statutory analysis. Wherever the outer limits of "income" in Section 482 lie, its ordinary meaning in everyday usage and tax law excludes payments that were never made because the law prohibited them. See pp. 21-23, *supra*. *Blocked* income is not "income" under Section 482.

Whether "income" might be ambiguous in *other* circumstances is immaterial. What matters is that the term speaks clearly to the question here. See, *e.g.*, *Wheaton* v. *McCarthy*, 800 F.3d 282, 287 (6th Cir. 2015) ("The term 'planet' might be ambiguous as applied to Pluto, but is clear

34

as applied to Jupiter."). Because Section 482's plain language provides an "unambiguous answer to the interpretive question at hand," *Chevron* never comes into play. *Pereira*, 138 S. Ct. at 2113.

b. The slate, moreover, is far from blank. The Supreme Court has definitively construed Section 482 to bar the IRS from treating as "income" payments a taxpayer cannot lawfully receive. *First Security*, 405 U.S. at 401-406. Every court to consider the issue until this case has correctly understood *First Security* as settling the statute's meaning on that question. See pp. 24-31, *supra*. Because that Supreme Court precedent "speaks to the issue" here, it governs, whatever the agency might think as an original matter. *Lechmere, Inc.* v. *NLRB*, 502 U.S. 527, 537 (1992); see Add. 301-304 (Buch, J., dissenting). *Chevron* does not empower Treasury to override that authoritative judicial interpretation. All of the Tax Court plurality's reasons for nevertheless deferring to Treasury's view under *Chevron* fail.

i. The plurality believed that Treasury was free to disregard *First Security* based on *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services*, 545 U.S. 967 (2005). Add. 231, 235-237. That is incorrect. *Brand X* held that a lower-court decision that did not

35

determine a statute's unambiguous meaning did not prohibit an agency from later taking a different, reasonable view. 545 U.S. at 982. That holding has no application here.

*Brand X* did not address whether an agency may override a decision of the Supreme Court interpreting a federal statute. "[I]t is far from settled that *Brand X* applies" at all "to prior decisions of the Supreme Court." *MikLin Enterprises, Inc.* v. *NLRB*, 861 F.3d 812, 823 (8th Cir. 2017) (en banc). That is particularly true of pre-*Chevron* decisions that had no reason to cast their holdings in *Chevron*'s magic words.

At a minimum, as the en banc Court made clear in *MikLin*, *Chevron* and *Brand X* should not be extended to cases where, as here, the key dispute concerns the correct interpretation of a Supreme Court decision that settled a statute's meaning. See 861 F.3d at 823-824. *MikLin* declined to apply *Chevron* to the National Labor Relations Board's interpretation of a statute that purported to follow, but in fact distorted, a pre-*Chevron* Supreme Court decision construing that provision. *Ibid.* As this Court explained, "statutory construction is first and foremost a judicial function," and a Supreme Court decision construing a statute "presumably remove[s] any pre-existing ambiguity." *Ibid.* (citation omitted). And an agency's

"interpretation of judicial precedent 'is not entitled to judicial deference'"
whatsoever. *Id.* at 823 (citation omitted). Applying those principles, this
Court held that no deference was due to the Board's gloss on Supreme
Court precedent construing the statute in a manner that "fundamentally
erode[d]" the Court's teaching. *Id.* at 824.

The same conclusion applies forcefully here. The key dispute is the
meaning of Section 482 as construed by *First Security*—specifically,
whether it permits allocating blocked income. As courts have consist-
ently recognized, *First Security* settled the statute's clear meaning on
that issue; any arguable ambiguity has long since been eliminated. See
pp. 24-31, *supra*. Neither Treasury's understanding of *First Security* nor
its disagreement with the Supreme Court's statutory interpretation—
and cases uniformly applying it in this context—deserves any deference.

ii.   The Tax Court plurality misapplied *Brand X* in any event by
concluding that *First Security* did not determine the clear meaning of
Section 482 because the Supreme Court did not label that statutory pro-
vision "unambiguous" and that *First Security* instead merely construed a
Treasury regulation. Add. 232-237. Both halves of the plurality's rea-
soning fail.

