# No. 23-3772

# In the United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

3M COMPANY, AND SUBSIDIARIES

*Appellant*

v.

COMMISSIONER OF INTERNAL REVENUE

*Appellee*

On Appeal From The United States Tax Court
No. 5816-13 – 160 T.C. No. 3

# BRIEF OF *AMICUS CURIAE* SILICON VALLEY TAX DIRECTORS GROUP IN SUPPORT OF APPELLANT AND REVERSAL [FILED WITH CONSENT]

THOMAS M. PETERSON
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
(415) 442-1344

MICHELLE L. ANDRIGHETTO
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 341-7712

RODERICK K. DONNELLY
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
(650) 843-7289

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Silicon Valley Tax Directors Group certifies that it is a non-profit corporation, that it does not have a parent corporation, and that no publicly held corporation owns ten percent or more of its stock.

Appellate Case: 23-3772     Page: 2     Date Filed: 02/14/2024 Entry ID: 5363507

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES .................................................................iv

INTERESTS OF AMICUS CURIAE ..................................................1

ARGUMENT ..................................................................3

I. The CWI standard must be interpreted consistently with the arm's length standard, and under this interpretation the blocked income regulation is invalid.................................................................3

    A.    The interaction of the CWI standard and the arm's length standard..............................................................6

        1.    The arm's length standard and how it applies ..........................6

        2.    The CWI standard ........................................................8

        3.    The CWI standard must be applied consistently with the arm's length standard ...............................................9

            a.    If the CWI standard operated in isolation, the blocked income regulation would be inconsistent with § 482 and thus invalid..............................9

            b.    Why the CWI standard must operate consistently with the arm's length standard......................................10

    B.    Applying the arm's length standard to the blocked income regulation.........................................................13

    C.    Summarizing substantive reasons the blocked income regulation is invalid ...............................................17

II. The integrity of the federal tax rulemaking process must be upheld by invalidating Treasury's procedurally-deficient regulation ...........................18

    A.    Treasury's failure to supply a "reasoned basis" for its rule at the time of promulgation was a clear violation of the *APA* ....................19

        1.    The Tax Court is not permitted to engage in "judicial speculation" or to infer a "reasoned basis" when Treasury provides none ...............................................19

Appellate Case: 23-3772    Page: 3    Date Filed: 02/14/2024    Entry ID: 5363507

# TABLE OF CONTENTS
### (continued)

2. By manufacturing a "reasoned basis" on Treasury's behalf, the Tax Court plurality erodes public confidence in notice-and-comment rulemaking ...........................................21

B. Treasury's failure to consider and respond to significant comments is a separate but equally egregious violation of the *APA* ...........................................................................................22

1. The plurality's misapplication of *Thompson* will discourage public submission of comments and—by condoning Treasury's lassitude—will embolden agencies to engage in sloppy rulemaking ................................................25

2. Because the opportunity to comment is meaningless unless Treasury responds to significant points raised, the Tax Court's analysis will have a chilling effect on the public comment process...........................................................27

III. Conclusion ............................................................................................28

CERTIFICATE OF COMPLIANCE......................................................29

CERTIFICATE OF SERVICE ...............................................................30

Appellate Case: 23-3772    Page: 4    Date Filed: 02/14/2024 Entry ID: 5363507

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Azar v. Allina Health Servs.*,
587 U.S. ___ (2019), 139 S. Ct. 1804 (2019) ................................................... 27

*Commissioner v. First Sec. Bank of Utah, N.A.*,
405 U.S. 394 (1972) ....................................................................................... 3, 16

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ............................................................................... 19, 20, 21

*Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................................ 19

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) ............................................................................ 23

*Hewitt v. Commissioner*,
21 F.4th 1336 (11th Cir. 2021) ......................................................................... 26

*Home Box Office, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) ...................................................................... *passim*

*Judulang v. Holder*,
565 U.S. 42 (2011) ................................................................................. 19, 20, 26

*L.E. Shunk Latex Prods., Inc. v. Commissioner*,
18 T.C. 940 (1952) ............................................................................................. 4

*MCI WorldCom, Inc. v. FCC*,
209 F.3d 760 (D.C. Cir. 2000) .......................................................................... 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................... *passim*

*N.C. Grower's Ass'n, Inc. v. United Farm Workers*,
702 F.3d 755 (4th Cir. 2012) ...................................................................... 22, 23

*Nat. Res. Def. Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988) .................................................................... 22, 24

iv

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015)..................................................................22

*Procter & Gamble Co. v. Comm'r,*
   95 T.C. 323 (1990)...................................................................4

*SEC v. Chenery Corp.,*
   332 U.S. 194 (1947)................................................................21

*Texaco, Inc. v. Commissioner,*
   98 F.3d 825 (5th Cir. 1996) ......................................................4

*Thompson v. Clark,*
   741 F.2d 401 (D.C. Cir. 1984)................................................25

*Xilinx, Inc. v. Commissioner,*
   598 F.3d 1191 (9th Cir. 2010) ...............................................7, 8

**STATUTES**

Administrative Procedure Act
   5 U.S.C. § 551.................................................................*passim*
   5 U.S.C. § 553.......................................................................22
   5 U.S.C. § 706..................................................................22, 23

Internal Revenue Code
   26 U.S.C. § 482..............................................................*passim*

