# No. 23-3772

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

_____

3M COMPANY & SUBSIDIARIES,

Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Appellee

_____

ON APPEAL FROM THE DECISION
OF THE UNITED STATES TAX COURT

_____

BRIEF FOR THE APPELLEE

_____

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

FRANCESCA UGOLINI          (202) 514-3361
JACOB EARL CHRISTENSEN     (202) 307-0878
MATTHEW S. JOHNSHOY        (202) 616-1908
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This federal income tax case concerns a dispute about the amount of taxable income that 3M Company ("3M") and its affiliates were required to report on their consolidated U.S. tax return for 2006 in connection with 3M's transfer of valuable intellectual property to its wholly-owned Brazilian subsidiary. Based on his determination that 3M underreported its true taxable income, the Commissioner of Internal Revenue ("Commissioner") allocated additional royalty income to 3M pursuant to his authority under Section 482 of the Internal Revenue Code ("I.R.C.") (26 U.S.C.). 3M filed a petition in the Tax Court challenging the Commissioner's allocation, and the Tax Court ruled in favor of the Commissioner. 3M now appeals.

Counsel for the Commissioner believe that oral argument would be beneficial and suggest that 15 minutes per side would be adequate to address the issues.

Appellate Case: 23-3772    Page: 2    Date Filed: 05/10/2024 Entry ID: 5392804

# TABLE OF CONTENTS

**Page**

Summary of the case and request for oral argument............................i
Table of contents ...............................................................ii
Table of authorities ...........................................................iv
Glossary .........................................................................x
Statement of the issue.........................................................1
Statement of the case .........................................................1

    A.    Overview of Section 482 ...........................................1

    B.    Statement of the facts ..............................................4

    C.    The Commissioner's allocation under Section 482.................8

    D.    Proceedings in the Tax Court ....................................9

Summary of argument ........................................................11
Argument:

    Section 482 authorizes the Commissioner's allocation of royalty income to 3M.............................................16

        Standard of review ...............................................16

    A.    The plain text of Section 482's second sentence authorizes the Commissioner's allocation ...........................17

        1.    The 1986 amendment established a new standard for determining "income" under Section 482 with respect to the transfer or license of intangible property .......................................................20

        2.    Section 482's second sentence makes no exception for "blocked income"......................................25

        3.    This Court should not read an exception into the statute for blocked income ...........................28

      a.    The income attributable to the intangible property in this case was not truly "blocked" .....28

      b.    A decision for 3M would violate established principles of tax parity inherent in Section 482   36

  B.    The Commissioner's allocation was separately authorized by Treasury Regulation § 1.482-1(b)(1) .............38

  C.    Alternatively, Treasury Regulation § 1.482-1(h)(2) authorized the Commissioner's allocation ............................40

    1.    Treasury Regulation § 1.482-1(h)(2) deserves *Chevron* deference ........................................................42

    2.    Treasury Regulation § 1.482-1(h)(2) is valid under the APA .......................................................................47

      a.    Treasury engaged in reasoned decision-making .............................................................................52

      b.    Treasury considered all comments, which is all the text of the APA requires .........................58

Conclusion ..........................................................................64
Certificate of compliance .....................................................65
Certificate of service ............................................................66

Appellate Case: 23-3772    Page: 4    Date Filed: 05/10/2024   Entry ID: 5392804

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ................................................................ 26

*Altera Corp. & Subs. v. Commissioner*,
  926 F.3d 1061 (9th Cir. 2019) ............................................ 23, 36

*American Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) .................................................. 58

*Appalachian Power Co. v. EPA*,
  579 F.2d 846 (4th Cir. 1978) .................................................... 56

*Ark. State Police Ass'n v. Commissioner*,
  282 F.3d 556 (8th Cir. 2002) .................................................... 17

*Biddle v. Commissioner*,
  302 U.S. 573 (1938) ............................................................ 30, 45

*Champion v. Shalala*,
  33 F.3d 963 (8th Cir. 1994) ...................................................... 59

*Chevron, U.S.A., Inc. v. Nat. Res.*
  *Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................... 10, 15, 42-43, 47

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................ 51-52

*Coca-Cola Co. & Subs. v. Commissioner*,
  T.C. Memo. 2023-135,
  2023 WL 7410872 (2023) ........................................................ 31

*Commissioner v. First Security Bank*
  *of Utah, N.A.*,
  405 U.S. 394 (1972) .......................... 9, 10, 11, 13-15, 18, 23, 27-31,
                                                 33, 36-37, 42-47, 60, 61

*Consumers Union of U.S., Inc. v. Consumer*
  *Prod. Safety Comm'n*,
  491 F.2d 810 (2d Cir. 1974) ................................................ 62-63

*Corliss v. Bowers*,
  281 U.S. 376 (1930) ................................................................ 33

Appellate Case: 23-3772     Page: 5     Date Filed: 05/10/2024 Entry ID: 5392804

*Eder v. Commissioner,*
138 F.2d 27 (2d Cir. 1943) ............................................... 35

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ................................ 48-49, 51, 56-57

*Garlock Inc. v. Commissioner,*
489 F.2d 197 (2d Cir. 1973) ......................................... 35

*Heiner v. Mellon,*
304 U.S. 271 (1938) ........................... 29, 34-35, 45

*Helvering v. Horst,*
311 U.S. 112 (1940) .................................... 34-35

*Home Box Office, Inc. v. FCC,*
567 F.2d 9 (D.C. Cir. 1977) ............................ 58-59

*Kingdomware Techs., Inc. v. United States,*
579 U.S. 162 (2016) ...................................... 26

*Lamie v. U.S. Trustee,*
540 U.S. 526 (2004) ...................................... 23

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998) ........................................ 26

*Little Sisters of the Poor Saints Peter & Paul Home v.*
*Pennsylvania,*
591 U.S. 657 (2020) ...................................... 50

*Medtronic, Inc. & Consol. Subs. v. Commissioner,*
900 F.3d 610 (8th Cir. 2018) ........................... 16

*Moore v. United States,*
36 F.4th 930 (9th Cir. 2022) .......................... 35

*Morton v. Mancari,*
417 U.S. 535 (1974) ...................................... 25

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet*
*Servs.,*
545 U.S. 967 (2005) ................................... 43-44

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ........................................ 50

*Oncale v. Sundowner Offshore Servs., Inc.,*
523 U.S. 75 (1998) ........................................ 24

Appellate Case: 23-3772    Page: 6    Date Filed: 05/10/2024   Entry ID: 5392804

**Cases (cont'd):**                                                           **Page(s)**

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ...................................................... 48, 51-52

*Porter v. Commissioner,*
130 T.C. 115 (2008) .................................................... 16

*Portland Cement Ass'n v. Ruckelshaus,*
486 F.2d 375 (D.C. Cir. 1973) .................................... 59

*PPL Corp. v. Commissioner,*
569 U.S. 329 (2013) .................................................. 30, 45

*Procter & Gamble Co. v. Commissioner,*
961 F.2d 1255 (6th Cir. 1992) ........................... 18, 32, 60

*Reytblatt v. U.S. Nuclear Reg. Comm'n,*
105 F.3d 715 (D.C. Cir. 1997) .................................... 60

*Smith v. Berryhill,*
139 S. Ct. 1765 (2019) .............................................. 26

*Stone v. INS,*
514 U.S. 386 (1995) .................................................. 23

*Texaco, Inc. v. Commissioner,*
98 F.3d 825 (5th Cir. 1996) ...................................... 19

*Thompson v. Clark,*
741 F.2d 401 (D.C. Cir. 1984) ...........................51-52, 60

*United States v. Gonzales,*
520 U.S. 1 (1997) ..................................................... 26

*United States v. Home Concrete & Supply, LLC,*
566 U.S. 478 (2012) .................................................. 44

*Vermont Yankee Nuclear Power Corp. v.*
*Nat'l Res. Def. Council,*
435 U.S. 519 (1978) .............................................. 50, 59

*Voyageurs Nat'l Park Ass'n v. Norton,*
381 F.3d 759 (8th Cir. 2004) .................................. 49, 56

*Whirlpool Fin. Corp. v. Commissioner,*
19 F.4th 944 (6th Cir. 2021) .................................... 37

*Woodworth v. Hulshof,*
891 F.3d 1083 (8th Cir. 2018) .................................. 17

Appellate Case: 23-3772     Page: 7     Date Filed: 05/10/2024   Entry ID: 5392804

**Statutes:**                                                        **Page(s)**

5 U.S.C.:

    § 553 .......................................................................... 48
    § 553(b) ..................................................................... 48
    § 553(c).................................................... 15, 48-51, 55-56
    § 706(2)(A) ........................................................ 48, 51, 59
    § 706(2)(D) ............................................................... 48

Internal Revenue Code (26 U.S.C.):

    § 482 .........................................1-3, 5, 8-27, 29, 31-34, 36-39,
                         41-44, 46-47, 52-54, 56-57
    § 902 ........................................................................ 34
    § 936(h)(3)(B)...................................................... 2, 17, 19, 55
    § 7482(a)(1).............................................................. 16

Pub. L. No. 115-97, § 1422(b)(2),
    131 Stat. 2054 (2017) ............................................................3

Revenue Act of 1928, Pub. L. No. 70-562,
    §45, 45 Stat. 791........................................................................2

Tax Reform Act of 1986, Pub. L. No. 99-514,
    § 1231(e)(1), 100 Stat. 2085 ...........................................2-3, 20

**Regulations:**

Treasury Regulations (26 C.F.R.):

    § 1.482-1 ...................................................................3, 54
    § 1.482-1(a)(1)....................................................... 36, 38
    § 1.482-1(a)(3).......................................................... 34
    § 1.482-1(b)(1)....................................... 1, 4, 15, 36, 38-39, 46
    § 1.482-1(h)................................................................ 54
    § 1.482-1(h)(2)........................... 1, 4, 10, 12, 14-16, 40, 42, 45,
                         47, 52, 54-55, 57-58, 60-62

Appellate Case: 23-3772    Page: 8    Date Filed: 05/10/2024   Entry ID: 5392804

**Regulations (cont'd):**                                              **Page(s)**

Treasury Regulations (26 C.F.R.) (cont'd):

