No. 23-3772

IN THE

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

3M COMPANY & SUBSIDIARIES,
*Appellant*,

---v.---

COMMISSIONER OF INTERNAL REVENUE,
*Appellee*.

On Appeal from the United States Tax Court
No. 5816-13 – 160 T.C. No. 3

**BRIEF OF DAVID A. WEISBACH AS *AMICUS CURIAE* IN SUPPORT
OF APPELLEE AND IN SUPPORT OF AFFIRMANCE**

Steven J. Alagna
Washington University School of Law
One Brookings Drive
MSC 1120-250-102
St. Louis, MO 63130
(314) 935-7238
salagna@wustl.edu

*Counsel for Amicus Curiae*

David A. Weisbach
University of Chicago Law School
1111 E 60th St
Room 522
Chicago, IL, 60637
(773) 702-9494
dweisbac@uchicago.edu

*Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... ii

INTEREST OF AMICUS CURIAE .......................................................1

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT ........................................................................4

I.  TREASURY'S ACTION WAS NOT ARBITRARY OR CAPRICIOUS UNDER
    SECTION 706(2)(A) BECAUSE IT WAS THE RESULT OF REASONED
    DECISION-MAKING. ...........................................................4

A.  Treasury Engaged In A Multi-Year Notice-And-Comment Process In
    Compliance With Section 553 Of The APA. ...................................5

B.  The Comments That Treasury Did Not Respond To Were Not Significant
    Enough To Require A Response Under State Farm.............................13

    1.  Agencies are only required to respond to significant comments. .......13

    2.  The comments that Treasury chose not to respond to were not
        significant. ....................................................15

II.  REGARDLESS OF WHETHER TREASURY ERRED, THIS COURT SHOULD NOT
     VACATE THE 482 REGULATIONS.. .............................................21

A.  If Treasury Erred By Not Responding To The Blocked Income Comments,
    Its Error Did Not Prejudice 3M. ..........................................21

B.  Alternatively, If The Court Finds That Treasury Acted Arbitrarily And
    Capriciously, The Court Should Remand But Not Vacate The 482
    Regulations. .............................................................24

CONCLUSION .....................................................................29

CERTIFICATE OF COMPLIANCE AND VIRUS-FREE CERTIFICATION .....30

CERTIFICATE OF SERVICE .........................................................30

Appellate Case: 23-3772     Page: 2     Date Filed: 05/14/2024 Entry ID: 5393697

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M v. Comm'r*, 160 T.C. No. 3 (2023) ....................................... 12, 15, 18, 19, 20, 28

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ...........................................................................................24, 25

*Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330 (D.C. Cir. 1968) ..............13

*Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) ............................................22

*Carlson v. Postal Regul. Comm'n*, 938 F.3d 337 (D.C. Cir. 2019)...................14, 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........3, 14, 15

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) ........................................14

*Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394 (1972) ..........................................8

*Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454 (D.C. Cir. 1997) ...............20

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ....................................................23

*Hewitt v. Comm'r*, 21 F.4th 1336 (11th Cir. 2021) ..................................................12

*Home Box Off., Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) ........................................5

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................12

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) ............24, 25

*Louisiana Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075 (D.C. Cir. 2003) ........................................................13, 19, 20, 25

*MCI WorldCom, Inc. v. FCC*, 209 F.3d 760 (D.C. Cir. 2000) ...........................14, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................................................................................2, 4, 15

*Nat. Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) .................21

*Nat. Tire Dealers & Retreaders Ass'n v. Brinegar*, 491 F.2d 31 (D.C. Cir. 1974)..27

*Oakbrook Land Holdings v. Comm'r*, 28 F.4th 700 (6th Cir. 2022) ......12, 13, 14, 18

*PDK Lab'ys Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004) ........................................21

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ........................................4, 5, 13

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ............................................................17

*Shinseki v. Sanders*, 556 U.S. 396 (2009)................................................................21

*Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) ..................14

ii

*Thompson v. Clark*, 741 F.2d 401 (D.C. Cir. 1984) .................................................13

*U.S. Steel Corp. v. EPA*, 649 F.2d 572 (8th Cir. 1981)..........................................24

**Statutes**

5 U.S.C. § 553 ......................................................................................4, 5, 13

5 U.S.C. § 706 ...........................................................................................4, 21

26 U.S.C. § 482 ...............................................................................................1

**Regulations and Administrative Materials**

57 Fed. Reg. 3571 (Jan. 30, 1992) ...................................................................7

58 Fed. Reg. 5263 (Jan. 21, 1993) ...................................................................8

58 Fed. Reg. 5310 (Jan. 21, 1993) ...................................................................8

59 Fed. Reg. 34971 (July 8, 1994)....................................................6, 7, 9, 10, 11

Prop. Treas. Reg. § 1.482-1 ......................................................................17, 18

Treas. Reg. § 1.482-1 .............................................................7, 9, 17, 18, 19

**Other Authorities**

A Study of Intercompany Pricing Under Section 482 of the Code,
    1988-2 C.B. 458 (Oct. 18, 1988) ...........................................................7

