# No. 23-3772

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————————

3M COMPANY & SUBSIDIARIES,

Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Appellee

———————————

ON APPEAL FROM THE DECISION
OF THE UNITED STATES TAX COURT

———————————

SUPPLEMENTAL BRIEF FOR THE APPELLEE

———————————

DAVID A. HUBBERT
 *Deputy Assistant Attorney General*

FRANCESCA UGOLINI          (202) 514-3361
JACOB EARL CHRISTENSEN     (202) 307-0878
MATTHEW S. JOHNSHOY        (202) 616-1908
 *Attorneys*
 *Tax Division*
 *Department of Justice*
 *Post Office Box 502*
 *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Page**

Table of contents.................................................................................i

Table of authorities ..........................................................................ii

Glossary ............................................................................................v

Supplemental brief for the appellee ..............................................1

Discussion .........................................................................................1

    A.    The Supreme Court's decision in *Moore* confirms the propriety of the allocation here ..............................................3

    B.    If this Court reaches the issue, the Treasury regulation sustained by the Tax Court, § 1.482-1(h), should be upheld under *Loper Bright* ....................................................13

        1.    Section 482 is a statute that delegates discretionary authority to the agency.........................15

        2.    Treasury acted within the bounds of its delegated authority in issuing Treas. Reg. § 1.482-1(h) ..............17

        3.    Treas. Reg. § 1.482-1(h)(2) is the product of reasoned decisionmaking.............................................22

Certificate of compliance ......................................................33

Certificate of service ............................................................34

# TABLE OF AUTHORITIES

**Cases:**                                                     **Page(s)**

*Altera Corp. & Subs. v. Commissioner,*
926 F.3d 1061 (9th Cir. 2019) .................................................. 20

*Chevron, U.S.A., Inc. v. Nat. Res. Def.*
*Council, Inc.,*
467 U.S. 837 (1984) ................................................................. 13

*Commissioner v. First Security Bank,*
405 U.S. 394 (1972) ........................................ 11, 12, 17, 18, 19, 20,
21, 23, 25, 28, 30, 31

*CSI Aviation Servs., Inc. v. U.S. Dep't*
*of Transp.,*
637 F.3d 408 (D.C. Cir. 2011) ............................................. 27, 28

*DHS v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) .............................................................. 30

*Eder v. Commissioner,*
138 F.2d 27, 28 (2d Cir. 1943) .................................................... 7

*Garlock, Inc. v. Commissioner,*
489 F.2d 197 (2d Cir. 1973) ........................................................ 7

*Heiner v. Mellon,*
304 U.S. 271 (1938) .............................................. 6, 7, 8, 10, 11, 12

*Helvering v. Hormel,*
111 F.2d 1 (8th Cir. 1940), *aff'd,*
312 U.S. 552 (1941) ...................................................................... 2

*Liberty Loan Corp. v. United States,*
498 F.2d 225 (8th Cir. 1974) ...................................................... 16

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024) ............................... 1, 3, 4, 13, 14, 15, 17, 18,
22, 23, 25, 26, 28, 31

*Mandan, Hidatsa & Arikara Nation v.*
*U.S. Dep't of Interior,*
95 F.4th 573 (8th Cir. 2024) ...................................................... 22

*Medtronic, Inc. v. Commissioner,*
900 F.3d 610 (8th Cir. 2018) ...................................................... 24

*Menorah Medical Center v. Heckler,*
768 F.2d 292 (8th Cir. 1985) ...................................................... 29

**Cases (cont'd):** Page(s)

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..................................................... 22

*Moore v. United States,*
    144 S. Ct. 1680 (2024) ........................................ 1, 3, 5, 6, 7, 8, 9,
        10, 11, 12, 18, 19

*Motor Vehicle Mfrs. Ass'n of United States,*
    *Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................ 22, 26

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) ........................... 1, 3, 26, 29, 30, 31

*Porter v. Commissioner,*
    130 T.C. 115 (2008) ...................................................... 3

*QinetiQ US Holdings, Inc. & Subs. v.*
    *Commissioner,*
    845 F.3d 555 (4th Cir. 2017) ......................................... 3

*United States v. Williams,*
    504 U.S. 36 (1992) ........................................................ 2

*Wilson v. United States,*
    530 F.2d 772 (8th Cir. 1976) ...................................... 16

*Woodworth v. Hulshof,*
    891 F.3d 1083 (8th Cir. 2018) ...................................... 3

**Statutes:**

5 U.S.C.:

    § 553(c) ....................................................................... 26
    § 706 .................................................................... 13, 26
    § 706(2)(C) ................................................................ 25

Internal Revenue Code (26 U.S.C.):

    § 59A(d)(5) ................................................................ 17
    § 482 ................................................. 1, 2, 3, 4, 5, 8, 11, 12, 13, 15,
        16, 17, 19, 20, 21, 24, 25, 31
    § 483 ....................................................................... 17

**Statutes (cont'd):**                                          **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 901(j) ......................................................................... 19
§ 952(a)(5) .................................................................... 19
§ 965 ............................................................................... 5
§ 6214(a) ......................................................................... 3
§ 6662(e)(3)(B)(i)(I) ..................................................... 17
§ 7805(a) ....................................................................... 16