The Supreme Court's decision in *United States* v. *Home Concrete & Supply, LLC*, 566 U.S. 478 (2012), refutes the Tax Court plurality's apparent view that *First Security* could not settle the clear meaning of Section 482 without uttering the magic word "unambiguous." In *Home Concrete*, the Supreme Court refused to defer to a Treasury regulation that rejected the Court's prior interpretation of a statute in a pre-*Chevron* decision. See *id.* at 483-487 (discussing *Colony, Inc.* v. *Commissioner*, 357 U.S. 28 (1958)). That earlier case (*Colony*) expressly stated that the statute's bare text was *not* "unambiguous." *Id.* at 486 (citation omitted). The *Home Concrete* Court nevertheless concluded that *Colony* had settled the interpretive issue: "*Colony* has already interpreted the statute, and there is no longer any different construction that is consistent with *Colony* and available for adoption by the agency." *Id.* at 487. A plurality in *Home Concrete* went on to articulate limits on *Brand X*, *id.* at 487-490, and the deciding fifth vote would have overruled *Brand X* altogether, *id.* at 492-497 (Scalia, J., concurring in part and concurring in the judgment). After *Home Concrete*, *Brand X* cannot fairly be read as reflexively elevating agency views over pre-*Chevron* Supreme Court decisions merely because those decisions do not incant the term "unambiguous."

Appellate Case: 23-3772   Page: 51   Date Filed: 02/08/2024 Entry ID: 5361698

The Tax Court plurality's other premise—that *First Security* "relied on a regulation rather than the text of the relevant statute," Add. 235—is equally meritless. The plurality reached that conclusion by misguidedly attempting to parse the Supreme Court's opinion as if construing a statute—a fraught endeavor, see *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 341 (1979). It sought to dissect the Court's analysis and to cordon off its consideration of the statute from its brief discussion of Treasury's rule, hunting for clues in "transition" sentences and in the Supreme Court's citation of cases elucidating "income" in the context of the Code's definition of "gross income." Add. 233-234; see Add. 232-237.

In that effort, the Tax Court plurality missed the forest for the trees. The crux of the Supreme Court's analysis was the "concept of income" in the statute, drawn from cases construing that term. 405 U.S. at 403; see *id.* at 403-407. The Court merely recognized along the way that a Treasury regulation then in force accorded with the Court's reading of the statute. *Id.* at 404-405. But the touchstone of the decision was "the statute" and the Court's own "decisions" construing it. *Id.* at 405.

The Tax Court plurality's single-minded focus on the regulation also disregards other aspects of *First Security*'s rationale. The Supreme

Court explained that "fairness requires the tax to fall on the party that actually receives the premiums rather than on the party that cannot." 405 U.S. at 405. That "inequity of attributing" to taxpayers "taxable income that they have not received and may not lawfully receive" further supported the Court's understanding of the "concept of income." *Id.* at 403, 405. That fairness rationale does not appear in the regulation *First Security* cited. *Id.* at 405. The plurality's position similarly cannot be squared with *First Security*'s reliance on *Shunk*, which squarely grounded its holding in Section 482's materially identical statutory precursor.

Finally, even if the then-extant regulation were the key to *First Security*'s conclusion, the Tax Court plurality failed to explain why the same conclusion would not follow here. *First Security* cited the language of the former rule that assumed a taxpayer's "complete power" over the income at issue. 405 U.S. at 404 (citation omitted). But the applicable 2006 regulation contains a similar "presumption" of control where income or deductions are arbitrarily shifted. 26 C.F.R. § 1.482-1(i)(4). The plurality did not attempt to explain why any differences between those versions undermined *First Security*'s analysis. To the extent the 2006

40

regulation's presumption might be viewed as weaker than its predecessor's, that hurts the IRS's position. The prior rule purported to allow the IRS to *assume*, without having to *prove*, that the controlled entities had full power to structure their affairs. If that assumption is weakened, there is even less justification to reallocate income. Add. 330 (Toro, J., dissenting).

iii. The Tax Court plurality alternatively reasoned that *Brand X* gave Treasury license to rewrite the law because *First Security* predated the language added to Section 482 in 1986. Add. 244-249. But the 1986 amendment is doubly irrelevant.

First, the 1986 amendment does not bear on the blocked-income issue and so cannot undermine *First Security*'s analysis. The 1986 amendment added to Section 482 a sentence stating that, "[i]n the case of any transfer (or license) of intangible property * * * the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2562-2563 (1986). That sentence does not address blocked income at all, much less purport to abrogate existing Supreme Court precedent. It does

41

not define "income," does not mention restrictions on income, and bears no necessary connection to the blocked-income issue.

Instead, the added sentence addresses particular valuation issues associated with the transfer or license of intangible property. Although this case happens to concern intangible property, it does not implicate any such valuation issues—as illustrated by the parties' stipulation to the adjustment amount absent the Brazilian restrictions. See p. 7, *supra*.

Moreover, such valuation problems are not confined to blocked-income issues. Add. 303-304 (Buch, J., dissenting). Blocked income affects many types of transactions, not just transfers of intangible property. For instance, "the 1986 amendment does not address blocked income from price controls as occurred in *Texaco*," involving foreign price ceilings on oil, "or the regulation of an industry as occurred in *First Security*," involving restrictions on banks' involvement in the insurance business. *Ibid.*; Add. 306 (Pugh, J., dissenting) (similar). Even for intangible property, the added sentence does not specify whether legal restrictions should be taken into account in determining whether income is "commensurate." If anything, a fair reading suggests that such restrictions *should* be given effect because the income attributable to intangible property is

42

not "commensurate" with the taxpayer's income when royalties are legally barred.  Add. 336 (Toro, J., dissenting).