**REGULATIONS**

REG-106359-02, 67 Fed. Reg. 48997 (July 29, 2002)...........................11

T.D. 8552, 59 Fed. Reg. 34971 (July 8, 1994) .......................9, 11, 12, 13

T.D. 9088, 68 Fed. Reg. 51171 (August 26, 2003) ..................................8

Treas. Reg. § 1.482-1 ....................................................................*passim*

Appellate Case: 23-3772     Page: 6     Date Filed: 02/14/2024 Entry ID: 5363507

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

Notice 88-123, 1988-2 C.B. 458......................................................................5, 9, 11

2006 U.S. Model Technical Explanation...............................................................11

Appellate Case: 23-3772    Page: 7    Date Filed: 02/14/2024 Entry ID: 5363507

## INTERESTS OF AMICUS CURIAE[12]

Amicus Silicon Valley Tax Directors Group ("***SVTDG***") has more than 110 member corporations whose aggregate market capitalization exceeds $12 trillion, and whose businesses comprise a significant portion of the U.S. economy. SVTDG members have extensive experience licensing intangible property to related and unrelated companies worldwide. SVTDG members have conducted their multinational businesses cognizant of § 482 of the Internal Revenue Code and in particular its second sentence, enacted in 1986, embodying the commensurate-with-income ("***CWI***") standard that looms in this case.

Amicus SVTDG disagrees with the Tax Court plurality's reasoning that the CWI standard can be applied in isolation, independently of the "***arm's length***" standard inherent in the first sentence of § 482. And we disagree with the plurality's use of this "isolationist" understanding of the CWI standard to validate the "***blocked income***" Treasury regulation (Treas. Reg. § 1.482-1(h)(2)).

The SVTDG has a substantial, ongoing interest in the lawful promulgation of effective Treasury regulations. The SVTDG takes very seriously the right and

---

[1]  All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2]  No party's counsel authored this brief in whole or part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than the *amicus curiae* and its counsel contributed money that was intended to fund preparing or submitting this brief.

Appellate Case: 23-3772    Page: 8    Date Filed: 02/14/2024 Entry ID: 5363507

civic duty to provide input to Treasury and the IRS (hereinafter "***Treasury***") as part of notice-and-comment rulemaking.  Its members have spent significant time and money preparing and submitting comments on proposed regulations and participating in public hearings on regulations.  The Tax Court plurality opinion shows a disturbing laxity in requiring Treasury's adherence to rulemaking requirements under the *Administrative Procedure Act* ("**APA**").

3M Company ("***3M***") has given the Court ample reasons to reverse the plurality opinion.  Amicus SVTDG hereby adds to them by: dispelling confusion about the CWI standard and how it interacts with the arm's length standard; showing that nothing in § 482 or the legislative history of the CWI standard signals an intent to modify the meaning of "income" in the first sentence of § 482; showing that the blocked income regulation is contrary to the arm's length standard; and identifying serious adverse consequences for the integrity of the federal tax rulemaking process attendant to the Tax Court plurality's unprecedented and startling holding that Treasury properly promulgated its blocked income regulation in the manner required by the *APA*.

2

## ARGUMENT

### I. THE CWI STANDARD MUST BE INTERPRETED CONSISTENTLY WITH THE ARM'S LENGTH STANDARD, AND UNDER THIS INTERPRETATION THE BLOCKED INCOME REGULATION IS INVALID

The Tax Court (plurality)[3] ruled that the Supreme Court's decision in *Commissioner v. First Security Bank of Utah, N.A.,* 405 U.S. 394 (1972), does not hold that the pre-CWI version of § 482 "unambiguously precluded an allocation of income that could not be legally received." 3M Addendum ("***Add.***") 236-237 ("In other words, we hold that *First Security Bank* was not a *Chevron* step one opinion."). 3M has demonstrated why this conclusion is wrong. The Tax Court backstopped its holding with four conclusions based on its understanding of the CWI standard. <u>First</u>, the Tax Court stated "[t]he proposed allocation is consistent with the [CWI] statutory amendment. The income [Treasury] seeks to allocate to 3M IPC is commensurate with the income attributable to the intangible property." Add. 244-245. But this statement does not account for how Treasury actually interprets and applies the CWI standard. Treasury's determination of 3M's income tax liability was based on the blocked income regulation (Add. 10 and 50), not the CWI standard, so it would have been more apt for the court to inquire whether the blocked income regulation is consistent with the CWI standard. It isn't.

---

[3] In this amicus brief we refer to the Tax Court plurality as the "***Tax Court***" or the "***plurality***."

Appellate Case: 23-3772    Page: 10    Date Filed: 02/14/2024 Entry ID: 5363507

Second, based on its view of *First Security Bank*,[4] the Tax Court deemed "the four opinions [including *First Security Bank*] are distinguishable because they construed the pre-1986 statutory provision that lacked the [CWI] sentence." Add. 244-245; see also Add. 249 n.190 ("[Treasury's] argument is that *First Security Bank* is not binding precedent as to this case because *First Security Bank* interpreted [§ 482] before it was changed in 1986."). But the Tax Court's premise doesn't logically allow it to distinguish the cases. True, the four opinions construed pre-CWI § 482. This is, however, beside the point. The relevant inquiry is the extent to which the four opinions hypothetically would have changed if the CWI standard, as interpreted and applied by Treasury, applied to the facts of the four cases. The Tax Court plurality ignored this.