§ 1.482-1(h)(2) (Ex. 1)......................................................63
§ 1.482-1(h)(2) (Ex. 3)......................................................63
§ 1.482-1(h)(2)(i)...............................................................41
§ 1.482-1(h)(2)(ii)(A).........................................................41
§ 1.482-1(h)(2)(ii)(B).................................................. 41, 62
§ 1.482-1(h)(2)(ii)(C).........................................................41
§ 1.482-1(h)(2)(ii)(D)........................................................41
§ 1.482-1(h)(2)(iii)............................................................55
§ 1.482-1(h)(2)(iv)............................................................55
§ 1.482-1(i)(9)...................................................................40
§ 1.482-2 ...........................................................................3
§ 1.482-3 ...........................................................................3
§ 1.482-4 ...........................................................................3
§ 1.482-4(a) ............................................................. 1, 4, 39
§ 1.482-5 ...........................................................................3
§ 1.482-6 ...........................................................................3
§ 1.482-8 ...........................................................................3

Former Treasury Regulations (26 C.F.R.):

§ 1.482-1(b)(1) (1971)......................................................46
§ 1.482-1(d)(6) (1968) .....................................................52

Proposed Treasury Regulations (26 C.F.R.):

§ 1.482-1(f)(2)(ii)(B) (proposed) ....................................62
§ 1.482-1(f)(2)(v) (proposed) ..........................................63

**Miscellaneous:**

58 Fed. Reg. 5310 (Jan. 21, 1993).............................59, 62

Attorney General's Manual on the Administrative
    Procedure Act (1947)...........................................49, 50, 61

Appellate Case: 23-3772     Page: 9     Date Filed: 05/10/2024 Entry ID: 5392804

**Miscellaneous (cont'd):**                                                    **Page(s)**

Bittker & Eustice, *Fed. Income Tax'n of Corp. &*
    *Shareholders*, ¶ 13.21[5][b], 1999 WL 516653.................23-24

H.R. Conf. Rep. 99-841 (Vol. II) (1986) .........................3, 22, 24, 52

H.R. Rep. No. 99-426 (1985)................................................19, 21-22

Intercompany Transfer Pricing Regulations Under
    Section 482, 59 Fed. Reg. 34971
    (July 8, 1994)......................................................52-56, 61-62

IRS Notice 88-123, 1988 WL 561206 (Dec. 5, 1988).....................53

Jack M. Beermann & Gary Lawson, *Reprocessing Vermont*
    *Yankee,* 75 Geo. Wash. L. Rev. 856 (2007) ...........................51

Revenue Procedure 99-32, 1999-2 C.B. 296
    (Aug. 23, 1999) ...............................................................33, 34

Appellate Case: 23-3772     Page: 10     Date Filed: 05/10/2024 Entry ID: 5392804

# GLOSSARY

| | |
|---|---|
| Add. | 3M's Addendum |
| APA | Administrative Procedure Act |
| App. | 3M's Appendix |
| Br. | 3M's Opening Brief |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| Manual | Attorney General's Manual on the Administrative Procedure Act |
| Treas. Reg. | Treasury Regulation (26 C.F.R.) |

Appellate Case: 23-3772     Page: 11     Date Filed: 05/10/2024 Entry ID: 5392804

## STATEMENT OF THE ISSUE

3M licenses its valuable intellectual property to its wholly-owned Brazilian subsidiary, which uses the intangibles to manufacture and sell 3M products. The subsidiary undercompensated 3M for these intangibles due to Brazilian legal restrictions on paying royalties to a non-Brazilian parent company. Invoking its authority under I.R.C. § 482, the IRS allocated an additional $23,651,332 in income to 3M, which all agree represents an arm's-length royalty for use of the intangibles. The issue is whether the allocation was permitted under § 482.

The most apposite authorities are I.R.C. § 482 and Treas. Reg. (26 C.F.R.) §§ 1.482-1(b)(1), 1.482-4(a), and 1.482-1(h)(2).[1]

## STATEMENT OF THE CASE

### A.    Overview of Section 482

Before its amendment in 1986, and for much of its history, Section 482 of the Internal Revenue Code had consisted of a single sentence authorizing the Commissioner to allocate gross income between

---

[1] Unless otherwise noted, references to the Internal Revenue Code and the Treasury Regulations are to the provisions as in effect during 2006, the year at issue.

Appellate Case: 23-3772    Page: 12    Date Filed: 05/10/2024 Entry ID: 5392804

companies owned or controlled by the same interests in order to prevent

evasion of taxes or clearly to reflect their income.  Before the 1986

amendment, § 482 provided:

> In any case of two or more organizations, trades, or
> businesses (whether or not incorporated, whether or not
> organized in the United States, and whether or not
> affiliated) owned or controlled directly or indirectly by the
> same interests, the Secretary may distribute, apportion, or
> allocate gross income, deductions, credits, or allowances
> between or among such organizations, trades, or businesses,
> if he determines that such distribution, apportionment, or
> allocation is necessary in order to prevent evasion of taxes or
> clearly to reflect the income of any of such organizations,
> trades, or businesses.

This text had remained substantially unchanged since at least 1928,

with only minor amendments.  (Add. 166.)  *Cf.* Revenue Act of 1928,

Pub. L. No. 70-562, § 45, 45 Stat. 791, 806.

In 1986, however, Congress significantly amended the statute by

adding the following new sentence at the end thereof:

> In the case of any transfer (or license) of intangible property
> (within the meaning of section 936(h)(3)(B)), the income with
> respect to such transfer or license shall be commensurate
> with the income attributable to the intangible.

Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat.

2085, 2562-63.  This amendment established a new standard for

determining "income" in the case of "any" transfer or license of

Appellate Case: 23-3772     Page: 13     Date Filed: 05/10/2024 Entry ID: 5392804

intangible property.  Under the amended statute, "income" in any such case "shall be commensurate with the income attributable to the intangible."  I.R.C. § 482 (1986).[2]

In the conference report accompanying the 1986 amendment, Congress directed the Treasury Department to conduct a comprehensive study of intercompany pricing rules and to modify the existing regulations under § 482.  *See* H.R. Conf. Rep. 99-841 (Vol. II), at II-638 (1986).  In 1994, following notice-and-comment rulemaking, Treasury promulgated final regulations to "reflect the changes made to section 482 by the Tax Reform Act of 1986, and provide guidance implementing the amendment."  Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 34971, 34971 (July 8, 1994) (codified at Treas. Reg. §§ 1.482-1 through 1.482-6 and 1.482-8).

As pertinent here, the regulations provide that, in determining the true taxable income of a controlled taxpayer, "the standard to be applied in every case is that of a taxpayer dealing at arm's length with

---

[2] Congress amended § 482 again in 2017, adding a third sentence to further address the valuation of intangibles.  Pub. L. No. 115-97, § 14221(b)(2), 131 Stat. 2054, 2219 (2017).  That amendment is not at issue in this case.

-3-

an uncontrolled taxpayer," Treas. Reg. § 1.482-1(b)(1), and that the "arm's length consideration for the transfer of an intangible determined under [one of four listed methods] must be commensurate with the income attributable to the intangible," Treas. Reg. § 1.482-4(a).

In addition, Treas. Reg. § 1.482-1(h)(2) addresses the extent to which a foreign legal restriction that affects the results of a transaction at arm's length will be taken into account. It provides that "a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time" and only if certain additional conditions specified in the regulation are satisfied.

## B. Statement of the facts

3M's description of facts in its Statement of the Case (Br. 5-7) omits relevant facts that are included in the statement below.

As described in its brief, 3M is the common parent of a global conglomerate of domestic and foreign affiliates that filed a consolidated federal income tax return for 2006. (App. 28; Br. 5.) 3M's intellectual property is an important part of its business and includes patents, trademarks, trade names, copyrights, name recognition, and

-4-

unpatented technology such as trade secrets and technical know-how. (App. 40-42; Br. 5.)  3M's intellectual property includes well-recognized brands such as Scotch, Post-it, Filtrete, and Nexcare, to name a few. (App. 35.)

During 2006, 3M licensed its intellectual property to most of its affiliates using a standard licensing agreement.  (App. 42.)  The standard licensing agreement permitted affiliates to manufacture and sell goods and to provide services using 3M's intellectual property in exchange for a royalty equal to 6% of the affiliate's net sales, plus 1% of net sales for marketing intangibles.  (App. 42-44.)

3M do Brazil Ltda. ("3M Brazil") is a wholly-owned Brazilian subsidiary[3] of 3M that manufactures and distributes 3M's products in Brazil.  (App. 38-39.)  The parties stipulated below that 3M Brazil was "owned or controlled" by 3M during 2006 for purposes of § 482. (App. 40.)  During 2006, 3M Brazil had access to and used 3M's intellectual property in its business operations, including 3M's patents,

---

[3] During 2006, 3M Brazil was a wholly-owned subsidiary of 3M Innovative Properties Company, which was a first-tier, wholly-owned subsidiary of 3M Financial Management Company, which was a first-tier, wholly-owned subsidiary of 3M.  (App. 38.)

Appellate Case: 23-3772     Page: 16     Date Filed: 05/10/2024 Entry ID: 5392804

trademarks, and unpatented technology.  (App. 45.)  3M Brazil reported approximately $563 million in sales for 2006, earning the designation of a "highly profitable" 3M subsidiary.  (App. 38, 56-57.)

Notwithstanding its profitability, 3M Brazil was one of the few foreign affiliates that did not operate under 3M's standard licensing agreement.  (App. 44.)  As a Brazilian company, 3M Brazil's business operations were governed by the laws of Brazil, which, during 2006, permitted the payment of royalties by a Brazilian company to a foreign controlling parent company only to the extent that such payments were deductible for Brazilian tax purposes.  (App. 39, 62-65.)  Brazilian tax law, in turn, capped the deductibility of trademark royalties at 1% of net sales and established a deductibility ceiling for patent royalties ranging from 1% to 5% of net sales, depending on the industry and product type.  (App. 69-73.)  This Brazilian legal restriction on the ability of Brazilian subsidiaries to remit royalties abroad to their controlling parent companies was selective in that it did not apply to royalties paid by a Brazilian company to an unrelated company (domestic or foreign); it applied only to royalty payments made by a

-6-

controlled Brazilian company (like 3M Brazil) to a controlling foreign company (like 3M). (App. 62-63, 87.)