Brian Galle & Stephen Shay, *Admin Law and the Crisis of Tax Administration*,
    101 N.C. L. Rev. 1645 (2023)...............................................................28

Brief for Anne Alstott et al. as *Amici Curiae* Supporting Appellants, *Altera v.
    Comm'r*, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16-70496, 16-70497) ...............28

Craig Smith, *Taking "Due Account" of the APA's Prejudicial-Error Rule*,
    96 Va. L. Rev. 1727 (2010) ...................................................................22

Jerry L. Marshaw, *Greed, Chaos, and Governance: Using Public Choice to Im-
    prove Public Law* (1997) .......................................................................11

Richard J. Pierce, Jr., *Which Institution Should Determine Whether an Agency's Ex-
    planation of a Tax Decision Is Adequate: A Response to Steve Johnson*,
    64 Duke L.J. Online 1 (2014) ...............................................................27

Appellate Case: 23-3772    Page: 4    Date Filed: 05/14/2024 Entry ID: 5393697

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* Professor David A. Weisbach is the Walter J. Blum Professor of Law at the University of Chicago Law School, where he teaches courses and writes about federal taxation. Prior to joining the Law School faculty, *Amicus* was an Attorney-Advisor and then an Associate Tax Legislative Counsel in the Office of the Tax Legislative Counsel for the Department of the Treasury. *Amicus*'s experience in the private and public sectors has given him insight into the strategies that companies use to minimize their tax liability and the difficulties that Treasury faces when trying to formulate effective, workable regulations. *Amicus* has a strong interest in the proper administration of the tax law and the appropriate and consistent application of administrative law in the context of tax administration.

## SUMMARY OF THE ARGUMENT

At stake in this case is the validity of a 1994 Treasury regulation that seeks to prevent avoidance of U.S. taxes through the use of foreign legal restrictions on repatriating income to the United States (the "blocked income regulation"). The IRS has long had the authority to reallocate income among controlled parties pursuant to 26 U.S.C. § 482. In 1994, Treasury finalized a regulation that addressed

---

[1] *Amicus* files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure with the consent of all the parties. No party's counsel authored this brief in whole or in part, and no party or its counsel contributed financial support intended to fund the preparation or submission of this brief.

1

many issues raised by Section 482, including how foreign legal restrictions affected its application. That regulation was the first major revision to the regulations under Section 482 since 1968 and was the result of a multi-year effort that spanned three presidential administrations. Treasury engaged in an extensive process of public engagement when drafting this regulation, including issuing a White Paper and two sets of proposed regulations before issuing the final regulation. The final regulation included an extensive preamble that responded to the numerous comments.

3M challenges the blocked income portion of the regulation, arguing that the regulation exceeds Treasury's statutory authority under *Chevron* and that Treasury did not comply with Section 706(2)(A) of the Administrative Procedure Act (APA), as interpreted by the Supreme Court in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).

*Amicus* files this brief to address the *State Farm* issues and makes three points. *First*, contrary to the characterization by 3M and *amici* supporting 3M, Treasury engaged in an extensive process of seeking comments from the public, and it responded to those comments by, among other things, reproposing the regulation and offering extensive responses to comments in the preambles to the various iterations of the regulation. In no sense did Treasury flout its obligations under

2

the APA or treat itself as immune from those obligations. Instead, Treasury considered all the comments and responded to those that, in its evaluation, raised issues that were sufficiently significant to warrant responses in the preamble to the final regulations. It had to exercise this judgment if the preamble was to be useful in promoting a dialogue with affected parties and helpful to taxpayers seeking to understand the regulation.

*Second*, Treasury exercised reasonable judgment about which comments required a response. The comments on the blocked income portion of the regulation were not significant. 3M has stipulated that Treasury considered all the comments when finalizing the regulation, which means that Treasury incorporated any needed substantive changes suggested by the comments into the final regulation. There is no dispute that Treasury met its obligations to consider comments under *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).

The only issue is whether Treasury provided a sufficient explanation of how it considered the comments. There were four comments on the blocked income portion of the regulation. The comments were either adopted, not relevant to this case, or not significant. As a result, Treasury fully complied with its obligations to respond to significant comments.

*Third*, 3M does not, and cannot, allege any harm from the claimed violation of Section 706(2)(A). A court may not invalidate a regulation under Section 706

3

unless there was prejudicial error. 3M stipulates that Treasury considered all the comments prior to finalizing the regulation. Therefore, 3M cannot claim that a response from Treasury on the blocked income comments would have led Treasury to alter the regulation. Similarly, because 3M chose not to participate in the notice-and-comment process, it cannot claim that Treasury prevented it from doing so. Because there was no prejudicial error, this Court may not invalidate the regulation under Section 706(2)(A). Alternatively, the Court should remand the regulation to Treasury without vacatur. The error, if any, can easily be remedied and the disruption to the tax system from vacating the regulation would be enormous.

## **ARGUMENT**

### I. TREASURY'S ACTION WAS NOT ARBITRARY OR CAPRICIOUS UNDER SECTION 706(2)(A) BECAUSE IT WAS THE RESULT OF REASONED DECISION-MAKING.