42 U.S.C.:

§ 7607 ........................................................................... 26
§ 7607(d)(3)(C) ............................................................ 26
§ 7607(d)(6)(B) ............................................................ 29

Tax Reform Act of 1984, Pub. L. No. 98-369, § 44(b)(2),
98 Stat. 494 (1984) ....................................................... 17

**Regulations:**

Treasury Regulations (26 C.F.R.):

§ 1.482-1(h) ....................................... 13, 17, 18, 22, 23, 28, 30, 31
§ 1.482-1(h)(2) ........................................................ 20, 22, 24
§ 1.482-1(h)(2)(iii) ....................................................... 24
§ 1.482-1(h)(2)(iv) ....................................................... 24

**Miscellaneous:**

H.R. Conf. Rep. No. 99-841 (Vol. II) (1986) .................................. 8, 16

H.R. Rep. No. 99-426 (1985) ................................................ 4

Intercompany Transfer Pricing Regulations Under
Section 482, 59 Fed. Reg. 34971 (July 8, 1994). ................... 23, 24

# GLOSSARY

| | |
|---|---|
| Add. | 3M's Addendum |
| APA | Administrative Procedure Act |
| App. | 3M's Appendix |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| Manual | Attorney General's Manual on the Administrative Procedure Act |
| MRT | Mandatory Repatriation Tax |
| Treas. Reg. | Treasury Regulation (26 C.F.R.) |

# SUPPLEMENTAL BRIEF FOR THE APPELLEE

As directed by the Court, this supplemental brief addresses the issues in this appeal in light of *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024); *Moore v. United States*, 144 S. Ct. 1680 (2024); and *Ohio v. EPA*, 144 S. Ct. 2040 (2024).

# DISCUSSION

3M licenses its valuable intellectual property to its wholly-owned Brazilian subsidiary, 3M Brazil, which uses the intangibles to manufacture and sell 3M products. 3M Brazil undercompensated 3M for these intangibles due to Brazilian legal restrictions on paying royalties to a non-Brazilian parent company. Invoking its authority under I.R.C. (26 U.S.C.) § 482, the IRS allocated an additional $23,651,332 in royalty income to 3M for the year 2006. In addition to finding that the allocation was authorized by a Treasury regulation that warranted *Chevron* deference, the Tax Court found that the IRS's allocation was commensurate with the income attributable to the intangibles and therefore proper under the second sentence of § 482 itself. (Add. 244, 251; *see also* Add. 281–286.)

In our brief on appeal, we explained that this Court may affirm the decision below based on this statutory ground, which independently authorizes the allocation here regardless of any Treasury regulation. 3M argues that this statutory argument was not preserved below (Reply Br. 22–23), but that assertion lacks merit. The Commissioner's briefs in the Tax Court relied broadly on § 482,[1] and the Tax Court explicitly addressed the issue of the statute's proper interpretation—with four Tax Court judges concluding in a concurring opinion that the statutory language by itself was controlling—thus preserving the issue for appeal.[2] (*See* Add. 250–254 (plurality), 281–286 (Copeland, J., concurring).) The IRS likewise cited the statute in its notice of deficiency to 3M (App. 106), although that notice does not limit the legal arguments that may be raised in the Tax Court in any event because a

---

[1] *See* Commissioner's Simultaneous Opening Br. 57, 62–64, 79–81, 85–86 (March 21, 2016) (Tax Ct. Dkt. 32); Commissioner's Amended Simultaneous Answering Br. 64 (Aug. 18, 2016) (Tax Ct. Dkt. 45).

[2] An issue that was "pressed or passed upon below" is preserved for appeal. *United States v. Williams*, 504 U.S. 36, 41 (1992). This "rule operates (as it is phrased) in the disjunctive, permitting review of an issue not pressed so long as it has been passed upon" by the lower court. *Id.*; *accord Helvering v. Hormel*, 111 F.2d 1, 5 (8th Cir. 1940), *aff'd*, 312 U.S. 552 (1941).

tax-deficiency proceeding is de novo. *See QinetiQ US Holdings, Inc. & Subs. v. Commissioner,* 845 F.3d 555, 560 (4th Cir. 2017); *Porter v. Commissioner*, 130 T.C. 115, 119 (2008); *see also* I.R.C. § 6214(a). Accordingly, this Court may affirm on any ground supported by the record. *E.g.*, *Woodworth v. Hulshof*, 891 F.3d 1083, 1088 (8th Cir. 2018).

As explained below, the Supreme Court's decision in *Moore* confirms the propriety of the § 482 allocation here and undermines 3M's argument that 3M cannot recognize "income" that 3M Brazil could not lawfully pay to it in the form of royalties. The Court's decision in *Loper Bright* means that the Tax Court's *Chevron* ruling is obsolete, but the Treasury regulation should be respected under *Loper Bright* nonetheless. The Court's decision in *Ohio v. EPA* has no bearing on this case, as we will explain.