Far from undercutting *First Security*'s definitive interpretation of Section 482, the 1986 amendment ratified *First Security's* holding by leaving Section 482's key first sentence unaltered.  When Congress makes statutory amendments but leaves untouched language the Supreme Court has already construed, Congress is presumed "to ratify" the Court's prior construction of that language.  *Bragdon* v. *Abbott*, 524 U.S. 624, 645 (1998).  By leaving untouched Section 482's first sentence, Congress effectively incorporated *First Security*'s reading of that sentence into the statute.

The 1986 amendment certainly did not overrule *First Security* obliquely, as Judge Copeland's concurrence posited.  Add. 281-286. Courts do not infer an "intent" to "abrogate" Supreme Court precedent "absent a clear expression * * * of Congress's intent" to do so.  *Forest Grove School District* v. *T.A.*, 557 U.S. 230, 240 (2009).  Nothing in the 1986 amendment evinces any congressional design, let alone a clear intent, to override *First Security*.

43

Judge Copeland's contrary view, based largely on "the legislative history of the 1986 amendment," Add. 281 (Copeland, J., concurring in the result), is unavailing. Legislative history cannot "muddy clear statutory language" or create ambiguity where none exists. *Milner* v. *Department of Navy*, 562 U.S. 562, 572 (2011). And the legislative history Judge Copeland canvassed shows merely that "Congress' aim was to assist the IRS in the difficult task of determining an arm's-length value for the transfer and license of intangibles between related companies." Add. 281-282. It thus illustrates only that Congress was dealing with a different problem—valuing intangibles—not seeking to overturn settled precedent addressing blocked income.

Second, the 1986 amendment cannot justify the blocked-income rule's departure from *First Security* because that rule does not purport to construe the text added by the 1986 amendment. Add. 260. The regulation does not interpret or implement that language—which other regulatory provisions address. See, *e.g.*, Final Rule, 59 Fed. Reg. at 34,984. The blocked-income rule cannot be sustained on grounds the agency did not advance. See *SEC* v. *Chenery Corp.*, 318 U.S. 80, 88 (1943).

44

The plurality tried but failed to "link" the 1986 amendment to the blocked-income rule by tracing a breadcrumb trail through Federal Register filings. Add. 248. That indulgent effort to reconstruct Treasury's thinking fails to explain the agency's approach to blocked income. As the plurality admitted, Treasury itself never identified how the blocked-income rule implements or interprets the commensurate-with-income sentence. See *ibid.* Treasury never suggested that the 1986 amendment mandated the approach reflected in the blocked-income rule. And if Treasury had adopted the rule based on the mistaken view that it was statutorily required, that legal error itself would require "declar[ing]" the rule "invalid." *Prill* v. *NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985).

## 2. Chevron *deference is unwarranted because the agency's statutory interpretation is unreasonable*

No deference under *Chevron* or *Brand X* is due here in any event because Treasury's reading is not "reasonable." *Brand X*, 545 U.S. at 980. "[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *MCI Telecommunications Corp.* v. *AT&T Co.*, 512 U.S. 218, 229 (1994). Deference thus cannot save an agency interpretation that falls outside "the zone of ambiguity" in the statute. *Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2415-2416

45

(2019). "It does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'" *Home Concrete*, 566 U.S. at 493 n.1 (Scalia, J., concurring in part and concurring in the judgment).

The interpretation embodied in Treasury's blocked-income regulation exceeds any ambiguity that the statute conceivably contains. No reasonable definition of "income" includes payments never made because the law prohibited them. See pp. 21-23, *supra*. And the regulation's criteria for determining whether to disregard a foreign legal restriction have no logical connection to "income." The rule authorizes the IRS to ignore a foreign legal restriction unless, among other things: (i) it is applicable to controlled and uncontrolled taxpayers alike; (ii) it is publicly promulgated; and (iii) it prohibits payment or receipt in any form. 26 C.F.R. § 1.482-1(h)(2)(ii)(A), (C). Whatever the wisdom of those criteria, they do not resemble any recognizable concept of income.

In addition, "*Chevron* deference is not warranted" because "the regulation is 'procedurally defective'—that is," because Treasury "err[ed] by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 220 (2016) (citation omitted). As discussed below, Treasury neither set forth a reasoned explanation for

46

the rule nor responded to significant comments. See Part II, *infra*. Those errors also render the rule unlawful, but at a minimum they preclude "accord[ing] *Chevron* deference to the agency interpretation." *Encino Motorcars*, 579 U.S. at 221.