Third, in rejecting 3M's argument that the scope of the CWI amendment is limited to the scope attributed to it by the House Ways and Means Committee report, the Tax Court said that "[i]t is reasonable to think that Congress would have expected that the interpretive questions posed by [CWI] would be resolved by subsequent regulations, not by pre-amendment legislative history." Add. 247. The Tax Court then pointed to Congressional exhortation that led Treasury to produce

---

[4] The court also examined *L.E. Shunk Latex Prods., Inc. v. Commissioner*, 18 T.C. 940 (1952); *Procter & Gamble Co. v. Comm'r*, 95 T.C. 323 (1990); and *Texaco, Inc. v. Commissioner*, 98 F.3d 825 (5th Cir. 1996).

Appellate Case: 23-3772     Page: 11     Date Filed: 02/14/2024 Entry ID: 5363507

the *White Paper*. *Id*. But the *White Paper* and subsequent regulations clearly articulate Treasury's view of the scope of the CWI standard. That view undercuts the Tax Court's conclusion in this case.

Fourth, the Tax Court found—piecing together a sequence of documents relevant to promulgation of the blocked income regulation—that "[Treasury] did draw a link between the [CWI] statutory change and the rules regarding foreign legal restrictions in [§ 1.482-1(h)(2)]." Add. 248-249. Had the Tax Court examined how Treasury interpreted and applied the CWI standard, however, it would have realized that the linkage doesn't justify the blocked income regulation.

The Tax Court plurality opinion interpreted § 482's CWI standard independently of the arm's length standard, and applied that interpretation to uphold the blocked income regulation at issue. But if the plurality's interpretation of the CWI standard were correct, Treasury would have no authority to promulgate any blocked income regulation. Treasury has in any case never embraced or articulated the plurality's understanding of the CWI standard, including when Treasury promulgated the blocked income regulation. Consequently, the plurality's view of the CWI standard cannot support the blocked income regulation because Treasury never shared it. Rather, Treasury explained that Congress intended the CWI standard to work consistently with the arm's length standard inherent in § 482. Treasury spelled out this consistency requirement in its

5

regulations embodying the CWI standard. These "periodic adjustment" regulations—promulgated at the same time as the blocked income regulation— prevent the IRS from making periodic (CWI) adjustments to royalty income in transactions meeting the arm's length standard. The Tax Court plurality ignored this. Treasury regulations direct that the arm's length standard applies "in every case," so it must apply to licensing transactions like those 3M entered into. The blocked income regulation pays lip service to the arm's length standard, but in fact the regulation flouts it. The blocked income regulation is contrary to the arm's length standard, and contrary to the CWI standard as it properly operates (consistently with the arm's length standard). The blocked income regulation is thus invalid. This invalidity is separate and independent from invalidity consequent to Treasury's several procedural flaws in promulgating the regulation (discussed in § II., below).

## A.   The interaction of the CWI standard and the arm's length standard

As it relates to this case, the relationship between the two standards is relatively straightforward.

### 1.   The arm's length standard and how it applies

Section 482 "places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer." § 1.482-1(a)(1). This determination turns on the arm's length standard,

6

embodied one subsection down, in paragraph (1) of § 1.482-1(b) (entitled *Arm's length standard*):

> (1) *In general.*—In determining the true taxable income of a controlled taxpayer, the standard to be applied <u>in every case</u> is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the <u>arm's length standard</u> if the results of the transaction are consistent with the <u>results that would have been realized</u> if uncontrolled taxpayers had engaged in the <u>same transaction</u> under the <u>same circumstances</u> (arm's length result). * * * [Emphasis added][5]

The language is clear enough. Determining whether a controlled transaction—like the licensing of intangibles from a U.S. corporation to its Brazilian subsidiary in exchange for royalties—meets the arm's length standard depends on the outcome of a conditional test that starts by supposing that <u>un</u>controlled taxpayers had engaged in the <u>same transaction</u> (the same licensing of intangibles from a U.S. corporation to an unrelated Brazilian corporation) under the <u>same circumstances</u>. "Same circumstances" as a matter of grammar and logic means the same circumstances as those to which the controlled transaction was subject.

Treasury has emphasized the conditional, hypothetical nature of this test if there is no evidence of exact comparable transactions between uncontrolled parties.

---

5    *See Xilinx, Inc. v. Commissioner*, 598 F.3d 1191, 1196 (9th Cir. 2010) ("[§ 1.482–1(b)(1)] specifies that the true taxable income of controlled parties is calculated based on how parties operating at arm's length would behave. The language is unequivocal: this arm's length standard is to be applied 'in every case.'").

7

*See*, *e.g.*, T.D. 9088, 68 Fed. Reg. 51171, 51172-51173 (August 26, 2003)

(drawing attention, through emphasis, to the phrases "would have been realized"

and "had engaged," and discussing the hypothetical nature of the inquiry); and

*Xilinx, Inc.*, 598 F.3d at 1197 (Fisher, J., concurring) ("The Commissioner reads

the arm's length standard as focused on what unrelated parties would do <u>under the</u>

<u>same circumstances</u>, and contends that analyzing comparable transactions is

unhelpful in situations where related and unrelated parties always occupy

materially different circumstances." (Emphasis in original)).