Against that legal backdrop, 3M decided not to enter into a formal licensing agreement for the use of its patents with 3M Brazil, although 3M Brazil still used 3M's patents. (App. 45, 53-55.) Instead, 3M and 3M Brazil entered into three separate licensing agreements for trademarks, which were in effect during 2006 and which governed 3M Brazil's use of 3M's trademarks. Under those agreements, 3M Brazil agreed to pay 3M a royalty in the amount of 1% of net sales (the amount allowed by Brazil for trademark royalties) for products bearing a 3M trademark. (App. 55-56.) In 2006, 3M Brazil paid $5,104,756 in royalties to 3M under the trademark licensing agreements (App. 82)—far less than the royalties 3M Brazil would have been required to pay under 3M's standard licensing agreement (*see* App. 88-89).

Although Brazilian law restricted royalty payments to a controlling foreign company, Brazilian law nevertheless permitted Brazilian companies to pay dividends to a controlling foreign company to the extent of the Brazilian company's current and retained earnings. Thus, apart from the current and retained earnings limitation,

-7-

Brazilian law imposed no restriction on 3M Brazil's ability to pay dividends to 3M. (App. 79.) In 2006, 3M Brazil paid dividends to 3M in the amount of $64,500,800. (App. 81.) But 3M Brazil had sufficient earnings and profits in 2006 so that it could have legally paid dividends—in addition to the dividends it actually paid—in an amount exceeding the Commissioner's allocation under I.R.C. § 482 of additional royalty income to 3M. (App. 82.)

### C. The Commissioner's allocation under Section 482

After an audit, the Commissioner, invoking I.R.C. § 482, allocated an additional $23,651,332 of royalty income to 3M for the year 2006 in connection with its transfer of intellectual property to 3M Brazil. (App. 88-89, 106.) In making the allocation, the Commissioner adopted the royalty structure under 3M's standard licensing agreement to calculate the transfer pricing adjustments for the intercompany licensing transactions between 3M and 3M Brazil. (App. 88.) The parties stipulated in the Tax Court that the rate of compensation provided under 3M's standard licensing agreement was an appropriate arm's-length rate under I.R.C. § 482 for the licensing transactions at issue. (App. 88-89.)

Appellate Case: 23-3772   Page: 19   Date Filed: 05/10/2024 Entry ID: 5392804

Based on the Commissioner's § 482 allocation, and other adjustments that 3M does not dispute, the Commissioner determined an income tax deficiency of $4,847,004 for the year 2006. (App. 29, 95-115.)

## D. Proceedings in the Tax Court

3M filed a petition with the Tax Court challenging the Commissioner's deficiency determination. (App. 12-24.) After the parties resolved all other adjustments by agreement, only the Commissioner's allocation of additional royalty income to 3M in the amount of $23,651,332 remained in dispute.[4] This issue was submitted for decision by the Tax Court on facts stipulated by the parties. (App. 25-94; Add. 10.)

3M argued that *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394 (1972), barred the Commissioner's allocation because Brazilian law prohibited 3M Brazil from paying the additional royalties to 3M. As discussed *infra*, the Supreme Court held in *First Security* that the Commissioner could not allocate, under the pre-1986 version of

_____

[4] 3M concedes that an allocation of additional royalty income was proper in the amount of $165,783, but disputes the Commissioner's allocation to the extent it exceeds that amount. (App. 94.)

Appellate Case: 23-3772   Page: 20   Date Filed: 05/10/2024 Entry ID: 5392804

§ 482, insurance-related income to domestic banks that were part of a controlled group because federal law prohibited the banks from engaging in insurance activities. 3M also argued that Treas. Reg. § 1.482-1(h)(2), which addresses the extent to which the Commissioner will take into account a foreign legal restriction when making § 482 allocations, was procedurally and substantively invalid.

In a reviewed opinion, the Tax Court sustained the Commissioner's allocation. (Add. 1-346.) A plurality of the court held that the Brazilian legal restrictions on the payment of royalties did not satisfy the criteria of Treas. Reg. § 1.482-1(h)(2) and that the Commissioner had, therefore, properly disregarded them under the regulation in making the § 482 allocation. (Add. 222-30.) Rejecting 3M's arguments to the contrary in reliance on *First Security*, the plurality determined that the regulation was both procedurally valid under the Administrative Procedure Act ("APA") and was entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). (Add. 231-73.) Two judges concurred in the result, and eight judges dissented. (Add. 274.)

Judge Copeland's concurring opinion concluded that "the result of this case is dictated by the plain text of section 482—specifically, the second sentence added by amendment in 1986." (Add. 281.) In that regard, the Tax Court plurality likewise had found that the Commissioner "seeks to allocate income to 3M [ ] for the use of the patents and for the transfer of unpatented technology in amounts that correlate with the income earned by 3M Brazil from its use" of such property and that the Commissioner's "allocation is consistent with the 1986 statutory amendment" because it is "commensurate with the income attributable to the intangible property." (Add. 244.)

## SUMMARY OF ARGUMENT

The Tax Court correctly sustained the Commissioner's allocation of $23,651,332 in additional royalty income to 3M to account for its subsidiary's use of 3M's valuable intangible property. The allocation was authorized by the plain language of I.R.C. § 482's second sentence. 3M's reliance on the Supreme Court's decision in *First Security* is misplaced, as that case was decided 14 years before Congress amended § 482 to add the second sentence that is controlling here. Moreover, *First Security* is distinguishable for other reasons. 3M complains at

-11-

length about a Treasury regulation (§ 1.482-1(h)(2)) that sets forth rules for taking into account foreign legal restrictions, but this Court need not reach those arguments as this case may be resolved on the basis of § 482 alone. 3M's arguments against the validity of the regulation lack merit in any event.

1. Section 482 confers broad authority on the Commissioner to reallocate income among the members of a controlled group of corporations when necessary to prevent tax evasion or to clearly reflect a member's true taxable income. In 1986, Congress added the following sentence to § 482 specifically to address income related to intangible property: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." This means that when a controlled group member transfers intangibles to another group member, the transferor's income from that transfer must be commensurate with the income generated by the intangibles. The statute provides no exceptions.

Here, 3M transferred valuable intangible property to 3M Brazil. Under the plain terms of § 482, 3M's income from the transfer shall be

Appellate Case: 23-3772    Page: 23    Date Filed: 05/10/2024 Entry ID: 5392804

commensurate with the income attributable to the intangible property in 3M Brazil's hands, and there is no dispute that the appropriate dollar figure is $23,651,332.

2.  Relying on *First Security,* 3M argues that because 3M Brazil was prohibited by Brazilian law from paying that amount of royalties to it, it cannot be forced to recognize this amount as income.  In *First Security,* the Supreme Court held that the Commissioner could not allocate insurance-related income to domestic bank members of a controlled group because federal banking law prohibited the banks from receiving such income.  But *First Security* was decided in 1972, before Congress amended § 482 to specifically address the precise transaction at issue in this case, *i.e.,* a transfer of intangibles.  Whatever restrictions *First Security* may impose on the Commissioner's authority under the first sentence of § 482, it has no bearing on Congress's ability to fashion a new, mandatory rule for income from intangibles, as reflected in the second sentence of § 482.

Moreover, this case is factually distinguishable from *First Security* for several reasons.  Significantly, unlike the domestic banks in *First Security,* 3M is not restricted by law from receiving (or reporting) any

-13-

income. 3M Brazil may not be able to pay income in the form of royalties due to Brazilian law, but 3M Brazil is free to pay income in the form of dividends to 3M—which it did, to the tune of over $60 million in the year at issue. As the ultimate 100% shareholder of 3M Brazil, 3M had full access to 3M Brazil's earning and profits. Therefore, this case does not actually involve "blocked income." In addition, *First Security* involved a federal legal restriction applicable to controlled and uncontrolled banks alike. This case, on the other hand, involves a foreign law that applies only to Brazilian companies controlled by a non-Brazilian parent. *First Security* says nothing about the effect to be given discriminatory foreign laws, and the Supreme Court has repeatedly held that it is up to Congress to determine what effect to give foreign laws in the context of federal income taxation. Therefore, *First Security* does not govern this case.

3. 3M's arguments regarding the validity of Treas. Reg. § 1.482-1(h)(2) are a red herring. The allocation in this case was permitted—indeed, mandated—by the plain language of § 482, and thus there is no need to consult regulations. In any event, the allocation here was proper under a different provision of the Treasury regulation that 3M

-14-

does *not* challenge, *i.e.*, Treas. Reg. § 1.482-1(b)(1), which authorizes allocations that are necessary to achieve an arm's length result.

But if this Court reaches the validity of Treas. Reg. § 1.482-1(h)(2), it should affirm the regulation's validity. 3M's arguments that *Chevron* deference is unwarranted boil down to the assertion that *First Security* resolved the unambiguous meaning of § 482 and that Treasury is not free to alter it by regulation. But *First Security* did not construe the amended version of § 482 that gave rise to the current regulation, and the case says nothing about the effect of foreign legal restrictions. Thus, Treasury was not foreclosed from issuing a regulation under the amended statute addressing that specific topic.

3M's argument under the APA also is wrong. Section 553(c) of the APA states that "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." Treasury met these statutory requirements when it issued the 1994

-15-

regulations. It engaged in notice-and-comment rulemaking, and the preamble to the regulation sets forth an explanation of Treas. Reg. § 1.482-1(h)(2). The parties stipulated that Treasury considered all comments, and it made changes to the final version of § 1.482-1(h)(2) based on some of the comments. 3M's arguments to the contrary hinge on judge-made rules from other circuits that far exceed what the actual text of the APA requires. Yet the Supreme Court has repeatedly held that the *text* of the APA sets forth the *maximum* procedural requirements that agencies must follow. Treasury met those statutory requirements here.

## ARGUMENT

### Section 482 authorizes the Commissioner's allocation of royalty income to 3M

#### Standard of review

A notice of deficiency is subject to de novo judicial review in the Tax Court, *Porter v. Commissioner*, 130 T.C. 115, 119 (2008) (citing cases), and this Court reviews the Tax Court's decisions "in the same manner as a district court's civil bench ruling," *Medtronic, Inc. & Consol. Subs. v. Commissioner*, 900 F.3d 610, 613 (8th Cir. 2018); *see also* I.R.C. § 7482(a)(1). Because this case was decided based on a

-16-

stipulated record, this Court "review[s] de novo the tax court's application of tax law principles, keeping in mind that the clearly erroneous standard applies to any reasonable inferences drawn by the tax court from the stipulated or undisputed facts." *Ark. State Police Ass'n v. Commissioner*, 282 F.3d 556, 558 (8th Cir. 2002) (internal citations omitted).