The APA requires agencies to engage in notice-and-comment rulemaking when promulgating legislative rules. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see also* 5 U.S.C. § 553(b)–(c). This notice-and-comment process is subject to a standard of judicial review under which judges are to invalidate any "arbitrary" or "capricious" agency actions. 5 U.S.C. § 706(2)(A). The purpose of notice and comment—and, by extension, arbitrary-or-capricious review—is to ensure that agency actions are the products of reasoned decision-making. *See State Farm*, 463 U.S. at 43. Accordingly, when courts engage in arbitrary-or-capricious

4

review, they look to see whether there was sufficient dialogue between the agency and the public during the rule-making process, *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977), and whether the agency responded to all *significant* comments, *Perez*, 575 U.S. at 96.

Section I.A, below, explains that Treasury engaged in the kind of dialogue that *Home Box Office* requires by complying with the notice-and-comment process outlined in Section 553 of the APA. Section I.B lays out the legal standard for what makes a comment "significant," and applies that standard to the four comments that Treasury did not respond to. It concludes that the comments were not significant and therefore did not warrant a response from Treasury.

## A. Treasury Engaged In A Multi-Year Notice-And-Comment Process In Compliance With Section 553 Of The APA.

"The APA sets out three procedural requirements: notice of the proposed rulemaking, an opportunity for interested persons to comment, and 'a concise general statement of (the) basis and purpose' of the rules ultimately adopted." *Home Box Off.*, 567 F.2d at 35 (citing 5 U.S.C. § 553(b)–(c)). Contrary to the assertions by 3M and the *amici* supporting 3M, Treasury engaged in an extensive notice-and-comment process on the regulation and responded to significant comments. In no sense did Treasury treat itself as if it were not subject to the APA.

5

The final regulations issued in 1994 were the first major revision to the 482 regulations since 1968. *See* Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 34971, 34972 (July 8, 1994) (explaining that the 1994 regulations were the product of a congressional directive to "conduct a comprehensive study and consider whether the regulations under section 482, which had been issued in 1968 . . . should be 'modified in any respect.'"). They were in part a response to changes made to Section 482 by the 1986 Tax Reform Act and in part a reaction to the changed economic circumstances since 1968. *Id.* The 1994 regulations were the product of a multi-year process that spanned at least three presidential administrations. This process involved multiple, detailed proposals, hearings and other interactions with affected parties, and lengthy explanations of the reasons for each of the proposals and the final regulations. The details of these interactions are found in the preambles to the various proposed and final regulations. A brief history of these interactions shows that the *State Farm* standard was met.

The purpose of the Section 482 regulations is to ensure that transactions with controlled taxpayers clearly reflect income. By transacting at favorable prices rather than market prices, commonly controlled parties can allocate income to low-tax jurisdictions to reduce their tax liability. To prevent this, Section 482 requires related parties to use arm's length prices when transacting with one another. As the

first paragraph in the current 482 regulations states, "section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer." Treas. Reg. § 1.482-1(a).

The core problem faced by Treasury in drafting regulations under Section 482 is that there are often no readily available transactions to use as comparables for computing arm's length prices. *See* 59 Fed. Reg. 34972. The various iterations of the regulations sought to find appropriate methods for determining arm's length prices in light of this problem. *Id.* at 34972–73.

Although it may be traceable to even earlier actions, the regulatory process at issue began, at the latest, with the White Paper that Treasury issued on October 18, 1988, in which Treasury proposed various methods for determining arm's length prices. *See* A Study of Intercompany Pricing Under Section 482 of the Code, 1988-2 C.B. 458 (Oct. 18, 1988) (the White Paper). On January 30, 1992, after receiving comments on the White Paper, Treasury issued a proposed regulation, which adopted a different approach. *See* Intercompany Transfer Pricing and Cost Sharing Regulations Under Section 482, 57 Fed. Reg. 3571 (Jan. 30, 1992) (the 1992 proposed regulation). The preamble to the 1992 proposed regulation was 7,131 words long and explained why, in response to comments, Treasury modified its approach. *Id.* at 3572.

7

After receiving extensive and largely critical comments on the 1992 proposed regulation, Treasury simultaneously issued temporary and proposed regulations on January 21, 1993. *See* Intercompany Transfer Pricing Regulations Under Section 482, 58 Fed. Reg. 5263 (Jan. 21, 1993) (the 1993 temporary regulation); Intercompany Transfer Pricing Regulations Under Section 482, 58 Fed. Reg. 5310 (Jan. 21, 1993) (the 1993 proposed regulation). In response to comments, Treasury replaced most of the provisions in the 1992 proposed regulations except the cost sharing rules. 58 Fed. Reg. at 5310. Once again, Treasury, in an extensive preamble, explained why it changed its approach. *See generally* 58 Fed. Reg. 5263; *see also* 58 Fed. Reg. at 5310 ("The preamble to the temporary regulations contains a full explanation of the reasons underlying the issuance of the proposed regulations.").