## A. The Supreme Court's decision in *Moore* confirms the propriety of the allocation here

The Commissioner's answering brief sets forth the reasons why the plain text of § 482—and, in particular, its second sentence added by amendment in 1986—authorizes the IRS's allocation in this case and why that statutory text is, by itself and without resort to the Treasury

regulations, dispositive of this appeal. (Comm'r Br. 17–38.) As we explained, the 1986 amendment to § 482 established a new standard for determining income in the case of any transfer or license of intangible property. Under the amended statute, the transferor's or licensor's "income" from "any" transfer or license of intangibles "shall be commensurate with the income attributable to the intangible." I.R.C. § 482.

This statutory text by its terms applies to 3M's transfer of intangibles to its Brazilian subsidiary; therefore, 3M must recognize income from the transfer that is commensurate with the income attributable to the intangibles—that is, commensurate with "the profit or income stream generated by or associated with" the intangible property in 3M Brazil's hands. *See* H.R. Rep. No. 99-426, at 426 (1985). Here, the Tax Court found (and did not clearly err in so finding) that the IRS's allocation of additional royalty income to 3M in the amount of $23,651,332 was commensurate with the income attributable to the intangible property transferred to and used by 3M Brazil in 2006. (Comm'r Br. 19–20.) Accordingly, the "best reading of the statute," *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), is that

§ 482's second sentence authorizes the IRS's allocation to 3M in this case.

Moreover, the Supreme Court's decision in *Moore v. United States*, 144 S. Ct. 1680 (2024), confirms the propriety of the IRS's allocation of additional royalty income to 3M from its wholly-owned Brazilian subsidiary, even if 3M Brazil's payment of royalties to 3M was subject to legal restrictions. In *Moore*, American shareholders of an American-controlled foreign corporation challenged the constitutionality of the Mandatory Repatriation Tax (MRT), I.R.C. § 965, which attributes income of American-controlled foreign corporations to their American shareholders and then taxes those shareholders on that income. 144 S. Ct. at 1685. The shareholders in *Moore* acquired a 13-percent ownership share of an American-controlled foreign corporation in 2006, and even though the corporation generated substantial income thereafter, it still had not distributed any income to its American shareholders as of 2017. *Id.* at 1686. After paying the MRT on their pro rata share of the corporation's accumulated, but undistributed, income, the American shareholders sued for a refund. They argued that the MRT was unconstitutional because it taxed them on income that

they never received or realized and that they could not force the corporation to pay to them. *Id.* at 1688.

The Supreme Court held that the MRT is constitutional because the income had been realized by the corporation, and Congress has long been able to attribute income from a corporation to its shareholders for tax purposes. *Id.* at 1688–89. The Court stated that its "longstanding precedents, reflected in and reinforced by Congress's longstanding practice," establish that "Congress may attribute an entity's realized and undistributed income to the entity's shareholders or partners, and then tax the shareholders or partners on their portions of that income." *Id.* at 1688–89.

To reach its holding, the Supreme Court examined its relevant precedents, including *Heiner v. Mellon*, 304 U.S. 271 (1938), which the Court confirmed "remains good law to this day." 144 S. Ct. at 1689–90. The Court explained that in *Mellon* "state law did not allow the partners to personally receive the income" earned by the partnership, and the partners had argued that "Congress could not tax them on income that they did not and could not personally receive." *Id.* at 1689. Yet, the Court observed, *Mellon* nevertheless "upheld the tax on the

partners, reasoning that it was immaterial that the partners did not actually receive the income earned by the partnership" and that Congress could tax the partners on the partnership's undistributed income. *Id.* The Court rejected the shareholders' argument that *Mellon* was distinguishable on the ground that it turned on unique features of partnership law—namely, that partnerships are not separate taxable entities from their partners. *Id.* at 1693–94. The Court concluded that the shareholders were "incorrect to claim that partnerships were not historically seen as separate taxable entities." *Id.* at 1694.

The Court also cited with approval the Second Circuit's decisions in *Garlock, Inc. v. Commissioner*, 489 F.2d 197, 202–03 & n.5 (2d Cir. 1973), and *Eder v. Commissioner*, 138 F.2d 27, 28 (2d Cir. 1943) ("In a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability"). 144 S. Ct. at 1690. These cases, along with *Mellon*, are all cited in our answering brief (at 34–35).

*Moore* refutes 3M's cornerstone argument that its "income" cannot include amounts realized by its wholly-owned Brazilian subsidiary that

could not be paid to 3M as royalties under Brazilian law. (Opening Br. 21–24; Reply Br. 4–8.) As *Moore* repeatedly states, since 1938, "it has gone without serious question in both Congress and the federal courts that Congress can attribute the undistributed income of an entity to the entity's shareholders or partners, and tax the shareholders or partners on their pro rata share of the entity's undistributed income." 144 S. Ct. at 1690. Congress allowed for that kind of attribution when it enacted the second sentence of § 482. H.R. Conf. Rep. No. 99-841 (Vol. II), at II-637 (1986) ("the objective of these provisions" is "that the division of income between related parties reasonably reflect the relative economic activity undertaken by each.").