## II. THE IRS'S SECTION 482 ALLOCATION IS INDEPENDENTLY UNLAWFUL BECAUSE IT RESTS ON A PROCEDURALLY INVALID REGULATION

The IRS's allocation and deficiency determination cannot stand for a separate reason: They rest squarely on the blocked-income regulation, 26 C.F.R. § 1.482-1(h)(2), but Treasury did not comply with the APA in adopting that rule. Treasury was required, but failed, both to articulate a reasoned basis for that rule and to respond to significant concerns raised in public comments. Those dual APA defects are each independently fatal to the regulation and thus the deficiency determination.

### A. The APA Required Treasury To Provide A Reasoned Explanation For Its Blocked-Income Rule And Respond To Significant Concerns Raised By Comments

The APA imposes several simple but essential requirements on rulemaking that an agency must satisfy, or else its regulation must be "h[e]ld unlawful." 5 U.S.C. § 706(2). Two requirements are critical here.

First, an agency must "articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the

47

choice made.'" *Menorah Medical Center* v. *Heckler*, 768 F.2d 292, 295 (8th Cir. 1985) (quoting *Motor Vehicles Manufacturers Ass'n of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).  That requirement flows from the APA's mandate that courts "reject an agency rule which is arbitrary and capricious."  *Ibid.*; see 5 U.S.C. § 706(2)(A).  To survive arbitrary-or-capricious review, a rule must be both "reasonable *and* reasonably explained." *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (emphasis added).  Regulations that articulate no "reasoned basis" necessarily fail that standard. *Gas Transmission Northwest Corp.* v. *FERC*, 363 F.3d 500, 502 (D.C. Cir. 2004); see, *e.g.*, *Rauenhorst* v. *U.S. Department of Transportation*, 95 F.3d 715, 719-723 (8th Cir. 1996); *Menorah Medical*, 768 F.2d at 295-296.

An agency adopting a rule that diverges from its prior position must also confront its change in course.  It must "at least 'display awareness that it is changing position,'" "'show that there are good reasons for the new policy,'" and account for "'serious reliance interests'" its prior policy "'engendered.'" *Encino Motorcars*, 579 U.S. at 221-222 (citation omitted).

Second, an agency adopting a "legislative rule"—*i.e.*, one that "'imposes new rights or duties'" or otherwise exercises "'the agency's *own*

48

*authority*,'" not merely glossing existing law—must follow the APA's notice-and-comment protocol. *Iowa League of Cities* v. *EPA*, 711 F.3d 844, 873 (8th Cir. 2013) (citations omitted). The agency must first provide public notice of its proposal and invite comments, and it must then "consider *and respond* to significant comments received." *Perez* v. *Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (emphasis added); see 5 U.S.C. § 553(b)-(c). Courts must "hold unlawful" rules adopted "without observance of" those and other "procedure[s] required by law." 5 U.S.C. § 706(2)(D); see, *e.g.*, *Iowa League of Cities*, 711 F.3d at 855, 873-876. And "[a]n agency's failure to respond meaningfully to objections raised by a party" also "renders its decision arbitrary and capricious." *PPL Wallingford Energy LLC* v. *FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (internal quotation marks omitted).

The APA requires rigorous judicial enforcement of the reasoned-explanation and notice-and-comment requirements because both serve vital public values. Add. 342 (Toro, J., dissenting). "Requiring Treasury to explain its reasoning * * * 'promotes agency accountability by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority.'" *Ibid.* (quoting *DHS* v. *Regents of the*

49

*University of California*, 140 S. Ct. 1891, 1909 (2020) (other internal quotation marks omitted). And that requirement facilitates judicial review by "instill[ing] confidence that the reasons given are not simply convenient litigating positions." *Ibid.* (brackets and internal quotation marks omitted); see *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2575-2576 (2019).

"Notice and comment" is likewise critical because it "gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Azar* v. *Allina Health Services*, 139 S. Ct. 1804, 1816 (2019). And "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *CTS Corp.* v. *EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014) (citation omitted). Indeed, "a central purpose of notice-and-comment rulemaking is * * * to obligate the agency to consider and respond to the material comments and concerns that are voiced." *Make the Road New York* v. *Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020).

Those bedrock APA requirements fully applied to Treasury in promulgating the blocked-income regulation. That rule is indisputably

"legislative." *Iowa League of Cities*, 711 F.3d at 873. It does not "simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." *Ibid.* (citation omitted). The rule does not address Section 482's text at all. 26 C.F.R. § 1.482-1(h)(2). Instead, it erects additional barriers to recognizing foreign legal restrictions that have no foothold in Section 482's text. See p. 10, *supra*. "[I]mposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created, is the hallmark of legislative rules." *Iowa League of Cities*, 711 F.3d at 873.