### 2. The CWI standard

Before its augmentation in 2017, section 482—entitled *Allocation of income*

*and deductions amount Taxpayers*—stated:

> In any case of two or more organizations, trades, or businesses
> . . . owned or controlled directly or indirectly by the same
> interests, the Secretary may distribute, apportion, or allocate gross
> income, deductions, credits, or allowances between or among
> such organizations, trades, or businesses, if he determines that
> such distribution, apportionment, or allocation is necessary in
> order to prevent evasion of taxes or clearly to reflect the income
> of any of such organizations, trades, or businesses. In the case of
> any transfer (or license) of intangible property (within the
> meaning of section 936(h)(3)(B)), the income with respect to such
> transfer or license shall be commensurate with the income
> attributable to the intangible.

The second sentence embodies the CWI standard. Treasury explained that

the CWI standard supplies a general rule—relevant if there's no evidence of the

behavior of comparable transactions between uncontrolled taxpayers—applicable

8

to the consideration charged in the transfer of intangible property between controlled taxpayers. *See*, Notice 88-123 (the "**White Paper**"), 1988-2 C.B. 458, 472 ("Congress determined that the existing [§ 482] regime, which depends heavily upon the use of comparable[] [transactions] and provides little clear guidance in the absence of comparables, was not in all cases achieving the statutory goal of reflecting the true taxable income of related parties. Congress therefore decided that a refocused approach was necessary in the absence of true comparables."); T.D. 8552, 59 Fed. Reg. 34971, 34984 (July 8, 1994) ("if an intangible is transferred . . . the consideration charged is generally subject to an annual adjustment to ensure that it is commensurate with the income attributable to the intangible.").

### 3. The CWI standard must be applied consistently with the arm's length standard

#### a. If the CWI standard operated in isolation, the blocked income regulation would be inconsistent with § 482 and thus invalid

The plurality opinion asserts in effect that, in the case of a U.S. corporation licensing intangibles to its Brazilian subsidiary, the CWI standard in the second sentence of § 482 <u>modifies</u> the definition of "income" in the first sentence.[6] But this is wrong. If the CWI standard in the second sentence overrode or modified the

---

[6] We pointed out above that the plurality treated the CWI amendment as modifying application of the first § 482 sentence.

9

definition of "income" in the first sentence, then the income allocated to the U.S. licensing corporation (first sentence) must be "commensurate with the income attributable to the intangible" (second sentence). The income allocated to the U.S. licensing corporation would <u>have to be</u> "commensurate with the income attributable to the [licensed] intangibles." <u>Under no circumstances</u> could the income allocated to the U.S. licensing corporation <u>not</u> be "commensurate with the income attributable to the [licensed] intangibles." Treasury would have <u>no authority under § 482</u> "to take into account the effect of the [Brazilian] legal restriction" (§ 1.482-1(h)(2)). But the blocked income regulation does precisely this—it specifies circumstances in which Treasury <u>will take into account</u> foreign government restrictions that constrain outbound payments, like royalties. Thus, <u>if</u> the CWI standard overrode or modified the definition of "income" in the first sentence, the blocked income regulation would be contrary to § 482 and thus invalid.[7] But the CWI standard doesn't actually work the way the Tax Court plurality thought.

### b. Why the CWI standard must operate consistently with the arm's length standard

The CWI standard and the arm's length standard work together. Treasury has clearly and repeatedly stated that the CWI standard <u>is consistent with</u> the arm's

---

[7] This result would on its own be sufficient to reverse the Tax Court holding, but we persevere and show the general invalidity of the blocked income regulation.

Appellate Case: 23-3772    Page: 17    Date Filed: 02/14/2024 Entry ID: 5363507

length standard. *See*, *e.g.*, *White Paper*, 1988-2 C.B. at 477 ("The approach taken by Congress in enacting the [CWI] standard and the approaches suggested [herein] for implementing that standard, including the provision for periodic adjustments, are consistent with internationally recognized arm's length principles.");[8] REG-106359-02, 67 Fed. Reg. 48997, 48998 (July 29, 2002) ("[Treasury said] that Congress intended that Treasury and the IRS apply and interpret the commensurate with income standard consistently with the arm's length standard."). This consistency only makes sense if the CWI standard doesn't override or modify the arm's length standard—instead, they must work in harmony. This is what Treasury thought and said, and it acted accordingly in promulgating regulations. The "periodic adjustment" § 482 regulations promulgated in 1994 were "required by the 1986 [CWI] amendment to section 482." T.D. 8552, 59 Fed. Reg. 34971, 34984 (July 8, 1994). The periodic adjustment regulations provide that if an intangible is transferred for a period of more than a year, the consideration for the

---

[8]   Treasury explained: "To allay fears that Congress intended the [CWI] standard to be implemented in a manner inconsistent with international transfer pricing norms and U.S. treaty obligations, Treasury officials publicly stated that Congress intended no departure from the arm's length standard, and that the Treasury Department would so interpret the new law." *Id.* at 475. *See also*, *2006 U.S. Model Technical Explanation*, p. 31 ("It is understood that the 'commensurate with income' standard for determining appropriate transfer prices for intangibles, added to [§ 482] by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard.").