This Court may affirm the Tax Court's decision on any ground supported by the record. *Woodworth v. Hulshof*, 891 F.3d 1083, 1088 (8th Cir. 2018).

## A. The plain text of Section 482's second sentence authorizes the Commissioner's allocation

The Commissioner's allocation of additional royalty income to 3M was authorized by the plain text of I.R.C. § 482's second sentence. Added to the statute in 1986, that statutory language controls this case:

> In the case of **<u>any</u>** transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the **<u>income</u>** with respect to such transfer or license **<u>shall be</u>** commensurate with the income attributable to the intangible.

I.R.C. § 482 (emphases added). As previously explained, the 1986 amendment established a new standard for determining "income" in the case of "any" transfer or license of intangible property. Under the

-17-

amended statute, "income" in any such case "shall be commensurate with the income attributable to the intangible." I.R.C. § 482. Judge Copeland's conclusion that "the result of this case is dictated by the plain text of section 482—specifically, the second sentence added by amendment in 1986" is correct for the reasons explained in her concurring opinion. (Add. 281-86.)

In *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 403 (1972), the Supreme Court held that, for purposes of § 482, "income" did not include payments that the taxpayer "did not receive and that he was prohibited from receiving." (The so-called "blocked income" rule.) But 3M's reliance on *First Security* is misplaced because that case was decided 14 years before Congress amended the statute by adding the second sentence of § 482, which established a new standard for determining "income" under § 482 with respect to transfers of intangible property. Therefore, *First Security* does not control this case, nor do the other cases on which 3M relies, which were all decided under the old version of the statute. *See Procter & Gamble Co. v. Commissioner*, 961 F.2d 1255, 1257-58 (6th Cir. 1992) (involving tax

years 1978-1979); *Texaco, Inc. v. Commissioner*, 98 F.3d 825, 827 (5th Cir. 1996) (involving tax years 1979-1981).

Here, 3M transferred valuable intangible property (including patents, trademarks, and unpatented technology) to 3M Brazil, a wholly-owned and "controlled" subsidiary within the meaning of § 482.[5] (App. 40.) 3M Brazil used that intangible property in its business operations in 2006 to generate sales of approximately $563 million for the year. (App. 38, 45.) Under § 482's second sentence, 3M is required to recognize income from the transfer of its intangible property to 3M Brazil in an amount that is "commensurate with the income attributable to the intangible." I.R.C. § 482. That is, 3M must recognize income commensurate with "the profit or income stream generated by or associated with" the intangible property in 3M Brazil's hands. *See* H.R. Rep. No. 99-426, at 426 (1985).

The Tax Court found that the Commissioner's allocation of additional royalty income to 3M in the amount of $23,651,332

---

[5] For purposes of § 482, "intangible property" includes, among other things, a "patent," "trademark," "trade name," "brand name," "franchise," or "any similar item." I.R.C. § 936(h)(3)(B) (cross-referenced by § 482).

Appellate Case: 23-3772     Page: 30     Date Filed: 05/10/2024 Entry ID: 5392804

"correlate[s] with the income earned by 3M Brazil from its use" of the intangible property during 2006. (Add. 244; *see also* Add. 251 ("[The Commissioner] seeks to allocate income to 3M [ ] for the use of the patents and for the transfer of unpatented technology in amounts that are proportionate to the income earned by 3M Brazil from its use of the patents and the transfer to it of unpatented technology."); *accord* Add. 285-86 (Copeland, J., concurring).) And 3M does not dispute that the *amount* of the allocation is an appropriate arm's-length royalty for use of the intangibles at issue. (App. 88-89.) Based on the Tax Court's finding—which is reviewed only for clear error—the income allocated by the Commissioner to 3M is "commensurate with the income attributable to the intangible" and was authorized—indeed, required—by the plain text of § 482.

1. **The 1986 amendment established a new standard for determining "income" under Section 482 with respect to the transfer or license of intangible property**

When Congress amended § 482 in 1986, it left unchanged the first, preexisting, sentence of the statute. *See* Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. at 2562-63. The first sentence has long authorized the IRS to allocate gross income, deductions, and

-20-

credits among related parties if "necessary in order . . . clearly to reflect the income" of such related parties. I.R.C. § 482. By adding the second sentence in 1986, however, Congress established a new standard that more precisely specifies the "income" that must be "clearly reflect[ed]" in cases involving the transfer of intangible property: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license *shall be* commensurate with the income attributable to the intangible." *Id.* (emphasis added).

The legislative history of the 1986 amendment confirms that Congress intended to change the existing law for determining income under § 482 with respect to any transfer or license of intangible property. The House Report by the Committee on Ways & Means expressed "concern[ ] that the provisions of section[ ] 482 . . . that allocate income to a U.S. transferor of intangibles may not be operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles" in situations involving the "transfer [of] intangibles to related foreign corporations." H.R. Rep. No. 99-426, at 423. Noting the difficulty in determining an arm's-length value in the "absence of comparable arm's length transactions" in those situations,

Appellate Case: 23-3772   Page: 32   Date Filed: 05/10/2024 Entry ID: 5392804

the committee explained that "unduly emphasiz[ing] the concept of comparables," as certain judicial interpretations had done, "is sufficiently troublesome where transfers of intangibles are concerned that a *statutory modification* to the intercompany pricing rules regarding transfers of intangibles is necessary." *Id.* at 423, 424 (emphasis added).

To remedy the situation, the committee articulated a new standard for determining an arm's-length value for intangibles: "The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation or possessions corporation be commensurate with the income attributable to the intangible. The committee believes, therefore, that this is the measure that should be used under . . . section 482 in the case of transfers to a foreign corporation." *Id.* at 425; *see also* H.R. Conf. Rep. No. 99-841 (Vol. II), at II-637 (following the House bill in the conference agreement, but extending the new provisions to apply to all transfers of intangible property, not just those to a foreign corporation).

Appellate Case: 23-3772    Page: 33    Date Filed: 05/10/2024 Entry ID: 5392804

"When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS,* 514 U.S. 386, 397 (1995). Therefore, as reflected in both the statute's text and its legislative history, the 1986 amendment to § 482 established a new standard for determining "income" with respect to any transfer of intangible property within a controlled group. *See Altera Corp. & Subs. v. Commissioner*, 926 F.3d 1061, 1079 (9th Cir. 2019) (rejecting argument that the 1986 amendment did not alter § 482's meaning: "It is illogical to argue that amending a singular statute does not alter its meaning."); *see also* Bittker & Eustice*, Fed. Income Tax'n of Corp. & Shareholders*, ¶ 13.21[5][b], 1999 WL 516653, *5 ("the final sentence of § 482 (added in 1986), in effect, imposes a profit-sharing, or super-royalty, approach for income derived from intangibles").

As mentioned, the Supreme Court's decision in *First Security*, on which 3M relies, was decided in 1972 and therefore did not interpret the second sentence of § 482. Therefore, *First Security* does not control this case, which involves the licensing and transfer of 3M's intangible property to its Brazilian subsidiary—transactions to which § 482's second sentence directly applies. *See Lamie v. U.S. Trustee*, 540 U.S.

Appellate Case: 23-3772      Page: 34      Date Filed: 05/10/2024 Entry ID: 5392804

526, 534 (2004) (courts must interpret "the existing statutory text . . . and not the predecessor statutes").  Furthermore, because the 1986 amendment itself specifies what "income" "shall be" with respect to any transfer or license of intangible property within a controlled group, 3M's reliance on dictionary definitions to define "income" for purposes of § 482 as it relates to intangibles is also misplaced.  (*See* Br. 21.)

3M also attempts to downplay the significance of the 1986 amendment by arguing that its purpose is limited to "particular valuation issues."  (Br. 42.)  The legislative history referenced above does not support that conclusion.  *See* Bittker, *supra*, ¶ 13.21[5][b], 1999 WL 516653, *5 ("the legislative objective was to ensure 'that the division of income between related parties reasonably reflect[s] the relative economic activity undertaken by each' ") (quoting H.R. Conf. Rep. No. 99-841 (Vol II), at II-637).  But, regardless, no such limitation appears in the statute's text, which uses "remarkably broad wording in the commensurate-with-income sentence."  (Add. 246.)  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Appellate Case: 23-3772     Page: 35     Date Filed: 05/10/2024 Entry ID: 5392804

### 2. Section 482's second sentence makes no exception for "blocked income"

In requiring that income with respect to the transfer or license of intangible property within a controlled group be commensurate with the income attributable to the intangible, Congress made no exception for "blocked income." In his dissenting opinion, Judge Buch concluded that "Section 482 is silent as to blocked income." (Add. 291.) 3M similarly contends in its brief that the amended statute "does not address blocked income at all." (Br. 41.) But these arguments cannot withstand scrutiny.

To be sure, the second sentence of § 482 makes no *explicit* reference to "blocked income." But Congress did not need to expressly refer to blocked income because the language it used in the 1986 amendment is mandatory and without limitation. It applies in the case of "any" transfer of intangible property, in which case the income with respect to such transfer "shall be" commensurate with the income attributable to the intangible. I.R.C. § 482. As the more specific provision dealing with transfers of intangible property, this provision governs this case without regard to any blocked-income rule that might or might not attach to the first sentence of § 482. *See Morton v.*

-25-

*Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

Moreover, Congress's use of the word "any" in § 482's second sentence and the absence of restrictive language leaves no basis in the text for creating an exception to the rule. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008); *United States v. Gonzales*, 520 U.S. 1, 5 (1997); *Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019) ("Congress' use of the word 'any' suggests an intent to use that term expansively.") (cleaned up). And § 482's statutory command "shall be" is equally unconditional, especially in light of the amendment's purpose to put an end to inadequate allocations of income attributable to intangibles. *See supra* pp. 26-27; *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion"). Therefore, the lack of an explicit reference to "blocked income" in § 482 is beside the point.

-26-

3M argues that Congress's silence when amending § 482 is evidence that Congress ratified the holding of *First Security*. (Br. 43-44.) As discussed later, it is unclear whether the Supreme Court in *First Security* was even interpreting the language of § 482, given that its opinion does not discuss the statutory text and is focused heavily on a then-existing Treasury regulation. But whatever the merits of 3M's argument with regard to the first sentence of § 482, it has no bearing on the meaning of the second, new sentence. Even if *First Security* places limits on the *Commissioner's* discretionary authority under the first sentence of § 482, it has no bearing on *Congress's* ability to dictate a new rule with respect to intangibles. (Indeed, nothing in *First Security* purports to place constitutional limits on Congress's taxing power.) There is thus no reason to read the first sentence (and any blocked-income gloss) as cabining the scope of the second sentence.