The 1993 proposed regulation was the first to propose the blocked income regulation—a set of rules for allocating income when a foreign country imposes legal restrictions on repatriating earnings. 58 Fed. Reg. at 5310–11. The 1968 regulations contained rules that had been interpreted in prior court decisions, most importantly *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972). The White Paper and the 1992 proposed regulation would have left the 1968 rules in place while the 1993 proposed regulation suggested various changes.

8

In 1994, Treasury issued the final 482 regulation, which included the blocked income regulation. *See* 59 Fed. Reg. at 34981; *see also* Treas. Reg. § 1.482-1(h). The 1994 regulation covered many highly complex issues with substantial revenue at stake. While, in terms of formatting and substance, the 1994 regulations remained consistent with the 1993 regulations, they "reflect[ed] numerous modifications in response to the comments received on the 1993 regulations." 59 Fed. Reg. at 34975.

The 1993 regulations elicited 33 comments from taxpayers, industry and professional groups, and tax treaty partners.[2] Almost every comment focused on aspects of the regulation other than blocked income. When finalizing the regulation, Treasury responded to these comments with an 18,285-word preamble. In 12-point Times New Roman font and 1-inch margins, the preamble is 40 pages long. A large fraction of it is devoted to addressing the comments and explaining how the final regulation was modified, in large part due to the comments. *Id.* at 34975–88

Many comments on the 1993 regulations expressed concern about the regulation's reliance on the comparable profits method (CPM) and the profit split

---

[2] These comments are available on Tax Analyst's website, www.taxnotes.com, which compiles and publishes all comments on regulations.

method (PSM) when allocating income under Section 482. *Id.* at 34975. Comment-ers worried that the CPM was inconsistent with the arm's length standard, that it might supplant other methods, and that the regulation did not clearly state whether it preferred the CPM to other methods. *Id.* Commenters also suggested that Treas-ury revisit the requirements that taxpayers must meet to use the PSM and define certain terms more explicitly. *Id.* The preamble to the final regulations addressed each of these concerns. *Id.* at 34985–88.

The preamble also responded to comments on the regulation's provisions governing tangible and intangible property. Regarding the tangible property provi-sions, commenters expressed concern about the limited role that evidence acquired through "inexact comparables" would play moving forward, the higher restrictive comparability standard that taxpayers would have to meet under the proposed com-parable uncontrolled price method (CUP), and the restrictions that the regulation would impose on the use of unspecified methods. *Id.* at 34975. Similarly, com-menters objected to the regulation's intangible-property provisions, expressing concern about the higher comparability standard under the comparable uncon-trolled transaction method (CUT), the potential that continued availability of peri-odic adjustments would conflict with the arm's length principle, and the limited weight given to the developer-assister rule when determining the owner of an in-tangible. *Id.* The preamble responded to each of these points. *Id.* at 34982–85.

10

Finally, commenters sought additional guidance from Treasury regarding the interaction between the regulation's rules for tangible and intangible property and requested that the thresholds for the relevant safe harbor be lowered to make it available to more taxpayers. *Id.* at 34975. Commenters also asked that electing taxpayers be allowed to report lower income under the published measures of profitability than they would have to report under otherwise applicable methods. *Id.* Once again, the preamble responded to each of these comments. *Id.* at 34981–85.

As discussed below, Treasury did not explicitly respond to four comments on the blocked income regulation. Treasury's compliance with the APA, however, must be judged based on the procedures it followed and its choice of which comments to respond to (because they were significant) for the entire regulation. The final 482 regulations were a substantial undertaking, and Treasury necessarily had to make choices about which comments to address. 3M's myopic focus on just one modest portion of the final regulations gives a distorted picture of Treasury's behavior. By any measure, Treasury engaged in an extensive notice-and-comment process and responded to significant comments.

When evaluating an agency's compliance with the APA, courts should not act as "robed roulette wheels" forcing agencies to either guess which comments a court will deem significant or to respond without regard to whether a comment is significant. Jerry L. Marshaw, *Greed, Chaos, and Governance: Using Public*

Appellate Case: 23-3772    Page: 15    Date Filed: 05/14/2024 Entry ID: 5393697

*Choice to Improve Public Law* 181 (1997). Instead, courts should respect reasonable choices made by agencies, particularly when, as here, the agency has gone through an extensive notice-and-comment process and responded to the comments that it identified as significant. As the Supreme Court held, "a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citations omitted). Judge Kerrigan made this point in her concurrence below:

> Determining whether a comment is significant may result in an analysis that is more subjective than objective. [Holding for 3M] would create a slippery slope whereby courts would be constantly faced with determining whether comments are significant and whether the agency responded appropriately to them.

*3M v. Comm'r*, 160 T.C. No. 3 at 279–80 (2023) (Kerrigan, concurring).

We saw this problem in the competing circuit opinions in *Hewitt v. Commissioner*, 21 F.4th 1336 (11th Cir. 2021), and *Oakbrook Land Holdings v. Commissioner*, 28 F.4th 700 (6th Cir. 2022). The Eleventh Circuit invalidated a regulation because it found that Treasury had failed to respond to a significant comment. *Hewitt*, 21 F.4th at 1353. The Sixth Circuit, considering the same regulation and comments, however, found that the comment at issue was not significant. *Oakbrook*, 28 F.4th at 714–18.