The IRS's allocation here attributes otherwise untaxed income to a shareholder exactly as Congress allowed. Consistent with the second sentence of § 482, which requires income from a transfer of intangibles to be commensurate with the income attributable to the intangibles, the IRS allocated $23.6 million of 3M Brazil's undistributed income to its 100-percent shareholder, 3M. The allocation here is entirely consistent with the understanding of "income" discussed in *Moore* and *Mellon*, where shareholders and partners were required to pay tax on their pro

rata share of the entity's income despite their inability to access that income.

3M's refrain is that 3M Brazil could not lawfully pay more in royalties under Brazilian law, but that does not place this case beyond the long line of precedent discussed in *Moore*. *Moore* noted "that there are due process limits on attribution to ensure that the attribution is not arbitrary—for example, limits based on the taxpayer's relationship to the underlying income." 144 S. Ct. at 1691 n.4. But there are no such concerns here because 3M owned (through other wholly-owned entities) all of 3M Brazil's stock when 3M Brazil earned the income attributable to its use of the intangibles. Moreover, unlike the 13-percent shareholders in *Moore,* 3M has full control over 3M Brazil's ability to distribute income to 3M as the owner. In fact, the parties stipulated in the Tax Court that "Brazilian law impose[d] no restriction on the ability of [3M Brazil] to pay dividends abroad to its shareholders, including to a controlling foreign company," and that "3M Brazil could have remitted all of its profits to 3M [ ] during 2006 as dividends without violating the laws of Brazil." (App. 79, 82.) Thus, as we have

explained (Comm'r Br. 28–35), the income allocated by the IRS in this case was not truly "blocked" as 3M contends.[3]

3M also offers a novel reading of *Mellon* as involving a state law that "*permitted* partners to receive profit distributions." (Reply Br. 8.) But the *Moore* Court plainly read *Mellon* as involving a legal prohibition on distribution, 144 S. Ct. at 1689–90, and the *Mellon* opinion speaks for itself: "The tax is thus imposed upon the partner's proportionate share of the net income of the partnership, and the fact that it may not be currently distributable, whether by agreement of the parties *or by operation of law*, is not material." 304 U.S. at 281 (emphasis added). 3M also seeks to distinguish *Mellon* on the same mistaken ground that the shareholders did in *Moore*, by arguing that partnerships are not separate taxable entities from their partners. (Reply Br. 8.) But *Moore* rejected that distinction, concluding that the shareholders in that case were "incorrect to claim that partnerships were not historically seen as separate taxable entities." 144 S. Ct. at

---

[3] 3M's assertion (Reply Br. 29) that the Commissioner did not raise this dividend issue below is incorrect. *See* Commissioner's Simultaneous Opening Br. 41–42, 44–45, 73–76 (Mar. 23, 2016) (Tax Ct. Dkt. 32).

1694.  Thus, contrary to 3M's arguments, both *Mellon* and now *Moore*

confirm that the IRS's allocation here accords with constitutional

principles of taxation, even if Brazilian law restricted 3M Brazil's

payment of royalties to 3M.

3M relies on *Commissioner v. First Security Bank*, 405 U.S. 394

(1972), but as explained in our answering brief, that case has no

bearing on the commensurate-with-income provision of § 482, which

was added to the statute 14 years after *First Security*.  (Comm'r Br. 18,

23, 27.)  And *First Security* is distinguishable in any event because it

did not involve an allocation from a controlled subsidiary to its *parent*

company, as does this case.  Rather, that case involved reallocating

income from one subsidiary (an insurance company) to other

subsidiaries (domestic banks).  As the Court explained, the banks could

not, under federal law, engage in insurance activities and thus were

prohibited from receiving insurance-related income.  *First Security,* 405

U.S. at 401–02.  That factual scenario is wholly distinct from this case

and from *Mellon* and *Moore*, all of which involve an allocation of income

from an entity to its *owners*.[4]  As *Moore* stated, "[t]he Court's longstanding precedents plainly establish that, when dealing with an entity's undistributed income, Congress may tax either (i) the entity or (ii) its shareholders or partners."  144 S. Ct. at 1691.

In sum, *Moore* confirms that Congress may attribute the income realized by a foreign controlled company to its U.S. owners, regardless of whether that income has been distributed and even where legal restrictions may prevent distribution.  Here, the second sentence of § 482 requires 3M to recognize income "commensurate with the income attributable to the intangible[s]" that it transferred to 3M Brazil.  Whether 3M Brazil can actually pay that income in the form of royalties

---

[4] *First Security* also involved a legal bar applicable to the ostensible *recipient* of the income, *i.e.,* the banks.  It is in that context that the Court stated, "it has been assumed that the person to whom the income was attributed could have received it."  405 U.S. at 403.  In *Mellon*, however, the legal bar applied to the entity holding the undistributed income, *i.e.,* the partnership that could not lawfully distribute income before its liabilities had been paid.  The partners to whom the income was attributed were not subject to any legal bar.  Similarly here, 3M is not subject to any legal bar on the income it can receive.  Thus, the concerns animated in *First Security*—a subsidiary that was prohibited from receiving the income allocated to it—are not present in this case.

to 3M is no impediment to the allocation called for by this provision of § 482.