It is now undisputed that the APA's requirements apply to the blocked-income regulation. To be sure, when adopting the rule, Treasury cursorily stated that the rule was exempt from the APA for unspecified reasons. Final Rule, 59 Fed. Reg. at 34,988 ("[S]ection 553(b) of the Administrative Procedure Act * * * do[es] not apply to these regulations"). That assertion accorded with Treasury's "historical view that the regulations were interpretative and therefore not subject to notice and comment under the APA." Add. 341 (Toro, J., dissenting) (citing Kristin E. Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*,

51

82 Notre Dame L. Rev. 1727, 1729 (2007)).  In the Tax Court, however, the IRS rightly abandoned that view and did not dispute that the APA applied.  App. 410-425; see Add. 309-310 n.3 (Toro, J., dissenting).

For good reason:  Courts have settled that Treasury's self-perceived immunity from the APA is a mirage.  See *Mayo Foundation for Medical Education & Research* v. *United States*, 562 U.S. 44, 55 (2011) (repudiating a special "approach to administrative review good for tax law only"); *Mann Construction, Inc.* v. *United States*, 27 F.4th 1138, 1148 (6th Cir. 2022) (Sutton, C.J.) ("[T]he U.S. Supreme Court has already rejected the idea that tax law deserves special treatment under the APA.").  Like other agencies, Treasury thus had to comply with the APA.

## B.  Treasury Defaulted On Its APA Obligations Here

Treasury defaulted on its APA duties in promulgating the blocked-income regulation.  Add. 309-340 (Toro, J., dissenting).  Neither the proposed rule nor final rule articulated any rationale for the regulation or recognized that it reflected a change in the agency's position.  And Treasury never mentioned, let alone meaningfully addressed, comments it received.  That is unsurprising, given the agency's explicit (but erroneous) view that the APA did not apply.

52

The Tax Court plurality implausibly found that Treasury somehow complied with procedural requirements that it believed inapplicable. Occam's razor offers a simpler answer: Treasury did not comply with the APA because it mistakenly thought itself exempt. Add. 340-342 (Toro, J., dissenting). The plurality's after-the-fact attempts to rehabilitate those errors—by backfilling a rationale Treasury never tendered and excusing it from addressing concerns of which it was aware—contravene basic administrative-law principles.

### 1. Treasury articulated no reasoned explanation for adopting the blocked-income regulation

a. Treasury did not offer a single word of explanation of the rationale for the blocked-income rule. Treasury proposed the rule in 1993 as part of a package of changes relating to Section 482. Proposed Rule, 58 Fed. Reg. at 5310-5316. But in proposing what is now 26 C.F.R. § 1.482-1(h)(2) (there designated as § 1.482-1(f)(2)), it said nothing about the rule's basis or purpose. It simply paraphrased in four paragraphs *what* the proposed rule would do, without explaining *why*. Proposed Rule, 58 Fed. Reg. at 5310-5311.

In adopting the final blocked-income regulation in 1994, Treasury again simply summarized the proposed and final versions of that rule.

53

Final Rule, 59 Fed. Reg. at 34,973, 34,981. The agency articulated no basis, reasoned or otherwise, for moving forward as proposed.

Treasury's non-explanation of the blocked-income rule contrasted with other portions of the regulatory package, for which Treasury did provide brief explanations. See, *e.g.*, Proposed Rule, 58 Fed. Reg. at 5311-5312; Final Rule, 59 Fed. Reg. at 34,975-34,988. Moreover, many parts of the proposed rule duplicated temporary rules that Treasury issued simultaneously; the temporary rules' separate preamble provided Treasury's "full explanation" of those other provisions. Proposed Rule, 58 Fed. Reg. at 5310; see 1993 Temporary Rule, 58 Fed. Reg. at 5264-5271. The blocked-income rule was not among those temporary rules, which expressly "reserved" the blocked-income issue. 1993 Temporary Rule, 58 Fed. Reg. at 5268; see *id.* at 5281.

b.    Treasury's complete silence on the rationale for the blocked-income rule is particularly troubling because the rule marked an unexplained departure from both the agency's position and settled precedent.

i.    Section 1.482-1(h)(2) diverged without explanation from Treasury's own existing approach to blocked income. Add. 314-315 (Toro, J., dissenting). For example, the IRS's prior, taxpayer-favorable rule

54

permitted taxpayers to wait to defer blocked income until *after* the IRS audited a return and proposed a Section 482 adjustment. See 26 C.F.R. § 1.482-1(d)(6)(ii) (1968). But under the 1994 regulation, a taxpayer may defer income blocked by foreign law only if the taxpayer shows that the law affected controlled and uncontrolled taxpayers alike—and even then a taxpayer must make the deferred-income election *before* the IRS contacts the taxpayer to audit the taxpayer's return. 26 C.F.R. § 1.482-1(h)(2)(i), (iii) (1994).