11

transfer is _generally_ subject to an annual adjustment by the IRS to ensure it's commensurate with the income attributable to the intangible. _Id_. But there are exceptions, as there _must be_ if the CWI standard must be "consistent[] with the arm's length standard." Subparagraph (i) of § 1.482-4(f)(2) (entitled _Periodic adjustments_) clearly signals the consistency:

> If an intangible is transferred under an arrangement that covers more than one year, the consideration charged in each taxable year may be adjusted to ensure that it is commensurate with the income attributable to the intangible. Adjustments made pursuant to this paragraph (f)(2) _shall be consistent with the arm's length standard_ and the provisions of Section 1.482-1. [Emphasis added]

The regulations prevent the IRS from making a periodic (CWI) adjustment to the royalties paid between controlled parties if the royalties mirror those paid if the _same intangible_ is transferred under the _substantially the same circumstances_ between _un_controlled parties. § 1.482-4(f)(2)(ii)(A).[9] To be clear, _regardless_ of whether the royalties paid between _un_controlled parties for the same intangible are

---

[9] "If the same intangible was transferred to an uncontrolled taxpayer under substantially the same circumstances as those of the controlled transaction; this transaction serves as the basis for the application of the comparable uncontrolled transaction method in the first taxable year in which substantial periodic consideration was required to be paid; and the amount paid in that year was an arm's length amount, then no [CWI periodic] allocation in a subsequent year will be made under [§ 1.482-4(f)(2)(i)] of this paragraph for a controlled transfer of intangible property." Treasury regulations also fetter the IRS's ability to make periodic adjustments to royalties determined based on uncontrolled transactions involving _comparable_ intangibles under _comparable_ circumstances. § 1.482-4(f)(2)(ii)(B).

Appellate Case: 23-3772    Page: 19    Date Filed: 02/14/2024 Entry ID: 5363507

"commensurate with the income attributable to the intangible," the IRS will not make an adjustment under the CWI standard to the same royalty paid between controlled parties.[10]  This restriction on IRS behavior would be contrary to the second (CWI standard) sentence of § 482 viewed in isolation (the perspective of the Tax Court plurality).  But Treasury has repeatedly rejected an isolationist view, signaling instead that the CWI standard is consistent with the arm's length standard.  The exceptions to the periodic adjustment rule are examples of this interpretation and application.

## B.   Applying the arm's length standard to the blocked income regulation

The "arm's length standard" applies "in every case," so it must apply to a situation in which a foreign government legally "blocks" outbound payments of royalties made by a foreign subsidiary to its licensor U.S. parent corporation.  The arm's length standard is precise and clear.  The arm's length standard doesn't simply look to whether and how the foreign government legal restriction applies (or doesn't apply) to uncontrolled licensors and licensees.  Rather, as explained above, determining whether a controlled transaction meets the arm's length

---

[10]   *See also* T.D. 8552, 59 Fed. Reg. at 34984 ("Thus, for example, the consideration for the transfer of an intangible to a controlled taxpayer in one country could be determined to be arm's length based on the transfer of the same intangible to an uncontrolled taxpayer in another country in which the relevant economic conditions were substantially similar to those in the first country.  In such case no periodic adjustment would be made if the two transactions occurred under substantially similar circumstances.").

Appellate Case: 23-3772     Page: 20     Date Filed: 02/14/2024 Entry ID: 5363507

standard depends on the outcome of a conditional test that starts by supposing that uncontrolled taxpayers had engaged in the <u>same transaction</u> the controlled taxpayers executed, under the <u>same circumstances</u> as the controlled taxpayer's actual transaction.[11]  The arm's length standard sets up the hypothetical of uncontrolled taxpayers conducting the same transaction under the same circumstances and then asks if the results of the controlled transaction "are consistent with the results that would have been realized" from the hypothetical transaction.

How does the blocked income regulation (§ 1.482-1(h)(2)) fare under the arm's length standard?  The regulation states in relevant part:

> (i)  *In general.*—The [IRS] will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length.  Thus, a foreign legal restriction will be taken into account <u>only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time</u>.  In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in [§§ 1.482-1(h)(2)(iii) and (iv)] (Deferred income method of accounting).
>
> (ii)  *Applicable legal restrictions.*—Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the

---

[11]  "A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the <u>results that would have been realized</u> if uncontrolled taxpayers had engaged in the <u>same transaction</u> under the <u>same circumstances</u> (arm's length result)."  § 1.482-1(b)(1) (emphasis added).

14

conditions set forth in [§§ 1.482-1(h)(2)(ii)(A) through (D)] are met.

>    (A)  The restrictions are publicly promulgated, <u>generally applicable to all similarly situated persons (both controlled and uncontrolled)</u>, and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

>    * * *

>    [Emphasis added]

Subparagraph (i) of the regulation states that the IRS will "take into account the effect of a foreign legal restriction . . . only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time."  This is the wrong inquiry under the arm's length standard.  In the case of a licensing transaction involving a foreign country, the correct inquiry is to first <u>assume</u> that <u>un</u>controlled taxpayers had licensed the same intangibles under the "same circumstances"—in this case, <u>including</u> the foreign legal restriction that applies.  If the hypothetical licensing transaction among uncontrolled taxpayers isn't subject to the foreign legal restriction, then it's not conducted under the "same circumstances" as those prevailing for the controlled transaction.  If a foreign legal restriction <u>doesn't</u> in fact apply to uncontrolled transactions, then the first step of the arm's length transaction deems the <u>opposite</u>—assume that the restriction <u>does apply</u>.  The second step is to ask if the results of the controlled transaction are consistent with the results of the hypothetical uncontrolled transaction.  On 3M's facts, the arm's length inquiry is

15

whether the results 3M experienced are consistent with the results of the hypothetical licensing of the same intangibles to a Brazilian subsidiary by uncontrolled taxpayers under the same circumstances—including the same legal restriction (cap) on royalties to which the controlled licensing transaction is subject. The Tax Court plurality ignored this. The blocked income regulation flouts proper application of the arm's length standard, which must apply "in every case" in determining the true taxable income of a controlled taxpayer.[12] Application of the CWI standard to the blocked income regulation cannot resuscitate the regulation because the CWI standard must be interpreted consistently with the arm's length standard. The blocked income regulation is therefore invalid.