As Judge Copeland correctly stated in her concurring opinion, "However taxable income from the transfer of intangibles was determined before the amendment, now we must impose the commensurate-with-income standard to determine the taxable portion

Appellate Case: 23-3772     Page: 38     Date Filed: 05/10/2024 Entry ID: 5392804

of income of a taxpayer that transfers an intangible to a taxpayer in the same controlled group." (Add. 284.)

### 3. This Court should not read an exception into the statute for blocked income

As demonstrated above, the statutory text is clear and provides no exception for blocked income. In addition to the clear text, this Court should not read an exception into the statute for at least two reasons, apart from the fact that doing so would run afoul of the statutory text.

### a. The income attributable to the intangible property in this case was not truly "blocked"

First, the royalty income allocated by the Commissioner to 3M in this case was not truly "blocked" as was the income at issue in *First Security*. In *First Security*, 405 U.S. 394, certain banks offered to arrange credit life insurance for interested borrowers, whom the banks would refer to an independent insurance company to underwrite the policies. Those policies were then reinsured by the wholly-owned subsidiary of a parent company that also owned the banks. Although it was customary for a party generating insurance business to receive a sales commission, federal law prohibited the banks from acting as insurance agents or receiving income from their customers' purchase of

-28-

insurance, so the insurance premiums were divided between the independent insurance company and the subsidiary that reinsured the contracts. Because insurance companies were taxed at a lower effective tax rate than banks, the subsidiary's tax liability on the premiums was lower than the banks' would have been. The Commissioner determined that because the banks had generated the income, a portion of the premiums paid to the subsidiary should be allocated to the banks under § 482. *Id.* at 396-400.

The Supreme Court disagreed. In rejecting the Commissioner's allocation, the Court explained that "the Banks could never have received a share of [the] premiums" because national banks were prohibited by federal law from "acting as insurance agents" or "receiving insurance-related income." *Id.* at 401, 402. The Court observed that "[i]n cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it." *Id.* at 403.[6]

---

[6] The Court apparently was unaware of its earlier decision in *Heiner v. Mellon*, 304 U.S. 271, 280-81 (1938), which held that partners can be allocated partnership income, and must pay tax thereon, even if state law prohibits current distributions to the partners.

-29-

By contrast to the banks in *First Security* that "could never have received" the income there in question without violating federal law, here, 3M is not subject to *any* legal restrictions on the income it can receive.[7]  Even if 3M Brazil could not make payments to it in the form of royalties, it nevertheless could—and did—make payments to 3M in the form of dividends.  Brazilian law permitted 3M Brazil to pay dividends to 3M "to the extent of its current and retained earnings."  (App. 79.)  Apart from this limitation, "Brazilian law impose[d] no restriction on the ability of [3M Brazil] to pay dividends abroad to its shareholders, including to a controlling foreign company."  (Nor does Brazil impose a withholding tax on dividends paid by a Brazilian company to a foreign shareholder.)  (App. 79.)

Accordingly, Brazilian law did not restrict 3M Brazil's ability to pay 3M dividends out of its earnings that were attributable to 3M Brazil's use of 3M's valuable intellectual property.  As the controlling

---

[7] *First Security* also says nothing about the extent to which a *foreign* law, as opposed to a U.S. federal law, must be given effect for federal tax purposes.  The Supreme Court has long recognized that foreign-law classifications are not controlling in interpreting federal tax law, unless Congress gives them such effect.  *See Biddle v. Commissioner*, 302 U.S. 573, 578-79 (1938); *see, e.g., PPL Corp. v. Commissioner*, 569 U.S. 329, 335 (2013).

Appellate Case: 23-3772     Page: 41     Date Filed: 05/10/2024 Entry ID: 5392804

parent company, 3M could cause 3M Brazil to pay dividends simply by declaring them. (App. 79.) In the proceedings below, the parties stipulated that "3M Brazil had sufficient earnings and profits in 2006 so that it could have legally paid dividends, in addition to the dividends . . . it actually paid ($64,500,800), in an amount exceeding the adjustment for additional royalties calculated by [the Commissioner] ($23,651,332)" and that "3M Brazil could have remitted all of its profits to 3M [ ] during 2006 as dividends without violating the laws of Brazil." (App. 82.)

Therefore, unlike the banks in *First Security*, the income generated by 3M Brazil's use of 3M's intangible property in this case was not actually "blocked." *Cf. Coca-Cola Co. & Subs. v. Commissioner*, T.C. Memo. 2023-135, at *9-14, 2023 WL 7410872 (2023) (opining that Brazilian law restricting royalty payments did not "block" payment of arm's-length compensation). Consequently, the facts of this case present no basis for reading an exception into § 482's clear statutory requirement that 3M must recognize income from its transfer of intangible property to 3M Brazil in an amount that is commensurate with the income attributable to the intangibles.

Appellate Case: 23-3772     Page: 42     Date Filed: 05/10/2024 Entry ID: 5392804

We recognize that in *Procter & Gamble*, 961 F.2d at 1259, the Sixth Circuit rejected a similar argument by the Commissioner that a taxpayer prohibited by foreign law from paying royalties could have paid an annual dividend instead. The court there concluded that the taxpayer "had no such obligation" to pay dividends because "[a] taxpayer need not arrange its affairs so as to maximize taxes," and it rejected the "suggestion that P&G should purposely evade Spanish law by making royalty payments under the guise of calling the payments something else." *Id.*

But the court misunderstood the argument. First, the Commissioner did not suggest that the subsidiary was *required* to pay dividends in lieu of royalties. An allocation under § 482 does not depend on whether controlled group members actually make payments to one another. Indeed, the whole point of § 482 is that the Commissioner makes an allocation where a payment was *not* made, but should have been made to clearly reflect the taxpayer's income.

Second, the Commissioner was not suggesting that the taxpayer "evade" Spanish law, nor are we suggesting that here. The relevant point is that if dividends can be paid, then there is no possible

-32-

unfairness or "realization" problem (Br. 21-22) in allocating additional income to the U.S. parent to account for the royalties that would have been paid in an arm's-length transaction. The U.S. parent is not stuck with a tax bill for income that it "cannot derive" (Br. 21). If the U.S. parent wants a cash distribution to match the allocation, then it can cause its wholly-owned subsidiary to declare a dividend. The allocation is proper whether the U.S. parent chooses to do so or not, as it has full control over the subsidiary's earnings and profits. *See First Security*, 405 U.S. at 403 (" 'The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not.' ") (quoting *Corliss v. Bowers,* 281 U.S. 376, 378 (1930)).

Here, the fact that 3M *could have* paid itself dividends from 3M Brazil, and that it could have done so *without violating any Brazilian law*, means that the income the Code expressly requires 3M to recognize under § 482 was not "blocked" after all as 3M contends.[8]

---

[8] We note that 3M could have elected to treat the dividends it did receive from 3M Brazil as royalties for U.S. tax purposes under Revenue Procedure 99-32, 1999-2 C.B. 296 (Aug. 23, 1999), by making a "taxpayer-initiated primary adjustment" on a timely-filed income tax

(continued…)

Appellate Case: 23-3772    Page: 44    Date Filed: 05/10/2024 Entry ID: 5392804

3M raises the specter that § 482's commensurate-with-income requirement for intangibles exceeds Congress's taxing power. (Br. 21-24.) But 3M's argument is a red herring because there are no constitutional concerns here. First of all, courts have long rejected the notion that the actual receipt or realization of income is a constitutional requirement for income taxation. *See Helvering v. Horst*, 311 U.S. 112, 116 (1940) ("[T]he rule that income is not taxable until realized . . . [is] founded on administrative convenience . . . and [is] not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal receipt of money or property."); *Heiner v. Mellon*, 304 U.S. 271, 280-81 (1938) (partner's share of partnership income was taxable even though state law prohibited its distribution during the years in question; the fact that the income was not currently distributable was "not material"); *Moore v. United States*,

---

return, but 3M did not (and no longer can) make such election on its 2006 return. *See* Treas. Reg. § 1.482-1(a)(3) ("If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged. . . ."); Rev. Proc. 99-32, Explanation of Provisions B. and § 4.02. Such elective treatment might be unattractive to a taxpayer because royalty characterization would require the taxpayer to forego foreign tax credits under I.R.C. § 902 with respect to those dividends.

Appellate Case: 23-3772    Page: 45    Date Filed: 05/10/2024 Entry ID: 5392804

36 F.4th 930, 935-36 (9th Cir. 2022), *cert. granted*, 143 S. Ct. 2656 (argued Dec. 5, 2023); *Garlock Inc. v. Commissioner*, 489 F.2d 197, 202-03 (2d Cir. 1973); *Eder v. Commissioner*, 138 F.2d 27, 28 (2d Cir. 1943).

Furthermore, here, 3M *did* realize a direct economic benefit from 3M Brazil's use of its intangibles. 3M owned valuable intangibles that it licensed and transferred to 3M Brazil for roughly $23.6 million less than an arm's-length price. Nevertheless, because 3M was the owner and controlling parent company of 3M Brazil, the profits generated by 3M Brazil's use of those intangibles directly accrued to 3M's economic benefit whether they were presently distributed to 3M or not. Such an "economic gain" to 3M is properly subject to income tax consistent with constitutional principles. *See Helvering v. Horst*, 311 U.S. at 115-16; *Heiner v. Mellon*, 304 U.S. at 280-81. This is especially so here, given that 3M also had full control over 3M Brazil's ability to declare dividends.[9]

---

[9] As 3M notes (Br. 24), the realization-of-income question is currently pending before the Supreme Court in *Moore*. We note that the taxpayers in that case had far less control over the undistributed corporate earnings that were allocated to them, as they held 11% of the company's stock and could not single-handedly declare a dividend. 3M of course owns (through other entities) all of 3M Brazil's stock.

Appellate Case: 23-3772    Page: 46    Date Filed: 05/10/2024 Entry ID: 5392804

### b. A decision for 3M would violate established principles of tax parity inherent in Section 482

Second, a decision for 3M in this case would violate established principles of tax parity between controlled and uncontrolled taxpayers inherent in § 482. *See Altera*, 926 F.3d at 1077 ("The congressional purpose in enacting § 482 was to establish tax parity.") (citing *First Security*, 405 U.S. at 400); *see also* Treas. Reg. § 1.482-1(a)(1), (b)(1).