12

This should come as no surprise. Determining whether a comment is significant involves considerable judgment. *Id.* at 714. ("[A]ssessing significance is context dependent and requires reading the comment in light of both the rulemaking of which it was part and the statutory ends that the proposed rule is meant to serve."). After engaging in a lengthy dialogue with affected parties over many years and multiple proposals and explanations, Treasury exercised its judgment and responded to the comments that it thought were significant. This meets the *State Farm* standard.

**B.    The Comments That Treasury Did Not Respond To Were Not Significant Enough To Require A Response Under State Farm.**

**1.    Agencies are only required to respond to significant comments.**

Although agencies must engage with the comments that they receive in response to their proposals, *Perez*, 575 U.S. at 96; *see also* 5 U.S.C. § 553(b)–(c), they do not have "to respond to every comment, or to analyze every issue or alternative raised by the comments, no matter how insubstantial." *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (citing *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)). They only must respond to "significant" comments. *Perez*, 575 U.S. at 96. Significant comments are "those comments which, if true . . . would require a change in [the] proposed rule," *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003)

13

(citation omitted), or could "'be thought to challenge a fundamental premise' underlying the proposed agency decision," *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)). Additionally, significant comments must "provide enough facts and reasoning to show the agency what the issue is and how it is relevant to the agency's aims." *Oakbrook*, 28 F.4th at 714 (citations omitted).

As the D.C. Circuit explained in *City of Waukesha v. EPA*, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996)). Accordingly, the central inquiry for this Court is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416.

In *State Farm*, the Supreme Court outlined four situations in which an agency action would be arbitrary and capricious for failure to consider the relevant factors: (1) "the agency has relied on factors which Congress has not intended it to consider," (2) the agency "entirely failed to consider an important aspect of the problem," (3) the agency "offered an explanation for its decision that runs counter to the evidence before the agency," and (4) the agency offered an explanation that

14

"is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 463 U.S. at 43. In *Overton Park*, the Supreme Court further reminded courts that, although their inquiry "is to be searching and careful, the ultimate standard of review is a narrow one." 401 U.S. at 416. Courts are "not empowered to substitute [their] judgment for that of the agency." *Id.*

### 2. The comments that Treasury chose not to respond to were not significant.

3M would have this Court focus (inappropriately) on just the comments on the blocked income portion of the regulation. Even with this narrow focus, Treasury met its burden.

Treasury did not fail to consider the relevant factors, and 3M does not allege any of the four situations outlined in *State Farm*: Treasury did not rely on factors that Congress did not intend it to consider; Treasury did not entirely fail to consider an important aspect of the problem; Treasury did not offer an explanation that ran counter to the evidence before it; and Treasury did not offer an explanation that was so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

3M has also stipulated that Treasury considered all the comments it received. *3M*, 160 T.C. No. 3 at 268, n. 208. ("First, paragraph 116 of the stipulation acknowledges that 'all the comments were considered.' Second, [3M's] brief argues that the Treasury Department did not 'respond[]' to the comments, not that it

15

failed to consider the comments."). 3M does not argue that Treasury, in its *deliberations*, did anything wrong. The only question is whether Treasury sufficiently explained its action. This is a very different posture than, for example, failing to consider significant comments or basing the regulation on inappropriate factors.

Only four out of 33 comment letters received on the 1993 proposed regulations addressed the blocked income portion of regulation. *See* "Comments by the American Petroleum Institute on the Temporary and Proposed Regulations on Intercompany Transfer Pricing under Code section 482," dated July 20, 1993 (API); "Comments of Tax Executives Institute, Inc. On Temporary and Proposed Regulations under Section 482 of the Internal Revenue Code, T.D. 8470, IL-401-88, submitted to the Internal Revenue Service," dated August 6, 1993 (TEI); "Statement of the United States Council for International Business on Proposed Regulation Section 1.482(f)(2) Issued Pursuant to the Internal Revenue Code," dated April 21, 1993 (USCIB); TRW, Inc., dated July 16, 1993 (TRW).

The central concern in each of these letters was whether Treasury had the authority to issue a regulation that would modify the rule announced in *First Security*. That Treasury did not specifically respond to this challenge of validity in the preamble, however, is not a reason for invalidating the regulation. 3M has stipulated that Treasury considered all the comments, including those addressing the regulation's validity. Treasury issued the regulation nonetheless, having concluded

16

that the regulation was valid. Accordingly, this Court should not require additional statements in the preamble to evaluate Treasury's choice. Unlike factual or policy issues, legal issues can be fully evaluated in litigation with their merits aired in the briefs. A statement in the regulation saying that "Treasury believes the regulation is valid notwithstanding the comments" would merely amount to using magic words to ensure validity. It would add no value.

Requiring legal briefs in preambles is particularly problematic in light of *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). Such a requirement might lead courts to limit the legal arguments available to the government at trial to those included in the relevant preamble. Agencies would have to include full legal briefs in the preambles of future regulations. This is not what *State Farm* requires, at least if, as the parties stipulate here, the agency considered the legal issues raised in the comments.