## B. If this Court reaches the issue, the Treasury regulation sustained by the Tax Court, § 1.482-1(h), should be upheld under *Loper Bright*

As mentioned, this case can be resolved on the basis of § 482 alone without resort to Treasury regulations.  But if this Court decides to address the regulations, then it should still affirm because the regulation that 3M contests, 26 C.F.R. (Treas. Reg.) § 1.482-1(h), should be upheld under the analysis set forth in *Loper Bright*.

In *Loper Bright*, the Supreme Court overruled the doctrine articulated in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), requiring federal courts to defer to "permissible" agency interpretations of ambiguous statutes that they administer, even when a reviewing court reads the statute differently.  Among other reasons, the Court determined that *Chevron*'s standard conflicts with the Administrative Procedure Act (APA), which states that "the reviewing court shall decide all relevant questions of law" (5 U.S.C. § 706) when reviewing agency action.  144 S. Ct. at 2261.  *Loper Bright*

held that courts must instead "exercise independent judgment in determining the meaning of statutory provisions." *Id.* at 2262.

The Supreme Court also held that "[i]n a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. And "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* The court "fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up); *see also id.* at 2273 ("And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.").

The Supreme Court gave the following examples of statutes that confer discretion on agencies: "some statutes expressly delegate to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to fill up the details of a

statutory scheme, or to regulate subject to the limits imposed by a term

or phrase that leaves agencies with flexibility, such as 'appropriate' or

'reasonable.' " *Id.* at 2263 (internal citations and quotations omitted).

### 1. Section 482 is a statute that delegates discretionary authority to the agency

Section 482 is a statute that delegates discretionary authority to

the IRS, as courts have long recognized. The first sentence of § 482

speaks in explicitly discretionary terms, stating (emphasis added):

> In any case of two or more organizations, trades, or
> businesses (whether or not incorporated, whether or not
> organized in the United States, and whether or not
> affiliated) owned or controlled directly or indirectly by the
> same interests, *the Secretary may distribute, apportion, or
> allocate* gross income, deductions, credits, or allowances
> between or among such organizations, trades, or businesses,
> *if he determines that such distribution, apportionment, or
> allocation is necessary* in order to prevent evasion of taxes or
> clearly to reflect the income of any of such organizations,
> trades, or businesses.

Section 482 thus uses language that is explicit in delegating

discretionary authority to the Secretary ("the Secretary may . . . if he

determines . . .") and includes terms that allow the Secretary to regulate

subject to limits while leaving some flexibility (such as, "necessary . . .

to prevent evasion of taxes or clearly to reflect [ ] income . . ."). Indeed,

this Court, consistent with the decisions of other courts, has long held

-15-

that "the Commissioner has broad discretion under § 482 . . . ." *Liberty Loan Corp. v. United States*, 498 F.2d 225, 229 (8th Cir. 1974); *accord Wilson v. United States*, 530 F.2d 772, 776 (8th Cir. 1976). Moreover, section 7805(a) of the Code authorizes the Secretary to "prescribe all needful rules and regulations for the enforcement of this title [26]," which includes regulations under § 482. Treasury has issued regulations under § 482 since 1934. (Add. 75.)

As explained in our brief (at 3, 52–53), the Conference Report accompanying the 1986 amendment to § 482 also clearly stated Congress's desire that the IRS conduct a comprehensive study of transfer-pricing rules and modify the then-existing regulations under § 482. H.R. Conf. Rep. 99-841 (Vol. II), at II-638 ("The conferees are also aware that many important and difficult issues under section 482 are left unresolved by this legislation. The conferees believe that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect."). Further evidence that Congress granted Treasury rulemaking authority to issue regulations under § 482 abounds. *See*,

*e.g.*, I.R.C. § 6662(e)(3)(B)(i)(I) (penalty provision referring to "pricing method[s] set forth in the regulations prescribed under section 482"); I.R.C. § 59A(d)(5) (base erosion alternative tax denies deduction for certain amounts by reference to section 482 regulations' "services cost method"); Tax Reform Act of 1984, Pub. L. No. 98-369, § 44(b)(2), 98 Stat. 494, 559 (1984) (directing Treasury Secretary to modify safe harbor interest rates under "regulations prescribed under section 482" to conform to those under I.R.C. § 483).

In sum, there can be no serious doubt that § 482 is a statute that delegates discretionary authority to the Secretary.  As such, this Court's task under *Loper Bright* is to ensure that Treasury acted within "the boundaries of the delegated authority" and "engaged in reasoned decisionmaking within those boundaries" in promulgating Treas. Reg. § 1.482-1(h).  144 S. Ct. at 2263 (cleaned up).

> ### 2. Treasury acted within the bounds of its delegated authority in issuing Treas. Reg. § 1.482-1(h)

3M's primary challenge to the regulation is that it is foreclosed by *First Security*.  3M argues that *First Security* created a blanket rule barring the IRS from using § 482 to reallocate "blocked income"—that

is, income subject to a legal restriction—to a controlled group member. Thus, according to 3M, the rules set forth in Treas. Reg. § 1.482-1(h) that delineate when the IRS will respect a foreign legal restriction are *ultra vires*. This is a legal question that implicates whether Treasury acted within the boundaries of its delegated authority and, as such, is a question for this Court. As *Loper Bright* states, "courts decide legal questions by applying their own judgment." 144 S. Ct. at 2261.