The Tax Court plurality believed that another change from the prior regulations—the deletion of the "complete power" language in the rule *First Security* quoted, 405 U.S. at 404 (quoting 26 C.F.R. § 1.482-1(b)(1))—was pivotal and distinguished the IRS's allocation here from the one *First Security* held invalid. See Add. 234-235, 237-243. The plurality misread the import of that modification, which if anything only weakens the plurality's reasoning. See pp. 40-41, *supra*; Add. 330 (Toro, J., dissenting). But if the plurality were correct that removing the "complete power" language was significant, that amendment would mark another material change in Treasury's position that Treasury should have confronted explicitly.

55

Treasury did not "display awareness" of these or other changes, much less identify "good reasons" for changing course. *Encino Motorcars*, 579 U.S. at 221 (citation omitted). It offered neither any "reasoned explanation * * * for disregarding facts and circumstances that underlay" its prior rule nor confronted "reliance interests" premised on its "prior policy." *Id.* at 222 (citation omitted). This "intolerably mute" modification renders its rule arbitrary and capricious. *Greater Boston Television Corp.* v. *FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

ii. The blocked-income rule also departed without discussion from judicial precedent that had settled the meaning of Section 482. See pp. 24-31, *supra*. Indeed, that was the rule's apparent purpose. As the Tax Court plurality recounted, commenters criticized the proposed rule as "an 'obvious attempt' to 'override' *Procter & Gamble*," in which the Sixth Circuit applied *First Security* to reject an allocation of income blocked by foreign law. Add. 268 (quoting App. 267); see App. 238 (commenter explaining that proposed rule "constitute[d] a not-too-subtle attempt to overrule *Procter & Gamble* * * * by administrative fiat"); App. 212 (similar); App. 262 (commenter questioning the rule based on "inconsistencies with judicial decisions, such as * * * *Procter & Gamble*").

Even if Treasury were free to disregard that precedent, "at a minimum" those "cases raised points that cast doubt on the wisdom of Treasury's proposed course." Add. 316 (Toro, J., dissenting). For example, the Sixth Circuit in *Procter & Gamble* explained that a Section 482 allocation based on payments barred by foreign law would not advance the "purpose of section 482" of "prevent[ing] artificial shifting of income between related taxpayers." 961 F.2d at 1259. And *First Security* itself explained why "fairness" supports "requir[ing] the tax to fall on the party that actually receives the premiums rather than on the party that cannot." 405 U.S. at 405. Treasury was required "to explain how those goals should be weighed against the statutory factors identified by the courts and the fairness concerns they embody." Add. 317 (Toro, J., dissenting). Moreover, those and other judicial decisions had settled the legal landscape—creating reliance interests—that the blocked-income rule upended. Treasury's failure to articulate any justification for attempting to abrogate those decisions is independently fatal.

c.     The Tax Court plurality improperly tried to reconstruct a basis for the rule on Treasury's behalf. Add. 265-267. Addressing just one of the rule's requirements—that the restriction must affect uncontrolled

taxpayers as well as controlled taxpayers—the plurality divined a "rationale" from the language of the blocked-income rule itself. Add. 265. It posited that the "effect-on-uncontrolled-taxpayers" requirement is merely "a specific application of two principles of section 482: (1) the arm's-length standard and (2) the principle that section 482 should achieve tax parity between controlled and uncontrolled parties." Add. 266. That judicially invented explanation cannot support Treasury's rule for at least two reasons.

First, the Tax Court plurality overstepped by backfilling a justification that Treasury itself never adopted. It is hornbook law that a "reviewing court should not attempt itself to make up for [the agency's] deficiencies"; courts "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC* v. *Chenery Corp.*, 332 U.S. 194, 196 (1947)); see *Red River Valley Sugarbeet Growers Ass'n* v. *Regan*, 85 F.4th 881, 890 n.2 (8th Cir. 2023) (validity of agency action turns on grounds on which agency "pin[s] its decision"). Courts cannot "'accept * * * *post hoc* rationalizations for agency action'" that "[t]he agency itself" never adopted, even if offered by the agency's "'appellate counsel,'" let alone if they are products of judicial creativity.

58

*Menorah Medical*, 768 F.2d at 296 (quoting *State Farm*, 463 U.S. at 50). The Tax Court plurality engaged in just such improper ventriloquism here.