---

[12] We note that proper application of the (1994) arm's length standard would allow a court to reach for 3M here a similar outcome to that reached by the Supreme Court in *Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394 (1972). If a U.S. parent corporation licensor doesn't receive royalty income from a foreign subsidiary that the parent was—because of foreign legal restrictions—"prohibited from receiving" (*Id.*, 405 U.S. at 403), the arm's length standard inquiry is whether the controlled licensing transaction result is consistent with the result of an uncontrolled licensing transaction under the same circumstances, including the imposition of foreign legal restrictions. Trial courts are capable of distinguishing bona fide restrictions from those contrived to aid taxpayers. If restrictions are bona fide, they are respected under the arm's length standard. Thus, the arm's length standard of the 1994 § 482 regulations can be viewed as embodying both the "complete dominion" income principle and the "compete power" (subsequently removed) § 482 regulation discussed by in *First Sec. Bank*.

16

The requirements in subparagraph (ii) of the regulation are relevant "[i]n the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers . . . ." Foreign legal restrictions in this case will be taken into account only if the conditions in four clauses are met. Clause 1.482-1(h)(2)(ii)(A) requires that the foreign legal restrictions must be "generally applicable to all similarly situated persons (both controlled and uncontrolled)." This, as above, is the wrong inquiry. For purposes of the arm's length standard the only relevant inquiry is into the results of the hypothetical "same transaction" conducted by uncontrolled taxpayers under the "same circumstances." Because this branch of the blocked income regulation flouts proper application of the arm's length standard, it is again contrary to that standard, and is therefore invalid.

**C.  Summarizing substantive reasons the blocked income regulation is invalid**

The Tax Court plurality was wrong to hold that the blocked income regulation is supported by the CWI standard in isolation. If the plurality's "isolationist" view of the CWI standard applied, the IRS would have no authority—in the case of licenses of intangibles—to take any foreign legal restrictions into effect unless the royalty payments in all cases were commensurate with the income attributable to the licensed intangible. The blocked income regulation doesn't do this; it ignores the CWI standard altogether. The blocked income regulation is also contrary to the arm's length standard, because it fails to

17

make the hypothetical inquiry clearly mandated in the arm's length standard. And because the CWI standard must properly be interpretated consistently with the arm's length standard, the blocked income regulation is contrary to the CWI standard, as properly interpreted. Because the blocked income regulation is contrary to the arm's length standard (which must apply "in every case") and thus with the CWI standard, which must be interpreted consistently with the arm's length standard, it is invalid.

## II. THE INTEGRITY OF THE FEDERAL TAX RULEMAKING PROCESS MUST BE UPHELD BY INVALIDATING TREASURY'S PROCEDURALLY-DEFICIENT REGULATION

The Tax Court plurality sustained § 1.482-1(h)(2), deferring to Treasury even though Treasury failed to comply with two basic requirements of the *APA*: (i) providing a contemporaneous, "reasoned explanation" of the regulation; and (ii) considering and responding to significant public comments. The Tax Court opinion sends the message that reviewing courts may cure procedurally-deficient rulemaking by conjuring *post hoc* justifications for a regulation that the agency never considered, use that as the "reasoned basis" for the agency's regulatory action, and excuse the agency's failure to properly address significant public comments. This Court's corrective action is needed to promote and protect public confidence in notice-and-comment rulemaking.

18

**A.    Treasury's failure to supply a "reasoned basis" for its rule at the time of promulgation was a clear violation of the *APA***

The *APA* directs Treasury to "disclose in detail the thinking that . . . animated the form of [its] proposed rule." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977). When an agency employs a rule to alter prior policies—as Treasury did here—it must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Treasury's "lack of reasoned explication for a regulation that is inconsistent with the [its] longstanding earlier position results in a rule that cannot carry the force of law." *Id.* at 224.

**1.    The Tax Court is not permitted to engage in "judicial speculation" or to infer a "reasoned basis" when Treasury provides none**

"[C]ourts retain a narrow but important role in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted). But as Judge Toro emphasized in his dissent, "[w]hen it adopted . . . § 1.482-1(h)(2), Treasury offered no explanation for its choices." Add. 311. Instead of taking Treasury to task for its fatal omission, the Tax Court plurality supplied a "reasoned basis" on

19

Treasury's behalf, saying that "the words of the requirement itself express its rationale." Add. 265. But no case supports the proposition that an agency can—using just the language of a new rule itself—bootstrap itself into "display[ing] awareness that it is changing position" and "show[ing] that there are good reasons for the new policy" (*Encino Motorcars*, 579 U.S. at 221), let alone "disclos[ing] in detail the thinking that . . . animated the form of [its] proposed rule" (*Home Box Office*, 567 F.2d at 35).