In *First Security*, the Supreme Court relied upon principles of tax parity between controlled and uncontrolled taxpayers to reach its decision. The Court explained that "the proscription against acting as insurance agent and receiving compensation therefor . . . applies equally to [all national] banks whether or not they are controlled by a holding company." 405 U.S. at 407. The Court thus concluded that its holding in favor of the banks in that case "comport[ed] with [tax] parity treatment." *Id.*

In contrast, a ruling for 3M here would not comport with tax parity. That is because Brazil's legal restriction on royalties selectively applied only to payments made abroad by Brazilian subsidiaries to a foreign controlling company. It does not apply to royalty payments

-36-

between unrelated companies.  (App. 62-63, 87.)  Therefore, unlike *First Security*, a ruling for 3M would endorse a foreign country's disparate treatment of controlled and uncontrolled taxpayers in contravention of Congress's tax parity objective inherent in § 482.

---

As explained above, the plain language of the 1986 amendment to § 482 fully resolves this case.  This case involves a transfer of intangible property, and Congress has mandated that "the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."  I.R.C. § 482.  3M does not dispute that the amount of the Commissioner's allocation reflects an appropriate arm's-length result that is commensurate with income.  3M's arguments rest entirely on *First Security*, which does not govern this case for the reasons explained above.

Because this case can be fully resolved on the basis of § 482's plain text, this Court need not reach 3M's arguments regarding the Treasury regulations.  *See, e.g., Whirlpool Fin. Corp. v. Commissioner*, 19 F.4th 944 (6th Cir. 2021) (resolving tax case on plain language of the statute despite Tax Court and parties' focus on Treasury regulations).  But, as

explained below, the Commissioner's allocation is also authorized by regulations that are procedurally and substantively valid.

## B. The Commissioner's allocation was separately authorized by Treasury Regulation § 1.482-1(b)(1)

First, as the Commissioner argued below, the § 482 allocation at issue was also authorized by Treas. Reg. § 1.482-1(b)(1), which provides an independent basis for affirming the Tax Court's decision. 3M has not challenged the validity of Treas. Reg. § 1.482-1(b)(1) in this proceeding.

The 1994 regulations explain that the purpose of I.R.C. § 482 is "to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transaction." Treas. Reg. § 1.482-1(a)(1). In furtherance of this purpose, the regulation says that "Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer." *Id.*

Treas. Reg. § 1.482-1(b)(1) then provides in pertinent part (emphasis added):

> In determining the true taxable income of a controlled taxpayer, the standard to be applied *in every case* is that of a taxpayer dealing at arm's length with an uncontrolled

-38-

taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). . . .

In this case, the parties stipulated that Brazil's legal restriction on royalty payments did not apply to uncontrolled transactions. (App. 62-63, 87.) And the parties stipulated that the arm's-length amount of royalties for purposes of this case is the amount that would have been paid under 3M's standard licensing agreement, which is also the amount of the Commissioner's allocation. (App. 88-89.) Thus, the Commissioner's allocation of an arm's-length amount of income—which the Tax Court found was commensurate with the income attributable to the intangible property at issue (Add. 244, 285-86), *see* Treas. Reg. § 1.482-4(a)—is authorized not only by the text of I.R.C. § 482, but is also what Treas. Reg. § 1.482-1(b)(1) requires.

One of 3M's amici, Silicon Valley Tax Directors Group, argues (at 15-16) that the arm's-length standard in Treas. Reg. § 1.482-1(b)(1), which compares a controlled transaction to a hypothetical transaction by an uncontrolled taxpayer "under the same circumstances," requires the comparison to involve a similar hypothetical legal restriction as the

-39-

one that applies to controlled taxpayers. But that is a flawed reading of the regulation because asking how an uncontrolled party would have acted under a non-existent Brazilian legal restriction would not measure the true arm's-length result that would have been obtained by an uncontrolled party in Brazil under the actual legal restriction at issue, which is the relevant inquiry under the plain terms of the regulation. The whole point of the arm's-length test is to determine the actual arm's-length result that "would have resulted had [the controlled taxpayer] dealt with the other member or members of the group at arm's length." Treas. Reg. § 1.482-1(i)(9). This necessarily requires looking at a hypothetical uncontrolled transaction under the actual legal restrictions that would apply in the particular place or country to the uncontrolled transaction.

## C. Alternatively, Treasury Regulation § 1.482-1(h)(2) authorized the Commissioner's allocation

Second, the allocation was proper under Treas. Reg. § 1.482-1(h)(2), which addresses the extent to which a foreign legal restriction that affects the results of a transaction at arm's length will be taken into account. Treas. Reg. § 1.482-1(h)(2)(i) provides that "a foreign legal restriction will be taken into account only to the extent

-40-

that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time." Treas. Reg. § 1.482-1(h)(2)(ii)(A) through (D) then sets forth additional criteria, including: (A) the foreign legal restriction must be publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the sovereign; (B) the taxpayer must have exhausted all remedies under foreign law or practice for obtaining a waiver of the restriction; (C) the restriction must expressly prevent the payment or receipt, in any form, of part or all of the arm's-length amount that would otherwise be required under section 482; and (D) the related parties must not have engaged in any arrangement that had the effect of circumventing the restriction or violated the restriction in any material respect.

A plurality of the Tax Court held that Brazil's legal restriction on royalty payments did not satisfy these criteria (Add. 222-30), and 3M does not challenge that aspect of the court's ruling on appeal. 3M instead argues that the Tax Court erred in sustaining the regulation's

Appellate Case: 23-3772    Page: 52    Date Filed: 05/10/2024 Entry ID: 5392804

validity under *Chevron* and the APA. The Court should reject these arguments, if it reaches them at all in this case.

### 1. Treasury Regulation § 1.482-1(h)(2) deserves *Chevron* deference

Under *Chevron*, courts must defer to an agency's reasonable interpretation of an ambiguous statute. As demonstrated above, the unambiguous terms of § 482's second sentence, added by the 1986 amendment, resolve this case. Therefore, the Court need not decide whether Treas. Reg. § 1.482-1(h)(2) is entitled to *Chevron* deference.[10] In any event, if the Court reaches the question, the Tax Court did not err in holding that Treas. Reg. § 1.482-1(h)(2) is entitled to *Chevron* deference. (Add. 231-63.)

3M's primary argument to the contrary relies on its misapplication of *First Security*. According to 3M, the pre-1986 version of § 482, as interpreted by *First Security*, unambiguously "bar[s] the IRS from treating as 'income' payments a taxpayer cannot lawfully

_____

[10] In the briefing below, counsel for the Commissioner said that § 482 "is silent as to the precise issue addressed by [Treas. Reg.] section 1.482-1(h)(2)." As explained *supra* pp. 30-33, although § 482 does not expressly reference blocked income or foreign legal restrictions, that "silence" does not mean that an exception for blocked income exists in the statute.

Appellate Case: 23-3772    Page: 53    Date Filed: 05/10/2024 Entry ID: 5392804

receive," and "*Chevron* does not empower Treasury to override that authoritative judicial interpretation." (Br. 35.) As we have explained, however, *First Security* did not interpret the statutory text that controls this case because it was not added to the statute until 14 years after *First Security* was decided. 3M concedes (Br. 42), as it must, that this case involves the transfer of intangibles within a controlled group and is therefore governed by the statutory text added by the 1986 amendment. As Chief Judge Kerrigan stated in her concurring opinion, "the additional sentence [added by the 1986 amendment] is essential to our analysis because at issue is the amount of income to be allocated upon the transfer or license of intangible property." (Add. 277; *accord* Add. 244-45 (plurality opinion).) Because *First Security* interpreted the old version of the statute, which obviously did not contain the language added by the 1986 amendment that controls this case, *First Security* cannot be viewed as having settled the meaning of an unambiguous statute in a manner that precludes Treasury's discretion even after the 1986 amendment. Under *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005), an agency's interpretation is not precluded by a court's prior construction of a statute that does not

Appellate Case: 23-3772    Page: 54    Date Filed: 05/10/2024 Entry ID: 5392804

"follow[ ] from the unambiguous terms of the statute and thus leaves no room for agency discretion"—a fact necessarily true here because *First Security* did not interpret the relevant statutory language.

For the same reason, 3M's reliance on *United States v. Home Concrete & Supply, LLC,* 566 U.S. 478 (2012), is misplaced. (Br. 38.) That case involved a Treasury regulation that interpreted the same version of a statute that the Supreme Court had construed in a prior case. Treasury viewed the statute as ambiguous and believed it had the authority, under *Brand X,* to issue a regulation interpreting the statute differently. The Court in *Home Concrete* held that its prior interpretation of the statute was conclusive, leaving no room for Treasury to issue a different interpretation. Here, however, the 1994 regulations interpret a different version of § 482 than the one at issue in *First Security.* Indeed, in *Home Concrete,* the Supreme Court recognized that later statutory amendments could nullify its earlier interpretation of the statute at issue. *See* 566 U.S. at 483-84.

Apart from the effects of the 1986 amendment, there are three additional reasons why *First Security* does not preclude Treasury from issuing a regulation dealing with foreign legal restrictions. First, as

Chief Judge Kerrigan observed in her concurring opinion (Add. 275), *First Security* involved the impact of a federal banking law, not a foreign law. As noted above, the Supreme Court has long recognized that foreign-law classifications are not controlling in interpreting federal tax law, unless Congress gives them such effect. *See Biddle v. Commissioner*, 302 U.S. 573, 578-79 (1938); *see, e.g., PPL Corp. v. Commissioner*, 569 U.S. 329, 335 (2013). *First Security* says nothing about the extent to which the Commissioner must give effect to foreign legal restrictions, and the Supreme Court itself has refused to give effect to state-law restrictions in determining what counts as income. *See Heiner v. Mellon,* 304 U.S. at 280-81. Therefore, *First Security* cannot be read as categorically barring the Treasury Department from issuing a regulation dealing with effects of foreign legal restrictions.

Second, Treas. Reg. § 1.482-1(h)(2) is aimed at foreign legal restrictions that discriminate between controlled and uncontrolled taxpayers, unlike the federal banking law at issue in *First Security*, which applied equally to both and thus comported with tax parity principles. *See supra* pp. 41-42. (*See* Add. 275-76 (Kerrigan, C.J., concurring).)