In addition to the regulation's validity, the comments raised seven other issues. One comment concerned the exhaustion of effective remedies requirement in the proposed regulation, arguing that that taxpayers would not be able to show that a remedy was not effective.  API at 18. Treasury modified the final rule to eliminate the effectiveness requirement. *Compare* Prop. Treas. Reg. § 1.482-1(f)(2)(ii)(B) (containing an effectiveness requirement) *with* Treas. Reg. § 1.482-1(h)(2)(ii)(B) (eliminating the effectiveness requirement). Two commenters asked

17

Treasury to clarify that payment of dividends did not count as circumvention of the foreign legal restriction. API at 19; TRW at 3. Treasury amended the regulation to respond to this comment. *Compare* Prop. Treas. Reg. § 1.482-1(f)(2)(v), Examples 1 and 2 (treating a dividend as circumvention), *with* Treas. Reg. § 1.482-1(h)(2)(v), Examples 1 and 3 (not treating a dividend as circumvention and illustrating how dividends are treated). Because Treasury adopted the comments, it did not need to include a statement saying that it agreed with the comments and amended the regulation in response.

Two of the comments were about the timing of deferral election, with the comments suggesting that Treasury retain the timing rules found in the 1968 regulation. API at 19–20; TEI at 17. The Tax Court found that 3M was not eligible to make the deferral election. *3M*, 160 T.C. No. 3 at 270. Therefore, these comments regarding the timing of the election are irrelevant to this case. One comment concerned the commercial-transaction requirement. API at 17–18. The Tax Court held that 3M met this requirement, so it is also irrelevant. *3M*, 160 T.C. No. 3 at 229. And another pair of comments worried that the regulation was too restrictive. API at 14–20; USCIB at 5. This is just an unsupported general policy preference. These comments did not "provide enough facts and reasoning to show the agency what the issue is and how it is relevant to the agency's aims." *Oakbrook*, 28 F.4th at 714. Therefore, they are not significant.

Appellate Case: 23-3772   Page: 22   Date Filed: 05/14/2024 Entry ID: 5393697

This leaves two comments that are plausibly relevant and to which Treasury did not respond. The first is that the regulation should not require the foreign legal restriction to apply to unrelated parties. TRW at 2–3; TEI at 17. This suggestion is directly contrary to the core policy behind Section 482 and the regulations, which is parity between controlled and uncontrolled taxpayers. *See* Treas. Reg. § 1.482-1(a)(1). The very first paragraph of the regulations makes this clear: "Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer." *Id.* The suggestion does not challenge Treasury's adoption of parity between controlled and uncontrolled taxpayers as a legitimate premise for the regulation. *See Carlson*, 938 F.3d at 344 (quoting *MCI WorldCom, Inc.*, 209 F.3d at 765). It merely recommends a change that would be inconsistent with that premise. Because further consideration of the comment would not "require a change in [the] proposed rule," *La. Fed. Land Bank*, 336 F.3d at 1080, given Treasury's legitimate commitment to maintaining parity between related and unrelated taxpayers, the comment is not significant.

Finally, one comment argued that the regulation should not require that the foreign legal restriction be publicly promulgated because many such restrictions are in fact not publicly promulgated. API at 17. As the Tax Court pointed out, "requir[ing] a restriction to be publicly promulgated implies the recognition that some restrictions are not publicly promulgated." *3M*, 160 T.C. No. 3 at 261. Furthermore,

19

the only reason Treasury would have imposed this requirement was because it was aware that some taxpayers have sought to claim that unpublished laws restrict their ability to repatriate income. *See id.* (explaining that "the public-promulgation requirement . . . avoids uncertainty about, and litigation over, the existence of a foreign legal restriction."). As a result, even if true, the fact that many foreign legal restrictions are not publicly promulgated would not "require a change in [the] proposed rule." *La. Fed. Land Bank*, 336 F.3d at 1080.

Nevertheless, this comment comes closest to a significant comment. This Court, however, should not substitute its judgment for Treasury's given the extensive process and response to comments in the regulation. The judgment made by regulators operating in real time, trying to draft an enormously complex regulation that covered many issues, deserves some deference.

Furthermore, even if Treasury should have responded to this comment, failure to respond should result in invalidation only of the public-promulgation requirement, not the entire blocked income regulation. There is (1) no indication that the regulation would not have been issued but for the public-promulgation rule, and (2) severance would not impair the function of the remainder of the blocked income regulation. *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1460 (D.C. Cir. 1997). Indeed, the API comment suggested the regulation could function

20

without this rule. Either the comment is insignificant, or the provision should be severed.

## II. REGARDLESS OF WHETHER TREASURY ERRED, THIS COURT SHOULD NOT VACATE THE 482 REGULATIONS.

If this Court determines that Treasury should have responded to some or all of the four comments on the blocked income portion of the regulation, the remedy should not be to vacate the rule as 3M urges. Either this Court should leave the regulation as it is currently drafted because the regulation did not prejudice 3M, or, alternatively, this Court should remand the regulation to Treasury without vacating it.