The Commissioner's brief (at 44–47) explains why *First Security* did not preclude Treasury from issuing a regulation dealing with discriminatory foreign legal restrictions. Most notably, *First Security* dealt with a federal legal restriction, not a foreign legal restriction. The Supreme Court's decision in *Moore* highlights the special tax problems involving foreign entities and the significant potential for U.S. tax avoidance, which is why the Supreme Court has long deferred to Congress to decide how to address such problems for federal tax purposes. As *Moore* explains at length, "[f]or legal and practical reasons," Congress "has devised more nuanced rules for foreign entities such as foreign corporations." 144 S. Ct. at 1685. Congress enacted a comprehensive scheme in subpart F of the Code to tax American-

controlled foreign corporations on a pass-through basis on certain forms of income, *id.* at 1685, 1692–93, 1695, and some of those rules turn on considerations of international comity.  For example, certain taxing provisions turn on whether the foreign government is one which the United States "does not recognize," whether the United States "has severed diplomatic relations" with the foreign country, and whether the foreign country is subject to other forms of U.S. sanctions.  *See* I.R.C. §§ 952(a)(5), 901(j); *Moore*, 144 S. Ct. at 1695.

3M is thus wrong to dismiss the domestic/foreign distinction as a distinction without a difference.  (Opening Br. 29-30; Reply Br. 6.)  *First Security* involved a group of domestic corporations and banks, and the insurance-related income that could not be allocated to the banks did not escape U.S. taxation.  Rather, it was taxed at a lower rate in the hands of the insurance-company subsidiary.  By contrast, 3M's use of a Brazilian subsidiary to earn substantial profits that (conveniently) cannot be repatriated in the form of royalties would allow millions of dollars to escape U.S. taxation *altogether*, if not for § 482.  Given the myriad complex tax issues presented by foreign entities and foreign jurisdictions—issues that the *First Security* Court did not confront—it

should not be assumed that *First Security* applies to foreign legal restrictions.

Our brief further explains that *First Security* involved a federal law that applied to controlled and uncontrolled banks alike, whereas the Treasury regulation deals only with foreign laws, like the Brazilian law here, that apply only to controlled taxpayers (*see* Treas. Reg. § 1.482-1(h)(2)).  3M fails to explain how *First Security* requires Treasury to treat foreign laws that discriminate against U.S. parent companies as equally on par with federal laws enacted by Congress, which would be contrary to Congress's tax parity objectives in § 482. *See Altera Corp. & Subs. v. Commissioner*, 926 F.3d 1061, 1077 (9th Cir. 2019) ("The congressional purpose in enacting § 482 was to establish tax parity.").  *First Security*'s reasoning also rested heavily on the language of a then-existing Treasury regulation.  3M insists that *First Security* interpreted § 482 itself (Opening Br. 24-26; Reply Br. 7), but the opinion is devoid of any discussion of the statutory text, which is quoted once in a footnote.  *See* 405 U.S. at 395 n.1.  Rather, *First Security* quotes from and discusses at length several Treasury

regulations, as well as a federal tax treatise paraphrasing the purposes of § 482.  *Id.* at 400 nn. 8–10, 404–05.

If, as we contend, *First Security* does not preclude the regulation here, then it should be beyond dispute that the broad delegation of discretionary authority in § 482 allows the Secretary to make rules regarding the impact of foreign legal restrictions on allocations of income among controlled group members.  Section 482 explicitly contemplates that the Secretary may make cross-border allocations, as the statute applies "[i]n any case of two or more organizations, trades, or businesses (whether or not incorporated, *whether or not organized in the United States*, and whether or not affiliated) owned or controlled directly or indirectly by the same interests."  (Emphasis added.)  And § 482 authorizes the Secretary to make allocations if she "determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect [ ] income . . . ."  Discriminatory foreign laws plainly affect whether income is clearly reflected, and whether taxes are being evaded, among multi-national conglomerates.  This very case demonstrates that this is true:  3M does not dispute that it received a non-arm's-length royalty for the

intangibles it licensed to 3M Brazil, and no rational economic actor would license its valuable intellectual property to an unrelated company for a pittance.

Thus, Treasury acted within the bounds of its delegated authority when it issued Treas. Reg. § 1.482-1(h) to address discriminatory foreign legal restrictions.

### 3.    Treas. Reg. § 1.482-1(h)(2) is the product of reasoned decisionmaking

Finally, *Loper Bright* instructs courts to ensure that "the agency has engaged in 'reasoned decisionmaking'" within the bounds of its delegated authority. 144 S. Ct. at 2263. The Court cited to the well-established "reasoned decisionmaking" standard set forth in *Michigan v. EPA*, 576 U.S. 743, 750 (2015), and *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). *See Loper Bright,* 144 S. Ct. at 2263. As stated in *Michigan v. EPA*, "the process by which [an agency] reaches [a] result must be logical and rational. It follows that agency action is lawful only if it rests 'on a consideration of the relevant factors.'" 576 U.S. at 750 (quoting *State Farm*); *accord Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 95 F.4th 573, 579–80 (8th Cir. 2024).