Second, the plurality's reconstructed rationale fails on its own terms. The portion of the rule it invoked does not "express" any "rationale" for the "effect-on-uncontrolled-taxpayers" requirement. Add. 265. At most, those "two sentences" reveal "what the district director will do under the new rule." Add. 312 (Toro, J., dissenting). The passage the plurality quoted states:

> The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time.

Add. 265 (quoting 26 C.F.R. § 1.482-1(h)(2)(i)). Nothing in that text explains why an "arm's-length standard" is appropriate in deciding whether to recognize foreign law or why legal restrictions applicable only to controlled entities should be ignored. The quoted text likewise mentions no "tax-parity goal." Add. 266. Although a separate subsection of the regulation describes Section 482 as "plac[ing] a controlled taxpayer

59

on a tax parity with an uncontrolled taxpayer," Add. 267 (emphasis omitted) (quoting 26 C.F.R. § 1.482-1(a)(1)), Treasury never explained how the blocked-income rule—which selectively disregards certain legal restrictions only for controlled taxpayers—promotes tax parity.

The plurality's account thus at least requires "several leaps in reasoning" from those abstract concepts to that portion of Treasury's rule. *Menorah Medical*, 768 F.2d at 295. If any rational link exists between the arm's-length and tax-parity concepts and the blocked-income rule, *the agency* must identify it. "Courts may overlook inartful explanations when the agency's path may be reasonably discerned, but they may not clear a path for the agency where none exists." Add. 313 (Toro, J., dissenting).

### 2. *Treasury failed to respond to significant comments*

Treasury also never responded to significant concerns commenters raised with the proposed rule. That failure violates the APA's notice-and-comment requirements and renders the rule arbitrary and capricious. 5 U.S.C. §§ 553(c), 706(2)(D); see *PPL Wallingford*, 419 F.3d at 1198.

a. Agencies must respond to "significant" comments—*i.e.*, comments that, "if true, raise points relevant to the agency's decision and

which, if adopted, would require a change in an agency's proposed rule." *Home Box Office, Inc.* v. *FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) (per curiam). The comments Treasury disregarded here readily qualify.

At least four institutional commenters raised serious concerns about Treasury's proposed blocked-income rule. App. 215, 238-240, 262-263, 267-270. They challenged Treasury's authority to adopt the rule based on the statute, *First Security*, and subsequent decisions. *E.g.*, App. 212, 238-240. Comments also raised multiple policy and practical concerns with Treasury's proposal. For example, they explained that:

- the proposed blocked-income rule's requirements for recognizing foreign legal restrictions failed to account for the diversity of foreign legal systems that do not neatly fit the rule's assumptions, App. 212;

- the proposed rule's criteria for recognizing foreign legal restrictions were "[u]nrealistic" and threatened to make *First Security*'s general rule a vanishing exception, App. 213-215;

- the proposed rule would prove particularly problematic for certain industries that are heavily regulated around the world, App. 212-213; and

- the proposed rule's requirement that legal restrictions be applicable to both controlled and uncontrolled taxpayers disregarded real-world conditions and would discourage cross-border transactions in regions such as Latin America where limitations exclusive to affiliated entities were common, App. 239.

Those concerns were significant. Challenges to an agency's authority are quintessentially significant because they undercut "a fundamental premise" of its proposed course. *Carlson* v. *Postal Regulatory Commission*, 938 F.3d 337, 344 (D.C. Cir. 2019) (citation omitted); see, *e.g.*, *American Fuel & Petrochemical Manufacturers* v. *EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019) (per curiam). And the policy and practical concerns raised would, if true, require the agency to rethink its approach. The comments thus required a response. See, *e.g.*, *Mortgage Bankers*, 575 U.S. at 96; *Menorah Medical*, 768 F.2d at 295-296 ("Since these criticisms cast serious doubt on the premise grounding the Secretary's explanation, her failure to respond to them was arbitrary and capricious.").

Treasury, however, did not mention any of these comments in adopting the final rule, let alone respond to them. 59 Fed. Reg. at 34,981. That silence contrasts sharply with Treasury's response to comments on other aspects of the regulatory package. Cf. *id.* at 34,975-34,988. Its rule must be "h[e]ld unlawful" for failing to "observ[e]" the "procedure required by law." 5 U.S.C. § 706(2)(D). And Treasury's "decision can hardly be classified as reasoned" given its failure to "answe[r] objections that on

62

their face seem legitimate." *PPL Wallingford*, 419 F.3d at 1198 (citation omitted).

b. The Tax Court plurality excused Treasury's failure to respond by deeming those comments "not significant," reasoning that Treasury "was already *aware*" of the concerns they raised. Add. 268-269 (emphasis added); cf. Add. 269-270 (reserving judgment on Treasury's failure to address other comments). But "'knowing'" of commenters' concerns "is not * * * the same as actually considering the problems [they] raised." *Gerber* v. *Norton*, 294 F.3d 173, 183 (D.C. Cir. 2002). The APA requires a response "to show that the agency has indeed considered all significant points articulated by the public." *Natural Resources Defense Council, Inc.* v. *EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988) (per curiam). That is the "fundamental purpose of the response requirement." *Ibid*.