The administrative record says nothing about Treasury's reasons for adopting § 1.482-1(h)(2). The Tax Court isn't permitted to cure this defect by assuming Treasury's rationale or hypothesizing one on a *post hoc* basis; instead, it must assess the regulation by "examin[ing] the reasons for [Treasury's] decisions, or the absence of such reasons" as reflected in the record. *Judulang*, 565 U.S. at 53. Here, the plurality asserted that the rule adopted articulates its rationale. Add. 266-267. But as dissenting Judge Toro observed, the rule in this case does "no such thing" (Add. 312)—it simply explains how the district director will account for a foreign legal restriction, but says nothing about the reason for the rule or why it was necessary for Treasury to depart from the approach taken in its earlier regulation. "Whatever potential reasons [Treasury] might have given, [it] in fact gave almost no reasons at all." *Encino Motorcars, LLC*, 579 U.S. at 221. When an

20

agency offers "no reasons at all" or only "conclusory statements" for its decision to change course, its rule "cannot carry the force of law." *Id*.

By inferring a rationale from the text of the rule, the Tax Court eviscerates the reasoned basis requirement, and in so doing, guts an important *APA* safeguard. The Tax Court's approach withstands no scrutiny. The Supreme Court has repeatedly emphasized that "the reviewing court should not attempt itself to make up for [an agency's] deficiencies [and it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *See, e.g., State Farm*, 463 U.S. at 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "It is not the role of the courts to speculate on reasons that might have supported an agency's decision." *Encino Motorcars, LLC*, 579 U.S. at 224; *see also State Farm*, 463 U.S. at 50. The plurality opinion runs afoul of these fundamental principles of administrative law and must therefore be overturned.

> ### 2. By manufacturing a "reasoned basis" on Treasury's behalf, the Tax Court plurality erodes public confidence in notice-and-comment rulemaking

If Treasury can explain a rule by simply reciting it, then an agency's obligation to supply a reasoned basis for that rule is meaningless. It would mean that an agency could promulgate a regulation without explanation, a flagrant violation of the *APA*, and a court could later rescue the agency by plugging gaps with inferences or speculation. Such an approach would erode public confidence

21

the administrative rulemaking process and call into question the legitimacy of the "rescued" regulation.

## B. Treasury's failure to consider and respond to significant comments is a separate but equally egregious violation of the *APA*

An agency must engage in notice-and-comment rulemaking when it promulgates a rule intended to create new laws, rights, or duties. 5 U.S.C. § 553(b). This requirement "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). The agency must then "consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (emphasis added). Significant comments are ones "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule," and therefore "cast doubt on the reasonableness of a position." *Home Box Off.*, 567 F.2d at 35 n.58. "The fundamental purpose of the response requirement is, of course, to show that the agency has indeed considered all significant points articulated by the public." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988).

How and whether an agency responds to public input is a factor in determining whether its rulemaking was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A). *See, e.g., North Carolina Grower's Ass'n, Inc.*

22

*v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (when an agency "did not provide a meaningful opportunity for comment," the Court cited 5 U.S.C. § 706(2) and had "no difficulty in concluding that . . . regulations [were] arbitrary and capricious in that the [agency's] action did not follow procedures required by law").

A fundamental tenet of administrative law is that final agency action is arbitrary and capricious if it "fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Courts recognize that public comments alert agencies to "important aspect[s] of the problem" thereby informing judicial review under the arbitrary and capricious standard. In *North Carolina Grower's Ass'n*, 702 F.3d at 763, 771, an agency's refusal to consider comments concerning the substance and merit of the rulemaking was a "failure to consider important aspects of the problem," and therefore arbitrary and capricious. *Accord, Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated as moot*, 142 S. Ct. 1665 (2022) (agency acted in an arbitrary and capricious manner by failing to analyze whether its rulemaking promoted the primary objectives of Medicaid: "concerns raised in the comments were enough to alert the Secretary that coverage loss was an important aspect of the problem" and the Secretary's "[f]ailure to consider whether the project will result in coverage loss is arbitrary and capricious.")

23

By not acknowledging or responding to public comments regarding its proposed regulation, Treasury failed "to show that [it] considered all significant points articulated by the public." *Nat. Res. Def. Council, Inc.* 859 F.2d at 188. Said differently, Treasury didn't consider "important aspect[s] of the problem," as *State Farm* requires. The Tax Court plurality, however, gave Treasury a free pass, saying Treasury wasn't required to address comments because they were insignificant or irrelevant. Add. 268-270. But that is an unfair characterization of the comments.

The comments—which addressed (among other things) whether Treasury had authority to issue its regulation and highlighted Supreme Court authority at odds with the proposed regulation—were undoubtedly significant within the meaning of *Home Box Office*. They raised points relevant to Treasury's decision, cast doubt on the reasonableness of Treasury's position, and may have required a change to the proposed rule. The comments "challenge[d] a fundamental premise" of the regulation (*MCI WorldCom, Inc. v. FCC,* 209 F.3d 760, 765 (D.C. Cir. 2000)) in that they "undercut Treasury's assumption that section 482 permitted it to act as it proposed to do." Add. 323.