Appellate Case: 23-3772    Page: 56    Date Filed: 05/10/2024 Entry ID: 5392804

Third, *First Security*'s "core reasoning" rested not on the language of the pre-1986 § 482—which it quoted only in a footnote, *see* 405 U.S. at 395 n.1—but rather on the language of an earlier regulation that has since been withdrawn by Treasury.  As a majority of the Tax Court explained (Add. 232-35 (plurality), 276 (Kerrigan, C.J., concurring)), the 1994 regulations made changes to the existing regulations, including the elimination of the "complete power" regulation provided in Treas. Reg. § 1.482-1(b)(1) (1971) ("The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income . . . of each of the controlled taxpayers.").  *First Security's* analysis was based heavily on that language, leading to the Court's conclusion that for purposes of § 482 "[t]he 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law."  405 U.S. at 405.  Thus, *First Security* did not purport to interpret statutory language in § 482 that was unambiguous.

Appellate Case: 23-3772     Page: 57     Date Filed: 05/10/2024 Entry ID: 5392804

For these reasons, 3M's argument that *First Security* precludes Treasury's discretion—even after the statute was materially changed in 1986 in a manner that directly controls this case—is without merit.

3M also argues that Treas. Reg. § 1.482-1(h)(2) is unreasonable because the criteria for determining whether to give effect to a foreign legal restriction "do not resemble any recognizable concept of income." (Br. 46.) 3M does not elaborate on this point, other than to cross-reference its arguments about receipt and realization of income (Br. 21-23). As explained above, however, none of those issues are present here, and 3M misstates the law in any event. 3M does not explain why any particular criterion in § 1.482-1(h)(2) is unreasonable, and those arguments are thus waived. As the Tax Court plurality explained (Add. 254-63), the regulatory criteria are reasonable and, thus, are entitled to *Chevron* deference.

## 2. Treasury Regulation § 1.482-1(h)(2) is valid under the APA

3M next argues (Br. 47-66) that Treas. Reg. § 1.482-1(h)(2) is procedurally invalid under the APA. 3M argues first that Treasury failed "to articulate a reasonable basis for that rule" and, second, that Treasury failed "to respond to significant concerns raised in public

-47-

comments." (Br. 47.) A majority of the Tax Court (plurality and concurring judges) correctly rejected these arguments. (Add. 263-74, 277-80.)

Section 553 of the APA provides a "three-step procedure" for notice-and-comment rule making: (1) the agency must issue a notice of proposed rulemaking; (2) the agency must " 'give interested persons an opportunity to participate in the rule making through submission of data, views, or arguments' "; and (3), in the final rule, the agency must include " 'a concise general statement of [its] basis and purpose.' " *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(b); quoting 5 U.S.C. § 553(c)). Only the third requirement is at issue.

The APA permits courts to set aside agency action that is "arbitrary [and] capricious" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The Supreme Court has made clear that this is a "narrow standard of review." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quotations omitted). Thus, the Court has stated that while "an agency must examine the relevant data and articulate a satisfactory explanation for its action, we have made clear, however, that a court is not to substitute its judgment

-48-

for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513-14 (cleaned up). "If an agency's determination is supportable on any rational basis," then a reviewing court "must uphold it." *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004).

3M cherry-picks quotations from numerous cases to depict a procedural standard that requires an agency to comprehensively explain each provision of a regulation and respond to all non-frivolous comments. (Br. 48-51.) Judge Toro's dissent and 3M's amici envision a similar standard. (*See* Add. 307-09, 320-33.) But nothing in the text of the APA requires this level of written explanation. The APA simply states: "After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

The 1947 Attorney General's Manual on the APA (the "Manual"), which the Supreme Court has treated as a persuasive contemporaneous interpretation given the Justice Department's role in enacting the APA, confirms the limited requirements under § 553(c). The Manual states that "[t]he required statement will be important in that courts and the

-49-

public may be expected to use such statements in the interpretation of the agency's rules.  The statement is to be 'concise' and 'general.'. . . [F]indings of fact and conclusions of law are not necessary.  Nor is there required an elaborate analysis of the rules or of the considerations upon which the rules were issued.  Rather, the statement is intended to advise the public of the general basis and purpose of the rules." *Attorney General's Manual on the Administrative Procedure Act*, at 32 (1947); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004) (collecting cases relying on the Manual).

To the extent courts have fashioned additional requirements found nowhere in the text of the APA—such as the non-statutory requirement to respond in writing to significant comments—their holdings are in serious tension with the Supreme Court's "repeated[ ]" admonition that "the *text* of the APA provides the maximum procedural requirements that an agency must follow in order to promulgate a rule." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 591 U.S. 657, 685-86 (2020) (emphasis added; cleaned up); *accord Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council,* 435 U.S. 519, 524 (1978); *Fox Television Stations*, 556 U.S. at 513-14; *Mortg. Bankers*,

Appellate Case: 23-3772     Page: 61     Date Filed: 05/10/2024 Entry ID: 5392804

575 U.S. at 100-02; *see also* Jack M. Beermann & Gary Lawson, *Reprocessing Vermont Yankee,* 75 Geo. Wash. L. Rev. 856, 892-95 (2007).

Some courts have cited dicta from *Mortgage Bankers* for the proposition that agencies must respond in writing to public comments. In summarizing § 553(c), the Court stated that "[a]n agency must consider and respond to significant comments received during the period for public comment." 575 U.S. at 96. But the Court did not say the agency's response must take the form of a written explanation, and neither of the citations following the Court's statement support that interpretation. *Id.* at 96 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), and *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984)). The better reading of this statement is that the agency must "respond" to comments by taking them into account in the rule-making process. That reading is consistent with the citation to *Overton Park*, which states that review under § 706(2)(A) requires courts to "consider whether the decision was based on a consideration of the relevant factors." 401 U.S. at 416; *Thompson*, 741 F.2d at 409-10. Any other reading would appear to conflict with the actual holding of

*Mortgage Bankers* that courts cannot add "judge-made procedural right[s]" to the text of the APA. 575 U.S. at 102.

### a. Treasury engaged in reasoned decision-making

Treasury met the APA's procedural requirements when promulgating § 1.482-1(h)(2). First, as mentioned, the regulation was issued in 1994 as part of a massive regulatory overhaul undertaken in response to Congress's 1986 amendment of § 482 and its specific request "that the IRS conduct a comprehensive study and consider whether the regulations under section 482, which had been issued in 1968 . . . should be 'modified in any respect.'" Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 34971, 34972 (July 8, 1994) (quoting H.R. Conf. Rep. No. 99-841 (Vol. II), at II-638). Those 1968 regulations had included, for the first time, a provision addressing allocations among controlled group members where "currency or other restrictions imposed under the laws of any foreign country" prevented payments for goods and services. Treas. Reg. § 1.482-1(d)(6) (1968). The regulation generally allowed taxpayers to elect a deferred method of accounting for such payments.

Appellate Case: 23-3772     Page: 63     Date Filed: 05/10/2024 Entry ID: 5392804

As explained by Treasury, one of the primary goals of the regulatory overhaul was to "assure that the division of income between related parties reasonably reflects the economic activities that each undertakes," consistent with the 1986 amendment to § 482 that "require[d] that consideration for intangible property transferred in a controlled transaction be commensurate with the income attributable to the intangible." 59 Fed. Reg. at 34972. The "comprehensive study" urged by Congress in the 1986 committee report led the IRS and Treasury to issue a "White Paper" in 1988 that "reexamined the theory and administration of section 482, with particular attention paid to transfers of intangible property" to foreign subsidiaries of U.S. companies. IRS Notice 88-123, 1988 WL 561206, at *1 (Dec. 5, 1988). Proposed and temporary regulations were then issued in 1992 and 1993, subject to notice and comment, and the regulations were finalized in 1994.

The preamble to the 1994 regulations contains a lengthy section entitled "Explanation of Revisions and Summary of Comments," spanning 17 pages of the Federal Register. 59 Fed. Reg. at 34972-34988. Treasury received many comments on its proposed and

Appellate Case: 23-3772    Page: 64    Date Filed: 05/10/2024 Entry ID: 5392804

temporary regulations, and the preamble identifies which comments were deemed "significant" by Treasury and includes responses to those comments. The two comments timely received by Treasury regarding foreign legal restrictions were not explicitly discussed.

Regarding the regulation that covers foreign legal restrictions (§ 1.482-1(h)(2)), the preamble first explains the general principles of § 1.482-1, dealing with "Allocation of income and deductions among taxpayers." It explains, among other things, that the "governing principle under section 482 is the arm's length standard" and that "[u]nder this standard controlled taxpayers are expected to realize from their controlled transactions the results that would have been realized if uncontrolled taxpayers had engaged in the same transactions under the same circumstances." 59 Fed. Reg. at 34976. Under the arm's-length standard, "controlled and uncontrolled taxpayers should be placed on the same (rather than a merely similar) footing." *Id.*

The preamble then explains each subsection of § 1.482-1 and states that "Section 1.482-1(h) provides special rules relating to a small taxpayer safe harbor, foreign legal restrictions and coordination with section 936." *Id.* at 34981. Critically here, it explains that:

-54-

> The rules on foreign legal restrictions were originally issued in proposed form in the 1993 regulations. Section 1.482-1(h)(2) modifies and finalizes that provision. It provides that a foreign legal restriction will be taken into account to the extent that such restriction affects the results of transactions at arm's length. If there is no evidence that the restriction affected uncontrolled taxpayers the restriction will be disregarded in determining an arm's length result, and it will be taken into account only to the extent provided in §§1.482-1(h)(2)(iii) and (iv), relating to the deferred income method of accounting.

*Id.* The preamble goes on to explain how a "foreign legal restriction" is defined and how the deferred method of accounting will operate. *Id.*

The foregoing explanation from Treasury meets § 553(c)'s requirement that "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." The basis and purpose of § 1.482-1(h)(2) is plain: to provide rules for allocating income among controlled group members affected by foreign legal restrictions in a manner consistent with the loadstar arm's-length principle. Treasury explained that foreign legal restrictions will be respected if uncontrolled taxpayers would be subject to the same restrictions, and if that standard is not met, the taxpayer may elect the deferred method of accounting, as was allowed under the 1968 version of the regulation. This reflects reasoned decision-making, as Treasury articulated a

Appellate Case: 23-3772    Page: 66    Date Filed: 05/10/2024 Entry ID: 5392804

"rational basis" and "satisfactory explanation" for its rule.  *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 763; *Fox Television Stations*, 556 U.S. at 513-14.