### A. If Treasury Erred By Not Responding To The Blocked Income Comments, Its Error Did Not Prejudice 3M.

Section 706 of the APA requires courts to take "due account . . . of the rule of prejudicial error" when reviewing agency action. 5 U.S.C. § 706; s*ee also Nat. Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule[.]" (quoting *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004))). The rule of prejudicial error stands for the proposition that if the agency's mistake "did not prejudice the petitioner, it would be senseless to vacate" the agency action. *PDK Lab'ys*, 362 F.3d at 799.

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 410

21

(2009). That party can demonstrate prejudice by either showing that (1) "the mistake led the agency to make different choices than it otherwise would have made," or (2) that the error "prevented specific facts or arguments from being presented . . . and entered into the record." Craig Smith, *Taking "Due Account" of the APA's Prejudicial-Error Rule*, 96 Va. L. Rev. 1727, 1740, 1744 (2010).

3M fails to demonstrate prejudice of either type. In fact, 3M does not allege anywhere in its brief that Treasury's silence on the blocked income comments harmed it. It merely claims that, because Treasury did not respond to comments addressing the blocked income regulation, the blocked income regulation should be invalidated.

Even if 3M had alleged harm, as required under *Sanders*, it would not have been able to show that Treasury would have made a different decision had it responded to the blocked income comments. 3M's stipulation that Treasury considered all the comments is fatal to any allegation that Treasury would have amended the blocked income regulation had it responded to every comment. While notice and comment "affords the agency a chance to avoid errors and make a more informed decision," *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019), it is the *consideration* of the comments, not the agency's written responses to the comments reflecting that consideration, that inform the agency.

Similarly, 3M would not have been able to show that Treasury's silence on the blocked income comments prevented facts or arguments from entering the record. As shown above, Treasury engaged in a long and deliberate notice-and-comment process, throughout which it solicited and responded to many comments. Treasury did nothing to prevent 3M—or any others—from participating in that process. 3M simply chose not to participate. *Cf. Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002) (finding that commenters "demonstrated as well as any plaintiffs could that they suffered prejudice" when they showed that the agency belatedly released information relevant to the agency action and denied commenters' request for time to comment on it). Now, 3M claims that Treasury erred in not responding to comments made by other stakeholders. Vague claims about the importance of procedure do not constitute harm to 3M, who is the only party before this Court and who chose not to participate in the notice-and-comment procedures that were available at the time.

There is, in short, no plausible argument that 3M was harmed even if Treasury failed to respond to significant comments. This Court may not set aside the regulation in this instance. There was no prejudicial error.

Appellate Case: 23-3772     Page: 27     Date Filed: 05/14/2024 Entry ID: 5393697

**B.** **Alternatively, If The Court Finds That Treasury Acted Arbitrarily And Capriciously, The Court Should Remand But Not Vacate The 482 Regulations.**

Even if this Court determines that Treasury acted arbitrarily and capriciously in failing to directly respond to the blocked income comments, this Court should not vacate the blocked income regulation. It should instead remand it to Treasury so that Treasury can clarify its explanation. *See U.S. Steel Corp. v. EPA*, 649 F.2d 572, 576–77 (8th Cir. 1981) (leaving the "designations in effect pending completion of further administrative proceedings in accordance with the APA"). "After all, vacatur is not necessarily indicated even if an agency acts arbitrarily and capriciously in promulgating a rule." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir.), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (citations omitted).

Before vacating Treasury's action, this Court must consider: (1) "the seriousness of the [regulations'] deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences" of vacating the action. *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). If the deficiencies of Treasury's action are not serious and vacating the action would lead to disruption, then this Court should not vacate the action.

Appellate Case: 23-3772    Page: 28    Date Filed: 05/14/2024 Entry ID: 5393697

These two factors, often referred to together as the *Allied-Signal* test, are to be balanced. In *Fox*, for example, the D.C. Circuit determined that the "the disruptive consequences" of vacating the agency action at issue "might not be great." 280 F.3d at 1049. Nevertheless, the *Fox* court determined that vacatur was "not appropriate" because the agency was sufficiently likely to be able to justify its action on remand (*i.e.*, the procedural deficiencies of the agency action were not serious). *Id.* The D.C. Circuit reached a similar conclusion in *Louisiana Federal Land Bank*, even though it was the surety of disruption, not the likelihood that the agency would "be able to justify a future decision to retain the rule," that convinced the court that vacatur would be inappropriate. 336 F.3d at 1085 (quoting *Allied-Signal*, 988 F.2d at 1049) (internal quotations omitted).

Here, the Court does not need to engage in any balancing because both factors of the *Allied-Signal* test strongly favor remand without vacatur. First, Treasury's silence on the blocked income comments is not a serious deficiency. Like the agency in *Fox*, Treasury can easily justify its decision to keep the blocked income regulation by explaining the regulation's role in an overarching effort to ensure tax parity between controlled and uncontrolled parties. While Treasury did appropriately respond to comments, as discussed above, Treasury could more explicitly

Appellate Case: 23-3772    Page: 29    Date Filed: 05/14/2024 Entry ID: 5393697

connect the blocked income regulation to the principles that motivated it on remand if this Court determines that the APA requires additional support for the blocked income regulation.