The notice-and-comment rulemaking process used by Treasury in issuing Treas. Reg. § 1.482-1(h) meets this standard, as explained on pp. 52–63 of the Commissioner's answering brief.[5] 3M argues that the "IRS does not and cannot point to any reasoned explanation for the blocked-income rule Treasury provided in the rulemaking" (Reply Br. 12; Opening Br. 52-54), but its argument is premised on simply claiming that the preamble does not include a discussion of the rule when it plainly does. *See* Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 34971, 34976, 34981 (July 8, 1994). 3M views that discussion as inadequate, stating that it "paraphrases *what* the regulation does without explaining *why* or without squaring it with the statute and *First Security*." (Reply Br. 12.)

As for 3M's first objection—that there is no explanation of "why"— 3M ignores the context. The preamble's discussion of the specific

---

[5] 3M attacks a straw man by claiming that we have asked this Court to "renounce the reasoned-explanation requirement." (Reply. Br. 12.) Our brief does no such thing. Rather, we argued that the reasoned decisionmaking standard is not as demanding as 3M describes. In particular, it does not require an encyclopedic exegesis. (Comm'r Br. 48–51.) 3M chides us for citing to the Attorney General's Manual on the APA in support of our argument (Reply Br. 13), but the Supreme Court itself just relied on the Manual in *Loper Bright*, 144 S. Ct. at 2262.

regulation dealing with foreign legal restrictions follows a lengthy

discussion of the arm's-length standard, which is described as "the

governing principle under section 482." 59 Fed. Reg. at 34976; *see, e.g.,*

*Medtronic, Inc. v. Commissioner,* 900 F.3d 610 (8th Cir. 2018). The

preamble states that "[u]nder this standard controlled taxpayers are

expected to realize from their controlled transactions the results that

would have been realized if uncontrolled taxpayers had engaged in the

same transactions under the same circumstances." 59 Fed. Reg. at

34976.

When the preamble specifically discusses the rule regarding

foreign legal restrictions, it is directly tied to this principle: "Section

1.482-1(h)(2) . . . provides that a foreign legal restriction will be taken

into account to the extent that such restriction affects the results of

transactions at arm's length. If there is no evidence that the restriction

affected uncontrolled taxpayers the restriction will be disregarded in

determining an arm's length result, and it will be taken into account

only to the extent provided in §§ 1.482-1(h)(2)(iii) and (iv), relating to

the deferred income method of accounting." 59 Fed. Reg. at 34981. 3M

complains that this only explains *what* the regulation does without

explaining *why*, but this contention lacks merit.  Both the "what" and the "why" are explained.  Here, after explaining that the fundamental goal of § 482 is to achieve an arm's-length result, Treasury stated that foreign legal restrictions that interfere with that goal will be disregarded.  It is hard to conceive of a more straightforward explanation for *why* foreign legal restrictions might be disregarded: because they may affect the arm's-length result.

3M's second objection—that the preamble does not square the regulation with *First Security* or § 482—confuses the analysis.  As *Loper Bright* makes clear, whether agency action exceeds the scope of delegated authority is a threshold legal question for courts to consider. 144 S. Ct. at 2263, 2273.  This is borne out by the APA, which allows agency action to be set aside when it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).  Thus, the question whether the regulation conflicts with *First Security* is an antecedent legal question that this Court decides *de novo*, not based on any agency explanation.

The reasoned decisionmaking standard, on the other hand, generally tests the factual and policy choices made by the agency, not

the adequacy of its legal explanations. *State Farm* explains that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 463 U.S. at 43 (cleaned up). "Data," "facts," and "judgment" refer to factual and policy choices, not legal rationales. Indeed, an agency's legal rationale is not necessarily entitled to any deference after *Loper Bright*, whereas "Section 706 [of the APA] *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Loper Bright*, 144 S. Ct. at 2261 (emphasis in original).

To be sure, some statutes require agencies to lay out *legal* rationales in rulemaking, such as 42 U.S.C. § 7607, which governed the rulemaking in *Ohio v. EPA*, 144 S. Ct. 2040 (2024). That statute requires rulemaking under the Clean Air Act to "include a summary of . . . the major legal interpretations and policy considerations underlying the proposed rule," among other things. 42 U.S.C. § 7607(d)(3)(C). But the APA has no such requirement. *See* 5 U.S.C. § 553(c) ("After

consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.").

That is not to say an agency can issue a regulation that conflicts with the governing statute or a Supreme Court case. But if the regulation does *not* conflict with the statute or a Supreme Court case, it would be a perversion of the APA to hold that the regulation is nevertheless invalid for failing to explain why not. The point of the APA is to ensure that agencies follow the law and make reasonable choices, not to serve as a "gotcha" for lawful agency action. 3M does not cite a single case in which a regulation was held to be consistent with the governing statute and within the agency's delegated authority, yet set aside under the APA because the agency did not explain its legal thinking.