Treasury's boilerplate assertion that it adopted the final rule "[a]fter consideration of all the comments," Final Rule, 59 Fed. Reg. at 34,972; see Add. 268 n.208, adds nothing. "[U]nless the agency *answers* objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *PPL Wallingford*, 419 F.3d at 1198 (emphasis added; brackets and citation omitted); see *PSEG Energy Resources &*

63

*Trade LLC* v. *FERC*, 665 F.3d 203, 210 (D.C. Cir. 2011) ("To characterize objections  * * *  is not to answer them."); Add. 321 & n.12 (Toro, J., dissenting) (collecting cases).  Deeming sufficient an agency's blanket statement that it considered all comments would eviscerate APA review.

The particular evidence the Tax Court plurality offered that Treasury knew of the concerns here only illustrates the illogic of the plurality's approach.  The plurality deemed commenters' challenges to Treasury's statutory authority "not significant" because commenters asserted "'obvious'" inconsistencies between the proposed rule and judicial precedent. Add. 268.  The APA contains no exception for concerns that are "'obvious,'" *ibid.*—which may be in the eye of the beholder.  Indeed, deeming a comment insignificant because it presses *obvious* problems with a rule turns the APA upside-down by enabling agencies to ignore the comments *most* in need of a response.

The plurality also inferred that Treasury was aware that many legal restrictions would be disregarded by its blocked-income rule because commenters flagged that issue yet Treasury moved forward *anyway*. Add. 269.  But if an agency's mere awareness of a comment coupled with its refusal to change course rendered that comment insignificant, its duty

to respond to comments would be a dead letter. On that view, an agency could always point to its final rule as proof that it necessarily rejected the comment's argument by implication.

The Tax Court plurality misread *Thompson* v. *Clark*, 741 F.2d 401 (D.C. Cir. 1984), to excuse Treasury from addressing concerns of which it was "already" aware. Add. 268 (citation omitted); see Add. 324-327 (Toro, J., dissenting). In *Thompson*, the Interior Department "clearly" and explicitly "identified the reasons for its action in its Notice of Proposed Rulemaking," "based upon [agency] studies and [an] economic theory." 741 F.2d at 409. The comments at issue either "simply denied the validity" of the agency's views or challenged the rule's benefits "without any serious analysis or data." *Ibid.* Even if true, the comments were not "destructive of the Department's rationale." *Ibid.* The comments thus were not significant even under the APA's low threshold. And the "explanation * * * already contained within the rulemaking record" itself "assure[d]" the court that the agency *had* addressed those concerns previously and considered all "relevant factors." *Id.* at 409-410 (citation omitted). The Tax Court plurality here cited nothing in the record showing that Treasury ever addressed commenters' concerns with the blocked-income rule.

65

c.     The concern stated in Chief Judge Kerrigan's concurrence—that holding Treasury accountable here for failing to address commenters' concerns would send the agency down a "slippery slope," Add. 280—provides no sound basis to forgo enforcing the APA.  If Treasury's past practice puts its regulations in jeopardy today, it must face the music.  Otherwise, an agency's evasion of the APA would become its own excuse.  Agencies cannot help themselves to an APA exemption by adverse possession.  If "[a]ny exceptions to the sturdy protections established by the APA's notice-and-comment requirements" are warranted, they "must come from Congress."  *Mann Construction*, 27 F.4th at 1148.

In any event, the concurrence's concern with enforcing the APA in this case is overstated.  This is not an edge case.  Applying the APA's basic requirements to the blocked-income rule does not require grading Treasury's homework or finely measuring the length of its response to each comment.  Treasury twice defaulted on its duty completely:  It failed to provide any rationale, and it failed to address significant comments.  The Court can decide these issues—indeed, resolve this appeal—on the simple ground that providing *no* rationale and *no* response is not enough.

66

**CONCLUSION**

This Court should reverse the Tax Court's judgment.

Respectfully submitted.

Dated:  February 7, 2024

/s/ Jonathan C. Bond

Jonathan C. Bond
Saul Mezei
Jeff Liu
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
JBond@gibsondunn.com

*Counsel for Appellant*
  *3M Company & Subsidiaries*

67

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 12,996 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.     This brief has been scanned for viruses and is virus-free.

Dated:  February 7, 2024

                         /s/ Jonathan C. Bond
                         Jonathan C. Bond

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ Jonathan C. Bond
Jonathan C. Bond