1. **The plurality's misapplication of *Thompson* will discourage public submission of comments and—by condoning Treasury's lassitude—will embolden agencies to engage in sloppy rulemaking**

3M has identified several categories of comments that Treasury failed to address. The Tax Court mischaracterized these comments as "not significant" or "irrelevant." Add. 268-270. The Tax Court applied *Thompson v. Clark*, 741 F.2d 401 (D.C. Cir. 1984), which is clearly distinguishable from Treasury's promulgation of the blocked income regulation at issue.

The Tax Court plurality repeatedly cites *Thompson* and states that a comment isn't significant if it "brought to the attention of the agency nothing which it had not already considered." Add. 268 (quoting *Thompson*, 741 F.2d at 409). What the plurality failed to mention, however, is that the comments in *Thompson* were in fact addressed in writing and incorporated into the rulemaking record for the public to see and consult. *See Thompson*, 741 F.2d at 409. In Judge Toro's dissenting words, the agency "show[ed] its work." Add. 326. Here, by contrast, Treasury <u>didn't even acknowledge</u> the public comments, let alone address them in the record.

To support its conclusion that the comments were insignificant, the plurality said "it is apparent that the Treasury Department was already aware that the proposed regulation was inconsistent with the caselaw," and was aware that "some foreign legal restrictions applied only to payments between related persons" and

25

"some legal restrictions are not publicly promulgated." Add. 268-269. Thus, the plurality assumed Treasury was aware of the subjects of these comments without citing any support for that view.

The *APA* demands more. An agency's obligation to respond to significant comments can't be satisfied with generalized assurances of *APA* compliance or with reviewing court assumptions made on an agency's behalf. *See, e.g., Hewitt v. Commissioner*, 21 F.4th 1336, 1351 (11th Cir. 2021) (generic statement that Treasury "considered 'all comments'" did not establish compliance). As dissenting Judge Toro recognized, "[a]lthough the scope of judicial review under the [*APA*] is 'narrow,' 'courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.'" Add. 311 (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Courts must examine "the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang*, 565 at 53 (citing *Fox Television Stations, Inc.*, 556 U.S. at 515.

By failing to address public comments, Treasury did not consider an "important aspect of the problem," as required under *State Farm*. This means Treasury acted in an arbitrary and capricious manner such that its rulemaking cannot be sustained.

**2. Because the opportunity to comment is meaningless unless Treasury responds to significant points raised, the Tax Court's analysis will have a chilling effect on the public comment process**

Notice-and-comment "dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Off.*, 567 F.2d at 35. If Treasury can stand silent, and not "disclose in detail the thinking that has animated the form of a proposed rule" (*id.*), public participation and comments will be discouraged. Why comment if the effort is for naught and the comments are ignored?

The Court must act to avoid this result. Notice-and-comment procedures play a critical role in administrative rulemaking, conferring significant benefits on the regulator and the regulated alike. These procedures serve the dual purpose of improving the quality of regulations while providing fair treatment to persons affected by the rule. As the Supreme Court explained in *Azar v. Allina Health Servs.*, 587 U.S. ___ (2019), 139 S. Ct. 1804, 1816 (2019), notice-and-comment rulemaking "gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes" and "affords the agency a chance to avoid errors and make a more informed decision." In order to achieve these goals, however, "there must be an exchange of views, information, and criticism between interested persons and the agency." *Home Box Off.*, 567 F.2d at 35. There was no such exchange when Treasury promulgated § 1.482-1(h)(2).

Appellate Case: 23-3772     Page: 34     Date Filed: 02/14/2024 Entry ID: 5363507

The Tax Court plurality's opinion will discourage interested stakeholders from providing comments, just as it will allow agencies to promulgate procedurally-deficient rules. These *APA* violations will inevitably lead to poorly reasoned, less effective regulations.

## III. CONCLUSION

For the substantive reasons explained in § I. above, and the procedural reasons explained in § II., we respectfully ask this Court to reverse the Tax Court opinion.

Dated: February 13, 2024

Respectfully submitted,

*s/ Roderick K. Donnelly*

THOMAS M. PETERSON
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
(415) 442-1344

RODERICK K. DONNELLY
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
(650) 843-7289

MICHELLE L. ANDRIGHETTO
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 341-7712

*Counsel for Amicus Curiae Silicon Valley Tax Directors Group*

Appellate Case: 23-3772   Page: 35   Date Filed: 02/14/2024 Entry ID: 5363507

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,498 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

In accordance with Circuit Rule 28A(h)(2), I certify that this brief has been scanned for viruses and is virus-free.

Dated:  February 13, 2024

*s/ Roderick K. Donnelly*
Roderick K. Donnelly

*Counsel for Amicus Curiae*
*Silicon Valley Tax Directors Group*

Appellate Case: 23-3772     Page: 36     Date Filed: 02/14/2024 Entry ID: 5363507

## CERTIFICATE OF SERVICE

I certify that, on this February 13, 2024, the foregoing Brief of Amicus Curiae was filed electronically through the appellate CM/ECF system with the Clerk of the Court.  All counsel of record in this case are registered CM/ECF users.

*s/ Roderick K. Donnelly*
Roderick K. Donnelly

*Counsel for Amicus Curiae*
*Silicon Valley Tax Directors Group*

Appellate Case: 23-3772     Page: 37     Date Filed: 02/14/2024 Entry ID: 5363507