3M is patently wrong in contending that there was "complete silence on the rationale" for the regulation.  (Br. 54.)  Treasury's explanation of the rule may have been brief compared to other parts of the 1994 regulations, but § 553(c) does not require a full exegesis, only a "concise general statement."  *See Appalachian Power Co. v. EPA,* 579 F.2d 846, 854 (4th Cir. 1978) ("No exhaustive statement of reasons for the rule is required[.]").  3M complains that Treasury did not explain "why an 'arm's-length standard' is appropriate in deciding whether to recognize foreign law or why legal restrictions applicable only to controlled entities should be ignored."  (Br. 59.)  Both matters are self-evident, but were explained by Treasury in any event:  the arm's-length standard is the overriding principle in § 482 and thus it necessarily was appropriate for Treasury to apply that standard in deciding whether to recognize foreign law.  59 Fed. Reg. at 34976.  And ignoring legal restrictions that apply only to controlled entities and not uncontrolled entities is, by definition, an application of the arm's-length principle.

Appellate Case: 23-3772     Page: 67     Date Filed: 05/10/2024 Entry ID: 5392804

3M accuses the Tax Court (Br. 45, 57) of "reconstruct[ing] a basis for the rule," but as explained above, the basis of the rule was explained in the preamble to the 1994 regulations. The Tax Court reviewed the regulatory history at length, correctly synthesized those materials to discern Treasury's rationale for the rule, and found Treasury's rationale to be sufficient. The APA requires nothing more. *See Fox Television Stations*, 556 U.S. at 513-14. There was no "backfilling" by the Tax Court (Br. 53, 58) simply because it stated, in its *own* words, that the regulation "is a specific application of two principles of section 482: (1) the arm's-length standard and (2) the principle that section 482 should achieve tax parity between controlled and uncontrolled parties." (Add. 265.) That is an accurate characterization of Treasury's stated rationale, not a post-hoc explanation.

3M also argues that Treasury did not sufficiently explain the 1994 changes to the procedures for electing the deferred method of accounting. (Br. 54-55.) But 3M never elected the deferred method of accounting under § 1.482-1(h)(2) and does not claim any injury stemming from this portion of the regulation. Thus, it is not clear that 3M has standing to challenge this aspect of the regulation in a tax

Appellate Case: 23-3772     Page: 68     Date Filed: 05/10/2024 Entry ID: 5392804

deficiency case regarding its own liability. Moreover, 3M's challenge would only harm *taxpayers*, as the deferred accounting option is a taxpayer-favorable rule.

### b. Treasury considered all comments, which is all the text of the APA requires

3M next argues that Treasury failed to respond to significant comments on § 1.482-1(h)(2). As mentioned above, the text of the APA does not require agencies to respond in writing to public comments, and 3M does not identify any other statute imposing that requirement here. Instead, 3M relies primarily on a judge-made rule from the D.C. Circuit's 1977 decision in *Home Box Office, Inc. v. FCC*, 567 F.2d 9, which has been adopted uncritically by other courts. (Br. 60-61.) As then-Judge Kavanaugh has explained, however, the 1970's was "an era when [the D.C. Circuit] created several procedural requirements not rooted in the text of the APA." *American Radio Relay League, Inc. v. FCC,* 524 F.3d 227, 246 (D.C. Cir. 2008) (concurring opinion). That "lack of roots in the statutory text creates a serious jurisprudential

Appellate Case: 23-3772    Page: 69    Date Filed: 05/10/2024 Entry ID: 5392804

problem because the Supreme Court later rejected this kind of freeform interpretation of the APA" in *Vermont Yankee.  Id.*[11]

This Court has not squarely adopted this non-statutory requirement.[12]  To the extent it can be reconciled with the text of the APA at all, the respond-to-significant-comments doctrine may ensure that the decision was based on a consideration of the relevant factors, which is the operative standard of review under § 706(2)(A).

3M mentions comments by "four institutional commenters" (Br. 61), but only two of those comments were timely submitted to Treasury. Treasury set a deadline of July 20, 1993, for written comments, 58 Fed. Reg. 5310, 5310 (Jan. 21, 1993), and only those from the American Petroleum Institute and TRW were timely.  (*Compare* App. 202-21, 262-64, *with* App. 222-61, 265-70.)  There is "no basis for

---

[11] Judge Kavanaugh's criticism was aimed specifically at *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973), which is the primary case upon which the *Home Box Office* court relied, *see* 567 F.2d at 35-36.

[12] In *Champion v. Shalala*, 33 F.3d 963, 966 n.4 (8th Cir. 1994), this Court stated in passing, in a footnote, that "[t]he APA requires . . . a reasoned response explaining why comments were rejected."  But this Court did not cite the APA or any case for this proposition, and it rejected the challenger's argument as lacking merit.

-59-

obliging an agency to specifically address untimely comments."
*Reytblatt v. U.S. Nuclear Reg. Comm'n,* 105 F.3d 715, 723 (D.C. Cir. 1997).

While these comments took issue with specific aspects of § 1.482-1(h)(2), the thrust of the comments was that the regulation was contrary to *First Security* and *Procter & Gamble* and, therefore, should not be adopted.  (App. 215, stating that "[o]n balance," the 1968 regulation should be reinstated.)  As the Tax Court correctly held, Treasury was already well aware of this criticism, as reflected in one commenter's statement that the proposed regulation "reflects the IRS's current litigating position in at least four cases pending before the Tax Court."  (App. 212.)  Thus, these comments "brought to the attention of the agency nothing which it had not already considered."  *Thompson*, 741 F.2d at 409.  The IRS's consistent litigation position was that *First Security* did not address foreign legal restrictions that affect only the payor and not the income recipient.  Its position had been laid out in public court filings and did not need to be repeated in promulgating regulations.

-60-

Ultimately, the central merits question in this case is whether the allocation here is barred by *First Security*.  If so, portions of § 1.482-1(h)(2) cannot survive apart from any procedural APA issue.  But if this Court decides that *First Security* does not bar the allocation, then any failure to specifically address *First Security* and its progeny in promulgating the regulation would be harmless error.  It would be an odd state of affairs to hold that a regulation is not actually in conflict with a Supreme Court case, but that the regulation is separately invalid for failing to explain why not.

As for other comments taking issue with particular aspects of § 1.482-1(h)(2), the Tax Court correctly concluded that Treasury did in fact consider them, but they were not significant enough to warrant a written response.  Indeed, the parties stipulated that Treasury considered all comments, as explicitly stated in the preamble.[13] (App. 86 (quoting 59 Fed. Reg. at 34972).)  This stipulation resolves any

---

[13] 3M argues that this "boilerplate assertion" in the preamble "adds nothing."  (Br. 63.)  But the Attorney General's Manual on the APA specifically advised agencies to include this statement.  The Manual states, "Each agency is affirmatively required to consider 'all relevant matter presented' in the proceeding; it is recommended that all rules issued after such informal proceedings be accompanied by an express recital that such material has been considered."  Manual at 31.

Appellate Case: 23-3772     Page: 72     Date Filed: 05/10/2024 Entry ID: 5392804

dispute over whether the comments were considered and by extension whether Treasury considered all relevant factors. Moreover, the two timely-submitted comments regarding § 1.482-1(h)(2) were not "significant" relative to the comments Treasury received on more central matters (such as transfer-pricing methods) and to which Treasury did respond in writing. *See* 59 Fed. Reg. at 34972-34988. The APA simply does not require agencies to respond in writing to every non-frivolous comment. *See Consumers Union of U.S., Inc. v. Consumer Prod. Safety Comm'n*, 491 F.2d 810, 812 (2d Cir. 1974) ("a formal opinion specifically covering all rejected alternatives is not required in an informal rule making proceeding").

In any event, the administrative record shows that Treasury not only considered the comments, but that it revised the final regulation in ways that addressed a number of them. For instance, Treasury amended the provision regarding exhaustion of remedies. *Compare* Treas. Reg. § 1.482-1(f)(2)(ii)(B) (proposed), 58 Fed. Reg. at 5312-13, *with* Treas. Reg. § 1.482-1(h)(2)(ii)(B) (clarifying the requirement excludes "remedies that would have a negligible prospect of success if pursued"). Also, in response to concerns about how dividends would be

treated, the final regulation changed its examples to make it clear that paying a dividend from a subsidiary to a parent is not a circumvention of law. *Compare* Treas. Reg. § 1.482-1(f)(2)(v) (Exs. 1, 2) (proposed), *with* Treas. Reg. § 1.482-1(h)(2) (Exs. 1, 3). As the parties stipulated, and as these changes demonstrate, Treasury thoughtfully considered all comments, and thus all relevant factors, before it finalized the regulation. *See, e.g., Consumers Union*, 491 F.2d at 812 (agency's consideration of comments evidenced by the fact that it incorporated some suggestions and rejected others).

Finally, 3M argues that Treasury could not possibly have complied with the APA because Treasury did not think it applied. (Br. 52-53.) Treasury's view was that the 1994 regulations were interpretive rather than legislative. Yet Treasury engaged in notice-and-comment rulemaking anyway, therefore affording the public *more* procedural right*s* than it thought necessary. In any event, as explained, it is 3M that seeks to impose a procedural standard that far exceeds what the text of the APA actually requires.

Appellate Case: 23-3772    Page: 74    Date Filed: 05/10/2024 Entry ID: 5392804

# CONCLUSION

For the foregoing reasons, the decision of the Tax Court was correct and should be affirmed.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Matthew S. Johnshoy

FRANCESCA UGOLINI                (202) 514-3361
JACOB EARL CHRISTENSEN           (202) 307-0878
MATTHEW S. JOHNSHOY              (202) 616-1908
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

MAY 10, 2024

Appellate Case: 23-3772     Page: 75     Date Filed: 05/10/2024 Entry ID: 5392804

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

> [X]   this document contains 12,612 words, **or**

> [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

> [ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

3.  Pursuant to Eighth Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses using Microsoft Windows Defender (updated daily), which reports that the file is virus-free.

(s)   _/s/ Matthew S. Johnshoy_

Attorney for Commissioner of Internal Revenue

Dated:   May 10, 2024

-65-

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2024, I electronically filed a PDF version of the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

  /s/ Matthew S. Johnshoy
             MATTHEW S. JOHNSHOY
             *Attorney*