Second, invalidating the blocked income regulation—which has been in effect for 30 years—would have serious, disruptive consequences on tax administration. The reduction of federal revenues alone would be significant. Disabling the blocked income regulation would allow controlled parties to engage in non-arm's length transactions and evade federal taxation. Potentially very large sums would be at stake because of an error that 3M admits had no substantive effect.

There is also the likelihood that many other regulations would be at risk because, several decades ago, Treasury exercised what it thought then to be reasonable judgment about which comments warranted a response in the preambles. *Ex post* exacting scrutiny to invalidate regulations based on a small number of missed responses to comments could have devastating effects on the tax system, well beyond the effects of invalidating just the blocked income portion of the Section 482 regulation.

Vacating the regulations would also create terrible incentives going forward. Regulated parties could, and likely would, submit comments for the sole purpose of reserving future opportunities to attack regulations. As a result, Treasury would

Appellate Case: 23-3772    Page: 30    Date Filed: 05/14/2024 Entry ID: 5393697

have to draft long and unhelpful preambles as a way of preempting such challenges.

Professor Richard Pierce describes precisely this dynamic in National Highway Traffic Safety Administration (NHTSA) proceedings. Richard J. Pierce, Jr., *Which Institution Should Determine Whether an Agency's Explanation of a Tax Decision Is Adequate: A Response to Steve Johnson*, 64 Duke L.J. Online 1, 9 (2014). As Pierce describes it, lawyers for regulated firms realized that they could make it easier to challenge a final NHTSA rule by hiring consulting firms to produce lengthy, but empty, reports purporting to criticize the proposed regulation. *Id*. at 9–10. The goal was to make it difficult for the agency to respond to all the comments. The strategy proved successful. The consultants overwhelmed the agency lawyers with garbage, and the final regulations were invalidated because the NHTSA did not adequately respond to those manufactured comments. *See National Tire Dealers & Retreaders Ass'n v. Brinegar*, 491 F.2d 31, 39–41 (D.C. Cir. 1974). This is now a standard strategy, enriching consulting firms but adding no value to the notice-and-comment process.

The response by regulated agencies is to make preambles lengthier and less useful. Brian Galle and Stephen Shay describe this effect in the tax context, noting:

> IRS and Treasury cannot easily risk short and simple rulemaking. The material increase in page lengths of tax regulation preambles read by the authors suggests that IRS is responding to the risk though there is

27

little evidence to date that this has improved the lives of the target tax-
payers. Tax professionals may complain, but the additional work ulti-
mately translates into additional fees.

Brian Galle & Stephen Shay, *Admin Law and the Crisis of Tax Administration*, 101 N.C. L. Rev. 1645, 1671 n. 149 (2023). Preambles, which have been part of a "long and important regulatory tradition of . . . providing thorough and *explanatory* guidance" to tax practitioners, will quickly turn into "defensive, litigation-oriented documents." Brief for Anne Alstott et al. as *Amici Curiae* Supporting Appellants at 30–31, *Altera v. Comm'r*, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16-70496, 16-70497) (emphasis in original).

Vacating the blocked income portion of the 482 regulation would also create problems for courts. It would embolden taxpayers to challenge "[v]irtually every existing tax regulation" on procedural grounds. *Id.* As Judge Kerrigan observes in her concurring opinion below:

> [C]ourts will be constantly faced with determining whether comments are significant and whether the agency responded appropriately to them.
>
>      . . . .
>
>      The result of this heightened scrutiny would likely be the undo-ing of years of regulatory promulgation. This would create uncertainty for both taxpayers and Treasury, performing a disservice to the tax system as a whole.

*3M*, 160 T.C. No. 3 at 280 (Kerrigan, concurring).

If this Court determines that Treasury's action was arbitrary and capricious, it can—and should—avoid the undesirable consequences of vacating the blocked

28

income regulation by allowing Treasury to provide a more robust justification for the rules on remand.

## CONCLUSION

For all the foregoing reasons, this Court should affirm the Tax Court's judgment.

Dated: May 14, 2024           Respectfully submitted,

/s/ Steven J. Alagna
Steven J. Alagna
Washington University School of Law
Appellate Clinic
One Brookings Drive, MSC 1120-250-102
St. Louis, MO 63130
(314) 935-7238
salagna@wustl.edu

*Counsel for Amicus Curiae*

David A. Weisbach
University of Chicago Law School
1111 E 60th St
Room 522
Chicago, IL, 60637
(773) 702-9494
dweisbac@uchicago.edu

*Amicus Curiae*

29

## CERTIFICATE OF COMPLIANCE AND VIRUS-FREE CERTIFICATION

1. I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5). This brief contains 6,496 words, including all headings, footnotes, and quotations, and excluding the parts exempted under Rule 32(f).

2. In addition, this brief complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3. The electronic version of this brief has been scanned for viruses and is virus-free.

/s/ Steven J. Alagna

## CERTIFICATE OF SERVICE

I certify that on May 14, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

/s/ Steven J. Alagna