3M attempts to bolster its argument with *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408 (D.C. Cir. 2011), but that case does not help it. (Reply Br. 20, 22.) In *CSI*, the Department of Transportation issued a cease-and-desist order to an air-charter company, taking the position that the company was "engaging in

'indirect air transportation' without the certificate of authority required by the Federal Aviation Act." *Id.* at 410. Yet the Department failed to explain how it reached this conclusion "both in its cease-and-desist order and in its brief to this court [the D.C. Circuit]." *Id.* at 416. Against that backdrop, the D.C. Circuit stated that "[g]iven DOT's complete failure to explain its reading of the statute, we find it impossible to conclude that the agency's cease-and-desist order was anything other than arbitrary and capricious, and hence unlawful." *Id.* The court did not find that the Department's legal position was correct yet insufficiently explained.

3M also argues that Treas. Reg. § 1.482-1(h) cannot survive APA scrutiny because Treasury did not respond to comments raising concerns about *First Security*. As we mentioned in our brief (at 58–59), the text of the APA does not actually require agencies to respond in writing to comments, and as the Supreme Court reiterated in *Loper Bright*, "[t]he text of the APA means what it says." 144 S. Ct. at 2262. 3M continues to claim that this judge-made gloss is not "atextual," yet it fails to point to any text in the APA requiring this. (Reply Br. 18.) The APA stands in contrast to more specific rulemaking statutes, like the

one at issue in *Ohio v. EPA*, 144 S. Ct. at 2050, which affirmatively requires a "promulgated rule [to] be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period." 42 U.S.C. § 7607(d)(6)(B).

Instead, when applying the APA, courts have evaluated an agency's response to comments in determining whether the agency has accounted for relevant factors and dealt with important aspects of a problem. In *Menorah Medical Center v. Heckler,* 768 F.2d 292 (8th Cir. 1985), for example, which 3M cites repeatedly in its briefs, this Court agreed with the Seventh Circuit's decision invalidating a Medicare rule. This Court opined that the Secretary "did not offer a plausible explanation for the Malpractice Rule or consider several important aspects of the problem" because the Secretary failed to substantiate the view that Medicare was overpaying certain costs and relied heavily on a statistical cost study of dubious origin. *Id.* at 295. Commenters had criticized the "adequacy of its data base to generalize to national totals and the accuracy of the statistics relied on" in the study. *Id.*

But 3M complains of a different problem. It does not take issue with any specific policy choices or factual assumptions reflected in Treas. Reg. § 1.482-1(h), other than to argue that the regulation is precluded by *First Security*. And as 3M acknowledges in its brief, when the regulation was proposed, the public was well aware of the IRS's position that *First Security* should be limited to its facts, as the IRS was actively arguing in then-pending Tax Court cases. (Reply Br. 16; App. 212.) 3M cites to no case suggesting that Treasury was required to recount this well-known legal dispute in the preamble to the regulation.[6]

*Ohio v. EPA* is not to the contrary. As the Supreme Court explained in granting the States' application for a stay pending appeal, the apparent problem with EPA's downwind pollution plan was that it

---

[6] 3M cites Justice Kavanaugh's concurring opinion in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1934 (2020), for the proposition that "courts cannot rely on assertions by 'agency lawyers during litigation' " (Reply Br. 19), but 3M fails to include the full quote, which refers to "after-the-fact explanations" by lawyers. This case does not involve an after-the-fact attempt by agency lawyers to supply missing reasoning for a regulation. Rather, our point is that the IRS's *contemporaneous* position regarding *First Security* was well-known (as 3M points out), due in part to the IRS's *before*-the-fact litigating position.

did not adequately explain how the plan could work when many of the 23 States intended to be covered by the plan had dropped out. *See* 144 S. Ct. at 2053-54. That is a feasibility problem, not a legal problem. The case does not support 3M's claim that Treasury had to explain its legal position regarding *First Security* in promulgating Treas. Reg. § 1.482-1(h).

In sum, Treas. Reg. § 1.482-1(h) was reasonably explained, and therefore it should be respected under *Loper Bright*. But, as argued here and in our answering brief, the decision below should be affirmed based on the commensurate-with-income provision of § 482, and this Court need not decide any issues related to the regulation.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Jacob Earl Christensen

| | |
|---|---|
| FRANCESCA UGOLINI | (202) 514-3361 |
| JACOB EARL CHRISTENSEN | (202) 307-0878 |
| MATTHEW S. JOHNSHOY | (202) 616-1908 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

OCTOBER 2, 2024

# CERTIFICATE OF COMPLIANCE

**Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

1. **This supplemental brief contains  6,305  words** (excluding the items exempted by Fed. R. App. P. 32(f)) in compliance with the length limit designated by court order dated **September 17, 2024**.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]  this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ]  this brief has been prepared in a monospaced typeface using _____ with _____.

3. Pursuant to Eighth Circuit Rule 28A(h)(2), I certify that the brief has been scanned for viruses using Microsoft Windows Defender (updated daily), which reports that the file is virus-free.

(s)  /s/ Jacob Christensen

Attorney for Commissioner of Internal Revenue

Dated:  October 2, 2024

**CERTIFICATE OF SERVICE**

I certify that on this 2nd day of October, 2024, I electronically filed a PDF version of the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                         /s/ Jacob Christensen
                         JACOB EARL CHRISTENSEN
                         *Attorney*